## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| | )  Chapter 11 |
| MAXUS ENERGY CORPORATION, *et al.*,[1] | ) |
| | )  Case No. 16-11501 (___) |
| Debtors. | ) |
| | )  Joint Administration Pending |

## DECLARATION OF JAVIER GONZALEZ IN SUPPORT OF
## CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

I, Javier Gonzalez, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.      I am the Vice President, General Counsel and Corporate Secretary of Maxus Energy Corporation ("Maxus"), a corporation organized under the laws of the State of Delaware, and its Debtor-affiliates and subsidiaries (collectively, the "Debtors").

2.      On June 17, 2016 (the "Petition Date") and contemporaneously with the filing of this declaration (the "First Day Declaration"), the Debtors filed voluntary petitions commencing cases (collectively, the "Chapter 11 Cases") in this Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") to preserve and maximize the value of their chapter 11 estates.  The Debtors will continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently herewith, the Debtors have filed a motion seeking joint administration of the Chapter 11 Cases pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Maxus Energy Corporation (1531), Tierra Solutions, Inc. (0498), Maxus International Energy Company (7260), Maxus (U.S.) Exploration Company (2439), and Gateway Coal Company (7425).  The address of each of the Debtors is 10333 Richmond Avenue, Suite 1050, Houston, Texas 77042.

3.      I submit this First Day Declaration in support of the Debtors' chapter 11 petitions and the First Day Pleadings (defined below) as described herein.[2]  Except as otherwise indicated, all statements in this First Day Declaration are based upon: my personal knowledge; information supplied or verified by current and former directors, officers and employees or current consultants familiar with the Debtors' business operations; my review of the Debtors' books and records as well as other relevant documents; information prepared or supplied by the Debtors' management team, consultants and legal and financial professional advisors; or my opinion based upon my experience and my familiarity with, expertise with, and knowledge of, the Debtors' books and records, operations, financial condition, and history.  I have relied upon these persons accurately recording, preparing, collecting, or verifying any such documentation and other information.

4.      Part I of this First Day Declaration provides a basic overview of the Chapter 11 Cases.  Part II describes the Debtors' business, including the Debtors' current assets and liabilities.  Part III describes the evolution of the Debtors' business going back to the mid-1990s.  Part IV describes in detail the developments that led to the filing of the Chapter 11 Cases.  Part V sets forth the relevant facts in support of the First Day Pleadings.

I.      **OVERVIEW OF THE CHAPTER 11 CASES**

5.      In 1986, Maxus sold its chemicals business to Occidental Chemical Corporation ("OCC") in order to focus its business on the petroleum industry, becoming an active exploration and production ("E&P") company with both domestic and foreign assets.  In 1995, YPF S.A. ("YPF") obtained control of Maxus through a leveraged buyout of Maxus' common stock.  In the years following YPF's acquisition, a global multi-faceted restructuring of Maxus' operations

---

[2] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the applicable First Day Pleadings.

shifted Maxus' foreign asset holdings to YPF so Maxus could concentrate its operations in the U.S. while also significantly reducing Maxus' leverage.  As a consequence, Maxus became a smaller domestic E&P company.

6.       In recent years, the Debtors have attempted unsuccessfully to grow and diversify their business.  For example, the Debtors made significant capital investments in exploratory oil wells in the Gulf of Mexico; however, the plummeting price of oil and the increase in the cost of complying with environmental regulations for activities in the Gulf of Mexico significantly impaired the Debtors' returns on investment.  In addition, within the past three years, the Debtors attempted to transform Tierra Solutions, Inc. ("Tierra") into an independent environmental remediation services company with clients other than OCC, which had some limited success, but ultimately the Debtors were not able to develop it into a viable venture.

7.       As a result, the Debtors' business today is comprised of three principal components:  (i) management of various oil and gas-related interests held by Maxus and its wholly-owned subsidiaries, (ii) environmental remediation management services by Tierra, which also holds title to certain real estate properties (principally, former chemical manufacturing plant sites), and (iii) management of legacy employee benefit obligations to retired former employees.  Tierra provides environmental remediation management services almost exclusively for Maxus so that Maxus can satisfy both its own remediation obligations as well as its longstanding contractual indemnification obligation to OCC.

8.       Although the Debtors' non-remediation business has been able to operate on a cash-flow neutral basis, in the years leading up to the Petition Date, the OCC indemnity-related environmental remediation obligation has become one of the Debtors' most significant liabilities. The Debtors have performed dutifully their environmental remediation obligations at an

aggregate cost of more than $755 million, the vast majority of which is on account of Maxus'

contractual environmental indemnification obligations to OCC.  Changes in environmental laws,

shifts in U.S. Environmental Protection Agency ("EPA") enforcement priorities, advances in

scientific knowledge about hazardous substances, and new information regarding environmental

contamination at a number of legacy Superfund sites over the last thirty years has increased

exponentially the burden on Maxus to perform its contractual indemnification obligations to

levels that neither Maxus nor OCC could have contemplated in 1986.  As a result, the ongoing

remediation obligations have placed an enormous strain on the Debtors' finances, and required

significant cash infusions, in the form of capital contributions and loans, from the Debtors'

ultimate parent company, YPF.  In fact, the Debtors' external auditor noted in its Independent

Accountants Auditors' Report (dated March 3, 2016) with respect to the consolidated financial

statements of Debtors' immediate parent company, that in light of the Debtors' dependence on

YPF for financial support, together with the Debtors' exposure to significant environmental

contingencies, the Debtors' ability to continue as a going concern is in doubt.

9.       Other than the Debtors' ongoing remediation obligations, litigation liability is the

most significant liability for the Debtors.  Over the past ten years, certain of the Debtors, as well

as OCC, have been defendants in litigation before the New Jersey state courts in which the N.J.

Department of Environmental Protection ("NJDEP") sought compensation from OCC and the

other defendants for environmental contamination of the Passaic River that dates back for over a

century (the "Passaic River Litigation").  NJDEP settled with the defendants, including certain of

the Debtors, but cross-claims among the defendants (including, but not limited to, OCC, YPF

and Maxus) remain, and one theory of damages being pursued by OCC is that YPF and Maxus

are alter egos on account of their historical dealings.  Through these claims, OCC seeks to extend to YPF a contractual indemnity obligation that Maxus has been held to owe to OCC.

10.    In light of these claims and developments in the Passaic River Litigation, approximately one year ago, two special independent directors were appointed to Maxus' board of directors in order to review and assess the historical transactions, interrelationships and course of dealing between Maxus and YPF, and identify potential claims arising in relation to such transactions and relationships.  As described in greater detail in the *Declaration of Bradley I. Dietz in Further Support of Debtors' Chapter 11 Petitions* (the "Dietz Declaration") submitted contemporaneously herewith, in the weeks leading up to the Petition Date, Maxus and YPF negotiated a settlement to resolve any and all claims that the Debtors may have against YPF and its affiliates arising from or related in any way to the Debtors or their business or assets. Pursuant to the terms of the Settlement and Release dated June 17, 2016 (the "Settlement Agreement") with YPF and certain of its affiliates, YPF will fund the Debtors' estate with $130 million upon the Effective Date (as defined in the Settlement Agreement) and the dismissal of the Passaic River Litigation as to YPF and its affiliates.  Moreover, subject to certain milestones, but without requiring the Settlement Agreement to first be approved by the Court, YPF will provide the estates with approximately $63.1 million of additional liquidity through a debtor-in-possession financing facility (the "DIP Facility").   The DIP Facility will provide adequate funding for the Chapter 11 Cases for twelve months, thereby allowing the Debtors to continue with their ongoing remediation obligations and ultimately consummate a value-maximizing reorganization that will benefit their creditors.

11.    Accordingly, the Debtors' objectives in the Chapter 11 Cases are to put an end to the Debtors' longstanding indemnification obligations to OCC as well as the related

environmental litigation that has burdened the Debtors for the past decade.  The Debtors seek to do so by implementing the Settlement Agreement through these Chapter 11 Cases in order to maximize recoveries for the Debtors' creditors.  The Debtors anticipate that a confirmed plan would distribute the Settlement Agreement consideration and the value of the Debtors' assets to the Debtors' creditors in satisfaction of the Debtors' liabilities.  With the Debtors freed from the burden of litigation and indemnification claims, the Chapter 11 Cases will provide the Debtors with the opportunity to assess whether the Debtors' existing environmental remediation operations and/or oil and gas operations can be restructured as a sustainable, stand-alone enterprise.

## II.    THE DEBTORS' BUSINESS

### A.    Corporate Structure[3]

12.    The Debtors' current business operations consist generally of managing a non-operating, working interest in an oil and gas field in the deep waters of the Gulf of Mexico (known as Neptune), collecting onshore oil and gas royalties from thousands of producing wells in Texas, Oklahoma and other states, providing environmental remediation management services, providing employee benefits to retired employees, and addressing certain other administrative matters as described below.  These operations are broken down on a Debtor by Debtor basis as follows:

**Maxus** is a Delaware corporation, which is a wholly-owned subsidiary of non-Debtor YPF Holdings, Inc. ("YPFH").  Maxus' current business consists of collecting onshore oil and gas royalties from over 3,000 wells located in six states in the U.S., overseeing the administration of benefits for Maxus and Debtor Gateway Coal Company

---

[3] A corporate organization chart identifying the Debtors and their non-debtor affiliates is attached hereto as **Exhibit 1**.

retirees, addressing environmental issues, providing general and administrative services for its subsidiaries and Tierra, and managing U.S.-based and international litigation on behalf of itself and OCC.

**Tierra Solutions, Inc.** is a Delaware corporation that is directly owned by CLH Holdings, Inc. ("CLH," an inactive, non-Debtor entity, which, in turn, is owned by YPFH). Tierra's business is to manage environmental remediation obligations owed by Maxus, either as principal or when acting on behalf of third parties, principally OCC.

**Maxus International Energy Company** ("Maxus International") is a Delaware corporation, and a wholly-owned subsidiary of Maxus, whose business is inactive. Maxus International is also a named defendant in the Passaic River Litigation.

**Maxus (U.S.) Exploration Company** ("MUSE") is a Delaware corporation, and a wholly-owned subsidiary of Maxus, which is involved in oil and gas exploration efforts in the deep waters of the Gulf of Mexico primarily through its ownership of a 15% non-operating working interest in an offshore oil drilling field known as Neptune.

**Gateway Coal Company** is a Delaware corporation, and a wholly-owned subsidiary of Maxus, whose business is limited to the administration of retiree benefits for its 142 former employees and their dependents.

## B. The Debtors' Assets

13. As described in greater detail below, the Debtors' assets are comprised primarily of (a) MUSE's 15% working interest in the Neptune field in the deep waters of the Gulf of Mexico, (b) Maxus' overriding royalty interests in thousands of wells located in six states throughout the U.S., (c) real property interests owned by Tierra, and (d) potential proceeds from reimbursement claims made against the Debtors' insurance policies. In addition, as of the Petition Date, the Debtors have approximately $6.4 million in cash on hand, $3.8 million in stock

investments, and $20 million of cash collateral that supports a letter of credit issued by Citibank and payable to the NJDEP, which constitutes financial assurance for the Hudson County chrome remediation and investigation work currently being done in New Jersey.

### (1) *Neptune*

14. MUSE owns a 15% non-operating working interest in the Neptune oil field, which is operated by non-affiliate BHPB Billiton Petroleum (GOM) Inc. (the "Operator"). The working interest requires MUSE to pay certain expenses and fund its share of capital expenditures that are billed by the Operator. In exchange, the Debtors receive revenues generated from third-party contracts to purchase the oil, gas and liquids that are produced at Neptune. The drilling field contains seven subsea producing oil and gas wells that produce (as of December 31, 2015) an average of 8,862 barrels of oil per day.

### (2) *Overriding Royalty Interests*

15. In recent years, through a sustained management effort, Maxus has been able to identify additional producing wells and obtain overriding royalty interests. Maxus presently holds overriding royalty interests in over 3,000 oil and gas wells located in six states within the United States (Louisiana, New Mexico, Oklahoma, Texas, West Virginia, and Wyoming), which entitles Maxus to receive periodic payments from the wells' operators as revenues are generated.

16. In 2015, Maxus earned approximately $3 million on account of these interests.

### (3) *Real Property Interests*

17. Tierra owns certain real property that is the subject of ongoing environmental remediation activities, including (a) 80-120 Lister Avenue in Newark, New Jersey, (b) property in Kearny, New Jersey, and (c) 1,300 acres in Painesville, Ohio. In 2011, Tierra entered into a development agreement and long-term ground lease with a "brownfields" real estate developer for the Painesville property with a plan to develop it into a mixed-use commercial, residential

01:18819733.1

ny-1233876

and recreational area; however, at this time, it is uncertain whether future productive use of the Painesville site will be realized.

### (4)    *Insurance Policies*

18.     In August 2012, Maxus engaged Aon Risk Insurance Services, Inc. ("<u>ARS</u>") to identify whether the Debtors could assert coverage claims against their insurers for litigation costs and damages the Debtors both have incurred previously and are expected to incur.   In exchange for such services, Maxus agreed to pay ARS a percentage of the funds recovered from the insurers.   At this time, Maxus has either notified or tendered claims to its insurers seeking reimbursement for those amounts that Maxus paid to settle outstanding litigation claims or that Maxus is being asked by OCC to pay pursuant to the existing indemnification obligation. Maxus' reimbursement claims submitted to its insurers exceed $200 million and were asserted against policies with aggregate coverage of approximately $500 million; however, the estimated recovery to Maxus is uncertain.

### C.    The Debtors' Liabilities[4]

19.     As of the Petition Date, Maxus has no outstanding secured or unsecured funded debt, and does not have a credit facility with any lender.

20.     The Debtors' liabilities fall primarily into the following general categories:

(a) historical environmental liabilities; (b) other legal liabilities; and (c) employee benefits plans. OCC is the Debtors' largest unsecured creditor.

### (1)    *Historical Environmental Liabilities*

21.     The vast majority of the Debtors' current environmental liabilities relate primarily to historical obligations of Diamond Shamrock Chemicals Company ("<u>DSCC</u>") and remediation

---

[4] Nothing herein affects the Debtors' rights, and the Debtors expressly reserve such rights, to object to, dispute, setoff, and otherwise challenge all claimed liabilities against the estates.

undertaken to fulfill DSCC-related legacy obligations to governmental authorities. OCC acquired DSCC and its active, ongoing "Chemicals Business" from DSC (defined below) pursuant to a Stock Purchase Agreement by and among Diamond Shamrock Corporation ("DSC," which subsequently changed its name to Maxus), Occidental Petroleum Corporation, Occidental Chemical Holding Corporation, and Oxy-Diamond Alkali Corporation, dated September 4, 1986 (the "SPA").[5] Under the SPA, DSC sold all of the outstanding stock of DSCC to Oxy-Diamond Alkali Corporation, which then merged into OCC on November 24, 1987, and DSCC merged into OCC on November 30, 1987.

22.     As part of the SPA, Maxus agreed to indemnify OCC from and against certain liabilities relating to DSCC's business or activities prior to the September 4, 1986 closing date (the "Closing Date"), including certain environmental liabilities relating to chemical plants and waste disposal sites used by DSCC prior to the Closing Date.[6] As of December 31, 2015, the Debtors' probable and reasonably estimable cost of work to be done at these sites exceeds $275 million. These environmental liabilities relate to specific locations throughout the U.S.: (a) the Diamond Alkali Superfund Site in Newark, New Jersey, which is comprised of the Lister Site[7] and two contaminated sites along the Passaic River and Newark Bay; (b) Hudson & Essex Counties, New Jersey; (c) Painesville, Ohio; (d) Greens Bayou, Texas; and (e) Other Sites. In

---

[5] The "Chemicals Business" is defined in section 2.02(b) of the SPA as "the DSCC Companies taken as a whole and the Business Units taken as a whole, and the business being conducted by them in the aggregate as of the date of this Agreement[September 4, 1986] . . . ."

[6] Section 9.03(a)(iii) and (iv) and the associated schedules of the SPA required Maxus to "indemnify, defend, and hold harmless" OCC, from and against, among other things, "any and all claims, demands, or suits . . . relating to, resulting from, or arising out of" certain Superfund Sites and Inactive Sites, including the Lister Site. Section 9.03(a)(viii) of the SPA also required Maxus to indemnify OCC for Historical Obligations, which generally includes "those obligations, liabilities, guarantees and contingent liabilities of the DSCC Companies, or any of them, which arose prior to or in connection with the Reorganization and which relate to any business, asset or property other than those of the Chemicals Business." (collectively, the "OCC Indemnification Obligations").

[7] In 1986, DSCC transferred ownership of the entire Lister Site to another affiliated company, Diamond Shamrock Chemical Land Holdings, Inc. (n/k/a Tierra), and Tierra continues to own the entire Lister Site today.

many cases, the remediation obligations arise out of either an administrative order on consent (an "AOC"), an Administrative Consent Order (an "ACO"), or a Consent Judgment ("CJ"). In certain cases, Maxus and/or Tierra may be a party to an AOC, ACO or CJ.

23.    In addition to participating on behalf of OCC in the aforementioned remediation activities, pursuant to its indemnification obligation, Maxus is also defending OCC (as successor to DSCC) in proceedings regarding sites in Louisville, Kentucky (Black Leaf), Galveston County, Texas (Malone Services), Hagerstown, Maryland (Central Chemical Co.), Yosemite Creek, California, and other third party sites where DSCC has been named a potentially responsible party by the EPA under CERCLA for certain sites where hazardous substances from DSCC's plant operations were allegedly disposed or have come to be located. In addition, there is one other proceeding regarding a site in Milwaukee, Wisconsin where Maxus is defending its own interests, as a successor to Pickland Mather & Co. and Milwaukee Solvay Coke Co.

### (2)    *Other Legal Liabilities and Proceedings*

24.    In addition to its environmental obligations, Maxus has liabilities associated with its working interest in the Neptune oil field, and also faces potential liability in connection with litigation involving personal injury claims associated with Agent Orange, more recent environmental contamination claims brought against it in Louisiana arising from legacy petroleum exploration and production activities, and toxic tort claims arising in Illinois, Missouri and Texas in which the plaintiffs allege harm (lung cancer and mesothelioma) caused by exposure to asbestos while working as oilfield service workers for an independent contractor.

### (3)    *Employee Benefit Plans*

25.    As described in greater detail in the Wages Motion (defined herein), the Debtors sponsor an Excess Benefits Plan, and provide certain health care and life insurance benefits for over 500 eligible retired employees and other post-employment benefits for eligible individuals

whose employment was terminated by the Debtors prior to their normal retirement.  In addition, the Debtors also have a Supplemental Death Benefit program for certain former executives and a Long-Term Disability program for disabled former employees and their dependents.  As of May 31, 2016, the net present value of the Debtors' obligations for these benefit plans and programs is approximately $20.2 million.

## III.   EVOLUTION OF THE DEBTORS' BUSINESS

### A.   YPF's Acquisition of Maxus

26.   In the early 1990s, Maxus experienced a liquidity crisis resulting from, among other things, depressed oil and gas prices, Maxus' high cost of debt, and its limited access to the capital markets.  On or about February 1994, the board of directors of Maxus (the "Maxus Board") engaged Credit Suisse First Boston as its financial advisor to review long-term strategic alternatives in order to fund a five-year projected funding gap of approximately $600 million.  At that time, Maxus could not access the capital markets on favorable terms, so various capital raising strategies were explored, including asset sales (that the Maxus Board believed would hinder future growth) and raising capital at the subsidiary level.

27.   On February 28, 1995, at the direction of the Maxus Board, Maxus entered into an Agreement of Merger (the "Merger Agreement") with YPF and YPF's wholly owned subsidiary, YPF Acquisition Corp. ("YPFA").  Pursuant to the Merger Agreement, YPFA merged into Maxus, leaving Maxus as YPF's wholly-owned subsidiary.  Immediately prior to the merger, Maxus had approximately $975.6 million (face value) in senior debt obligations.  As of April 1, 1995, following the execution of the Merger Agreement, Maxus' senior debt obligations increased to approximately $1,410.5 million (face value).

**B.**     **YPF's Global Restructuring of Maxus**

28.     Beginning in 1995, the management of Maxus and YPF explored the best way to maximize the synergies that existed between YPF and Maxus.  By mid-1996, a multi-faceted restructuring of Maxus was implemented through the following transactions:   (a) a tax restructuring that transferred Maxus' international assets to YPF-owned foreign corporations in order to maximize tax synergies for the YPF enterprise; (b) an environmental restructuring that placed Maxus' environmental liabilities under specialized management (i.e., Tierra) and presented a more streamlined balance sheet to external investors; and (c) a debt restructuring that replaced expensive debt that Maxus incurred in connection with the merger with lower-priced debt owing to YPF and its affiliates.

29.    The    environmental reorganization spun off CLH, an indirect wholly owned subsidiary of Maxus, to YPFH (a newly formed U.S. affiliate of YPF) that would also hold all of Maxus' equity.    CLH and Maxus entered into an agreement (the "Assumption Agreement") whereby CLH assumed, among other things, the    OCC    Indemnification    Obligations. CLH's commitment to Maxus under the Assumption Agreement was supported by a capital    contribution    agreement,    whereby

**YPF-Maxus Corporate Structure After Creation of YPFI, YPFH and CLHH**



YPF agreed to make contributions to CLH up to an amount equal to $111.5 million.  In addition, YPF agreed to cover general and administrative costs and expenses incurred, including legal expenses, up to 110% of CLH's budget, as prepared annually.

30.    By the time the tax restructuring concluded, Maxus' outstanding senior debt obligations (as of December 31, 1998) were only a fraction of what they were immediately after the merger.[8]  However, Maxus' assets were also significantly diminished from what existed before the merger and were limited to domestic E&P working and overriding royalty interests in oil exploration wells.

31.    In the years that followed, Maxus' asset portfolio of E&P interests further diminished and Maxus' capital investments went primarily towards developing its working

---

[8] At the time, Maxus had approximately $304.1 million (face value) in senior debt obligations.  Maxus also had approximately $87.5 million (liquidation value) outstanding pursuant to its $2.50 Preferred Stock as of December 31, 1998.

interest in the Neptune oil field (discussed in greater detail in Part IV.A herein).  By late 2005, Maxus' property interests included approximately eighty leased blocks lying offshore in the deepwater region of the Gulf of Mexico (the "Gulf Assets").

### C.    The Passaic River Litigation

#### (1)    *2005: Litigation Commences*

32.    The Passaic River Litigation started on December 13, 2005, when the State of New Jersey (the "State") filed its complaint in the Superior Court of New Jersey, Law Division – Essex County, against OCC, Tierra, Maxus, Repsol, S.A. ("Repsol"),[9] YPF, YPFH and CLH Holdings, Inc. ("CLHH") seeking to hold them liable for damages resulting from alleged toxic discharges from the Lister Site.  Thereafter, the State amended its complaint four more times, adding additional claims and defendants, including Debtor Maxus International and non-debtor YPF International ("YPFI").

33.    On October 6, 2008, the court granted OCC's motion to amend its answer to assert cross-claims for the fraudulent transfer of Maxus' assets as well as for breach of the SPA, tortious interference with the SPA, unjust enrichment, contractual indemnification, common law indemnification, contribution under the New Jersey Spill Compensation and Control Act (the "Spill Act"), statutory contribution, and a declaratory judgment that Maxus, and not OCC, is the successor to the Lister Site.  All of these claims, except for tortious interference with the SPA and unjust enrichment, were asserted against Maxus.

34.    On October 18, 2010, OCC filed its First Amended Cross-Claims adding YPFI as a cross-claim defendant and asserting claims against the YPF Defendants[10] for alter ego liability.

---

[9] Repsol was YPF's controlling shareholder from 1999-2012.
[10] The "YPF Defendants" include YPF, YPFH, YPFI and CLHH.

35.     On July 19, 2011, the court held that OCC is liable to the State under the Spill Act for any "cleanup and removal costs" later shown to be associated with Lister Site discharges, and that OCC is DSCC's successor and liable for its operations at the Lister Plant.

36.     On August 24, 2011, an order was entered against Maxus affirming its contractual indemnification obligations.  The *Order Granting Defendant & Cross-Claimant Occidental Chemical Corporation's Motion for Partial Summary Judgment Against Defendant Maxus Energy Corporation* provides, in pertinent part, that "Maxus Energy Corporation is required to indemnify Occidental Chemical Corporation for any costs, losses and liabilities that may be incurred by Occidental Chemical Corporation in the above-captioned action as a result of Occidental Chemical Corporation's acquisition of Diamond Shamrock Chemicals Company."

37.     On May 21, 2012, the court held that Maxus was the alter ego of Tierra, and that both entities were strictly, jointly, and severally liable under the Spill Act for any "cleanup and removal costs" later shown to be associated with Lister Site discharges, based solely on Tierra having acquired title to the Lister Site in 1986.

38.     On September 26, 2012, OCC filed its Second Amended Cross-Claims Complaint, adding claims for civil conspiracy/aiding and abetting against all Cross-Claim Defendants[11], and breach of fiduciary duty and aiding and abetting breach of fiduciary duty against the YPF Defendants and Repsol (the "Second Amended Cross-Claims").

(2)     *2013/2014: Settlements*

39.     On December 12, 2013, the court approved a settlement between the State and the non-OCC defendants (the "RYM Settlement").   Specifically, all claims that the State had asserted against Repsol, YPF, YPFI, YPFH, CLHH, Maxus, Tierra, and Maxus International

---

[11] The "Cross-Claim Defendants" means, collectively, Maxus, Maxus International, Tierra, Repsol, YPF, YPFH, YPFI and CLHH.

were dismissed in exchange for a $130 million payment to the State, subject to certain reservations. Repsol funded $65 million and Maxus/Tierra/YPF funded the remaining $65 million. The State released certain claims against OCC as part of that settlement.

40.     On December 16, 2014, the court then approved a settlement between the State and OCC (the "OCC Consent Judgment") in which OCC agreed to pay $190 million to the State in exchange for the release of certain of the State's remaining claims against OCC. This resolved the State's claims against OCC for all costs already incurred by the State, economic damages, punitive damages, penalties, Natural Resource Damages assessment costs, and Natural Resource Damages (subject to certain claims for future costs above a certain amount).

### (3)     *Remaining Causes of Action*

41.     Thus, after OCC settled with the State, the only claims remaining in the Passaic River Litigation were OCC's Second Amended Cross-Claims against the Cross-Claim Defendants, as well as Repsol's counter-claims against OCC. In November 2014, the YPF Defendants filed two motions to dismiss the Second Amended Cross-Claims. In late January 2015, the court granted in part and denied in part the YPF Defendants' motions to dismiss. In responding to OCC's Second Amended Cross-Claims, Repsol asserted counter-claims against OCC in February 2015 seeking to recover from OCC the $65 million that Repsol paid to the State pursuant to the RYM Settlement. OCC has submitted an indemnity claim to Maxus for any amount for which OCC is held liable to Repsol as well as the $190 million that OCC paid to the State pursuant to the OCC Consent Judgment.

42.     After additional discovery, the court permitted a second round of dispositive motion practice, which resulted in a further narrowing of the contested causes of action against the Cross-Claim Defendants. As a result of rulings from the Special Master in mid-January 2016 (which were subsequently adopted by the trial court judge), the matters presently scheduled to go

to trial on or about June 21, 2016 include (a) Repsol's claim for contribution from OCC under the Spill Act for the $65 million settlement, and (b) OCC's claims against (i) Maxus, as to whether Maxus has an obligation to indemnify, defend and hold OCC harmless for $190 million paid by OCC under the OCC Consent Judgment, and (ii) Maxus/YPF Defendants, as to whether (A) Maxus (and YPF Defendants, as alter egos) failed to indemnify, defend and hold OCC harmless pursuant to SPA indemnification obligations, and (B) OCC is entitled to contractual indemnification from these defendants.

## IV.   EVENTS LEADING TO THE CHAPTER 11 CASES

43.    In recent years, Debtor MUSE made significant capital investments in numerous exploratory oil wells to create additional revenue sources, but production at those wells has been disappointing.  There were also efforts to develop Tierra into an international environmental remediation services company; however, that too was not successful.  Despite the Debtors' best efforts, they have not been able to get out from under the enormous financial burden that is the OCC contractual indemnification obligation, which has enveloped the Debtors in litigation for the last eleven years.

44.    Within the last year, the Maxus Board decided that a change of course was needed.  As discussed in greater detail herein and in the Dietz Declaration, two independent directors were appointed to conduct an investigation of claims Maxus might be able to pursue against its ultimate parent, YPF, and if possible, pursue a settlement of those claims that would inure to the benefit of Maxus' creditors.  A settlement has been agreed to, and it will be implemented through the Chapter 11 Cases.

### A.    Underperformance of the Gulf Assets

45.    On May 22, 2003, Maxus acquired a 15% working interest in the Neptune oil field from non-debtor BHP Billiton Petroleum (Deepwater) Inc.  Commercial production was

expected to commence in late 2007, but setbacks occurred in 2006 and continued through 2007 and 2008.  Initial production was achieved on July 6, 2008, and by the end of that year, six wells had started production.  Unfortunately, by that time, international commodity prices declined as the 2008 global financial collapse took shape, and in the years that followed, actual production did not meet estimates.  When combined with low commodity prices, Maxus' cash realization on its interest in the Neptune field fell well short of projected expectations.

46.     Notwithstanding the challenging market conditions, in the years that followed, MUSE continued its oil exploration efforts in the Gulf of Mexico by making substantial capital commitments of $350 million towards numerous projects.  Certain exploratory wells, including those at Coronado and Tiger/Bronto proved to be "dry holes" that did not produce oil.  On the other hand, the Neptune field actively produced oil, but required substantial capital commitments.  In recent years, the Debtors have spent $285 million on production-related costs at Neptune, yet the asset continues to underperform against the Debtors' expectations.

### B.     Ongoing Indemnification Obligations Owing to OCC

47.     Since 1986, Maxus (through Tierra) has regularly performed its indemnification obligations to OCC in accordance with the SPA.  Those efforts have led to the successful remediation of a number of contaminated industrial sites throughout the country.  Tierra's successful remediation activities have included treating groundwater, removing and treating polluted sediment, dismantling industrial structure, pioneering the use of new remediation technologies, and purifying contaminated soil.  Moreover, in certain instances, Tierra has continued to oversee the maintenance of such properties to ensure that remedies are properly implemented.

48.     However, these services have come at a significant price to Maxus.  Over the past thirty years, Maxus (through its affiliate, Tierra) has provided approximately $755 million worth

of remediation services both to OCC (on account of the aforementioned contractual indemnification obligation) as well as other parties, which includes remedial investigation, feasibility studies, and remediation work at Superfund sites across the country.  Tierra bills Maxus for its remediation services, and Maxus pays Tierra.  Maxus is not able to recover those funds from any third-party source.

49.    Even though Neptune, combined with Maxus' other E&P holdings, provides Maxus with adequate income to cover its overhead, it is not enough to address the substantial ongoing indemnification obligation to OCC.  As a result, over the past few years, the Debtors have requested and obtained significant cash infusions from YPF to meet their contractual obligations to OCC.

### C.    Inability to Develop an Independent Tierra

50.    From 2013-2015, Tierra tried to develop an international environmental consulting service and actively worked to develop new business opportunities throughout both the United States and South America.  Efforts were undertaken by Tierra to construct a business plan and find potential business partners to assist with the venture's entry into international markets.  Despite some initial successes, the business venture never reached critical mass and sustainability because of the numerous challenges to break into a highly competitive marketplace for these types of services, including certification and licensing requirements as well as significant upfront capital needs.  Independent of that effort, Tierra also devoted substantial resources towards developing an environmentally friendly technology for the cleanup of contaminated sediment, but this effort is presently dormant due to a lack of funding.

### D.    2015/2016 Investigation By Maxus' Independent Directors

51.    In July 2015, the Maxus Board formed a Special Independent Committee, comprised of Bradley Dietz and Theodore Nikolis, to "design and implement a process and

procedure for the review and assessment of (A) all material transactions entered into between the Corporation and any affiliate involving aggregate consideration of $10 million or more in any instance that occurred after April 8, 1995, and prior to the date of creation of the Special Independent Committee, (B) the historic course of dealing and interrelationships between the Corporation and its affiliates over the same time period, and (C) potential claims and defenses arising in relation to these transactions and interrelationships (collectively, the "Special Independent Committee Investigative Responsibilities")."  The Special Independent Committee also was empowered to negotiate a settlement, release, discharge or any other agreement relating to any potential claims and defenses identified in connection with the execution of the Special Independent Committee Investigative Responsibilities.

52.    As set forth in detail in the Dietz Declaration, the Special Independent Committee, together with its advisors, analyzed the historical relationship between the Debtors and YPF and examined whether Maxus was damaged by its ultimate parent's actions.  The assessment served as the foundation for the Special Independent Committee's negotiation with YPF, which resulted in the Settlement that the Debtors seek to effectuate through a confirmed plan in the Chapter 11 Cases.

## V.    FACTS IN SUPPORT OF FIRST DAY PLEADINGS

53.    To enable the Debtors to operate effectively and minimize potential adverse effects from the commencement of the Chapter 11 Cases, the Debtors request certain relief in various motions and applications for orders filed with the Court contemporaneously herewith (collectively, the "First Day Pleadings").  As described herein, the First Day Pleadings seek, among other things, to stabilize and maintain the Debtors' remaining operations by (a) ensuring the continuation of the Debtors' cash management system, (b) allowing the Debtors to obtain post-petition financing on a partially secured, superpriority basis, (c) maintaining employee

morale and confidence, and (d) ensuring performance of certain remediation obligations, and thereby, promoting a seamless transition into chapter 11.

54.     I am familiar with the contents of each of the First Day Pleadings, and I believe that the relief sought therein is necessary.  If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.  In my role as the Debtors' general counsel, I have formed opinions as to: (a) the urgency and necessity for obtaining the relief sought by the Debtors in the First Day Pleadings; (b) the need for the Debtors to continue to effectively maintain their current activities and, as seamlessly as possible, commence the Chapter 11 Cases; (c) the detrimental effects upon the Debtors and their estates if the Debtors do not obtain the relief requested in the First Day Pleadings; and (d) the immediate and irreparable harm that the Debtors, their estates, and their stakeholders would be exposed to in the event that the Court does not approve such relief.  My opinions are based on my review of various materials and information and discussions with the Debtors' management team and the Debtors' professional advisors.

55.     The relief sought in the First Day Pleadings will minimize the adverse impact of the Chapter 11 Cases on, and preserve and maximize the value of, the Debtors' estates.  The Debtors, in consultation with their professional advisors, carefully designed the relief requested so that the Debtors will not suffer any immediate and irreparable harm as a result of the commencement of the Chapter 11 Cases.  Accordingly, for the reasons stated herein and in the First Day Pleadings, I believe that the relief requested in each of the First Day Pleadings is in the best interests of the Debtors, their estates, and their creditors, and, therefore, should be approved.  Set forth below are facts in support of the First Day Pleadings, summarized for the convenience of the Court.

**A.**     ***Debtors' Motion for Interim and Final Orders (A) Approving Post-Petition Financing; (B) Granting Liens and Providing Superpriority Administrative Expense Claims; (C) Modifying the Automatic Stay; (D) Scheduling Interim and Final Hearings; and (E) Granting Related Relief* (the "<u>DIP Motion</u>")**

56.     The Debtors are in need of postpetition financing for, among other things, working capital and other general purposes.  As of the Petition Date, the Debtors have approximately $6.4 million of cash on hand.  By the DIP Motion, the Debtors seek authority to obtain $63.1 million of post-petition financing in the form of the DIP Facility, which is bifurcated into two tranches:  (1) Tranche A, consisting of a senior secured, superpriority $31,900,000 facility (the "<u>Tranche A Facility</u>"), and (2) Tranche B, consisting of a subordinated unsecured $31,200,000 facility (the "<u>Tranche B Facility</u>").  The Debtors seek to grant a superpriority administrative expense claim and liens on substantially all of their assets to the Lender (subject and subordinate to payment of the Carve-Out) to secure the Tranche A Facility. The Tranche B Facility, however, is unsecured and subordinate in payment to all unsecured claims, and the Lender will not receive payment of the Tranche B Facility until all allowed general unsecured claims (other than the claims of the Lender and its affiliates) have been fully satisfied.

57.     I believe that without access to the DIP Facility, the Debtors will not have sufficient cash to, among other things, meet its obligations to its employees, consultants, independent contractors, and vendors, comply with environmental and regulatory obligations, and satisfy other working capital and operational needs during the pendency of these Chapter 11 Cases.  Without the funds made available through the DIP Facility, the Debtors will be unable to meet their obligations and risk losing the opportunity to maximize the value of their estates for all stakeholders.  Accordingly, I believe that, in light of the Debtors' need for immediate

liquidity, entry into the DIP Facility is in the best interests of the Debtors' estates and stakeholders.

**B.** ***Debtors' Motion for Entry of an Order (I) Authorizing, but Not Directing, the Debtors to (A) Maintain Their Accounts and Cash Management System and Honor Certain Prepetition Obligations Related Thereto, (B) Continue Using Existing Checks, Business Forms and Records, and (C) Continue Conducting Intercompany Transactions in the Ordinary Course and Grant Administrative Priority Status to Postpetition Intercompany Claims among the Debtors, (II) Waiving the Section 345(b) Deposit and Investment Requirements, as Necessary, and (III) Granting Related Relief* (the "<u>Cash Management Motion</u>")[12]**

58.     In the ordinary course of their business, the Debtors maintain a cash management system to fund their operations and manage their cash flow (the "<u>Cash Management System</u>"). Under this system, the Debtors are able to efficiently collect funds generated by their operations and distribute them, as necessary, to pay their obligations.

59.     The Debtors maintain a total of twenty (20) accounts (collectively, the "<u>Accounts</u>").  Seven (7) of the accounts are bank accounts utilized in connection with the Debtors' cash management functions, two (2) accounts are investment accounts (together, the "<u>Investment Accounts</u>"), two (2) accounts hold security deposits for letters of credit, eight (8) accounts hold funds in trust to satisfy certain ongoing environmental remediation obligations, and one (1) account holds funds associated with a rabbi trust.

60.     The Debtors seek authority to maintain their existing Accounts and Cash Management System, and manage their cash and investments, in accordance with their prepetition practices, which the Debtors submit is in the best interests of the Debtors' estates, their creditors, and other interested parties.  Through the Cash Management System, the Debtors are able to collect and disburse funds, as well as monitor and control the movement of cash.  Requiring the Debtors to establish new accounts at this juncture would create an

---

[12]     The Debtors are not seeking interim relief with respect to the Cash Management Motion.

unnecessary administrative burden, delay the payment of workforce-related obligations and other expenses, and eliminate cost savings. The cost and delay associated with opening new accounts and establishing modified cash management practices and policies would disrupt the Debtors' transition into chapter 11 and the interim maintenance of their business. Conversely, maintenance of the Cash Management System avoids the inconvenience, cost, confusion, and delay associated with transferring cash management operations to new accounts. The Debtors will maintain strict records of all receipts and disbursements from the Accounts during the pendency of these Chapter 11 Cases, thereby ensuring that the Debtors properly distinguish between prepetition and post-petition transactions.

61.     The Debtors also seek authority to continue using existing Business Forms. The Debtors submit that authorization to use the Business Forms will minimize disruption to the Debtors' business affairs and save the unnecessary expense, nuisance, and delay of ordering entirely new forms as required under the U.S. Trustee Guidelines.

62.     At any given time, there may be Intercompany Claims owing by one Debtor to another, and Intercompany Transactions are made between and among Debtors in the ordinary course as part of the Cash Management System. The Debtors seek authority to continue conducting Intercompany Transactions and grant administrative priority status to post-petition Intercompany Claims among the Debtors. If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' and their estates' detriment.

63.     The Debtors also seek a waiver of the deposit and investment requirements set forth in section 345(b) of the Bankruptcy Code with respect to the Investment Accounts. The

Debtors submit that a waiver of these requirements will facilitate an orderly transition into chapter 11.

      **C.**     ***Debtors' Motion for Entry of an Order Authorizing, but Not Directing, Debtors to (I) Pay and Honor Prepetition Wages, Compensation, Reimbursable Business Expenses, and Employee Benefit Obligations and (II) Maintain and Continue Certain Compensation and Benefit Programs Post-Petition*** **(the "<u>Wages Motion</u>")**[13]

64.     As of the Petition Date, the Debtors employed 30 individuals, consisting of 29 full time employees and 1 part time employee, and 4 independent contractors (the "<u>Current Workforce</u>"). Each member of the Current Workforce is essential to the administration of these Chapter 11 Cases and the ability of the Debtors to successfully reorganize and emerge from these cases. As discussed below, the Current Workforce is being compensated in the ordinary course and consistent with the Debtors' historical practice.

65.     The Debtors believe that, as of the Petition Date, the majority of all prepetition amounts owed on account of Current Workforce Obligations and Former Workforce Obligations have been satisfied, including severance and other benefit amounts that accrued and became payable upon retirement or termination of employment. However, certain amounts may remain outstanding on account of certain Current Workforce Obligations and Former Workforce Obligations due to a number of factors, including (a) discrepancies that exist between amounts paid prepetition and the amounts that should have been paid, (b) the fact that certain accrued obligations may not yet have become due and payable as of the Petition Date, and (c) the possibility that certain prepetition amounts may have accrued but remain outstanding because they are pending approval or they have not yet been submitted.

66.     Based on my knowledge and conversations with the Debtors' professional advisors, it is my understanding that the members of the Current Workforce and Former

---

[13]   The Debtors are not seeking interim relief with respect to the Wages Motion.

Workforce heavily rely on the continued payment of outstanding wages and benefits.  If the Debtors' Current Workforce ceases to provide services to the Debtors, it would derail the Debtors' efforts to successfully reorganize.  A significant deterioration in their morale at this critical time undoubtedly would have a devastating impact on the Debtors and the value of their assets and business.  Thus, the Debtors' payment of these obligations would enable the Debtors to devote their resources to ensuring successful chapter 11 cases and minimizing the personal hardship of these individuals following their retirement or termination from the Debtors' employ as full-time employees.

**D.**    ***Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, (II) Deeming Utility Companies Adequately Assured of Future Performance, (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Adequate Assurance of Payment, and (IV) Granting Related Relief***

67.    In connection with operating their businesses and managing their properties, the Debtors obtain various landline, internet, cable, WiFi, electrical and similar utility products and services (the "Utility Services") from various utility companies (the "Utility Companies"). Approximately six (6) different Utility Companies provide these services through various accounts.  On average, the Debtors spent an aggregate of approximately $10,000 each month on utility costs.

68.    The Utility Services provided by the Utility Companies are crucial to the Debtors' continued operations and, thus, these chapter 11 cases.  If the Utility Companies refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely (and potentially irreparably) disrupted.  It is therefore essential that the Utility Services continue uninterrupted.

**E.**       ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, but Not Directing, the Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief***

1.        In the ordinary course of business, the Debtors incur certain tax liabilities, including real property, personal property, excise, royalty, and business taxes (collectively, the "<u>Taxes</u>") necessary to operate their business, incur associated regulatory and other fees (collectively, the "<u>Fees</u>"), and remit such taxes and fees to applicable taxing and other regulatory authorities (collectively, the "<u>Authorities</u>").   The Debtors pay the Taxes and Fees monthly, quarterly or annually to the respective Authorities, in each case as required by applicable laws and regulations.   The Debtors believe that they are current in the payment of assessed and undisputed Taxes and Fees that were due as of the Petition Date.   Certain Taxes and Fees attributable to the prepetition period, however, have accrued and will not come due until after the Petition Date.

69.        The Debtors' failure to pay the Taxes and Fees could negatively impact the Debtors' estate because, absent payment of Taxes and Fees, the Debtors may incur substantial liabilities to the Authorities.   Further, certain Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will be administratively burdensome to the estate, including revoking the Debtors' licenses and/or permits and other privileges.   Any unexpected or inopportune interruption of the Debtors' activities during the course of these chapter 11 cases could greatly diminish the value of the estates and frustrate the Debtors' chapter 11 efforts.

70.        Based on my knowledge and conversations with the Debtors' professional advisors, it is my understanding that certain Taxes may be "trust fund" taxes that are not considered property of the Debtors' estates.   Further, based on my knowledge and conversations with the Debtors' professional advisors, it is my understanding that certain of the Taxes and Fees

01:18819733.1

ny-1233876

are entitled to priority status under the Bankruptcy Code and, as a result, must be paid in full before any general unsecured obligations may be satisfied.  Accordingly, the Debtors' payment of Taxes and Fees is an exercise of sound business judgment.

**F.**     ***Debtors' Motion for Entry of Order Directing Joint Administration of Chapter 11 Cases***

71.     Given the integrated nature of the Debtors' operations, I believe that the joint administration of these cases will provide significant administrative convenience without prejudicing the substantive rights of any party in interest.  The Debtors are "affiliates" pursuant to section 101(2) of the Bankruptcy Code.

72.      Joint administration of these chapter 11 cases will reduce parties' fees and costs by avoiding duplicative filings and objections and make the most efficient use of the Court's resources and the resources of all parties in interest.  Accordingly, I believe that joint administration of the Debtors' cases is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**G.**     ***Debtors' Application for an Order Approving Retention and Employment of Prime Clerk LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date*** **(the "<u>Prime Clerk Retention Application</u>")**

73.     The Debtors request entry of an order, pursuant to section 156(c) of title 28 of the United States Code authorizing the retention and appointment of Prime Clerk LLC as claims and noticing agent in these Chapter 11 Cases.  I believe that the relief requested in the Prime Clerk Retention Application will ease the administrative burden on the Clerk of the Court in connection with these Chapter 11 Cases.

## **CONCLUSION**

74.     Accordingly, for the reasons stated herein and in each of the First Day Pleadings, the Debtors request that the relief sought in the proposed orders appended to the First Day Pleadings be granted.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

I swear under penalty of perjury that the foregoing is true and correct.

Dated: June 18, 2016

MAXUS ENERGY CORPORATION

*/s/ Javier Gonzalez*
Javier Gonzalez
Vice President, General Counsel and
Corporate Secretary

## Exhibit 1

