**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) |
| MAXUS ENERGY CORPORATION, *et al.*,[1] | )  Chapter 11 |
| | ) |
| Debtors. | )  Case No. 16-11501 (___) |
| | ) |
| | )  Joint Administration Pending |

## DECLARATION OF BRADLEY I. DIETZ IN FURTHER SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS

I, Bradley I. Dietz, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.     I am a member of the Board of Directors of Maxus Energy Corporation ("Maxus") and each of the other above-captioned debtors (collectively, the "Debtors"). Each of the Debtors is a corporation organized under the laws of the State of Delaware.

2.     I was first appointed to the Board of Directors of Maxus (the "Maxus Board") on July 13, 2015 as one of two independent directors, and was appointed to the Boards of Tierra Solutions, Inc., Maxus International Energy Company, Maxus (U.S.) Exploration Company, and Gateway Coal Company on June 17, 2016.

3.     I have held various positions in banking and finance over the last thirty years. From 1984 to 1987, I served as Vice President of Bankers Trust Company. From 1987 to 1990, I was a Vice President of the Mergers and Acquisitions Group of Citibank, N.A. ("Citibank"). From 1991 to 2001, I was a Vice President and then a Managing Director of Citibank's Institutional Recovery Management Group. In 2001, I became a Managing Director and Partner

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Maxus Energy Corporation (1531), Tierra Solutions, Inc. (0498), Maxus International Energy Company (7260), Maxus (U.S.) Exploration Company (2439), and Gateway Coal Company (7425). The address of each of the Debtors is 10333 Richmond Avenue, Suite 1050, Houston, Texas 77042.

of Peter J. Solomon Company, Ltd. ("<u>PJS</u>") through 2010.  At PJS, I served as head or co-head of the firm's Restructuring Group.  Since 2010, I have served on corporate boards and as a trustee and chief restructuring officer at a number of companies, including ACA Financial Guaranty, Associated Wholesalers, Inc., Cinram International Income Fund, Contec Holdings, Limited, Pioneer Marine, Inc., Powerwave, Inc., Orchard Brands, Inc., and Stratus Technologies Bermuda Ltd., among others.  I have a B.A. (1976) and M.B.A. (1980) from the University of California, Los Angeles.

4.      On June 17, 2016, and contemporaneously with the filing of this declaration (this "<u>Declaration</u>"), the Debtors filed voluntary petitions commencing cases (collectively, the "<u>Chapter 11 Cases</u>") in this Court under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") to preserve and maximize the value of their chapter 11 estates.  The Debtors will continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      I submit this Declaration in further support of the Debtors' chapter 11 petitions and to explain some of the background leading to the decision to commence the Chapter 11 Cases.  Except as otherwise indicated, all statements in this Declaration are based upon: my personal knowledge; information supplied or verified by former employees or current consultants familiar with the business operations of the Debtors; my review of the Debtors' books and records as well as other relevant documents; information prepared or supplied by the Debtors' management team, consultants and professional advisors; or my opinion based upon my experience and my familiarity with, expertise with, and knowledge of, the Debtors' operations, financial condition, and history.  I have relied upon these persons accurately recording, preparing, collecting, or verifying any such documentation and other information.

## I.     CREATION OF THE SPECIAL INDEPENDENT COMMITTEE

6.     Over the past eleven years, certain of the Debtors have been parties to the so-called Passaic River Litigation in the New Jersey state courts, in which the State of New Jersey sought to recover for environmental contamination of the Passaic River that dates back for over a century.  Among other issues, the litigation involves claims by Occidental Chemical Corporation ("OCC") that Maxus is an "alter ego" of YPF, S.A. ("YPF") on account of YPF's historical dealings with Maxus.  Through these claims, OCC seeks to extend to YPF a contractual indemnity obligation that Maxus owes to OCC.

7.     On or about July 13, 2015, the Special Independent Committee (the "SIC") of the Maxus Board was formed, consisting of Theodore P. Nikolis and me.  In our capacity as members of the SIC, we were given the power and authority to design and implement a process and procedure for the review and assessment of (a) all material transactions entered into between Maxus and any affiliate involving aggregate consideration of $10 million or more in any instance that occurred after April 8, 1995 and before July 12, 2015, (b) the historical course of dealing and interrelationships between the corporation and its affiliates over the same time period, and (c) potential claims and defenses arising in relation to these transactions and interrelationships (collectively, the "Special Independent Committee Investigative Responsibilities").

8.     The SIC also was empowered to negotiate and recommend a settlement, release, discharge or any other agreement relating to any potential claims and defenses identified in connection with the execution of the Special Independent Committee Investigative Responsibilities.

9.     The Maxus Board permitted the SIC to engage, at Maxus' expense, financial and other experts and consultants, including legal counsel, in connection with the Special

Independent Committee Investigative Responsibilities in order to properly assess any of the relevant transactions and interrelationships.

10.    On November 23, 2015, after an extensive search for experienced and capable counsel, the SIC engaged Morrison & Foerster LLP ("Morrison & Foerster") to represent and assist the SIC in the performance of the Special Independent Committee Investigative Responsibilities.

11.    On or about April 5, 2016, after a further search for financial advisors, in which Mr. Nikolis and I participated, seeking a firm with experience regarding the issues in the Investigation (defined below), Morrison & Foerster engaged Zolfo Cooper, LLC ("Zolfo Cooper," together with Morrison & Foerster, the "Firms") to assist Morrison & Foerster and the SIC.  The Firms reported only to members of the SIC and took direction only from the SIC in connection with the performance of the Special Independent Committee Investigative Responsibilities.

II.    **THE SIC'S INVESTIGATION**

12.    Consistent with its mandate, the SIC examined, among other things, whether Maxus could recover damages against YPF and/or Repsol, S.A. ("Repsol") under an "alter ego" theory of liability on account of asset transfers and intercompany transactions and other corporate activity that occurred in connection with and during the period following YPF's 1995 leveraged buyout of Maxus (the "Investigation").

13.    The Investigation was based primarily on a review and assessment of the contentions raised, documents produced, and opinions issued in the underlying Passaic River Litigation between OCC, Maxus, YPF, and Repsol.  The Firms examined and assessed the facts presented and the respective contentions of these parties concerning OCC's "alter ego" damages

theories, and the extent of potential damages related to those theories, and provided a written analysis of the issues to the SIC.

## III.    THE SIC'S NEGOTATION WITH YPF

14.    Following the conclusion of the Investigation, the SIC and representatives of YPF engaged in negotiations to resolve all claims Maxus may have against YPF arising from the material transactions between the parties after April 1995.  The negotiations started on May 18, 2016 and continued through June 15, 2016.

15.    On June 15, 2016, the parties succeeded in reaching an agreement in principle (the "Settlement") and executed that certain Settlement and Release dated June 17, 2016 (the "Settlement Agreement," a copy of which is attached as **Exhibit A**) pursuant to which YPF agreed to (a) provide debtor-in-possession financing (the "DIP Financing") to the Debtors (the details of which are described in greater detail in the *Declaration of Javier J. González in Support of Chapter 11 Petitions and Requests for First Day Relief*), and (b) pay $130 million to the Debtors and their estates for distribution to the Debtors' creditors upon the satisfaction of certain conditions and the earlier of (i) the date on which an order approving the Settlement Agreement becomes a Final Order (as defined in the Settlement Agreement), or (ii) the date on which an order confirming a chapter 11 plan for the Debtors, which includes the terms of the Settlement Agreement, becomes a Final Order.

16.    I was actively and personally involved in the negotiations that produced the Settlement, as was Mr. Nikolis.  These negotiations were arm's-length and adversarial.  Mr. Nikolis and I sought, and we believe obtained, a fair resolution of the "alter ego" claims against YPF for the benefit of Maxus and its creditors.

17.    In making my decision to vote in favor of settling these claims, I relied on my independent business judgment and balanced the benefits and risks associated with the

Settlement.  I believe that the benefits to be received through the Settlement outweigh the attendant risks.  Therefore, I believe that the Settlement is in the best interests of the Debtors' estates.

18.      In my judgment, the Settlement reflects a fair and reasonable settlement of any and all claims that the Debtors could assert against YPF.  Furthermore, in my view, settling now, before the commencement of the trial in the Passaic River Litigation, is in the best interests of the Debtors and their creditors.  A ruling in YPF's favor on the "alter ego" claims in the Passaic River Litigation would foreclose in all likelihood any opportunity for the Debtors to realize any recovery on these claims.

19.      The Debtors are not seeking immediate approval of the Settlement.  Rather, the Debtors will file a motion seeking approval of the Settlement after entry of a final order approving the DIP Financing.  The Settlement only will become effective after an order approving the Settlement Agreement or an order confirming a chapter 11 plan for the Debtors that includes the terms of the Settlement Agreement becomes a Final Order.

I swear under penalty of perjury that the foregoing is true and correct.

Dated: June 18, 2016

_/s/ Bradley I. Dietz_
Bradley I. Dietz
Independent Director, Maxus Energy
Corporation

**Exhibit A**

## SETTLEMENT AND RELEASE

This SETTLEMENT AND RELEASE (including all exhibits attached hereto, this "**Agreement**") is made and entered into as of June 17, 2016, by and among (i) Maxus Energy Corporation, Tierra Solutions, Inc., Maxus International Energy Company, Maxus (U.S.) Exploration Company, and Gateway Coal Company, as debtors and debtors-in-possession (collectively, the "**Debtors**") and (ii) YPF S.A., YPF International S.A., YPF Holdings, Inc., CLH Holdings, Inc., and YPF Services USA Corp. (collectively, the "**YPF Entities**") (each of the foregoing, a "**Party**" and, collectively, the "**Parties**").

## RECITALS

**WHEREAS**, each of the Debtors intend to file on or about June 17, 2016 (the "**Petition Date**") a voluntary petition under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") commencing cases (the "**Chapter 11 Cases**"), which are proposed to be jointly administered for procedural purposes;

**WHEREAS**, the Debtors have alleged that certain claims exist or may arise in the future based on, in whole or in part, acts or omissions occurring prior to the Effective Date (as defined below), against the YPF Entities related to the corporate relationship between the Debtors and the YPF Entities, including with respect to certain transactions entered into between the Debtors and the YPF Entities or affiliates of the YPF Entities, including, without limitation, claims made under federal or state law based on theories of fraudulent transfer and avoidance, and veil piercing and alter ego liability;

**WHEREAS**, the YPF Entities disagree with and dispute the Debtors' allegations and the YPF Entities believe they have substantial claims against the Debtors, including, without limitation, claims for contribution, defaulted loans, and loan forgiveness;

**WHEREAS**, certain of the Debtors and certain of the YPF Entities have been named as defendants in lawsuits brought by third parties, including in the Passaic River Litigation (as defined below), in connection with, or arising from, the Debtors' past business activities;

**WHEREAS**, on July 13, 2015, the bylaws of Maxus Energy Corporation, a Debtor in the Chapter 11 Cases, were amended and restated to provide for a "Special Independent Committee" consisting of two independent directors;

**WHEREAS**, the Special Independent Committee was granted the power and authority to, among other things, review and assess the historic course of dealing, interrelationships, and transactions between the Parties and any potential claims and defenses arising in relation to such transactions and interrelationships;

**WHEREAS**, the Special Independent Committee, assisted by its independent professionals, investigated the Debtors' potential claims against the YPF Entities;

**WHEREAS**, the Debtors, through the Special Independent Committee, and the YPF Entities have engaged in good faith and arms' length negotiations with each other and have agreed to a settlement of the claims they hold against each other on the terms set forth herein;

**WHEREAS**, in connection with this Agreement and subject to Bankruptcy Court Approval, the YPF Entities have agreed to provide loans to the Debtors in an aggregate amount of up to Sixty-Three Million One Hundred Thousand Dollars ($63,100,000) under the DIP Financing Facility (as defined below) to fund the Debtors' business operations and satisfy working capital needs and other expenses during the Chapter 11 Cases;

**WHEREAS**, in connection with this Agreement, the Debtors have agreed to seek a Bankruptcy Court Order confirming a Chapter 11 plan that contains, incorporates, and implements the term of this Agreement;

**WHEREAS**, this Agreement is not intended to be and shall not be deemed to be a solicitation for votes on a Chapter 11 plan; and

**NOW, THEREFORE**, in consideration of the promises and mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

**Secton 1.1   Terms Defined in the Preamble and Recitals**. The following terms shall have the meaning ascribed therefor in the preamble and recitals of this Agreement: Agreement, Bankruptcy Code, Bankruptcy Court, Chapter 11 Cases, Debtors, Party and Parties, Petition Date, and the YPF Entities.

**Secton 1.2   Other Defined Terms**. The following definitions shall apply and constitute a part of this Agreement and all annexes and exhibits hereto:

"Allowed YPF Claims" means all Claims held by the YPF Entities against any of the Debtors (i) for a reimbursement of the loan proceeds advanced to any of the Debtors and any fees, costs, expenses, including, without limitation, the fees and expenses of their counsel, and other amounts due under the DIP Credit Agreement, and (ii) that arise in the ordinary course of the Debtors' business from and after the Petition Date.

"Bankruptcy Court Order" means an order of the Bankruptcy Court.

"Cash" means legal tender of the United States of America.

"Claim" means a claim, as such term is defined in section 101(5) of the Bankruptcy Code.

"Confirmation Order" means a Bankruptcy Court Order, in form and substance satisfactory to the Parties, confirming the Plan that reflects and contains the terms and conditions of this Agreement, including the Debtor Release and the YPF Release.

CPAM: 9445116.24

"<u>Debtors' Obligations</u>" means such term as defined in Section 3.1.

"<u>Debtor Release</u>" means the release contained in Section 3.1(c).

"<u>Debtor Released Parties</u>" means the Debtors and each of their respective current and former employees, officers, directors, members, managers, representatives, agents, successors, assignees, attorneys, financial advisors, and other professionals and agents.

"<u>DIP Credit Agreement</u>" means that certain Debtor-in Possession Credit and Security Agreement dated as of June __, 2016, among the Debtors and YPF Holdings, Inc., pursuant to which YPF Holdings, Inc., subject to certain terms and conditions, will provide loans to the Debtors in an aggregate amount of up to Sixty-Three Million One Hundred Thousand Dollars ($63,100,000), a copy of which is attached hereto as **Exhibit B**.

"<u>DIP Financing Facility</u>" means the debtor-in-possession credit facility proposed to be provided by YPF Holdings, Inc., as lender, to the Debtors pursuant to the DIP Credit Agreement.

"<u>Effective Date</u>" means the earlier of (i) the date on which the Settlement Order becomes a Final Order, or (ii) the date on which the Confirmation Order becomes a Final Order.

"<u>Entity</u>" means entity as such term is defined in section 101(15) of the Bankruptcy Code.

"<u>Environmental Costs, Claims and Liabilities</u>" means, in respect of any Person, all liabilities, obligations, responsibilities, Remedial Actions, losses, damages, punitive damages, consequential damages, treble damages, costs, and expenses (including all reasonable fees, disbursements, and expenses of counsel, experts, and consultants and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any Claim (however denominated) or demand by any other Person or in response to any violation of Environmental Law, whether known or unknown, accrued or contingent, concealed or hidden, latent or patent, asserted or unasserted, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute, to the extent based upon, related to, or arising under or pursuant to any Environmental Law, any and all Permits, orders, injunctions, judgments, decrees, rulings, writs, assessments, awards, contracts or agreements with any Governmental Authority or other Person, that relates to any environmental, health or safety condition, violation of Environmental Law, or any Environmental Release or threatened Environmental Release of Hazardous Materials.

"<u>Environmental Law</u>" means any Law, now or hereafter in effect, in any way relating to the protection of human health and safety, the environment or natural resources including, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §9601 *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. App. §1801 *et seq.*), the Resource Conservation and Recovery Act (42 U.S.C. §6901 *et seq.*), the Clean Water Act (33 U.S.C. §1251 *et seq.*), the Clean Air Act (42 U.S.C. §7401 *et seq.*), the Toxic Substances Control Act (15 U.S.C. §2601 *et*

3

*seq.*), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §136 *et seq.*), and the Occupational Safety and Health Act (29 U.S.C. §651 *et seq.*), and similar or equivalent federal, state, local or foreign Laws, as each has been or may be amended.

"Environmental Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, migration or leaching into the indoor or outdoor environment, or into or out of or through any property.

"Final Order" means an order or judgment of any court of competent jurisdiction, including the Bankruptcy Court, that has not been modified, amended, reversed, vacated, or stayed, is in full force and effect, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such order or judgment of a court of competent jurisdiction (including the Bankruptcy Court) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing shall have expired, as a result of which such order shall have become final in accordance with all applicable law and rules, including Rule 8002 of the Federal Rules of Bankruptcy Procedure.

"Governmental Authority" means, with respect to any Person, the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government to the extent such entity or body has jurisdiction over such Person.

"Hazardous Material" means any substance, material, vapor, gas, or waste that is regulated, classified, or otherwise characterized under or pursuant to any Environmental Law as "hazardous," "toxic," "pollutant," "contaminant," "radioactive," or words of similar meaning or effect, including petroleum and its by-products, asbestos, chromate, dioxin, DDT, polychlorinated biphenyls, radon, mold, mercury and urea formaldehyde insulation and similar.

"Law" means, the common law and all federal, state, local, and foreign laws, rules and regulations, orders, injunctions, judgments, decrees, rulings, writs, assessments or awards and other determinations of the United States, any foreign country, or any domestic or foreign Governmental Authority.

"Milestones" means the deadlines and conditions set forth in **Exhibit A** attached hereto.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Passaic River Litigation" means the civil action pending before the Superior Court of New Jersey Law Division-Essex County, bearing the caption *New Jersey Department of Environmental Protection, et al. v. Occidental Chemical Corp.*, Docket No. ESX-L0968-05 (PASR).

"Permits" shall mean any and all franchises, licenses, permits, approvals, notifications, certifications, registrations, authorizations, exemptions, qualifications and other rights, privileges and approvals, in each case required under any Law.

"Person" means person as such term is defined in section 101(41) of the Bankruptcy Code.

"Plan" means a Chapter 11 plan of reorganization or liquidation, together with all addenda, exhibits, schedules, or other attachments, if any, and as may be amended, modified, or supplement from time to time, for the Debtors that contains, incorporates, and implements the terms of this Agreement, including the Debtor Release and the YPF Release, in form and substance satisfactory to the Debtors and the YPF Entities.

"Remedial Action" means all actions to (i) clean up, remove, treat, or in any other way address any Hazardous Material, (ii) prevent the Release of any Hazardous Material so it does not endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (iii) perform pre-remedial or concurrent studies and investigations or post-remedial studies, monitoring and care, or (iv) correct, otherwise address or compensate for any condition of noncompliance with Environmental Laws or related harms, including natural resource damages.

"Settlement Motion" means a motion, in form and substance satisfactory to the YPF Entities, filed by the Debtors with the Bankruptcy Court seeking approval of this Agreement under Federal Rule of Bankruptcy Procedure 9019.

"Settlement Order" means a Bankruptcy Court Order under Federal Rule of Bankruptcy Procedure 9019 granting the Settlement Motion and approving this Agreement and all the releases contained herein in form and substance satisfactory to the Parties.

"Settlement Payment" means such term as defined in Section 2.2.

"YPF Release" means the release contained in Section 2.3.

"YPF Released Parties" means the YPF Entities and each of their respective subsidiaries and affiliates (other than the Debtors) and each of their current and former employees, officers, directors, members, managers, representatives, agents, parents, owners, successors, assignees, attorneys, financial advisors, and other professionals and agents.

**Secton 1.3    Exhibits Incorporated by Reference.** Each of the exhibits attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits. In the event of any inconsistency between this Agreement (without reference to the exhibits) and the exhibits, this Agreement (without reference to the exhibits) shall govern.

## ARTICLE II
## YPF OBLIGATIONS

**Secton 2.1    Debtor-in-Possession Financing**. The YPF Entities have agreed, subject to Bankruptcy Court Approval, to provide loans to the Debtors, subject to certain terms and conditions, in an aggregate amount of up to Sixty-Three Million One Hundred Thousand Dollars ($63,100,000) in accordance with the DIP Credit Agreement and Bankruptcy Court Orders approving the DIP Financing Facility.

**Secton 2.2    The Settlement Payment.** Promptly following the Effective Date and the dismissal of the Passaic River Litigation as to the YPF Entities pursuant to a Final Order, the YPF Entities will pay One Hundred Thirty Million Dollars ($130,000,000) (the "Settlement Payment") to or for the benefit of the Debtors and their estates by wire transfer of immediately available funds pursuant to the written instructions provided by the Debtors to the YPF Entities.

**Secton 2.3    Obtaining Bankruptcy Court Approval of the Agreement.** The YPF Entities agree to use reasonable best efforts to assist the Debtors with their efforts to obtain the Settlement Order and confirmation of a Plan that incorporates, and implements the terms of this Agreement, including the Debtor Release and the YPF Release, and that is not otherwise inconsistent with the terms of this Agreement.

## ARTICLE III
## DEBTORS' OBLIGATIONS

**Secton 3.1    Debtor-in-Possession Financing.** The Debtors will comply with the terms of the DIP Credit Agreement and the Bankruptcy Court Orders approving the DIP Financing Facility, including, but not limited to, the requirements (i) to meet the Milestones, and (ii) to propose a Plan that contains, incorporates, and implements the terms of this Agreement, including the Debtor Release and the YPF Release, and that is not otherwise inconsistent with the terms of this Agreement, in form and substance satisfactory to the YPF Entities.

**Secton 3.2    Settlement Motion**. The Debtors shall file the Settlement Motion with a copy of this Agreement annexed thereto with the Bankruptcy Court on or before ten (10) days subsequent to entry of a final order by the Bankruptcy Court authorizing and approving the DIP Financing Facility and the terms of the DIP Credit Agreement and shall serve it on all parties entitled to notice under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules.

CPAM: 9445116.24

**Secton 3.3    Confirmation Order**.  The Debtors shall use good faith efforts to obtain a Confirmation Order that contains, incorporates, and implements the terms of this Agreement, including the Debtor Release and the YPF Release, in form and substance satisfactory to the YPF Entities no later than May 15, 2017, unless otherwise agreed to by the YPF Entities.

**Secton 3.4    Passaic River Litigation**.  If requested by the YPF Entities, the Debtors shall use good faith efforts to obtain a stay of the Passaic River Litigation as against the Debtors and the YPF Entities immediately after the Petition Date, including joining with the YPF Entities in any relevant motion or submission.  In addition, the Debtors shall use good faith efforts to obtain a Final Order dismissing the Passaic River Litigation as against the Debtors and the YPF Entities no later than June 15, 2017, unless otherwise agreed to by the YPF Entities.

## ARTICLE IV
## RELEASES

**Secton 4.1    Debtor Release**. On and as of the Effective Date and without further action by any Party, Person, or Entity, for the good and valuable consideration provided by each of the YPF Entities, each of the Debtors shall forever release and discharge and be deemed to have released and discharged each of the YPF Released Parties and their respective assets and properties of and from any and all manner of action or actions, cause or causes of action, counterclaims, cross-claims, damages, demands, in law or equity, suits, debts, liens, contracts, agreements, promises, liabilities, Claims (however denominated), including, but not limited to, Environmental Costs, Claims and Liabilities and all other Claims arising under or in connection with constitution, statute, regulation, ordinance, contract, common law, or otherwise, direct, derivative or indirect, whether known or unknown, foreseen or unforeseen, currently existing or arising in the future, based in whole or in any part on acts or omissions occurring on or before the Effective Date, suspected or unsuspected, fixed or contingent, concealed or hidden, latent or patent, asserted or unasserted, for any injury, damage or loss of any kind whatsoever, including, but not limited to, compensatory damages, consequential damages, incidental damages, statutory damages, liquidated damages, exemplary damages, punitive damages, sanctions, costs, expenses, interest, and attorneys' fees, including, but not limited to, any and all Claims that may be asserted under Chapter 5 of the Bankruptcy Code and Claims arising under similar statutes, rules or theories, any and all Claims under or related to veil piercing or alter-ego theories of liability, any and all Claims under or related to fraudulent conveyance theories, a theory of debt recharacterization, or equitable subordination liability, and any and all Claims which any of the Debtors ever had or now have or may have against the YPF Released Parties arising from or related in any way to the Debtors or their businesses or assets, including those that any of the Debtors would have been legally entitled to assert against a YPF Released Parties in their own right (whether individually or collectively) or that any holder of a Claim or Interest, or other Entity asserted or would have been legally entitled to assert derivatively, including, but not limited to, those arising from or in any way related to the Passaic River Litigation, Environmental Law, Hazardous Materials, or the Chapter 11 Cases.

**Secton 4.2    YPF Release**.  On and as of the Effective Date and without further action by any Party, Person, or Entity, each of the YPF Entities shall forever release and discharge and be deemed to have released and discharged the Debtor Released Parties of and from any and all manner of action or actions, cause or causes of action, counterclaims, cross-claims, damages,

demands, in law or equity, suits, debts, liens, contracts, agreements, promises, liabilities, Claims (however denominated), including, but not limited to, Environmental Costs, Claims and Liabilities and all other Claims, arising under or in connection with construction, statute, regulation, ordinance, contract, common law, or otherwise, direct, derivative or indirect, whether known or unknown, foreseen or unforeseen, currently existing or arising in the future, based in whole or in any part on acts or omissions occurring on or before the Effective Date, suspected or unsuspected, fixed or contingent, concealed or hidden, latent or patent, asserted or unasserted, for any injury, damage or loss of any kind whatsoever, including, but not limited to, compensatory damages, consequential damages, incidental damages, statutory damages, liquidated damages, exemplary damages, punitive damages, sanctions, costs, expenses, interest, and attorneys' fees, including, but not limited to, any and all Claims which any of the YPF Entities ever had or now have or may have against the Debtor Released Parties, including, but not limited to, those arising from or related in any way to the Passaic River Litigation, Environmental Law, Hazardous Material, or the Chapter 11 Cases; *provided*, *however*, that the YPF Entities will be entitled to reimbursement and payment in full in Cash of the Allowed YPF Claims in accordance with the Plan and Confirmation Order.

**Secton 4.3    General Release.**  EACH OF THE DEBTORS AND THE YPF ENTITIES EXPRESSLY ACKNOWLEDGE THAT AT TIMES A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, EACH OF THE DEBTORS AND THE YPF ENTITIES HAVE CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THIS AGREEMENT AND THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES, OR CLAIMS.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH OF THE DEBTORS AND THE YPF ENTITIES EXPRESSLY WAIVE ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING, WITHOUT LIMITATION, THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542.  THE RELEASES CONTAINED IN THIS SECTION ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED, UNSUSPECTED, FORESEEN, OR UNFORESEEN.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF THE PARTIES**

**Secton 5.1**    The Parties, solely and on behalf of themselves and their respective subsidiaries, represent and warrant that:

(a)    **Due Organization, Standing, and Authority**. Such Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation.

8

(b)      **Authorization and Validity of the Agreement**. Subject to entry of the Bankruptcy Court Orders set forth herein, the execution, delivery, and performance of this Agreement (a) are within such Party's powers, (b) have been duly authorized by all necessary action on its behalf and all necessary consents or approvals have been obtained and are in full force and effect, and (c) do not violate any of the terms and conditions of (i) such Party's Organizational Documents, (ii) any applicable law, or (iii) any contract to which it is a party.

(c)      **Enforceability**. This Agreement has been duly executed and delivered on behalf of such Party and constitutes a legal, valid, and binding obligation of such Party enforceable against it in accordance with its terms, subject to the Confirmation Order becoming a Final Order.

(d)      **Acknowledgment of Party**. Each Party acknowledges that, except with respect to the representations and warranties made in this Agreement: (a) it has relied on its own independent investigation, and has not relied on any information or representations furnished by any Party or any representative or agent thereof in determining whether or not to enter into this Agreement; (b) it has conducted its own due diligence as well as undertaken the opportunity to review information, ask questions, and receive satisfactory answers concerning the terms and conditions of this Agreement; and (c) it possesses the knowledge, experience, and sophistication to allow it to fully evaluate and accept the merits and risks of entering into the transactions contemplated by this Agreement.

## ARTICLE VI
## <u>TERMINATION OF THE AGREEMENT</u>

**Secton 6.1      Termination of the Agreement by the YPF Entities**.   This Agreement shall automatically terminate five (5) days following the occurrence of any of the following events, unless the Debtors cure or obtain a written waiver or deferral from the YPF Entities within such five (5) day period:

(a)      an Event of Default (as defined in the DIP Credit Agreement) has occurred and such Event of Default is not timely cured in accordance with the terms of the DIP Credit Agreement;

(b)      the Bankruptcy Court enters an order in any of the Debtors' Chapter 11 Cases appointing (i) a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, (ii) a responsible officer or (iii) an examiner, in each case with enlarged powers relating to the operation of the business (powers beyond those set forth in sub-clauses (3) and (4) of section 1106(a) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code;

(c)      any of the Debtors' Chapter 11 Cases is dismissed;

(d)      the Bankruptcy Court confirms a Chapter 11 plan that does not reflect or is inconsistent with this Agreement in any material respects;

CPAM: 9445116.24

(e)     the Debtors publicly announce their intention not to seek a Final Order approving this Agreement or provide written notice to the YPF Entitles of their intention not to seek such a Final Order;

(f)     Any court issues or enters a ruling, decision, or order declaring that the Passaic River Litigation is not stayed as against any of the Debtors or any of the YPF Entities or otherwise allowing the Passaic River Litigation to proceed or continue as against any of the Debtors or the YPF Entities;

(g)     any court issues or enters a ruling, decision, or order declaring this Agreement or any material portion hereof to be unenforceable; or

(h)     the Debtors fail to achieve any of the Milestones.

**Secton 6.2     Termination of the Agreement by the Debtors**. This Agreement shall automatically terminate five (5) days following the YPF Entities' failure to comply with, or breach of, any of their obligations or representations under this Agreement, unless YPF cures such non-compliance or breach or obtains a written waiver or deferral from the Debtors agree within such five (5) day period.

**Secton 6.3     Termination Event Procedure**. The Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder solely in connection with giving any notice of termination (and agree not to object to any non-breaching Party seeking to lift the automatic stay solely in connection with giving any such notice, if necessary), subject to all rights of the Party to contest any such alleged termination.

## ARTICLE VII
## <u>MISCELLANEOUS</u>

**Secton 7.1     Notices.**  All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to the Debtors, to:

Morrison & Foerster LLP
250 West 55th Street
New York, New York 10019
Attention:  James M. Peck, J. Alexander Lawrence, Jordan A. Wishnew
E-mail addresses:  jpeck@mofo.com; alawrence@mofo.com; jwishnew@mofo.com

CPAM: 9445116.24

       (b)     if the YPF Entities

          Chadbourne & Parke LLP
          1301 Avenue of the Americas
          New York, New York 10019
          Attention:  Howard Seife, Samuel S. Kohn, and Francisco Vazquez
          E-mail addresses:  hseife@chadbourne.com; skohn@chadbourne.com;
          fvazquez@chadbourne.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.

Any notice given by delivery, mail, or courier shall be effective when received.

**Secton 7.2    Specific Performance**.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and that each non-breaching Party shall be entitled to specific performance of the terms hereof and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages), including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder, in addition to any other remedy at law or equity; *provided*, *however*, that no Party shall be liable for special, indirect, consequential, or punitive damages arising out of, in connection with, or relating to this Agreement or any agreement or instrument contemplated hereby.

**Secton 7.3    GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY**.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  EACH PARTY HERETO AGREES THAT IT SHALL BRING ANY ACTION OR PROCEEDING IN RESPECT OF ANY CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT, TO THE EXTENT POSSIBLE, IN THE BANKRUPTCY COURT, AND SOLELY IN CONNECTION WITH CLAIMS ARISING UNDER THIS AGREEMENT: (A) IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT; (B) WAIVES ANY OBJECTION TO LAYING VENUE IN ANY SUCH ACTION OR PROCEEDING IN THE BANKRUPTCY COURT; AND (C) WAIVES ANY OBJECTION THAT THE BANKRUPTCY COURT IS AN INCONVENIENT FORUM OR DOES NOT HAVE JURISDICTION OVER ANY PARTY HERETO.

**Secton 7.4    Complete Agreement**.  This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto.

**Secton 7.5    Amendment and Waiver**.  This Agreement may not be amended and right or obligation under this Agreement may be waived, except by written instrument signed by the Parties.

**Secton 7.6    Severability**. Each of the provisions of this Agreement is an integrated, essential and non-severable part of this Agreement. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to the Parties. Upon any determination that any term or other provision is invalid, illegal, or incapable of being enforced, each Party hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of this Agreement as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Secton 7.7    Reliance on Representations**. All representations, warranties, agreements, covenants, and obligations herein are material, and shall be deemed to have been relied upon by the other Parties.

**Secton 7.8    Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns, and is intended to be binding upon any Chapter 11 or Chapter 7 trustee, any successor trustee, and the estates of any or all of the Debtors. Without in any manner limiting the scope, extent, or effect of the foregoing, no Party hereto shall transfer, assign, or otherwise dispose of their right, title, and interests in and to any claims or causes of action of such Party that are the subject of this Agreement, and any such transfer shall be void and of no force and effect unless and until such transferee or assignee agrees in writing at the time of such transfer or assignment to be bound by this Agreement in its entirety without revision.

**Secton 7.9    Cooperation.**  The Parties shall reasonably cooperate with one another with regard to any actions taken in the Chapter 11 Cases in a manner that is consistent with this Agreement

**Secton 7.10   No Admission of Liability**. This Agreement is not an admission of any liability, but is a compromise and settlement and this Agreement shall not be treated as an admission of liability. All communications (whether oral or in writing) between and/or among the Parties, their counsel, and/or their respective representatives relating to, concerning, or in connection with this Agreement, or the matters covered hereby and thereby, shall be governed and protected in accordance with the Federal Rule of Evidence 408 and New York Civil Practice Law and Rules Section 4547 to the fullest extent permitted by law.

**Secton 7.11   Reservation of Rights**.  Nothing in this Agreement is meant to prejudice any of the Parties' Claims, defenses, or rights against any entity that is not party to this Agreement. The Parties expressly reserve any and all Claims, defenses, and rights, at law and equity, that they may against any entity that is not party to this agreement without prejudice whatsoever.

**Secton 7.12   Interpretation and Rules of Construction**.  This Agreement is the product of negotiations among the Debtors and the YPF Entities, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the

12

interpretation hereof.  The Debtors and the YPF Entities were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.  In addition, this Agreement shall be interpreted in accordance with section 102 of the Bankruptcy Code.

**Secton 7.13   Expenses**.  Except as specifically provided otherwise, the Parties shall be responsible for the payment of their own respective costs and expenses (including attorneys' fees) in connection with the negotiation, participation, execution, and delivery of, and the observance or performance of their obligations under, this Agreement.  The Parties agree that claims for enforcement of this Agreement shall not be released by any of the provisions contained herein.

**Secton 7.14   Headings**.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

**Secton 7.15   Execution of Agreement**.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

*[Remainder of page intentionally left blank.]*

13

MAXUS (U.S.) EXPLORATION COMPANY

_____

Name:  Brad Dietz
Title: Independent Director

Address:


E-mail address(es):
Telephone:
Facsimile:


GATEWAY COAL COMPANY

_____

Name:  Brad Dietz
Title: Independent Director

Address:


E-mail address(es):
Telephone:
Facsimile:

[*Remainder of page intentionally left blank.*]

MAXUS ENERGY CORPORATION

_____

Name: Brad Dietz
Title: Independent Director

Address:


E-mail address(es):
Telephone:
Facsimile:


TIERRA SOLUTIONS, INC.

_____

Name: Brad Dietz
Title: Independent Director

Address:


E-mail address(es):
Telephone:
Facsimile:


MAXUS INTERNATIONAL ENERGY COMPANY

_____

Name: Brad Dietz
Title: Independent Director

Address:


E-mail address(es):
Telephone:
Facsimile:

YPF S.A.

_____

Name: Eduardo Andrés Pipretti
Title: Gerente SSJJ Ambiental

Address: Macacha Güemes 515
Ciudad de Buenos Aires
Argentina

E-mail address(es): eduardo.pigretti@ypf.com
Telephone: + 54 911.3811.1014
Facsimile:


YPF INTERNATIONAL S.A.

_____

Name:
Title:

Address:


E-mail address(es):
Telephone:
Facsimile:

YPF HOLDINGS, INC.

_____

Name:
Title:

Address:


E-mail address(es):
Telephone:
Facsimile:

YPF S.A.

_____

Name:
Title:

Address:


E-mail address(es):
Telephone:
Facsimile:


YPF INTERNATIONAL S.A.

_____

Name: Julio Cesár Landivar Castro
Title: Legal Representative

Address: La Plata Street, number 19,
Santa Cruz de la Sierra,
Bolivia.

E-mail address(es): jlandivar @ gg-iex.com
Telephone: (591)-3-3433594
Facsimile: (591)-3-3428643

YPF HOLDINGS, INC.

_____

Name:
Title:

Address:


E-mail address(es):
Telephone:
Facsimile:

YPF S.A.

_____
Name:
Title:

Address:

E-mail address(es):
Telephone:
Facsimile:

YPF INTERNATIONAL S.A.

_____
Name:
Title:

Address:

E-mail address(es):
Telephone:
Facsimile:

YPF HOLDINGS, INC.

_____
Name: Jorge Norberto Peña
Title:

Address:

E-mail address(es):
Telephone:
Facsimile:

CLH HOLDINGS, INC.

Name: Hector Macran Mandaraus
Title:

Address:


E-mail address(es):
Telephone:
Facsimile:


YPF SERVICES US. CORP.

Name: Jorge Norberto Peña
Title:

Address:


E-mail address(es):
Telephone:
Facsimile:


*[Remainder of page intentionally left blank.]*

## EXHIBIT A
## MILESTONES[1]

Each of the Debtors shall cause the following actions to occur no later than the applicable date set forth below:

(a)    Commence the Chapter 11 Cases on or before June 17, 2016;

(b)    No later than five (5) Business Days subsequent to the Petition Date, obtain an interim order, which, among other things, authorizes, on an interim basis, the Debtors to execute and perform under the terms of the DIP Credit Agreement and the other Loan Documents (as defined in the DIP Credit Agreement), as applicable, and incur and secure the Loans (as defined in the DIP Credit Agreement) and other Obligations (as defined in the DIP Credit Agreement) in connection therewith, which order and all extensions, modifications and amendments thereto shall be in form and substance satisfactory to YPF S.A.;

(c)    No later than thirty-five (35) days subsequent to the Petition Date, obtain a final order (the "Final DIP Order") authorizing and approving the DIP Financing Facility and the terms of the DIP Credit Agreement and the other Loan Documents (including the payment of interest, fees, costs and expenses thereunder), which order or judgment is in effect and not stayed and as to which no stay pending appeal shall have been granted, as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof, which order and all extensions, modifications and amendments thereto shall be in form and substance satisfactory to YPF S.A.;

(d)    No later than ten (10) days subsequent to the date of entry of the Final DIP Order, file the Settlement Motion with and seek approval of the Agreement from the Bankruptcy Court;

(e)    No later than February 28, 2017, file a Plan that contains, incorporates and implements, and in no manner is inconsistent with, the terms of the Agreement in form and substance acceptable to YPF S.A.;

(f)    No later than May 15, 2017, obtain an order from the Bankruptcy Court confirming a Plan that (i) contains, incorporates and implements the terms of the Agreement in form and substance acceptable to YPF S.A. or, (ii) in the event the Bankruptcy Court has issued a Settlement Order, in form and substance acceptable to YPF S.A., is in no manner inconsistent with the terms of the Agreement;

(g)    No later than June 1, 2017, obtain a Final Order dismissing the Passaic River Litigation as against the Debtors and the YPF Entities.

(h)    No later than June 15, 2017, the Plan shall become effective in accordance with its terms.

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the accompanying Settlement and Release.