**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 11 |
| MAXUS ENERGY CORPORATION, *et al.*,[1] | ) |
| | ) Case No. 16-11501 (___) |
| Debtors. | ) |
| | ) Joint Administration Pending |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS
(A) APPROVING POST-PETITION FINANCING; (B) GRANTING LIENS
AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE
CLAIMS; (C) MODIFYING THE AUTOMATIC STAY; (D) SCHEDULING
INTERIM AND FINAL HEARINGS; AND (E) GRANTING RELATED RELIEF**

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Maxus Energy Corporation (1531), Tierra Solutions, Inc. (0498), Maxus International Energy Company (7260), Maxus (U.S.) Exploration Company (2439), and Gateway Coal Company (7425). The address of each of the Debtors is 10333 Richmond Avenue, Suite 1050, Houston, Texas 77042.

By this motion (the "Motion"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") seek entry of an interim order (the "Interim Order"), substantially in the form attached hereto as **Exhibit A**, and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders"), pursuant to sections 105(a), 362, 363, 364(c) and (e), and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 4001-1, 4001-2, and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), providing for, among other things:

> (i)        this Court's authorization, pursuant to sections 105(a), 362, 363, and 364(c) and (e) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001, and Local Rules 4001-1, 4001-2, and 9013-1(m), for the Debtors, in their capacity as borrowers (the "Borrowers") to enter into a debtor-in-possession financing agreement (the "DIP Agreement"), substantially in the form attached hereto as **Exhibit B**, with the Lender (defined below), to obtain cash advances and other extensions of credit as described more fully below in an aggregate amount not to exceed $63.1 million (the "DIP Facility," and the loans under such facility, the "DIP Extensions of Credit") on the terms of the DIP Agreement (together with any and all documents, agreements, and instruments delivered pursuant thereto or executed and filed in connection therewith, as may be amended hereafter from time to time, including without limitation, the Budget (defined below), collectively, the "DIP Loan Documents");

> (ii)       this Court's ordering, pursuant to section 364(c)(1), (2), and (3) of the Bankruptcy Code, that all of the obligations of the Debtors under the DIP Loan

ny-1235659

Documents, including, without limitation, principal, interest, fees and expenses, and other amounts due thereunder (collectively, the "DIP Obligations") are:

(a)      with respect to the Tranche A Facility (defined below), secured under sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code by an automatically fully perfected, valid, enforceable, unavoidable, and first-priority security interest and lien on all of the Debtors' assets and all "property of the estate" (within the meaning of the Bankruptcy Code) of any kind or nature whatsoever, including all real and personal property, tangible or intangible or mixed whether now owned or existing or hereafter acquired or created, but excluding Owned Real Property of the Debtors (as defined in the DIP Credit Agreement), subject and subordinate only to payment of the Carve-Out (defined below); and

(b)      with respect to the Tranche A Facility, granted allowed superpriority administrative expense status in the Debtors' bankruptcy cases (and against the Debtors' estates created pursuant to section 541 of the Bankruptcy Code) pursuant to section 364(c)(1) of the Bankruptcy Code having priority over all administrative expenses of the kind specified in or arising under any section of the Bankruptcy Code (including, without limitation, sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c) or 726 thereof), subject and subordinate only to payment of the Carve-Out;

(iii)      this Court's finding that the Lender is entitled to the protections provided in section 364(e);

(iv)      this Court's authorization of a modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and

2

effectuate the terms and provisions of the DIP Facility, the DIP Loan Documents, the

Interim Order and the Final Order and to provide for the immediate effectiveness of this

Interim Order;

(v)        this Court's scheduling, pursuant to Bankruptcy Rule 4001(c)(2), of an

interim hearing (the "Interim Hearing") to consider entry of the Interim Order, which,

among other things, (a) approves, on an interim basis, the postpetition financing to be

made pursuant to the DIP Loan Documents and (b) authorizes the Debtors to obtain the

DIP Facility on an interim basis, in accordance with the DIP Loan Documents and

following entry of this Interim Order, in the aggregate principal amount of up to $11

million (the "Interim DIP Facility Commitment") in accordance with the budget annexed

hereto as **Exhibit C** (as may be modified, amended, restated or supplemented with the

consent of the Lender, in its sole discretion on the terms set forth in the DIP Loan

Documents and the terms hereof, the "Budget"); and

(vi)       this Court's scheduling a hearing (the "Final Hearing") as soon as

practicable after the 21st day following the entry of the Interim Order to consider

approval of the relief requested by the Motion on a final basis and establish the date that

is seven days prior to the Final Hearing as the deadline for parties to file objections to the

Motion.

## PRELIMINARY STATEMENT[2]

1.        In order to reach a successful resolution and fund the costs of these chapter 11

cases, the Debtors desperately require additional liquidity.  The Debtors' objectives in these

chapter 11 cases are to implement a prepetition settlement with their ultimate corporate parent,

---

[2] Capitalized terms not otherwise defined in this preliminary statement shall have the meanings ascribed to them elsewhere in this Motion.

YPF, S.A. ("YPF"), and additional affiliated parties, that will curtail their longstanding indemnification obligations and related environmental litigation and maximize recoveries for all creditors. In order to implement the settlement and provide a distribution to creditors, the Debtors require additional financing to fund the Debtors' operations and the administration of these chapter 11 cases.

2.      Given the Debtors' current liquidity position, and lack of significant operations, and existing indemnification and environmental liabilities, third-party financing is not available. As such, and in addition to the other contributions being made by the YPF Entities to the restructuring process, YPF Holdings, Inc. (the "Lender"), a non-debtor subsidiary of YPF, the direct parent of Debtor Maxus Energy Corporation, has agreed to provide the Debtors with financing, subject to the terms and conditions of the relief requested herein. The DIP Facility, if approved, will ensure that the Debtors have the financial wherewithal to restructure, pay the costs of administering these chapter 11 cases, maintain their facilities, and comply with various environmental, operational, and safety regulations and related requirements.

3.      The DIP Facility is a revolving $63.1 million credit facility bifurcated into two tranches: (a) Tranche A, consisting of a senior secured, superpriority $31,900,000 facility (the "Tranche A Facility"); and (b) Tranche B, consisting of a subordinated unsecured $31,200,000 facility (the "Tranche B Facility").

4.      The Tranche A Facility will be used for the Debtors' general bankruptcy and restructuring expenses. The Tranche A Facility is secured by a lien on substantially all of the Debtors' assets, including overriding royalty interests in 3,000 wells, working interests, cash, and cash investments (the "DIP Collateral"). The lien securing the Tranche A Facility will be a first priority lien and security interest on the DIP Collateral, subject and subordinate only to payment

of the Carve-Out.

5.      The Tranche B Facility will be used to fund the Debtors' corporate overhead expenses, such as salaries and administrative fees, the E&P operations and related overhead, and the operations of Debtor Tierra Solutions Inc. ("Tierra"), including all current and active remediation projections being undertaken by Tierra.  The Tranche B Facility is subordinate in payment to all general unsecured claims, and the Lender will not receive repayment of the Tranche B Facility until all allowed general unsecured claims (other than the claims of the Lender and its affiliates) have been fully satisfied.

6.      Of the $63.1 million provided by the DIP Facility, $11 million of the Tranche A Facility will be available to the Debtors upon the entry of the Interim Order.  The remaining $52.1 million will be made available to the Debtors through revolving extensions of credit after the entry of the Final Order, subject to certain terms and conditions in the DIP Agreement.  The DIP Agreement contains terms and conditions that are very fair to the Debtors and their creditors under the circumstances, particularly considering that the Tranche B Facility is being provided to the Debtors on a subordinated unsecured basis.  For these reasons and the reasons discussed below, the Motion should be granted on an interim and final basis.

## JURISDICTION AND VENUE

7.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.    This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory bases for the relief requested herein are sections 105(a), 362, 364(c) and (e), and 507 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001, and Local Rules 4001-1, 4001-2, and 9013-1(m).

## BACKGROUND

10.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.    The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.    Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).    No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no statutory committees have been appointed or designated.

11.      A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the above-captioned chapter 11 cases, are set forth in

6

greater detail in the *Declaration of Javier J. González in Support of Chapter 11 Petitions and Requests for First Day Relief* (the "<u>First Day Declaration</u>"), filed contemporaneously herewith and incorporated by reference herein.

12.     In support of the Motion, the Debtors also rely upon the *Declaration of Scott Winn in Support of the Debtors' Motion For Interim and Final Orders (A) Approving Post-Petition Financing; (B) Granting Liens and Providing Superpriority Administrative Expense Claims; (C) Modifying the Automatic Stay; (D) Scheduling Interim and Final Hearings; and (E) Granting Related Relief* (the "<u>Winn Declaration</u>"), filed contemporaneously herewith and incorporated by reference herein.

**A.     <u>The Debtors Have No Existing Secured Obligations</u>**

13.     As of the Petition Date, the Debtors have no outstanding secured or unsecured funded debt, and do not have a credit facility with any lender.

**B.     <u>The Debtors' Prepetition Settlement Agreement with the Lender</u>**

14.     Prior to the Petition Date, the Debtors alleged that certain claims exist or may arise in the future against YPF, YPF International S.A., the Lender, CLH Holdings, Inc., and YPF Services USA Corp. (collectively, the "<u>YPF Entities</u>") related to the corporate relationship between the Debtors and the YPF Entities, including claims based on theories of fraudulent transfer and avoidance, and veil piercing and alter ego liability.  The YPF Entities disputed the Debtors' allegations and asserted that they may have claims against the Debtors for contribution, defaulted loans, and loan forgiveness.

15.     Following good faith and arms' length negotiations, the Debtors entered into that certain Settlement and Release dated June 17, 2016 (the "<u>Settlement Agreement</u>") whereby the YPF Entities agreed, upon the Effective Date (as defined in the Settlement Agreement) and other

conditions set forth therein, to fund the Debtors' estates with $130 million (the "Settlement Payment").  In addition, in connection with the Settlement Agreement but prior to Bankruptcy Court approval of the Settlement Agreement, the Lender agreed to make the DIP Extensions of Credit under the DIP Facility to fund the Debtors' business operations and satisfy working capital needs and other expenses during the chapter 11 cases.

16.     The Settlement Agreement further provides that the loan proceeds advanced to the Debtors and any other amounts due under the DIP Agreement, as well as those amounts that arise in the ordinary course of the Debtors' business, will be allowed claims (the "Allowed YPF Claims")[3] under a chapter 11 plan and a confirmation order, and the YPF Entities will be entitled to reimbursement and payment in full in cash on account of the Allowed YPF Claims.  As part of the Settlement Agreement, the Debtors also agreed to propose a chapter 11 plan that implements the terms of the Settlement Agreement, including the releases contained therein.

## C.     The Debtors' Need Liquidity

17.     As explained in greater detail in the Winn Declaration, the DIP Facility will be used to provide the Debtors with liquidity for working capital and other general corporate purposes, and will enable the Debtors to formulate and strategize a beneficial restructuring process.

18.     As detailed in the First Day Declaration, as of the Petition Date, the Debtors only have approximately $6.4 million of cash on hand.  Due to their declining cash position, the Debtors have a need to obtain postpetition financing under the DIP Facility in order to fund the costs of these chapter 11 cases.  The proposed DIP Facility also will provide the Debtors with the

---

[3] "YPF Allowed Claims" means all Claims held by the YPF Entities against any of the Debtors (i) for a reimbursement of the loan proceeds advanced to any of the Debtors and any fees, costs, expenses, including, without limitation, the fees and expenses of their counsel, and other amounts due under the DIP Credit Agreement, and (ii) that arise in the ordinary course of the Debtors' business from and after the Petition Date.

capital to meet their obligations to their current employees, independent contractors, and vendors. The Debtors require the funds to be made available through the DIP Facility to administer these chapter 11 cases in order to implement the Settlement Agreement and fund ongoing operations. The DIP Facility is the only viable source of funding for the Debtors and, if this Motion is not granted, then the Debtors risk losing the opportunity to successfully restructure and maximize value for all stakeholders.

**D.**   **Summary of Terms of the DIP Agreement**[4]

19.   The salient terms of the DIP Agreement are as follows, including those that are required to be identified in accordance with Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a).[5] The majority of the additional provisions to be highlighted pursuant to Local Rule 4001-2(a)(i) are inapplicable because the Debtors have no prepetition secured debt. Relevant provisions are included in the below summary.

| Required Disclosures | Summary of Material Terms | Location of Provision in Relevant Document(s) |
|---|---|---|
| **DIP Agreement Parties** | <u>Borrowers</u>: Maxus Energy Corp., Tierra Solutions, Inc., Maxus International Energy Co., Maxus (U.S.) Exploration Company, and Gateway Coal Company<br><br><u>Lender</u>: YPF Holdings, Inc. | Interim DIP Order - Preamble |
| **DIP Commitments** | <u>Interim Financing Commitment</u>: An aggregate amount of up to $11 million<br><br><u>Final Financing Commitment</u>: An aggregate amount of $63.1 million | Interim DIP Order - Preamble |

---

[4] For purposes of this summary only, capitalized terms used but not otherwise defined shall have the meanings given to such terms in the DIP Agreement or the DIP Orders, as applicable.

[5] This summary is qualified in its entirety by reference to the provisions of the DIP Agreement. The DIP Agreement will control in the event of any inconsistency between this Motion and the DIP Agreement.

| Required Disclosures | Summary of Material Terms | Location of Provision in Relevant Document(s) |
|---|---|---|
| **Use of Proceeds** | Borrowers shall apply the proceeds of DIP Extensions of Credit to provide, among other things, ongoing working capital financing for Borrowers and provide financing for general corporate purposes, in each case subject to compliance with the terms, conditions and amounts set forth in the DIP Budget. | Interim DIP Order, ¶ 7. |
| **DIP Liens** | With respect to the Tranche A Facility, and subject only to payment of the Carve-Out, the Lender is granted the following liens (the "<u>DIP Liens</u>"), which shall immediately be valid, binding, perfected, continuing, enforceable, and non-avoidable upon entry of the Interim Order:<br><br>1) pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, enforceable, fully perfected and non-avoidable first priority liens on and security interests in all DIP Collateral that was not encumbered by valid, enforceable, perfected and non-avoidable liens as of the Petition Date; and<br><br>2) pursuant to Section 364(c)(3) of the Bankruptcy Code, valid, enforceable, perfected and non-avoidable liens on and security interests in all DIP Collateral on which a third party (a "<u>Third Party Lienholder</u>"), had a pre-existing lien on the Petition Date in each case immediately junior only to any such liens and security interests of Third Party Lienholders, but solely to the extent that such liens and security interests of Third Party Lienholders were in each case valid, enforceable, perfected and non-avoidable as of the Petition Date (the "<u>Senior Third Party Liens</u>").<br><br>The DIP Liens shall secure all of the Obligations with respect to the Tranche A Loans.  The DIP Liens shall not, without the consent of the Lender, be made subject to, or *pari passu* with, any other lien or security interest, other than to the extent expressly provided herein and to the Carve-Out, by any court order heretofore or hereafter entered in the Cases, and shall be valid and enforceable against any trustee appointed in the Cases, upon the conversion of any of the Cases to a case under Chapter 7 and/or upon the dismissal of any of the Cases.  The DIP Liens shall not be subject to Sections 510, 549, 550 or 551 | Interim DIP Order ¶2(f) |

| Required Disclosures | Summary of Material Terms | Location of Provision in Relevant Document(s) |
|---|---|---|
| | of the Bankruptcy Code or, upon entry of the Final DIP Order, the "equities of the case" exception of Section 552 of the Bankruptcy Code[6] or Section 506(c) of the Bankruptcy Code. | |
| **DIP Superpriority Claims** | With respect to the Tranche A Facility, and subject only to payment of the Carve-Out, the DIP Obligations shall, pursuant to Section 364(c)(1) of the Bankruptcy Code, at all times constitute an allowed superiority claim (the "<u>DIP Superpriority Claim</u>") of the Lender and be payable from and have recourse to all DIP Collateral. | Interim DIP Order ¶2(g) |
| **Tranche B Facility** | The Tranche B Facility is unsecured and subordinate in payment to all general unsecured claims, and the Lender will not receive repayment of the Tranche B Facility until all allowed general unsecured claims (other than the claims of the Lender and its affiliates) have been fully satisfied. | Interim DIP Order ¶2(i) |
| **Interest Rate & Fees** | <u>Interest Rate</u>:  Interest on Advances shall be payable in arrears on each Quarterly Payment Date.  Each Loan shall bear interest on the outstanding principal amount thereof per annum equal to 7% (the "<u>Fixed Rate</u>").  On each Quarterly Payment Date, the full amount of accrued but unpaid interest shall automatically be capitalized by increasing the then outstanding principal amount of the loans by an amount equal to such accrued and unpaid interest.<br><br><u>Default Interest</u>: The Fixed Rate plus two (2.00%) percent per annum.<br><br>Commitment Fee: two (2.00%) percent per annum on undrawn amounts. | DIP Credit Agreement, § 2.07(a) |
| **Maturity Date** | June 30, 2017 | DIP Credit Agreement, § 1.0 |
| **DIP Budget and Reporting** | On the third Business Day of each month, the Debtors shall submit rolling 13-week supplemental budgets to update the Base Budget (each a "<u>Supplemental Budget</u>", and collectively, | DIP Credit Agreement, |

---

[6] This provision is highlighted pursuant to Local Rule 4001-2(H).

| Required Disclosures | Summary of Material Terms | Location of Provision in Relevant Document(s) |
|---|---|---|
| | the Base Budget and all Supplemental Budgets shall be referred to as the "<u>DIP Budget</u>"), and each Supplemental Budget shall be subject to the reasonable approval of Lender. In the event that a Supplemental Budget is not approved by the Lender, the Base Budget shall control for such period until a Supplemental Budget is approved.<br><br>The Debtors shall deliver to the Lender no later than 9:00 pm (NY time):<br><br>(i) commencing with the initial two-week period ending after the Closing Date and for each two-week period thereafter, a report showing actual receipts and disbursements for the prior two-week period, and<br><br>(ii) commencing with the period through the end of the initial calendar month ending after the Closing Date, and for each calendar month thereafter, a reconciliation of actual receipts and disbursements, cash receipts, cash balance and loan balance against such figures set forth in the DIP Budget, on a line-by-line basis, showing any percentage variance to the proposed corresponding line item of the DIP Budget. | § 6.01 |
| **Permitted Variance** | 10%, with permitted carryover to apply to all budget line items in the aggregate on a rolling basis | DIP Credit Agreement, § 7.15(e) |
| **Bankruptcy Related Events of Default** | The occurrence of any one or more of the following bankruptcy case events shall constitute an "<u>Event of Default</u>":<br><br>(a)   <u>Non-Payment</u>.  The Borrowers fail to pay any amount under the DIP Agreement when and as required to be paid.<br><br>(b)   <u>Specific Covenants</u>.  Any of the Borrowers fail to perform or observe any term, covenant or agreement to be performed or observed by it that is contained in (i) any of Sections 6.05,  6.11,  6.12 or 6.18 hereof or (ii) Article VII hereof, or<br><br>(c)   <u>Other Defaults</u>.  Any of the Borrowers fails to perform or observe any other covenant or agreement (not | DIP Credit Agreement, § 8.01 |

| Required Disclosures | Summary of Material Terms | Location of Provision in Relevant Document(s) |
|---|---|---|
| | specified in <u>Section 8.01(a)</u> or (b)) contained in any DIP Loan Document on its part to be performed or observed and such failure continues for 30 days after the earlier of (i) actual knowledge by the Chief Executive Officer (or, in the case of Tierra Solutions, Inc., Chairman of the Board) or the General Counsel of a Borrower thereof and (ii) receipt of notice of such failure by the Borrowers from the Lender; or<br><br>     (d)    <u>Representations and Warranties</u>. Any representation or warranty is incorrect or misleading in any material respect when made or deemed made; or<br><br>     (e)    <u>Attachment</u>. Any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of a Borrower and is not released, vacated or fully bonded within 60 days after its issue or levy; or<br><br>     (f)    <u>Judgments</u>. There is entered against a Borrower (i) one or more final, non-appealable Post-Petition judgments or orders for the payment of money in an amount (with respect to any individual judgment or order) exceeding the Individual Threshold Amount ($1.5 million) or in an aggregate amount (as to all such judgments or orders) exceeding the Aggregate Threshold Amount ($7 million) (to the extent not covered by independent third-party insurance which meets the requirements of <u>Section 6.07</u>, and the insurer has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced and have not been otherwise stayed or discharged by any creditor upon such judgment or order, or (B) there is not in effect a stay of enforcement or discharge within 60 days of such judgment, by reason of a pending appeal or otherwise; or<br><br>     (g)    <u>Invalidity of DIP Loan Documents</u>. Any material provision of any DIP Loan Document, ceases to be in full force and effect; or a Borrower contests in any manner the validity or enforceability of any provision of any Loan Document; or a Borrower denies that it has any or further | |

| Required Disclosures | Summary of Material Terms | Location of Provision in Relevant Document(s) |
|---|---|---|
| | liability or obligation under any provision of any Loan Document; or<br><br>(h)    Change of Control.  There occurs any Change of Control; or<br><br>(i)    Collateral Documents.    Any    Collateral Document from and after the Closing Date or after the delivery thereof pursuant to Section 6.12 or Section 9.16, as applicable, shall for any reason (other than pursuant to the terms thereof or hereof) cease to create at any time a valid and perfected first priority Lien (subject to Permitted Liens) on Collateral with a value exceeding $1 million purported to be covered thereby; provided, however, that if (i) such cessation shall be capable of being cured, corrected or otherwise remedied, (ii) such cessation shall have occurred solely as the result of any act or omission of the Lender with respect to the actions available to the Lender to perfect or maintain the perfection of the Lender's Liens, and (iii) the Borrowers are promptly taking any actions reasonably requested by the Lender contemplated by Section 6.14 to effect the cure, correction or remedy of such cessation, then such cessation shall not constitute a Default or an Event of Default for all purposes of this Agreement and the other Loan Documents; or<br><br>(j)    Alternative Plan.    The Bankruptcy Court confirms a Chapter 11 plan that does not provide for the termination of the Revolving Credit Commitments and payment in full in Cash of all Obligations, or the implementation of the Settlement Agreement and the transactions contemplated therein.<br><br>(k)    Settlement Motion.  Settlement Motion is denied or the Settlement Agreement is deemed unenforceable<br><br>(l)    Chapter 11 Cases.  The chapter 11 cases are dismissed, converted to chapter 7 cases, a trustee or examiner is appointed, or application shall be filed by a Borrower for the approval of any other Superpriority Claim; or<br><br>(m)    Orders.  (i) an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, | |

| Required Disclosures | Summary of Material Terms | Location of Provision in Relevant Document(s) |
|---|---|---|
| | vacating or otherwise amending, supplementing or modifying the Interim DIP Order and/or the Final DIP Order without the prior written consent of the Lender, or a Borrower shall apply for authority to do so, without the prior written consent of the Lender, (ii) an order with respect to a Chapter 11 Case shall be entered by the Bankruptcy Court without the express prior written consent of the Lender to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to a Borrower equal or superior to the priority of the Lender in respect of the Obligations except as otherwise provided in this Agreement, (iii) an order of the Bankruptcy Court shall be entered permitting the grant of a Lien on the Collateral (other than Permitted Liens), (iv) the Interim DIP Order and/or the Final DIP Order shall cease to create a valid and perfected first priority Lien (subject to Permitted Liens) on the Collateral or otherwise cease to be valid and binding and in full force and effect, (v) a Borrower shall fail to comply with any material provision (or any provision in such a way as is materially adverse to the interests of the Lender) of the Interim DIP Order and/or the Final DIP Order, (vi) a Borrower shall seek any modification of the Interim DIP Order and/or the Final DIP Order or assert in any pleading filed in any court that any material provision of the Interim DIP Order and/or the Final DIP Order is not valid and binding for any reason or otherwise modifying the Interim DIP Order and/or the Final DIP Order in a manner adverse to the Lender, (vii) the period provided by Section 1121 of the Bankruptcy Code for the Borrowers' exclusive right to file a plan shall expire or terminate, or (viii) a Borrower is enjoined, restrained or in any way prevented by court order from continuing or conducting all or any material part of its business or affairs; or<br><br>      (n)   <u>Milestones</u>.  The Borrowers have not timely satisfied the Milestones[7] set forth in Section 6.20 of DIP Agreement; or | |

---

[7] The Milestones include:
- a) Commence the chapter 11 case on or before June 17, 2016
- b) Obtain the Interim DIP Order no less than 5 days following the Petition Date
- c) Obtain the Final DIP Order no later than 35 days following the Petition Date

| Required Disclosures | Summary of Material Terms | Location of Provision in Relevant Document(s) |
|---|---|---|
| | (o)    <u>Authorized Payments</u>.  Except as permitted by this Agreement, the Orders, the DIP Budget (subject to the Permitted Budget Variance) or as otherwise agreed to by the Lender, a Borrower shall not make any payments without the consent of the Lender; or<br><br>(p)    <u>Avoidance; Disgorgement; etc</u>.  The Bankruptcy Court shall (i) enter an order avoiding or requiring disgorgement by the Lender of any amounts received in respect of the Obligations or (ii) enter an order authorizing or directing payment of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral; or<br><br>(q)    <u>Non-Approved Sales</u>.   The Bankruptcy Court shall enter an order or orders to sell, transfer, lease, exchange, alienate or otherwise dispose of any assets, or properties of a Borrower or any Equity Interest of a Borrower pursuant to Section 363 of the Bankruptcy Code without the consent of the Lender unless such order or orders contemplate the repayment in full in cash of and termination in full of all Revolving Credit Commitments and Obligations under this Agreement; or<br><br>(r)    <u>Borrowers' Actions</u>.  A Borrower shall (i) take any action in support of any matter set forth in <u>Section 8.01(r), (s), (t)</u> or <u>(u)</u> of the DIP Agreement or any other Person shall do so and such application is not contested in good faith by the Borrower and the relief requested is granted in an order that is not stayed pending appeal, (ii) file a motion, pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Lender or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment, (iii) file a motion in the Chapter 11 Cases (A) to obtain additional financing under Sections 364(c) or (d) | |

d)    File the Settlement Motion no later than 10 days after entry of the Final DIP Order

e)    File a plan that incorporates the terms of the Settlement Agreement in form and substance acceptable to the YPF Entities.

f)    Obtain a confirmation order by May 15, 2017

g)    Obtain an order dismissing the Passaic River Litigation as against the Borrowers and YPF Entities by June 1, 2017

h)    Plan's effective date to occur no later than June 15, 2017

| Required Disclosures | Summary of Material Terms | Location of Provision in Relevant Document(s) |
|---|---|---|
| | of the Bankruptcy Code not otherwise permitted under this Agreement or (B) to take any other action or actions adverse to any of the Lender or their rights and remedies hereunder or under any of the other DIP Loan Documents, the Settlement Agreement, or the Orders, or the Lender's interest in any of the Collateral, (iv) file any Chapter 11 plan of reorganization or liquidation that is not approved by the Lender unless such Chapter 11 plan of reorganization or liquidation provides for (A) the repayment in full in cash of and termination in full of all Revolving Credit Commitments and Obligations under the DIP Facility and (B) the implementation of the Settlement Agreement and the transactions contemplated therein.<br><br>    (s)    Relief from Automatic Stay.  The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Borrowers in an amount exceeding One Million Dollars $1 million, individually or in the aggregate, or the Equity Interests of a Borrower, (ii) permit the Passaic River Litigation to continue as against any of the Borrowers or any of the YPF Entities for any purpose, including the valuation or determination of any claims asserted therein, or any discovery, or (iii) permit other actions that would have a Material Adverse Effect.<br><br>    (t)    Passaic River Litigation.  Any court issues or enters a ruling, decision, or order declaring that the Passaic River Litigation is not stayed as against any of the Borrowers or any of the YPF Entities or otherwise allowing the Passaic River Litigation to proceed or continue as against any of the Borrowers or the YPF Entities. | |
| **Carve-Out** | The claims and liens against the Debtors shall be subject to the Carve-Out as follows:<br><br>(i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); | Interim DIP Order, ¶ 7. |

| Required Disclosures | Summary of Material Terms | Location of Provision in Relevant Document(s) |
|---|---|---|
| | (ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); | |
| | (iii) to the extent allowed at any time, whether by interim order, procedural order or otherwise, all accrued but unpaid costs, fees and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327 or 328 of the Bankruptcy Code (the "Debtor Professionals") and any Committee (together with the Debtor Professionals, the "Professional Persons") at any time before the day of delivery by the Lender of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; and | |
| | (iv) after the second Business Day following delivery by the Lender of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of Professional Fees of Professional Persons in an aggregate amount not to exceed $1,800,000, less the amount of any prepetition retainers received by such Professional Persons and not previously applied to the fees and expenses of such Professional Persons. | |
| | For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by the Lender to the Debtors and their lead counsel and the U. S. Trustee invoking the Carve-Out Cap, provided that such notice may not be delivered until after an Event of Default under the DIP Credit Agreement has occurred and is continuing. | |
| **Carve-Out Reserves** | On the day on which a Carve Out Trigger Notice is received by the Debtors (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed an automatic draw request and irrevocable notice of Revolving Credit Borrowing by the Debtors under Section 2.02 of the DIP Credit Agreement in an amount equal to the sum of the then accrued and unpaid amounts of the Professional Fees (the "Pre-Carve-Out Trigger Notice Reserve"), provided that the Debtors shall have three (3) business days from the date of receipt of the Carve Out Trigger Notice to provide the Lender with the estimate of the total amount of accrued and unpaid Professional Fees (the | Interim DIP Order, ¶ 7. |

ny-1235659

| Required Disclosures | Summary of Material Terms | Location of Provision in Relevant Document(s) |
|---|---|---|
| | "Professional Fee Estimate"); and (ii) constitute a demand to the Debtors to utilize all cash on hand as of the date of receipt of such notice and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Pre-Carve-Out Trigger Notice Reserve.   The Debtors shall promptly deposit and hold such amounts in a segregated account in trust to pay the Pre-Carve-Out Trigger Notice Reserve prior to any and all other claims.<br><br>On the Termination Declaration Date, the Carve-Out Trigger Notice shall also be deemed an automatic draw request and irrevocable notice of Revolving Credit Borrowing by the Debtors under Section 2.02 of the DIP Credit Agreement in an amount equal to the Post-Carve-Out Trigger Notice Cap.  The Debtors shall promptly deposit and hold such amounts in a segregated account in trust to pay such Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve-Out Reserves") prior to any and all other claims.  Within ten (10) business days following receipt of the Carve-Out Trigger Notice, the Borrowers shall remain subject to the DIP Budget and available cash on hand not used for the Carve-Out Reserves may be used pursuant to the DIP Budget, including for the payment of wages and other compensation.   On the first business day following receipt by the Lender of the Professional Fee Estimate, notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of any Default or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for the loans under the DIP Facility, any termination of the DIP Commitments following an Event of Default, or the occurrence of the Maturity Date, the Lender shall honor such request for Revolving Credit Borrowing and shall fund the amount of the Carve Out Reserves, *provided, however*, that the Lender shall have a security interest in any residual interest in the Carve-Out Reserve, with any excess re-paid to the Lender in accordance with the DIP Documents. | |
| **506(c) Waiver** | Subject to entry of a Final DIP Order, As a further condition of the DIP Facility and any obligation of the Lender to make DIP Extensions of Credit, the Debtors (and any successors thereto or | Interim DIP Order, ¶ 9. |

| Required Disclosures | Summary of Material Terms | Location of Provision in Relevant Document(s) |
|---|---|---|
| | any representatives thereof, including any trustees appointed in the Cases or any Successor Case) shall be deemed to have waived any rights, benefits or causes of action under Section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the Lender, the DIP Liens, or the DIP Collateral.  Save and except for the Carve-Out, nothing contained in the Interim Order, in the Final DIP Order or in the other DIP Loan Documents shall be deemed a consent by the Lender to any charge, lien, assessment or claim against, or in respect of, the DIP Collateral under Section 506(c) of the Bankruptcy Code or otherwise. | |
| **Relief from Automatic Stay** | Upon the occurrence of a Termination Date and Event of Default, the Lender shall be immediately entitled to exercise all of its rights and remedies in respect of the DIP Collateral in accordance with the Interim Order and the other DIP Loan Documents.  The Debtors and any Committee shall be entitled to an emergency hearing before this Court within seven (7) days after the giving of written notice by the Lender of the occurrence of an Event of Default; provided that the only issue that may be raised at such hearing shall be whether an Event of Default has in fact occurred and is continuing.  If the Debtors or any Committee do not contest the occurrence of the Event of Default within such seven (7) day period, or if the Debtors or any Committee do timely contest the occurrence of an Event of Default and the Bankruptcy Court after notice and a hearing declines to stay the enforcement thereof, the Termination Date shall be deemed to have occurred for all purposes and the automatic stay, as to the Lender, shall automatically terminate in all respects. | Interim DIP Order, ¶ 15. |
| **Disparate Treatment for Professionals** | The professionals retained by the Debtors and any Creditors' Committee will be treated the same under the Interim Order with respect to the Carve-Out. | Interim DIP Order, ¶ 7. |
| **Provisions Regarding Equities of the Case[8]** | Subject to the entry of the Final DIP Order, the Lender shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to | Interim DIP Order, ¶ 18(g). |

---

[8] This provision is highlighted pursuant to Local Rule 4001-2(H).

| Required Disclosures | Summary of Material Terms | Location of Provision in Relevant Document(s) |
|---|---|---|
| | the Lender with respect to proceeds, product, offspring or profits of any of the DIP Collateral. | |
| **Avoidance Actions** | The DIP Collateral shall not include causes of action for preferences, fraudulent conveyances, and other avoidance power claims under chapter 5 of the Bankruptcy Code and other similar laws for preferences, fraudulent conveyances, and other avoidance powers claims (the "Avoidance Actions"), but shall, upon entry of the Final DIP Order, include the proceeds of Avoidance Actions, which shall be available, to the extent necessary, to pay any administrative expense claim held by the Lender in respect of the DIP Facility. | Interim DIP Order, ¶ 2(e) |

## THE DIP FINANCING SHOULD BE APPROVED

20.     It is essential for the Debtors to immediately obtain access to financing to continue their operations, fund their chapter 11 cases, and restructure their operations. The Debtors' ability to fund their ongoing obligations depends heavily upon the expeditious approval of the DIP Facility. As set forth below, the Debtors have satisfied the Bankruptcy Code requirements for approval of the DIP Facility.

**A.      The DIP Facility Should be Approved
          Under Section 364 of the Bankruptcy Code**

21.     The Debtors propose to obtain financing under the DIP Facility by providing superpriority administrative expense claims, security interests, and other liens as set forth above pursuant to section 364(c) of the Bankruptcy Code. Section 364(c) of the Bankruptcy Code provides that if a debtor is unable to obtain unsecured credit allowable as an administrative expense, the court may authorize the debtor to obtain credit or incur debt (a) on a superpriority administrative basis, (b) secured by a lien on the debtor's unencumbered assets, or (c) secured by a junior lien on the debtor's already encumbered assets, or a combination of the foregoing. *See*

11 U.S.C. § 364(c).[9]

22.     The statutory requirement for obtaining post-petition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under § 503(b)(1) of [the Bankruptcy Code] as an administrative expense."  11 U.S.C. § 364(c); *see also In re The Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code), *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987).

23.     Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

> (i)      the debtor is unable to obtain unsecured credit under section 364(b) (*i.e.*, by granting a lender administrative expense priority);
>
> (ii)     the credit transaction is necessary to preserve the assets of the estate; and
>
> (iii)    the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011) (noting these three factors in considering proposed postpetition financing) (citations omitted); *In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test).  As described in more detail below, each of the elements is satisfied here.

---

[9]     Section 364(c) of the Bankruptcy Code provides as follows:

> (c)     If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> > (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

### (i)    The Debtors Are Unable to Obtain Necessary
### <u>Postpetition Financing on an Unsecured Basis</u>

24.    To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co. Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.* Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom, Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

25.    As detailed above and in the Winn Declaration, in the months before the commencement of these chapter 11 cases, the Debtors, with the assistance of their advisors, determined that they would not be able to obtain financing from a third-party lender on a secured, administrative, or unsecured basis. Except for the DIP Facility from the Lender, the Debtors do not believe that another party would be willing to provide the Debtors with *any* post-petition financing, let alone financing on the favorable terms provided in the DIP Facility, due to, in part, the absence of material assets to pledge as collateral for additional financing. Moreover, the Debtors have come to regularly rely on their ultimate parent's financial support to address their obligations. Accordingly, in light of the Debtors' imminent liquidity needs, the Debtors, in the reasonable exercise of their business judgment, with the assistance of their advisors, determined that the DIP Facility from the Lender is the best available financing option at this time.

ny-1235659

      (ii)      **The DIP Facility is Necessary to Preserve
              and Protect the Assets of the Debtors' Estates**

26.      It is essential that the Debtors obtain the financing necessary to preserve and protect the value of their estates.  As noted in the First Day Declaration and the Winn Declaration, the Debtors need additional funding to continue to operate, pay ordinary expenses, and fund the costs of these chapter 11 cases, all of which will protect the value of the Debtors' estates and permit the Debtors to implement their prepetition settlement with YPF.  Moreover, the additional liquidity provided by the DIP Facility will permit the Debtors to ultimately consummate the Settlement Agreement, which will provide a source of recovery for the Debtors' creditors.  Based on the foregoing, the Debtors submit that the DIP Facility is necessary to protect the value of the Debtors' estates.

      (iii)     **The Terms of the DIP Facility are Entirely Fair, Reasonable
              and Appropriate Under the Circumstances**

27.      The terms and conditions of the DIP Facility must be judged by the Court taking into account the Debtors' financial circumstances and alternatives.  *In re W. Pac. Airlines, Inc.*, 223 B.R. 567, 572 (Bankr. D. Colo. 1997) (financing facility was approved because it fairly reflected the debtor's "situation and the market in which the Debtor is forced to participate as a result of its financial circumstances and the deadlines it faces").  Judged from that perspective, the terms of the DIP Facility are entirely fair and reasonable under the circumstances.

28.      As set forth in the Winn Declaration, given the Debtors' inability to obtain third-party financing, the Debtors believe that the financial terms of the DIP Agreement are reasonable and appropriate under the circumstances.  One of the most beneficial elements of the DIP Facility is the Lender's agreement to provide over $30 million in financing on a subordinated and unsecured basis.  The Lender could have sought to secure the entire DIP Facility, but instead worked constructively and consensually with the Debtors and agreed to finance these cases, in

part, on a subordinated unsecured basis, thus allowing the Debtors to maximize value for all stakeholders.

29.    Additionally, among other things, the DIP Facility does not include any fees or original issue discount that would reduce the amount actually available to the Debtors.   In addition, the costs of the DIP Facility are typical for a loan of this type and size.   Finally, the milestones set forth in the DIP Agreement provide a reasonable timeframe during which the Debtors must formulate a restructuring that incorporates the terms of the Settlement Agreement.

30.    The Debtors believe that the terms and conditions of the DIP Facility are entirely fair under the circumstances and could not be improved upon or replicated in the marketplace. In the absence of immediate access to the DIP Facility from the Lender, the Debtors will be unable to bear the costs of these chapter 11 cases, continue their operations, or complete their plan process.  In addition, the DIP Facility does not directly or indirectly deprive the Debtors or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *See In re Tenney Vill. Co.*, 104 B.R. 562, 568-69 (Bankr. D.N.H. 1989) (denying approval of a financing facility that, among other things, did not provide a carve-out for professional fees).  Instead, the proposed DIP Facility and the proposed Interim Order provide that the security interests and superpriority administrative expense claims granted to the Lender are subject to payment of the Carve-Out, which provides for (a) all unpaid fees of the Clerk of the Court and the Office of the United States Trustee, (b) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code, and (c) allowed professional fees and expenses for any professionals retained pursuant to sections 327 or 328 of the Bankruptcy Code by the Debtors and any official committee of unsecured creditors, at any time before delivery by the Lender of a Carve-Out Trigger Notice, and following the

25

delivery of the Carve-Out Trigger Notice, allowed professionals fees in an amount not to exceed $1,800,000 (less the amount of any unapplied retainers held by estate professionals). Additionally, the Carve-Out protects against administrative insolvency during the course of these cases by ensuring that assets remain for the payment of United States Trustee fees and professional fees of the Debtors and any official committee of unsecured creditors, notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.   Thus, the Debtors submit that entry into the DIP Agreement on the terms and conditions set forth therein represents a prudent exercise of their business judgment and should be approved.

31.    For these reasons, the Debtors believe that the terms of the DIP Agreement—the only source of available funding—are entirely fair and reasonable in light of the circumstances of these cases, and will prevent the immediate and irreparable harm that would result from the Debtors' inability to continue their operations and pursue consummation of the Settlement Agreement through a restructuring.

**B.    Entry into the DIP Agreement Reflects an Exercise of the Debtors' Reasonable Business Judgment**

32.    After consideration of their strategic and financing options, the Debtors concluded in their reasonable business judgment that the DIP Facility is the best option (and indeed only option) available under the circumstances.   Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.   *See In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) (stating that "[c]ourts have generally deferred to a debtor's business judgment in granting section 364 financing"); *Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the

interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"); *cf. In re Filene's Basement, LLC*, No. 11-13511(KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) (stating "[t]ransactions under § 363 must be based upon the sound business judgment of the debtor or trustee."). In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

33.     Ultimately, after consultation with their advisors and consideration of all financing options, the Debtors determined that the financing provided under the DIP Facility was the only financing available. Moreover, the Debtors weighed heavily the fact that failure to obtain funding would prevent the Debtors from consummating the Settlement Agreement, which would cause harm to the Debtors' estates and their stakeholders. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 885 (Bankr. W.D. Mo. 2003) (approving postpetition financing that "gives the Debtors sufficient time to market and sell several of their major assets so as to pay down the debt to the Financing Parties and then reorganize around their remaining core assets."). Accordingly, the Court should grant the Motion, allow the Debtors to enter into the DIP Loan Documents, and allow the Debtors to obtain the funds available under the DIP Facility as described above, pursuant to section 364(c) of the Bankruptcy Code.

## THE AUTOMATIC STAY SHOULD BE MODIFIED

34.     The Debtors seek a modification of the automatic stay imposed by section 362 of the Bankruptcy Code, to the extent applicable and necessary, to permit the parties to implement the terms of the DIP Orders and the DIP Agreement. Such stay modification provisions are

27

customary in financings such as the DIP Facility and the Debtors believe they are reasonable under the circumstances.

35.    In addition to the foregoing, the Debtors are requesting a finding in the Interim Order that the Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code, and is entitled to all of the protections afforded by that section.  See 11 U.S.C. §364(e).  The DIP Credit Agreement provides the Debtors with the financing necessary to maintain their operations and maximize estate value, and the provisions thereof were extensively negotiated, at arms' length and in good faith.  Accordingly, the requested finding pursuant to section 364(e) of the Bankruptcy Code is warranted.

## INTERIM APPROVAL SHOULD BE GRANTED

36.    Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fourteen days after the service of such motion.  Fed. R. Bankr. P. 4001(c).  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  Courts apply the business judgment standard applicable to other business decisions when considering whether to conduct a preliminary hearing.  *See, e.g.*, *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985).  After the 14-day period, the request for financing is not limited to those amounts necessary to prevent disruption of the debtor's business, and the debtor is entitled to borrow those amounts that it believes prudent in the operation of its business.  *Id*.

37.    Pursuant to Bankruptcy Rule 4001(c) and Local Rule 4001-1, the Debtors request that the Court hold and conduct an Interim Hearing to consider entry of the Interim Order authorizing the Debtors to obtain funds in an amount not to exceed $11 million pending entry of the Final Order.  This relief will enable the Debtors to preserve and maximize the value of their

assets, and therefore, avoid immediate and irreparable harm and prejudice to their estates and all stakeholders, pending the Final Hearing. The Debtors represent that expedited notice of the Interim Hearing and service of the Motion was completed on the necessary parties at least 48 hours prior to the Interim Hearing such that a preliminary hearing is appropriate before the Court.

## WAIVER OF BANKRUPTCY RULE 6004(h)

38.    To the extent that any aspect of the relief sought herein constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As described above, the relief that the Debtors seek in this Motion is immediately necessary in order for the Debtors to be able to continue to operate their business and preserve the value of their estates. The Debtors thus submit that the requested waiver is appropriate.

## NOTICE

39.    Notice of this Motion will be given to the following parties, or in lieu thereof, to their counsel: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the twenty (20) largest unsecured claims against the Debtors (on a consolidated basis); (c) YPF S.A. and YPF Holdings, Inc.; (d) Occidental Chemical Corporation; (e) the Internal Revenue Service; (f) the Environmental Protection Agency; (g) the U.S. Department of Justice; (h) the New Jersey Department of Environmental Protection and other applicable state environmental agencies; (i) the office of the attorneys general for the states in which the Debtors operate; (j) the Pension Benefit Guaranty Corporation; and (k) the Lender. Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court (a) enter the Interim Order, in substantially the form attached hereto as **Exhibit A**; (b) set a date for a Final Hearing to consider entry of the Final Order, and (c) grant such other and further relief as is just.

Dated:  June 18, 2016
      Wilmington, Delaware

/s/ Joseph M. Barry
M. Blake Cleary (No. 3614)
Joseph M. Barry (No.4221)
Justin P. Duda (No. 5478)
Travis G. Buchanan (No. 5595)
**YOUNG CONAWAY STARGATT &**
**TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

-and-

James M. Peck (*pro hac vice* admission pending)
Lorenzo Marinuzzi (*pro hac vice* admission pending)
Jennifer L. Marines (*pro hac vice* admission pending)
Jordan A. Wishnew (*pro hac vice* admission pending)
**MORRISON & FOERSTER LLP**
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Proposed Counsel for Debtors*
*and Debtors-in-Possession*

**Exhibit A**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 11 |
| MAXUS ENERGY CORPORATION, *et al.,*[1] | ) |
| | ) Case No. 16-11501 (___) |
| Debtors. | ) |
| | ) Joint Administration Pending |

## INTERIM ORDER (A) APPROVING POST-PETITION FINANCING; (B) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (C) MODIFYING THE AUTOMATIC STAY; (D) SCHEDULING A FINAL HEARING; AND (E) GRANTING RELATED RELIEF

Upon the motion (the "Motion") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") seeking interim and final orders, pursuant to sections 105(a), 362, 363, 364(c) and (e), and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 4001-1, 4001-2, and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"):

(i)     authorizing the Debtors, pursuant to sections 363, 364(c)(1), (2), and (3) of the Bankruptcy Code, to (A) obtain up to $63.1 million in financing under a debtor-in-possession credit facility (the "DIP Facility") consisting of two tranches:  (1) Tranche A, consisting of a senior secured, superpriority $31,900,000 facility (the "Tranche A Facility"), and (2) Tranche B,

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Maxus Energy Corporation (1531), Tierra Solutions, Inc. (0498), Maxus International Energy Company (7260), Maxus (U.S.) Exploration Company (2439), and Gateway Coal Company (7425).  The address of each of the Debtors is 10333 Richmond Avenue, Suite 1050, Houston, Texas 77042.

consisting of a subordinated unsecured $31,200,000 loan (the "Tranche B Facility"), provided by YPF Holdings, Inc.,[2] as lender (in such capacity, the "Lender"), pursuant to that certain Debtor-in-Possession Secured Credit Agreement entered into by and between each of the Debtors and the Lender attached hereto as Exhibit 1 (the "DIP Credit Agreement")[3] and, together with this order (the "Interim Order"), the Final DIP Order (defined below), and all other agreements, documents and instruments delivered or executed in connection therewith, as hereafter amended, supplemented or otherwise modified from time to time, including the DIP Budget (defined below), collectively, the "DIP Loan Documents"), and (B) obtain extensions of credit thereunder, (1) during the period (the "Interim Period") from the date hereof through and including the earlier to occur of (x) the date of entry of the Final DIP Order by this Court and (y) the Termination Date (defined below), in an aggregate principal amount not to exceed $11 million, and (2) upon entry of the Final DIP Order and thereafter until the Termination Date, in an aggregate additional principal amount not to exceed $52.1 million, in each case at any time outstanding (all financial accommodations and extensions of credit under the DIP Credit Agreement and the DIP Facility, the "DIP Extensions of Credit");

(ii)      authorizing the Debtors to execute the DIP Credit Agreement and all other DIP Loan Documents to which they are a party and to perform such other and further acts as may be necessary or appropriate in connection therewith;

_____

[2]    YPF Holdings, Inc. is the parent company of Maxus Energy Corporation, one of the Debtors, and the indirect parent company of the other Debtors.

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the DIP Credit Agreement.

(iii)    authorizing the Debtors to use DIP Extensions of Credit in accordance with the proposed budget prepared by the Debtors and annexed hereto as <u>Exhibit 2</u> (as updated from time to time pursuant to and in accordance with the terms of the DIP Loan Documents and, in each case, subject to the prior approval of the Lender, the "<u>DIP Budget</u>"), including any variances permitted under the DIP Credit Agreement, and as otherwise provided herein and in the other DIP Loan Documents;

(iv)    with respect only to the Tranche A Facility, authorizing the Debtors to grant to the Lender, in respect of the DIP Obligations (defined below), a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code and first priority liens on and security interests in all assets and property of the Debtors (now owned or hereafter acquired), pursuant to sections 364(c)(2) and (c)(3) of the Bankruptcy Code, in each case as and to the extent set forth more fully below and subject and subordinate to payment of the Carve-Out (defined below);

(v)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code and any other applicable stay (including Bankruptcy Rule 6004) to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility, this Interim Order and the other DIP Loan Documents and to provide for the immediate effectiveness of this Interim Order;

(vi)    scheduling a hearing (the "<u>Interim Hearing</u>") to consider entry of this Interim Order;

(vii)    scheduling a final hearing (the "<u>Final Hearing</u>") to consider entry of an order granting the relief requested in the Motion on a final basis (the "<u>Final DIP Order</u>") and approving the form of notice with respect to the Final Hearing and the transactions contemplated by the Motion; and

(viii)    approving the Final DIP Order, pursuant to and in connection with which the Debtors will be required to satisfy certain Milestones (as defined in the DIP Credit Agreement).

The Court having considered the Motion, the terms of the DIP Facility and the DIP Loan Documents, the *Declaration of Javier J. González in Support of Chapter 11 Petitions and Requests for First Day Relief,* and the evidence submitted at the Interim Hearing held before the Court on June __, 2016 to consider entry of this Interim Order; and in accordance with Bankruptcy Rules 2002, 4001(c) and (d); and, given the exigent circumstances of these chapter 11 cases, due and sufficient notice of the Motion and the Interim Hearing having been given; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and is otherwise fair and reasonable and in the best interests of the Debtors, their creditors and their estates, and essential for the continued operation of the Debtors' businesses; and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved or overruled by the Court; and after due deliberation and consideration; and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A. **Petition Date**. On June 17, 2016 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Cases.

B. **Jurisdiction and Venue**. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

C. **Committee Formation**. As of the date hereof, no official committee of unsecured creditors (a "Creditors' Committee") has been appointed in the Cases (together with any other

statutory committee that may be appointed in the Cases pursuant to sections 328 or 1103 of the Bankruptcy Code, a "Committee").

D.    **Notice**.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, by telecopy, email, overnight courier and/or hand delivery, to (a) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), (b) counsel to the Lender, (c) all other parties asserting a lien on or a security interest in the assets of the Debtors to the extent reasonably known to the Debtors, (d) the Office of the United States Attorney General for the District of Delaware, (e) the Internal Revenue Service, (f) the Office of the United States Attorney General for the District of Delaware, and (g) those creditors holding the twenty (20) largest unsecured claims against the Debtors' estates.  Given the exigent circumstances of the Cases, such notice of the Interim Hearing and the relief requested in the Motion constitutes due and sufficient notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b) and (c), and the Local Rules.

E.    **Immediate Need for Postpetition Financing**.    The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).  Good cause has been shown for entry of this Interim Order.  An immediate need exists for the Debtors to obtain funds and liquidity in order to continue operations, to satisfy in full the costs and expenses of administering the Cases, and to preserve the value of their estates.  The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets, and to maximize the return for all creditors requires the availability of the DIP Facility.  In the absence of the availability of such funds and liquidity in accordance with the terms hereof, the continued operation of the Debtors' businesses would not be possible, and serious and irreparable harm to the Debtors and their estates and creditors would occur.  Thus, the ability of the Debtors to preserve and

maintain the value of their assets and maximize the return for creditors requires the availability of working capital from the DIP Facility in accordance with the DIP Budget.

F. **No Credit Available on More Favorable Terms**. The Debtors have been unable to obtain on more favorable terms and conditions than those provided in this Interim Order (a) adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, (b) credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, (c) credit for money borrowed secured by a lien on property of the estate that is not otherwise subject to a lien, or (d) credit for money borrowed secured by a junior lien on property of the estates which is subject to a lien. The Debtors are unable to obtain credit for borrowed money without granting the DIP Liens and the DIP Superpriority Claim (defined below) to (or for the benefit of) the Lender.

G. **Use of Proceeds of the DIP Facility**. The Debtors represent and stipulate that all proceeds of the DIP Facility shall be used and/or applied in accordance with the terms and conditions of this Interim Order, the DIP Budget (subject to variances permitted under the DIP Credit Agreement) and all other DIP Loan Documents for the types of expenditures in the DIP Budget and for no other purpose.

H. **Extension of Financing**. The Lender has indicated a willingness to provide financing to the Debtors in accordance with the DIP Credit Agreement and all other DIP Loan Documents (including the DIP Budget) and subject to (i) the entry of this Interim Order and the Final DIP Order, (ii) approval in the Final DIP Order of the Milestones, and (iii) findings by this Court that such financing is essential to the Debtors' estates, that the Lender has extended such credit in good faith, and that the Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order (and the Final DIP Order) and the DIP Facility (including the DIP Superpriority Claim and the DIP Liens) will not be affected by any

subsequent reversal, modification, vacatur or amendment of, as the case may be, this Interim Order, the Final DIP Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

**I.**    **Business Judgment and Good Faith Pursuant to Section 364(e)**.

(i)    The terms and conditions of the DIP Facility are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and consideration;

(ii)    the DIP Facility was negotiated in good faith and at arm's length among the Debtors and the Lender; and

(iii)    the use of the proceeds to be extended under the DIP Facility will be so extended in good faith and for valid business purposes and uses, and the Lender shall be entitled to the protection and benefits of Section 364(e) of the Bankruptcy Code.

**J.**    **Relief Essential; Best Interests**.  The relief requested in the Motion (and provided in this Interim Order) is necessary to avoid immediate and irreparable injury to the Debtors, their property, and their estates, and essential and appropriate for the continued operation of the Debtors' businesses and the management and preservation of the Debtors' assets and property.  It is in the best interests of the Debtors' estates that the Debtors be allowed to enter into the DIP Facility, incur the DIP Obligations, and use the proceeds to be extended under the DIP Facility as contemplated herein.

**NOW, THEREFORE**, upon the Motion and the record before this Court with respect to the Motion, including the record made during the Interim Hearing, and with the consent of the Debtors and the Lender, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.    **Motion Granted**.  The Motion is granted on an interim basis in accordance with the terms and conditions set forth in this Interim Order.  Any objections to the Motion with respect to

entry of this Interim Order, to the extent not withdrawn, waived or otherwise resolved, and all reservation of rights included therein, are hereby denied and overruled.

2.    **DIP Facility**.

(a)    **DIP Obligations.**  The Debtors are expressly and immediately authorized and empowered to enter into the DIP Credit Agreement and all other DIP Loan Documents and to incur and to perform the DIP Obligations in accordance with and subject to this Interim Order (and, upon its entry, the Final DIP Order) and the DIP Loan Documents, and to take all actions which may be reasonably required or otherwise necessary for the performance by the Debtors under the DIP Facility, including the creation and perfection of the DIP Liens described and provided for herein. The Debtors are hereby authorized to pay all principal, interest, fees and expenses, and other amounts described herein and in all other DIP Loan Documents as such shall accrue and become due hereunder or thereunder, including, without limitation, the fees and expenses of the attorneys and financial and other advisors and consultants of the Lender as, and to the extent, provided for herein and in the other Loan Documents (collectively, all loans, advances, extensions of credit, financial accommodations, fees, expenses, and other liabilities and obligations in respect of DIP Extensions of Credit, the DIP Facility and the DIP Loan Documents, the "DIP Obligations").  The DIP Loan Documents and all DIP Obligations shall represent, constitute and evidence, as the case may be, valid and binding obligations of the Debtors, enforceable against the Debtors, their estates and any successors thereto in accordance with their terms.  No obligation, payment, transfer, or grant of security or superpriority claim by the Debtors under the DIP Loan Documents as approved under this Interim Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including, without limitation, sections 502(d), 544, 548, 550, or under any applicable state Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act), or subject to any contest, attack, objections, defense, reduction, setoff,

recoupment, counterclaim, avoidance, recharacterization, reclassification, disallowance, recovery, disgorgement, attachment, Claim (as defined in section 101(5) of the Bankruptcy Code), impairment, or subordination (whether equitable, contractual, or otherwise).  The term of the DIP Facility shall commence on the date of entry of this Interim Order and end on the Termination Date, subject to the terms and conditions set forth herein and in all other DIP Loan Documents, including the protections afforded a party acting in good faith under section 364(e) of the Bankruptcy Code.

(b)     **Authorization to Borrow**.  In order to continue to operate their businesses, subject to the terms and conditions of this Interim Order and all other DIP Loan Documents (including the DIP Budget), the Debtors are hereby authorized to borrow under the DIP Facility during the Interim Period up to an aggregate principal amount of $11 million.  Notwithstanding anything contained herein or in the DIP Loan Documents, any borrowings during the Interim Period prior to the entry of the Final DIP Order shall be deemed to be Tranche A Borrowings.

(c)     **Conditions Precedent**.  The Lender shall have no obligation to make any DIP Extension of Credit or any other financial accommodation hereunder or under all other DIP Loan Documents (and the Debtors shall not make any request therefor) unless all conditions precedent to making DIP Extensions of Credit under the DIP Loan Documents have been satisfied or waived in accordance with the terms of the DIP Loan Documents.

(d)     **DIP Budget**. Attached as <u>Exhibit 2</u> hereto and incorporated by reference herein is the DIP Budget, which has been approved by the Lender and the Debtors, setting forth the Debtors' projected receipts and disbursements for the 13 week period after the date hereof.  The Debtors' use of proceeds of the DIP Extensions of Credit shall be only permitted pursuant to the terms of, and in accordance with, the DIP Budget, this Interim Order, and all other DIP Loan Documents, as such may be amended in accordance with their terms.  The Lender shall have no obligation with respect to the Debtors' use of proceeds of the DIP Extensions of Credit and shall not

be obligated to ensure or monitor the Debtors' compliance with the DIP Budget or to pay any expenses incurred or authorized to be incurred pursuant to the DIP Budget.  Any an all proceeds of the DIP Extensions of Credit shall be used by the Debtors in accordance with the DIP Loan Documents, this Interim Order, and the DIP Budget.  The Lender's consent to the DIP Budget shall not be construed as consent to the use of any of the proceeds of the DIP Extensions of Credit after the occurrence of an Event of Default, regardless of whether the aggregate funds shown on the DIP Budget have been expended.

       (e)    **DIP Collateral**.  As used herein, "<u>DIP Collateral</u>" shall mean all property (including any previously unencumbered property), whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's estate (as created pursuant to section 541 of the Bankruptcy Code), of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contracts, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, other intellectual property, and licenses therefor, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, owned real estate, real property leaseholds, fixtures, commercial tort claims, securities accounts, investment property, letter of credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), accounts receivable, including intercompany accounts (and all rights associated therewith), other rights to payment whether arising before or after the Petition Date, deposit accounts (including the cash collection, "lockbox" and "concentration" accounts provided for in the DIP Loan Documents), "core concentration accounts," "cash collateral accounts," and in each case all amounts on deposit therein from time to time, equity interests, securities entitlements, securities, commercial tort claims, books, records, plants, supporting obligations, and all cash and non-cash proceeds, rents, profits, products,

accessions, and substitutions, if any, of any of the foregoing, but excluding Owned Real Property of the Debtors (as defined in the DIP Credit Agreement).  The DIP Collateral shall not include causes of action for preferences, fraudulent conveyances, and other avoidance power claims under chapter 5 of the Bankruptcy Code and other similar laws for preferences, fraudulent conveyances, and other avoidance powers claims (the "Avoidance Actions"), but shall, upon entry of the Final DIP Order, include the proceeds of Avoidance Actions, which shall be available, to the extent necessary, to pay any administrative expense claim held by the Lender in respect of the DIP Facility.

(f)    **DIP Liens**. With respect only to the Tranche A Facility, effective immediately upon the entry of this Interim Order, and subject and subordinate to payment of the Carve-Out, as set forth more fully in this Interim Order, the Lender is hereby granted the following security interests and liens, which shall immediately (without the necessity of execution by the Debtors or the recording or other filing of any security agreement or similar agreement or arrangement or other document or the possession or control by the Lender) be valid, binding, perfected, continuing, enforceable and non-avoidable (all liens and security interests granted to and for the benefit of the Lender pursuant to this Interim Order, the Final DIP Order, and all other DIP Loan Documents, the "DIP Liens"):

(I)    pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, fully perfected and non-avoidable first priority liens on and security interests in all DIP Collateral that was not encumbered by valid, enforceable, perfected and non-avoidable liens as of the Petition Date; and

(II)    pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, perfected and non-avoidable liens on and security interests in all DIP Collateral on which a third party (a "Third Party Lienholder") had a pre-existing lien on the Petition Date, in each case immediately junior only to any such liens and

security interests of Third Party Lienholders, but solely to the extent that such liens and security interests of Third Party Lienholders were in each case valid, enforceable, perfected and non-avoidable as of the Petition Date (the "Senior Third Party Liens").

(g)    **Superpriority Administrative Expense Claim Status**. With respect only to the Tranche A Facility, the DIP Obligations shall, pursuant to section 364(c)(1) of the Bankruptcy Code, at all times constitute an allowed superpriority administrative expense claim (the "DIP Superpriority Claim") of the Lender and be payable from and have recourse to all DIP Collateral. The DIP Superpriority Claim shall be subject and subordinate only to payment of the Carve-Out. Other than as expressly provided herein, including in Paragraph 7 hereof with respect to payment of the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Sections 328, 330 and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Cases or in any Successor Cases (defined below), and no priority claims are, or will be, senior to, prior to or *pari passu* with the DIP Liens, the DIP Superpriority Claim, or any of the DIP Obligations, or with any other claims of the Lender arising hereunder or under all other DIP Loan Documents, or otherwise in connection with the DIP Facility.

(h)    **Other Provisions Relating to the DIP Liens**. The DIP Liens shall secure all of the DIP Obligations. The DIP Liens shall not, without the consent of the Lender, be made subject to, or *pari passu* with, any other lien or security interest, other than to the extent expressly provided herein and to the Carve-Out, by any court order heretofore or hereafter entered in the Cases, and shall be valid and enforceable against any trustee appointed in the Cases, upon the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code, or in any other proceedings related to any of the foregoing (such cases or proceedings, "Successor Cases"), and/or upon the dismissal of any of the Cases. The DIP Liens shall not be subject to sections 510, 549, 550 or 551 of the

Bankruptcy Code or, upon entry of the Final DIP Order, the "equities of the case" exception of section 552 of the Bankruptcy Code or section 506(c) of the Bankruptcy Code.

(i)    **Tranche B Facility**.  Notwithstanding the fact that the Tranche B Facility shall be due and payable on the Termination Date, the Lenders shall not receive repayment of the principal amount of the Tranche B Loans until such time as all general unsecured claims allowed under the Bankruptcy Code (other than the claims of the Lender or any of its affiliates) have been fully satisfied, extinguished, or discharged.

3.    **Authorization and Approval to Use Proceeds of DIP Facility**.  Subject to the terms and conditions of this Interim Order, the DIP Budget, and the other DIP Loan Documents, the Debtors are authorized during the Interim Period (and not beyond) to request and use proceeds of the DIP Extensions of Credit, in each case in the amounts and for the line item expenditures set forth in the DIP Budget (subject to variances permitted under the DIP Credit Agreement).  The DIP Budget may only be amended, supplemented, modified, restated, replaced, or extended in accordance with the DIP Loan Documents and the prior written consent of the Lender without further order of the Court.  Notwithstanding anything herein to the contrary, subject only to the Debtors' rights under Paragraph 7(b) hereof and the Carve-Out, the Debtors' right to request or use proceeds of DIP Extensions of Credit shall terminate on the Termination Date.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates or other proceeds resulting therefrom outside the ordinary course of business, except as permitted herein (subject to any required Court approval).

4.    **Monitoring of Collateral**.  The Lender and its respective consultants and advisors shall be given reasonable access to the Debtors' books, records, premises, assets and properties for purposes of monitoring the Debtors' businesses and the value of the DIP Collateral, and shall be permitted to conduct, at their discretion and at the Lender's cost and expense, which cost and

expense shall be subject to reimbursement by the Debtors in accordance with the DIP Credit Agreement, field audits, collateral examinations and inventory appraisals in respect of the DIP Collateral.

5.    **Financial Reporting**.  The Debtors shall provide the Lender the financial reporting as required under, and in all instances consistent with, the DIP Loan Documents.

6.    **DIP Lien Perfection**.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens, or to entitle the DIP Liens to the priorities granted herein.  Notwithstanding the foregoing, the Lender may, in its sole discretion, file such financing statements, deeds of trust, mortgages, security agreements, notices of liens and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, deeds of trust, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Cases.  The Debtors shall execute and deliver to the Lender all such financing statements, mortgages, security agreements, notices and other documents as the Lender may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens.  The Lender, in its sole discretion, may file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtors have real or personal property and, in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order.  The Lender is also deemed to be the secured party under the Debtors' account control agreements, if any, and a loss payee under the Debtors' insurance policies,

and shall have all rights and powers attendant to that position (including, without limitation, rights of enforcement) and shall act in that capacity and distribute any proceeds recovered or received in accordance with the terms of this Interim Order and/or the Final DIP Order, as applicable, and the other DIP Loan Documents.

7.    **Carve-Out**.

(a)    As used in this Interim Order, the "Carve-Out" shall mean the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and U.S. Trustee under Section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order or otherwise, all accrued but unpaid costs, fees and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327 or 328 of the Bankruptcy Code (the "Debtor Professionals") and any Committee (together with the Debtor Professionals, the "Professional Persons") at any time before the day of delivery by the Lender of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) after the second Business Day following delivery by the Lender of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of Professional Fees of Professional Persons in an aggregate amount not to exceed $1,800,000, less the amount of any prepetition retainers received by such Professional Persons and not previously applied to the fees and expenses of such Professional Persons (the "Post Carve-Out Trigger Notice Cap").

(b)    For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by the Lender to the Debtors and their lead counsel and the U. S. Trustee

01:18819732.1

15

invoking the Carve-Out Cap, provided that such notice may not be delivered until after an Event of Default under the DIP Credit Agreement has occurred and is continuing.

(c)     On the day on which a Carve Out Trigger Notice is received by the Debtors (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed an automatic draw request and irrevocable notice of Revolving Credit Borrowing by the Debtors under Section 2.02 of the DIP Credit Agreement in an amount equal to the sum of the then accrued and unpaid amounts of the Professional Fees (the "Pre-Carve-Out Trigger Notice Reserve"), *provided* that the Debtors shall have three (3) business days from the date of receipt of the Carve Out Trigger Notice to provide the Lender with the estimate of the total amount of accrued and unpaid Professional Fees (the "Professional Fee Estimate"); and (ii) constitute a demand to the Debtors to utilize all cash on hand as of the date of receipt of such notice and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Pre-Carve-Out Trigger Notice Reserve.  The Debtors shall promptly deposit and hold such amounts in a segregated account in trust to pay the Pre-Carve-Out Trigger Notice Reserve prior to any and all other claims.

(d)     On the Termination Declaration Date, the Carve-Out Trigger Notice shall also be deemed an automatic draw request and irrevocable notice of Revolving Credit Borrowing by the Debtors under Section 2.02 of the DIP Credit Agreement in an amount equal to the Post-Carve-Out Trigger Notice Cap.  The Debtors shall promptly deposit and hold such amounts in a segregated account in trust to pay such Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve-Out Reserves") prior to any and all other claims.  Following receipt of the Carve-Out Trigger Notice, the Borrowers shall remain subject to the DIP Budget and available cash on hand not used for the Carve-Out Reserves may be used pursuant to the DIP Budget, including for the payment of wages and other compensation.  Within ten (10) business days following receipt by

the Lender of the Professional Fee Estimate, notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of any Default or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for the loans under the DIP Facility, any termination of the DIP Commitments following an Event of Default, or the occurrence of the Maturity Date, the Lender shall honor such request for Revolving Credit Borrowing and shall fund the amount of the Carve Out Reserves, *provided*, *however*, that the Lender shall have a security interest in any residual interest in the Carve-Out Reserve, with any excess re-paid to the Lender in accordance with the DIP Documents.

(e)     For the avoidance of doubt and notwithstanding anything to the contrary contained in this Interim DIP Order, the Final DIP Order, the DIP Documents or any prepetition secured debt document, the Carve-Out shall be senior to all liens and claims securing the DIP Facility, the 507(b) Claims and any liens or claims securing the obligations under the DIP Facility or prepetition secured obligations.  Any payment or reimbursement made prior to the occurrence of the Carve-Out Trigger Notice in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(f)     No portion of the Carve-Out and no proceeds of the DIP Facility, the DIP Collateral or DIP Extensions of Credit may be used for the payment of the fees and expenses of any person incurred (i) in investigating, challenging, or in relation to the challenge of, any of the DIP Liens or DIP Obligations (or the value of the DIP Collateral), or the initiation or prosecution of any claim or action against the Lender or any of its affiliates, including, without limitation, any claim under chapter 5 of the Bankruptcy Code, or any state, local or foreign law, in respect of the DIP Facility, or in preventing, hindering or delaying the realization by Lender upon any DIP Collateral, or the enforcement of the Lender's rights under this Interim Order, the Final DIP Order, or any other DIP Loan Document, (ii) in requesting authorization, or supporting any request for authorization, to

obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than (x) from the Lender or (y) if such financing is sufficient to indefeasibly pay and satisfy all DIP Obligations in full in cash and such financing is immediately so used, (iii) in connection with any claims or causes of actions against the Lender or any of its subsidiaries or affiliates (other than the Debtors), or any of their respective current and former employees, officers, directors, members, managers, representatives, agents, parents, owners, successors, assignees, attorneys, financial advisors, and other professionals and agents, including, without limitation, formal or informal discovery proceedings in anticipation thereof, and/or in challenging any DIP Obligations or DIP Liens, or (iv) investigating the circumstances relating to the negotiations of, reviewing, assessing, or analyzing, or challenging any motion for the approval by the Court of, that certain Settlement and Release entered into as of June 17, 2016 (the "Settlement Agreement"), by and among (i) the Debtors and (ii) YPF S.A., YPF International S.A., YPF Holdings, Inc., CLH Holdings, Inc., and YPF Services U.S.A. Corp., including, without limitation, formal or informal discovery proceedings with respect thereto or in connection therewith; *provided* that the Debtors may challenge an Event of Default under the DIP Facility.

8.     **Payment of Compensation**.  Nothing herein shall be construed as consent to the allowance of any Professional Fees or expenses of any of the Debtors or any Committee or shall limit or otherwise affect the right of the Lender to object to the allowance and payment of any such fees and expenses.  So long as no Event of Default exists that has not been waived in writing, the Debtors shall be permitted to pay compensation and reimbursement of expenses allowed by the Court and payable under sections 330 and 331 of the Bankruptcy Code or compensation procedures approved by the Bankruptcy Court and in form and substance reasonably acceptable to the Debtors and the

Lender, as the same may be due and payable, and the same shall not reduce the Post-Carve-Out Trigger Notice Cap.

9.      **Section 506(c) Claims**.  Subject to the entry of the Final DIP Order, as a further condition of the DIP Facility and any obligation of the Lender to make DIP Extensions of Credit, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Cases or any Successor Case) shall be deemed to have waived any rights, benefits or causes of action under section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the Lender, the DIP Liens, or the DIP Collateral.  Save and except for the Carve-Out, nothing contained in this Interim Order, in the Final DIP Order or in the other DIP Loan Documents shall be deemed a consent by the Lender to any charge, lien, assessment or claim against, or in respect of, the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.

10.      **Collateral Rights; Limitations in Respect of Subsequent Court Orders**.  Without limiting any other provisions of this Interim Order, unless the Lender has provided its prior written consent, there shall not be entered in these Cases, or in any Successor Case, any order which authorizes the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on any portion or all of the DIP Collateral and/or entitled to priority administrative expense status which is superior to or *pari passu* with those granted pursuant to this Interim Order to or for the benefit of the Lender.

11.      **Proceeds of Subsequent Financing**.  Without limiting the provisions and protections of Paragraph 10 hereof, if at any time prior to the indefeasible repayment and satisfaction in full in cash of all DIP Obligations and the termination of the Lender's obligations to make DIP Extensions of Credit, including subsequent to the confirmation of any chapter 11 plan or plans with respect to the Debtors (the "Plan"), the Debtors, the Debtors' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed, shall obtain credit or incur debt in

violation of this Interim Order or the other DIP Loan Documents, then all of the cash proceeds derived from such credit or debt shall immediately be turned over to the Lender for application in accordance with Paragraph 16(b) hereof and the DIP Loan Documents.

12.    **Cash Management**.  The Debtors' cash management system shall at all times be maintained (i) in accordance with the terms of the DIP Loan Documents and any order of this Court approving the maintenance of the Debtors' cash management system, and (ii) in a manner which in any event shall be reasonably satisfactory to the Lender.  The Lender shall be deemed to have "control" over all cash management accounts for all purposes of perfection under the Uniform Commercial Code.  Until the occurrence of an Event of Default, all amounts collected in the cash collection accounts may be used in accordance with this Interim Order, the DIP Budget and the other DIP Loan Documents; after the occurrence and during the continuance of an Event of Default, subject only to the funding of the Carve-Out and the Debtors' rights under Paragraph 15(b) hereof, all such amounts shall be applied in accordance with Paragraph 16(b) hereof.

13.    **Disposition of DIP Collateral**.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as permitted by the DIP Loan Documents and as approved by the Court.

14.    **Survival of Certain Provisions**.  In the event of the entry of any order converting any of these Cases to a Successor Case, the DIP Liens, the DIP Superpriority Claim, and the Carve-Out shall continue in these Cases and in any Successor Case, and such DIP Liens, DIP Superpriority Claim, and Carve-Out shall maintain their respective priorities as provided by this Interim Order.

15.    **Events of Default; Rights and Remedies Upon Event of Default**.

(a)    Any automatic stay otherwise applicable to the Lender is hereby modified so that, upon and after the occurrence of the Termination Date, the Lender shall, subject to subparagraph (b) of this Paragraph 15, be immediately entitled to exercise all of its rights and

remedies in respect of the DIP Collateral in accordance with this Interim Order and the other DIP Loan Documents.  The term "Termination Date" shall mean: (a) prior to entry of the Final DIP Order, the earliest to occur of (i) thirty-five (35) days after the Petition Date, (ii) the Maturity Date, (iii) the date on which the maturity of the Loans is accelerated and the Revolving Credit Commitments are terminated in accordance with the DIP Credit Agreement, and (iv) this Interim Order ceasing to be in full force and effect for any reason, and (b) subsequent to entry of the Final DIP Order, the earliest to occur of (i) the Maturity Date, (ii) the date on which the maturity of the Loans is accelerated and the Revolving Credit Commitments are terminated in accordance with the DIP Credit Agreement, (iii) the Final DIP Order ceasing to be in full force and effect for any reason, and (iv) the effective date of the Plan that has been confirmed by an order of the Court.

(b)    Notwithstanding the foregoing subparagraph (a) of this Paragraph 15, immediately following the giving of notice by the Lender to the Debtors, counsel to the Debtors, counsel for any Committee appointed in the Cases, and the U.S. Trustee of the occurrence of an Event of Default: (i) all Commitments of the Lender to provide any DIP Extensions of Credit shall immediately be suspended; (ii) the Debtors shall have no right to request or use any proceeds of any DIP Extensions of Credit or DIP Collateral, other than towards the satisfaction of the DIP Obligations and the Carve-Out, as provided in the applicable DIP Loan Documents and this Interim Order; (iii) the Debtors shall deliver and cause the delivery of the proceeds of the DIP Extensions of Credit and the DIP Collateral to the Lender as provided herein and in the DIP Loan Documents subject to the funding of the Carve-Out as provided in Paragraph 7(d); and (iv) the Lender shall be permitted to apply such proceeds of the DIP Extensions of Credit, and the DIP Collateral in accordance with the terms of this Interim Order and the DIP Loan Documents.  The Debtors and any Committee shall be entitled to an emergency hearing before this Court within seven (7) days after the giving of written notice by the Lender of the occurrence of an Event of Default; provided that the

only issue that may be raised at such hearing shall be whether an Event of Default has in fact occurred and is continuing, and such entities hereby waive their right to seek any relief, whether under section 105 of the Bankruptcy Code or otherwise, that would in any way impair, limit, restrict or delay the rights and remedies of the Lender under the DIP Loan Documents.  If the Debtors or any Committee do not contest the occurrence of the Event of Default within such seven (7) day period, or if the Debtors or any Committee do timely contest the occurrence of an Event of Default and the Court after notice and a hearing declines to stay the enforcement thereof, the Termination Date shall be deemed to have occurred for all purposes and the automatic stay, as to the Lender, shall automatically terminate in all respects.  Nothing herein shall preclude the Lender from seeking an order from the Bankruptcy Court upon written notice (electronically (including via facsimile) in a manner that generates a receipt for delivery, or via overnight mail) to the U.S. Trustee, counsel to the Debtors and counsel to any Committee, if any, authorizing the Lender to exercise any enforcement rights or remedies with respect to the DIP Collateral on less than seven (7) days' notice, or the Debtors' right to contest such relief.

(c)      The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of the DIP Loan Documents as necessary to (i) permit the Debtors to grant the DIP Liens and to incur all DIP Obligations and all liabilities and obligations under the other DIP Loan Documents, and (ii) authorize the Lender to retain and apply payments, and otherwise enforce their respective rights and remedies hereunder subject to the provisions herein.

(d)      Nothing included herein shall prejudice, impair or otherwise affect the Lender's rights to seek any other or supplemental relief in respect of the Debtors.

16.      **Applications of Proceeds of Collateral, Payments and Collections**.

(a)      As a condition to the DIP Extensions of Credit, each Debtor has agreed that proceeds of any DIP Collateral, any amounts held on account of the DIP Collateral, and all payments

and collections received by the Debtors with respect to all proceeds of DIP Collateral, shall be used and applied in accordance with the DIP Loan Documents (including repayment and reduction of the DIP Obligations), the DIP Budget (subject to variances permitted under the DIP Credit Agreement) and this Interim Order.

(b)     Subject to the Debtors' rights under Paragraph 15(b) hereof and, if applicable, the funding of the Carve-Out, upon and after the occurrence of the Termination Date, all proceeds of DIP Collateral, whenever received, shall be paid and applied as follows: (i) *first*, to permanently and indefeasibly repay and reduce the DIP Obligations then due and owing in accordance with the DIP Loan Documents, until paid and satisfied in full in cash; (ii) *second*, to whomever may be lawfully entitled to receive such surplus as determined by the Court.  For avoidance of doubt, nothing in this Interim Order shall be construed to limit the voluntary and mandatory repayment provisions set forth in the DIP Loan Documents.

17.    **Proofs of Claim**.  The Lender shall not be required to file proofs of claim in any of the Cases or any Successor Case for any claim allowed herein.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Cases or any Successor Case to the contrary, the Lender is hereby authorized and entitled, in its sole and absolute discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in any of the Cases or any Successor Case for any claim allowed herein; for avoidance of doubt, any such proof of claim may be (but is not required to be) filed as one consolidated proof of claim against all of the Debtors, rather than as separate proofs of claim against each Debtor.  Any order entered by the Court in relation to the establishment of a bar date for any claim allowed herein (including, without limitation, administrative expense claims) in any of the Cases or any Successor Case shall not apply to the Lender.

18.    **Other Rights and Obligations**.

(a)    **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order**.  Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility as approved by this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter appealed or modified, amended or vacated by a subsequent order of the Court or any other court, the Lender is entitled to the full protections provided in section 364(e) of the Bankruptcy Code, and no such appeal, modification, amendment or vacation shall affect the validity and enforceability of any advances made hereunder or the liens or priority authorized or created hereby.  Notwithstanding any such appeal, modification, amendment or vacation, any claim granted to the Lender hereunder arising prior to the effective date of such appeal, modification, amendment or vacation of any DIP Liens or of the DIP Superpriority Claim granted to or for the benefit of the Lender shall be governed in all respects by the original provisions of this Interim Order, and the Lender shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Liens and the DIP Superpriority Claim granted herein, with respect to any such claim.  Because the DIP Extensions of Credit are made in reliance on this Interim Order, the DIP Obligations incurred by the Debtors or owed to the Lender prior to the effective date of any stay, modification, amendment, or vacation of this Interim Order shall not, as a result of any subsequent order in the Cases or in any Successor Case, be disallowed or subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the Lender under this Interim Order.

(b)    **Expenses**.  To the fullest extent provided in the DIP Loan Documents and this Interim Order, the Debtors will pay in cash on the effective date of any Plan all expenses incurred by the Lender (including, without limitation, the fees and disbursements of its counsel, any other local counsel that it shall retain, and any internal or third-party appraisers, consultants,

financial, restructuring or other advisors and auditors advising any such counsel; *provided* that the Lender's professionals and advisors submit invoices to the U.S. Trustee, the Debtors, and any Committee twenty (20) days prior to the effective date of any Plan) in connection with (i) the preparation, execution, delivery, funding and administration of the DIP Loan Documents, including, without limitation, all due diligence fees and expenses incurred or sustained in connection with the DIP Loan Documents, (ii) the Cases or any Successor Case, or (iii) enforcement of any rights or remedies under the DIP Loan Documents, in each case whether or not the transactions contemplated hereby are fully consummated.  For the avoidance of doubt, and without limiting any of the forgoing or any other provision of this Interim Order all fees and expenses due to the Lender under the DIP Credit Agreement, including but not limited to, the fees and expenses specified in Sections 2.08 and 9.04 thereof are, upon entry of this Interim Order and irrespective of any subsequent order approving or denying the DIP Facility or any other financing pursuant to section 364 of the Bankruptcy Code, fully entitled to all protections of section 364(e) of the Bankruptcy Code and are deemed fully earned, indefeasibly paid, non-refundable, irrevocable and non-avoidable as of the date of this Interim Order.

(c)      **Binding Effect**.  The provisions of this Interim Order shall be binding upon and inure to the benefit of the Lender, the Debtors, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors) whether in the Cases, in any Successor Case, or upon dismissal of any of the Cases of Successor Case

(d)      **No Waiver**.  The failure of the Lender to seek relief or otherwise exercise its rights and remedies under this Interim Order, the other DIP Loan Documents, or otherwise, shall not constitute a waiver of any of the Lender's rights hereunder, thereunder or otherwise. Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not

constitute a waiver of, expressly or implicitly, or otherwise impair any of the rights, claims, privileges, objections, defenses or remedies of the Lender under the Bankruptcy Code or under non-bankruptcy law against any other person or entity in any court, including without limitation, the rights of the Lender (i) to request conversion of any of the Cases to cases under chapter 7, dismissal of any of the Cases, or the appointment of a trustee in any of the Cases, or (ii) to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Plan, or (iii) to exercise any of its rights, claims or privileges (whether legal, equitable or otherwise).

(e)    **No Third Party Rights**.    Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, third party or incidental beneficiary.

(f)    **No Marshaling**.    The Lender shall not shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

(g)    **Section 552(b)**.    Subject to the entry of the Final DIP Order, the Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Lender with respect to proceeds, product, offspring or profits of any of the DIP Collateral.

(h)    **Amendment**.    The Debtors and the Lender may amend, modify, supplement or waive any provision of the DIP Loan Documents without further notice to or approval of the Court, unless such amendment, modification, supplement or waiver (x) increases the interest rate (other than as a result of the imposition of the default rate) or fees charged in connection with the DIP Facility, (y) increases the commitments of the Lender to make DIP Extensions of Credit under the DIP Loan Documents, or (z) changes the Termination Date.    Except as otherwise provided herein, no waiver, modification or amendment of any of the provisions hereof shall be effective

01:18819732.1

26

unless set forth in writing, signed by, or on behalf of, the Debtors and the Lender and approved by the Court after notice to parties in interest.

(i)    **Priority of Terms**.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Motion, any other order of the Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "defined in" or "as set forth in" the DIP Credit Agreement, the terms and provisions of this Interim Order shall govern.

(j)    **Survival of Interim Order**.  Unless and until the entry by the Bankruptcy Court of the Final DIP Order, the provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any Plan in any of the Cases, (ii) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, (iii) to the extent authorized by applicable law, dismissing any of the Cases, (iv) withdrawing the reference of any of the Cases from the Court, or (v) providing for abstention from handling or retaining jurisdiction of any of the Cases in this Court.  Unless and until the entry by the Court of the Final DIP Order, the terms and provisions of this Interim Order, including the DIP Liens and DIP Superpriority Claim granted pursuant to this Interim Order, shall continue in full force and effect notwithstanding the entry of such order, and such DIP Liens and DIP Superpriority Claim shall maintain their priority as provided by this Interim Order and the other DIP Loan Documents, until all of the DIP Obligations have been indefeasibly paid and satisfied in full in cash and discharged.

(k)    **Enforceability**.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

(l)    **No Waivers or Modification of Interim Order**.  The Debtors irrevocably waive any right to seek any modification or extension of this Interim Order without the prior written consent of the Lender and no such consent shall be implied by any other action, inaction or acquiescence of the Lender.

(m)    **Immediately Effective**.  This Interim Order is hereby deemed effective immediately pursuant to Bankruptcy Rule 6004(h).

19.    **Final Hearing**.

(a)    The Final Hearing to consider entry of the Final DIP Order and final approval of the DIP Facility is scheduled for _____, 2016, at __:__ __.m. (EST) at the United States Bankruptcy Court for the District of Delaware.  If no objections to the relief sought at the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final DIP Order may be presented by the Debtors and entered by the Court.

(b)    On or before June __, 2016, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Motion, on the Notice Parties and to any other party that has filed a request for notices with this Court prior thereto and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final DIP Order shall file written objections with the Clerk of the Bankruptcy Court no later than _____, 2016 at __:__ __.m. (EST), which objections shall be served so that the same are received on or before such date by: (a) proposed co-counsel for the Debtors, Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, Attn: Jordan Wishnew, (b) proposed co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19050, Attn: M. Blake Cleary, Esquire and Joseph M. Barry,

Esquire; (c) co-counsel for the Lender, Chadbourne & Parke LLP, 1301 Avenue of the Americas, New York, New York 10019, Attn: Howard Seife, Samuel S. Kohn, and Francisco Vazquez, and (d) co-counsel for the Lender, Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, DE 19801, Attn: Adam Landis.

(c)     **Retention of Jurisdiction**.    The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Dated: June_____, 2016.

_____

UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

**DEBTOR-IN-POSSESSION SECURED CREDIT AGREEMENT**

Dated as of June [__], 2016

among

**MAXUS ENERGY CORP.**
**TIERRA SOLUTIONS, INC.**
**MAXUS INTERNATIONAL ENERGY COMPANY**
**MAXUS (U.S.) EXPLORATION COMPANY**
**GATEWAY COAL COMPANY**,
**(each, a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code)**,
as the Borrowers,

and

**YPF HOLDINGS, INC.**,
as the Lender

CPAM: 9490930.20CPAM: 9490930.20CPAM: 9490930.20CPAM: 9490930.20CPAM: 9490930.20CPAM: 9490930.20

CPAM: 9490930.20

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS AND ACCOUNTING TERMS ......................................................1

    1.01    **Defined Terms.** ............................................................1
    1.02    **Other Interpretive Provisions.** ................................15
    1.03    **Accounting Terms.** ...................................................16
    1.04    **Rounding.** ...................................................................17
    1.05    **Times of Day.** ............................................................17

ARTICLE II. THE REVOLVING CREDIT COMMITMENTS AND REVOLVING CREDIT
             BORROWINGS.........................................................17

    2.01    **Loans.** ..........................................................................17
    2.02    **Revolving Credit Borrowings.** ................................18
    2.03    **[Reserved].** .................................................................18
    2.04    **Prepayments.** .............................................................18
    2.05    **Termination or Reduction of Revolving Credit Commitments.** .....................19
    2.06    **Repayment of Loans.** ...............................................19
    2.07    **Interest.** ......................................................................20
    2.08    **Fees.** ............................................................................20
    2.09    **Computation of Interest and Fees.** ........................20
    2.10    **Evidence of Debt.** .....................................................21
    2.11    **Payments Generally; Lender's Clawback.** .............21
    2.12    **No Discharge; Survival of Claims.** .........................21
    2.13    **Reorganizational Matters.** .......................................21

ARTICLE III. [RESERVED] ........................................................24

ARTICLE IV. CONDITIONS PRECEDENT TO LOANS .....................................24

    4.01    **Conditions of Initial Loan.** .....................................24
    4.02    **Conditions to All Loans.** .........................................27

ARTICLE V. REPRESENTATIONS AND WARRANTIES ..................................28

    5.01    **Existence, Qualification and Power** .......................28
    5.02    **Authorization; No Contravention.** ..........................28
    5.03    **Governmental Authorization; Other Consents.** ....29
    5.04    **Binding Effect.** .........................................................29
    5.05    **No Material Adverse Effect** .....................................29
    5.06    **[Reserved].** .................................................................29
    5.07    **[Reserved].** .................................................................29
    5.08    **Ownership of Property; Liens; Investments.** .........29
    5.09    **Investment Bank and Finder's Fees.** .......................30
    5.10    **[Reserved].** .................................................................30
    5.11    **Insurance.** ...................................................................31
    5.12    **[Reserved].** .................................................................31

5.13     **[Reserved]**..........................................................................................31
5.14     **Subsidiaries; Equity Interests**...............................................................31
5.15     **Margin Regulations; Investment Company Act**...................................31
5.16     **Disclosure**.................................................................................................31
5.17     **[Reserved]**.................................................................................................32
5.18     **Intellectual Property; Licenses, Etc**........................................................32
5.19     **Casualty, Etc**..............................................................................................32
5.20     **Collateral Documents**...............................................................................32
5.21     **[Reserved]**.................................................................................................32
5.22     **Orders**.........................................................................................................32
5.23     **Appointment of Trustee or Examiner; Liquidation**.............................33
5.24     **Perfection of Security Interest**................................................................33
5.25     **Secured Superpriority Claim; Liens**.......................................................33

ARTICLE VI. AFFIRMATIVE COVENANTS .......................................................33

6.01     **Reports**........................................................................................................33
6.02     **Certificates; Other Information**...............................................................34
6.03     **Notices**........................................................................................................36
6.04     **Payment of Obligations**............................................................................36
6.05     **Preservation of Existence, etc**..................................................................37
6.06     **Maintenance of Properties**.......................................................................37
6.07     **Maintenance of Insurance**........................................................................37
6.08     **[Reserved]**.................................................................................................37
6.09     **Books and Records**...................................................................................37
6.10     **Inspection Rights**......................................................................................37
6.11     **Use of Proceeds**........................................................................................38
6.12     **Covenant to Give Security**.......................................................................38
6.13     **[Reserved]**..................................................................................................39
6.14     **Further Assurances**...................................................................................39
6.15     **[Reserved]**.................................................................................................39
6.16     **Accounting Policies**..................................................................................39
6.17     **Advisors and Cooperation**.......................................................................39
6.18     **Chapter 11 Cases Milestones**...................................................................39

ARTICLE VII. NEGATIVE COVENANTS...............................................................40

7.01     **Liens**...........................................................................................................41
7.02     **Investments**................................................................................................42
7.03     **Indebtedness**..............................................................................................43
7.04     **Fundamental Changes; No Subsidiaries**.................................................43
7.05     **Dispositions**...............................................................................................43
7.06     **Burdensome Agreements**..........................................................................44
7.07     **Margin Regulations**..................................................................................44
7.08     **Capital Expenditures**...............................................................................44
7.09     **Amendments of Organization Documents**...............................................45
7.10     **Hazardous Materials**................................................................................45
7.11     [Reserved]......................................................................................................45
7.12     **Accounts**....................................................................................................45

| | | |
|---|---|---|
| 7.13 | **Limitation on Sales and Leasebacks.** | 45 |
| 7.14 | **Fiscal Year.** | 45 |
| 7.15 | **DIP Budget.** | 45 |
| 7.16 | **Amendments of Post-Petition Agreements.** | 47 |
| 7.17 | **Use of Proceeds.** | 47 |
| 7.18 | **Final Bankruptcy Court Order; Administrative Priority; Lien Priority; Payment of Claims.** | 47 |
| 7.19 | **Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws; OFAC.** | 48 |

ARTICLE VIII. EVENTS OF DEFAULT AND REMEDIES ...............................................49

| | | |
|---|---|---|
| 8.01 | **Events of Default.** | 50 |
| 8.02 | **Remedies Upon Event of Default.** | 54 |
| 8.03 | **Application of Funds.** | 54 |

ARTICLE IX. MISCELLANEOUS .......................................................................................55

| | | |
|---|---|---|
| 9.01 | **Amendments, Etc.** | 55 |
| 9.02 | **Notices; Effectiveness; Electronic Communication.** | 55 |
| 9.03 | **No Waiver; Cumulative Remedies; Enforcement.** | 56 |
| 9.04 | **Expenses; Damage Waiver.** | 57 |
| 9.05 | **Payments Set Aside.** | 57 |
| 9.06 | **Successors and Assigns.** | 58 |
| 9.07 | **[Reserved].** | 58 |
| 9.08 | **Right of Setoff.** | 58 |
| 9.09 | **Interest Rate Limitation.** | 58 |
| 9.10 | **Counterparts; Integration; Effectiveness.** | 59 |
| 9.11 | **Survival of Representations and Warranties.** | 59 |
| 9.12 | **Severability.** | 59 |
| 9.13 | **Governing Law; Jurisdiction; Etc.** | 59 |
| 9.14 | **Waiver of Jury Trial.** | 60 |
| 9.15 | **Electronic Execution of Assignments and Certain Other Documents.** | 61 |
| 9.16 | **[Reserved].** | 61 |
| 9.17 | **Entire Agreement.** | 61 |
| 9.18 | **Order.** | 61 |
| 9.19 | **Limitation on Liability.** | 62 |
| 9.20 | **Parties Including Trustees; Bankruptcy Court Proceedings.** | 62 |

CPAM: 9490930.20

**SCHEDULES**

| | |
|---|---|
| 1.01 – RO | Responsible Officers |
| 4.02(c) | Material Events |
| 5.07 | No Default |
| 5.08(b) | Liens |
| 5.08(d)(i) | Lessee Real Property Leases |
| 5.08(d)(ii) | Lessor Real Property Leases |
| 5.11 | Insurance |
| 5.14 | Equity Interests in the Borrower; Borrower and Holdings Information |
| 5.16 | Disclosure |
| 7.02 | Investments |
| 7.12 | Accounts |

**EXHIBITS**

| | |
|---|---|
| A | Form of Loan Notice |
| B | Form of Revolving Credit Note |
| C | Interim DIP Order |
| D | Initial Approved Budget |
| E | Form of Security Agreement |
| F | Settlement Agreement |

DEBTOR-IN-POSSESSION SECURED CREDIT AGREEMENT

This DEBTOR-IN-POSSESSION SECURED CREDIT AGREEMENT ("Agreement") is entered into as of June [__], 2016, among Maxus Energy Corp., a Delaware corporation, Tierra Solutions, Inc., a Delaware corporation, Maxus International Energy Company, a Delaware corporation, Maxus (U.S.) Exploration Company, a Delaware corporation, and Gateway Coal Company, a Delaware corporation (each, a "Borrower" and together, the "Borrowers"), and YPF Holdings, Inc., a Delaware corporation (the "Lender").

WHEREAS, on June 17, 2016 (the "Petition Date"), the Borrowers commenced voluntary cases (each, a "Chapter 11 Case" and together, the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and the Borrowers continue to operate their respective businesses and manage respective their properties as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrowers have requested that the Lender provide a debtor-in-possession secured DIP Facility (as defined below) in an aggregate principal amount not to exceed $63.1 million and the proceeds of which shall be used solely for the purposes permitted under Section 6.11;

WHEREAS, the Lender is willing to make certain Post-Petition (as defined below) loans at the request of the Borrowers in an aggregate amount at any time outstanding of up to (i) in the case of Tranche A Loans, the Tranche A Commitment and (ii) in the case of Tranche B Loans, the Tranche B Commitment, upon the terms and conditions set forth herein;

WHEREAS, the Borrowers acknowledge that they will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrowers as provided in this Agreement; and

WHEREAS, to provide security for the repayment of all obligations of any kind of the Borrowers hereunder and under the other DIP Loan Documents, (other than the Tranche B Obligations), the Borrowers will provide to the Lender the Liens, status and protections set forth in Sections 2.13 and 5.25, the Interim DIP Order and the Final DIP Order.

NOW, THEREFORE, In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I.
## DEFINITIONS AND ACCOUNTING TERMS

1.01    **Defined Terms**.

As used in this Agreement, the following terms shall have the meanings set forth below:

"Accounts" has the meaning specified in Section 7.12.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; provided, however, that the Lender shall not be deemed an "Affiliate" for purposes of this Agreement.

"Aggregate Threshold Amount" means $ 7 million.

"Agreement" has the meaning specified in the introductory paragraph hereto.

"Anti-Corruption Laws" shall mean The United States Foreign Corrupt Practices Act of 1977 (Pub. L. No. 95 213, §§101 104), as amended, the UK Bribery Act of 2010, the Corruption of Foreign Public Officials Act (Canada), as amended, and any related or similar laws, rules, regulations or guidelines, which in each case are issued, administered or enforced by any Governmental Authority having jurisdiction over any Borrower, or to which any Borrower is subject.

"Anti-Terrorism Laws" means any applicable laws, rules or regulations relating to terrorism or money laundering.

"Anti-Money Laundering Laws" shall mean all applicable financial recordkeeping and reporting requirements and the money laundering statutes and the rules and regulations thereunder and any related or similar rules, regulations or guidelines, which in each case are issued, administered or enforced by any Governmental Authority having jurisdiction over any Borrower, or to which any Borrower is subject.

"Applicable Fee Rate" means, at any time, 2.0% per annum.

"Attributable Indebtedness" means, on any date, (a) in respect of any capital lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a capital lease.

"Availability Period" means the period from and including the Closing Date to the Termination Date.

"Avoidance Actions" mean claims and causes of action under Chapter 5 of the Bankruptcy Code and other similar laws for preferences, fraudulent conveyances, and other avoidance power claims.

"Bankruptcy Code" has the meaning specified in the Recitals hereto.

2-

"<u>Bankruptcy Court</u>" has the meaning specified in the Recitals hereto.

"<u>Base Cash Amount</u>" means $2.5 million.

"<u>Borrower</u>" has the meaning specified in the introductory paragraph hereto.

"<u>Borrowers' Professional Fees</u>" has the meaning specified in <u>Section 7.15(e)</u>.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"<u>Capital Expenditures</u>" means, with respect to any Person for any period, any expenditure that is capitalized in accordance with GAAP in respect of the purchase or other acquisition of any fixed or capital asset.

"<u>Carve Out</u>" has the meaning specified in the Interim DIP Order and, upon entry thereof, the Final DIP Order.

"<u>Cash Equivalents</u>" means an investment, to the extent owned by a Borrower free and clear of all Liens (other than Liens created under the Collateral Documents or Permitted Liens), in any of the following:

(a)    direct obligations of the United States of America (including obligations issued or held in book-entry form on the books of the Department of the Treasury of the United States of America) or obligations the timely payment of the principal of and interest on which are fully guaranteed by the United States of America;

(b)    interest-bearing deposit accounts (which may be represented by certificates of deposit) in national, state or foreign commercial banks whose outstanding long-term debt is rated "<u>A</u>" or higher by S&P or "A2" or higher by Moody's; and

(c)    direct obligations of, obligations guaranteed by, and any other obligations the interest on which is excluded from income for federal income tax purposes issued by, any state of the United States, the District of Columbia or any political subdivision, agency, authority or instrumentality of any of the foregoing, which are rated at "<u>A</u>" or higher by S&P or "A2" or higher by Moody's.

"<u>Change of Control</u>" means the consummation of any transaction or series of transactions as a result of which the Lender ceases to own, directly or indirectly, in aggregate, 100% of the equity interests in the Borrowers.

"<u>Chapter 11 Cases</u>" has the meaning specified in the Recitals hereto.

3-

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with this Agreement.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means all property and interests in property of the Borrowers and all equity interests in the Borrowers, now owned or hereafter acquired, upon which a Lien is purported to be created by any Collateral Document, which, for the avoidance of doubt, shall exclude the Excluded Collateral.  The Collateral shall not include Avoidance Actions but shall, upon entry of a Final DIP Order, include the proceeds of Avoidance Actions, which shall be available to pay any administrative claim held by the Lender in respect of the DIP Facility.

"Collateral Documents" means the Security Agreement and any other agreement, document, or instrument pursuant to which a Lien is granted securing any Obligations or under which rights or remedies with respect to such Liens are governed.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any legally binding agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is legally bound (other than the DIP Loan Documents).

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate equal to (i) the Fixed Rate plus (ii) 2% per annum.

"DIP Budget" means the budget for the Borrowers comprised, collectively but without duplication, of all line items that are set forth in the Initial Approved Budget and any Supplemental Approved Budget.

"DIP Facility" means, at any time, the aggregate amount of the Revolving Credit Commitment at such time.

4-

"DIP Loan Documents" means this Agreement, each Revolving Credit Note, the Collateral Documents, the Orders, the DIP Budget, and each other document from time to time designated as a DIP Loan Document in writing by the Borrowers.

"Disposition", "Dispose", or "Disposed" means the sale, transfer, lease or other disposition by the Borrower (including any sale and leaseback transaction) of any property of the Borrower, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith, but excluding (the incurrence, creation or suffering to exist of any Lien.

"Dollar" and "$" mean lawful money of the United States.

"Environmental Claim" means any written notice or written claim, administrative, regulatory or judicial action, suit, judgment, demand or other written communication alleging or asserting liability for investigatory costs, clean-up costs, governmental response costs, damages to natural resources or other property, personal injuries, fines or penalties or seeking injunctive relief, in each case arising out of, based on or resulting from: (a) the presence, Use or Release of any Hazardous Material; or (b) any violation, or alleged violation, of any Environmental Law. The term "Environmental Claim" shall include any claim by any Governmental Authority for enforcement, clean-up, removal, response, remedial or other actions or penalties or damages pursuant to any applicable Environmental Law, and any claim by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from the presence of Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment.

"Environmental Laws" means all applicable Laws of any Governmental Authority having jurisdiction over any Borrower regulating or imposing liability or standards of conduct concerning pollution or the protection of the environment or the Release of any materials into the environment as such relates to Hazardous Materials, including without limitation air emissions and discharges to public waste systems.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required of any Borrower under any Environmental Law.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member

5-

or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"Event of Default" has the meaning specified in Section 8.01.

"Excess Cash Amount" means an amount equal to the (x) aggregate balance of unrestricted cash of the Debtors available as of the date of any Loan Notice less (y) Base Cash Amount.

"Excluded Collateral" means any Owned Real Property.

"Executive Order" means Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001.

"Existing Liens" has the meaning specified in Section 2.13(a)(iii).

"Final DIP Order" means, collectively, the final order or orders entered by the Bankruptcy Court with respect to the Borrowers in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2), authorizing and approving the DIP Facility and the terms of this Agreement and the other DIP Loan Documents (including the payment of interest, fees, costs and expenses hereunder and thereunder) and granting the Liens, status and protections set forth in Sections 2.13 and 5.24 hereof and provided for in the Collateral Documents, which order or judgment is in effect and not stayed and as to which the time to appeal, petition for certiorari, or move for re-argument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for re-argument or rehearing shall then be pending, or, if pending, no stay pending appeal shall have been granted, as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof; provided, however, that such order and all extensions, modifications and amendments thereto shall be in form and substance satisfactory to the Lender.

"Final DIP Order Entry Date" means the date on which the Final DIP Order (which, for the purpose of this definition, shall be determined without regard to whether or not the time to appeal, petition for certiorari, or move for re-argument or rehearing has expired) shall have been entered on the docket of the Bankruptcy Court.

"Fixed Rate" means 7% per annum.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"GAAP" means generally accepted accounting principles in the United States (except to the extent set forth in Section 1.03(b)), consistently applied.

6-

"<u>Governmental Action</u>" means all permits, authorizations, registrations, consents, approvals, waivers, exceptions, variances, orders, judgments, decrees, licenses, exemptions, of or with, or required by, any Governmental Authority or required by any Law (including all environmental and operating permits and licenses) and filings by any Governmental Authority, that, in each case, are legally binding and required for the operation of the business of the Borrowers.

"<u>Governmental Authority</u>" means, with respect to any Person, the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, to the extent such entity or body has jurisdiction over such Person.

"<u>Guarantee</u>" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness of the payment or performance of such Indebtedness (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness of any other Person, whether or not such Indebtedness is assumed by such Person. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"<u>Hazardous Materials</u>" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other contaminants or pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes regulated pursuant to any Environmental Law.

"<u>Indebtedness</u>" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

7-

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)    all obligations of such Person to pay the deferred purchase price of property or services (other than accounts payable in the ordinary course of business that are not past due for more than 30 days after the date on which such account payable was due or being contested in good faith by appropriate proceedings diligently pursued);

(d)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(e)    capital leases;

(f)    all obligations of such Person to purchase, redeem, retire, defease or otherwise make any dividend payment (other than a Restricted Payment permitted pursuant to the terms of the DIP Loan Documents) in respect of any Equity Interest in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(g)    all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company and other than any partnership in which such Person is a limited partner but not also a general partner) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of any capital lease or Synthetic Lease Obligation as of any date shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date.

"Individual Threshold Amount" means $1.5 million.

"Initial Approved Budget" has the meaning given to it in Section 4.01(f), substantially in the form attached hereto as Exhibit D.

"Interim DIP Order" means, collectively, the interim order or orders entered by the Bankruptcy Court with respect to the Borrowers in the Chapter 11 Cases on or prior to June [__], 2016, together with all extensions, modifications and amendments thereto, which, among other

8-

matters but not by way of limitation, authorizes, on an interim basis, the Borrowers to execute and perform under the terms of this Agreement and the other DIP Loan Documents, as applicable, and incur and secure the Loans and other Obligations in connection therewith, which order and all extensions, modifications and amendments thereto shall be in form and substance satisfactory to the Lender and which shall be deemed satisfactory to the Lender if such order is substantially in the form of Exhibit C.

"Interim DIP Order Amount" means, upon entry of the Interim DIP Order, $11 million.

"Investment" means, as to any Person, any (a) purchase or other acquisition of capital stock or other securities of another Person, (b) loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor Guarantees Indebtedness of such other Person, or (c) purchase or other acquisition (in one transaction or a series of related transactions) of assets of another Person that constitute a business unit.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IRS" means the United States Internal Revenue Service.

"Laws" means, with respect to any Person, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents, common law or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, mandatory requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case that are legally binding on such Person.

"Lender" has the meaning specified in the introductory paragraph hereto.

"Lessee Real Property Leases" has the meaning specified in Section 5.08(d)(i).

"Lessor Real Property Leases" has the meaning specified in Section 5.08(d)(ii).

"Lien" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement to create security, encumbrance, lien (statutory or other), charge, or preference or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

CPAM: 9490930.20

"Loan" means an extension of credit by the Lender to the Borrower under Article II in the form of a Revolving Loan.

"Loan Notice" means a notice of a Revolving Credit Borrowing, substantially in the form of Exhibit A.

"Material Adverse Effect" means a material adverse change in, or a material adverse effect upon (a) the business, operations, or financial condition of the Borrowers, (b) (i) the rights, remedies or benefits available to the Lender under any DIP Loan Document, or (ii) the ability of the Borrowers, taken as a whole, to fully and timely perform their obligations under any DIP Loan Document in accordance with the terms of such DIP Loan Document or (c) the validity, binding effect, enforceability or priority of the Liens granted to the Lender pursuant to the Collateral Documents; provided that the commencement of the Chapter 11 Cases shall not, in itself, constitute a Material Adverse Effect under clause (a) or (b)(ii) of this definition.

"Maturity Date" means June 30, 2017.

"Milestones" has the meaning set forth in Section 6.18.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Monthly Budget Amount" means, with respect to any Revolving Credit Borrowing, the aggregate weekly net cash requirements for the calendar month in which such Revolving Credit Borrowing will be made as set forth in the DIP Budget.

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, the Borrower arising under any DIP Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement of the Chapter 11 Cases, regardless of whether such interest and fees are allowed claims in such proceeding.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"Orders" means, together, the Interim DIP Order and the Final DIP Order.

10-

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Outstanding Amount" means the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans occurring on such date.

"Owned Real Property" means all real property owned in fee by any Borrower from time to time.

"Passaic River Litigation" means the civil action pending before the Superior Court of New Jersey Law Division-Essex County, bearing the caption *New Jersey Department of Environmental Protection, et al. v. Occidental Chemical Corp., et al.*, Docket No. ESX-L09868-05 (PASR).

"PBGC" means the Pension Benefit Guaranty Corporation.

"Permitted Budget Variance" has the meaning specified in Section 7.15(e).

"Permitted Liens" has the meaning specified in Section 7.01.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the Recitals hereto.

"Plan" means a Chapter 11 plan of reorganization or liquidation, together with all addenda, exhibits, schedules, or other attachments, if any, and as may be amended, modified, or supplement from time to time, for the Borrowers that (i) contains, incorporates, and implements the terms of the Settlement Agreement, and (ii) provides for the payment of all of the Obligations in full in cash on a date no later than the effective date of the Plan that has been confirmed by an order of the Bankruptcy Court, in form and substance satisfactory to the YPF Entities.

"Post-Petition" means the time period beginning immediately upon the filing of any Chapter 11 Case.

11-

"Post-Petition Indebtedness" means the obligations of the Borrowers arising on or after the Petition Date relating to the Borrowers' bankruptcy estate, including related to the Post-Petition operation of the Borrowers' business (including the Obligations).

"Pre-Petition" means the time period prior to filing of any Chapter 11 Case.

"Proceeding" means any complaint, lawsuit, action, suit, or other proceeding at law or in equity, in each case in arbitration or by or before a Governmental Authority.

"Prudent Operating Practices" means, with respect to a particular time, those practices, methods and acts that are generally accepted for use in the industry of the Borrowers.

"Quarterly Payment Date" means the last Business Day of each March, June, September and December and the Termination Date.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Release" means, with respect to any Hazardous Material, any release, spill, emission, emanation, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration of such Hazardous Material into the indoor or outdoor environment, including the movement of such Hazardous Material through ambient air, soil, surface water, groundwater, wetlands, land or subsurface strata.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer, assistant treasurer or controller of a Borrower or any other authorized signatory or authorized Person of a Borrower either identified on Schedule 1.01 – RO or otherwise acceptable to the Lender.  Any document delivered hereunder that is signed by a Responsible Officer of a Borrower shall be conclusively presumed to have been authorized by all necessary corporate action on the part of such Borrower and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Borrower.

"Revolving Credit Borrowing" means a Tranche A Borrowing and/or a Tranche B Borrowing, as applicable.

"Revolving Credit Commitment" means the Tranche A Commitment and/or the Tranche B Commitment, as applicable.

12-

"Revolving Credit Note" means a promissory note made by the Borrowers in favor of the Lender evidencing Revolving Loans made by the Lender, substantially in the form of Exhibit B.

"Revolving Loan" means Tranche A Loans and/or Tranche B Loans, as applicable.

"S&P" means Standard & Poor's Financial Services LLC, a subsidiary of McGraw-Hill Financial, Inc., and any successor thereto.

"SDN List" means OFAC's list of Specially Designated Nationals and Blocked Persons.

"Security Agreement" means the Security Agreement, dated as of the Closing Date, executed and delivered by the Borrowers in favor of the Lender, substantially in the form of Exhibit E.

"Security Documents" means the Security Agreement and all other instruments and agreements now or at any time hereafter securing the whole or any part of the Obligations.

"Settlement Agreement" means the Settlement and Release entered into as of June 17, 2016, by and among (i) Maxus Energy Corp., Tierra Solutions, Inc., Maxus International Energy Co., and Maxus (U.S.) Exploration Company and Gateway Coal Company, as debtors and debtors-in-possession and (ii) YPF S.A., YPF International S.A., YPF Holdings, Inc., CLH Holdings, Inc., and YPF U.S.A. Services Corp., attached hereto as Exhibit F.

"Settlement Motion" means a motion filed by the Borrowers with the Bankruptcy Court seeking approval of the Settlement Agreement under Federal Rule of Bankruptcy Procedure 9019 in form and substance satisfactory to the Lender.

"Settlement Order" means an order of the Bankruptcy Court under Federal Rule of Bankruptcy Procedure 9019 granting the Settlement Motion and approving the Settlement Agreement in form and substance satisfactory to the Lender.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person

"Superpriority Claim" means a claim against the Borrower in the Chapter 11 Case which is an administrative expense claim having priority over any or all administrative expenses of a Chapter 11 and Chapter 7 trustee, subject and subordinate to the Carve Out, of the kind specified in Sections 364(c)(1), 503(b), 507(a)(2) and 507(d) of the Bankruptcy Code.

13-

"Supplemental Approved Budget" means, in respect of the Initial Approved Budget, supplemental or replacement budgets delivered to and approved by the Lender in accordance with Section 6.01 (covering any time period covered by a prior budget or covering additional time periods).

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earliest to occur of (i) the Maturity Date, (ii) the date on which the maturity of the Loans is accelerated and the Revolving Credit Commitments are terminated in accordance with Section 8.02, and (iii) the effective date of the Plan that has been confirmed by an order of the Bankruptcy Court.

"Total Revolving Outstandings" means the aggregate Outstanding Amount of all Revolving Loans.  The Total Revolving Outstandings shall not include the aggregate principal amount of the Loans constituting capitalized principal pursuant to Section 2.07(c).

"Tranche A Borrowing" means a borrowing consisting of one or more Tranche A Loans made by the Lender pursuant to Section 2.01(a).

"Tranche A Commitment" means the Lender's obligation to make Tranche A Loans to the Borrowers pursuant to Section 2.01(a) in the aggregate principal amount at any one time outstanding not to exceed $31.9 million.

"Tranche A Loan" has the meaning set forth in Section 2.01(a).

"Tranche A Outstandings" means the total amount of all outstanding Tranche A Loans.

"Tranche B Borrowing" means a borrowing consisting of one or more Tranche B Loans made by the Lender pursuant to Section 2.01(b).

"Tranche B Commitment" means the Lender's obligation to make Tranche B Loans to the Borrowers pursuant to Section 2.01(b) in the aggregate principal amount at any one time outstanding not to exceed $31.2 million.

"Tranche B Loan" has the meaning set forth in Section 2.01(b).

14-

"Tranche B Outstandings" means the total amount of all outstanding Tranche B Loans.

"Transaction" means, collectively, (a) the entering into by the Borrowers of, or the continued performance by the Borrowers under, the DIP Loan Documents to which they are or are intended to be a party and (b) the payment of the fees and expenses incurred in connection with the consummation of the foregoing.

"UCC" means the Uniform Commercial Code as in effect in the State of New York, as amended or modified.

"United States" and "U.S." mean the United States of America.

"Use" means, with respect to any Hazardous Material and with respect to any Person, the generation, manufacture, processing, distribution, handling, use, treatment, recycling, storage or other management of such Hazardous Material, including transportation to or from the property of such Person of such Hazardous Material.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Trustee" has the meaning given to such term in Section 8.02.

"YPF Entities" means, collectively, YPF S.A., YPF International S.A., YPF Holdings, Inc., CLH Holdings, Inc., and YPF U.S.A. Services Corp..

1.02    **Other Interpretive Provisions**.

With reference to this Agreement and each other DIP Loan Document, unless otherwise specified herein or in such other DIP Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.   The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other DIP Loan Document) and including any agreement, instrument or other document (including any Organization Document) in substitution or replacement of any of the foregoing (subject to any restrictions on such substitutions or replacements as set forth herein or in any other DIP Loan Document), (ii) any reference herein to

15-

any Person shall be construed to include such Person's successors and assigns, (iii) the words "hereto," "herein," "hereof" and "hereunder," and words of similar import when used in any DIP Loan Document, shall be construed to refer to such DIP Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a DIP Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the DIP Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)     Section headings herein and in the other DIP Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other DIP Loan Document.

1.03    **Accounting Terms**.

(a)     Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including any financial ratios or other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis subject to clause (b) below, as in effect from time to time, applied in a manner consistent with that used in preparing any financial statements, except as otherwise specifically prescribed herein.  Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Borrower shall be deemed to be carried at 100% of the outstanding principal amount thereof.

(b)     Changes in GAAP.  If at any time any change in GAAP would affect the computation of any ratio, requirement or amount set forth in any DIP Loan Document, and either a Borrower or the Lender shall so request, the Lender and the Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Lender); provided that, until so amended, (A) such ratio, requirement or amount shall continue to be computed in accordance with GAAP prior to such change therein and (B) the Borrowers shall provide to the Lender documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between

16-

calculations of such ratio, requirement or amount made before and after giving effect to such change in GAAP.

1.04  **Rounding**.

Any financial ratios required to be maintained by the Borrowers pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

1.05  **Times of Day**.

Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

## ARTICLE II.
## THE REVOLVING CREDIT COMMITMENTS AND REVOLVING CREDIT BORROWINGS

2.01  **Loans**.

(a)  The Tranche A Borrowings.  Subject to the Orders and the terms and conditions set forth herein, the Lender agrees to make loans (each such loan, a "Tranche A Loan") to the Borrowers from time to time, on any Business Day during the Availability Period, in an aggregate amount not to exceed at any time outstanding the amount of the Tranche A Commitment; provided, however, that (i) the Borrower shall not be entitled to request the making of Tranche A Loans hereunder in an aggregate amount that exceeds the aggregate amounts of the applicable line item expenditures set forth in the DIP Budget, except to the extent in accordance with the Permitted Budget Variance, and (ii) after giving effect to any Tranche A Borrowing, the Tranche A Outstandings shall not exceed the Tranche A Commitment.  Within the limits of the Tranche A Commitment, and subject to the other terms and conditions hereof, the Borrower may borrow and reborrow under this Section 2.01(a), prepay under Section 2.04.

(b)  The Tranche B Borrowings.  Subject to the Orders and the terms and conditions set forth herein, the Lender agrees to make loans (each such loan, a "Tranche B Loan") to the Borrowers from time to time, on any Business Day following the Final DIP Order Entry Date during the Availability Period, in an aggregate amount not to exceed at any time outstanding the amount of the Tranche B Commitment; provided, however, that (i) the Borrower shall not be entitled to request the making of Tranche B Loans hereunder in an aggregate amount that exceeds the aggregate amounts of the applicable line item expenditures set forth in the DIP Budget, except to the extent in accordance with the Permitted Budget Variance, and (ii) after giving effect to any Tranche B Borrowing, the Tranche B Outstandings shall not exceed the

17-

Tranche B Commitment.  Within the limits of the Tranche B Commitment, and subject to the other terms and conditions hereof, the Borrower may borrow and reborrow under this Section 2.01(b), prepay under Section 2.04.

(c)    Interim DIP Order Amount.  Notwithstanding anything to the contrary set forth herein, prior to the Final DIP Order Entry Date, the aggregate principal amount of the Tranche A Loans at any time outstanding, shall not exceed the Interim DIP Order Amount.

2.02    **Revolving Credit Borrowings**.

(a)    Each Revolving Credit Borrowing shall be made upon the Borrowers' irrevocable notice to the Lender, which may be given by telephone.  Each such notice of any Revolving Credit Borrowing must be received by the Lender not later than 1:00 p.m. ten Business Days prior to the requested date of such Revolving Credit Borrowing.  Each telephonic notice by the Borrowers pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Lender of a written Loan Notice, appropriately completed and signed by a Responsible Officer of each of the Borrowers.  Each Revolving Credit Borrowing shall be in a principal amount of $500,000 or a whole multiple of $10,000 in excess thereof (or the full amount of the undrawn Tranche A Commitments or Tranche B Commitments, as applicable).  Each Loan Notice (whether telephonic or written) shall specify (i) whether such Loan will be a Tranche A Loan or a Tranche B Loan, (ii) the requested date of the Revolving Credit Borrowing (which shall be a Business Day) and (iii) the principal amount of Loans to be borrowed. The Borrower shall only be entitled to submit one Loan Notice per calendar month.

(b)    Notwithstanding anything to the contrary herein, with respect to any individual Loan Notice, the Borrowers shall not be permitted to request, and the Lender will not be required to fund, an amount of Loans in excess of the (x) Monthly Budget Amount less (y) Excess Cash Amount.

2.03    **[Reserved]**.

2.04    **Prepayments**.

(a)    Optional Prepayments.

(i)    The Borrowers may, upon notice to the Lender, at any time or from time to time voluntarily prepay Tranche A Loans in whole or in part without premium or penalty; provided that:

(A)    each notice of prepayment must be received by the Lender not later than 1:00 p.m. (A) one Business Day prior to any date of prepayment and shall specify the date and amount of such prepayment; and

18-

(B)      each prepayment of Tranche A Loans shall be in a principal amount of $1 million or a whole multiple of $100,000 in excess thereof or, in each case, the entire principal amount thereof then outstanding.

If such notice is given by the Borrowers and not withdrawn by the Borrowers, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.

(b)      <u>Mandatory Prepayments</u>. If for any reason the aggregate Tranche A Outstandings at any time exceed the Tranche A Commitment then in effect, the Borrowers shall immediately prepay Tranche A Loans in an aggregate amount sufficient to eliminate such excess; provided, however, that for purposes of this calculation, any interest, fees or expenses that have accrued and been capitalized pursuant to this Agreement shall be excluded from the aggregate Tranche A Outstandings. If for any reason the aggregate Tranche B Outstandings at any time exceed the Tranche B Commitment then in effect, the Borrowers shall immediately prepay Tranche B Loans in an aggregate amount sufficient to eliminate such excess; provided, however, that for purposes of this calculation, any interest, fees or expenses that have accrued and been capitalized pursuant to this Agreement shall be excluded from the aggregate Tranche B Outstandings.

(c)      Each prepayment of the Loans pursuant to this <u>Section 2.04</u> shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid.

(d)      Amounts prepaid may be reborrowed in accordance with this Agreement.

2.05   **Termination or Reduction of Revolving Credit Commitments**.

The Borrowers may, upon notice to the Lender, terminate the Revolving Credit Commitment, or from time to time permanently reduce the Revolving Credit Commitment, in whole or in part; <u>provided</u> that (i) any such notice shall be received by the Lender not later than 1:00 p.m. five (5) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $5 million or any whole multiple of $100,000 in excess thereof, and (iii) the Borrowers shall not terminate or reduce (x) the Tranche A Commitment if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Tranche A Outstandings would exceed the Tranche A Commitment and (y) the Tranche B Commitment if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Tranche B Outstandings would exceed the Tranche B Commitment.

2.06   **Repayment of Loans**.

The Borrowers shall repay to the Lender on the Termination Date the aggregate principal amount of Loans outstanding on such date; <u>provided</u> that, notwithstanding the fact that the Tranche B Loans shall be due and payable on the Termination Date, the Lenders shall not receive payment of the principal amount of the Tranche B Loans until such time as all claims

19-

allowed under the Bankruptcy Code (other than the claims of the Lender or any of its affiliates) have been fully satisfied, extinguished, or discharged.

2.07    **Interest**.

(a)    Subject to the provisions of underline subsection (b) below, each Loan shall bear interest on the outstanding principal amount thereof per annum equal to the Fixed Rate.

(b)    (i)    While any Event of Default under Section 8.01(a) exists, the Borrowers shall pay interest on the principal amount of all outstanding Obligations hereunder at a rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each Loan shall be due and payable in arrears on each Quarterly Payment Date applicable thereto and at such other times as may be specified herein.  On each Quarterly Payment Date (other than the Termination Date), the full amount of accrued and unpaid interest shall automatically be capitalized by increasing the then outstanding principal amount of the Tranche A Loans (in respect of interest accrued on the principal amount of the Tranche A Loans) and Tranche B Loans (in respect of interest accrued on the principal amount of the Tranche B Loans) by an amount equal to such accrued and unpaid interest.

2.08    **Fees**.

The Borrowers shall pay to the Lender a commitment fee equal to the Applicable Fee Rate times the actual daily amount by which the DIP Facility exceeds the Total Revolving Outstandings.  The commitment fee shall accrue at all times during the Availability Period, including at any time during which one or more of the conditions in Article IV is not met, and on each Quarterly Payment Date the accrued amount shall automatically be capitalized by increasing the then outstanding principal amount of the Loans by an amount equal to such accrued and unpaid commitment fee, commencing with the first Quarterly Payment Date to occur after the Closing Date.

2.09    **Computation of Interest and Fees**.

All computations of interest for Loans shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed.  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.11(a), bear interest for one day.  Each determination by the Lender of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

20-

2.10    **Evidence of Debt**.

The Loans made by the Lender shall be evidenced by one or more accounts or records maintained by the Lender in the ordinary course of business.  The accounts or records maintained by the Lender shall be conclusive absent manifest error of the amount of the Loans made by the Lender to the Borrowers and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations.  Upon the request of the Lender, the Borrowers shall execute and deliver to the Lender a Revolving Credit Note, which shall evidence the Lender's Loans in addition to such accounts or records.  The Lender may attach schedules to its Revolving Credit Note and record thereon the date, amount and maturity of its Loans and payments with respect thereto.

2.11    **Payments Generally; Lender's Clawback**.

(a)    <u>General</u>.  All payments to be made by the Borrowers shall be made free and clear of and without condition or deduction for any counterclaim, defense, recoupment, setoff or right of rescission.  Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be directly made to the Lender in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.  All payments received by the Lender after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    <u>Insufficient Funds</u>.  If at any time insufficient funds are received by and available to the Lender to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) <u>first</u>, toward payment of interest and fees then due hereunder, and (ii) <u>second</u>, toward payment of principal then due hereunder.

2.12    **No Discharge; Survival of Claims**.

Until the Obligations (other than the Tranche B Obligations) are paid in cash in full and the Revolving Credit Commitment has been terminated, the Borrowers agree that (i) their Obligations hereunder shall not be discharged by the entry of an order confirming a Chapter 11 plan (and the Borrowers, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge) and (ii) the Superpriority Claim and Liens granted to or for the benefit of the Lender pursuant to the Orders and the other DIP Loan Documents shall not be affected in any manner by the entry of an order confirming any Chapter 11 plan that does not provide for the Obligations to be paid in cash in full.

2.13    **Reorganizational Matters**.

21-

(a)   <u>Superpriority Claim and Liens</u>.  The Borrowers hereby covenant, represent and warrant that, upon entry of the Orders, the Obligations of the Borrowers under the DIP Loan Documents authorized by the Orders, and to the extent permitted by applicable law:

(i)   pursuant to Sections 364(c)(1) and 507(b) of the Bankruptcy Code, constitute an allowed administrative expense claim in the Chapter 11 Cases having superpriority over all administrative expenses of the kind specified in Sections 105, 326, 328, 330, 364(c)(1), 365, 503(a), 503(b), 506(c), 507(a)(2), 507(b), 546(c), 546(d), 726, or 1114 of the Bankruptcy Code or any other provision thereof;

(ii)   pursuant to Sections 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and the Collateral Documents, other than the Tranche B Obligations, shall be secured by, and the Borrowers shall have granted to the Lender a perfected first priority Lien on all presently owned and hereafter acquired unencumbered tangible and intangible property and assets of the Borrowers and their estates wherever located, and any proceeds and products thereof, including, without limitation, accounts, deposit accounts, cash, chattel paper, investment property, letter-of-credit rights, securities accounts, commercial tort claims, causes of action (other than Avoidance Actions, subject to the last sentence in the definition of "Collateral"), investments, instruments, documents, inventory, contract rights, general intangibles, intellectual property, fixtures, goods, equipment, vessels and other fixed assets and proceeds and products of all of the foregoing (including earnings and insurance proceeds); and

(iii)   pursuant to Section 364(c)(3) of the Bankruptcy Code and the Collateral Documents, other than the Tranche B Obligations, shall be secured by, and the Borrowers shall have granted to the Lender a perfected junior priority Lien on all presently owned and hereafter acquired tangible and intangible property and assets of the Borrowers and their estates wherever located, and any proceeds and products thereof, including, without limitation, accounts, deposit accounts, cash, chattel paper, investment property, letter-of-credit rights, securities accounts, commercial tort claims, causes of action (other than Avoidance Actions, subject to the last sentence in the definition of "Collateral"), investments, instruments, documents, inventory, contract rights, general intangibles, intellectual property, fixtures, goods, equipment, vessels and other fixed assets and proceeds and products of all of the foregoing (including earnings and insurance proceeds) that are subject to (x) valid and perfected Liens in existence on the Petition Date or (y) valid Liens in existence on the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, if any, each solely to the extent that such Liens were in each case valid, enforceable, perfected and non-avoidable as of the Petition Date (the "<u>Existing Liens</u>").

Each of <u>Sections 2.13(a)(i)</u>, <u>2.13(a)(ii)</u> and <u>2.13(a)(iii)</u> shall be subject and subordinate only to the Carve Out.

22-

(b)    <u>Collateral Security Perfection</u>.    Notwithstanding anything to the contrary contained herein or elsewhere:

(i)    the parties hereto agree, and the Orders shall provide, that the Lender shall not be required to prepare, file, register or publish any financing statements, mortgages, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on the Collateral granted by or pursuant to this Agreement, the Orders or any other DIP Loan Document. If the Lender (in its sole discretion), from time to time elects to prepare, file, register or publish any such financing statements, mortgages, account control agreements, notices of Lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Liens on the Collateral, then (A) the Borrowers shall reasonably cooperate with the Lender in all such actions, (B) all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that the Interim DIP Order is entered, and (C) any such actions by the Lender shall not negate or impair the validity or effectiveness of this Section 2.13(b) or of the perfection of any other Liens in favor and for the benefit of the Lender on the Collateral; and

(ii)    except as otherwise agreed to by the Lender, the Liens, Lien priorities, Superpriority Claims and other rights and remedies granted to the Lender pursuant to this Agreement, the Orders or the other DIP Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the Superpriority Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by any Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of the Chapter 11 Cases, or by any other act or omission whatsoever.

(c)    <u>Collateral Security Priority</u>. Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)    subject only to the Carve Out and to the extent provided in any of the Orders and subject to the Orders, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the Lender against the Borrowers in respect of any Obligations (other than the Tranche B Obligations);

23-

(ii) other than as provided in the Orders or the DIP Loan Documents, the Liens on the Collateral shall constitute valid, enforceable and perfected Liens, and, except with respect to the Carve Out and Existing Liens, shall be prior to all other Liens now existing or hereafter arising, in favor of any other creditor or other Person; and

(iii) the parties hereto agree, and the Orders shall provide, that the Liens on the Collateral shall continue to be valid, enforceable and perfected without the need for the Lender to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect the Liens under applicable non-bankruptcy law.

(d) <u>Disposition of Collateral</u>. In connection with any sale or Disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of a Chapter 11 plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by the Lender, in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, each Borrower hereby gives the Lender the power and right, without assent by such Borrower, to "credit bid" the full amount of all Obligations (other than the Tranche B Obligations) and any Existing Liabilities then outstanding, in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

## ARTICLE III.
## [RESERVED]

## ARTICLE IV.
## CONDITIONS PRECEDENT TO LOANS

4.01 **Conditions of Initial Loan**.

The obligation of the Lender to make its initial Loan hereunder is subject to satisfaction of the following conditions precedent:

(a) The Lender's receipt of the following, each of which shall be originals or, other than in the case of the Revolving Credit Note, electronic copies (including in .pdf format) (followed promptly, if requested by the Lender, by originals) unless otherwise specified, each (where applicable) properly executed by a Responsible Officer of the Borrowers, each (unless otherwise specified) dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Lender:

24-

(i)     executed counterparts of this Agreement;

(ii)     an original Revolving Credit Note executed by the Borrowers in favor of the Lender;

(iii)     executed counterparts of the Security Agreement;

(iv)     proper financing statements in form appropriate for filing under the Uniform Commercial Code of all jurisdictions that the Lender may deem necessary or desirable in order to perfect the Liens created under the Collateral Documents;

(v)     completed UCC, judgment and tax Lien searches listing all effective financing statements filed in the jurisdictions referred to in clause (iv) above that name the applicable Borrower as debtor, together with copies of such financing statements, confirming that no Liens (other than Permitted Liens) exist on the assets or properties of the applicable Borrower, in each case that will not be discharged on the Closing Date and that are otherwise reasonably acceptable to the Lender;

(vi)     executed counterparts of the Settlement Agreement;

(vii)     not less than one Business Day prior to the Closing Date, an appropriately completed Loan Notice requesting a Revolving Credit Borrowing to be made on the Closing Date;

(viii)     [reserved];

(ix)     such documents and certifications from a Responsible Officer of the Borrowers as the Lender may reasonably require to evidence that each Borrower is duly organized, validly existing and in good standing and qualified to engage in business in the State of Delaware including (A) a copy of the certificate of incorporation of each of the Borrowers, together with any and all amendments thereto and (B) a copy of the bylaws of each of the Borrowers, together with any and all amendments thereto, in each case certified by a Responsible Officer of such Person as being true, correct and complete as of the Closing Date; and

(x)     a certificate signed by a Responsible Officer of (A) the Borrowers certifying that the representations and warranties contained in Article V or any other DIP Loan Document, are true and correct in all material respects on and as of the Closing Date (except to the extent that (1) any such representation and warranty specifically refers to an earlier date, in which case such representation and warranty is true and correct as of such earlier date or (2) with respect to any DIP Loan Document other than this Agreement, any such representation and warranty is impacted by the commencement of the Chapter 11 Cases), and (B) the Borrowers certifying that, subject to the entry by

25-

the Bankruptcy Court of the applicable Orders, no Default exists, or would result from any Revolving Credit Borrowing or from the application of the proceeds thereof;

(b)     On or prior to the Closing Date, the Borrowers shall have commenced the Chapter 11 Cases in the Bankruptcy Court.

(c)     On or prior to the Closing Date, the Bankruptcy Court shall have entered the Interim DIP Order, which Interim DIP Order shall be in full force and effect and shall not have been amended, modified, stayed or reversed; provided that (x) if such Interim DIP Order is the subject of a pending appeal in any respect, none of such Interim DIP Order, the initial extensions of credit, or the performance by the Borrowers of any of the Obligations shall be the subject of a presently effective stay pending appeal, (y) the Borrowers and the Lender shall be entitled to rely in good faith upon such Interim DIP Order, notwithstanding objection thereto or appeal therefrom by any interested party and (z) the Borrowers and the Lender shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant order has been stayed by a court of competent jurisdiction.

(d)     On or prior to the Closing Date, the Collateral Documents and the Interim DIP Order, upon entry thereof, shall be effective to create in favor and for the benefit of the Lender a legal, valid and enforceable first priority (except for Existing Liens entitled to priority under applicable laws) perfected security interest in and lien on the Collateral, subject to the Carve Out.

(e)     On the Closing Date, all of the "first day orders" entered by the Bankruptcy Court in the Chapter 11 Cases and critical vendor payments approved by the Bankruptcy Court in the Interim DIP Order or otherwise shall be reasonably satisfactory in form and substance to the Lender.

(f)     On the Closing Date, the Lender shall have received and be satisfied with an initial cash flow budget, for the period through the Maturity Date (the "Initial Approved Budget").

(g)     The Lender shall have received all documents and instruments (in form and substance satisfactory to the Lender) that the Lender has then reasonably requested, in addition to those described in this Section 4.01.

Without limiting the generality of the provisions of Section 9.03, for purposes of determining compliance with the conditions specified in this Section 4.01, the Lender shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Lender unless the Borrowers shall have received written notice from the Lender prior to the proposed Closing Date specifying its objection thereto.

26-

4.02    **Conditions to All Loans**.

The obligation of the Lender to honor any Loan Notice is subject to the following conditions precedent:

(a)    The representations and warranties of the Borrowers contained in Article V or any other DIP Loan Document shall be true and correct in all material respects on and as of the date of such Revolving Credit Borrowing (except to the extent that (1) any such representation and warranty specifically refers to an earlier date, in which case such representation and warranty is true and correct as of such earlier date or (2) with respect to any DIP Loan Document other than this Agreement, any such representation and warranty is impacted by the commencement of the Chapter 11 Cases).

(b)    Subject to the entry by the Bankruptcy Court of the applicable Orders, no Default shall exist, or would result from such proposed Revolving Credit Borrowing or from the application of the proceeds thereof.

(c)    There shall have been no event or occurrence since December 31, 2015 that has had and continues to have or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect (other than the events set forth in Schedule 4.02(c)).

(d)    The Lender shall have received a Loan Notice in accordance with the requirements hereof.

(e)    At the time of each such proposed Revolving Credit Borrowing and also after giving effect thereto, (x) if an extension of credit has been requested before the Final DIP Order has been entered by the Bankruptcy Court, (i) the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, stayed, or modified or amended in any respect; and (ii) the aggregate outstanding amount of Tranche A Loans and Tranche B Loans, as applicable does not exceed (and will not exceed, after giving effect to the Revolving Credit Borrowing) the Interim DIP Order Amount at the time of such proposed Revolving Credit Borrowing and (y) if an extension of credit is requested after the Final DIP Order has been entered by the Bankruptcy Court, the Lender shall have received a copy of the Final DIP Order and the Final DIP Order shall be in full force and effect and shall not have been vacated, reversed, stayed, or modified or amended in any respect.  If either the Interim DIP Order or the Final DIP Order is the subject of a pending appeal in any respect, none of such Order, the making of the Loans or the performance by the Borrowers of any of their obligations under any of the DIP Loan Documents shall be the subject of a presently effective stay pending appeal. The Borrowers and the Lender shall be entitled to rely in good faith upon the Orders, notwithstanding objection thereto or appeal therefrom by any interested party.  The Borrowers and the Lender shall be permitted and required to perform their respective obligations in

27-

compliance with this Agreement, notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction.

(f)      The Borrowers shall be in compliance with the DIP Budget, except to the extent in accordance with the Permitted Budget Variance.

Each Loan Notice submitted by the Borrowers shall be deemed to be a representation and warranty that the conditions specified in Sections 4.02 have been satisfied on and as of the date of the applicable Revolving Credit Borrowing.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES

Each of the Borrowers represents and warrants to the Lender that:

### 5.01    **Existence, Qualification and Power**.

Each of the Borrowers (a) is duly organized or formed and validly existing under the Laws of the jurisdiction of its formation, incorporation or organization, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and, subject to the entry by the Bankruptcy Court of the applicable Orders, carry on its business and (ii) subject to the entry by the Bankruptcy Court of the applicable Orders, execute, deliver and perform its obligations under the DIP Loan Documents to which it is a party and consummate the Transaction, and (c) is duly qualified and is licensed and, as applicable, in good standing under the Laws of the jurisdiction of its formation, incorporation or organization and of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

### 5.02    **Authorization; No Contravention**.

Subject to the entry by the Bankruptcy Court of the applicable Orders, the execution, delivery and performance by each of the Borrowers of each DIP Loan Document to which such Person is or is to be a party have been duly authorized by all necessary corporate, limited liability company, partnership or other organizational action, and do not and will not (a) contravene the terms of any of such Borrower's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien (other than a Permitted Lien) under, or require any material payment to be made under (i) any material Contractual Obligation to which such Borrower is a party or affecting such Borrower or the properties of such Borrower or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Borrower or its property is subject; or (c) violate any Law in any material respect.

28-

CPAM: 9490930.20

5.03    **Governmental Authorization; Other Consents**.

Subject to the entry by the Bankruptcy Court of the applicable Orders, no material permit, license, approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by each of the Borrowers of this Agreement or any other DIP Loan Document, (b) the consummation of the Transaction, or (c) the grant by the Borrowers of the Liens granted by each of them pursuant to the Collateral Documents, except for the authorizations, approvals, actions, notices and filings provided in the Orders.

5.04    **Binding Effect**.

Subject to the entry by the Bankruptcy Court of the applicable Orders, this Agreement has been, and each other DIP Loan Document, when delivered hereunder, will have been, duly executed and delivered by each of the Borrowers, as applicable.  Subject to the entry by the Bankruptcy Court of the applicable Orders, this Agreement constitutes, and each other DIP Loan Document to which a Borrower is a party when so delivered will constitute, a legal, valid and binding obligation of a Borrower enforceable against each of the Borrowers, as applicable, in accordance with its terms, except as such enforceability (a) may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and laws affecting the enforcement of creditors' rights and remedies generally and (b) is subject to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

5.05    **No Material Adverse Effect**.

(a)    [Reserved].

(b)    Since December 31, 2015, there has been no event or occurrence, either individually or in the aggregate, that has had and continues to have or could reasonably be expected to have a Material Adverse Effect (other than the events set forth in Schedule 4.02(c)).

5.06    **[Reserved]**.

5.07    **[Reserved]**.

5.08    **Ownership of Property; Liens; Investments**.

(a)    The Borrowers have good and indefeasible title to, or a valid leasehold or easement interest in, all real property necessary or used in the ordinary conduct of its business, except for (i) Permitted Liens and (ii) such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

29-

(b)     The property of the Borrowers is subject to no Liens (other than the Carve Out), other than Liens set forth on Schedule 5.08(b) and other Permitted Liens.

(c)     [Reserved].

(d)     (i)     Schedule 5.08(d)(i) sets forth as of the Closing Date a complete and accurate list of all leases of real property under which a Borrower is the lessee (the "Lessee Real Property Leases"), showing the street address, county or other relevant jurisdiction, state, lessor, lessee, expiration date and annual rental cost thereof.  Any lease of real property material to the operation of the business of a Borrower under which such Borrower is the lessee is the legal, valid and binding obligation of the lessee thereof, enforceable against the lessee in accordance with its terms, except as such enforceability (a) may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and laws affecting the enforcement of creditors' rights and remedies generally and (b) is subject to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

(ii)     Schedule 5.08(d)(ii) sets forth a complete and accurate list as of the Closing Date of all leases of real property under which a Borrower is the lessor (the "Lessor Real Property Leases"), showing the street address, county or other relevant jurisdiction, state, lessor, lessee, expiration date and annual rental cost thereof.  To each of the Borrower's knowledge each lease under which a Borrower is the lessor is the legal, valid and binding obligation of the lessor thereof, enforceable against lessor in accordance with its terms except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.09    **Investment Bank and Finder's Fees**.

The Borrowers have not paid or agreed to pay, or reimbursed any other party with respect to, any investment banking or similar or related fee, underwriter's fee, finder's fee, or broker's fee to any Person in connection with this Agreement other than as disclosed to the Lender.

5.10    **[Reserved]**.

30-

5.11    **Insurance**.

As of the Closing Date, the properties of the Borrowers are insured with companies having an A.M. Best Rating of at least A- that are not Affiliates of a Borrower, such insurance being of such types, in such amounts, with such deductibles and covering such risks as are customary in the exercise of Prudent Operating Practices.

5.12    **[Reserved]**.

5.13    **[Reserved]**.

5.14    **Subsidiaries; Equity Interests**.

As of the Closing Date, the Borrowers have no Subsidiaries and no equity investments in any corporation, entity or joint venture except as set forth on Schedule 5.14. As of the Closing Date, all of the outstanding Equity Interests in the Borrowers have been validly issued, are fully paid and non-assessable and are owned as specified on Part (a) of <u>Schedule 5.14</u> free and clear of all Liens except Permitted Liens. Set forth on Part (b) of <u>Schedule 5.14</u> is a complete and accurate list showing as of the Closing Date (as to the Borrowers) the jurisdiction of its incorporation or formation, the address of its principal place of business and its U.S. taxpayer identification number.

5.15    **Margin Regulations; Investment Company Act**.

(a)    Except as set forth on Schedule 5.15, none of the Borrowers are engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock. Following the application of the proceeds of each Revolving Credit Borrowing, not more than 25% of the value of the assets of any of the Borrowers will be margin stock.

(b)    None of the Borrowers is required to be registered as an "investment company" under the Investment Company Act of 1940.

5.16    **Disclosure**.

Except as set forth on <u>Schedule 5.16</u>, (a) no written report, certificate or other written information that has been both (i) prepared by any Borrower and (ii) furnished by or on behalf of a Borrower to the Lender, or any of their respective consultants, in connection with the Transactions or this Agreement or delivered hereunder or under any other DIP Loan Document, as modified or supplemented by other information so furnished and taken as a whole, contains any material misstatement of fact or omits to state any material fact necessary to make the

31-

statements therein, in the light of the circumstances under which they were made, not materially misleading.

5.17    **[Reserved]**.

5.18    **Intellectual Property; Licenses, Etc**.

Each of the Borrowers owns, or possesses the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights that are reasonably necessary for the operation of its businesses, without conflict with the rights of any other Person except where such failure could not reasonably be expected to have a Material Adverse Effect.  To the knowledge of each of the Borrowers, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by a Borrower infringes upon any rights held by any other Person except for any infringement which could not reasonably be expected to have a Material Adverse Effect.

5.19    **Casualty, Etc**.

Neither the businesses nor the properties of the Borrowers are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, tsunami, embargo, act of God or of the public enemy or other casualty (in the case of such representation made on the Closing Date, whether or not covered by insurance, and in the case of each such representation made after the Closing Date, considering applicable insurance that is in full force and effect and as to which the coverage has not been disputed) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.20    **Collateral Documents**.

The provisions of the Collateral Documents are effective to create in favor and for the benefit of the Lender a legal, valid and enforceable Lien on all right, title and interest of the Borrowers in the Collateral described therein and such Liens have first priority as provided in the Collateral Documents and Section 2.13.

5.21    **[Reserved]**.

5.22    **Orders**.

(a)    The Interim DIP Order and, at all times after its entry by the Bankruptcy Court, the Final DIP Order is in full force and effect, and has not been reversed, modified, amended, stayed or vacated absent the written consent of the Lender.

CPAM: 9490930.20

(b)    Upon the Termination Date of any of the Obligations, the Lender shall, subject to the provisions of Article VIII and the applicable provisions of the applicable Order, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder in accordance with the terms hereof, without further application to or order by the Bankruptcy Court.

(c)    If either the Interim DIP Order or the Final DIP Order is the subject of a pending appeal in any respect, none of such Order, the making of the Loans or the performance by the Borrowers of any of their obligations under any of the DIP Loan Documents shall be the subject of a presently effective stay pending appeal.  The Borrowers and the Lender shall be entitled to rely in good faith upon the Orders, notwithstanding objection thereto or appeal therefrom by any interested party.  The Borrowers and the Lender shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction.

5.23    **Appointment of Trustee or Examiner; Liquidation**.

No order has been entered in the Chapter 11 Cases (i) for the appointment of a Chapter 11 trustee, (ii) for the appointment of a responsible officer or an examiner with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under 1106(b) of the Bankruptcy Code or (iii) to convert a Chapter 11 Case to a case under Chapter 7 or to dismiss a Chapter 11 Case.

5.24    **Perfection of Security Interest**.

Upon entry of each of the Interim DIP Order and the Final DIP Order, each such Order shall be effective to create in favor of and for the benefit of the Lender a legal, valid, enforceable and perfected security interest in the Collateral and proceeds thereof.

5.25    **Secured Superpriority Claim; Liens**.

Upon the entry of each of the Interim DIP Order and the Final DIP Order, each such Order and the DIP Loan Documents are sufficient to provide the Superpriority Claim and Liens described in, and with the priority provided in, <u>Section 2.13</u>.

## ARTICLE VI.
## AFFIRMATIVE COVENANTS

So long as the Lender shall have any Revolving Credit Commitment hereunder, or any Loan or other Obligation (other than any contingent indemnity or expense reimbursement obligations for which no claim has been made) hereunder shall remain unpaid or unsatisfied:

6.01    **Reports**.

33-

The Borrowers shall deliver to the Lender: (a) by 12:00 noon (New York time) on the second and fourth Wednesday of each month (or if such day is not a Business Day, the next succeeding Business Day), a report showing actual receipts and disbursements, cash receipts, cash balance and loan balance for the two-week period which ended on the immediately preceding Friday; (b) by 12:00 noon (New York time) on the third Business Day of each month, a reconciliation of actual receipts and disbursements, cash receipts, cash balance and loan balance against such figures set forth in the DIP Budget, on a line-by-line basis, showing any percentage variance to the proposed corresponding line item of the DIP Budget for the immediately preceding month, certified by a Responsible Officer of the Borrowers as having been prepared in good faith and with written explanations of material variances and accompanied by an updated forecast of drawings of Loans for the immediately subsequent month (if such forecasts are projected to vary from the figures set forth in the DIP Budget); provided that the first report for a two-week period shall be for the first two full weeks ending [        ], 2016] and the first reconciliation for a calendar month shall be for the first full calendar month ending [        ], 2016]; and (c) on [        ], 2016 and the third Business Day of each month thereafter, an updated "rolling" 13-week budget (commencing with the immediately succeeding Saturday) supplementing the most recent DIP Budget; at the time such budget is in form and substance reasonably acceptable to the Lender, such budget shall constitute a Supplemental Approved Budget (provided, however, that in the event that such updated "rolling" 13-week budget is not approved by the Lender, the budget corresponding to the applicable 13-week period set forth in the Initial Approved Budget shall constitute a Supplemental Approved Budget for such period until a Supplemental Approved Budget is approved by the Lender; and provided further that the Borrowers may make modifications to any DIP Budget with the consent of the Lender).

6.02    **Certificates; Other Information**.

The Borrowers shall deliver to the Lender in form and detail satisfactory to the Lender:

(a)    [reserved];

(b)    promptly after any request by the Lender, copies of any detailed audit reports or management letters submitted to the Borrowers (of a type that would customarily be submitted to a board of directors (or the audit committee of the board of directors)) by independent accountants in connection with the accounts or books of the Borrowers, or any audit of any of the Borrowers;

(c)    as soon as available, but in any event within 30 days after the end of each insurance year of each of the Borrowers, a report summarizing the insurance coverage (specifying the type, amount, dates and carrier and other matters required by Schedule 5.11) in effect for the Borrowers as of the end of the insurance year immediately preceding such delivery date and applicable thereafter to the then-current insurance year;

34-

(d)      promptly after the assertion or occurrence thereof, notice (describing in reasonable detail in a manner that would not reasonably be expected to jeopardize any legal privilege available to a Borrower or its Affiliates) of any Proceeding against or any noncompliance by any of the Borrowers with any Environmental Law or Environmental Permit or any Environmental Claim (other than any such Proceeding or noncompliance commenced or first occurring prior to the Closing Date), that in each case could reasonably be expected to have a Material Adverse Effect;

(e)      [reserved];

(f)      by no later than 12:00 noon (New York time) on the third Business Day of each month (commencing following the week in which the Closing Date occurs), a true and complete report (which may be delivered directly to the Lender or its counsel by the counsel and other professionals retained by the Borrowers) setting forth in reasonable detail (i) the total amount of Borrowers' Professional Fees (whether billed or unbilled) accrued for the immediately preceding month, including related time entries, and (ii) the total amount of Borrowers' Professional Fees paid in the Chapter 11 Cases through the immediately preceding month; provided, however, with respect to clause (i) above, the Borrowers shall use commercially reasonable efforts to submit accurate reports but such reports shall not be binding upon any applicable professional with respect to the actual amount of fees reflected in any subsequent monthly invoice submitted to the Bankruptcy Court or pursuant to any fee procedure approved by the Bankruptcy Court;

(g)      promptly after the same are available, copies of all pleadings, motions, applications, financial information and other documents filed by or on behalf of any of the Borrowers with the Bankruptcy Court in the Chapter 11 Cases, to the extent not available on-line or delivered electronically; and

(h)      promptly, such additional information regarding the material business, financial or corporate affairs of any of the Borrowers, or compliance with the terms of the DIP Loan Documents, as the Lender may from time to time reasonably request.

Documents required to be delivered pursuant to Section 6.01 or Section 6.02 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrowers post such documents, or provides a link thereto on the Borrowers' website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Borrowers' behalf on an Internet or intranet website, if any, to which the Lender have access (whether a commercial, or third-party website); provided that the Borrowers shall notify the Lender (by facsimile or electronic mail) of the posting of any such documents and provide to the Lender by electronic mail electronic versions (i.e., soft copies) of such documents.  The Lender shall have no obligation to request the delivery of or to maintain paper copies of the documents referred to above.

35-

6.03    **Notices**.

The Borrowers shall promptly notify the Lender (in a manner that would not reasonably be expected to jeopardize any legal privilege available to the Borrowers; provided, that the qualification in this parenthetical shall not limit the obligation of the Borrowers to provide any such notice but merely the manner in which such notice is provided):

(a)    of (i) the occurrence of any Default or Event of Default, together with a description of any action, if any, being taken or proposed to be taken with respect thereto, and (ii) the commencement of any Proceeding seeking damages in excess of the Individual Threshold Amount or seeking material injunctive relief against any of the Borrowers;

(b)    of any matter that has resulted and continues to result or could reasonably be expected to result in a Material Adverse Effect (other than the events set forth in Schedule 4.02(c)), including, but not limited to, (i) breach or non-performance of, or any default under, a Contractual Obligation of any of the Borrowers; (ii) any dispute, litigation, investigation, proceeding or suspension by any Governmental Authority against any of the Borrowers; or (iii) the commencement of, or any material development in, any litigation or proceeding affecting any of the Borrowers, including pursuant to any applicable Environmental Laws, in each case, that has resulted and continues to result or could reasonably be expected to result in a Material Adverse Effect (other than the events set forth in Schedule 4.02(c));

(c)    of any material change in accounting policies or financial reporting practices by the Borrower (other than such changes required by GAAP);

(d)    of any casualty, damage or loss to any property of a Borrower, whether or not insured, through fire, theft, other hazard or casualty, involving a probable loss of $1 million or more;

(e)    of any cancellation or receipt of written notice of threatened cancellation of any insurance required to be maintained under Section 6.07.

6.04    **Payment of Obligations**.

(a)    Subject to Section 7.16, the Borrowers shall pay and discharge as the same shall become due and payable or before they become delinquent (unless such payment has been waived) all its Post-Petition obligations under the Contractual Obligations of the Borrowers except (i) if prevented from paying as a result of the Chapter 11 Cases, (ii) as the same are being contested in good faith by appropriate proceedings and adequate reserves in accordance with GAAP are being maintained by the Borrowers or (iii) as could not reasonably be expected to have a Material Adverse Effect.

36-

6.05    **Preservation of Existence, etc**.

Each of the Borrowers shall (a) preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its formation, incorporation or organization; (b) preserve, renew and maintain in full force and effect its qualification, license and, as applicable, good standing under the Laws (i) of the jurisdiction of its formation, incorporation or organization and (ii) of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license except, in the case of subclause (ii), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have a Material Adverse Effect; and (e) except (i) as otherwise permitted pursuant to this Agreement, (ii) as would not result in a Default or Event of Default hereunder, or (iii) where the failure to do so could not reasonably be expected to have a Material Adverse Effect, preserve and maintain good and marketable title to or a valid leasehold, easement or other interest in its properties and assets.

6.06    **Maintenance of Properties**.

(a)    Subject to <u>Section 7.05</u>, each of the Borrowers shall maintain consistent with Prudent Operating Practices all of its material properties and equipment necessary in the operation of its business in good working order and operating condition, ordinary wear and tear, casualty and condemnation excepted.

6.07    **Maintenance of Insurance**.

(a)    Each of the Borrowers shall maintain with financially sound and reputable insurance companies not Affiliates of such Borrower insurance of such types and in such amounts substantially similar to the insurance described on <u>Schedule 5.11</u>.

6.08    **[Reserved].**

6.09    **Books and Records**.

Each of the Borrowers shall maintain in accordance with GAAP proper books of record and account, in which full, true and correct entries of all financial transactions and matters involving the assets and business of the Borrowers.

6.10    **Inspection Rights**.

Each of the Borrowers shall permit representatives and independent contractors of the Lender to visit and inspect any of its properties, to examine its corporate, financial and operating

CPAM: 9490930.20

CPAM: 9490930.20CPAM: 9490930.20CPAM: 9490930.20CPAM: 9490930.20CPAM: 9490930.20CPAM: 9490930.20CPAM: 9490930.20

records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of the Lender subject to reimbursement by the Borrowers, and at such reasonable times during normal business hours upon reasonable advance notice to, and coordination with, the Borrowers. The Lender shall maintain in confidence all information it obtains in accordance with this Section 6.10, unless such information is in the public domain by reason of prior publication, provided, that the Lender may disclose such information (a) to any Affiliates, successors and assigns, and any accountants, consultants, lawyers and other professionals who receive such information under an obligation of confidentiality; (b) to the extent required by any applicable law, any regulatory authority, or the Bankruptcy Court; or (c) in connection with the exercise of any remedies hereunder.

6.11    **Use of Proceeds**.

Each of the Borrowers shall use the proceeds of the Revolving Loans not in material contravention of any Law or of any DIP Loan Document, and solely: (i) in the case of the Tranche A Loans, to pay (x) any fees required hereunder, (y) fees and expenses of the Borrower's counsel and other professional advisors permitted by the Orders and Section 7.21(f), and (z) administrative expenses of the Chapter 11 Cases, and (ii) in the case of the Tranche B Loans, to fund operating expenses and other amounts required under the Orders and general corporate and working capital requirements of such Borrower and, in each case in compliance with Section 7.15.

6.12    **Covenant to Give Security**.

(a)    Upon the acquisition of any property by any of the Borrowers, if such property, in the judgment of the Lender, shall not already be subject to a perfected first priority security interest (subject to Permitted Liens) in favor and for the benefit of the Lender, then such Borrower shall, at the Borrower's expense:

(i)    within 10 days after such acquisition, furnish to the Lender a description of the property so acquired in detail satisfactory to the Lender;

(ii)    within 15 days after such acquisition, duly execute and deliver to the Lender supplements to the Collateral Documents and other security and pledge agreements, as specified by and in form and substance satisfactory to the Lender, securing payment of all the Obligations (other than the Tranche B Obligations) of the Borrowers and constituting Liens on all such properties;

(iii)    within 30 days after such acquisition, deliver to the Lender (A) Uniform Commercial Code financing statements, and (B) notices and the endorsement of notices

38-

on title documents, to the extent necessary or advisable in the reasonable opinion of the Lender to vest in the Lender valid and subsisting Liens on such property.

6.13    **[Reserved]..**

(a)

6.14    **Further Assurances**.

(a)      Each of the Borrowers shall, promptly upon written request by the Lender, (a) correct any material defect or error that may be discovered in any DIP Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Lender may reasonably deem necessary or desirable from time to time in order to (i) carry out more effectively the purposes of the DIP Loan Documents, (ii) to the fullest extent permitted by applicable law, subject the Borrowers' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, and (iii) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder; provided, however, that in each case no such action or instrument shall increase any of the Borrowers' liability or decrease the Borrowers' rights under the DIP Loan Documents.

6.15    **[Reserved]**.

6.16    **Accounting Policies**.

Each of the Borrowers shall maintain its accounting policies and reporting practices as in effect on the Closing Date, except for changes as required by or permitted by GAAP.

6.17    **Advisors and Cooperation**.

Each of the Borrowers shall continue to (a) grant the Lender with reasonable access to any advisers of the Borrower as the Lender shall reasonably request, (b) reasonably cooperate with the Lender's financial advisors, auditors, attorneys, appraisers and any other consultants engaged from time to time at the reasonable discretion of the Lender and (c) reimburse reasonable fees and expenses of such financial advisors, auditors, attorneys, appraisers and other consultants in accordance with the terms of its engagement that have been agreed to by the Borrowers.

6.18    **Chapter 11 Cases Milestones**.

Each of the Borrowers shall cause the following actions (collectively, the "Milestones") to occur no later than the applicable date set forth below:

39-

(a)     Commence the Chapter 11 Cases on or before June 17, 2016;

(b)     No later than five (5) Business Days subsequent to the Petition Date, obtain an interim order, which, among other things, authorizes, on an interim basis, the Borrowers to execute and perform under the terms of the DIP Credit Agreement and the other DIP Loan Documents, as applicable, and incur and secure the Loans and other Obligations in connection therewith, which order and all extensions, modifications and amendments thereto shall be in form and substance satisfactory to the YPF Entities;

(c)     No later than thirty five (35) days subsequent to the Petition Date, obtain the Final DIP Order authorizing and approving the DIP Financing Facility and the terms of the DIP Credit Agreement and the other DIP Loan Documents (including the payment of interest, fees, costs and expenses thereunder), which order or judgment is in effect and not stayed and as to which no stay pending appeal shall have been granted, as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof, which order and all extensions, modifications and amendments thereto shall be in form and substance satisfactory to the YPF Entities;

(d)     No later than ten (10) days subsequent to the Final DIP Order Entry Date, file the Settlement Motion with and seek approval of the Settlement Agreement from the Bankruptcy Court;

(e)     No later than February 28, 2017, file a Plan that contains, incorporates and implements, and in no manner is inconsistent with, the terms of the Settlement Agreement in form and substance reasonably acceptable to the YPF Entities;

(f)     No later than May 15, 2017, obtain an order from the Bankruptcy Court confirming a Plan that (i) contains, incorporates and implements the terms of the Settlement Agreement in form and substance reasonably acceptable to the YPF Entities or, (ii) in the event the Bankruptcy Court has issued a Settlement Order, in form and substance reasonably acceptable to the YPF Entities, is in no manner inconsistent with the terms of the Settlement Agreement;

(g)     No later than June 1, 2017, obtain a final order dismissing the Passaic River Litigation as against the Borrowers and the YPF Entities in accordance with the Settlement Agreement.

(h)     No later than June 15, 2017, the Plan shall become effective in accordance with its terms.

## ARTICLE VII.
## NEGATIVE COVENANTS

40-

So long as the Lender shall have any Revolving Credit Commitment hereunder or any Loan or other Obligation (other than any contingent indemnity or expense reimbursement obligations for which no claim has been made) hereunder shall remain unpaid or unsatisfied, each of the Borrowers shall not:

7.01    **Liens**.

Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or sign or file under the Uniform Commercial Code of any jurisdiction a financing statement that names any Borrower as debtor, other than the following (collectively, "Permitted Liens"):

(a)    Liens pursuant to any Collateral Document;

(b)    (i) Liens for Pre-Petition Taxes, assessments or governmental charges or levies (provided that the enforcement and collection of the same are subject to the automatic stay in the Chapter 11 Cases), and (ii) Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings, if adequate reserves with respect to Liens in this clause (ii) are maintained on the books of the applicable Person in accordance with GAAP;

(c)    carriers', warehousemen's, mechanics', materialmen's, repairmen's, landlord's, operator's or other like Liens arising in the ordinary course of business which are not delinquent for a period of more than 90 days or which are being contested in good faith by appropriate proceedings, if adequate reserves with respect thereto are maintained on the books of the applicable Person (provided that the enforcement and collection of the same are subject to the automatic stay in the Chapter 11 Cases or, in respect of Post-Petition obligations, such obligations are not overdue for a period of more than thirty (30) calendar days or are being contested in good faith by appropriate proceedings, if adequate reserves with respect thereto are maintained on the books of the applicable Person);

(d)    pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(e)    Liens imposed by a Governmental Authority to address Environmental Liability as authorized under Environmental Law;

(f)    Existing Liens;

(g)    easements, rights-of-way, restrictions, reservations, servitudes, permits, encroachments, covenants running with the land and other similar encumbrances affecting real property incurred in the ordinary course of business and which, in the aggregate, do not materially impair the value of the property subject thereto, materially interfere with the ordinary

41-

conduct of the business of the applicable Person, and which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect;

(h)     Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.01(f) or deposits securing appeal or other surety bonds related to such judgments;

(i)     any Lien (other than, for the avoidance of doubt, any security interest) on property or assets in connection with a sale, transfer or other disposition of such property or assets permitted by Section 7.05;

(j)     Liens on cash deposits in the nature of a right of setoff, banker's lien or counterclaim or any ordinary course setoff or netting arrangements;

(k)     Liens securing Indebtedness incurred by any Borrower which is permitted under Section 7.03; provided that (i) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and (ii) the Indebtedness secured thereby does not exceed the cost or fair market value, whichever is lower, of the property being acquired on the date of acquisition;

(l)     Liens securing Indebtedness incurred in the ordinary course of any Borrower's business in an aggregate principal amount not to exceed $1 million at any time outstanding;

(m)     the Carve Out; and

(n)     any encumbrance, covenant or preference (other than, for the avoidance of doubt, any security interest) that arises by virtue of any covenant (other than a breach of any covenant) under any shared facilities agreement.

7.02     **Investments**.

Make or hold any Investments, except:

(a)     Investments held by any of the Borrowers in the form of Cash Equivalents;

(b)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit or prepayments or deposits with respect to transactions permitted by the DIP Loan Documents in the ordinary course of business (but in no event more than 30 days past due with respect to trade credit for Affiliates), and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(c)     Investments existing on the Closing Date and set forth on Schedule 7.02;

42-

(d)      Investments in a Borrower; and

(e)      Guarantees permitted by Section 7.03.

7.03    **Indebtedness**.

Create, incur, assume or suffer to exist any Indebtedness, except:

(a)      Indebtedness under the DIP Loan Documents;

(b)      Guarantees of any of the Borrowers in respect of Indebtedness otherwise permitted hereunder of such Borrower;

(c)      Obligations of a Borrower in respect of appeal or other surety bonds related to judgments for the payment of money not constituting an Event of Default under Section 8.01(f); and

(d)      to the extent constituting Indebtedness, Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, provided that such Indebtedness is extinguished within 5 Business Days of its incurrence.

7.04    **Fundamental Changes; No Subsidiaries**.

Merge, dissolve, liquidate, consolidate with or into another Person, change its form of organization or its business, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, other than in connection with a Disposition permitted pursuant to Section 7.05(b) or in accordance with a Plan confirmed by the Bankruptcy Court.

7.05    **Dispositions**.

Make any Disposition or enter into any agreement to make any Disposition (other than any agreement that is conditioned on the receipt of the consent of the Lender or the repayment in full of the Loans, the permanent termination of all Revolving Credit Commitments hereunder and the payment in full of all other Obligations (other than any contingent indemnity or expense reimbursement obligations for which no claim has been made) hereunder), except:

(a)      Dispositions of equipment or licenses to the extent provided in the DIP Budget and to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are substantially contemporaneously applied to the purchase price of such replacement property; provided, that

43-

each such Disposition shall be made on terms determined by the Borrowers as long as such terms are commercially reasonable;

(b)        any assets which have become worn out or obsolete or which are promptly being replaced, whether in the ordinary course of business or as approved by order of the Bankruptcy Court;

(c)        non-exclusive licenses of patents, trademarks, copyrights and other intellectual property rights in the ordinary course of business and substantially consistent with past practice;

(d)        Dispositions of inventory in the ordinary course of business or as approved by order of the Bankruptcy Court;

(e)        Dispositions of the Investments listed on Schedule 7.02;

(f)        any transaction pursuant to and in accordance with the Settlement Agreement; and

(g)        any assets sold in the ordinary course of any Borrower's business in an aggregate amount not to exceed $500,000 in value.

7.06    **Burdensome Agreements**.

Enter into or permit to exist any Contractual Obligation that (a) limits the ability of such Person to create, incur, assume or suffer to exist Liens on the Collateral pursuant to the Collateral Documents except any negative pledge on any property (A) contained in any agreement for the Disposition of such property so long as such Disposition is permitted by the terms of this Agreement or (B) to the extent such property has been pledged pursuant to and in accordance with Section 7.01(a), (e), (g), (h) or (i), or (b) requires the grant of a Lien on property of the Borrower to secure an obligation of the Borrower if a Lien on such property is granted to secure another obligation of the Borrower (other than in the case of the Secured Parties pursuant to the Collateral Documents).

7.07    **Margin Regulations**.

Use the proceeds of any Loan, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

7.08    **Capital Expenditures**.

CPAM: 9490930.20

Make or become legally obligated to make any Capital Expenditure, except for (i) those required by Law or in accordance with any Governmental Action, or (ii) those set forth in the DIP Budget.

7.09    **Amendments of Organization Documents**.

Amend or waive any provision of any of its Organization Documents without the prior written consent of the Lender other any such amendment or waiver that does not adversely affect the Lender in any material respect.

7.10    **Hazardous Materials**.

Use or Release, or permit the Use or Release of, Hazardous Materials at or from the property of the Borrowers other than in compliance with all applicable Environmental Laws the failure with which to comply would reasonably be expected to have a Material Adverse Effect and where such Use or Release would not reasonably be expected to result in a Material Adverse Effect.

7.11    [Reserved].

7.12    **Accounts**.

Establish or maintain any deposit account, securities account or other banking, brokerage or commodity account other than the accounts listed on Schedule 7.12, as the same may be updated with the consent of the Lender (the "Accounts").

7.13    **Limitation on Sales and Leasebacks**.

Enter into any arrangement with any Person providing for the leasing by the Borrowers of real or personal property which has been or is to be sold or transferred by the Borrower to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of the Borrowers.

7.14    **Fiscal Year**.

Change the last day of its fiscal year unless required by Law or GAAP without the prior written consent of the Lender.

7.15    **DIP Budget**.

(a)      Each of the Borrowers will not permit the proceeds of Loans to be used for any use other than a use permitted by Section 6.11, it being understood that (x) the Lender shall not have any duty to monitor such compliance and (y) the line items in the DIP Budget for payment

45-

of amortization of principal, interest, expenses and other amounts to the Lender are estimates only, and the Borrowers remain obligated to pay any and all Obligations in accordance with the terms of the DIP Loan Documents.  Nothing in any DIP Budget shall constitute an amendment or other modification of this Agreement;

(b)    Each of the Borrowers will not make any disbursements other than itemized expenses in the amounts set forth in the DIP Budget, except to the extent in accordance with the Permitted Budget Variance, without the express written consent of the Lender;

(c)    Notwithstanding anything in any DIP Budget, each of the Borrowers shall not make any disbursements or payments of any kind (including by way of set off) with respect to any Indebtedness or other obligations arising on or before the Petition Date owed by the Borrowers to vendors, suppliers, mechanics or materialmen without the express written consent of the Lender, except as authorized by the Bankruptcy Court;

(d)    Notwithstanding anything in any DIP Budget, each of the Borrowers shall not make any disbursements or payments of any kind (including by way of set off) with respect to any employee incentive expenses or severance without the express written consent of the Lender.

(e)    The Borrowers shall not, without the express written consent of the Lender, use proceeds of Loans with respect to any line item for any calendar month in the DIP Budget in an amount in excess of the amount budgeted for such line item in such month in the DIP Budget; provided that (i) there shall be a permitted variance of 10% (the "Permitted Budget Variance") in the aggregate for all expenditures listed in any month in the DIP Budget (but excluding restructuring-related charges, professional fees and expenses and debt service) in excess of the aggregate amount of expenditures in the DIP Budget for such month (but excluding restructuring-related charges, professional fees and expenses and debt service), (ii) any expenditure set forth in the line item "direct bill invoices" may be paid in a period prior to the period for which such expenditure appears in the DIP Budget, (iii) the Borrowers may use proceeds of Loans to pay reasonable and documented unpaid fees and expenses incurred by estate professionals retained by the Borrowers pursuant to section 327 or 328 of the Bankruptcy Code (the "Borrowers' Professional Fees"), to the extent allowed by the Bankruptcy Court at any time, whether by interim order, final order, procedural order or otherwise, in excess of the amount budgeted for such Borrowers' Professional Fees for such month in the DIP Budget, including any carry forward amounts as provided for herein (but any such payment shall constitute an Event of Default as set forth in Section 8.01(v)) and (iv) the aggregate amounts or expenses listed in the DIP Budget, if any, that are unused in any month may be carried over and used by the Borrower in any subsequent month without respect to the specific line items to which such amounts or expenses originally applied.

For the avoidance of doubt: "disbursements" shall include all uses of cash of any kind, including, without limitation, investments, capital expenditures and repayments of Indebtedness (other than

46-

repayments of debt under this Agreement); and "receipts" shall not include borrowings, tax refunds or other extraordinary receipts.

7.16    **Amendments of Post-Petition Agreements**.

Each of the Borrowers will not waive, amend, supplement, modify, terminate or release the provisions of any document, agreement or instrument evidencing, creating or governing any Post-Petition Indebtedness if the same is materially adverse to the Lender's interests.

7.17    **Use of Proceeds**.

Each of the Borrowers will not, directly or indirectly, use proceeds of the DIP Facility or any Collateral to (i) investigate or pursue any claims, causes of action, defenses, counterclaims, litigation or discovery against the Lender or any Affiliate of the Lender (or their respective agents, professionals, employees, officers, subsidiaries, Affiliates or other similar Persons) or (ii) pay any or all claims for fees and expenses of any other person or entity in connection with the investigation of, the assertion of or joinder in any claim, cause of action, counterclaim, action, proceeding, application, litigation, motion, objection, defense or other contested matter, the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration or similar relief: (x) invalidating, setting aside, avoiding, recharacterizing or subordinating, in whole or in part, any claim, indebtedness, liens and/or security interests of the Lender (y) objecting to or commencing any action that prevents or delays the exercise by Lender of any of its rights and remedies under any agreement or document or the Interim DIP Order or the Final DIP Order; or (z) seeking any affirmative legal or equitable remedy against the Lender or any affiliate of the Lender (or their respective agents, professionals, employees, officers, subsidiaries, Affiliates or other similar Persons).

7.18    **Final Bankruptcy Court Order; Administrative Priority; Lien Priority; Payment of Claims**.

Each of the Borrowers will not:

(a)    at any time, seek or consent to any reversal, modification, amendment, stay or vacation of (i) any "first day order" entered by the Bankruptcy Court in the Chapter 11 Cases, if such reversal, modification, amendment, stay or vacation could have a Material Adverse Effect on the rights of the Lender under this Agreement or the Settlement Agreement, (ii) the Interim DIP Order or (iii) the Final DIP Order;

(b)    at any time, seek or consent to a priority for any administrative expense or unsecured claim against any of the Borrowers (now existing or hereafter arising) of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in, or arising or ordered under, Sections 105(a), 326, 328, 330, 331, 503(b), 506(c),

47-

507, 546(c), 726, and 1114 of the Bankruptcy Code equal or superior to the priority of the Lender in respect of the Obligations, except as provided in <u>Section 2.13(a)</u>;

(c)     prior to the date on which the Obligations (other than any contingent indemnity or expense reimbursement obligations for which no claim has been made) have been paid in cash in full and the Revolving Credit Commitments have been cancelled and terminated, (i) pay any administrative expense claims of any of the Borrowers except (A) the Obligations then due and payable hereunder, (B) other administrative expense and professional fees and expenses and claims set forth in the DIP Budget, in each case to the extent and having the order of priority set forth in the Orders, or (C) pursuant to an order by the Bankruptcy Court requiring such payment, or (ii) file with the Bankruptcy Court any alternative debtor-in-possession financing proposal that does not provide for the Obligations to be paid in cash in full and for the Revolving Credit Commitments to be cancelled and terminated;

(d)     seek or consent to the entry of any order providing for a modification, stay, vacation or amendment to the Orders to which the Lender has not consented in writing;

(e)     seek or consent to a sale of any material portion of the Collateral unless all or a portion of the Obligations are to be paid (or repaid) from the proceeds thereof; or

(f)     seek or consent to any order granting a Borrower any authority to (i) take any action that is prohibited by the terms of this Agreement or the other DIP Loan Documents or (ii) refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other DIP Loan Documents.

7.19    **Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws; OFAC**.

(a)     Each of the Borrowers agree that it will not conduct its business in a manner so as to, directly or indirectly:

(i)     engage in any transaction that violates any of the applicable prohibitions set forth in any Anti-Terrorism Laws or that would reasonably give rise to any violation of such prohibitions by any party to this Agreement;

(ii)    use any funding or proceeds from this Agreement in connection with any:

(A)    transaction relating directly or indirectly to any Person on the SDN List, Executive Order and/or any similar list, or relating directly or indirectly, to business with Persons in countries that are the target of U.S., European Union or United Kingdom economic sanctions, including Crimea, Iran, Belarus, Sudan, Cuba, Myanmar, Syria, and North Korea;

48-

(B)    sale, supply, export, import, purchase or transport, or any related technical or financial assistance, of products or technology, that is prohibited under any Anti-Terrorism Laws; and

(C)    investments or any related financial services which are restricted or prohibited under any Anti-Terrorism Laws.

(iii)    (A) repay or prepay the Obligations under this Agreement or any part thereof from funds or assets that constitute property of, or that are beneficially owned directly or indirectly by, any Person on the SDN List, Executive Order and/or any similar list, or from funds or assets obtained or derived from transactions with or relating to countries that are the target of U.S., European Union or United Kingdom comprehensive country wide economic sanctions, including Iran, Sudan, Cuba, Syria or North Korea or (B) fund all or any part of any payment under this Agreement out of proceeds derived from transactions that violate any prohibition set forth in any Anti-Terrorism Laws.

(iv)    (A) permit any Person on the SDN List, Executive Order and/or any similar list to have any direct or indirect interest in the Borrower or (B) obtain or allow to continue any direct or indirect interest in any Person on the SDN List and/or any similar list.

(b)    Each of the Borrowers will not conduct its business in a manner so as to, directly or indirectly (i) use any corporate funds (including the proceeds of any Loans) for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity, (ii) offer, pay, give, promise to pay, authorize the payment of, or take any action in furtherance of the payment of anything of value directly or indirectly to a government official or any other person with the intent to improperly influence the Lender's action or otherwise to obtain or retain business or to secure an improper business advantage, or use the proceeds of any Loans for any of the foregoing purposes, or (iii) by act or omission, violate in any material respect any Anti-Corruption Laws.

(c)    Each of the Borrowers (i) shall not conduct its operations at any time in violation of any Anti-Money Laundering Law and (ii) shall not, directly or indirectly, use the proceeds of the Loans or lend, contribute or otherwise make available such proceeds to any Subsidiary, Affiliate, joint venture partner or other Person for the purpose of financing or facilitating any activity that would violate any Anti-Money Laundering Laws or to any Affiliate or other Person or entity, for the purpose of financing the activities of any Person currently subject to any U.S. sanctions administered by OFAC.

## ARTICLE VIII.
## EVENTS OF DEFAULT AND REMEDIES

49-

8.01    **Events of Default**.

Any of the following shall constitute an "<u>Event of Default</u>":

(a)    <u>Non-Payment</u>.  The Borrowers fail to (i) pay when and as required to be paid herein any amount of principal of any Loan, or (ii) pay within three (3) Business Days after the same becomes due any interest on any Loan or any fee due hereunder, or (iii) pay within five (5) days after the same becomes due (and the Borrowers have been provided notice thereof) any other amount payable hereunder or under any other DIP Loan Document; or

(b)    <u>Specific Covenants</u>.  Any of the Borrowers fail to perform or observe any term, covenant or agreement to be performed or observed by it that is contained in (i) any of <u>Sections 6.05</u>, <u>6.11</u>, <u>6.12</u> or <u>6.18</u> hereof or (ii) <u>Article VII</u> hereof, or

(c)    <u>Other Defaults</u>.  Any of the Borrowers fails to perform or observe any other covenant or agreement (not specified in <u>Section 8.01(a)</u> or (b)) contained in any DIP Loan Document on its part to be performed or observed and such failure continues for 30 days after the earlier of (i) actual knowledge by the Chief Executive Officer (or, in the case of Tierra Solutions, Inc., Chairman of the Board) or the General Counsel of a Borrower thereof and (ii) receipt of notice of such failure by the Borrowers from the Lender; or

(d)    <u>Representations and Warranties</u>.  Any representation or warranty made or deemed made by or on behalf of any of the Borrowers herein, in any other DIP Loan Document, or in any certificate required to be delivered to the Lender pursuant to this Agreement or the DIP Loan Documents, shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    <u>Attachment</u>.  Any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of a Borrower and is not released, vacated or fully bonded within 60 days after its issue or levy; or

(f)    <u>Judgments</u>.  There is entered against a Borrower (i) one or more final, non-appealable Post-Petition judgments or orders for the payment of money in an amount (with respect to any individual judgment or order) exceeding the Individual Threshold Amount or in an aggregate amount (as to all such judgments or orders) exceeding the Aggregate Threshold Amount (to the extent not covered by independent third-party insurance which meets the requirements of <u>Section 6.07</u>, and the insurer has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced and have not been otherwise stayed or discharged by any creditor upon such judgment or order, or (B) there is not in effect a stay of

50-

enforcement or discharge within 60 days of such judgment, by reason of a pending appeal or otherwise; or

(g)    Invalidity of DIP Loan Documents.  Any material provision of any DIP Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or a Borrower contests in any manner the validity or enforceability of any provision of any Loan Document to which it is a party; or a Borrower denies that it has any or further liability or obligation under any provision of any Loan Document to which it is a party, or purports to revoke, terminate or rescind any provision of any Loan Document to which it is a party other than as expressly permitted hereunder or thereunder or upon satisfaction in full of all the Obligations; or

(h)    Change of Control.  There occurs any Change of Control; or

(i)    Collateral Documents.  Any Collateral Document from and after the Closing Date or after the delivery thereof pursuant to Section 6.12 or Section 9.16, as applicable, shall for any reason (other than pursuant to the terms thereof or hereof) cease to create at any time a valid and perfected first priority Lien (subject to Permitted Liens) on Collateral with a value exceeding $1 million purported to be covered thereby; provided, however, that if (i) such cessation shall be capable of being cured, corrected or otherwise remedied, (ii) such cessation shall have occurred solely as the result of any act or omission of the Lender with respect to the actions available to the Lender to perfect or maintain the perfection of the Lender's Liens, and (iii) the Borrowers are promptly taking any actions reasonably requested by the Lender contemplated by Section 6.14 to effect the cure, correction or remedy of such cessation, then such cessation shall not constitute a Default or an Event of Default for all purposes of this Agreement and the other Loan Documents; or

(j)    [reserved]

(k)    Alternative Plan.  The Bankruptcy Court confirms a Chapter 11 plan that does not provide for the termination of the Revolving Credit Commitments and payment in full in Cash of all Obligations.

(l)    Settlement Motion.   The Bankruptcy Court or another court of competent jurisdiction shall have entered an order denying the Settlement Motion or an order declaring the Settlement Agreement or any material portion thereof to be unenforceable or does not provide for the implementation of the Settlement Agreement and the transactions contemplated thereby.

(m)    Chapter 11 Cases.  A Chapter 11 Case shall be dismissed (which dismissal does not require as a condition to such dismissal the termination of the Revolving Credit Commitments and the payment in full in cash of all Obligations) or converted to a case under

51-

Chapter 7 of the Bankruptcy Code or a Borrower shall file a motion or other pleading seeking the dismissal or conversion of a Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise without the consent of the Lender; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Chapter 11 Cases; any officer or director of a Borrower shall authorize a liquidation of a Borrower's business without the consent of the Lender; or an application shall be filed by a Borrower for the approval of any other Superpriority Claim (other than the Carve Out, which shall have a Superpriority Claim ranking senior to the Obligations, and which shall be paid by the Borrower at the times and in the amounts permitted by an order of the Bankruptcy Court consistent with Section 2.13(a)) in the Chapter 11 Cases which is senior to the claims of the Lender against the Borrowers hereunder or under any of the other DIP Loan Documents if it is not used to repay the Obligations in full in cash, or there shall arise or be granted any such senior Superpriority Claim; or

(n)     [reserved].

(o)     Orders. (i) an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Interim DIP Order and/or the Final DIP Order without the prior written consent of the Lender, or a Borrower shall apply for authority to do so, without the prior written consent of the Lender, (ii) an order with respect to a Chapter 11 Case shall be entered by the Bankruptcy Court without the express prior written consent of the Lender to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to a Borrower equal or superior to the priority of the Lender in respect of the Obligations except as otherwise provided in this Agreement, (iii) an order of the Bankruptcy Court shall be entered permitting the grant of a Lien on the Collateral (other than Permitted Liens), (iv) the Interim DIP Order and/or the Final DIP Order shall cease to create a valid and perfected first priority Lien (subject to Permitted Liens) on the Collateral or otherwise cease to be valid and binding and in full force and effect, (v) a Borrower shall fail to comply with any material provision (or any provision in such a way as is materially adverse to the interests of the Lender) of the Interim DIP Order and/or the Final DIP Order, (vi) a Borrower shall seek any modification of the Interim DIP Order and/or the Final DIP Order or assert in any pleading filed in any court that any material provision of the Interim DIP Order and/or the Final DIP Order is not valid and binding for any reason or otherwise modifying the Interim DIP Order and/or the Final DIP Order in a manner adverse to the Lender, (vii) the period provided by Section 1121 of the Bankruptcy Code for the Borrowers' exclusive right to file a plan shall expire or terminate, or (viii) a Borrower is enjoined, restrained or in any way prevented by court order from continuing or conducting all or any material part of its business or affairs; or

52-

(p)     Milestones.  The Borrowers have not timely satisfied the Milestones set forth in Section 6.20 of this Agreement; or

(q)     Authorized Payments.  Except as permitted by this Agreement, the Orders, the DIP Budget (subject to the Permitted Budget Variance) or as otherwise agreed to by the Lender, a Borrower shall not make (or shall have made) any payments without the consent of (or non-objection by) the Lender; or

(r)     Avoidance; Disgorgement; etc.  The Bankruptcy Court shall (i) enter an order avoiding or requiring disgorgement by the Lender of any amounts received in respect of the Obligations or (ii) enter an order authorizing or directing payment of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral; or

(s)     Non-Approved Sales.  The Bankruptcy Court shall enter an order or orders to sell, transfer, lease, exchange, alienate or otherwise dispose of any assets, or properties of a Borrower or any Equity Interest of a Borrower pursuant to Section 363 of the Bankruptcy Code without the consent of the Lender unless such order or orders contemplate the repayment in full in cash of and termination in full of all Revolving Credit Commitments and Obligations under this Agreement; or

(t)     Borrower Actions.  A Borrower shall (i) take any action in support of any matter set forth in Section 8.01(r), (s), (t) or (u) or any other Person shall do so and such application is not contested in good faith by the Borrower and the relief requested is granted in an order that is not stayed pending appeal, (ii) file a motion, pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Lender or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment, (iii) file a motion in the Chapter 11 Cases (A) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted under this Agreement or (B) to take any other action or actions adverse to any of the Lender or their rights and remedies hereunder or under any of the other DIP Loan Documents, the Settlement Agreement, or the Orders, or the Lender's interest in any of the Collateral, (iv) file any Chapter 11 plan of reorganization or liquidation that is not approved by the Lender unless such Chapter 11 plan of reorganization or liquidation provides for (A) the repayment in full in cash of and termination in full of all Revolving Credit Commitments and Obligations under the DIP Facility and (B) the implementation of the Settlement Agreement and the transactions contemplated therein.

(u)     Relief from Automatic Stay.  The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Borrowers in an amount exceeding $1 million, individually or in the aggregate, or the

53-

Equity Interests of a Borrower, (ii) permit the Passaic River Litigation to continue as against any of the Borrowers or any of the YPF Entities for any purpose, including the valuation or determination of any claims asserted therein, or any discovery, or (iii) permit other actions that would have a Material Adverse Effect.

(v)    <u>Passaic River Litigation</u>.  Any court issues or enters a ruling, decision, or order declaring that the Passaic River Litigation is not stayed as against any of the Borrowers or any of the YPF Entities or otherwise allowing the Passaic River Litigation to proceed or continue as against any of the Borrowers or the YPF Entities.

8.02    **Remedies Upon Event of Default**.

Notwithstanding Section 362 of the Bankruptcy Code, but subject to entry of the Interim DIP Order or the Final DIP Order, if any Event of Default occurs and is continuing, the Lender may, without any action or approval of the Bankruptcy Court, after 7 days' written notice to the Borrowers and the Office of the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>"), take any or all of the following actions, without prejudice to the rights of the Lender to enforce its claims against the Borrower:

(a)    declare the commitment of the Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated and any commitment fees accrued in accordance with <u>Section 2.08</u> with respect thereto shall forthwith become due and payable without any other notice of any kind;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other DIP Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrowers; <u>provided</u> that, notwithstanding the fact that the Tranche B Loans have become due and payable, the Lenders shall not receive payment of the principal amount of the Tranche B Loans until such time as all claims allowed under the Bankruptcy Code (other than the claims of the Lender or any of its affiliates) have been fully satisfied, extinguished, or discharged; and

(c)    exercise on behalf of itself all rights and remedies available to it under the DIP Loan Documents.

In addition, upon expiration of the seven day notice period referred to above, the automatic stay provided in Section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order of the Bankruptcy Court, and the Lender shall be entitled, in its sole discretion, to exercise all of its respective rights and remedies under the DIP Loan Documents.

8.03    **Application of Funds**.

54-

After the exercise of remedies provided for in Section 8.02, any amounts received on account of the Obligations (net of any amounts required to be paid in respect of (and in any amount not to exceed) the Carve Out pursuant to the Orders) shall, subject to the provisions of Section 2.13, be applied by the Lender in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lender (including fees, charges and disbursements of counsel to the Lender and amounts payable under Article III);

Second, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and other Obligations;

Third, to payment of that portion of the Obligations constituting unpaid principal on the Loans and other Obligations; and

Last, the balance, if any, after all of the Obligations have been paid in full, to whomever may be lawfully entitled to receive such surplus as determined by the Bankruptcy Court.

## ARTICLE IX.
## MISCELLANEOUS

9.01    **Amendments, Etc**.

No amendment or waiver of any provision of this Agreement or any other DIP Loan Document, and no consent to any departure by a Borrower therefrom, shall be effective unless in writing signed by the Lender and the Borrowers, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

9.02    **Notices; Effectiveness; Electronic Communication**.

(a)    Notices Generally.   Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Borrowers to Morrison Foerster, 425 Market Street, San Francisco, California 94105, Attention: Darío D. Avram, email address: DarioAvram@mofo.com; and

(ii)    if to the Lender to Chadbourne & Parke LLP, 1301 Avenue of the Americas, New York, New York 10019, Attention:  Howard Seife, Samuel S. Kohn, and

55-

Francisco        Vazquez,        E-mail        addresses:        hseife@chadbourne.com; skohn@chadbourne.com; and fvazquez@chadbourne.com.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the Lender, shall be deemed to have been given at the opening of business on the next Business Day for the Lender).  Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)        Electronic Communications.  Notices and other communications to the Borrowers and the Lender hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites).

Unless the Lender otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received when sent, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended Lender at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii), if such notice, email or other communication is not sent during the normal business hours of the Lender, such notice, email or communication shall be deemed to have been sent at the opening of business on the next business day for the Lender.

(c)        Change of Address, Etc.  Each of the Borrowers may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the other parties hereto.  The Lender may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the Borrowers.

(d)        Reliance by the Lender.  The Lender shall be entitled to rely and act upon any notices (including telephonic or electronic Loan Notices) purportedly given by or on behalf of a Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the Lender, varied from any confirmation thereof.  .

9.03    **No Waiver; Cumulative Remedies; Enforcement**.

No failure by the Lender to exercise, and no delay by the Lender in exercising, any right, remedy, power or privilege hereunder or under any other DIP Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and

56-

provided under each other DIP Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

9.04    **Expenses; Damage Waiver**.

(a)    <u>Costs and Expenses</u>.  The Borrower shall pay (i) all actual, reasonable, out-of-pocket, documented expenses incurred by the Lender (including the reasonable and documented fees, charges and disbursements of counsel for the Lender), in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other DIP Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all actual, out-of-pocket, documented expenses incurred by the Lender (including the fees, charges and disbursements of any counsel for the Lender), in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other DIP Loan Documents, including its rights under this <u>Section 9.04</u>, or (B) in connection with the Loans made hereunder, including all such actual, out-of-pocket, documented expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)    <u>Waiver of Consequential Damages, Etc</u>.  To the fullest extent permitted by applicable law, the parties hereto shall not assert, and hereby waive, and acknowledge that no other Person shall have, any claim against any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other DIP Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.

(c)    <u>Payments</u>.  All amounts due under this <u>Section 9.04</u> shall be payable on the Termination Date.

(d)    <u>Survival</u>.  The agreements in this <u>Section 9.04</u> shall survive the termination of the Revolving Credit Commitment and the repayment, satisfaction or discharge of all the other Obligations.

9.05    **Payments Set Aside**.

To the extent that any payment by or on behalf of a Borrower is made to the Lender, or the Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

57-

9.06 **Successors and Assigns**.

The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrowers may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of the Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

9.07 **[Reserved]**.

9.08 **Right of Setoff**.

Notwithstanding Section 362 of the Bankruptcy Code, but subject to entry of the Interim DIP Order or the Final DIP Order, if any Event of Default shall have occurred and be continuing, the Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by the Lender to or for the credit or the account of the Borrowers against any and all of the Obligations owing to the Lender, irrespective of whether or not the Lender shall have made any demand under this Agreement or any other DIP Loan Document and although such Obligations may be contingent or unmatured.  The rights of the Lender under this Section 9.08 are in addition to other rights and remedies (including other rights of setoff) that the Lender may have.  The Lender agrees to notify the Borrowers promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

9.09 **Interest Rate Limitation**.

Notwithstanding anything to the contrary contained in any DIP Loan Document, the interest paid or agreed to be paid under the DIP Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate").  If the Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged, or received by the Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, characterize any payment that is not principal as an expense, fee, or premium rather than interest, exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

58-

9.10    **Counterparts; Integration; Effectiveness**.

This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other DIP Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Lender and the Borrowers. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging means (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement.

9.11    **Survival of Representations and Warranties**.

All representations and warranties made hereunder and in any other DIP Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Lender, regardless of any investigation made by the Lender or on their behalf and notwithstanding that the Lender may have had notice or knowledge of any Default at the time of any Revolving Credit Borrowing, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

9.12    **Severability**.

If any provision of this Agreement or the other DIP Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other DIP Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

9.13    **Governing Law; Jurisdiction; Etc**.

(a)    GOVERNING LAW.  THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER DIP LOAN DOCUMENT, AS EXPRESSLY SET FORTH

59-

THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)    <u>SUBMISSION TO JURISDICTION</u>.    THE BORROWERS IRREVOCABLY AND UNCONDITIONALLY AGREE THAT THEY WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST THE LENDER OR ANY RELATED PARTY IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, IN ANY FORUM OTHER THAN THE BANKRUPTCY COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWERS OR THEIR PROPERTIES IN THE COURTS OF ANY JURISDICTION.    NOTHING CONTAINED HEREIN SHALL BE DEEMED TO CONSTITUTE THE LENDER'S CONSENT TO JURISDICTION OF THE BANKRUPTCY COURT FOR ANY PURPOSES OTHER THAN THE ENFORCEMENT OF THIS AGREEMENT AND THE ORDERS.

(c)    <u>WAIVER OF VENUE</u>.    THE BORROWERS IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN <u>PARAGRAPH (b)</u> OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    <u>SERVICE OF PROCESS</u>.    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN <u>SECTION 9.02</u>.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

9.14    **Waiver of Jury Trial**.

60-

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).    EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

9.15    **Electronic Execution of Assignments and Certain Other Documents**.

The words "execute," "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Lender, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

9.16    **[Reserved]**.

9.17    **Entire Agreement**.

**THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.    THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES**.

9.18    **Order**.

In the event of any inconsistency between the terms and conditions of any of the DIP Loan Documents and the Interim DIP Order or the Final DIP Order, whichever is in effect at the

-61-

time of reference thereto, the provisions of the Interim DIP Order or the Final DIP Order, as the case may be, shall govern and control.

9.19    **Limitation on Liability**.

TO THE EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT OR THE OTHER DIP LOAN DOCUMENTS: (A) THE LENDER SHALL NOT BE LIABLE TO A BORROWER OR ANY OTHER PARTY FOR ANY INDIRECT, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES IN CONNECTION WITH THEIR RESPECTIVE ACTIVITIES RELATED TO THIS AGREEMENT, THE OTHER DIP LOAN DOCUMENTS, THE TRANSACTIONS CONTEMPLATED THEREBY, THE REVOLVING LOANS OR OTHERWISE IN CONNECTION WITH THE FOREGOING; (B) WITHOUT LIMITING THE FOREGOING, THE LENDER SHALL NOT BE SUBJECT TO ANY EQUITABLE REMEDY OR RELIEF, INCLUDING SPECIFIC PERFORMANCE OR INJUNCTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER DIP LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY; (C) THE LENDER SHALL NOT HAVE ANY LIABILITY TO THE BORROWER, FOR DAMAGES OR OTHERWISE, ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER DIP LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY; AND (D) IN NO EVENT SHALL LENDER'S LIABILITY TO THE BORROWERS FOR FAILURE TO FUND ANY REVOLVING LOAN EXCEED ACTUAL DIRECT DAMAGES INCURRED BY THE BORROWERS OF UP TO $1 MILLION IN THE AGGREGATE.

9.20    **Parties Including Trustees; Bankruptcy Court Proceedings**.

This Agreement, the other DIP Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other DIP Loan Document shall be binding upon the Borrowers, the estates of the Borrowers, and any trustee, other estate representative or any successor in interest of the Borrowers in a Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code. This Agreement and the other DIP Loan Documents shall be binding upon, and inure to the benefit of, the Lender and its assigns, transferees and endorsees. Until the Revolving Credit Commitments have expired or have been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full, the Liens created by this Agreement and the other DIP Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of the Borrowers to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Lender file financing statements or otherwise perfect its Liens under applicable law. Any such purported assignment, transfer, hypothecation or other conveyance by a Borrower without the prior express written consent of the Lender shall be void.

62-

The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of the Borrowers and the Lender with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other DIP Loan Documents.

63-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.


[Signature pages follow]

CPAM: 9490930.20CPAM: 9490930.20CPAM: 9490930.20CPAM: 9490930.20CPAM: 9490930.20CPAM: 9490930.20CPAM: 9490930.20CPAM: 9490930.20CPAM: 9490930.20CPAM: 9490930.20CPAM: 9490930.20CPAM: 9490930.20CPAM: 9490930.20930.19

CPAM: 9490930.20CPAM: 9490930.20

CPAM: 9490930.20

**MAXUS ENERGY CORP.**


**By:**_____
    **Name:**
    **Title:**

**TIERRA SOLUTIONS, INC.**


**By:**_____
    **Name:**
    **Title:**

**MAXUS INTERNATIONAL ENERGY COMPANY**


**By:**_____
    **Name:**
    **Title:**

**MAXUS (U.S.) EXPLORATION COMPANY**


**By:**_____
    **Name:**
    **Title:**

**GATEWAY COAL COMPANY**


**By:**_____
    **Name:**
    **Title:**

]

[*signature pages to the DIP Credit Agreement*]

**YPF HOLDINGS, INC.**


**By:**_____
    **Name:**
    **Title:**

**Exhibit C**

Exhibit C

Maxus Energy Corporation and Affiliates
Detailed 13 Week DIP Budget
USD in '000s

| | Week Ending | | | | | | | | | | | | | Post-Petition Period | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13 Weeks | Thereafter | Total |
| | 6/25/16 | 7/2/16 | 7/9/16 | 7/16/16 | 7/23/16 | 7/30/16 | 8/6/16 | 8/13/16 | 8/20/16 | 8/27/16 | 9/3/16 | 9/10/16 | 9/17/16 | | | |
| **Operating Receipts** | | | | | | | | | | | | | | | | |
| E&P Revenues (Neptune) | 1,086 | - | - | - | 1,312 | - | - | - | 1,290 | - | - | - | - | 3,688 | 11,095 | 14,783 |
| Overriding royalty interests | - | 110 | - | - | - | 212 | - | - | - | - | 213 | - | - | 535 | 2,021 | 2,556 |
| Total Operating Receipts | 1,086 | 110 | - | - | 1,312 | 212 | - | - | 1,290 | - | 213 | - | - | 4,223 | 13,116 | 17,339 |
| **Operating Disbursements** | | | | | | | | | | | | | | | | |
| Production Cost (Neptune) | 0 | 0 | (98) | (518) | 0 | (85) | (119) | (471) | 0 | 0 | (103) | (118) | (468) | (1,980) | (6,278) | (8,257) |
| Capex (Neptune) | 0 | 0 | 0 | (60) | 0 | 0 | 0 | (60) | 0 | 0 | 0 | 0 | (60) | (181) | (542) | (722) |
| Exploration Cost | 0 | 0 | (12) | (12) | (12) | (12) | (7) | (6) | (6) | (6) | (4) | (5) | (5) | (88) | (335) | (423) |
| Total Oil & Gas Disbursements | 0 | 0 | (110) | (590) | (12) | (97) | (126) | (537) | (6) | (6) | (108) | (123) | (533) | (2,248) | (7,154) | (9,402) |
| Site Remediation Costs | 0 | 0 | (721) | (721) | (721) | (721) | (428) | (343) | (343) | (343) | (257) | (468) | (468) | (5,534) | (21,478) | (27,012) |
| G&A Labor (Tierra) | 0 | (97) | 0 | (97) | 0 | (97) | 0 | (97) | 0 | 0 | (97) | 0 | (97) | (584) | (1,957) | (2,541) |
| G&A Other (Tierra) | 0 | 0 | (35) | (35) | (35) | (35) | (26) | (21) | (21) | (21) | (15) | (26) | (26) | (296) | (983) | (1,279) |
| Total Tierra Disbursements | 0 | (97) | (756) | (854) | (756) | (854) | (454) | (461) | (363) | (363) | (370) | (494) | (592) | (6,414) | (24,417) | (30,832) |
| Active Labor & Benefits | 0 | (143) | 0 | (146) | 0 | (146) | 0 | (131) | 0 | 0 | (131) | 0 | (131) | (829) | (2,644) | (3,473) |
| Other Non Labor | 0 | 0 | (58) | (58) | (58) | (58) | (47) | (37) | (37) | (37) | (28) | (42) | (42) | (504) | (1,476) | (1,980) |
| Pension & OPEBs | 0 | 0 | (11) | (11) | (11) | (11) | (7) | (6) | (6) | (6) | (4) | (7) | (7) | (89) | (2,451) | (2,540) |
| Independent Directors Expenses | 0 | 0 | (23) | 0 | 0 | 0 | (326) | 0 | 0 | 0 | 0 | (23) | 0 | (373) | (210) | (583) |
| Total Corporate Disbursements | 0 | (143) | (93) | (215) | (69) | (215) | (380) | (175) | (43) | (43) | (164) | (73) | (181) | (1,795) | (6,781) | (8,576) |
| Total Operating Disbursements | 0 | (241) | (959) | (1,659) | (838) | (1,166) | (960) | (1,172) | (413) | (413) | (641) | (690) | (1,306) | (10,457) | (38,353) | (48,810) |
| Net Operating Cash Flows | 1,086 | (131) | (959) | (1,659) | 475 | (954) | (960) | (1,172) | 877 | (413) | (428) | (690) | (1,306) | (6,234) | (25,237) | (31,471) |
| **Bankruptcy & Restructuring** | | | | | | | | | | | | | | | | |
| Ordinary Course Professionals (OCC) | 0 | 0 | (43) | (43) | (43) | (81) | (43) | (34) | (34) | (34) | (26) | (43) | (43) | (465) | (1,149) | (1,614) |
| Ordinary Course Professionals (Non-OCC) | 0 | 0 | (19) | (19) | (19) | (53) | (19) | (16) | (16) | (16) | (12) | (20) | (20) | (227) | (846) | (1,073) |
| Professional Fees (Cash) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (487) | 0 | 0 | 0 | (487) | (21,400) | (21,886) |
| Critical Vendor Claims (General Unsecured) | 0 | 0 | 0 | 0 | 0 | 0 | (281) | (225) | (225) | (225) | (169) | (281) | (281) | (1,686) | (562) | (2,248) |
| Priority Tax/Regulatory Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (500) | (500) |
| Utility Deposits | 0 | 0 | 0 | (5) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (5) | 0 | (5) |
| KEIP/KERP (Tierra) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (1,477) | (1,477) |
| KEIP/KERP (Maxus) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (2,141) | (2,141) |
| Total Non-Operating Disbursements | 0 | 0 | (62) | (67) | (62) | (134) | (343) | (275) | (275) | (761) | (206) | (343) | (343) | (2,870) | (28,075) | (30,944) |
| Net Cash Requirement | 1,086 | (131) | (1,021) | (1,725) | 413 | (1,088) | (1,303) | (1,447) | 603 | (1,174) | (634) | (1,033) | (1,649) | (9,104) | (53,312) | (62,415) |
| DIP Financing (Weekly) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,312 | 0 | 571 | 634 | 1,033 | 1,649 | 5,200 | 53,312 | 58,512 |
| Weekly Net Cash Flows | 1,086 | (131) | (1,021) | (1,725) | 413 | (1,088) | (1,303) | (135) | 603 | (603) | 0 | 0 | 0 | (3,904) | 0 | (3,904) |
| Beginning Cash 1 | 6,404 | 7,490 | 7,359 | 6,338 | 4,613 | 5,026 | 3,938 | 2,635 | 2,500 | 3,103 | 2,500 | 2,500 | 2,500 | 6,404 | 2,500 | 6,404 |
| Weekly Net Cash Flow | 1,086 | (131) | (1,021) | (1,725) | 413 | (1,088) | (1,303) | (135) | 603 | (603) | 0 | 0 | 0 | (3,904) | 0 | (3,904) |
| Ending Cash | 7,490 | 7,359 | 6,338 | 4,613 | 5,026 | 3,938 | 2,635 | 2,500 | 3,103 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| **Funding Needs** | | | | | | | | | | | | | | | | |
| **Tranche A (Restructuring & Bankruptcy)** | | | | | | | | | | | | | | | | |
| Beginning Tranche A Balance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,179 | 0 | 3,179 | 0 |
| Tranche A Draw (Restructuring and Bankruptcy) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,179 | 0 | 3,179 | 25,189 | 28,368 |
| Ending Tranche A Balance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,179 | 3,179 | 3,179 | 28,368 | 28,368 |
| **Tranche B (Normal Course Operations)** | | | | | | | | | | | | | | | | |
| Beginning Tranche B Balance | 0 | 0 | 0 | 0 | 0 | 0 | 2,518 | 2,518 | 2,518 | 2,518 | 2,518 | 4,503 | | 0 | 0 | 0 |
| Tranche B Draw (Normal Course Operations) | 0 | 0 | 0 | 0 | 0 | 2,518 | 0 | 0 | 0 | 0 | 1,985 | 0 | | 4,503 | 25,646 | 30,149 |
| Ending Tranche B Balance | 0 | 0 | 0 | 0 | 0 | 2,518 | 2,518 | 2,518 | 2,518 | 2,518 | 4,503 | 4,503 | | 4,503 | 25,646 | 30,149 |
| Beginning DIP Balance | 0 | 0 | 0 | 0 | 0 | 0 | 2,518 | 2,518 | 2,518 | 2,518 | 2,518 | 7,682 | | 0 | 7,682 | 0 |
| DIP Draw (Cash) | 0 | 0 | 0 | 0 | 0 | 2,518 | 0 | 0 | 0 | 0 | 5,164 | 0 | | 7,682 | 50,835 | 58,517 |
| Total DIP Facility | 0 | 0 | 0 | 0 | 0 | 2,518 | 2,518 | 2,518 | 2,518 | 2,518 | 7,682 | 7,682 | | 7,682 | 58,517 | 58,517 |