**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>MAXUS ENERGY CORPORATION, *et al.,*[1]<br><br>Debtors. | ) Chapter 11<br>)<br>) Case No. 16-11501 (CSS)<br>)<br>) Jointly Administered<br>)<br>) **Ref. Docket Nos. 10, 11, 193, 194, 195, 196, 197, 198, 199**<br>) **Hearing Date:  August 15, 2016, at 10:00 a.m. (ET)** |

**DEBTORS' REPLY IN SUPPORT OF DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (A) APPROVING POST-PETITION FINANCING; (B) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (C) MODIFYING THE AUTOMATIC STAY; (D) SCHEDULING INTERIM AND FINAL HEARINGS; AND (E) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby submit this reply (the "Reply") in support of the *Debtors' Motion for Interim and Final Orders (A) Approving Post-Petition Financing; (B) Granting Liens and Providing Superpriority Administrative Expense Claims; (C) Modifying the Automatic Stay; (D) Scheduling Interim and Final Hearings; and (E) Granting Related Relief* [Docket No. 10] (the "DIP Motion") and in response to the objections (the "Objections") of Occidental Chemical Corporation ("OCC") and Benjamin Moore & Co.[2] ("Benjamin Moore" and, together with OCC, the "Objectors").[3]  In support of this Reply, the Debtors submit the supplemental declaration of Scott Winn (the "Supp. Winn Decl.") and the declaration of Bradley I. Dietz (the "Dietz Decl.").  In further support of the Reply, the Debtors respectfully represent as follows:

---

[1]  The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Maxus Energy Corporation (1531), Tierra Solutions, Inc. (0498), Maxus International Energy Company (7260), Maxus (U.S.) Exploration Company (2439), and Gateway Coal Company (7425).  The address of each of the Debtors is 10333 Richmond Avenue, Suite 1050, Houston, Texas 77042.

[2]  Due to the disputed nature of Benjamin Moore's purported claims against the Debtors, the Debtors hereby reserve the right to challenge Benjamin Moore's standing to bring its Objection.

[3]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion.

## PRELIMINARY STATEMENT

1.      Good faith negotiations between the Creditors' Committee and YPF Holdings, Inc. ("YPFH" or the "Lender"), with active encouragement by the Debtors, have yielded a significantly improved financing proposal that is supported by the Committee.  This vitally important debtor-in-possession financing is essential to assure the success of these cases, plainly benefits all stakeholders, including those who persist in objecting, and should be approved.

2.      Negotiations between the Creditors' Committee (the "Committee") and YPFH have resulted in a series of highly desirable clarifications and improvements to the terms of the proposed DIP financing that address a significant portion of the Objectors' concerns.[4]  Among other things, YPFH (a subsidiary of YPF and the immediate parent of the Debtors), the lender under the proposed DIP Facility, has agreed to the following modifications summarized below:

- Subordination of Tranche B Facility.  The Tranche B Facility is strictly subordinated for all purposes; if the DIP Facility is to be refinanced, only the Tranche A Facility must be repaid.  *See* Final DIP Order ¶ 2(i).  This subordinated portion of the financing amounts to more than 50% of the total facility.

- No Round Tripping.  YPFH has agreed that the Debtors will not be required to repay the DIP Facility with the proceeds of the Settlement Agreement (if approved).  *See* Final DIP Order ¶ 2(e).

- Limits on Foreclosure Rights.  YPFH must provide the Debtors with ten days' notice of any hearing regarding stay relief upon the occurrence of an event of default.  *See* Final DIP Order ¶ 15(a).

- Tranche A Facility Reduced.  The amount of advances under the Tranche A Facility are capped at $28.75 million (reduced from $31.9 million).  *See* Final DIP Order ¶ 2(b).

- Interest/Fees to Be PIK.  YPFH has agreed that all interest and fees owing under the DIP Facility are payable in kind and not in cash.  *See* DIP Credit Agreement § 2.07(c).

---

[4] Contemporaneously herewith, the Debtors are filing a form of final order approving the DIP Facility (the "Final DIP Order").

01:19138221.1

- <u>Setoff Rights Waived</u>. YPFH has waived its right of setoff with respect to the Tranche B Facility. *See* Final DIP Order ¶ 2(i).

- <u>Committee's Investigation Budget</u>. The fees available for Committee professionals to investigate and take a position on the Settlement Agreement are fixed at $1.25 million subject to the Committee's ability to demonstrate "cause" and increase that amount. *See* Final DIP Order ¶ 7(f).

- <u>No Lien on Avoidance Actions</u>. YPF will not have a lien on chapter 5 avoidance actions (and non-bankruptcy law equivalents) nor proceeds of such actions. *See* Final DIP Order ¶ 2(e).

3.      The DIP financing before the Court, as materially improved by the aforementioned enhancements, may well qualify as one of the most generous, debtor-friendly financings ever offered by any lender to a chapter 11 debtor burdened with such overwhelming financial obligations. A DIP loan is pivotal here, and the alternative to approval of this financing is as fraught with risk as it is bleak for all parties in interest: foreseeable prompt conversion of these cases to chapter 7 and the loss of the benefit of the settlement bargain made between the Debtors and their ultimate parent, YPF. This is not the time to address the merits of the Settlement Agreement, but, subject to court approval, the settlement avoids the inherent uncertainty of litigation and offers an opportunity for a substantial contribution to the estates. Loose talk of conversion to chapter 7 by the Objectors is plainly inappropriate and reckless under the circumstances.

4.      The DIP loan is an important component of the Debtors' prepetition agreements reached with YPF. The Debtors seek approval of an even better financing arrangement that is enormously beneficial to stakeholders. Security for the loan is inadequate to support all of the advances, and once drawn, the advances are unlikely to be repaid in full. Although these facts would ordinarily make it impossible to borrow on any terms in the commercial market, YPFH

01:19138221.1

3

remains committed to extending financing to satisfy the Debtors' budgeted obligations and enable the Debtors to remain in chapter 11 to negotiate and propose a consensual plan.

5.     To state the obvious, YPFH is not a typical lender, but OCC is not a typical objector either.  OCC has been litigating with YPF regarding its alter ego claims for years and is naturally antagonistic to, and motivated to inflict maximum damage on, YPF and its affiliates. Perhaps that is the reason for an objection that amounts to a smear campaign.  YPF, for its part, is eager to support the Debtors' financing needs because of an unconcealed economic interest in resolving all alter ego claims of the Debtors' estates within the context of these cases.  That makes YPF (through its affiliates) the most logical source of funding on what has turned out to be exceptionally liberal financing terms, but YPF's economic motivation to support the Debtors in these cases has reasonable boundaries.  YPF has informed the Debtors that it is willing to lend through YPFH even without the expectation of repayment in full.  However, from a purely commercial point of view, YPFH is unwilling under any circumstances to give money away in the manner suggested by OCC.  No party would do such a thing, and a historical pattern of prepetition capital contributions from YPF to its subsidiaries has no bearing on a post-petition situation that has already proved to be intensely adversarial.  YPFH has agreed to lend, but not to make advances amounting to gifts.

6.     Moreover, OCC has not offered alternative financing to the Debtors.  Rather, in its far ranging Objection, OCC distorts the facts, harps on about the process that led to these bankruptcy cases, and seems to be betting on the possibility that a defeat of the financing will somehow compel the Lender to return with even more generous terms.  YPFH is a lender, not a benefactor, and has insisted that funds are to be advanced pursuant to loan documentation negotiated at arms'-length and not as capital contributions.  The Objectors' desire for even more

advantageous capital commitments by YPFH should not be allowed to derail this critical financing that is necessary to support the administration of these chapter 11 cases. It is undisputed that financing is not available on comparable terms from any other party. The reason is simple: the aggregate advances under Tranche A and Tranche B exceed the fair value of the Debtors' current asset base.

7. In continuing to oppose this manifestly beneficial DIP financing, even after terms of that financing have been greatly improved because of agreements reached by YPFH and the Committee, OCC is using its Objection to pursue an ongoing litigation strategy against YPF, the Debtors, the independent directors of the Debtors, and the Debtors' advisors. OCC's arguments are long on false assertions, innuendo, and conspiracy theories and short on relevant facts.[5] The Objectors cannot be serious in cavalierly suggesting that a chapter 7 case would be a better alternative for creditors.

8. Most importantly, OCC's unsubstantiated conspiracy theory narrative should not divert attention from the subject at hand: whether the modified form of financing is fair and appropriate, has been negotiated in good faith, and should be approved in accordance with applicable law. This financing is far superior to traditional DIP loan transactions, but it still must be considered in relation to well-established precedent for approving debtor-in-possession financing. Measured by that familiar standard, the financing offered by YPF is attractive and vitally important, and will enable the Debtors to utilize chapter 11 to pursue a substantial value-maximizing settlement with YPF that is beneficial to all creditors. The Objectors would seek to

---

[5] For example, OCC claims that "[i]n its latest publicly filed annual statements, YPF provisioned approximately $200 million in potential environmental liabilities linked to the Passaic River Litigation alone - *i.e.*, approximately $70 million more than YPF proposes to pay to resolve all claims against it in the Settlement Agreement." OCC Objection ¶ 9. The $200 million accounting reserve booked by YPFH (which accounts for the results of its subsidiaries, including the Debtors) represents certain of the Debtors' potential, direct environmental liability to OCC arising from the Passaic River Litigation, and not YPF's potential litigation liability related to the alter ego claims being settled with the Debtors pursuant to the Settlement Agreement. *See* Supp. Winn Decl. ¶¶ 16-17.

deny to YPFH customary lender protections and are looking for what amounts to unconditional capital infusions with no expectation of repayment under any circumstances. Such advances are neither attainable nor commercially reasonable.

9.      Tellingly, the present form of financing provides essential liquidity that benefits all stakeholders and that materially benefits OCC itself. OCC is conflicted. It opposes a financing that will enable Tierra to perform remediation of environmental damage for which OCC is primarily liable, yet if OCC succeeds in defeating the financing, OCC would be responsible for direct payment of these remediation costs. Accordingly, OCC's Objection is hardly credible since it opposes a financing that will enable the Debtors to perform indemnity obligations to OCC within the bankruptcy cases at no cost to OCC. OCC may want even better terms, but objecting without negotiating is not calculated to achieve that end. The Committee (which includes OCC) has done that for the benefit of all creditors. As confirmed by the support of the Committee, it is indisputable that the financing before this Court is needed by all stakeholders, including OCC, and should be approved.

## REPLY

### I.      The Debtors' Need for the DIP Facility Is Beyond Dispute

10.     The Debtors' need for financing is clear. In the years leading up to the bankruptcy filing, the Debtors relied on financial support from YPF to meet their significant remediation obligations. *See* Supp. Winn Decl. ¶ 4. The Debtors lack the resources to support themselves during these chapter 11 cases. *See* Supp. Winn Decl. ¶ 4. As of the Petition Date, the Debtors had only $6.4 million of cash on hand and, as confirmed by the latest DIP Budget, need the DIP Facility to meet their obligations to their current employees, independent contractors, and vendors, as well as to administer these chapter 11 cases and fund ongoing operations. *See* Supp. Winn Decl. ¶ 4. Accordingly, the Debtors and their advisors evaluated

both the Debtors' ongoing remediation obligations and their operating needs for a twelve month period, and determined that $63.1 million in financing was required.  *See* Supp. Winn Decl. ¶ 4.

11.     The Debtors' advisors carefully developed the DIP Budget in consultation with the Debtors' operational and financial personnel, and thoroughly negotiated the specific line items of the DIP Budget with YPFH.  *See* Supp. Winn Decl. ¶ 4.  If the Final DIP Order is not entered, the Debtors will be administratively insolvent by the week ending September 17, 2016. *See* Supp. Winn Decl. at ¶ 4.  It is obvious to all, even to the Objectors, that the Debtors need the financing provided by the DIP Facility to maintain themselves as chapter 11 debtors-in-possession.

**II.    The DIP Facility Fully Satisfies the
        Requirements of Section 364(c) of the Bankruptcy Code**

12.     The statutory requirements for obtaining post-petition credit are set forth in section 364(c) of the Bankruptcy Code, which provides:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

13.     Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

(i)     the debtor must be unable to obtain unsecured credit under section 364(b) (*i.e.*, by granting a lender administrative expense priority);

(ii)    the credit transaction must be necessary to preserve the assets of the estate; and

(iii)   the terms of the transaction must be fair, reasonable, and adequate,

01:19138221.1

given the circumstances of the debtor-borrower and the proposed
lender.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011) (noting these three factors in considering proposed post-petition financing) (citations omitted); *In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test).

### A.    The Debtors Are Unable to Obtain Unsecured Credit

14.    To show that the credit required could not be obtained on an unsecured basis, a debtor need only demonstrate "by a good faith effort" that such credit was not available. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id*. Moreover, where few lenders are willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988).

15.    The terms of the financing obtained by the Debtors under the DIP Facility are, in some respects, even more favorable than unsecured credit—because advances under the Tranche B Facility are subordinated to the claims of all unsecured creditors. *See* Final DIP Order ¶ 2(i). As revised, $34.35 million is available under the Tranche B Facility, more than half of the total funding. *See* Supp. Winn Decl. ¶ 5. In other words, more funds are coming into the estates on a basis junior to unsecured creditors than on a senior, secured basis. *See* Supp. Winn Decl. ¶ 5. This feature essentially neutralizes the impact of the senior advances, making the financing remarkably beneficial to the Debtors' estates.

16.    Furthermore, the requirement that the Debtors be unable to obtain unsecured credit is plainly satisfied because, aside from the DIP Facility provided by YPFH, the Debtors

have no ability to obtain secured credit from the market, let alone unsecured credit.  *See* Supp.

Winn Decl. ¶ 5.

17.     With no legal basis, the Objectors assert that YPFH should be compelled to fund

these chapter 11 cases through a capital contribution to the Debtors.  *See* OCC Objection ¶ 48;

Benjamin Moore Objection ¶ 28.  The Debtors requested that YPFH fund these chapter 11 cases

through a capital contribution, but that request was not accepted.  *See* Supp. Winn Decl. ¶ 6.

Historically, YPF made equity contributions to the Debtors in its discretion, *see* Supp. Winn

Decl. ¶ 6, and had no legal obligation to fund the Debtors prior to the Petition Date.  The

Bankruptcy Code does not include any provision that would require a parent to provide unlimited

support in the form of equity contributions to its subsidiaries in bankruptcy.

18.     The Objectors fault the Debtors for failing to consider financing these chapter 11

cases through non-traditional sources, such as litigation funding, *see* Benjamin Moore Objection

¶ 32; OCC Objection ¶ 24, yet fail to identify a single chapter 11 case in which a Debtors'

decision to forgo non-traditional and expensive methods of funding, such as litigation finance,

constituted grounds to deny approval of traditional DIP financing.  Litigation funding is not a

means to secure financing for Tierra's remediation services, nor is it a logical source of financing

for facilitating approval of a settlement that has already been negotiated.  Therefore, the

Objectors are incorrect in suggesting that litigation funding is a reasonable alternative to the

financing before the Court.

> **B.     The DIP Financing Is Necessary to Preserve Assets of the Estates**

19.     It is essential that the Debtors obtain the financing necessary to preserve and

protect the value of their estates.  *See* Dietz Decl. ¶ 18.  The Debtors' inability to access post-

petition funding in these chapter 11 cases would likely result in the following, which would destroy value that would otherwise be distributed to unsecured creditors:

- The Debtors' ongoing environmental remediation efforts would quickly come to a halt (which might result in additional environmental harm and enlarged or additional claims against the Debtors' estates);

- Parties involved could incur penalties in connection with the lack of continuing performance of government-imposed obligations relative to ongoing environmental response/remediation projects (including OCC, which will forfeit the benefit of an orderly transfer of remediation services from Tierra);

- YPF would be released from the Settlement Agreement, and the Debtors' unsecured creditors would exchange a fixed and certain amount for the risk of future litigation, with an uncertain outcome, in both trial and appellate courts; and

- The Debtors' business would be shuttered, causing the Debtors' entire workforce to become immediately unemployed and destroying the value of Tierra's remediation services platform.

*See* Supp. Winn Decl. ¶ 7.

20.    The DIP Facility provides the liquidity needed by the Debtors to implement a process to obtain approval of a settlement that can yield significant value for unsecured creditors. *See* Supp. Winn Decl. ¶ 8.  Therefore, the DIP Facility is necessary to preserve the Debtors' assets.

**C.    The Terms of the DIP Financing Are Fair, Reasonable, and Adequate**

21.    The terms and conditions of any DIP facility must be evaluated by a bankruptcy court in light of a debtor's financial circumstances and alternatives.  *See, e.g., In re W. Pac. Airlines, Inc.*, 223 B.R. 567, 572 (Bankr. D. Colo. 1997) (financing facility was approved because it fairly reflected the debtor's "situation and the market in which the Debtor is forced to participate as a result of its financial circumstances and the deadlines it faces").  Judged from

that perspective, the terms of the DIP Facility are entirely fair and reasonable under the circumstances.

22.    Given the Debtors' limited cash reserves and revenue-generating business operations, as well as the value of assets available to collateralize a post-petition loan, no third party would be willing to provide the Debtors with financing on the same or better terms.  *See* Supp. Winn Decl. at 9.  Moreover, the terms of the DIP Facility are extremely favorable to the Debtors, and include:

- The Tranche B Facility, which consists of **$34.35 million in financing on an unsecured and subordinated basis** that will not be repaid unless all allowed general unsecured claims of other creditors have been satisfied.  This is an extraordinarily favorable term that the Debtors' financial advisor has not seen in his thirty years of experience.

- An interest rate of 7% per annum, paid-in-kind, which is below market and favorable for loans of this type.  The typical median fixed rate range for similar new money DIP loans is 9–10%, and loans usually require cash interest payments.

- No fees that reduce the amount of financing actually available to the Debtors.  The 2% commitment fee is favorable because the fee is not paid in cash, but rather paid-in-kind, and operates like an unused line fee.  In addition, there are no upfront fees and no closing or agent fees.

- A maturity date of 12.5 months, which is significantly longer than the average duration of new money debtor-in-possession loans.

- DIP Budget variance reporting requirements that occur monthly instead of weekly or biweekly, so the Debtors are less likely to violate any covenants if a given week is out of variance.

*See* Supp. Winn Decl. ¶ 9.

23.    Moreover, following the appointment of the Committee, the Debtors, the Committee, and YPFH worked collaboratively to modify the DIP Credit Agreement to further benefit unsecured creditors.  *See* Supp. Winn Decl. ¶ 10.  As a result of these efforts, the

Committee agreed to support the DIP Motion. The revised terms, which are reflected in the blackline of the DIP Credit Agreement and Final DIP Order (as applicable), include:

- An investigation budget for the Committee to challenge the Settlement Agreement is increased to $1.25 million (subject to increase for "cause");

- YPFH's enforcement rights to seek stay relief upon default must be sought on no fewer than 10 days' notice;

- YPFH agrees that only the Tranche A Facility must be repaid if the DIP Facility is refinanced, and that Tranche A is reduced to approximately $28.75 million and Tranche B is increased to $34.35 million;

- YPFH will not receive a lien on Avoidance Actions or the proceeds thereof, thereby preserving potential unencumbered value for unsecured creditors;

- The Final DIP Order and DIP Credit Agreement further clarify that the DIP Facility will not be repaid from the Settlement Agreement proceeds; and

- The Final DIP Order and DIP Credit Agreement further clarify that the Tranche B Facility can be discharged in a chapter 11 plan, and is subordinate to the prior payment in full of all allowed general unsecured claims.

*See* Supp. Winn Decl. ¶ 10.

24.    The Objectors suggest that entry into the proposed DIP Facility would benefit YPF at the expense of the Debtors' unsecured creditors. *See* OCC Objection ¶ 40-41; Benjamin Moore Objection ¶ 6. This argument has no merit. The proposed DIP Facility provides the Debtors with one year of breathing room to realize significant value for the Debtors' estates through the prosecution of the Settlement Agreement, which resolves highly contentious and uncertain litigation, while also allowing the Debtors to remain a going concern and perform their ongoing remediation obligations—all of which benefits the very parties that are objecting to this DIP Facility. *See* Supp. Winn Decl. ¶ 11.

25.     OCC suggests that the Debtors should gamble away their most substantial asset—the Settlement Agreement—for a chance to continue to pursue untested claims against YPF in hopes of a huge dollar recovery.  *See* OCC Objection ¶ 3.  The Debtors are pursuing a more responsible path—a settlement to be considered within adequately funded chapter 11 cases.

## III.    **The Independent Directors Are Not Conflicted**

26.     The decision to seek approval of the proposed DIP Facility was made by the Debtors' duly appointed independent directors.  The Objectors have challenged the directors' independence, rolling out questions about the nature of the directors' appointment and their relationships with YPF and its various representatives.  *See* OCC Objection ¶¶ 15, 37-38; Benjamin Moore Objection ¶ 12.  For example, OCC alleges that YPF's counsel "personally called" the independent directors to ask them to serve as directors of Maxus.  *See* OCC Objection ¶ 15.  Likewise, OCC notes that Mr. Nikolis "is a practicing bankruptcy attorney" and alleges that Mr. Nikolis worked with Mr. Seife at Chadbourne.  *See id*.  The Objectors' allegations demonstrate nothing remotely close to the true conflict of interest required to disprove director independence under well-established Delaware law.

27.     Delaware courts recognize that "the question of independence turns on whether a director is, *for any substantial reason*, incapable of making a decision with only the best interests of the corporation in mind."  *Parfi Holding AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1232 (Del. Ch. 2001) (emphasis in original), *rev'd in part on other grounds*, 817 A.2d 149 (Del. 2002).  When determining whether a director's independence has been tainted as a result of receiving compensation from a company, Delaware courts require that the payment received be "so material as to taint" the director's judgment.  *White v. Panic*, 793 A.2d 356, 366 (Del. Ch. 2000), aff'd, 783 A.2d 543 (Del. 2001).  Likewise, "[a]llegations of mere personal friendship or a

mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence." *Beam v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004). "To create a reasonable doubt about an outside director's independence, a plaintiff must plead facts that would support the inference that . . . the non-interested director would be more willing to risk his or her reputation than risk the relationship with the [insider]." *Id.* at 1052.

28.     The two members of the Special Independent Committee have no relationship with YPF (or their affiliates, including YPFH), and their independence cannot be reasonably questioned.  The fact that Mr. Seife, who currently represents YPF, knows both of the independent directors is inconsequential.  Moreover, the fact that Mr. Nikolis was employed as an associate at Chadbourne (counsel to YPF) years earlier is remote in time and does not conclusively demonstrate any reason for the directors' alleged biased treatment of a Chadbourne client.  In addition, there is no indication that either of the independent directors has, since their introduction to YPF by Mr. Seife in 2014, spent time regularly socializing or developing close relationships with YPF personnel.  *See* Dietz Decl. ¶¶ 6-7.  The facts alleged by OCC fail to demonstrate that either independent director would be "willing to risk his or her reputation" for YPF or Chadbourne.  Accordingly, these relationships fall far short of the closeness that would call into question the directors' independence under Delaware law.

29.     Furthermore, neither independent director has received compensation, relative to his net asset worth or income, that is "so material as to taint" his judgment.  The Objectors fail to demonstrate that either of the independent directors would derive any financial benefits from the relationship between YPF and Chadbourne.  Accordingly, the Objectors cannot show that YPF's financial influence over either independent director is "so material as to taint" the directors'

01:19138221.1

14

judgment, which is the standard that must be satisfied to discredit the directors' independence under Delaware law.

30.     The reality is that YPF has no influence whatsoever over these directors.

## IV.     The DIP Financing Meets the Heightened Scrutiny Standard

31.     The Debtors' decision to seek approval of the proposed DIP Facility was made by independent directors, based on the advice of qualified counsel and financial advisors, *see* Supp. Winn Decl. ¶ 12, and is therefore entitled to deference under the business judgement rule. *See In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 591 (Del. Ch. 2007) ("A committee of independent directors enjoys the presumption that its actions are *prima facie* protected by the business judgment rule.").   Nevertheless, even if this Court were to apply a more stringent standard of review, the decision to enter into the proposed DIP Facility also satisfies the "entire fairness" level of scrutiny because the transaction was the result of fair arms'-length dealing between YPFH and the independent directors, and the financing terms and price are also entirely fair.

32.     The "entire fairness" standard applies when a corporate board makes a decision under the influence of an "actual" conflict of interest. *See In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013).   "Once entire fairness applies, the defendants must establish to the court's satisfaction that the transaction was the product of both fair dealing and fair price." *Id*. (citation and internal quotations omitted).   Under Delaware law, a self-dealing transaction that is not the result of fair dealing, or was not made for a fair price, must be set aside as a matter of equity. *See Venhill Ltd. P'ship v. Hillman*, C.A. No. 1866-VCS, 2008 WL 2270488, at *22 (Del. Ch. June 3, 2008) (entire fairness is "an inquiry designed to assess whether a self-dealing transaction should be respected or set aside in equity.").

01:19138221.1

33.     In light of current market conditions in the E&P industry, the independence of the Debtors' independent directors, and the urgent need for liquidity to maintain the Debtors' viability and to proceed with their overall restructuring, both the terms of the DIP Credit Agreement (which includes approximately $34.35 million in subordinated and unsecured financing) and the process by which those terms were negotiated satisfy the "entire fairness" standard.  *See* Supp. Winn Decl. ¶ 12.  By any standard, this is an amazingly beneficial loan that offers the Debtors what they need on terms that are entirely fair.

A.     **Fair Dealing**

34.     To determine whether fair dealing exists, courts look to the process involved in entering into a transaction, including "when the transaction was timed, how it was initiated, structured, negotiated, disclosed . . . , and how the approvals . . . were obtained."  *See Emerald Partners v. Berlin*, 787 A.2d 85, 97 (Del. 2001) (quoting *Weinberger v. UOP Inc.*, 457 A.2d 701, 711 (Del. 1983), the seminal Delaware case regarding the entire fairness standard); *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006) (citing to *Weinberger* and noting that "the establishment of an independent special committee can serve as powerful evidence of fair dealing.").

35.     The terms of the DIP Facility were heavily negotiated at arms'-length by and among counsel for YPF and the two independent directors.  Neither of the independent directors is connected in any respect to YPF (or its affiliates), and neither YPF nor any of its affiliates (including YPFH) has any relationship with the independent directors that would enable it to exert any control over the independent directors.  *See* Dietz Decl. ¶¶ 6-7.

36.     In the days leading up to the Petition Date, the independent directors negotiated with YPF (through YPFH) to reach the best possible financing package for the Debtors.  *See*

Dietz Decl. ¶¶ 12-13.  For example, the independent directors initially requested that the entirety of Tierra's 12-month budget be included in the DIP Budget.  *See* Dietz Decl. ¶ 16.  Ultimately, the Debtors and YPF reached an agreement that YPFH would provide twelve months of funding for Tierra, which would include substantially all of Tierra's estimated remediation costs, other than costs associated with (a) remediation sites for which OCC was primarily liable to the applicable regulator, and (b) expenditures not immediately needed for project continuity and success.  *See* Dietz Decl. ¶ 16.

37.     The independent directors were actively engaged in all aspects of the Debtors' post-petition financing efforts and were aware of the Debtors' liquidity position and the absence of material assets to pledge as collateral for additional financing.  *See* Dietz Decl. ¶¶ 14-15.  The independent directors, in consultation with the Debtors' legal and financial advisors, determined that the DIP Facility from YPF (through YPFH) was the best financing option available for the Debtors.  *See* Dietz Decl. ¶ 18.  These negotiations with YPF (through YPFH) are consistent with a course of fair dealing with respect to the terms of the proposed DIP Facility.

**B.      Fair Price**

38.     Fair price "relates to the economic and financial considerations" of the proposed transaction, *see In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 56 (Del. Ch. 2013) (citation omitted), and takes "into account all relevant factors," which may be measured by any of the "techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court . . . ."  *Weinberger v. UOP, Inc.*, 457 A.2d 701, 713-14 (Del. 1983).  Only the speculative elements of value that may arise from the "accomplishment or expectation" of the transaction are excluded.  *See id*. at 713.  Given the many challenges associated with obtaining adequate financing, the terms of the DIP Facility are extremely

favorable to the Debtors.  *See* Supp. Winn Decl. ¶ 14.  Pricing is attractive relative to the market for DIP loans, and the terms of the financing cannot reasonably be questioned.  *See* Supp. Winn Decl. ¶ 14.

39.    Moreover, the milestones included in the financing are reasonable and customary. *See* Supp. Winn Decl. ¶ 15.  DIP lenders routinely condition the availability of post-petition financing upon the occurrence of a sale or other liquidation of the debtors' assets by a date certain.  *See* Supp. Winn Decl. ¶ 15.  That the Lender would condition financing upon the inclusion of a mechanism to ensure the Settlement Agreement is timely heard by this Court is consistent with the requirements of other cases in which a lender imposes a timeline to ensure that a restructuring moves promptly towards a conclusion.  *See, e.g.*, *In Re Signal International, Inc.*, No. 15-11498 (MFW) (Bankr. D. Del. Sept. 11, 2015) [Docket No. 316] (approving DIP facility requiring assumption of plan support agreement containing prepetition settlement within 51 days of petition date); *In re Nirvanix, Inc. (f/k/a Streamload, Inc.)*, No. 13-12595 (BLS) (Bankr. D. Del. Oct. 23, 2013) [Docket No. 92] (approving DIP facility requiring approval of a sale transaction within 48 days of the petition date); *In re Synagro Techs., Inc.*, No. 13-11041 (BLS) (Bankr. D. Del. May 28, 2013) [Docket No. 218] (approving DIP facility requiring approval of a sale transaction within 75 days of the petition date).

40.    Therefore, this Court should overrule the Objections to the proposed DIP Facility because the transaction satisfies the entire fairness standard.

## IV.    As a Good Faith Lender, YPFH Qualifies for the Protections of Section 364(e) of the Bankruptcy Code

41.    Section 364(e) of the Bankruptcy Code provides that a post-petition financing order granted to an entity extending credit in good faith cannot be overturned on appeal unless the objecting party obtains a stay of the order pending appeal.  *See* 11 U.S.C. § 364(e).  The

Bankruptcy Code does not attempt to define the term "good faith."  In construing the term, bankruptcy courts "borrow[] from traditional equitable principles . . . ."  *In re Tempo Tech. Corp.*, 202 B.R. 363, 367 (D. Del. 1996).  "Good faith means honesty in fact in the conduct or transaction concerned."  *Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. of Escanaba* (*In re Ellingsen MacLean Oil Co., Inc.*), 834 F.2d 599, 605 (6th Cir. 1987) (internal quotation marks omitted).

42.    YPFH plainly qualifies as a good faith lender because it engaged in robust negotiations with the Debtors' independent directors over the amount and terms of the DIP Facility, and agreed to significant concessions.  Furthermore, the terms of the proposed DIP Facility are highly favorable to the Debtors.  Bargaining with the Committee resulted in a series of improvements that have led the Committee and the Office of the United States Trustee to withhold the filing of any objections.

43.    Rather than provide any evidence that the Lender has not acted with "honesty in fact," OCC recites a list of "preliminary indications" of bad faith, including the fact that the proposed DIP financing and Settlement Agreement are "intertwined," the fact that the Settlement Agreement contains releases of the Debtors' claims against YPF, and the fact that YPF is an affiliate of the Debtors.  *See* OCC Objection at ¶ 55.  None of these facts suggests anything other than YPF acting in its own economic interest to resolve its outstanding liabilities to the Debtors in a commercially reasonable manner.  Accordingly, this Court should find that YPFH acted in good faith in connection with its approval of the proposed DIP financing.

01:19138221.1

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (i) overrule the

Objections, (ii) enter the Final DIP Order approving the DIP Motion on a final basis, and (iii)

grant such other and further relief as is just.

Dated:  August 11, 2016
        Wilmington, Delaware

*/s/ Joseph M. Barry*
M. Blake Cleary (No. 3614)
Joseph M. Barry (No. 4221)
Justin P. Duda (No. 5478)
Travis G. Buchanan (No. 5595)
**YOUNG CONAWAY STARGATT &
TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

-and-

James M. Peck (admitted *pro hac vice*)
Lorenzo Marinuzzi (admitted *pro hac vice*)
Jennifer L. Marines (admitted *pro hac vice*)
Jordan A. Wishnew (admitted *pro hac vice*)
**MORRISON & FOERSTER LLP**
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for Debtors
and Debtors-in-Possession*

01:19138221.1