## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 11 |
| MAXUS ENERGY CORPORATION, *et al.*,[1] | ) |
| | ) Case No. 16-11501 (CSS) |
| Debtors. | ) |
| | ) Joint Administration |
| | ) |
| | ) **Ref. Nos. 10, 193, 197** |

### YPF HOLDINGS, INC.'S REPLY TO THE OBJECTIONS OF OCCIDENTAL CHEMICAL CORPORATION AND BENJAMIN MOORE & CO. TO THE DEBTORS' MOTION FOR ORDER (A) APPROVING POST-PETITION FINANCING; (B) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (C) MODIFYING THE AUTOMATIC STAY; (D) SCHEDULING INTERIM AND FINAL HEARINGS; AND (E) GRANTING RELATED RELIEF

YPF Holdings, Inc. ("YPFH") respectfully submits this reply (the "Reply") to the

objections of Occidental Chemical Corporation ("Occidental") ["Occidental Objection" -- Dkt.

No. 197] and Benjamin Moore & Co. ("Benjamin Moore") ["Benjamin Moore Objection" -- Dkt.

No. 193] to the Debtors' Motion for an Order (A) Approving Post-Petition Financing,

(B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying

the Automatic Stay, (D) Scheduling Interim and Final Hearings; and (E) Granting Related Relief

(the "DIP Financing Motion")[2] [Dkt. No. 10].  In support, YPFH respectfully represents as

follows:

### PRELIMINARY STATEMENT

1.    The limited issue before the Court is the Debtors' DIP Financing Motion.  While

the Debtors have stated that they intend to seek approval of a settlement with their ultimate

---

[1]  The Debtors in the above-captioned Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Maxus Energy Corporation (1531), Tierra Solutions, Inc. (0498), Maxus International Energy Company (7260), Maxus (U.S.) Exploration Company (2439), and Gateway Coal Company (7425).  The address of each of the Debtors is 10333 Richmond Avenue, Suite 1050, Houston, Texas 77042.

[2]  Capitalized terms not defined herein shall have the meanings ascribed to them in the DIP Financing Motion.

corporate parent YPF S.A. and the YPF Entities[3] (the "Settlement Agreement"), no such motion has been filed.  Indeed, Occidental acknowledges that "[t]his is not the proper forum or the proper time to discuss the Settlement Agreement."  Occidental Obj. ¶ 42.  Similarly, Benjamin Moore "recognizes that the Settlement Agreement is not before the Court today."  Benjamin Moore Obj. ¶ 5.

2.      Yet, despite their  acknowledgement that the Settlement Agreement -- and whether it is reasonable or fair or should be approved by this Court -- is simply not at issue at this time, Occidental and Benjamin Moore nevertheless repeatedly attack the YPF Entities and the Settlement Agreement under the guise of objecting to the DIP Financing Motion.  Occidental and Benjamin Moore contend that the YPF Entities allegedly schemed to improperly settle alter ego and other claims with the Debtors, including claims asserted by Occidental in a litigation against Maxus, YPF and other parties in New Jersey (the "Passaic River Litigation").  *See, e.g.,* Benjamin Moore Obj. ¶¶ 1, 3; Occidental Obj. ¶ 3.  Nothing is further from the truth.

3.      While YPF has provided significant funding to the Debtors at various points over the last 20 years, primarily though capital infusions, YPF has concluded that such financial assistance cannot continue indefinitely.  As the Debtors have stated, without YPF funding the Debtors would have no choice but to liquidate under Chapter 7 unless another source of funding is available.  *See* June 20, 2016 Hr'g Tr. at 6:5-8.  Prior to the filing of the Chapter 11 cases, YPF agreed to provide the $63.1 million DIP Facility to allow the Debtors to (1) continue their operations while they consider all restructuring alternatives; (2) continue their environmental remediation projects for the benefit of, among others, OCC, and implement a process to transition such projects post-bankruptcy; and (3) seek Bankruptcy Court approval of the

---

[3]  The YPF Entities are YPF; YPFH; YPF International S.A. ("YPFI"); CLH Holdings, Inc. ("CLHH"); and YPF U.S.A. Services Corp.

Settlement Agreement, pursuant to which the YPF Entities will pay $130 million to the Debtors

for the benefit of all creditors, including the objectors.  The Debtors and the YPF Entities

negotiated the terms of the DIP Facility (and the Settlement Agreement) in good faith and at

arm's length.  Consequently, YPFH is a good faith lender and it is entitled to all of the

protections of Section 364(e) of the Bankruptcy Code.

4.    Occidental and Benjamin Moore have in their presentations misrepresented the

corporate relationships between YPF, Maxus and their affiliates; misstated the procedural

posture and status of the Passaic River Litigation at the time the Debtors filed the Chapter 11

cases; and neglected to inform this Court of their own direct culpability as dischargers of toxic

material in the Passaic River.[4]  Indeed, although there have been numerous accusations from

various parties, including Occidental, that the Debtors filed these Chapter 11 cases so that YPF

could avoid billions of dollars in environmental liability, to the contrary, unlike Occidental and

Benjamin Moore, the YPF Entities possess no such obligations, having never discharged any

toxic material in the Passaic River or Newark Bay.

5.    While a point-by-point response to the objectors' revisionist history is not

appropriate at this juncture, given the irrelevance of these matters to approval of the DIP

Financing, the YPF Entities offer below a reply to certain specific objections to the DIP

Financing Motion raised by the objectors and, as an illustration, a brief response to several of

their gross misstatements and omissions.

---

[4]  While Occidental "wishes to stress that its review and its conclusions are preliminary," Occidental Obj. ¶ 11, that does not excuse its numerous factual misstatements and misrepresentations.  Occidental has been involved in this litigation for over ten years and its trial counsel in the Passaic River Litigation, Munger, Tolles & Olson LLP, have appeared in this bankruptcy case.

## ARGUMENT

### I.    YPFH IS A GOOD FAITH LENDER UNDER SECTION 364(e)

6.      YPFH qualifies as a good faith lender and is entitled to all of the protections of

Section 364(e) of the Bankruptcy Code.  Section 364(e) provides that "the validity of [DIP

financing]" is not affected by "[t]he reversal or modification on appeal of [a DIP financing

order]" if the lender "extended such credit in good faith."  11 U.S.C.A. § 364(e).  As Occidental

acknowledges, Section 364(e) protection is necessary "to facilitate . . . DIP financing" which is

"potentially risky."  Occidental Obj. ¶ 54.

7.      In evaluating good faith under Section 364(e), courts focus primarily on whether

the DIP financing was the result of arm's length negotiations between the lender and the debtors.

*See In re Gen. Growth Properties, Inc.*, 423 B.R. 716, 722 (S.D.N.Y. 2010) (holding that the DIP

financing was in "good faith" under § 364(e) where the record demonstrated that the "the terms

of the DIP loan were 'vigorously negotiated at arm's length and in good faith.'"); *In re Cooper

Commons, LLC*, 430 F.3d 1215, 1220 (9th Cir. 2005) (upholding finding of "good faith" under §

364(e) because of findings that additional financing was needed and "the agreement was

negotiated at arms' length").[5]  YPF satisfies the good faith standard because, as set forth in the

---

[5]  The cases cited by Occidental are inapposite.  In *In re EDC Holding Co.*, the DIP lenders knew that the terms of the DIP loan provided an improper benefit to the lenders by granting a priority to certain attorneys' fees at the expense of general unsecured creditors.  676 F.2d 945, 948 (7th Cir. 1982).  The court held that the lenders were not acting in good faith because the lenders knew that the debtor could not properly grant the priority that was included in the DIP loan and "the transaction amounted to taking money out of the pockets of the general [unsecured] creditors to pay lawyers whose claims were not allowable under bankruptcy law at all."  *Id.* at 928.  Consistent with its holding, the court reversed the district court's affirmance of the DIP financing order, and remanded the issue to the bankruptcy court with instructions to reverse the order granting the priority and Section 364(e) protection.  *Id.* at 949.  In *In re TMT Procurement Corp.*, the lender had knowledge of an "adverse claim" on stock pledged as collateral in the DIP financing arrangement.  764 F.3d 512, 522 (5th Cir. 2014).  The court reasoned that, although a lender's knowledge of an objection did not constitute a lack of good faith, a lender's knowledge of an adverse claim "preclude[s] a finding of good faith" because the Fifth Circuit previously "defined a 'good faith purchaser' as 'one who purchases the assets for value, in good faith, and without notice of adverse claims.'"  *Id.* at 521-22.  Because the court found Section 364(e) protection did not apply, the court allowed the bankruptcy court order approving the DIP loan to be challenged on appeal and ultimately reversed that order.  *Id.* at 522.

Debtors' reply papers, there were extensive and robust negotiations between YPF and the Independent Directors (on behalf of the Debtors) as to the DIP financing arrangement. *See* June Dietz Decl. ¶ 16 (independent directors affirming that the negotiations were extensive, at "arm's length and adversarial"); Debtors Reply in Support of DIP Financing Motion ¶¶ 34-36.

8.      Importantly, following the bankruptcy filing, YPFH negotiated substantial revisions to the DIP Loan Documents with the Committee that address all of the Committee's concerns, including narrowing the sources of repayment and collateral, modifying Tranche B to ensure it is subordinated in all respects,[6] and providing the Committee ample resources to investigate the proposed settlement. *See* Debtors Reply in Support of DIP Financing Motion ¶ 2. Notably, the Committee will support the DIP Financing Motion at the hearing. In addition, the DIP Loan Documents have been further revised to address the US Trustee's concerns. Having resolved the concerns of the Committee and the US Trustee, most of the specific objections of Occidental and Benjamin Moore also have been resolved.

9.      At bottom, the proposed DIP financing is proper and YPFH is a good faith lender under Section 364(e) because the loan is an arm's length transaction that was negotiated vigorously, reflects input from nearly all of the key stakeholders in the bankruptcy, and is in the best interest of the creditors and of the estate.

## II.    YPFH'S APPOINTMENT OF INDEPENDENT DIRECTORS IS PROPER AND CONSISTENT WITH DELAWARE LAW

10.      Occidental's emphasis on the fact that YPFH selected the independent directors is irrelevant and wholly ignores applicable Delaware law. In accordance with the Delaware General Corporation Law, the Maxus Bylaws provide that the shareholders are the entities that

---

[6] Tranche B of the proposed DIP financing is deeply subordinated -- to an extent that is almost unprecedented in DIP financing situations -- and is structured for the purpose of providing a smooth and orderly transition of the Debtors' remediation efforts to third parties.

appoint the independent directors.  Del. Code Ann. tit. 8, § 211; Declaration of Bradly I. Dietz,

dated August 11, 2016 (the "August Dietz Decl."), at ¶ 2.  YPFH is the sole shareholder of

Maxus, and accordingly exercised its lawful right to select the independent directors that were

added to the Maxus board on July 13, 2015.  *See* Declaration of Bradley I. Dietz, dated June 18,

2016 ("June Dietz Decl.") [Dkt. No. 3], at ¶ 2.

      11.     The facts demonstrate that the appointment of the independent directors was

entirely proper.  YPFH appointed independent directors to independently assess any claims that

Maxus had against its parent and affiliates and ceded the requisite authority to the independent

directors to investigate such claims.  *See* June Dietz Decl. ¶ 7.  Under the Amended and Restated

Bylaws of Maxus Energy Corporation, adopted as July 13, 2015 (the "July 2015 Bylaws"), a

Special Independent Committee ("SIC") was formed (consisting of the two independent

directors) and was granted the authority to investigate and negotiate matters that posed potential

conflicts between Maxus and its affiliates, and to retain outside counsel and consultants to assist

the independent directors in fulfilling those duties.  *See* June Dietz Decl. ¶ 7; August Dietz Decl.

¶¶ 9-10.  Thereafter, upon the request of the independent directors, the SIC's authority was

expanded to include the authority to enter into a proposed settlement agreement related to the

claims that were the subject of the independent investigation, and the authority to file a Chapter

11 petition.  August Dietz Decl. ¶ 20.  As explained in the June Dietz Declaration, the

independent directors used their independent business judgment and a detailed report prepared

by their counsel and financial advisors in the negotiation of the potential settlement based on the

investigations.  *See* June Dietz Decl. ¶ 17.  Accordingly, Occidental's fictional assertions of

nefarious conduct deliberately ignore the important corporate governance safeguards that are provided by Delaware law and complied with by YPFH and the Debtors.[7]

### III.    OCCIDENTAL AND BENJAMIN MOORE MISREPRESENT THE RELATIONSHIP BETWEEN THE YPF ENTITIES AND THE DEBTORS AND THE STATUS OF THE PASSAIC RIVER LITIGATION

#### A.    Occidental and Benjamin Moore Misrepresent the Relationship Between the YPF Entities and the Debtors

12.    Occidental and Benjamin Moore further challenge the DIP Financing Motion on the grounds that the YPF Entities allegedly schemed to improperly settle alter ego and other claims with Maxus.  Benjamin Moore, which has never asserted a claim against the YPF Entities, opens its supposed narrow Objection to the DIP Financing Motion by immediately challenging the Chapter 11 cases themselves as "the latest chapter in a long history of attempts by Debtor Maxus and [YPF] to shield their assets from their obligations for contamination of the New Jersey Passaic River . . . ."  Benjamin Moore Obj. ¶ 1.  It then concludes: "On its face, the Settlement Agreement appears patently unreasonable compared to the potential liability of the YPF Entities."  *Id.* ¶ 3.  Similarly, Occidental objects to the DIP Financing Motion, stating "[i]ndeed the DIP Motion is the culmination of a highly choreographed multi-year process by which YPF set about to avoid the consequences of impending environmental litigation," and calling the Settlement Agreement the "centerpiece of that strategy."  Occidental Obj. ¶ 3.

13.    Far from any strategy or scheme that supposedly culminated in the DIP Financing Motion or the Settlement Agreement, the Objections completely ignore that YPF saved Maxus

---

[7] In support of its conspiracy theory, Occidental states that Theodore P. Nikolis worked with Howard Seife at Chadbourne & Parke LLP ("Chadbourne").  *See* Debtors Reply in Support of DIP Financing Motion ¶¶ 26-28.  This is simply one of the many patently false and irresponsible allegations laden throughout Occidental's objection.  Mr. Nikolis was an associate at Chadbourne from September 1986 through February 1991.  Mr. Seife joined Chadbourne in October 1997, more than 6 years after Mr. Nikolis had left the firm.  *See* https://www.linkedin.com/in/howard-seife-03438510; https://www.linkedin.com/in/ted-nikolis-9685b11.  In its attempt to create a conspiratorial fairytale, Occidental deliberately misleads this Court and repeatedly strays from the truth and facts.

from the brink of bankruptcy in 1995 when it acquired Maxus as an indirect subsidiary. Since

then, in 1996-1997, YPF paid Maxus over $1 billion in consideration for Maxus's non-US assets,

which allowed Maxus to drastically reduce its crippling high-interest third-party debt and begin

to turn a profit, and contributed *an additional* $1.4 billion to the Debtors -- including obligations

to Occidental under the indemnity agreement with Maxus. A partial timeline of the key events

can be found at Appendix A, which plainly demonstrates that YPF had no connection to Maxus

or the contract to pursuant to which Maxus agreed to indemnify Maxus in certain circumstances.

14.     A brief history correcting the record is in order. The Maxus and Occidental

environmental liabilities at issue here largely arose from activities in the 1950s and 1960s by a

subsidiary of a predecessor of Maxus, Diamond Shamrock Chemical Company ("DSCC"),

including the manufacturing of the defoliant Agent Orange for the US government at a DSCC

facility located on the Passaic River in Newark, New Jersey (the "Lister Site"). In September

1986, Occidental, through an affiliate, entered into a Stock Purchase Agreement (the "SPA")

with a predecessor of Maxus to acquire DSCC. The SPA required, among other things, that

Maxus in some circumstances indemnify Occidental for certain DSCC environmental liabilities.

Occidental subsequently merged with DSCC, assuming all of its environmental and other

liabilities.

15.     Prior to YPF's 1995 indirect acquisition of Maxus, none of the YPF Entities had

any involvement in these matters. The YPF Entities were not involved in polluting the Passaic

River (or any other DSCC-related site), had no ownership interest in DSCC or Maxus, and were

not and are not parties to the SPA.

16.     Contrary to the rosy picture Occidental paints of Maxus's financial viability

before it was indirectly acquired by YPF, by the early 1990s, Maxus was a failing company

facing grave liquidity problems.  From 1986 to 1995, Maxus's net income was negative in all but

two years.  By mid-1994, Maxus also owed over $1 billion in long-term, high-interest bond and

related debt, and faced a severe funding gap.  In 1993 and 1994, Maxus sold hundreds of

millions of dollars of producing assets, but was unable to close the funding gap.  On the advice

of its investment bankers that the status quo was not tenable, in February 1995, the Maxus Board

of Directors accepted an offer by YPF to indirectly acquire Maxus.[8]

17.    Instead of raiding Maxus to the detriment of its environmental creditors as

Occidental asserts, YPF's acquisition fueled an immediate financial turnaround at Maxus.  In

1995, Maxus posted losses of $108 million, with an additional $96.5 million in losses projected

for 1996.  But by the end of 1996, less than two years after YPF's acquisition, Maxus posted

$12.3 million in gains -- a $108.8 million improvement over Maxus's prior forecast for that year

and the first positive income year for Maxus in three years.

18.    In addition to certain structural changes introduced by YPF which contributed to

Maxus's financial turnaround, Maxus, YPF and their advisors formulated a global reorganization

strategy for Maxus (hereinafter "the 1996-1997 Reorganization") intended to accomplish three

strategic business objectives: (i) the elimination or replacement of Maxus's expensive, high-

interest debt and preferred stock; (ii) a reorganization in which Maxus's non-US operations were

sold to YPF subsidiaries outside the US to minimize aggregate taxation; and (iii) an agreement

by Tierra committing to manage and cover Maxus environmental liabilities.

---

[8]  OCC complained in the Passaic River Litigation that, upon YPF's acquisition of Maxus, Maxus absorbed $425
million of YPF's acquisition financing without receiving adequate consideration.  OCC's fraudulent transfer
claims arising therefrom were dismissed as time-barred. And because the Maxus Board approved that financing
and contractually committed to it months before YPF owned or controlled Maxus, that financing could not have
resulted from any abuse of the corporate form of parent company dominance and, thus, could not be an element of
alter ego damages.

19.    To effectuate the 1996-1997 Reorganization, Maxus sold certain of its
international assets to other entities within the YPF corporate structure, which removed those
subsidiaries from Maxus's U.S. tax jurisdiction.  These sales were at fair market value as
determined by independent advisors.  Maxus was paid approximately $1 billion in consideration
from YPF in connection with these sales, which Maxus used to pay down its crushing bond debt
and redeem interest-bearing preferred stock.  As a result of those asset sales, from 1996 to 1998,
Maxus reduced its debt burden by approximately $1 billion, a direct benefit to Maxus's creditors.

20.    In 1999, Repsol acquired supermajority ownership of YPF (and with it YPF's
direct and indirect subsidiaries, including the Debtors).  From 1999 to 2012, Repsol was the
ultimate parent of the YPF Entities and the Debtors and developed the overall strategy of the
corporate entities.  From 1999 to 2012, allegedly at Repsol's insistence, Maxus sold many of its
valuable U.S. assets.  Maxus's remaining debt was paid off, and Maxus's strategic focus shifted
to investing in prospects in the Deepwater Gulf of Mexico, which in the early 2000s was seen by
oil companies as having significant geologic and commercial promise.

21.    Maxus's current insolvency resulted from the strategic shift and investments
Maxus made during the thirteen years that Maxus was under Repsol's corporate control,
including investment in exploratory wells in the Gulf of Mexico that produced disappointing
returns.  Neither the YPF Entities' purchase of Maxus's international assets for fair market value
two decades ago, nor the significant equity contributions Maxus received from YPF then and
since are to blame for the Debtors' current insolvency.

22.    Indeed, Occidental concedes that the YPF Entities "injected over $1.4 billion over
the last decade in equity contributions to fund Maxus's remediation and indemnification
obligations."  Occidental Obj. ¶ 8.  Occidental fails to mention, however, that this $1.4 billion is

above and beyond the over $1 billion in consideration paid in 1996-1997 by the YPF Entities to Maxus for asset purchases used to pay down Maxus's debt.

23.      Whatever "scheme" or "strategy" Occidental and Benjamin Moore imagine in their respective Objections to the DIP Financing Motion is, at bottom, absurd.  The evidence, including the deposition testimony of every single fact witness and the contemporaneous documentation produced during the Passaic River Litigation, now removed and transferred to this Court, confirms that YPF paid at least fair market value for the Maxus assets it purchased. But even accepting Occidental's view of value, this alleged "scheme" plainly makes no sense: Occidental's own valuation expert in the Passaic River Litigation asserted that, *in toto*, the YPF Entities may have underpaid Maxus by $200 - $400 million -- an opinion with which YPF and Maxus have vehemently disagreed.  It strains credulity to suggest that the YPF Entities sunk $1.4 billion of capital into Maxus as part of a 20-year scheme to walk away with just $200 - $400 million in value.

24.      Occidental also fails to acknowledge that YPF's investments in Maxus over the last two decades are the very reason that Maxus has continued to meet all of its environmental-indemnity obligations to Occidental through 2016.  Indeed, from 1986 through 2014, Maxus and Tierra have satisfied over $734 million in indemnity obligations for the benefit of Occidental arising from sites covered by the SPA.

**B.      Occidental and Benjamin Moore Misrepresent the Status of the Passaic River Litigation and YPF's Intent in Agreeing to the DIP Financing**

25.      Occidental insinuates that the YPF Entities were motivated to agree to provide DIP Financing and enter into the Settlement Agreement with the Debtors to avoid an impending adverse result at trial in the Passaic River Litigation.  *See* Occidental Obj. ¶¶ 3, 23.  In fact, it was Occidental -- not YPF -- that suffered procedural and substantive loss after loss during its

meritless attempt to find deep pockets and put itself a better position than it was in 1995 as an unsecured creditor when Maxus was first on the verge of bankruptcy.  A partial timeline of the Passaic River Litigation can be found at Appendix B.

26.    In 2005, the State of New Jersey's Department of Environmental Protection and other state agencies (the "State") filed suit against Occidental, Repsol, Maxus, Tierra, YPF, YPFH, and CLHH based on claims related to Passaic River and the Lister Site.  In June 2008, Occidental filed cross-claims asserting, among other causes of action, fraudulent transfer and breach of the SPA.  Both the State and Occidental amended their claims several times.  By 2012, the State had asserted eight claims against YPF, YPFH, YPFI and CLHH (collectively the "YPF Defendants"),[9] while Occidental had asserted eleven.  The State and Occidental both asserted alter ego claims predicated on the same alleged conduct; indeed, Occidental simply incorporated by reference the State's allegations into its alter ego cross-claims.

27.    In 2013, the YPF Defendants agreed on a settlement with the State.  Although the State sought to hold the YPF Defendants liable on a number of claims amounting potentially to several billion dollars, the portion of the State's settlement attributable to releasing the YPF Defendants' liability was a mere $65 million.[10]  In December 2013, the New Jersey Superior Court concluded that amount was reasonable and approved the settlement.  Tellingly, Occidental did not object that the settlement amount was inadequate or unreasonable, even though for $65 million the State settled the same alter ego claims that Occidental asserted against the YPF Defendants, and which Occidental now contends are worth far more than $130 million.

28.    In support of its assertion that YPF was motivated by an adverse result at trial, which led to an alleged "highly choreographed" scheme between YPF and the SIC that

---

[9]  YPF U.S.A. Services Corp. was never a defendant to the Passaic River litigation.

[10]  This amount also settled the State's claims against Maxus and Tierra.

culminated in the DIP Financing Motion, Occidental sets forth a chronology that is highly

misleading, and full of half-truths and glaring omissions.  Occidental Obj. ¶¶ 2, 23.

- Occidental begins its conspiracy chronology by stating that in July 2014, Occidental requested leave to file amended cross-claims that outlined "a more robust alter ego case against YPF than had been alleged to date."  *Id.* at ¶ 23.  However, Occidental conveniently ignores that, in October 2014, the New Jersey Court granted the YPF Defendants' motion striking those amended cross-claims.  Occidental further fails to mention that on April 5, 2016, the New Jersey Court again denied Occidental's motion to supplement its cross-claims.

- Occidental omits from its chronology the New Jersey Court's January 2015 dismissal of its fraudulent transfer claims, which were at the heart of its cross-claims against the YPF Defendants.  The New Jersey Court also dismissed at that time Occidental's claims for declaratory judgment regarding alter ego liability, tortious interference with contract, unjust enrichment, civil conspiracy, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty.  *See* Jan. 29, 2015 MTD Order, Docket No. ESX-L9868-05(PASR); Jan. 13, 2015 MTD Opinion.  Immediately following this adverse ruling Occidental rushed to hire new litigation counsel.  As a consequence, the only issues remaining for trial out of Occidental's 11 original cross-claims against the YPF Defendants were Occidental's two contract claims against Maxus, both of which as against the YPF Defendants were premised solely on a theory of alter ego liability -- a drastic and extraordinary remedy.[11]

- Occidental further disingenuously asserts that the YPF Defendants moved for summary judgment to dismiss Occidental's alter ego claims and "the SIC rushed to settle before a trial" when that motion was dismissed.[12]  This assertion is baseless.  The YPF Defendants <u>never</u> made any motion for summary judgment that would have precluded trial.  Rather, on November 2, 2015 the YPF Defendants moved for <u>partial</u> summary judgment, among other things, that <u>some</u> of alleged conduct giving rise to alter ego liability was time barred.  Occidental points to nothing in the litigation's posture indicating that this denial triggered any additional activity by the SIC.

- Occidental's further claim that YPF attempted to "avoid settling with Occidental" similarly strains credulity.  Occidental Obj. ¶ 3.  Occidental fails to inform the Court that it engaged in multi-day settlement mediations with YPF in 2013 (Professor Eric

---

[11] Occidental's chronology also avoids stating the numerous pre-trial rulings made in the YPF Defendants' favor in April, May and June 2016 on the eve of trial, including the denial of Occidental's jury trial request, a number of rulings excluding evidence at the heart of Occidental's case, the dismissal of OCC's alter ego claims against Repsol, and the granting of Maxus's and YPF's motion to dismiss OCC's claim for declaratory judgment on future damages.

[12] In seeking to tie the DIP Financing Motion to supposed adverse consequence of the Passaic River Litigation, Occidental states that "YPF and Maxus knew the petitions had to be filed before the trial date."  Occidental Obj. ¶ 24.  But, this is not true.  While the YPF Defendants and Maxus preferred not to waste Occidental's and the Court's expense and resources with a one or two month trial, there is no requirement that a petition be filed prior to the start of trial.

Green as Mediator), 2015 (Special Master Maria Corodemus as Mediator), and 2016 (retired District Court Judge Faith Hochberg as Mediator).

29.     In fact, contrary to Occidental's assertions, the YPF Defendants were in an excellent position on the eve of trial.  Indeed, at the close of discovery and after a decade of litigation, there exists no factual support for Occidental's assertion that the YPF Defendants so dominated and controlled Maxus that it had "no separate existence," misused Maxus's corporate form to cause a fraud or similar injustice, and in doing so proximately caused damage to Maxus and, therefore, Occidental as creditor.  The notion that Occidental had the upper hand heading into trial, or that the YPF Defendants sought to avoid trial for lack of confidence, is simply preposterous.[13]

30.     As to the fairness of the DIP Financing, Occidental's spurious assertion that the DIP Financing is unfair based on the amount of environmental reserves listed in YPF's consolidated annual financial statement is entirely misleading because the amount of environmental reserves and the Settlement Agreement amount pertain to separate risks.  *See* Occidental Obj. ¶¶ 3, 9.  The approximately $200 million of environmental reserves listed in a recent annual financial statement are Maxus's reserves for Maxus's reasonable estimable environmental liabilities, as required by applicable GAAP in a consolidated financial statement.  They have nothing to do with YPF's potential litigation risk.  Occidental's Objection concedes this distinction, noting that the Settlement Agreement pertains to "alter ego and fraudulent conveyance claims" rather than to any environmental claims against YPF -- of which there are none.  Occidental Obj. ¶ 4.  In fact, YPF has never set reserves associated with any litigation risk with Occidental.

---

[13] In addition, Occidental fails to mention that, in light of the Special Master's Recommendation that summary judgment on Repsol's $65 million counterclaim against Occidental be granted, the first phase of the trial likely could have resulted in a $65 million judgment against Occidental, for which Occidental sought indemnification from Maxus, and which would have adversely affected the estate for all creditors.

31.    Equally ludicrous are Occidental's and Benjamin Moore's suggestions that the YPF Defendants could be exposed to open-ended alter ego liability for any remediation costs that might arise out of the Lister Site or the SPA.  That notion contradicts basic and well-settled principles of proximate causation, as well as logic, as was recognized in the Passaic River Litigation.  *See, e.g.*, Sept. 10, 2015 Hr'g Tr. at 40:5-9 (Special Master, Hon. Marina Corodemus) ("That's the key issue, is dominance and damages.  Those are two necessary elements, and ***there has to be a nexus that the dominance causes specific damages for the latter to result***.") (emphasis added).

## CONCLUSION

For the foregoing reasons, YPFH respectfully requests that (i) the DIP Financing Motion

be granted, and (ii) the Court grant such other and further relief as it may deem just and proper.

Dated: August 11, 2016
      Wilmington, Delaware

           **LANDIS RATH & COBB LLP**

           _/s/ Joseph Wright_

           Adam G. Landis (No. 3407)
           Matthew B. McGuire (No. 4366)
           Joseph D. Wright (No. 5669)
           919 Market Street, Suite 1800
           Wilmington, Delaware 19801
           Telephone: (302) 467-4400
           Facsimile: (302) 467-4450
           Email: landis@lrclaw.com
                  mcguire@lrclaw.com
                  wright@lrclaw.com

           -and-

           **CHADBOURNE & PARKE LLP**
           Howard Seife (admitted _pro hac vice_)
           Thomas J. Hall (admitted _pro hac vice_)
           Samuel S. Kohn (admitted _pro hac vice_)
           Francisco Vazquez (admitted _pro hac vice_)
           Benjamin D. Bleiberg (admitted _pro hac vice_)
           1301 Avenue of the Americas
           New York, New York 10019
           Telephone:  (212) 408-5100
           Facsimile:  (212) 541-5369
           Email:  hseife@chadbourne.com
                  thall@chadbourne.com
                  skohn@chadbourne.com
                  fvazquez@chadbourne.com
                  bbleiberg@chadbourne.com

           _Attorneys for YPF S.A.; YPF International
           S.A.; YPF Holdings, Inc.; CLH Holdings,
           Inc.; and YPF U.S.A. Services Corp._