## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MAXUS ENERGY CORPORATION, *et al.*,[1] | ) Case No. 16-11501 (CSS) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) **Objection Deadline: April 11, 2017, at 4:00 p.m. (ET)** |
| | ) **Hearing Date: April 18, 2017, at 11:00 a.m. (ET)** |

**DEBTORS' MOTION FOR AN ORDER (I) APPROVING AND AUTHORIZING
THE SALE OF THE DEBTORS' OVERRIDING ROYALTY INTERESTS FREE AND
CLEAR OF ALL LIENS, INTERESTS, CLAIMS, AND ENCUMBRANCES, (II)
AUTHORIZING THE DEBTORS TO PAY THE SALE SUCCESS FEE, AND
(III)WAIVING THE REQUIREMENTS OF BANKRUPTCY RULE 6004(h)**

By this motion (the "Motion"), the above-captioned debtors and debtors-in-possession

(collectively, the "Debtors") seek entry of an order (the "Sale Order"), substantially in the form

annexed hereto as **Exhibit A**, pursuant to sections 105 and 363 of title 11 of the United States

Code (the "Bankruptcy Code"), rules 2002 and 6004 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and rule 6004-1 of the Local Rules of Bankruptcy Practice

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules"): (a) approving and authorizing the sale of Debtor Maxus Energy Corporation's

("Maxus") overriding royalty interests and related assets in certain oil and gas properties to

Kimbell Royalty Holdings, LLC (the "Purchaser") free and clear of all liens, interests, claims,

and encumbrances in connection with that certain purchase agreement (as modified and amended

from time to time, the "Purchase Agreement") entered into by and between Maxus and the

Purchaser on March 7, 2017; (b) authorizing the payment of a success fee (the "Sale Success

---

[1]  The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Maxus Energy Corporation (1531), Tierra Solutions, Inc. (0498), Maxus International Energy Company (7260), Maxus (U.S.) Exploration Company (2439), and Gateway Coal Company (7425).  The address of each of the Debtors is 10333 Richmond Avenue, Suite 1050, Houston, Texas 77042.

Fee") to EnergyNet.com, Inc. ("EnergyNet"); and (c) waiving the requirements of Bankruptcy Rule 6004(h).  In support of the Motion, the Debtors submit the declarations of Cody Felton (the "Felton Declaration") and Brett Taylor (the "Purchaser Declaration," together with the Felton Declaration, the "Declarations"), copies of which is annexed hereto as **Exhibit B** and **Exhibit C**, respectively.  In further support of the Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

The Debtors have been actively exploring ways to monetize their assets and maximize recoveries to creditors.  To that end, the Court previously authorized the Debtors' retention of EnergyNet to market the Debtors' overriding royalty interests in approximately 3,700 wells located in Louisiana, New Mexico, Oklahoma, Texas, and West Virginia and certain related property rights, interests and privileges specified in the conveyance documents, the form of which are attached as **Exhibit D** (the "ORRIs").  Following a robust online sealed bid auction process, EnergyNet received the highest and best bid from the Purchaser[2] to purchase the ORRIs for $15,850,000 (the "Purchase Price").  The Purchase Price exceeds the Debtors' sale projections for the ORRIs and receipt of the funds will facilitate the Debtors' ability to satisfy its secured financing obligations.  The Purchase Agreement provides an added benefit to the Debtors by the Purchaser agreeing to pay all 2017 ad valorem taxes related to the ORRIs, thereby relieving the Debtors' estate of a potential administrative expense claim that would further reduce the funds available to satisfy obligations to creditors.

Notwithstanding that certain of the ORRIs may be subject to Preferential Rights (as defined below), the Debtors have reached out to the holders of such purported preferential rights

---

[2] The Purchase Agreement requires the Debtors to keep the substance of the Purchase Agreement confidential prior to the time the transaction closes.  With the Purchaser's consent, the Debtors are nevertheless disclosing the material terms of the transaction in this Motion.

to ensure they are given an adequate opportunity to object and establish the validity and enforceability of any such rights in connection with the hearing on the Motion (the "Sale Hearing"). For reasons discussed in more detail herein, the Purchaser has provided the Debtors with the highest and best price for the ORRIs.

For the foregoing reasons and those set forth below, the Debtors respectfully request that this Court enter an order approving and authorizing the sale of the ORRIs (the "Sale") to the Purchaser free and clear of all liens, interests, claims, and encumbrances, permitting the Debtors to pay EnergyNet its Sale Success Fee, and waiving the requirements of Bankruptcy Rule 6004(h).

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to rule 9013-l(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware to the entry of a final order by the Court in connection with the Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested in the Motion are sections 105, 328, and 363 of the Bankruptcy Code, Bankruptcy Rules 2002 and 6004, and Local Rule 6004-1.

ny-1274764

## BACKGROUND

4.     On June 17, 2016 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' chapter 11 cases (the "Chapter 11 Cases") are being jointly administered pursuant to rule 1015(b) of the Bankruptcy Rules.  On July 7, 2016, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee") pursuant to section 1102 of the Bankruptcy Code.  On December 16, 2016, the U.S. Trustee appointed an official committee of retirees pursuant to section 1114 of the Bankruptcy Code (the "Retiree Committee").  No party has requested the appointment of a trustee or examiner in the Chapter 11 Cases.

5.     A detailed description of the Debtors and their business are set forth in greater detail in the *Declaration of Javier J. González in Support of Chapter 11 Petitions and Requests for First Day Relief* [Docket No. 2] (the "First Day Declaration").

## THE PROPOSED SALE

### A.  The ORRIs

6.     The Debtors' current business operations consist generally of managing a non-operating, working interest in an oil and gas field in the deep waters of the Gulf of Mexico, collecting onshore oil and gas royalties from the ORRIs, and providing environmental remediation management services.  On December 29, 2016, the Debtors filed the *Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al.* [Docket No. 697] (as the same may be amended, modified, and/or supplemented from time to time, the "Plan") and the

ny-1274764

*Disclosure Statement for the Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al.* [Docket No. 698] (as the same may be amended, modified, and/or supplemented from time to time, the "<u>Disclosure Statement</u>").  As set forth in the Plan and the Disclosure Statement, the Debtors are in the process of liquidating their assets in order to satisfy the DIP Facility prior to the effective date of the Plan.

7.      As background, although a well owner may explore and drill for itself, it is the holder of the leasehold interest that owns the "working interest" because the holder is entitled to "work" the land by exploring, drilling, and producing oil, gas, and other hydrocarbons at its own risk in exchange for a fractional royalty on any oil obtained from the wells.  However, before the working interest owners may enjoy the profits, parties may be entitled to share in the proceeds through a royalty interest.  A royalty interest is a nonpossessory right to a share of the oil's value free of the cost of production.  Overriding royalties are royalty interests carved out of a working interest and entitle overriding royalty interest owners, like Maxus, to a fraction of revenues from the sale of oil and/or gas without the need to contribute to the costs of development or production.

8.      Wells, including the wells in which Maxus obtained the ORRIs, may be subject to preferential rights (including, without limitation, approval rights, consent rights, rights of first refusal, rights of first offer, or any other rights of similar nature or effect, the "<u>Preferential Rights</u>").  In this case, two parties—BP and Pantera Energy—appear to hold what may constitute Preferential Rights in respect of certain of the Debtors' ORRIs located in Texas and Oklahoma that are potentially implicated or relevant to the Sale.[3]  Out of an abundance of caution, on March 8, 2017, the Debtors sent letters to each of these parties advising them of the sale and requesting that they agree to waive their Preferential Rights, if any.  In connection with the filing

---

[3] Both BP and Pantera Energy will be provided notice of this Motion.

ny-1274764

of the Motion, the Debtors have also provided notice to all entities known to have asserted any lien, charge, claim or encumbrance on the ORRIs, including, without limitation, holders of the Preferential Rights.  On March 9, 2017, Pantera Energy advised the Debtors they would not waive their purported rights.

9.    By this Motion, the Debtors seek to sell the ORRIs free and clear of all liens, claims and interests, including Preferential Rights, unless the holder thereof timely objects to the Motion, demonstrates a valid and enforceable Interest (as defined in the proposed Sale Order), and one of the five conditions of section 363(f) are not otherwise satisfied.

10.    The ORRIs are one of the Debtors' primary assets.  In recent years, Maxus was able to identify producing wells and obtained ORRIs in 3,700 oil and gas wells located in five states within the United States (Louisiana, New Mexico, Oklahoma, Texas, and West Virginia). The ORRIs entitle Maxus to receive periodic payments from the wells' operators as revenues are generated.  In 2015, Maxus earned approximately $3 million on account of the ORRIs.  First Day Declaration, ¶16.

**B.  Retention of EnergyNet**

11.    On December 15, 2016, the Court entered an order granting the Debtors' application to retain EnergyNet as sales broker and consultant with respect to the potential sale of the Debtors' rights, title, and interests in and to certain oil and gas properties (the "Retention Order") [Docket No. 629].[4]

12.    EnergyNet is a widely-known, reputable, and professional firm that specializes in oil and gas marketing and divestitures, including the preparation, evaluation, analysis, marketing, negotiation, and closing of oil and gas property sales.  EnergyNet conducts efficient oil and gas

---

[4] On February 21, 2017, the Bankruptcy Court entered an order expanding the scope of the retention and employment of EnergyNet as sales broker and consultant by expanding the list of the oil and gas properties to be marketed and sold [Docket No. 919].

ny-1274764

auction, sealed bid, and negotiated sale services that facilitate transactions of producing working interests (operated and non-operated), overrides, royalties, mineral interests, and non-producing leaseholds. EnergyNet is unique in its approach, as the bulk of its sales solicitations and auctions are conducted online. EnergyNet's technological reach presents an oil and gas property portfolio to thousands of potential buyers with multi-billion-dollar buying power and allows buyers the flexibility and convenience of conducting their acquisition and divestment activities online. The Debtors believe that the use of EnergyNet's internet auction mechanism exposed the ORRIs to a wide market, such that the Debtors will derive maximum value from the sale of the ORRIs.

13.     As part of EnergyNet's engagement agreement (the "Engagement Agreement"), upon the closing of any sale of the specified oil and gas properties, including the ORRIs, the Debtors are obligated to pay EnergyNet the Sale Success Fee from the proceeds of the Sale based on the total gross sales price pursuant to an agreed upon commission schedule. Pursuant to the Retention Order, the Debtors, as part of the motion to approve the Sale, shall seek approval of the Sale Success Fee on an interim basis, subject to the Court's approval of EnergyNet's final fee application. See Retention Order, ¶4. The amount of the Sale Success Fee is $392,000. Other than the Sale Success Fee, the Debtors have no further obligation to pay EnergyNet additional fees or retainers.

### C. The Marketing Process, Qualification of Bidders, and Purchase Agreement

14.     The Debtors, with EnergyNet's assistance, solicited bids from numerous interested parties, received the highest and best bid from the Purchaser, and are now seeking approval of the Sale to the Purchaser.

15.     To begin the sale process, EnergyNet populated a data room (the "Data Room") for interested parties through its online platform—www.EnergyNet.com. Felton Declaration, ¶4.

The Data Room included a property overview, a mapping overview, historical production curves, copies of received revenue checks, a revenue summary, a well list, API well identification numbers (i.e., unique numbers given to each of the wells), and documents establishing ownership. Id.

16.     Any party potentially interested in submitting a bid for the ORRIs that was not already a registered user of EnergyNet's online platform had to complete the registration form at https://www.energynet.com/bidder_reg.pl.    Id., ¶5. Once registered, the bidder either (a) requested a bidder allowance by allowing EnergyNet's controller to examine their creditworthiness and contacting the bidder's financial institution to ensure funds were readily available in the event the bidder was the winning bidder or (b) did not request a bidder allowance and submitted an offer on a sealed bid package, and EnergyNet vetted the bidder to ensure adequate funds were available. Id. Bidders were required to verify that they are "Accredited Investors," as defined by SEC's Regulation 501 Rule D. Id.

17.     The auction opened on February 9, 2017, and closed on March 2, 2017 (the "Sale Period"). Id., ¶8. As described more fully in the Felton Declaration, during the Sale Period, the ORRIs went through the highest level of mass and targeted marketing offered by EnergyNet. Multiple means were utilized to advertise the Sale in order to ensure that all potentially interested parties were made aware of this purchase opportunity, including (a) conducting multiple mailings to 1,924 targeted contacts, EnergyNet's 20,000 database contacts, and additional general contacts who received advertisements of the Sale, (b) making direct phone calls to parties that EnergyNet identified as high-interest candidates, (c) conducting in-person advertising of the Sale at the North American Prospect Expo, and (d) marketing the ORRIs to EnergyNet

members who have previously subscribed to receive such results using pre-selected search criteria. <u>Id.</u>, ¶¶6-7.

18.    All bidders were advised, among other things, that: (a) bids were being accepted in the form of a "sealed bid"; (b) no offers would be considered that required further technical evaluation or due diligence; (c) offers contingent on financing would not be considered; (d) the sale would be with no warranties; (e) the purchaser would assume all liabilities associated with the ORRIs; (f) the Debtors preferred an offer for all ORRIs from one buyer or buyer group; (g) the winning bidder must make a 15% non-refundable deposit on the date the property is awarded to the winning bidder and a purchase letter agreement is signed; and (h) the closing of the Sale is contingent on Court approval and DIP Lender approval at or before the Sale Hearing, and the remainder of the purchase price would be due upon Court approval. <u>Id.</u>, ¶9.

19.    The Debtors chose to use a "sealed bid" process that allows for privatized bidding because they determined that such process would maximize value given the nature of the assets at issue.  There are many ways companies evaluate properties, such as ORRIs, and that can lead to a wide range of bidding approaches.  In a sealed bid process, bidders put in the best bid based on their individual approach to the asset; whereas, in an open auction, bidders have more visibility and can elect to simply bid one increment over the rest of the market.  As a result, an open auction requires multiple parties to compete heavily to raise the price.  By comparison, a seller can achieve significant value for its asset in a more efficient manner by using the sealed bid process. <u>Id.</u>, ¶10.

20.    During the Sale Period, there were 888 views of EnergyNet's website from 301 unique companies. <u>Id.</u>, ¶11. Ultimately, seven parties submitted bids, and the range in the value of those bids was significant.  For example, the Purchaser's winning bid was almost four times

the amount of the lowest bid.[5]  The third-highest bid was 46% lower than the second-highest bid,

and the fourth-highest bid was approximately 20% lower than the third-highest bid.  Id.

21.     On or about March 7, 2017, the Debtors entered into the Purchase Agreement.[6]

Id., ¶10.

22.     The terms of the Purchase Agreement are as follows:

- **Purchased Assets** (Purchase Agreement, Preamble and ¶1): All of Maxus's: (i) overriding royalty interests in the lands, oil, gas, and/or mineral leases, wells, and units owned by Maxus, including, without limitation all of Maxus's right, title, and interest in the assets described in the Data Room, including, without limitation, the interests described in check details, spreadsheets and engineering data provided in the Data Room; and (ii) all other assets, rights, privileges and interests specified in the mutually agreed upon conveyance documents.

- **Purchase Price** (Purchase Agreement, ¶3): The Purchaser shall pay $15,850,000 for all of Seller's right, title and interest in and to the Properties (as defined in the Purchase Agreement) and other interests specified in the mutually agreed upon conveyance documents, paid in immediately available funds.  The Purchaser shall pay the Purchase Price, less the deposit and any adjustments and credits, on the Closing Date (as defined below).

- **Deposit** (Purchase Agreement, ¶9): The Purchaser shall pay the deposit which represents 15% of the Purchase Price, to be held in escrow by EnergyNet until closing.  The deposit is non-refundable unless the Debtors are in material breach of the Purchase Agreement or any of the Closing Conditions.

- **Effective Date of the Sale** (Purchase Agreement, ¶2): April 1, 2017.

- **Closing Date** (Purchase Agreement, ¶2): The closing will occur no later than one (1) business day after Court approval and entry of the final Sale Order that is not stayed; provided that the Purchaser, in its sole discretion, may waive the condition that such order be final (the "Closing Date").

- **Closing Conditions** (Purchase Agreement, ¶4): Closing is conditioned (the "Closing Conditions") upon:

---

[5] After the Purchaser submitted its initial bid, EnergyNet followed up with the Purchaser to clarify its offer. Thereafter, the Purchaser enhanced its initial offer. Felton Decl., ¶13.

[6] The summary of the terms contained in this Motion is qualified in its entirety by reference to the provisions of the Purchase Agreement.  In the event of any inconsistencies between the provisions of the Purchase Agreement and the summary set forth herein, the terms of the Purchase Agreement shall govern.

ny-1274764

- o agreement of mutually acceptable conveyance documents, which shall convey all of Seller's right, title and interest to the Properties and overriding royalty interests on a county-wide basis and include known legal descriptions of the Properties, but the conveyance documents shall not contain any warranties (*i.e.*, "as is, where is");

- o entry of a final order pursuant to section 363 of the Bankruptcy Code providing, among other things, that the sale shall be free and clear of all liens, claims and interests to the maximum extent permitted by law, except as otherwise may be permitted in the Purchase Agreement;

- o the Debtors making a good faith and reasonable effort to promptly notify potential claimants of the bankruptcy hearing to approve this transaction, and

- o in the event a third party timely objects to the Motion, demonstrates a valid and enforceable Preferential Right, one of the five conditions of section 363(f) are not otherwise satisfied in respect of such Preferential Right, and the holder thereof duly exercises such Preferential Right before the Closing Date, the Debtors and the Purchaser will work together in good faith to allocate a value to those exercised properties. Such election of a Preferential Right by a third party before the Closing Date shall cause the Purchase Price to be reduced by the agreed upon value allocation amount, and the Debtors and Purchaser will maintain their respective obligations under the Purchase Agreement as to the balance of the Properties.

- **Adjustments and Credits** (Purchase Agreement, ¶¶4, 5): The Purchaser shall receive a credit in the amount of all revenue attributable to production from the ORRIs after April 1, 2017, and received by the Debtors prior to the Closing Date. The Debtors shall immediately forward to the Purchaser any revenue received from the Properties attributable to production after the Effective Date, but received by the Debtors after the Closing Date. At or before the Closing Date, if requested, the Debtors shall sign transfer orders or similar documents and instruct all purchasers or production from the Properties to make payment to the Purchaser for all production from and after the Effective Date. The Purchaser and the Debtors shall execute, acknowledge and deliver or cause to be executed, acknowledged and delivered such instruments and take such other action as may be necessary or advisable to carry out their obligations under the Purchase Agreement and under any document, certificate or other instrument delivered pursuant to the Purchase Agreement, before, at and after the Closing Date.

- **Ad Valorem Taxes** (Purchase Agreement, ¶6): The Purchaser shall assume the obligation to pay all 2017 ad valorem taxes related to the ORRIs. However, if the Purchaser notifies the Debtors no less than five (5) days prior to closing that the Debtors owe outstanding ad valorem taxes for years prior to 2017, the Debtors shall either (i) satisfy such amounts directly to the taxing authority or (ii) credit the Purchaser such outstanding amounts through an adjustment of the Purchase Price owed by Purchaser at Closing.

- **Costs and Liabilities** (Purchase Agreement, ¶7): The Purchaser will be responsible for all costs and liabilities associated with the ORRIs from and after April 1, 2017. The Debtors shall be responsible for all costs and liabilities associated with the ORRIs prior to April 1, 2017.

- **Records** (Purchase Agreement, ¶8): At closing all original files relating to the ORRIs and production or revenue from the ORRIs will be given to the Purchaser.

- **EnergyNet Fee** (Sale Order, ¶ 19): The Sale Success Fee will be paid on the Closing Date from the Sale Proceeds, but, notwithstanding the foregoing, the Sale Success Fee shall be subject to the Court's approval of EnergyNet's final fee application.

23.    The Purchaser is an affiliate of Kimbell Royalty Partners, LP ("Kimbell"), a publicly traded mineral and royalty master limited partnership based in Fort Worth, Texas. Kimbell is one of the largest owners of minerals, royalties and overriding royalty interests nationwide. Since 1998, Kimbell and its predecessors have engaged in over 160 transactions and acquired interests in approximately 48,000 wells. Kimbell now owns mineral and royalty interests in approximately 4.5 million gross acres in twenty states and in nearly every major onshore basin in the continental United States. It is publicly traded on the NYSE under the ticker symbol KRP. Neither Kimbell nor the Purchaser has any relationship with any of the Debtors other than the Purchaser being party to the Purchase Agreement. No common identity of current directors and officers exists between the Purchaser and any of the Debtors. Felton Declaration, ¶¶12, 13; Purchaser Declaration, ¶¶4,5.

24.    The Purchaser has deposited with EnergyNet 15% of the Purchase Price. Felton Declaration, ¶16. The closing of the Sale is subject to, among other things, approval by this Court and approval by the DIP Lender at or before the Sale Hearing. Moreover, as discussed below, the Sale of the ORRIs will be "free and clear" to the broadest extent possible under section 363(f) of the Bankruptcy Code and any party asserting a lien, claim, encumbrance, or

other interest in the ORRIs (including any Preferential Rights) that opposes such relief must object to this Motion or otherwise be deemed to consent to the relief herein and any valid lien, claim, encumbrance, or other interest shall attach to the respective proceeds.

25.     The Debtors submit that the ORRIs were thoroughly marketed to all potential interested parties, the sealed bid auction was conducted in a manner consistent with industry norms, and that the Purchase Price to be paid by the Purchaser represents the highest and best price for the ORRIs. Id., ¶17.

## RELIEF REQUESTED

26.     By this Motion, the Debtors request the entry of the Sale Order (a) approving and authorizing the Sale of the ORRIs to the Purchaser free and clear of all liens, interests, claims, and encumbrances, (b) authorizing payment of the Sale Success Fee, and (c) waiving the requirements of Bankruptcy Rule 6004.

## ARGUMENT

### A.     The Court Should Approve the Relief Requested as a Sound Exercise of the Debtors' Business Judgment.

27.     The Sale should be approved as a sound exercise of the Debtors' business judgment.  Section 363(b)(l) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business. *See, e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991).  Once a court determines that a valid business justification exists for a sale outside of the ordinary course of

business, the court must determine whether (a) adequate and reasonable notice of the sale was given to interested parties, (b) the sale will produce a fair and reasonable price for the property, and (c) the parties have acted in good faith.  *See In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012); *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008).  The Sale meets each of these requirements.

28.    A strong business justification exists for the Sale because the Debtors are in the midst of liquidating their assets and the Sale will allow the Debtors to maximize the value of the ORRIs and satisfy a significant portion of the DIP Facility.  Moreover, a strong business justification exists for payment of the Sale Success Fee because EnergyNet facilitated the Sale, payment was previously contemplated by the Retention Order, and the Sale Success Fee is the only payment due EnergyNet for procuring the Purchaser.  In addition, the marketing and bidding process outlined above satisfied each of the remaining requirements for approval of a sale under section 363 of the Bankruptcy Code by (a) providing more than ample notice of the proposed sale process, (b) facilitating a value-maximizing Sale, and (c) ensuring an unbiased and good faith sale process.

29.    The Debtors, through EnergyNet, provided more than sufficient notice of the opportunity to bid on the ORRIs. As described above, EnergyNet used the highest level of mass and targeted marketing via several channels to ensure that all potentially interested parties were made aware of the sale of the ORRIs.  In total, EnergyNet mailed notice of the sale transaction to 1,924 targeted contacts and over 20,000 database contacts, conducted in-person advertising, targeted parties with matching pre-selected interests in the EnergyNet database, and reached even more parties through third-party advertising services.  Bidders were informed of the bidding process, bid qualifications, bid submission and selection criteria, and the auction process.  Thus,

the Debtors and EnergyNet assured each entity potentially interested in purchasing the ORRIs that their respective rights would be protected and that the sale process was fair and reasonable.

30.     The Sale has produced a price that is fair and reasonable as the Purchase Price represents the highest and best offer out of the seven bids submitted and is a strong offer in the current market for ORRIs.  The Purchaser is not an insider or affiliate of any of the Debtors, and no common identity of current directors and officers exists between the Purchaser and any of the Debtors.  Purchaser Declaration, ¶5.  Finally, the Debtors and the Purchaser negotiated the terms of the deal at arm's length and in good faith, and in the absence of any collusion or any similar conduct that would permit the Sale to be avoidable under section 363(n), to effectuate a sale process that benefits both parties.  Purchaser Declaration, ¶¶5-6.  Therefore, the Sale should be approved as a sound exercise of the Debtors' business judgment and the Purchaser should be afforded all of the protections of Bankruptcy Code section 363(m).  *See Abbotts Dairies of Pennsylvania Inc.*, 788 F. 2d 143 (3rd Cir. 1986).

**B.     Sale Free and Clear of Liens, Claims, Encumbrances and Interests and Distribution of Proceeds.**

31.     The Debtors seek to sell the ORRIs free and clear of all liens, claims, encumbrances, and other interests, including any Preferential Rights (collectively and as further specified in the Sale Order, the "Interests").  Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (1) applicable nonbankruptcy law permits such a "free and clear" sale; (2) the holder of the interest consents; (3) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (4) the interest is in bona fide dispute; or (5) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).  Courts have interpreted the requirements of section 363(f) of the Bankruptcy

Code to be disjunctive. *See In Re Elliot*, 94 B.R. 343, 345 (Bankr. E. D. Pa. 1988). Accordingly, if any of the five conditions set forth in section 363(f) are met, then a debtor is empowered to sell property free and clear of liens. *Id.*

32. The Sale of the ORRIs to the Purchaser will satisfy the requirements of section 363(f). All relevant parties will have sufficient notice and the ability to object to this Motion. Accordingly, if a party with an interest in the ORRIs does not timely object to a transaction in accordance with the proposed procedures, the Debtors submit that such party should be deemed to have consented to the Sale within the meaning of section 363(f)(2) of the Bankruptcy Code. *See Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (finding failure to object to sale free and clear of liens, claims, and encumbrances satisfies section 363(f)(2)).

**C.    The Debtors are Authorized to Pay the Sale Success Fee**

33. Pursuant to the Retention Order, EnergyNet shall be paid the Sale Success Fee pursuant to section 328(a) of the Bankruptcy Code in accordance with the percentage fee schedule set forth in the Engagement Agreement. Prior to and during the Sale Period, EnergyNet diligently performed its duties under the Engagement Agreement and ultimately secured a winning bidder for the ORRIs. The Sale Success Fee is reasonable and consistent with the compensation provided for in the Retention Order and the Debtors should therefore be authorized to pay the Sale Success Fee directly from the Sale Proceeds.

**D.    Relief Under Bankruptcy Rule 6004(h)**

34. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."

16

35.     Here, a waiver of the stay is appropriate because the Sale was extensively marketed and notice of the Sale was adequately provided to all parties-in-interest.  In addition, the Purchaser has expressed significant interest in closing the transaction as soon as practicable. Due to such facts and the posture of the Debtors' bankruptcy cases in general, the Debtors request that the Sale Order be effective immediately by providing that the 14-day stay under Bankruptcy Rule 6004(h) is waived.

## NOTICE

36.     Notice of the Motion will be given to the following parties or, in lieu thereof, to their counsel: (a) the U.S. Trustee; (b) the Creditors' Committee; (c) the Retiree Committee; (d) YPF S.A. and YPF Holdings, Inc.; (e) Occidental Chemical Corporation; (f) the Internal Revenue Service; (g) the U.S. Environmental Protection Agency; (h) the U.S. Department of Justice; (i) the New Jersey Department of Environmental Protection and other applicable state environmental agencies; (j) the offices of the attorneys general for the states in which the Debtors operate; (k) the Pension Benefit Guaranty Corporation; (l) all entities known to have asserted any lien, charge, claim or encumbrance on the ORRIs including, without limitation, all known entities potentially holding any Preferential Right in respect of the ORRIs, and (m) all parties that have requested notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE the Debtors respectfully request that this Court (a) enter the Sale Order, and (b) grant such other and further relief as the Court deems just and proper.

Dated: March 28, 2017
Wilmington, Delaware

/s/ Travis G. Buchanan
M. Blake Cleary (No. 3614)
Joseph M. Barry (No. 4221)
Justin P. Duda (No. 5478)
Travis G. Buchanan (No. 5595)
**YOUNG CONAWAY STARGATT &
TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

-and-

James M. Peck (admitted *pro hac vice*)
Lorenzo Marinuzzi (admitted *pro hac vice*)
Jennifer L. Marines (admitted *pro hac vice*)
Jordan A. Wishnew (admitted *pro hac vice*)
**MORRISON & FOERSTER LLP**
250 West 55th Street
New York, New York 10019
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900

*Counsel for Debtors
and Debtors-in-Possession*