**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MAXUS ENERGY CORPORATION, *et al.*,[1] | ) Case No. 16-11501 (CSS) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) |

---

**AMENDED DISCLOSURE STATEMENT FOR THE**
**AMENDED CHAPTER 11 PLAN OF LIQUIDATION**
**PROPOSED BY MAXUS ENERGY CORPORATION, *et al.* AND THE OFFICIAL**
**COMMITTEE OF UNSECURED CREDITORS**

---

**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AND THE INFORMATION CONTAINED HEREIN IS SUBJECT TO CHANGE.  THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT IS NOT, AND SHOULD NOT BE CONSTRUED AS, A SOLICITATION OF VOTES WITH RESPECT TO THE PLAN.  ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Maxus Energy Corporation (1531), Tierra Solutions, Inc. (0498), Maxus International Energy Company (7260), Maxus (U.S.) Exploration Company (2439), and Gateway Coal Company (7425).  The address of each of the Debtors is 10333 Richmond Avenue, Suite 1050, Houston, Texas 77042.

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
M. Blake Cleary (No. 3614)
Joseph M. Barry (No. 4221)
Justin P. Duda (No. 5478)
Travis G. Buchanan (No. 5595)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

- and -

**MORRISON & FOERSTER LLP**
James M. Peck
Lorenzo Marinuzzi
Jennifer L. Marines
Jordan A. Wishnew
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for Debtors and Debtors-in-Possession*

**COLE SCHOTZ P.C.**
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
500 Delaware Avenue
Suite 1410
Wilmington, DE 19801
Telephone:  (302) 652-3131
Facsimile:   (302) 652-3117

- and -

**SCHULTE ROTH & ZABEL LLP**
Adam C. Harris
David M. Hillman
Lucy F. Kweskin
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile:  (212) 593-5955

*Counsel to the Official Committee of*
*Unsecured Creditors of Maxus Energy*
*Corporation, et al.*

Dated:  April 19, 2017
New York, New York

THE PLAN PROPONENTS URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND ALL OF THE ACTIONS NECESSARY TO EFFECTUATE THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT MAY BE ATTACHED HERETO AND ARE INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE PLAN PROPONENTS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. THE PLAN PROPONENTS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A AND SECTION 21E OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). SUCH STATEMENTS MAY CONTAIN WORDS SUCH AS "MAY," "WILL," "MIGHT," "EXPECT," "BELIEVE," "ANTICIPATE," "COULD," "WOULD," "ESTIMATE," "CONTINUE," "PURSUE," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY, AND MAY INCLUDE, WITHOUT LIMITATION, INFORMATION REGARDING THE PLAN PROPONENTS' EXPECTATIONS WITH RESPECT TO FUTURE EVENTS. FORWARD-LOOKING STATEMENTS ARE INHERENTLY UNCERTAIN AND ARE SUBJECT TO CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER FROM THOSE EXPRESSED OR IMPLIED IN THIS DISCLOSURE STATEMENT AND THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN. MAKING INVESTMENT DECISIONS BASED ON THE

INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN IS, THEREFORE, SPECULATIVE.

IN PREPARING THIS DISCLOSURE STATEMENT, THE PLAN PROPONENTS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. ALTHOUGH THE PLAN PROPONENTS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS, THE LIQUIDATING TRUST, THE ENVIRONMENTAL RESPONSE/RESTORATION TRUST, AND THE PROPERTY TRUST. THE PLAN PROPONENTS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS AND/OR THE LIQUIDATING TRUST MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH OBJECTIONS TO CLAIMS.

THE PLAN PROPONENTS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE PLAN PROPONENTS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE PLAN PROPONENTS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. THE PLAN PROPONENTS RESERVE THE RIGHT TO FILE AN AMENDED PLAN AND RELATED AMENDED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED IN ARTICLE XII OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED OR, IF CONFIRMED, THAT SUCH MATERIAL CONDITIONS PRECEDENT WILL BE SATISFIED OR WAIVED. YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING, BUT NOT LIMITED TO, THE PLAN AND

ARTICLE VII OF THIS DISCLOSURE STATEMENT ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING," BEFORE SUBMITTING YOUR BALLOT TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE PLAN PROPONENTS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE PLAN PROPONENTS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR EQUITY INTERESTS WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND ANY TRANSACTIONS CONTEMPLATED THEREBY.

**THE PLAN PROPONENTS SUPPORT CONFIRMATION OF THE PLAN AND RECOMMEND ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.**

# TABLE OF CONTENTS

Page

ARTICLE I. INTRODUCTION AND OVERVIEW OF THE PLAN ........................................ 4

    A.    The Plan .................................................................................................. 4

    B.    The Adequacy of this Disclosure Statement ............................................. 5

    C.    Summary of Claims and Equity Interests Under the Plan ..................... 7

    D.    Voting on and Confirmation of the Plan ............................................. 10

    E.    Classes Entitled to Vote on the Plan ................................................... 10

    F.    Votes Required for Acceptance by a Class ........................................... 11

    G.    Certain Factors to Be Considered Prior to Voting .............................. 11

    H.    Classes Not Entitled to Vote on the Plan ............................................. 11

    I.    Solicitation Procedures ....................................................................... 12

    J.    Voting Procedures ............................................................................... 13

    K.    Confirmation Objection Deadline ....................................................... 15

    L.    Confirmation Hearing ........................................................................ 15

    M.    Holders of Environmental Claims in Class 4 and Class 5 ................... 15

    N.    Settlement and Compromise of Certain Claims................................... 16

ARTICLE II. DEBTORS' ORGANIZATIONAL STRUCTURE AND BUSINESS ................ 17

    A.    Current Corporate Structure and Business Operations ........................ 17

    B.    The Debtors' Assets ............................................................................ 18

    C.    Debtors' Workforce ............................................................................ 25

    D.    Collective Bargaining Agreements ...................................................... 25

    E.    The Debtors' Liabilities ...................................................................... 25

ARTICLE III. EVENTS LEADING TO THE CHAPTER 11 CASES ..................................... 32

    A.    Genesis of Maxus's Environmental Liability and the OCC Indemnification Obligations ........................................................................................ 32

    B.    YPF's Acquisition of Maxus in 1995 ................................................. 34

    C.    YPF/Maxus Global Restructuring ...................................................... 34

    D.    Repsol's Acquisition of YPF ............................................................... 35

    E.    Settlements Between Maxus, Repsol and YPF..................................... 35

    F.    Argentina's Expropriation of YPF ...................................................... 36

    G.    Underperformance of Neptune ........................................................... 36

    H.    The Passaic River Litigation ............................................................... 36

# TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| I. | Special Independent Committee Formation and Investigation | 38 |
| J. | Settlement Agreement with YPF | 39 |
| K. | YPF Causes of Action | 40 |
| L. | YPF Entities' Position on the YPF Causes of Action | 41 |
| ARTICLE IV. | EVENTS DURING THE CHAPTER 11 CASES | 43 |
| A. | "First Day" Pleadings | 43 |
| B. | Other Case Matters | 44 |
| C. | Financing, YPF Settlement Agreement, and Plan Matters | 51 |
| D. | Transition of Remediation Responsibilities | 56 |
| ARTICLE V. | SUMMARY OF THE PLAN | 61 |
| A. | DIP Claim, Administrative Claims, Professional Claims, Priority Tax Claims, and U.S. Trustee Fees | 61 |
| B. | Classification, Consolidation, Treatment, and Voting of Claims and Equity Interests | 64 |
| C. | Implementation of the Plan | 71 |
| D. | Treatment of Executory Contracts and Unexpired Leases | 74 |
| E. | The Liquidating Trust | 79 |
| F. | Provisions Governing Liquidating Trust Distributions | 85 |
| G. | The Property Trust | 90 |
| H. | Environmental Response/Restoration Trust | 92 |
| I. | Procedures for Resolving Disputed Claims | 94 |
| J. | Release, Injunction, and Related Provisions | 96 |
| K. | Conditions Precedent to Confirmation and Consummation of the Plan | 103 |
| L. | Modification, Revocation, or Withdrawal of the Plan | 105 |
| M. | Retention of Jurisdiction | 106 |
| N. | Miscellaneous Provisions | 108 |
| ARTICLE VI. | STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN | 112 |
| A. | Confirmation Hearing | 113 |
| B. | Confirmation Standards | 114 |
| C. | Acceptance by Impaired Classes | 116 |
| D. | Confirmation Without Acceptance by All Impaired Classes | 117 |

## TABLE OF CONTENTS
(continued)

Page

ARTICLE VII. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING .... 118

    A.    Risk Factors that May Affect Recoveries Available to Holders of Allowed Claims Under the Plan ......................................................................................... 118

    B.    Certain Bankruptcy Law Considerations ............................................................ 121

    C.    Disclosure Statement Disclaimer ........................................................................ 123

    D.    Liquidation Under Chapter 7 .............................................................................. 125

ARTICLE VIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES ...................................................................................... 125

    A.    Certain United States Federal Income Tax Consequences to the Debtors......... 127

    B.    Certain United States Federal Income Tax Consequences to Holders of Allowed Claims .................................................................................................. 127

    C.    Tax Treatment of the Liquidating Trust and Holders of Beneficial Interests.... 129

ARTICLE IX. RECOMMENDATION OF THE DEBTORS AND THE CREDITORS' COMMITTEE .............................................................................................. 132

## EXHIBITS

EXHIBIT A          Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy
                   Corporation, *et al.* and the Official Committee of Unsecured Creditors

EXHIBIT B          Disclosure Statement Order

EXHIBIT C          List of Properties

EXHIBIT D          Liquidation Analysis

## ARTICLE I.

## INTRODUCTION AND OVERVIEW OF THE PLAN

This amended disclosure statement (this "Disclosure Statement") provides information regarding the *Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of Unsecured Creditors* (as may be further amended, supplemented, or otherwise modified from time to time, the "Plan"), which the Debtors and the Official Committee of Unsecured Creditors (the "Creditors' Committee", and together with the Debtors, the "Plan Proponents") are seeking to have confirmed by the Bankruptcy Court.[1] A copy of the Plan is attached hereto as **Exhibit A**. The rules of construction set forth in Article I of the Plan shall govern the interpretation of this Disclosure Statement.

**The Plan Proponents believe that the Plan is in the best interests of the Debtors' Estates. The Plan Proponents recommend that all Holders of Claims entitled to vote accept the Plan by returning their Ballots so as to be actually received by the Voting Agent (as defined below) no later than [_____] at 4:00 p.m. (prevailing Eastern Time). Assuming the requisite acceptances to the Plan are obtained, the Plan Proponents will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing scheduled for May 22, 2017, at 10:00 a.m. prevailing Eastern Time, and, as necessary, May 23, 25, and 26, 2017 (commencing each day at 10:00 a.m. prevailing Eastern Time).**

A.      *The Plan*

The Debtors filed for chapter 11 bankruptcy protection on June 17, 2016. The purpose of a chapter 11 bankruptcy case is to resolve the affairs of a debtor and distribute the proceeds of the debtor's estate pursuant to a confirmed chapter 11 plan. To that end, the Plan Proponents filed the Plan, the terms of which are more fully described herein, contemporaneously with the filing of this Disclosure Statement. The Plan contemplates a liquidation of the Debtors and their Estates and is therefore referred to as a "plan of liquidation."

---

[1] Unless otherwise specified herein, capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

As set forth in more detail in Article V hereof, the Plan provides for the creation of a Liquidating Trust to, among other things, liquidate and distribute the Liquidating Trust Assets for the benefit of the Liquidating Trust Beneficiaries. The Liquidating Trust will receive all the assets of the Estates other than the Debtors' owned real property or assets related to such real property. In particular, the Liquidating Trust will receive and prosecute the Causes of Action held by the Debtors against the YPF Entities (the "YPF Causes of Action"), the Debtors' most valuable asset. The Liquidating Trust will be funded from the proceeds of the Liquidating Trust Promissory Note and the Liquidating Trust Facility.

The Plan also provides that the Environmental Response/Restoration Trust shall receive Class B Beneficial Interests in the Liquidating Trust, and that the Environmental Response/Restoration Trust shall distribute the amounts received on account of the Class B Beneficial Interests pursuant to the ERRT Waterfall set forth in Article IX of the Plan. The Environmental Response/Restoration Trust will be funded from the proceeds of the Liquidating Trust Promissory Note.

In addition, as set forth in more detail in Article V hereof, the Plan provides for the creation of a Property Trust, the purpose of which is to receive, hold title to, ensure the security of, and provide potentially responsible parties with access to the PT Properties (*i.e.*, the Debtors' owned real property) until such properties are sold or otherwise disposed of. The Property Trust will be funded from the proceeds of the Liquidating Trust Promissory Note.

The primary objective of the Plan is to maximize the value of recoveries to all Holders of Allowed Claims and to distribute all property of the Estates that is or becomes available for distribution in accordance with the priorities established by the Bankruptcy Code. The Plan Proponents believe that the Plan accomplishes this objective and is in the best interests of Creditors and the Estates, as it preserves the Estates' most valuable asset, the YPF Causes of Action and settles several of the most important claims against the Estates, thereby limiting the risk of a costly and lengthy estimation and/or confirmation process. The Plan Proponents therefore seek to confirm the Plan. The Plan Proponents believe that Confirmation of the Plan will avoid the lengthy delay and significant cost of conversion to and completion of a liquidation under chapter 7 of the Bankruptcy Code. The Plan classifies Holders of Claims and Equity Interests according to the type of the Holder's Claim or Equity Interest, as more fully described below.

The Plan designates the Classes of Claims against and Equity Interests in the Debtors and specifies which Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, or (c) deemed to accept or reject the Plan. Claims against and Equity Interests in the Debtors are classified into eight (8) separate Classes as described herein.

B.      *The Adequacy of this Disclosure Statement*

Before soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a written disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan. The Plan Proponents submit this

Disclosure Statement in accordance with such requirements. This Disclosure Statement includes, without limitation, information about:

- the procedures for voting on the Plan and projected recoveries under the Plan (Article I hereof);

- the Debtors' organizational structure, business operations, and assets and liabilities (Article II hereof);

- the events leading to the Chapter 11 Cases (Article III hereof);

- the major events during the Chapter 11 Cases, including significant pleadings Filed in the Chapter 11 Cases and certain relief granted by the Bankruptcy Court in connection therewith (Article IV hereof);

- the classification and treatment of Claims and Equity Interests under the Plan, including identification of the Holders of Claims entitled to vote on the Plan (Article V hereof);

- the means for implementation of the Plan, the provisions governing distributions to certain Holders of Claims pursuant to the Plan, the procedures for resolving Disputed Claims, the formation of the Liquidating Trust, the Property Trust, and the Environmental Response/Restoration Trust, and other significant aspects of the Plan (Article V hereof);

- the releases, exculpations, and injunctions contemplated by the Plan (Article V hereof);

- the statutory requirements for confirming the Plan (Article VI hereof);

- certain risk factors that Holders of Claims should consider before voting to accept or reject the Plan and information regarding alternatives to Confirmation of the Plan (Article VII hereof); and

- certain United States federal income tax consequences of the Plan (Article VIII hereof).

In light of the foregoing, the Plan Proponents believe that this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code.

The Plan and all documents to be executed, delivered, assumed, and/or performed in connection with the Consummation of the Plan, including the documents to be included in the

Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date.

C.      *Summary of Claims and Equity Interests Under the Plan*

1.      *Classified Claims and Equity Interests*

As set forth in Articles II and III of the Plan, and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Equity Interests (other than Administrative Claims, Priority Tax Claims, Professional Claims, and the DIP Claim, which are unclassified Claims under the Plan) are classified into Classes for all purposes, including voting, Confirmation, and distributions pursuant to the Plan. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or an Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The table below summarizes the classification and treatment of all classified Claims and Equity Interests under the Plan. The classification, treatment, and projected recoveries of classified Claims are described in summary form below for illustrative purposes only. ***Recoveries available to Holders of Claims are estimates and actual recoveries may differ materially based on, among other things, the amount of Claims actually Allowed. Depending on the amount of Allowed Claims, the actual recoveries available to Holders of Allowed Claims could be materially higher or lower compared to the estimates provided below. To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.***

| Class | Designation | Impairment | Voting Rights | Projected Approximate Amount of Allowed Claims or Equity Interests ($000s) | Projected Plan Recovery |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $0 | N/A |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $5 | 100% |
| 3 | General Unsecured Convenience Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $759 | 100% |
| 4 | General Unsecured Claims (Creditors Electing Cash Option) | Impaired | Entitled to Vote | $5,449 | 7.9%[2] |
| 4 | General Unsecured Claims (LT Class A) | Impaired | Entitled to Vote | $706,096[3] | 60.5 –100%[4] |

---

[2]  Electing GUC Holders will receive the greater of (a) 5 percent of such Holder's Allowed Claim or (b) $1,000.  The Plan Proponents expect that the average distribution to Electing GUC Holders will be 7.9 percent.

[3]  The Debtors' advisors analyzed the Class 4 Claims pool and, after removing certain claims, including duplicate claims, amended and superseded claims, and claims filed against multiple Debtors, the Debtors estimate the amount of Allowed Class 4 Claims to be approximately $706,096,000.  In addition to claims filed by vendors, litigation claimants, current and former employees, and other potentially responsible parties ("PRPs"), this amount is inclusive of the OCC Class 4 Claim of $510,626,872.18, the United States Class 4 Claims in the aggregate amount of $146,000,000, the CPG Class 4 Claim of $14,365,320.14, and other Class 4 Environmental Claims.

[4]  The projected recoveries for Holders of General Unsecured Claims are based on certain estimates regarding the value of the Debtors' assets, including Causes of Action held by the Estates (which Causes of Action are discussed in greater detail below). Holders of General Unsecured Claims should be advised that there can be no assurance as to the outcome of any Cause of Action that may be prosecuted by the Liquidating Trust after the Effective Date, and that the amounts recovered by the Liquidating Trust from the prosecution of any such Cause of Action could differ in material respects from the values attributed thereto in this Disclosure Statement and the accompanying Liquidation Analysis.

| Class | Designation | Impairment | Voting Rights | Projected Approximate Amount of Allowed Claims or Equity Interests ($000s) | Projected Plan Recovery |
|---|---|---|---|---|---|
| 5 | Environmental Claims for the Diamond Alkali Site (LT Class B) | Impaired | Entitled to Vote | $11,795,650[5] | 0.6 – 15.4%[6] |
| 6 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | $422,345 | 0% |
| 7 | YPF Tranche B Claim | Impaired | Not Entitled to Vote (Deemed to Reject) | $7,970 | 0% |
| 8 | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | $0 | 0% |

Except to the extent a Holder of an Allowed Claim or Equity Interest, as applicable, agrees to a less favorable treatment, such Holder shall receive under the Plan the treatment described in Article V hereof.  Unless otherwise indicated, each Holder of an Allowed Claim or Equity Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

2.    *Unclassified Claims*

---

[5] The United States on behalf of the EPA and the NRD Trustees have filed the United States EPA/NRD Trustees Claim against the Debtors for approximately $11.9 billion relating to the Debtors' environmental liabilities, primarily related to the Diamond Alkali Site.

[6] On the Effective Date, in full and final satisfaction of all Allowed Class 5 Diamond Alkali Claims, the Liquidating Trust shall issue the Class B Beneficial Interests to the Environmental Response/Restoration Trust.  The Environmental Response/Restoration Trust shall receive distributions from the Liquidating Trust on account of the Class B Beneficial Interests pursuant to the Liquidating Trust Waterfall set forth in Article VI of the Plan. The Environmental Response/Restoration Trust will distribute any amounts received on account of the Class B Beneficial Interests pursuant to the ERRT Waterfall set forth in Article IX of the Plan.

The table below summarizes Claims that are not classified into individual Classes under the Plan.  These Claims will be paid or satisfied in full pursuant to the Plan, unless otherwise agreed to by the Holder of such Claims.

| Designation | Projected Approximate Amount of Allowed Claims ($000s) |
|---|---|
| DIP Claim | $16.3[7] |
| Administrative Claims | $0[8] |
| Priority Tax Claims | $131 |

D.     *Voting on and Confirmation of the Plan*

By order of the Bankruptcy Court, entered on [_____], 2017 [Docket No. ____] (the "Disclosure Statement Order"), the Bankruptcy Court, among other things, (a) approved the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code and (b) established Plan voting tabulation procedures, which include certain vote tabulation rules that temporarily allow or disallow Claims for voting purposes (the "Solicitation Procedures").  A copy of the Disclosure Statement Order is attached hereto as **Exhibit B**.

E.     *Classes Entitled to Vote on the Plan*

The following Classes are the only Classes entitled to vote to accept or reject the Plan (the "Voting Classes"):

| Class | Claim | Status |
|---|---|---|
| 4 | General Unsecured Claims | Impaired |
| 5 | Environmental Claims for the Diamond Alkali Site | Impaired |

If your Claim or Equity Interest is not included in one of the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package or a Ballot.  If your Claim or Equity Interest is included in one of the Voting Classes, you should read your Ballot and carefully follow the instructions set forth therein.  Please use only the Ballot that accompanies

---

[7]   Pursuant to the OCC DIP Agreement and the Plan, all or a portion of the DIP Claim may be rolled into the DIP Promissory Note.

[8]   Accrued administrative expenses as of the Effective Date are included in the DIP Claim and will be paid in accordance with the OCC DIP Order and OCC DIP Agreement.

this Disclosure Statement or the Ballot that the Debtors, or the Voting Agent on behalf of the Debtors, otherwise provide to you.

F.      *Votes Required for Acceptance by a Class*

Under the Bankruptcy Code, acceptance of a plan by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims or interests voting to accept, as a percentage of the allowed claims or interests, as applicable, in the class. Each Class of Claims entitled to vote on the Plan will have accepted the Plan if: (a) the Holders of at least two-thirds in dollar amount of the Claims validly voting in each Class vote to accept the Plan; and (b) the Holders of more than one-half in number of the Claims validly voting in each Class vote to accept the Plan.

G.      *Certain Factors to Be Considered Prior to Voting*

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan, including:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Plan Proponents believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Plan Proponents can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Plan Proponents may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims or Professional Claims.

For a further discussion of risk factors, please refer to Article VII hereof, entitled "Certain Risk Factors to be Considered Before Voting."

H.      *Classes Not Entitled to Vote on the Plan*

Under the Bankruptcy Code, holders of claims and equity interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan, in which case they are conclusively presumed to accept the proposed plan, or if they will receive no property under the plan, in which case they are deemed to reject the proposed plan.  Accordingly, the following Classes of Claims and Equity Interests are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | General Unsecured Convenience Claims | Unimpaired | Presumed to Accept |
| 6 | Intercompany Claims | Impaired | Deemed to Reject |
| 7 | YPF Tranche B Claim | Impaired | Deemed to Reject |
| 8 | Equity Interests | Impaired | Deemed to Reject |

I.      *Solicitation Procedures*

1.      *Voting Agent*

The Debtors retained Prime Clerk LLC ("Prime Clerk" or the "Voting Agent") to act, among other things, as the voting agent in connection with the solicitation of votes to accept or reject the Plan.

2.      *Solicitation Package*

The Disclosure Statement Order provides that Holders of Claims as of [_____], 2017 (the "Voting Record Date") are entitled to vote to accept or reject the Plan.  The Debtors will mail or cause to be mailed appropriate solicitation materials (the "Solicitation Package") to the U.S. Trustee and Holders of Claims in the Voting Classes, which will include the following:

- the Disclosure Statement Order, without attachments;

- the notice of the Confirmation Hearing;

- a CD-ROM or USB Flash Drive containing the Disclosure Statement, which shall include the Plan as an exhibit thereto;

- a Ballot customized for each Holder and conforming to Official Bankruptcy Form No. B314, and a postage-prepaid return envelope; and

- any supplemental documents filed with the Bankruptcy Court and any documents that the Bankruptcy Court orders to be included in the Solicitation Package, including any other letters in support of the Plan.

3.      *Distribution of the Solicitation Package and Plan Supplement*

The Debtors will cause Prime Clerk to begin to distribute the Solicitation Packages to Holders of Claims in the Voting Classes on or before [_____], 2017, which will be at least [__] days before the deadline to vote to accept or reject the Plan (*i.e.*, 4:00 p.m. (prevailing Eastern Time) on [_____], 2017 (the "Voting Deadline").

The Solicitation Package (except for the Ballots) may also be obtained: (a) from Prime Clerk by (i) visiting, free of charge, https://cases.primeclerk.com/maxus; (ii) writing to Maxus Ballot Processing, c/o Prime Clerk, 830 3rd Avenue, 3rd Floor, New York, New York 10022, or via email at maxusballots@primeclerk.com; or (iii) calling (855) 252-4093; or (b) for a fee via PACER at https://ecf.deb.uscourts.gov.

The Debtors shall File the Assumption Schedule no later than twenty (20) days prior to the deadline to object to the Plan or such later date as may be approved by the Bankruptcy Court, and the remainder of the substantially complete versions of the materials comprising the Plan Supplement no later than ten (10) days prior to the deadline to object to the Plan or such later date as may be approved by the Bankruptcy Court, except as otherwise provided under the Plan. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve paper, CD-ROM, or USB Flash Drive copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement (a) from Prime Clerk by (i) visiting, free of charge, https://cases.primeclerk.com/maxus; (ii) writing to Maxus Ballot Processing, c/o Prime Clerk, 830 3rd Avenue, 3rd Floor, New York, New York 10022, or via email at maxusballots@primeclerk.com; or (iii) calling (855) 252-4093; or (b) for a fee via PACER at https://ecf.deb.uscourts.gov.

As described above, certain Holders of Claims may not be entitled to vote because they are Unimpaired or are otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code. In addition, certain Holders of Claims and Equity Interests may be Impaired but are receiving no distribution under the Plan, and are therefore deemed to reject the Plan and are not entitled to vote. Such Holders will receive only notice of the Confirmation Hearing, the deadline to object to the Plan, and the applicable Notice of Non-Voting Status (as defined in the Disclosure Statement Order). The Debtors are only distributing a Solicitation Package, including this Disclosure Statement and a Ballot to be used for voting to accept or reject the Plan, to the Holders of Claims or Equity Interests entitled to vote to accept or reject the Plan as of the Voting Record Date.

J.      *Voting Procedures*

If, as of the Voting Record Date, you are a Holder of a Claim in Class 4 or 5 you may vote to accept or reject the Plan in accordance with the Solicitation Procedures by either completing the Ballot and returning it in the envelope provided or completing the Ballot on Prime Clerk's E-Ballot platform as described in more detail in the Disclosure Statement Order.

If your Claim or Equity Interest is not included in one of the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package. Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

1.      *Voting Deadline*

The Disclosure Statement Order establishes a deadline to vote on the Plan of [_____], 2017, at 4:00 p.m. (prevailing Eastern Time). To be counted as a vote to

accept or reject the Plan, a Ballot must be **actually received** by Prime Clerk no later than the Voting Deadline.

      2.     *Voting Instructions*

      As described above, the Debtors retained Prime Clerk to serve as the voting agent for purposes of the Plan.  Prime Clerk is available to answer questions, provide additional copies of all materials, oversee the voting process, and process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

| **BALLOTS** |
|---|
| To be counted, all Ballots must be **actually received** by Prime Clerk by the Voting Deadline, which is [_____], 2017, at 4:00 p.m. (prevailing Eastern Time), via Prime Clerk's E-Ballot platform by visiting https://cases.primeclerk.com/maxus **or** at the following address:<br><br>MAXUS ENERGY CORPORATION<br>Ballot Processing<br>c/o Prime Clerk<br>830 3rd Avenue, 3rd Floor<br>New York, New York 10022<br><br>If you have any questions on the procedure for voting on the Plan, you may contact Prime Clerk LLC by calling the Debtors' restructuring hotline at (855) 252-4093, writing to Maxus Ballot Processing, c/o Prime Clerk, 830 3rd Avenue, 3rd Floor, New York, New York 10022, or emailing maxusballots@primeclerk.com. |

      More detailed instructions regarding the procedures for voting on the Plan are contained on the Ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Plan.  All votes to accept or reject the Plan must be cast by using the appropriate Ballot.  All Ballots must be properly executed, completed, and delivered according to their applicable voting instructions.  Any Ballot that is properly executed by the Holder of a Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.  Ballots received by facsimile or electronic means (other than E-Ballots submitted through Prime Clerk's E-Ballot platform) will not be counted.

      Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim held by such Holder.  By signing and returning a Ballot, each Holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtors that no other Ballots with respect to such Claim have been cast or, if any other Ballots have been cast with respect to such Claim, such earlier Ballots are revoked.

      All Ballots will be accompanied by postage prepaid return envelopes.  It is important to follow the specific instructions provided on each Ballot, as failing to do so may result in your Ballot not being counted.

K.    *Confirmation Objection Deadline*

The deadline to file objections to confirmation of the Plan is [_____], 2017, at 4:00 p.m. (prevailing Eastern Time) (the "Confirmation Objection Deadline").  All objections to confirmation of the Plan must (a) be in writing, (b) comply with the Bankruptcy Rules and the Local Rules, (c) set forth the name of the objector and the nature and amount of any Claim or Equity Interest asserted by the objector against or in the Debtors, and (d) state with particularity the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan that would resolve such objection.  Any such objection must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the Disclosure Statement Order so that they are **actually received** on or before the Confirmation Objection Deadline.  The deadline to file replies to any confirmation objection is [_____], 2017, at 4:00 p.m. (prevailing Eastern Time) (or, in the event the Confirmation Hearing is adjourned, the date that is two (2) business days prior to the adjourned hearing date).

L.    *Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  The Bankruptcy Court has entered the Disclosure Statement Order that, among other things, scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing").

The Confirmation Hearing is scheduled for **May 22, 2017, at 10:00 a.m. prevailing Eastern Time, and, as necessary, May 23, 25, and 26, 2017 (commencing each day at 10:00 a.m. prevailing Eastern Time)**, before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Courtroom No. 6, Wilmington, Delaware.  The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served on the entities who have Filed objections to the Plan, without further notice to other parties in interest.  The Bankruptcy Court, in its discretion and before the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  The Plan may be modified, if necessary, before, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

M.    *Holders of Environmental Claims in Class 4 and Class 5*

All Holders of Environmental Claims for (a) unreimbursed out of pocket costs and expenses incurred by the Holder of such Claim prior to the Effective Date, (b) costs and expenses the Holder of such Claim has, as of the Effective Date, contractually committed itself to expend (as evidenced by a writing between such Holder and a Government Environmental Entity or a judgment of a court of competent jurisdiction), or (c) such other amounts as may be Allowed as a Class 4 Environmental Claim pursuant to (i) any agreement or settlement with the Debtors or (ii) order of the Bankruptcy Court, will have Class 4 Environmental Claims. Other than as expressly set forth in the Plan, (x) Holders asserting liquidated Environmental Claims (regardless of whether they have also asserted contingent and unliquidated amounts) shall be

entitled to vote in Class 4 in the liquidated amount specified in their respective Proofs of Claim, and (y) Holders asserting only contingent and unliquidated Environmental Claims shall be included in Class 4 and be permitted to vote at $1.00 in accordance with the Solicitation Procedures.

The Class 5 Diamond Alkali Claims are (a) that portion of the United States EPA/NRD Trustees Claim relating to the Diamond Alkali Site arising under or in connection with any Environmental Law that is not included in the United States Class 4 Claim and (b) any other amounts as may be Allowed as a Class 5 Diamond Alkali Claim pursuant to (i) any agreement or settlement with the Debtors or (ii) order of the Bankruptcy Court. The Claim of any Person other than the United States treated as a Class 5 Diamond Alkali Claim shall also have distinct legal rights against the Debtors not shared by the Holders of Environmental Claims generally. Class 5 Diamond Alkali Claims shall receive the treatment specified under the Plan, and no distributions shall be made directly to Holders of Class 5 Diamond Alkali Claims.

N.      *Settlement and Compromise of Certain Claims*

The Plan constitutes a settlement negotiated in good faith and at arm's length between and among the Debtors, the Creditors' Committee, OCC, the United States (on behalf of the EPA and the NRD Trustees), and the CPG pursuant to which (among other things) OCC and the United States have agreed to bifurcate their Environmental Claims between Class 4 and Class 5, thus substantially reducing that portion of their Claims that will be treated *pari passu* with other Holders of Allowed Class 4 Claims under the Plan. OCC and the United States have also agreed to allow assets of the Estates to be used to pay all Allowed General Unsecured Convenience Claims in Class 3, and to afford the Cash election offered to certain Holders of Allowed Claims in Class 4. The result of the settlement is that OCC and the United States have effectively subordinated the vast majority of their Claims to the prior payment in full of all Allowed Class 4 Claims and distributions to various other Classes of creditors under the Plan. The settlement therefore provides a significant and material benefit to all Holders of Allowed Claims in the Chapter 11 Cases.

The United States EPA/NRD Trustees Claim asserts claims against the Debtors in excess of $11.9 billion relating to the Debtors' environmental liabilities. More than 99.5% of the claimed amounts relate to the Diamond Alkali Site. Under the Plan, the EPA and the NRD Trustees have agreed to settle the United States EPA/NRD Trustees Claim in exchange for (i) the United States Class 4 Claims in the aggregate amount of $146,000,000, and (ii) a Class 5 Diamond Alkali Claim that will benefit solely from distributions made to the Environmental Response/Restoration Trust on account of the Class B Beneficial Interests in the Liquidating Trust.

OCC filed Proofs of Claim against the Debtors asserting that under the OCC Indemnity the Debtors are obligated to reimburse OCC for past unreimbursed costs and expenses as well as for any future remediation and restoration costs with respect to DSCC-related sites, which includes the vast majority of the up to $11.9 billion in future remediation costs and restoration asserted in the United States EPA/NRD Trustees Claim. OCC contends that the portions of its Proofs of Claim relating to future remediation and restoration costs are non-contingent and allowable, among other reasons, because the OCC Indemnification Obligations under the SPA as

they relate to OCC's Claims concerning the Diamond Alkali Site have been affirmed by various court orders.  Under the Plan, OCC has agreed to settle its Proofs of Claim in exchange for a Class 4 Environmental Claim in the amount of $510,626,872.18, representing its unreimbursed actual or committed costs and expenses, and a Class 5 Diamond Alkali Claim that will benefit solely from distributions made to the Environmental Response/Restoration Trust on account of the Class B Beneficial Interests in the Liquidating Trust.

In the absence of this settlement, the Debtors, the United States, OCC, the CPG, the Gibbons Parties and various other Holders of Environmental Claims relating to the Diamond Alkali Site would be required to engage in costly and time consuming litigation regarding (among other matters), the Debtors' allocable share of liability for remediation and restoration costs at the Diamond Alkali Site (which necessarily implicates each other potentially responsible party and its potential allocable share) as well as the amount at which the United States' and OCC's Claims should be Allowed.   If the United States EPA/NRD Trustees Claim and the Proofs of Claim filed by OCC were Allowed in their entirety (or even at a fraction of their stated amounts) and were placed in the same class as all other general unsecured creditors, other general unsecured creditors would only be entitled to a *de minimis* percentage of any recoveries from the YPF Causes of Action and other Liquidating Trust Assets.  Accordingly, the settlement avoids years of unnecessary litigation by fixing and reducing the Class 4 Claims held by the United States and OCC, which in turn provides general unsecured creditors with significantly greater recoveries from the Liquidating Trust Assets than they otherwise would be entitled to. Under the Plan, Holders of Class 4 Claims will receive Class A Beneficial Interests in the Liquidating Trust, which shall entitle them to the first 85% of recoveries from the Liquidating Trust Assets (after payment of certain fees and expenses) until such time as those Claims are paid in full with interest.

Accordingly, the Plan Proponents believe that the compromise and settlement of these Claims is in the best interests of the Debtors and the Estates, and is fair, equitable, and reasonable.


# ARTICLE II.

## DEBTORS' ORGANIZATIONAL STRUCTURE AND BUSINESS

A.    *Current Corporate Structure and Business Operations*

Debtor Maxus Energy Corporation ("Maxus") is a Delaware corporation, which is a wholly owned subsidiary of non-Debtor YPF Holdings, Inc. ("YPF Holdings").  YPF Holdings is wholly owned by non-debtor YPF S.A. ("YPF").

Maxus's business consists of collecting onshore oil and gas royalties from over 3,000 wells located in six states in the United States, overseeing the administration of benefits for Maxus and Debtor Gateway Coal Company ("Gateway Coal") retirees, complying with environmental remediation obligations, providing general and administrative services for its

subsidiaries and Debtor Tierra Solutions, Inc. ("Tierra"), and managing U.S.-based and international litigation on behalf of itself and Occidental Chemical Corporation ("OCC").

Tierra is a Delaware corporation that is directly owned by CLH Holdings, Inc. (an inactive, non-Debtor entity, which, in turn, is owned by YPF Holdings). Tierra's business is to manage its own environmental remediation obligations as well as those owed by Maxus, either as principal or when acting on behalf of third parties, principally OCC.

Debtor Maxus International Energy Company ("Maxus International"), a wholly owned subsidiary of Maxus, is a Delaware corporation whose business is inactive.

Debtor Maxus (U.S.) Exploration Company ("MUSE"), a wholly owned subsidiary of Maxus, is a Delaware corporation which is involved in oil and gas exploration efforts in the deep waters of the Gulf of Mexico primarily through its ownership of a 15% non-operating working interest in three oil and gas leases relating to an offshore oil and gas drilling field known as "Neptune."

Gateway Coal, a wholly owned subsidiary of Maxus, is a Delaware corporation whose business is limited to the administration of Retiree Benefits for its 142 former employees and their dependents.

B.     *The Debtors' Assets*

As discussed in further detail in Article IV hereof and pursuant to section 2(e) of the OCC DIP Order (as defined below), substantially all of the Debtors' assets are pledged as collateral in connection with the OCC DIP Facility (as defined below) and are subject to the DIP Liens (as defined in the OCC DIP Order). Some of the assets are liquid, including restricted cash on hand and cash equivalents, while other assets are currently being marketed by the Debtors and their third-party advisors. The Debtors are hopeful that they will be able to liquidate (or recover to the Estates, as the case may be) many of the assets that have value prior to the Effective Date. If sufficient assets are not monetized prior to the Effective Date to repay the OCC DIP Lender, the OCC DIP Lender has agreed to take a DIP Promissory Note secured by a lien on the Liquidating Trust Assets, solely to the extent of any unpaid portion of its DIP Claim, thereby allowing the Debtors to satisfy the condition precedent to consummation in Article II.A. of the Plan.

1.     *Causes of Action Against YPF*

As discussed in further detail in Articles III and IV hereof, the YPF Causes of Action represent the Debtors' most valuable asset. Pursuant to the Plan, the YPF Causes of Action will be transferred to and prosecuted by the Liquidating Trust.

2.     *Neptune*

As noted above, MUSE owns a 15% non-operating working interest in Neptune. Neptune is operated by non-affiliate BHP Billiton Petroleum (Deepwater) Inc. (the "Operator"). The working interest requires MUSE to pay its percentage of operating expenses and capital expenditures that are billed by the Operator. In exchange, MUSE receives revenues generated

from third-party contracts to purchase the oil, gas, and liquids that are produced at Neptune. Prior to the Petition Date, MUSE granted to the Operator liens and security interests to secure payment of its share of expenses.

The Neptune drilling field contains seven subsea producing oil and gas wells that produce (as of December 31, 2015) an average of 8,862 barrels of oil per day.  In 2015, MUSE earned approximately $20.2 million on account of its working interest in Neptune.  From January 1, 2016 through December 31, 2016, MUSE earned approximately $13.5 million on account of its working interest in Neptune.  As of December 31, 2015, Neptune had 1.16 million barrels of oil equivalent (a combined measure of oil, gas, and natural gas liquids) of proved reserves.  Based on current estimates of future oil prices and production, Neptune's reserves will decline to a point where it will cease to be operated profitably in early 2023.

The Bureau of Ocean Energy Management ("BOEM") requires financial assurance for decommissioning (*i.e.*, plugging and abandonment) liability for Neptune.  Given the $190,892,139 total amount of decommissioning liability calculated by BOEM, MUSE's proportionate share of liability, based on its 15% working interest in Neptune, is $28,633,821.[9] MUSE is currently evaluating potential alternatives for providing its share of financial assurance for the decommissioning liability, which will be included as part of a so-called "tailored plan" to be submitted by the Operator to BOEM.  In the event that MUSE is unable to provide its share of financial assurance, the Operator can, among other things, foreclose on its liens and security interests and offset the amount owed against the proceeds of sale of MUSE's share of oil and gas production.

As discussed in Article IV hereof, the Debtors retained a sales broker and consultant to auction MUSE's working interest in Neptune. Bids have been solicited for the "as is" sale of the working interest, and the winning bidder submitted a final bid of approximately $15 million (net of a sale commission) and agreed to assume the decommissioning liability.  On or before April 19, 2017, the Debtors anticipate filing a motion pursuant to section 363 of the Bankruptcy Code seeking approval of a "free and clear", "as is" sale of its working interest in Neptune to the winning bidder, which will be heard by the Bankruptcy Court during the scheduled omnibus hearing on May 10, 2017.

3.   *Overriding Royalty Interests*

Maxus owns overriding royalty interests ("ORRIs") in over 3,700 oil and gas wells located in five states within the United States (Louisiana, New Mexico, Oklahoma, Texas, and West Virginia) that entitle Maxus to receive periodic payments from the wells' operators as revenues are generated.  In 2015, Maxus earned approximately $3 million on account of the ORRIs.  Maxus currently receives approximately $180,000 per month on account of the ORRIs. From January 1, 2016 through December 31, 2016, Maxus earned approximately $2.3 million on account of the ORRIs.  As discussed in Article IV hereof, the Debtors retained a sales broker and consultant to auction the ORRIs.  A sealed bid auction has been completed and the winning bidder has offered to purchase the ORRIs for approximately $15.5 million (net of a sale

---

[9]  BOEM asserts that MUSE, as a lessee of record, is jointly and severally liable for the entire amount of the Neptune-related decommissioning liability.

commission).  The Debtors filed a motion with the Bankruptcy Court to approve the sale, which was approved by the Bankruptcy Court on April 17, 2017  [Docket No. 1207].

4.  *Real and Leased Property*

Tierra owns the properties that are the subject of environmental remediation at five master sites in New Jersey, Ohio, and Alabama.  Several of these master sites have been broken down into sub-sites or "operable units" by government regulators.   These five master sites include (a) 80-120 Lister Avenue in Newark, New Jersey (the "Lister Site"), (b) two properties in Kearny, New Jersey, (c) property in Lake County, Ohio, and (d) property in Tuscaloosa, Alabama (collectively, as defined in the Plan, the "Properties").   A list of the Properties is attached hereto as **Exhibit C**.

The Debtors undertook a comprehensive marketing process of the Properties for a 60-day period, which concluded with a March 22, 2017 bid deadline.  The Debtors recently received an offer (in the form of a Letter of Intent) from an interested third party to purchase all five of the Properties, including the 1,000+ acres in Painesville, Ohio, for an amount in excess of $19 million.  The Debtors are in the process of negotiating an asset purchase agreement with the bidder and will move promptly to seek Bankruptcy Court approval of this transaction.  Any sale of the Properties would require the purchaser to allow ongoing remediation activities to continue at the Properties.   In conjunction with the negotiation of the asset purchase agreement, the Debtors (in consultation with the potential bidder and the Creditors' Committee) will determine whether to reject the Ground Lease Agreement with Lakeview Bluffs, LLC or assume and assign it to the purchaser of the Properties.  To the extent the Debtors' efforts to sell the Properties are unsuccessful in whole or in part, then title to the unsold Properties will be transferred to the Property Trust.

The Debtors also lease certain non-residential real property, including offices located in Houston, Texas, and East Brunswick, New Jersey.  On January 3, 2017, the Bankruptcy Court entered an order further extending the Debtors' deadline to assume or reject their office leases and certain oil and gas and submerged land leases as described more fully in Article IV.B hereof [Docket No. 704].

5.  *Security for NJDEP Letter of Credit*

The Debtors maintain a bank account containing restricted cash (the "Collateral Account") to act as security for an irrevocable $20 million letter of credit (the "NJDEP LOC") Citibank has issued for the benefit of the New Jersey Department of Environmental Protection (the "NJDEP") to address financial assurance requirements for the performance of environmental remediation obligations at properties in Kearny, New Jersey.[10]  The Plan Proponents believe that the collateral securing the NJDEP LOC is an asset of the Estates.  The Debtors provided the collateral and have been paying the annual fees for the NJDEP LOC pursuant to an existing indemnification obligation owed to OCC (described in more detail below).  The collateral held in the Collateral Account can only be released to the Debtors upon (a) NJDEP's approval of a substitute financial assurance or determination that the projected remaining costs of the

---

[10]  This letter of credit was obtained by the Debtors pursuant to their contractual indemnification obligation to OCC upon which the government's remediation and financial assurance requirements were imposed.

associated remediation no longer require the financial assurance or (b) Citibank's timely notification to NJDEP of nonrenewal of the letter of credit followed by NJDEP's failure to draw on the NJDEP LOC within 120 days thereof.

Although the fee due to Citibank for renewing the NJDEP LOC has already been paid for the current year, the Debtors will not be able to continue to maintain the NJDEP LOC beyond the current year. Further, the Plan shall constitute notice of non-renewal of the NJDEP LOC, and the NJDEP LOC shall expire on the first expiration date to occur after the Effective Date and shall not be automatically renewed or otherwise renewed by the Debtors or the Liquidating Trust, as the case may be. Upon termination or expiration of the NJDEP LOC, any undrawn amounts belonging to the Estates shall be returned to the Liquidating Trust.

In conjunction with their efforts to transition environmental remediation responsibilities for certain properties to OCC, on February 24, 2017 the Debtors sent a letter to NJDEP informing it that the Debtors will not be able to maintain the NJDEP LOC after the Effective Date and advising NJDEP that OCC might be contacting it to discuss putting a substitute financial assurance into place prior to that time. As of yet, NJDEP has not approved such a substitute financial assurance from OCC and the Debtors have not been apprised of where any such discussion between OCC and NJDEP stands. Thus, the timing of the release of the collateral held in the Collateral Account to the Debtors or the Liquidating Trust, as applicable, is uncertain.

6.      *Litigation Assets*

a.      *Insurance Policies and Litigation*

In August 2012, Maxus engaged Aon Risk Consulting ("Aon") and Arcina Risk Group ("Arcina" and, together with Aon, "ARS") to identify whether the Debtors could assert coverage claims against their insurers for litigation costs and damages the Debtors both have incurred previously and are expected to incur. In exchange for such services, Maxus agreed to pay ARS a percentage of the funds recovered from the insurers. At this time, Maxus has either notified or tendered claims to its insurers seeking reimbursement for those amounts that Maxus paid to settle outstanding litigation claims or that Maxus is being asked by OCC to pay pursuant to an existing indemnification obligation owed to OCC (described in more detail below). The estimated recovery to Maxus on account of reimbursement claims submitted to its insurers is speculative.

The Debtors are engaged in pending litigation against Bedivere Insurance Company ("Bedivere") in the Texas state courts. The Bedivere lawsuit seeks to recover fees and costs totaling approximately $16.7 million that Maxus incurred in defending the *Ruby Mhire* lawsuit in Louisiana (discussed in more detail below). In 2013, the *Ruby Mhire* suit was tendered to the solvent insurers. Two years later, the insurers filed a declaratory judgment action against Maxus seeking a finding that no coverage was available to the Debtors under the existing policies. Maxus counterclaimed seeking coverage for the aforementioned amounts. A summary judgment motion brought by one of the insurers has been briefed and argued, and the court in Texas is expected to issue a ruling in the near future. Trial is expected to commence on September 18, 2017. The Debtors estimate the potential recovery of their claims at zero to approximately $16.7 million, inclusive of statutory interest.

The Debtors are also exploring the viability of a separate claim against Greenstone Assurance, Ltd. ("Greenstone") and related excess insurers seeking coverage for "liabilities assumed by contract," which, if meritorious, could cover portions of those amounts paid by the Debtors over time pursuant to the Debtors' contractual indemnification obligations. The Debtors' analysis is in its nascent stages and they are continuing to diligence the merits of the claim. As a result, the Debtors cannot specifically quantify the likelihood of success, and any estimated range of recovery on the claim would be highly speculative. If a viable claim does exist, there may be coverage for reimbursements of portions of $65 million in payments made to third parties. The Debtors previously gave notice of the claim to Greenstone, and coverage for the claim was denied in 2015. The Debtors, together with their professionals, continue to examine the merits of such an excess coverage claim and evaluate the associated costs relative to the potential recovery amounts.

The Debtors have also identified general primary liability coverage with a policy limit of $1 million to cover both defense costs and potential indemnification claims related to the Milwaukee Solvay Coke & Gas Superfund Site in Milwaukee, Wisconsin (the "Solvay Site"). The Debtors tendered notice of such claims to the insurer (i.e., The Hartford) at the beginning of February 2017. To date, the Debtors have not received a response from the general insurer as to whether it will agree to reimburse the Debtors for such claims. In addition, Arcina is undertaking additional diligence efforts to locate further primary liability coverage, as well as examining whether excess coverage may also be available and the coverage limits of such policies.

In addition to the potential coverage available to the Debtors through Greenstone (discussed above), Arcina identified "occurrence-based" coverage of up to $25 million from Munich Re that relates to environmental claims dating back to the 1950s. The Debtors tendered these claims to Munich Re as early as May 2015, but the insurer has never meaningfully engaged with the Debtors on its coverage position. The Debtors are working to get additional coverage information from the insurer and, if necessary, will pursue a Bankruptcy Rule 2004 examination of Munich Re in order to obtain the necessary and specific information regarding Munich Re's current coverage position and any related or pertinent supporting documentation. As a result, at this time, the Debtors are not in a position to meaningfully assess the merits of the claim or the likelihood of success of recovering a coverage judgment against the insurer.

The Debtors, with Arcina's assistance, have identified insurance policies issued by Old Republic to the Debtors' predecessor, Natomas Co., which can address the costs incurred by the Debtors associated with the *Jumonville* litigation (discussed in more detail below). The Debtors have submitted that claim to the insurer for coverage and believe that total aggregate value of the responsive policies exceeds both the indemnity amount of $750,000 and the estimated defense costs of $500,000. The Debtors are in active discussions with the claims adjuster about its willingness to pay out on the claim, but are not presently in a position to know whether or not the insurer will agree to cover the claim.

b.    *Non-Insurance Litigation*

As of the Petition Date, Tierra was the plaintiff in a breach of contract action against Scepter Management Corporation, Inc. ("Scepter") and Erie Coke and Chemical Company ("Erie"). As set forth in Article IV hereof, the Debtors have settled the litigation with Scepter and Erie, obtained Bankruptcy Court approval of same, and received $925,000, which will be used to repay the Debtors' obligations under the YPF Tranche A Facility.

7.    *Cash and Cash Equivalents*

As of March 17, 2017, the Debtors maintained a cash balance of approximately $12.6 million consisting of unrestricted cash on hand, proceeds from the Scepter settlement, liquidation of an environmental remediation trust account with the permission of the applicable governmental authority, and borrowings under the YPF DIP Facility (as defined below). That amount will be used to repay the YPF Tranche A Facility (as defined below). Additionally, approximately $163,000 in the aggregate is maintained in segregated bank accounts that (a) act as security for the Debtors' corporate credit card program, (b) act as security for the Debtors' utility providers, and (c) fund workers' compensation benefits.

In addition, the Debtors maintain a rabbi trust account funded with $760,000, which, prepetition, was held for the benefit of beneficiaries of the Debtors' SERP. The Plan Proponents believe that the funds contained in this account are assets of the Estates.[11]

8.    *Contribution Claims Against Honeywell*

Since 2007, the Debtors have been participating in an investigation of hazardous substances in the subsurface at the Solvay Site under the oversight of the U.S. Environmental Protection Agency (the "EPA"). In doing so, the Debtors have incurred, and will continue to incur, substantial response costs arising from the investigation and cleanup of the Solvay Site.

On February 28, 2017, the Debtors filed a complaint commencing an adversary proceeding against Honeywell International Inc. ("Honeywell") as successor to two companies— the Solvay Process Company and the Semet-Solvay Company—that had previously owned or operated a portion of the Solvay Site that was operated as a gas and coke manufacturing facility. In the complaint, the Debtors seek to recover response costs and damages related to the release of hazardous substances at the Solvay Site under CERCLA (as defined below). A pretrial conference in this matter is currently scheduled for May 10, 2017.

---

[11] The Debtors have funded seven (7) trust accounts containing restricted cash to fund payments for environmental remediation activities at certain sites, as required by various governmental agencies. As part of the Services Agreement (as defined below) by and between Tierra and OCC, the Debtors are transferring the agreements governing the trust accounts with respect to OCC sites to OCC. With respect to all other sites, the Debtors will use their best efforts to transfer remediation projects to the appropriate potentially responsible party or parties prior to the Effective Date. The Debtors will also, prior to the Effective Date, assign whatever rights that remain in the return of funds from trust accounts established at such other sites as directed by the governmental agency with lead responsibility for overseeing the remediation to be performed.

9.    *Preserved Contribution Claims*

The Debtors will also preserve and transfer to the Liquidating Trust certain claims for recovery of past costs paid in excess of the Debtors' allocable share of liability against certain third parties that are also potentially liable for those same environmental liabilities at the Diamond Alkali Site or other sites on which the Debtors performed environmental remediation or restoration activities, which contribution claims the Debtors have chosen to preserve based on their independent business judgment.

In order to promote the best use of the Estates' assets, the Debtors sought to identify Contribution Claims that are estimated to yield material value to the Estates relative to the reasonably anticipated expense associated with prosecuting those claims.  To determine which entities should be included on the list of Preserved Contribution Claims, the Debtors reviewed remediation information in conjunction with their counsel and their expert technical and forensic environmental consultants.  The Debtors reviewed historical operation information at each of the relevant remediation sites to determine which entities owned and operated facilities that were responsible for the past production, storage, and disposal of hazardous substances.  After identifying the parties that were potentially responsible for the release of hazardous substances at the various sites, the Debtors evaluated which entities that, based on the available information, were responsible for a material share of the past remediation and investigation costs.  The Debtors made this determination based on the length of time of ownership or operation of a particular facility, or an estimation of the amount and type of hazardous substances used and disposed of at such facility.  The Debtors sought to eliminate those parties that (a) appeared to either be *de minimis* contributors or (b) had previously contributed to the investigation and remediation costs in amounts roughly proportionate to their share of liability.

On April 11, 2017, the list of the Preserved Contribution Claims was filed with the Bankruptcy Court.  [Docket No. 1147].

10.    *Miscellaneous Other Assets*

In addition to the foregoing, the Debtors' assets include internet protocol addresses,[12] *de minimis* office supplies, a contingent settlement receivable, furniture and fixtures, mineral interests in Ohio,[13] and an approximate $270,000 account receivable from Valero (as defined below).  The Debtors filed a motion authorizing them to conduct *de minimis* asset sales on March 16, 2017 to efficiently liquidate certain of these miscellaneous assets.  The Bankruptcy Court granted the motion on April 5, 2017. [Docket No. 1109].

The Debtors own three annuity contracts established in 1986 to supplement the Debtors' prepetition obligations related to the SERPs (as defined below) pursuant to which the Debtors receive, in the aggregate, approximately $22,000 per month. The Debtors currently estimate that

---

[12] As discussed in Article IV hereof, the Debtors retained an internet protocol address broker to assist with the sale of the internet protocol addresses.  The Debtors filed a motion for approval of the sale of the internet protocol addresses that is expected to yield approximately $680,000 (net of a sale commission) to the Estates.  The Bankruptcy Court granted the motion on April 5, 2017. [Docket No. 1120].

[13] The Debtors estimate that the proceeds from the liquidation of the mineral interests would be between $0–$50,000.

they will receive between $200,000-400,000 (net of sales commissions) from the sale of these annuity contracts.

## C.   *Debtors' Workforce*

As of the Petition Date, the Debtors employed approximately 30 employees, consisting of 29 full time employees and 1 inactive employee[14] (the "Employees"), and 4-5 independent contractors (the "Independent Contractors," and together with the Employees, the "Workforce"). As of the date of this Disclosure Statement, the Workforce consists of approximately 28 Employees and 5 Independent Contractors.

The Workforce is essential to the Debtors' ongoing environmental remediation projects and other critical business operations necessary to maintain value for the Estates throughout the Chapter 11 Cases. The Workforce also plays a key role in enabling the Debtors to comply with environmental regulations. The Workforce has specialized experience in the exploration and production ("E&P") and environmental remediation industries and possesses significant institutional knowledge of the Debtors and their operations. The Employees are all salaried, and the Independent Contractors are paid once monthly based upon services performed during the prior month.

## D.   *Collective Bargaining Agreements*

Gateway Coal was a signatory to the National Bituminous Coal Wage Agreement of 1988 (the "1988 Wage Agreement"), which was the national agreement between certain coal operators and the International Union, United Mine Workers of America (the "UMWA"). The 1998 Wage Agreement expired on February 1, 1993, and Gateway Coal did not sign the successor agreement, which was the National Bituminous Coal Wage Agreement of 1993. Currently, neither Gateway Coal nor any of the other Debtors is a party to an unexpired collective bargaining agreement.

## E.   *The Debtors' Liabilities*

As of the Petition Date, the Debtors had no outstanding secured or unsecured funded debt, and did not have a credit facility with any lender. The Debtors' most significant prepetition liabilities fall into the following general categories: (a) environmental liabilities; (b) contractual indemnification obligations; (c) other legal liabilities; and (d) Retiree obligations.

### 1.   *Environmental Liabilities*

As discussed in further detail in Article III hereof, Maxus's liability largely relates to releases by Diamond Alkali Company ("Diamond Alkali"), a chemical company founded in West Virginia more than 100 years ago, and various of its predecessors and successors. As a result of activities undertaken by Diamond Alkali, and properties owned by it (of which a few are now held by the Debtors) federal and state regulators have imposed a variety of legal liabilities and obligations upon the Debtors, among other PRPs, through judicial or

---

[14] The inactive employee was terminated on January 31, 2017 and the individual's long term disability case is still under review.

administrative orders or decrees, based on their statutory authorities related to the pollution or protection of the environment (the "<u>Direct Environmental Liabilities</u>").[15]

Analytically, there are at least three distinct legal bases for the Direct Environmental Liabilities. The first is "owner liability," which consists of obligations arising from the Debtors' ongoing ownership of facilities at which hazardous substances have historically been released into the environment or their prior ownership of facilities at the time hazardous substances were released into the environment. The second is "operator liability," which consists of obligations arising from the Debtors' management and operation of facilities at which hazardous substances have been released into the environment. The third is "arranger liability," which arises from the Debtors' disposal of materials at waste disposal sites owned and operated by third parties from which there have been releases of hazardous substances into the environment. Accordingly, the Debtors are potentially liable as current "owners" of the Lister Site or the other owned real property discussed herein. The Debtors also are potentially liable as prior "owners" and/or "operators" of certain facilities or "arrangers" at other properties across the United States.

Relatedly, as discussed in further detail in Article III hereof, the Debtors also are contractually obligated to defend, indemnify, and hold OCC harmless for the environmental liabilities of DSCC (as defined in Article III hereof), a former subsidiary of Maxus that was acquired by OCC's affiliate, Oxy-Diamond Alkali, in 1986.[16] Prior to the acquisition, DSCC managed and operated a wide variety of chemical manufacturing facilities located across the United States and disposed of wastes at various disposal sites around the country. In 1987, the stock of DSCC was transferred to OCC. In connection with the 1986 transaction, Maxus agreed to indemnify OCC for DSCC's historical environmental liabilities (largely as an "operator").

Prior to the Petition Date, the exact nature and scope of the Debtors' and OCC's respective environmental liabilities was generally determined in one of two ways. If the nature and scope of a particular liability was not disputed, then the Debtors (or the Debtors acting as agent on behalf of OCC) would enter into a consensual administrative order with the EPA or state agency equivalent that obligated the Debtors (or OCC) to perform specified response activities (*e.g.*, removal, remedial investigation, feasibility study, remedial design) and/or reimburse the governmental regulator for response costs already incurred. If the nature and scope of a particular liability was disputed, then the EPA or state agency equivalent would sue one or more of the Debtors or OCC, as applicable, and the parties would litigate or resolve by settlement the nature and scope of liability. The Passaic River Litigation (defined and discussed in further detail in Article III hereof) is an example of one such litigation.

Based on a review of the Debtors' financial records, over the past 30 years, the Debtors incurred approximately $687 million in response costs through September 30, 2016 on account of the Direct Environmental Liabilities and the OCC Indemnification Obligations. Because future response costs are highly speculative, and because in many cases remedies have not been selected or allocations of liabilities between PRPs made, the Debtors are generally unable to reliably quantify potential future costs arising from the Direct Environmental Liabilities and the

---

[15] To the best of the Debtors' knowledge, only Maxus and Tierra have any actual or potential responsibility for the Direct Environmental Liabilities.

[16] Such obligations are defined in Article III hereof as the "OCC Indemnification Obligations."

OCC Indemnification Obligations.  In the context of the Chapter 11 Cases, Governmental Environmental Entities have submitted joint and several environmental liability claims against the Debtors in the collective amount of up to $12.3 billion on account of the Debtors' Direct Environmental Liabilities, notwithstanding that there are potentially responsible third parties who are also responsible and liable to the Governmental Units for those same asserted liabilities. The Debtors intend to preserve and potentially prosecute certain contribution claims to recover past costs paid in excess of the Debtors' allocable share of liability against such potentially responsible third parties (*i.e.*, the Preserved Contribution Claims).  The Estates (and the Liquidating Trust) may be able to reduce the Debtors' overall liability by asserting objections or defenses to these claims through the claims reconciliation process, as well as pursuing the Preserved Contribution Claims (which shall inure to the benefit of the Exit Lender and the Holders of the Class C Beneficial Interests).

The Debtors have taken, and will continue to take, significant measures to wind down their business in an environmentally responsible manner.  The Debtors continue, within the constraints of their financial resources, including DIP financing, to comply with their obligations under the Comprehensive Environmental Response, Compensation, and Liability Act (commonly referred to as "CERCLA," or the Superfund statute) and state law equivalents as well as other laws relating to the pollution or protection of the environment.

As detailed in Article V hereof, the Plan provides for the establishment of a Property Trust that will receive, hold, and administer the PT Properties until such properties are remediated or other otherwise disposed.

### 2.    *Other Legal Liabilities*

In addition to their environmental obligations, the Debtors face potential liability in connection with litigation involving personal injury claims associated with Agent Orange,[17] more recent environmental contamination claims brought against them in Louisiana arising from legacy petroleum E&P activities, and toxic tort claims arising in Illinois, Missouri and Texas in which the plaintiffs allege harm (lung cancer and mesothelioma) caused by exposure to asbestos while working as oilfield service workers for an independent contractor.[18]  In addition, Gateway Coal has ongoing mining-related monitoring and maintenance obligations at the Gateway Coal Site in Pennsylvania.  Moreover, MUSE has liabilities associated with its working interest in Neptune unrelated to the financial assurance obligation described above.

### 3.    *Retiree Obligations*

The Debtors have liabilities associated with (a) several defined benefit pension plans (the "Pension Plans") historically maintained by the Debtors, each of which was terminated prior to the Petition Date, and (b) other post-employment benefit plans (the "OPEB Plans") provided by the Debtors to certain of their retired employees, each of which is described in detail below.

---

[17] On December 7, 2016, special counsel to the Debtors sent a letter requesting that the plaintiff dismiss the suit against Maxus and Tierra on the grounds that Maxus and Tierra were not in existence at the time of the plaintiff's exposure to Agent Orange.

[18]  Three proofs of claim related to the Agent Orange personal injury litigation have been filed against the Debtors in unliquidated amounts, and three asbestos proofs of claim have been filed against the Debtors in the aggregate amount of $1.35 million.

a. *The Pension Plans*

The Debtors historically maintained several defined benefit pension plans (the "Legacy Pension Plans") for the benefit of their retired employees.  In 1987, the Debtors terminated the Legacy Pension Plans and replaced them with two new defined benefit pension plans:  (a) the Diamond Shamrock Corporation Chemical Consolidated Pension Plan, and (b) the Maxus Energy Corporation Career Average Retirement Income Plan (together, the "New Pension Plans").  The Debtors terminated the New Pension Plans in 2009 and replaced them with a defined contribution plan (the "401(k) Plan").  As of the Petition Date, the 401(k) Plan was the only active retirement plan maintained by the Debtors.

i. *Legacy Pension Plans*

In connection with the termination of the Legacy Pension Plans, the Debtors caused the Legacy Pension Plans to purchase an annuity contract (the "Aetna Contract") from Aetna Life Insurance Company ("Aetna"), which was intended to fully satisfy any future obligations related to the Legacy Pension Plans.  Under the Employee Retirement Income Security Act of 1974 ("ERISA"), the Debtors may remain liable for Legacy Pension Plan obligations to the extent those obligations are not fully satisfied by the Aetna Contract.

The Legacy Pension Plans provided participants with retirement benefits that varied in amount based on the participant's compensation and years of service.  After turning 55, the participants in the Legacy Pension Plans had ten years to make a one-time election to receive benefits.  The participants could elect to receive either a stream of monthly annuity payments or a lump-sum benefit payout.  To calculate the amount of the lump-sum benefit payout, the Legacy Pension Plans required that the lesser of two discount rates be used:  a fixed rate of 5.5 percent and a variable rate established by the Pension Benefit Guaranty Corporation (the "PBGC").

The Aetna Contract did not contain a methodology for calculating the amount of the lump-sum benefit payouts.  Instead, the Aetna Contract included exhibits (the "Aetna Lump Sum Exhibits") that recorded the amount of the lump-sum benefit payout due to each participant under the Legacy Pension Plans.  The amounts listed on the Aetna Lump Sum Exhibits were calculated using 5.5 percent as the discount rate, which was the rate required by the Legacy Pension Plans at the time the Legacy Pension Plans purchased the Aetna Contract.

In 1993, the PBGC rate fell below 5.5 percent.  As a result, there existed a differential between the higher lump-sum benefit payout due under the Legacy Pension Plans (calculated using the PBGC rate) and the lower lump-sum amounts listed on the Aetna Lump Sum Exhibits (calculated using the fixed rate of 5.5 percent).  Aetna invoiced the Debtors for this differential amount (the "Aetna Differential Amount") until October 11, 2016, when Aetna informed the Debtors that it would not collect the Aetna Differential Amount without a Bankruptcy Court order expressly authorizing the Debtors to make such payments.  As of the date hereof, the Debtors have not sought a Bankruptcy Court order authorizing the payment of the Aetna Differential Amount, and the Debtors have ceased making Aetna Differential Amount payments.  Aetna timely filed unliquidated proofs of claim against Maxus and Gateway Coal for, among other things, any damages that Aetna may incur in connection with any funds advanced by Aetna pursuant to the Aetna Contract for which Aetna has not been or may not be reimbursed.

There are currently approximately 171 individuals who have not yet elected to receive benefits under the Legacy Pension Plans.  If each of those individuals elects to receive the lump-sum benefit payout (rather than the annuity stream), the Aetna Differential Amount owing to such participants could exceed $3.5 million.

ii.    *The New Pension Plans*

Shortly after terminating the New Pension Plans in 2009, Maxus amended the New Pension Plans to reduce benefits for most (and increase benefits for a few) participants (the "2009 Amendments").  There are approximately 3,100 individuals who receive benefits under the New Pension Plans.  The 2009 Amendments modified the interest rate and mortality table used to calculate benefits to participants in the New Pension Plans, effectively reducing the value of the New Pension Plan benefits by an average of $2,000 per participant (but increasing the value of benefits to some participants).  The Debtors also caused the New Pension Plans to purchase an annuity contract (the "Prudential Contract") from Prudential Insurance Company of America ("Prudential").  The Prudential Contract funded all benefits due to New Pension Plan participants after giving effect to the 2009 Amendments.

In August 2016, the PBGC announced the result of an audit of the 2009 termination of the New Pension Plans, which found that the 2009 Amendments had impermissibly reduced benefits owing to New Pension Plan participants.  The Debtors do not contest the findings of the audit.  As a result of the audit findings, the Prudential Contract is insufficient to fund the New Pension Plans once the 2009 Amendments are disregarded.  In order to fully fund the New Pension Plans, the Prudential Contract must be amended and an additional fee must be paid to Prudential in connection with the amendment (or an alternative insurance product must be purchased), plus additional benefits must be paid to participants who have already received lump sums.  Participants in the New Pension Plans that received or will receive benefits under the Prudential Contract may assert general unsecured claims against the Debtors for the amount of the differential (the "Prudential Differential Amount") between benefits paid (or to be paid) under the Prudential Contract and the benefits actually due under the New Pension Plans.  Participants and the PBGC also may have a claim against non-Debtor affiliates that are part of the Debtors' "controlled group," as that term is understood under ERISA.  This may include claims against YPF and others.  The Debtors have been working diligently with their actuary to determine the amount of the Prudential Differential Amount.

In addition, if the New Pension Plans are not fully funded by the Debtors, the PBGC may treat the New Pension Plans as if they were not terminated, and the PBGC may involuntarily terminate the New Pension Plans.  If the New Pension Plans are involuntarily terminated by the PBGC, additional termination premiums may be imposed by the PBGC on the Debtors or their controlled group.  Those premiums, for which the PBGC has filed contingent Claims, are estimated by the PBGC to total $13,102,500.  The PBGC asserts that, under ERISA, Maxus, as plan sponsor, and each of its controlled group members (as defined under Title IV of ERISA, which include each of the other Debtors and YPF Holdings, and possibly certain of its affiliates or related entities) would be jointly and severally liable for termination premiums.  These termination premiums would be in addition to contingent Claims filed by the PBGC for any unfunded benefit liabilities, any unpaid minimum funding contributions due, and flat-rate and variable-rate premiums.  Each of these additional PBGC Claims also asserts joint and several

liability against Maxus and each of its controlled group members as defined under Title IV of ERISA.

Notwithstanding the foregoing, the Debtors are in active discussions with Prudential, YPF, and the PBGC in an effort to remedy any shortfalls under the Prudential Contract, which, if successful, would eliminate the Prudential Differential Amount and cause participants to receive the amount to which they are entitled under the New Pension Plan. The Debtors remain optimistic that this issue can be resolved and that participants will be paid in full.

### iii. *Supplemental Executive Retirement Plans*

The Maxus Energy Corporation Excess Benefits Plan (formerly the Diamond Shamrock Corporation Excess Benefit Plan) and the Maxus Energy Corporation Supplemental Executive Retirement Income Plan (the "SERPs") were adopted by Diamond Shamrock Corporation and Maxus as unfunded nonqualified deferred compensation plans to provide retirement income in addition to the Pension Plans' benefits for highly paid executives of both corporations. The benefits provided by the SERPs were funded from a rabbi trust, annuities, and the general assets of the Debtors. All benefit payments ceased as of the Petition Date and the rabbi trust has been terminated. The cash from the rabbi trust is currently being held in a trust account. The SERPs have not yet been terminated.

### iv. *The 401(k) Plan*

The Debtors currently provide defined contribution retirement benefits to current and former employees pursuant to the 401(k) Plan. Most of the Debtors' current employees are participating in the 401(k) Plan and numerous former employees have fully vested account balances. The 401(k) Plan may be terminated at any time, and the Debtors will have no further obligation to contribute to the 401(k) Plan after the occurrence of the termination date. Following termination, the Debtors may no longer administer the 401(k) Plan, but such a termination will not affect any participant's vested contributions that are already in the 401(k) Plan.

### b. *The OPEB Plans*

The Debtors historically offered medical and life insurance benefits to approximately 520 members of their former workforce pursuant to the OPEB Plans. As of the Petition Date, the Debtors maintained the following OPEB Plans:

- The Maxus Energy Corporation Retiree Health and Welfare Plan (the "General OPEB Plan"). The Debtors provide Retiree Benefits to approximately 393 participants under the General OPEB Plan. The terms of the General OPEB Plan entitle the Debtors to discontinue the General OPEB Plan at any time without liability to certain participants. In addition, the Debtors provide approximately 10 former executives and 30 Natomas participants with Retiree Benefits under the General OPEB Plan pursuant to the Natomas

early retirement window program and/or individual agreements with executives (the "Executive Agreements").

- The 1988 Employer Benefit Plan for the UMWA Represented Employees of Gateway Coal Company (the "UMWA OPEB Plan"). The Debtors provide Retiree Benefits to approximately 144 participants under the UMWA OPEB Plan. Pursuant to section 9711 of title 26 of the United States Code, the UMWA OPEB Plan is an individual employer plan subject to certain maintenance provisions under sections 9701 through 9722 of title 26 of the United States Code (collectively, the "Coal Act"). As a general rule, the Coal Act prohibits the Debtors from terminating or modifying health benefits provided under UMWA OPEB Plan.

- The Health and Welfare Plan for LTD Participants (the "LTD OPEB Plan"). The Debtors provide Retiree Benefits to approximately 11 participants under the LTD OPEB Plan.

The Debtors currently spend approximately $2.5 million per year on the OPEB Plans. Since the Petition Date, the Debtors have continued to maintain the OPEB Plans pursuant to section 1114 of the Bankruptcy Code. The Debtors listed their obligations under the OPEB Plans as $18,569,000 on their balance sheet as of December 31, 2015. The Debtors presently have no significant operations and no meaningful prospect of generating the revenue necessary to fund Retiree Benefits after the conclusion of the Chapter 11 Cases other than by monetizing causes of action through litigation or settlement.

In 1987, Diamond Shamrock Corporation (n/k/a Maxus) spun off a subsidiary called Diamond Shamrock R&M, Inc. ("R&M"), which eventually was purchased by, or merged into, Valero Corporation ("Valero"). As part of a distribution agreement entered into by Maxus and R&M, R&M agreed to bear responsibility for one-third of the cost of Retiree Benefits for Retirees who retired prior to May 1, 1987. Valero has historically complied with the obligation to reimburse one-third of such benefits, and has continued to do so during the Chapter 11 Cases.

As set forth in more detail in Article IV hereof, on December 16, 2016, the U.S. Trustee appointed the Retiree Committee pursuant to section 1114 of the Bankruptcy Code [Docket No. 641].

While the Debtors believe they could terminate some or a substantial amount of the OPEB retirement benefits outside of bankruptcy, the Debtors are pursuing a modification of Retiree Benefits pursuant to section 1114 of the Bankruptcy Code via the Modification Agreement (a consensual agreement with the Authorized Representative on behalf of the affected Retirees).

c.    *Coal Act Benefits*

The United Mine Workers of America 1992 Benefit Plan (the "1992 Plan") provides benefits to (a) former employees of Gateway Coal who, based on their age and service record as

of February 1, 1993, could have retired and received benefits under the United Mine Workers of America 1950 Benefit Plan and Trust or the United Mine Workers of America 1974 Benefit Plan and Trust if those trusts had not been merged by statute, and who actually retired between July 20, 1992 and October 1, 1994; and (b) former employees of Gateway Coal who would be covered by an individual employer plan maintained pursuant to the Coal Industry Retiree Health Benefit Act of 1992 but who no longer receive such coverage.

The Debtors intend to coordinate with the UMWA and the 1992 Plan officials to arrange for the transition of retirees entitled to benefits under the UMWA OPEB Plan to the 1992 Plan with no loss of benefits. The Debtors anticipate that all Retirees entitled to receive benefits under the Coal Industry Retiree Health Benefits Act of 1992 will receive no gap in coverage. The Debtors maintain a letter of credit in the amount of approximately $1.5 million with Citibank, N.A. to support any obligation they may owe to the 1992 Plan resulting from the termination of the UMWA OPEB Plan.

d.       *Workers' Compensation Benefits*

The Debtors currently provide workers' compensation benefits (the "Workers' Compensation Benefits") to 21 former employees of Gateway Coal and Diamond Shamrock Corporation, at the level required by law, including coverage for occupational pneumoconiosis (also known as "black lung") claims under applicable state and federal law, and claims made under the Longshore and Harbor Workers' Compensation Act. The Debtors self-insure the majority of the Workers' Compensation Benefits. Based on an actuarial analysis conducted in April 2016, the Debtors estimate that they have approximately $2.18 million in total liability for the Workers' Compensation Benefits; however, the Debtors may have contractual rights to reimbursement for a portion of such liability. The Plan will terminate the Debtors' obligation to provide Workers' Compensation Benefits, and individuals receiving such benefits will be notified individually of such termination. In most, if not all, instances, individuals will receive replacement benefits from a federal or state fund such as the Federal Black Lung Program.

## ARTICLE III.

## EVENTS LEADING TO THE CHAPTER 11 CASES

The following is a description of certain factors that led to the commencement of the Chapter 11 Cases.

A.       *Genesis of Maxus's Environmental Liability and the OCC Indemnification Obligations*

During the 1950s and 1960s, various predecessors and successors in interest to Diamond Alkali (collectively, "DSCC"), a chemical company founded in West Virginia in 1910, operated, among others around the country, a chemical plant (the "Lister Plant") located on the Lister Site that manufactured pesticides and herbicides. In 1982, the EPA initiated a study targeting facilities that had produced certain pesticides and herbicides, including those produced at the Lister Plant, for soil sampling and testing for an impurity known as "dioxin." The study produced a list of contaminated sites, including the Lister Site. On June 13, 1983, the NJDEP issued an administrative order requiring DSCC to implement certain partial site stabilization

measures designed to prevent further off-site migration of dioxin and other contaminants from the Lister Site.

In 1983, DSCC incorporated, and transferred all of its stock to, an entity now known as Maxus. In 1986, after having re-acquired the Lister Site, DSCC transferred ownership of the Lister Site to an entity now known as Tierra Solutions, Inc., which continues to own the Lister Site today. Since 1986, a number of former DSCC plant sites, nearby properties, and third-party owned and operated waste disposal sites to which DSCC sent hazardous substances have been identified by the EPA or state equivalents as contaminated properties subject to remediation requirements pursuant to CERCLA and/or other environmental statutes.[19]

In 1986, Maxus sold all of the outstanding stock of DSCC to Oxy-Diamond Alkali, an OCC affiliate, pursuant to the *Stock Purchase Agreement between Diamond Shamrock Corporation, Occidental Petroleum, Occidental Chemical Holding Corporation, and Oxy-Diamond Alkali Corporation*, dated September 4, 1986 (the "SPA"). In 1987, the stock of DSCC was transferred to OCC. Under the terms of the SPA, Maxus is contractually required to indemnify OCC against, among other things, a broad range of liabilities, including claims related to the Lister Site and other contaminated properties associated with DSCC's operations and waste disposal practices. On August 24, 2011 and April 5, 2016, as part of the litigation pending in New Jersey among Maxus, OCC, Repsol S.A. ("Repsol") and YPF, a New Jersey state court (the "NJ State Court") entered orders against Maxus affirming these contractual indemnification obligations (the "OCC Indemnification Obligations"). OCC had previously obtained similar findings in front of Texas and Ohio state courts.

Since 1986, Maxus (through Tierra) has generally performed its OCC Indemnification Obligations. Those efforts, together with OCC's efforts, have led to the successful remediation of a number of contaminated sites throughout the United States and substantial progress toward that end at many others. Tierra's remediation activities have included the investigation of contamination and potential feasible remedies, treating groundwater, removing and treating polluted sediment, dismantling industrial structures, pioneering the use of new remediation technologies, and purifying contaminated soil. Moreover, as set forth in Article IV.B.18 hereof, Tierra has continued to oversee the maintenance of interim remedial measures during the Chapter 11 Cases to ensure that remedies continue to be properly implemented and monitored and that human health and the environment are adequately protected. The parties refer to the various status reports on remediation submitted to the Bankruptcy Court in these Chapter 11 Cases, as well as the discussion thereof at the hearings in front of the Bankruptcy Court for a further discussion on the remediation efforts undertaken by Tierra since the Petition Date.

---

[19] For the avoidance of doubt, to the best of the Debtors' knowledge, all production of agricultural chemicals at the Lister Site ceased in the 1970s, well before Tierra acquired the Lister Site for purposes of remediating it.

Over the past thirty years, Maxus (largely through Tierra) has contributed more than $687 million in response costs at contaminated properties on account of the Direct Environmental Liabilities and the OCC Indemnification Obligations.

B.      *YPF's Acquisition of Maxus in 1995*

In the early 1990s, Maxus experienced a liquidity crisis resulting from, among other things, depressed oil and gas prices, the high cost of Maxus's existing debt service, and its limited access to the capital markets.  As a result, Maxus began to sell assets to satisfy cash flow needs.  In late February 1995, after conducting a marketing process involving financial and strategic investors, the board of directors of Maxus voted to enter into a merger agreement with YPF and YPF Acquisition Corporation ("<u>YPFA</u>"), a subsidiary of YPF, and to recommend that Maxus's shareholders accept a tender offer from YPFA for Maxus's issued and outstanding common stock.  The tender offer occurred in April 1995.

The merger agreement included a covenant (the "<u>Keepwell Covenant</u>") requiring YPF to capitalize Maxus should Maxus be "unable to meet its obligations as they come due."  YPF's obligation under the Keepwell Covenant was limited to approximately $440 million, subject to certain adjustments, and expired in 2004, nine years after the effective date of the merger agreement.

C.      *YPF/Maxus Global Restructuring*

During the years that followed the acquisition, Maxus sold substantially all of its non-U.S. oil and gas assets to YPF International and its affiliates and used the proceeds of those sales to retire Maxus's outstanding public and private debt, the majority of which was guaranteed by YPF.

By mid-1996, Maxus and YPF determined to engage in the following series of transactions:  (a) a restructuring that would transfer Maxus's non-U.S. assets to YPF's foreign subsidiaries; (b) a debt restructuring that would repay and/or replace Maxus's outstanding public and private debt through a combination of proceeds from asset sales and loans provided by YPF; and (c) an environmental restructuring that would place Maxus's environmental liabilities under specialized management and present a more streamlined balance sheet to investors.

As part of the environmental restructuring, Tierra, a Maxus subsidiary then known as Chemical Land Holdings, Inc. ("<u>CLH</u>"), was spun off to CLH Holdings, Inc. and YPF Holdings was to hold all of Maxus's equity.  CLH and Maxus also entered into an agreement whereby CLH assumed, among other things, the OCC Indemnification Obligations. Maxus, however, remained obligated to perform the OCC Indemnification Obligations.  On June 18, 1996, the board of directors of Maxus approved an initial restructuring of Maxus, whereby Maxus sold the equity of its subsidiaries in Bolivia and Venezuela to YPF International and used a portion of those proceeds to redeem certain of its preferred stock.  Maxus also effectuated an environmental reorganization, including the assumption of Maxus's environmental remediation obligations by Tierra.  In connection with the environmental reorganization, YPF entered into an agreement (the "<u>Contribution Agreement</u>") to fund certain environmental remediation costs and to provide funds for ongoing general and administrative and legal expenses of Tierra.

Beginning in late 1996 and continuing through 1997, Maxus carried out the next phase of the restructuring of its public debt and preferred stock, which had the effect of replacing its third-party debt, which had been guaranteed by YPF, with over $1.4 billion in aggregate amount of unsecured loans owed by Maxus and its subsidiaries to YPF and its subsidiaries. The final stage of the global restructuring began in late 1997, when Maxus sold its Indonesian and Ecuadorian subsidiaries to YPF International and used the proceeds of those sales to partially repay its unsecured loans owing to YPF.

At the conclusion of the global restructuring, Maxus had significantly deleveraged its balance sheet, transferred all of its non-U.S. assets to affiliates of YPF, and transferred management responsibilities for its environmental obligations to Tierra. Maxus's main asset after the restructuring was its indirect interest in a joint venture called Crescendo with Amoco Production Company that generated approximately $22 million in net income annually.

D.    *Repsol's Acquisition of YPF*

In 1999, Repsol gained control of YPF through the purchase of approximately 97% of YPF's outstanding capital stock. Beginning that same year and continuing into 2000, Repsol caused Maxus to sell its interest in Crescendo, and used a portion of the proceeds of that sale to partially retire Maxus's third-party debt. Maxus later used some of those proceeds to invest in exploratory wells in the Gulf of Mexico. By the end of 2000, Repsol owned 99% of YPF's outstanding capital stock.

In January 2005, Repsol began formulating a "corporate separation" plan intended to separate Maxus's exploration and production assets from its environmental liabilities. Pursuant to the corporate separation plan, Repsol caused Maxus to sell the majority of its domestic E&P assets, including its interests in prospects (*i.e.*, prospective oil deposits) in the Gulf of Mexico. In February 2007, a U.S. subsidiary of Repsol hired 140 of Maxus's employees without compensating Maxus.

E.    *Settlements Between Maxus, Repsol and YPF*

Between April and July 2007, Repsol subsidiaries entered into three separate settlement agreements with Maxus subsidiaries to compensate Maxus for marketing, distribution, exploration, and technical services performed on behalf of Repsol during 2006 and 2007.

In October 2007, YPF, Maxus, and Tierra, along with affiliates of each, entered into a settlement agreement pursuant to which (a) the Contribution Agreement was terminated, (b) YPF contributed to YPF Holdings the right to seek repayment of a $14.4 million pre-settlement transfer to Maxus, and (c) YPF forgave a $363 million receivable from Maxus. Additionally, the parties agreed that YPF would contribute to Maxus (through YPF Holdings) its right to seek repayment of a $43 million transfer to Maxus, which YPF made prior to the closing of the settlement agreement on account of Maxus's underfunded pension liability.

In July 2009, Maxus entered into a settlement agreement with affiliates of Repsol that resolved several disputes between the parties, including (a) the use by Repsol affiliates of Maxus's intellectual property, (b) the lack of consideration provided by Repsol to Maxus in

connection with certain asset sales and the transfer of Maxus's employees, and (c) unpaid invoices for services rendered by Maxus to Repsol and certain of its subsidiaries.

F.    *Argentina's Expropriation of YPF*

In May 2012, the Argentine government expropriated control of 51% of YPF's outstanding shares, thereby displacing Repsol as the majority holder of YPF's shares. Thus, as of 2012, Repsol effectively had no controlling interest in YPF and was no longer a controlling indirect parent of Maxus or its affiliates.

G.    *Underperformance of Neptune*

On May 22, 2003, MUSE acquired a 15% working interest Neptune from non-affiliate BHP Billiton Petroleum (Deepwater) Inc. Commercial production was expected to commence in late 2007, but setbacks occurred in 2006 and continued through 2007 and 2008. Initial production was achieved on July 6, 2008, and by the end of that year, six wells had started production. International commodity prices declined in 2008 as global financial markets collapsed, and in the years that followed, actual production did not meet estimates. When combined with low commodity prices, MUSE's cash realization on its interest in the Neptune field fell well short of projected expectations.

Despite the challenging market conditions, MUSE continued its oil exploration efforts in the Gulf of Mexico by making substantial capital commitments of $350 million towards numerous projects. Certain exploratory wells, including those at Coronado and Tiger/North Bronto, proved to be "dry holes" that did not produce oil. On the other hand, the Neptune field actively produced oil, but required substantial capital commitments. In recent years, the Debtors have spent $285 million on production-related costs at Neptune, yet the asset continues to underperform.

Even though the revenue generated by Neptune, combined with Maxus's other oil and gas holdings, provides Maxus with adequate income to cover its overhead costs, the Neptune revenues have not been sufficient to address Maxus's indemnification obligations to OCC. As a result, between 2010 and the Petition Date, the Debtors requested and obtained cash infusions from YPF in the approximate amount of $335 million to satisfy the indemnification obligations to OCC.

H.    *The Passaic River Litigation*

On December 13, 2005, the NJDEP and the Administrator of the New Jersey Spill Compensation Fund (the "Plaintiffs") filed a complaint against OCC, Tierra, Maxus, YPF, and Repsol, among others (the "Defendants"), in the New Jersey Superior Court, Law Division, Essex County, seeking to hold the Defendants liable for damages resulting from toxic discharges at and from the Lister Site (the "Passaic River Litigation").

On November 30, 2006, the Plaintiffs filed an amended complaint in the Passaic River Litigation, which asserted that YPF, Repsol, and certain of their affiliates had "worked to strand the environmental liabilities associated with the Newark Bay Complex in Maxus and Tierra, while systematically stripping Maxus's and Tierra's assets and ability to satisfy these

obligations."   The amended complaint asserted that YPF, Repsol, Maxus, and Tierra were "acting jointly, as a common economic unit, and as alter egos of each other" and sought to hold Repsol and YPF jointly and severally liable for the environmental liabilities of Maxus and Tierra.

In late 2007, OCC filed certain cross-claims against YPF and Repsol asserting that Repsol and YPF, and certain of their affiliates, were "alter egos of Maxus" and were "contractually obligated to defend and to indemnify OCC" in the Passaic River Litigation.

On July 19, 2011, the NJ State Court held that OCC, as successor to DSCC, was liable to the Plaintiffs for any "cleanup and removal costs" later shown to be associated with toxic discharges at and from the Lister Site.  On May 21, 2012, following entry of the order affirming the OCC Indemnification Obligations, the NJ State Court held that Maxus was the alter ego of Tierra, and that both entities were strictly, jointly, and severally liable for these "cleanup and removal costs" based solely on Tierra having acquired title to the Lister Site in 1986.

On December 12, 2013, the NJ State Court approved a settlement between the Plaintiffs and the non-OCC Defendants, which released all of the Plaintiffs' claims against those Defendants, as well as certain of their claims against OCC, in exchange for a $130 million payment from the non-OCC Defendants, of which $65 million was paid by YPF and Maxus and $65 million was paid by Repsol.  On December 16, 2014, the NJ State Court then approved a settlement between the Plaintiffs and OCC, pursuant to which OCC agreed to pay $190 million to the Plaintiffs for a release of the Plaintiffs' remaining claims against OCC.  As a result of the foregoing settlements, the only claims remaining in the Passaic River Litigation were the cross-claims among the Defendants.

On November 21, 2014, the YPF-affiliated Defendants filed motions to dismiss OCC's cross-claims, including those predicated on OCC's allegation that YPF was an "alter ego" of Maxus.  On January 13, 2015, a Special Master appointed by the NJ State Court issued a recommendation that the YPF-affiliated Defendants' motions to dismiss be granted with respect to all of OCC's claims, except those premised on YPF's alter ego conduct. The Special Master's recommendation was adopted by the NJ State Court on January 29, 2015.

On April 5, 2016, the NJ State Court adopted a series of recommendations issued by the Special Master that, among other things, (a) denied YPF's motion for partial summary judgment on several transactions on which OCC's alter ego claim was based in part, thereby allowing those claims against YPF to proceed to trial, (b) granted summary judgment to Repsol on OCC's alter ego claims against Repsol, and (c) found Maxus was not entitled to an offset against OCC's claim for $190 million for the environmental damages that Maxus alleged OCC itself caused at the Lister Site.  On April 25, 2016, OCC, YPF, and Maxus each filed requests for interlocutory appeals of certain of the April 5, 2016 orders in the New Jersey Superior Court, Appellate Division, which were denied on May 25, 2016.

The trial on OCC's alter ego claims against YPF was set to begin June 20, 2016 in the NJ State Court, but was stayed by the Debtors' bankruptcy filings.

01:21813073.1

37

As set forth in more detail in Article IV hereof, the Passaic River Litigation was removed to the Bankruptcy Court and, thereafter, certain claims were remanded to the NJ State Court.

I.    *Special Independent Committee Formation and Investigation*

In light of the claims and developments in the Passaic River Litigation, the board of directors of Maxus began searching for individuals to serve as members of a special committee of independent directors (the "Special Independent Committee") in 2014, and on July 13, 2015, formed the Special Independent Committee, which includes Theodore P. Nikolis and Bradley I. Dietz, in order to review and assess the historical transactions, interrelationships and course of dealing between Maxus and YPF, and identify potential claims arising in relation to such transactions and relationships. Initially, the Special Independent Committee was empowered and authorized to design and implement a process and procedure for the review and assessment of (a) all material transactions entered into between Maxus and any affiliate involving aggregate consideration of $10 million or more in any instance that occurred from April 1995 (when YPF acquired Maxus) through July 12, 2015, (b) the historical course of dealing and interrelationships between Maxus and its affiliates over the same time period, and (c) potential claims and defenses arising in relation to these transactions and interrelationships (collectively, the "Special Independent Committee Investigative Responsibilities").

The Special Independent Committee also was authorized to negotiate and recommend a settlement, release, discharge, or other agreement relating to any potential claims and defenses identified in connection with the execution of the Special Independent Committee Investigative Responsibilities. As of the date of its formation, the Special Independent Committee was not, however, authorized to prosecute any claims against YPF or cause the Debtors to file bankruptcy cases in the event a settlement could not be reached.

The board of directors of Maxus permitted the Special Independent Committee to engage, at Maxus's expense, financial and other experts and consultants, including legal counsel, in connection with the Special Independent Committee Investigative Responsibilities in order to properly assess any of the relevant transactions and interrelationships.

On November 23, 2015, the Special Independent Committee engaged Morrison & Foerster LLP ("Morrison & Foerster") to represent and assist the Special Independent Committee in the performance of the Special Independent Committee Investigative Responsibilities. On April 5, 2016, after a search for financial advisors in which the Special Independent Committee participated, Morrison & Foerster engaged Zolfo Cooper, LLC ("Zolfo Cooper," and together with Morrison & Foerster, the "Firms") to assist Morrison & Foerster and the Special Independent Committee. The Firms reported only to the Special Independent Committee and took direction only from the Special Independent Committee in connection with the performance of the Special Independent Committee Investigative Responsibilities. During the course of its work, the Special Independent Committee had regular communications with the Firms regarding the progress of their work and developments in the Passaic River Litigation.

Consistent with its mandate, the Special Independent Committee examined, among other things, whether Maxus could recover damages against YPF and against Repsol under an alter ego theory of liability on account of asset transfers and intercompany transactions and other

corporate activity that occurred in connection with and during the period following YPF's 1995 leveraged buyout of Maxus (the "Investigation").

The Investigation was based primarily on an extensive review and assessment of the contentions raised, documents produced, and opinions issued in the Passaic River Litigation. In particular, the Special Independent Committee looked at each of the claims asserted by OCC as part of the litigation, including the alter ego claims and other claims against YPF. All of these issues were heavily litigated by the parties to the Passaic River Litigation, who were represented by experienced counsel. OCC was represented principally by Munger, Tolles & Olson LLP; YPF was represented principally by Chadbourne & Parke LLP; Repsol was represented principally by Weil, Gotshal & Manges LLP; and Maxus, Tierra, and Maxus International were represented principally by Drinker Biddle & Reath LLP. The evidentiary record regarding the alter ego claims was exceptionally well developed by the parties to the Passaic River Litigation at the time of the Investigation.

The Firms examined and assessed the facts presented and the respective contentions of these parties concerning OCC's alter ego damages theories, and the extent of potential damages related to those theories, and provided a written analysis of the issues to the Special Independent Committee. The Investigation involved the review of over a quarter of a million pages of materials from the Passaic River Litigation, including pleadings, motions and exhibits thereto, orders, interrogatory responses, deposition transcripts and exhibits thereto, expert reports and referenced documents, board minutes, and other documents produced by the parties to the Passaic River Litigation during the course of discovery regarding the alter ego and other issues.

As part of examining the transactions placed at issue in the Passaic River Litigation, and to assess the competing contentions concerning the existence and extent of any monetary injury to Maxus that could form the basis of alter ego or other liability (including the dismissed fraudulent conveyance claims), Morrison & Foerster worked with Zolfo Cooper, who analyzed Maxus's financial and other records made available to it in order to validate the parties' stated asset values for Maxus's foreign oil and gas assets and evaluate the degree to which YPF's inter-company transactions, including loan forgiveness and capital contributions, harmed or benefited Maxus.

J.      *Settlement Agreement with YPF*

Following the conclusion of the Investigation, the Special Independent Committee and representatives of YPF engaged in negotiations to resolve the Debtors' claims against YPF and certain of its affiliates (collectively, the "YPF Entities"), including claims predicated on alter ego conduct by YPF toward Maxus, arising from the material transactions between the parties after April 1995. These negotiations lasted from May 18, 2016 through June 15, 2016.

On June 15, 2016, the parties reached a settlement of all of the Debtors' claims against YPF and its affiliates and executed a settlement agreement on June 17, 2016 (the "YPF Settlement Agreement") pursuant to which (a) YPF agreed to pay $130 million to the Debtors and their Estates upon the satisfaction of certain conditions, and (b) YPF Holdings agreed to provide debtor-in-possession financing in the amount of $63.1 million to the Debtors, of which $34.35 million is subordinate in payment to all general unsecured claims. In exchange, the

Debtors agreed to, among other things, (i) release their claims against the YPF Entities, and (ii) prosecute the Chapter 11 Cases in accordance with certain case milestones set forth in the YPF DIP Agreement (as defined below).

As discussed further in Article IV.C. hereof, the Debtors filed a motion with the Bankruptcy Court seeking approval of the YPF Settlement Agreement.  However, the Debtors withdrew that motion on [__], 2017, and have determined to proceed with the Plan.

K.    *YPF Causes of Action*

The primary YPF Causes of Action concern whether YPF is the "alter ego" of the Debtors.  The NJ State Court in the Passaic River Litigation denied YPF's motion for summary judgment on OCC's alter ego claim finding that a "jury could easily look at the evidence and find that–when viewed in its entirety–OCC is entitled to pierce Maxus's corporate veil and recover from the YPF defendants."  Here, the Creditors' Committee asserts that there is overwhelming and compelling evidence to show that YPF and the Debtors operated as a single economic unit and that YPF used its position as the Debtors' parent in order to perpetrate a fraud or injustice.  Dominion and control or "single economic" unit is often demonstrated by examining a non-exhaustive list of factors, including (a) an insolvent or undercapitalized subsidiary; (b) siphoning of value from the subsidiary by the parent; and (c) the failure to observe corporate formalities.  These factors, as well as many others, are present here.  First, the historical evidence shows that Maxus and Tierra were both insolvent and undercapitalized at all relevant times as a result of their significant environmental liabilities, including their indemnification obligations to OCC.  Second, the Creditors' Committee believes that there is compelling evidence that YPF abused its control over the Debtors by siphoning away billions of dollars of value by, among other ways: (a) failing to pay fair market value for Maxus's valuable international assets by at least $265 million; (b) causing Maxus to repay more than $1 billion of insider debt when YPF knew that Maxus was insolvent and undercapitalized to address Maxus's looming environmental liabilities; (c) terminating Tierra's valuable contract with YPF, valued at roughly $378 million, for inadequate consideration; and (d) compelling Maxus to incur $71 million to redeem certain preferred stock prior to maturity to eliminate covenants that precluded affiliate transactions.  Other facts support the imposition of alter ego liability on the YPF Entities including (a) Maxus's complete financial dependency on YPF after its income producing assets were stripped; (b) the repeated failure of the Maxus and Tierra boards, dominated by YPF designees, to respect basic corporate formalities; (c) the failure of the Maxus board to assess the financial impact on Maxus that resulted from the transfer of its international assets to YPF; and (d) numerous instances of YPF's dominion and control over the Debtors in ways that benefited YPF and harmed the Debtors' creditors.  In sum, the Creditors' Committee believes that there is a robust factual record to support imposition of alter ego liability on the YPF Entities.

The Debtors may also have viable fraudulent transfer claims against the YPF Entities.  In 2008, YPF sought to unwind problematic financial arrangements in place with the Debtors, which it believed heightened its alter ego exposure.  One of these arrangements was a contract with Tierra pursuant to which YPF promised to provide significant financial support to Tierra, which was indisputably insolvent and undercapitalized.  YPF asserts that it paid consideration worth $378 million (primarily in the form of debt forgiveness) in exchange for terminating the contract. The Creditors' Committee asserts that the evidence, however, shows that the alleged

debts forgiven were actually owed by *Maxus*, not Tierra.  For this reason, Tierra could not find an advisory firm willing to issue a fairness opinion stating that the transaction was fair *to Tierra* (as required by the terms of the agreement among Tierra, Maxus and YPF).  Put simply, YPF did not provide Tierra with adequate consideration for this transaction.  Consequently, the only opinion that could be obtained provided that the transaction was fair to Maxus and Tierra, *taken as a whole.*  Even though the transaction occurred approximately nine years ago in 2008, Tierra has the statutory power to step into the shoes of one of the Debtors' New Jersey governmental creditors pursuant to section 544(b) of the Bankruptcy Code and, in those shoes, avail itself of the 10 year statute of limitations available for New Jersey state agencies pursuing fraudulent transfer claims under New Jersey law for the benefit of all creditors.  *See In re G-I Holdings, Inc.,* 313 B.R. 612, 636 (Bankr. D.N.J. 2004) *aff'd* 2006 WL 1751793, at *15 (D. N.J. June 21, 2006) (permitting creditors' committee to step in the shoes of a New Jersey agency using a 10 year statute of limitations to avoid a fraudulent transfer under New Jersey law).  Thus, Tierra appears to have viable fraudulent transfer claims against the YPF Entities for the value of its terminated contract, which experts have opined was worth hundreds of millions of dollars.

Thus, the Plan Proponents believe that the YPF Causes of Action are valuable assets of the Debtors' Estates.  However, as discussed further in Article VII hereof, the Plan Proponents recognize that litigation is uncertain and difficult to predict and thus their views are not a guaranty as to how a court would rule in adjudicating the YPF Causes of Action.

L.      *YPF Entities' Position on the YPF Causes of Action*

In deciding whether to support the Plan, YPF believes that creditors should be fully informed of the risk that the Liquidating Trust will not receive any recovery on account of the YPF Causes of Action.

At the hearing on approval of the Disclosure Statement, counsel for YPF set forth additional objections challenging, among other things, the propriety of the Debtors' decision to abandon the YPF Settlement Agreement in favor of the Plan and the apparent domination of OCC in the plan process and anticipated prosecution of the YPF Causes of Action.  Counsel's arguments can be found on the transcript of the hearing at pages 27 – 36.  The transcript will be available on the website maintained by Prime Clerk for the Chapter 11 Cases at https://cases.primeclerk.com/maxus.

1.   Alter Ego Claims

YPF argues that any alter ego claims against the YPF Entities would need to overcome a number of sizeable hurdles. YPF asserts that established case law recognizes that persuading a court to disregard the corporate veil "is a difficult task" reserved only for "exceptional circumstances." According to YPF, recognizing these difficulties, the State of New Jersey, which asserted the same alter ego claims at issue here, accepted $65 million in 2014 to settle those claims against the YPF Entities, Maxus, and Tierra.

YPF will argue that no evidence exists that the YPF Entities abused the corporate form, let alone exercised "complete domination and control" over Maxus in connection with the challenged transactions or otherwise, the legal standard for alter ego liability. It is YPF's belief

that Maxus, based in Texas, operated autonomously from YPF, based in Argentina, because Maxus had its own board of directors, its own management, and its own general counsel. YPF believes that Maxus's decisions to sell its subsidiaries to YPF were made in good faith by Maxus.

YPF believes that no proximately caused damages tied to an abuse of the corporate form can be demonstrated. YPF will argue that all of Maxus's indemnity and environmental obligations, as well as its deteriorating financial condition, existed well before YPF acquired Maxus. Thus, even if alter ego liability is found, YPF will argue that the damages are limited to those proximately caused by the abuse of the corporate form. YPF will argue that the assertions of the Creditors' Committee that the YPF Entities are effectively guarantors of all of Maxus's liabilities, including the indemnity to OCC, finds no support in fact or law.

Even if alter ego liability could be established, and even if proximately caused damage resulting from the abuse of the corporate form could be proven, YPF will argue that the court would still need to consider the additional $1.4 billion in capital contributions that YPF made to Maxus and Tierra, much of which was used for environmental remediation. Of that $1.4 billion, YPF asserts that $468 million (including $319.5 million in cash and $148.9 million in loan forgiveness) had been contributed to Maxus by mid-1998, which disproves the Creditors' Committee's assertion that YPF paid $265 million less than fair market value for Maxus's non-U.S. subsidiaries.

Finally, YPF asserts that it never moved for summary judgment in the New Jersey action on the entirety of the alter ego claims. Instead, YPF moved only for limited, partial summary judgment that sought dismissal of alter ego liability arising from certain narrow conduct. Accordingly, YPF believes that the NJ State Court never offered, nor could it have offered, any conclusions regarding the totality of the alter ego evidence and the YPF Entities' defenses, which in YPF's opinion still have not been presented to and evaluated by a court. And YPF argues that, after the NJ State Court's ruling on YPF's motion for partial summary judgment, material evidence on which OCC relied in opposition to that limited motion was ruled inadmissible.

2.  Fraudulent Transfer Claims

YPF notes that the Creditors' Committee has suggested that viable fraudulent transfer claims may exist against the YPF Entities arising from a 2007-08 settlement agreement among the YPF Entities, Maxus, and Tierra. However, YPF asserts that no such claim is viable. YPF argues that any such claim would be barred by the statute of limitations and would face other serious procedural obstacles. Additionally, YPF believes there is no basis to assert the existence of a fraudulent transfer.

YPF believes that the Creditors' Committee is focused on the fact that, by that settlement, the Contribution Agreement was terminated and, therefore, the YPF Entities had no further obligation to fund Tierra's indemnity work. It is YPF's position that the Creditors' Committee has completely ignored the fact that the 1996 Assumption Agreement by which Tierra agreed with Maxus to perform Maxus's indemnity obligations to OCC was terminated simultaneously with the Contribution Agreement. YPF believes that the termination of the Assumption Agreement immediately relieved Tierra of what the Creditors' Committee now asserts to be

billions of dollars of ongoing liabilities, eliminated Tierra's obligation to perform under Maxus's indemnity to OCC, and eliminated the need for further funding to satisfy those obligations. In YPF's view, the termination of the Assumption Agreement alone was reasonably equivalent value for the termination of the Contribution Agreement.

## ARTICLE IV.

## EVENTS DURING THE CHAPTER 11 CASES

On the Petition Date, each of the Debtors filed with the Bankruptcy Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued to operate their business and manage their properties as debtors-in-possession in accordance with sections 1107 and 1108 of the Bankruptcy Code.  The Chapter 11 Cases are being jointly administered (*i.e.*, for procedural purposes only) by order of the Bankruptcy Court pursuant to Bankruptcy Rule 1015(b) [Docket No. 34].

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined all collection efforts and actions by creditors, the enforcement of liens against property of the Debtors, and both the commencement and the continuation of prepetition litigation against the Debtors.

A.      *"First Day" Pleadings*

On the Petition Date, the Debtors filed numerous "first day" motions seeking various forms of relief intended to ensure a seamless transition of the Debtors' business operations into chapter 11 and facilitate an efficient administration of the Chapter 11 Cases.  The relief requested in these motions, among other things, allowed the Debtors to continue certain normal business activities that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code may have required prior court approval.  All of the relief requested in the first-day motions was granted by the Bankruptcy Court.  These motions and orders are available for review on the website maintained by Prime Clerk for the Chapter 11 Cases at https://cases.primeclerk.com/maxus.

The orders entered pursuant to the Debtors' first-day motions authorized the Debtors to, among other things:

- pay prepetition wages, compensation, reimbursable business expenses, and employee benefit obligations, and maintain and continue certain compensation and benefit programs post-petition [Docket No. 36];

- provide adequate assurance of payment to utility companies and establish procedures for resolving requests by utility companies for additional assurance of payment [Docket Nos. 37 and 121];

- maintain their existing bank accounts and cash management system, and continue use of existing business forms and records [Docket Nos. 38 and 146]; and

- pay certain prepetition taxes and fees [Docket No. 122].

B.    *Other Case Matters*

    1.    *Debtors' Retention of Professionals*

Pursuant to Bankruptcy Court approval, the Debtors retained (a) Morrison & Foerster as bankruptcy counsel [Docket No. 152], (b) Young Conaway Stargatt & Taylor, LLP as Delaware co-counsel [Docket No. 125], (c) Zolfo Cooper as bankruptcy consultants and special financial advisors [Docket No. 153], (d) Drinker Biddle & Reath LLP as special counsel (in connection with certain environmental and personal injury litigation and regulatory matters) [Docket Nos. 171 and 323], (e) McKool Smith P.C. as special counsel (in connection with certain insurance litigation) [Docket No. 172], (f) BDO USA, LLP as tax services provider [Docket Nos. 324 and 1014], and (g) Prime Clerk as Claims and Noticing Agent [Docket No. 35] and as administrative agent [Docket No. 170].

The Bankruptcy Court also authorized the Debtors to retain, employ, and compensate certain professionals utilized by the Debtors in the ordinary course of business [Docket No. 147].

Moreover, the Bankruptcy Court entered orders authorizing the Debtors to retain and employ (a) EnergyNet.com as sales broker and consultant with respect to the potential sale of the Debtors' rights, title, and interests in and to certain oil and gas properties [Docket No. 629], (b) Keen-Summit Capital Partners LLC as real estate broker with respect to the potential sale of certain parcels of real property [Docket No. 643], and (c) Hilco IP Services, LLC d/b/a Hilco Streambank as broker in connection with the marketing of certain of the Debtors' internet protocol numbers and/or other internet number resources [Docket No. 631].

On February 21, 2017, the Bankruptcy Court entered an order expanding the scope of the retention and employment of EnergyNet.com as sales broker and consultant by expanding the list of the oil and gas properties to be marketed and sold [Docket No. 919].

    2.    *Appointment of the Creditors' Committee/Retention of Professionals*

On July 7, 2016, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Creditors' Committee.  The Creditors' Committee was reconstituted on or about February 17, 2017 [Docket No. 906].  The current members of the Creditors' Committee are OCC, the Lower Passaic River Study Area Cooperating Parties Group, and Mallinckrodt Pharmaceuticals.[20]  Pursuant to Bankruptcy Court approval, the Creditors' Committee retained (a) Schulte Roth & Zabel LLP as its counsel [Docket No. 255], (b) Cole Schotz P.C. as its Delaware co-counsel [Docket No. 256], and (c) Berkeley Research Group, LLC as its financial advisor [Docket No. 257].

Since the Creditors' Committee's formation, the Debtors have consulted with the Creditors' Committee concerning the administration of the Chapter 11 Cases, and the Creditors' Committee has remained an active participant in the Chapter 11 Cases.  The Debtors have kept

---

[20]    Brown and Caldwell was a member of the Creditors' Committee from its formation until December 20, 2016.  Mallinckrodt Pharmaceuticals was appointed to the Creditors' Committee on February 17, 2017.

the Creditors' Committee informed of matters relating to the Debtors' business operations and have conferred with, and sought the concurrence of, the Creditors' Committee to the extent transactions outside of the ordinary course of the Debtors' business would affect the Creditors' Committee's constituency.  The Debtors have conducted several meetings with the Creditors' Committee to discuss chapter 11 plan constructs and the status of the Creditors' Committee's ongoing investigation of the YPF Settlement Agreement.

3.    *Appointment of Section 1114 Retiree Committee & Proposed Consensual Modification of the OPEB Plans*

On November 15, 2016, the Bankruptcy Court entered an order authorizing the U.S. Trustee to appoint one or more official committees of retirees pursuant to section 1114 of the Bankruptcy Code, as determined by the U.S. Trustee, to serve as the section 1114 authorized representative of the OPEB Plan participants [Docket No. 567].  On December 16, 2016, the U.S. Trustee appointed a three-person committee of retirees (the "Retiree Committee") [Docket No. 641].

Pursuant to Bankruptcy Court approval, the Retiree Committee retained (a) Akin Gump Strauss Hauer & Feld LLP as counsel [Docket No. 931], (b) Ashby & Geddes, P.A. as co-counsel [Docket No. 932], and Kenney Consulting, LLC as actuary [Docket No. 933].

The Debtors have been engaged in active and good-faith bargaining with the Retiree Committee regarding modification of the OPEB Plans. The Debtors made their initial proposal to the Retiree Committee to modify Retiree Benefits on January 17, 2017. On January 31, 2017, the Retiree Committee rejected the offer and made a counterproposal, which the Debtors rejected. The Retiree Committee made a subsequent proposal to modify Retiree Benefits on March 8, 2017, which the Debtors rejected. Finally, on or around March 31, 2017, the Retiree Committee made a proposal to the Debtors to modify Retiree Benefits to which the Debtors agreed in principle. Since that time, the Debtors and the Retiree Committee have worked together to finalize a consensual modification of the OPEB Plans, as set forth in the Modification Agreement.

The Modification Agreement provides for the consensual modification of Retiree Benefits upon the Effective Date. A motion seeking Bankruptcy Court approval of the Modification Agreement (the "Modification Approval Motion") was filed on April [__], 2017 [Docket No. ___]. A hearing to consider the Modification Approval Motion is scheduled for May [_], 2017. Notice of the Modification Approval Motion, together with a copy of the Modification Agreement, will be sent to the applicable Retirees.  If the Modification Agreement is approved by the Bankruptcy Court, certain Retirees may receive, among other things, Class 3 General Unsecured Convenience Claims or Class 4 General Unsecured Claims pursuant to the Plan. To the extent any Retirees are entitled to vote to accept or reject the Plan, the Modification Agreement provides that the Retiree Committee will vote on behalf of such Retirees, and the Retiree Committee will vote to accept the Plan.

If the Modification Agreement is not approved by the Bankruptcy Court prior to the Effective Date, the Debtors will seek authority from the Bankruptcy Court to terminate the applicable Retiree Benefits as of the Effective Date through a Modification Order.  Any Claims

asserted on account of a Modification Order could be treated as Class 3 General Unsecured Convenience Claims or Class 4 General Unsecured Claims, if applicable. Individual Retirees will not vote on the Plan on account of their Retiree Benefits.

4.     *Filing of Amended Bylaws*

On November 8, 2016, the Debtors adopted amended bylaws [Docket No. 533] that grant the Debtors' two independent directors exclusive authority over any claims, transactions, litigations, disputes, arrangements or other matters between the Debtors and YPF. The expanded authority of the independent directors extends to the YPF Settlement Agreement (including with respect to any decisions concerning its prosecution or amendment), the YPF DIP Agreement (including with respect to any decisions concerning alternative financing), and all plan matters that implicate YPF.

5.     *Schedules and Statements*

On August 16, 2016, the Debtors filed their Schedules of Assets and Liabilities and Schedules of Executory Contracts and Unexpired Leases (the "Schedules") and Statements of Financial Affairs (the "Statements") [Docket Nos. 236-245]. On November 1, 2016, November 30, 2016, January 11, 2017, February 13, 2017, and February 23, 2017, the Debtors filed amended Schedules [Docket Nos. 498-1, 593-599, 726-730, 884-886, and 951]. These documents contain basic information including, among other things, schedules of creditors holding unsecured priority and non-priority claims against the Debtors. Copies of the Schedules and Statements are available for inspection on the Bankruptcy Court's website at https://ecf.deb.uscourts.gov/ and on the website maintained by Prime Clerk for the Chapter 11 Cases at https://cases.primeclerk.com/maxus.

6.     *Claims Bar Dates*

On August 25, 2016, the Bankruptcy Court entered an order establishing: (a) October 31, 2016 as the General Bar Date; (b) December 15, 2016 as the Governmental Bar Date; (c) the later of the date that is thirty (30) days after entry of an order providing for the rejection of an executory contract or unexpired lease, the applicable Bar Date, or such other date as the Bankruptcy Court may fix in the order authorizing such rejection as the Rejection Bar Date; and (d) the later of the General Bar Date or Governmental Bar Date, as applicable, and the date that is thirty (30) days after the date that notice of any Amended Schedules is served on the claimant as the Amended Schedules Bar Date [Docket No. 289].

On February 21, 2017, the Bankruptcy Court entered an order establishing April 3, 2017 as the deadline for filing Administrative Claims that first arose on or after the Petition Date through and including February 28, 2017 [Docket No. 920].

7.     *Status of Claims Against Repsol in the Passaic River Litigation*

On June 20, 2016, OCC filed a *Notice of Removal of Claims* (the "Notice of Removal") in the United States Bankruptcy Court for the District of New Jersey (the "New Jersey Bankruptcy Court"), pursuant to which OCC removed the following claims asserted in the Passaic River Litigation to the New Jersey Bankruptcy Court: (a) all cross-claims asserted by

OCC against the YPF Defendants (as defined in the Notice of Removal) (the "OCC YPF Claims); (b) all cross-claims asserted by OCC against Repsol (the "Repsol Claims"); and (c) the counterclaim asserted by Repsol against OCC (the "Repsol Counterclaim," and collectively with the OCC YPF Claims and the Repsol Claims, the "Removed Claims").

On June 21, 2016, OCC moved in the New Jersey Bankruptcy Court for transfer of venue of the Removed Claims to the Bankruptcy Court. On June 28, 2016, the New Jersey Bankruptcy Court ordered that the venue of the Removed Claims be transferred to the Bankruptcy Court. The Removed Claims were docketed in the Bankruptcy Court as Case No. 16-51025-CSS (the "Adversary Proceeding"). On July 5, 2016, Repsol filed a statement pursuant to Bankruptcy Rule 9027(e)(3) in connection with the Notice of Removal stating that (a) the Repsol Claims and Repsol Counterclaim are non-core, (b) Repsol takes no position on whether the OCC YPF Claims are core or non-core, and (c) Repsol does not consent to entry of final orders or judgments by the Bankruptcy Court [Docket No. 85]. On July 6, 2016, the YPF Defendants filed a statement in response to the Notice of Removal and Repsol's related statement stating that (x) the claims asserted by OCC against YPF are property of the Debtors' estates, (y) certain of the OCC YPF Claims may be core and certain may be non-core, and (z) the YPF Defendants take no position on whether the Repsol Claims or Repsol Counterclaim are core or non-core [Docket No. 91].

On July 20, 2016, Repsol filed a motion to remand the Repsol Claims and the Repsol Counterclaim to the NJ State Court (the "Repsol Remand Motion") [Adv. Proc. Docket No. 27]. The OCC YPF Claims are not at issue in the Repsol Remand Motion. On August 10, 2016, OCC filed an objection to the Repsol Remand Motion [Adv. Proc. Docket No. 30], the Debtors filed a statement in response to the Repsol Remand Motion [Adv. Proc. Docket No. 31], and the YPF Defendants filed an objection to the Repsol Remand Motion [Adv. Proc. Docket No. 33]. After additional briefing by the parties, Repsol filed a notice of completion of briefing on September 9, 2016 [Adv. Proc. Docket No. 41]. On November 15, 2016, the Bankruptcy Court entered an opinion [Docket No. 560 and Adv. Proc. Docket No. 42] and an order (the "Repsol Remand Order") [Docket No. 561 and Adv. Proc. Docket No. 43] granting the Repsol Remand Motion, thereby remanding the Repsol Claims and the Repsol Counterclaim to the NJ State Court.

On November 29, 2016, OCC filed a motion for clarification or, in the alternative, for reconsideration of the Repsol Remand Order [Adv. Proc. Docket No. 44] (the "Motion for Reconsideration"). On December 13, 2016, the Debtors filed an objection to OCC's motion [Adv. Proc. Docket No. 45], and on December 23, 2016, OCC filed a reply to the Debtors' objection [Adv. Proc. Docket No. 47]. On December 29, 2016, the Debtors filed a sur-reply to OCC's reply [Adv. Proc. Docket No. 48]. On January 24, 2017, OCC filed a notice of completion of briefing [Adv. Proc. Docket No. 60]. The Motion for Reconsideration is currently under consideration by the Bankruptcy Court.

On January 6, 2017, the Debtors filed a motion seeking to enforce the automatic stay and to enjoin further prosecution of (a) claims asserted by OCC against Repsol in the Passaic River Litigation that seek to establish that Repsol is Maxus's alter-ego and (b) a counterclaim asserted by Repsol against OCC under the New Jersey Spill Act in the Passaic River Litigation. [Docket No. 712]. On January 25, 2017, the Bankruptcy Court entered an order denying the Debtors' motion. [Docket No. 799].

On March 15, 2017, Repsol filed a motion for clarification that the automatic stay does not apply to the Repsol alter-ego based claims or, in the alternative, to modify the automatic stay [Docket No. 1024].  At the hearing to consider this motion on April 6, 2017, the Bankruptcy Court denied the motion without prejudice.

8.    *Insurance*

On July 11, 2016, the Bankruptcy Court entered an order authorizing the Debtors' payment of prepetition obligations incurred in the ordinary course of business in connection with insurance policies and the continuation of the Debtors' insurance premium financing agreement [Docket No 123].

9.    *Critical Vendors*

On September 2, 2016, the Bankruptcy Court entered an order authorizing the Debtors to pay prepetition claims of certain critical vendors up to a cap of $2 million [Docket No. 321].  As of November 25, 2016, the Debtors made approximately $1.4 million in payments on account of prepetition claims of critical vendors.

10.    *Credit Card Program*

On September 2, 2016, the Bankruptcy Court entered an order authorizing the Debtors to reinstate their commercial credit card program with JPMorgan Chase Bank, N.A. [Docket No. 320].

11.    *Key Employee Retention Plan and Modified Severance Plan*

On September 2, 2016, the Bankruptcy Court entered an order approving the Debtors' key employee retention plan (the "KERP") and authorizing the Debtors to implement and maintain a modified severance plan (the "Modified Severance Plan," and together with the KERP, the "KERP/Severance Plans") [Docket No. 322].  The Debtors discussed and negotiated the terms of the KERP/Severance Plans with the Creditors' Committee and the U.S. Trustee prior to filing the motion seeking approval thereof.

The KERP applies to 25 employees who are critical to the Debtors' ongoing operations and remediation efforts and other critical business functions, and is designed to incentivize such employees to remain with the Debtors through the effectiveness of a chapter 11 plan.  The maximum cost of the KERP is $1,290,000.  The Modified Severance Plan applies to all current employees and is payable upon termination, change of control, or death, based on years of service (capped at 4 months' salary).  The maximum cost of the Modified Severance Plan is $1,038,000.  The KERP/Severance Plans will be funded out of the fully subordinated Tranche B Facility.

12.    *Removal Deadline*

On September 2, 2016, the Bankruptcy Court entered an order extending the period within which the Debtors may remove actions to the Bankruptcy Court through and including January 13, 2017, without prejudice to the right to seek further extensions of the removal

deadline [Docket No. 325]. On January 10, 2017, the Bankruptcy Court entered an order further extending the period within which the Debtors may remove actions to the Bankruptcy Court through and including May 15, 2017, without prejudice to the right to seek further extensions of the removal deadline [Docket No. 718].

13.    *Deadline to Assume or Reject Non-Residential Real Property Leases*

On October 4, 2016, the Bankruptcy Court entered an order extending the Debtors' deadline to assume or reject non-residential real property leases pursuant to section 365(d)(4) of the Bankruptcy Code through and including January 13, 2017, without prejudice to the right to seek further extensions of the deadline with the consent of the affected lessors [Docket No. 382]. On January 3, 2017, the Bankruptcy Court entered an order further extending the Debtors' deadline to assume or reject certain leases, with prior consent of the lessors, and to establish procedures related thereto. [Docket No. 704]. On March 10, 2017, the Debtors filed a notice further extending the deadline to assume or reject their office lease in East Brunswick, New Jersey through and including June 30, 2017 [Docket No. 1010].

14.    *Key Employee Incentive Plan*

On October 18, 2016, the Bankruptcy Court entered an order approving the Debtors' key employee incentive plan (the "KEIP") for the Debtors' three-member senior management team (the "Senior Management Team") [Docket No. 448]. The Debtors discussed and negotiated the terms of the KEIP with the Creditors' Committee prior to and after filing the motion seeking approval thereof and modified the proposed KEIP based on these discussions.

The KEIP (as modified) consists of four performance objectives: (a) conducting a pre-sale marketing process for the Debtors' non-litigation assets; (b) achieving at least a threshold value from the sale of some or all of the Debtors' non-litigation assets; (c) achieving certain milestones in order to maintain claims for distribution to a litigation trust or receiving affirmative judgments and/or other recoveries in connection with the Debtors' pending and potential litigations; and (d) transitioning environmental remediation projects (the "Projects") from Tierra to OCC. If each member of the Senior Management Team achieves the "threshold" award in each performance objective, the total cost of the KEIP is $950,000. If each member of the Senior Management Team achieves the "maximum" award in each performance objective, the total cost of the KEIP is $1,425,000.

The Senior Management Team achieved the "maximum" award under the pre-sale marketing performance objective by completing the objective before December 15, 2016. The Senior Management Team achieves the "threshold" award under the non-litigation assets performance objective when the value derived from the sale of any non-litigation assets reaches $10 million, and the award opportunity increases at the $20 million "maximum" level. The Senior Management Team has not yet achieved this performance objective. The litigation performance objective is broken down into four different categories and the Senior Management Team achieves the "threshold" and "maximum" awards at various points in time when certain milestones or recoveries are achieved. The Senior Management Team achieved the "threshold" award in one category of the litigation performance objective by entering into and receiving Bankruptcy Court approval of a settlement agreement with Scepter and Erie, pursuant to which

the Estates recovered approximately $925,000, as described more fully herein.  The Senior Management Team has not yet met the "threshold" or "maximum" awards in the other three litigation objective categories.

The Senior Management Team *entered into* a transition plan with OCC, as described more fully below, for the Projects prior to November 15, 2016 and thus achieved the "maximum" award under the Tierra transition performance objective.   With respect to *completion* of the Tierra transition, the Senior Management Team must complete the transition of the Projects to OCC by March 31, 2017 to achieve the "maximum" awards and by May 15, 2017 to achieve the "threshold" awards.  The Debtors entered into a transition agreement with OCC on March 28, 2017 (the "Transition Agreement"), which effectively transitioned all relevant Projects to OCC and caused the Senior Management Team to achieve the "maximum" award under this performance objective.  On March 28, 2017, the Debtors filed a motion seeking Bankruptcy Court approval of the Transition Agreement [Docket No. 1069] and filed the exhibits to the Transition Agreement with the Bankruptcy Court thereafter. [Docket No. 1131].  No objections were filed to the motion, and on April 12, 2017, a Certificate of No Objection was filed with the Bankruptcy Court seeking entry of the proposed form of order approving the Transition Agreement. [Docket No. 1183].  The Bankruptcy Court granted the motion on April 17, 2017.  [Docket No. 1208].

15.    *Settlement Agreement with Scepter and Erie*

On November 29, 2016, the Debtors filed a motion, pursuant to Bankruptcy Rule 9019, seeking approval of a settlement agreement by and among Tierra, Scepter, and Erie [Docket No. 589].  This settlement provides, in pertinent part, for a recovery for the Debtors in the amount of $925,000, which represents more than 90% of the amounts sought in pending litigation, in full and final resolution of all of the Debtors' claims against Scepter and Erie.  On December 13, 2016, the Creditors' Committee filed a limited objection to the motion [Docket No. 618].  The Creditors' Committee had no issue with the terms of the settlement, but instead objected to any use of proceeds as unrestricted cash that the Debtors are required to use before they could borrow further funds under the YPF DIP Facility.  On December 16, 2016, the YPF Entities filed a reply to the limited objection [Docket No. 638].  On December 20, 2016, the Bankruptcy Court entered an agreed order granting the motion as set forth therein [Docket No. 666].

16.    *Motion to Approve Sale of Internet Protocol Addresses*

On March 16, 2017, the Debtors filed a motion to approve the sale of their internet protocol addresses for approximately $720,000 (exclusive of a sale commission) [Docket No. 1027].  The Bankruptcy Court granted the motion on April 5, 2017.  [Docket No. 1120].

17.    *Motion to Establish Procedures for Sale or Abandonment of De Minimis Assets*

On March 16, 2017, the Debtors filed a motion to establish certain procedures for the sale or abandonment of *de minimis* assets [Docket No. 1029], which was approved by the Bankruptcy Court on April 5, 2017  [Docket No. 1109].

18.    *Motion to Approve Sale of ORRIs*

On March 28, 2017, the Debtors filed a motion to approve the sale of the ORRIs for approximately $15.5 million [Docket No. 1065].  No objections were filed to the sale motion, and on April 13, 2017, a Certificate of No Objection was filed with the Bankruptcy Court seeking approval of the proposed sale [Docket No. 1188]. The Debtors anticipate the sale will close no later than the first week of May 2017.

C.    *Financing, YPF Settlement Agreement, and Plan Matters*

1.    *YPF DIP Facility*

On August 19, 2016, the Bankruptcy Court entered a final order approving a debtor-in-possession financing facility from YPF Holdings (in its capacity as debtor-in-possession lender, the "YPF DIP Lender") on a final basis [Docket No. 268] (the "YPF DIP Order")[21], pursuant to which the Debtors (a) entered into a debtor-in-possession financing agreement (the "YPF DIP Agreement") with the YPF DIP Lender, to obtain cash advances and other extensions of credit in an aggregate amount not to exceed $63.1 million (the "YPF DIP Facility") in accordance with the terms of the YPF DIP Agreement; (b) granted to the YPF DIP Lender, with respect to the proposed $28.75 million Tranche A portion of the YPF DIP Facility (the "YPF Tranche A Facility"), a first-priority security interest in and lien on nearly all of the Debtors' assets to secure the obligations under the YPF Tranche A Facility, subject to certain exceptions; and (c) grant superpriority administrative expense status to the YPF DIP Lender's claims on account of the YPF Tranche A Facility, subject to certain exceptions.  The Tranche B portion of the YPF DIP Facility consisted of an unsecured $34.35 million facility (the "YPF Tranche B Facility") that could not be repaid until all administrative expense claims, priority claims, and general unsecured claims against the Debtors had been fully satisfied in cash or such other distribution permitted under the Bankruptcy Code.  The YPF Tranche A Facility was intended to fund the Debtors' general bankruptcy and restructuring expenses, and the YPF Tranche B Facility was intended to fund the Debtors' corporate overhead expenses such as salaries and administrative fees, the E&P operations and related overhead, and the operations of Tierra, including all current and active remediation projects being undertaken by Tierra.

The YPF DIP Agreement required the Debtors to achieve certain case milestones including setting deadlines for the Debtors to, among other things, obtain approval of the YPF Settlement Agreement and file and confirm a plan that would incorporate the YPF Settlement Agreement.

2.    *Motion to Approve Settlement Agreement with YPF Entities*

On August 29, 2016, the Debtors filed a motion pursuant to Bankruptcy Rule 9019 seeking an order of the Bankruptcy Court approving the YPF Settlement Agreement and granting related relief (the "9019 Motion") [Docket No. 300].

---

[21]    The YPF DIP Facility approved by the Bankruptcy Court reflected several modifications as a result of discussions with the Creditors' Committee and objections filed by certain interested parties.  There was no interim order approving any financing from YPF because the Debtors, in consultation with their professional advisors and the Creditors' Committee, determined that the Debtors had sufficient cash on hand to fund their operations prior to the entry of the YPF DIP Order.

Shortly after its appointment in July of 2016, the Creditors' Committee instructed its professionals to investigate the Debtors' potential claims against the YPF Entities that would be released by the YPF Settlement Agreement, including, among other things, (a) the propriety of the settlement process (*e.g.*, the independence of the Special Independent Committee and its members, the timing and scope of the investigation, and whether all causes of action were sufficiently considered); (b) the facts giving rise to claims against the YPF Entities from 1995 to the present; and (c) the potential damages associated with any claims or causes of action.  As part of its investigation, the Debtors provided the Creditors' Committee's professionals with the "Report of the Special Independent Committee of Maxus Energy Corporation."  In addition, the Creditors' Committee's professionals met with attorneys for the Debtors, the YPF Entities, OCC, members of The Lower Passaic River Study Area Cooperating Parties Group, and representatives from the EPA and the NRD Trustees.  They also reviewed documents, pleadings, expert reports and deposition transcripts from the Passaic River Litigation, and had requested additional discovery in the form of document requests and depositions from YPF and the Debtors.[22]

As a result of that investigation, the Creditors' Committee believed that the YPF Settlement Agreement was grossly inadequate and fell well below the range of reasonableness. Other parties in the Chapter 11 Cases, most notably OCC, also criticized the neutrality and integrity of the process that produced the YPF Settlement Agreement and expressed dissatisfaction with the adequacy of the $130 million to be contributed by YPF to the Estates.

The deadline for most parties to object to the 9019 Motion was set for January 13, 2017. In response, various objections and limited objections to the motion (and/or joinders to such objections) were filed by parties in interest [Docket Nos. 755, 756, 767, 772, 773, 793, 794, 795, 796, 797, and 842].  The deadline for the remaining parties to object was set for March 23, 2017 but was adjourned to April 20, 2017.   [Docket Nos. 936, 1004].   Though the Creditors' Committee and several others had not yet filed their objections to the 9019 Motion, the Creditors' Committee and other parties had expressed their opposition to the YPF Settlement Agreement on the record.

A hearing date on the 9019 Motion had previously been scheduled for no earlier than April 17, 2017.

3.    *Plan Exclusivity*

On October 20, 2016, the Bankruptcy Court entered an order extending the Debtors' exclusive period to file a chapter 11 plan through and including December 19, 2016 and extending the Debtors' exclusive period to solicit acceptances of a plan through and including February 17, 2017, without prejudice to the right to seek further extensions of the exclusive periods [Docket No. 465].   The order further provided that the Debtors, the Creditors' Committee, and OCC may stipulate to a further 30 day extension of each of the exclusive periods without further order of the Bankruptcy Court.

---

[22]    After objections and revisions from numerous parties, on February 17, 2017, the Bankruptcy Court entered an order approving a protocol for discovery related to plan confirmation and the YPF Settlement Agreement [Docket No. 907].

On November 29, 2016, the Debtors filed a motion to further extend the Debtors' exclusive period to file a chapter 11 plan through and including February 17, 2017 and the Debtors' exclusive period to solicit acceptances of a plan through and including April 18, 2017 [Docket No. 590].   On December 13, 2016, OCC, the Lower Passaic River Study Area Cooperating Parties Group, and the Creditors' Committee each filed objections to the motion [Docket Nos. 616, 617, 619].   On December 16, 2016, the Debtors filed an omnibus reply in support of the motion [Docket No. 636].  Also on December 16, 2016, the YPF Entities filed an omnibus reply to the objections and joinder to the Debtors' omnibus reply [Docket. 639].   On December 20, 2016, the Bankruptcy Court entered an order, as agreed to among the Debtors and the objectors, further extending the Debtors' exclusive period to file a chapter 11 plan through and including January 18, 2017 and further extending the Debtors' exclusive period to solicit acceptances of a plan through and including March 18, 2017; provided, however, that the exclusive filing period would terminate if the Debtors failed to file an initial plan (as described by the Debtors' counsel on the record of the hearing) by 11:59:59 p.m. on December 31, 2016 [Docket No. 664].  The Debtors filed an initial plan (the "Initial Plan") on December 29, 2016. [Docket No. 697].

On March 16, 2017, the Debtors filed a motion to further extend the period during which only the Debtors may solicit acceptances of a chapter plan through May 31, 2017.  On March 28, 2017, the Debtors filed a version of the Plan.  Over the objections of certain creditors including YPF, on April 6, 2017, the Bankruptcy Court granted the Debtors' motion to further extend the Debtors' exclusive right to solicit votes on the Plan through May 31, 2017.  [Docket No. 1124].

4.    *Initial Plan and Initial Disclosure Statement*

On December 29, 2016, the Debtors filed the Initial Plan and an initial disclosure statement (the "Initial Disclosure Statement") [Docket Nos. 697, 698].

The Initial Plan provided that (a) if the YPF Settlement Agreement was approved by the Bankruptcy Court, the proceeds of the YPF Settlement Agreement would be distributed to creditors in accordance with the priorities set forth under the Bankruptcy Code, and (b) if the YPF Settlement Agreement was not approved by the Bankruptcy Court, the Causes of Action against the YPF Entities (and the Debtors' other assets) would be transferred to a liquidating trust for prosecution.

The Debtors filed a notice setting the deadline to object to the Initial Disclosure Statement for January 27, 2017 [Docket No. 699].  The Creditors' Committee and several other parties filed objections to the Initial Disclosure Statement, citing among other things, concerns regarding the feasibility and confirmability of the Initial Plan, and the Initial Disclosure Statement's failure to provide adequate information with respect to (a) the treatment of certain claimants, (b) recoveries for certain claimants, and (c) the future of the Debtors' environmental remediation projects [Docket Nos. 810, 811, 812, 813, 814, 818, 844, and 859].

On February 14, 2017, the Debtors filed a motion seeking approval of the voting and solicitation procedures (and the Initial Disclosure Statement) for the Initial Plan (the "Solicitation Procedures Motion") [Docket No. 890].

The Creditors' Committee and other parties filed objections to the Solicitation Procedures Motion because, among other things, the Solicitation Procedures Motion failed to provide claimants with an opportunity to express a view on the YPF Settlement Agreement. [Docket Nos. 965, 966, 973, and 974].

On March 28, 2017, the Debtors filed a revised form of order approving the Solicitation Procedures Motion [Docket No. 1061].

5.    *Committee Term Sheets*

The Creditors' Committee and numerous creditors vigorously opposed the YPF Settlement Agreement and sought to give the Debtors a viable path to exit their Chapter 11 Cases while preserving the Debtors' ability to pursue the YPF Causes of Action. The Creditors' Committee sought out several sources of financing for a liquidating trust to prosecute claims against the YPF Entities, with OCC ultimately agreeing to provide such financing (and financing to replace the YPF DIP Facility) on very reasonable terms.

On March 1, 2017, counsel to the Creditors' Committee sent the Special Independent Committee a letter requesting that the Special Independent Committee review term sheets attached thereto outlining (a) a debtor-in-possession financing facility from OCC to replace the YPF DIP Facility, (b) a financing facility and promissory note from OCC to fund a liquidating trust, and (c) a plan of liquidation that would transfer the Debtors' assets and Causes of Action (including the YPF Causes of Action) to a liquidating trust for prosecution and liquidation (collectively, the "Committee Term Sheets"). The Creditors' Committee also requested that the Debtors adjourn the March 7, 2017 hearing on the Initial Disclosure Statement so that the Special Independent Committee could consider the Committee Term Sheets.

In a reply letter to the Creditors' Committee on March 2, 2017, the Special Independent Committee agreed to adjourn the March 7, 2017 hearing on the Initial Disclosure Statement while it considered the Committee Term Sheets.

On March 7, 2017, the Bankruptcy Court held a telephonic status conference where counsel for the Creditors' Committee gave an overview of the Committee Term Sheets. The Bankruptcy Court requested that the Creditors' Committee file the Committee Term Sheets publicly so that all creditors could review them. The Bankruptcy Court also set a hearing for April 7, 2017 to consider the Initial Disclosure Statement or an amended disclosure statement as the case may be (with parties reserving their rights to object that they had insufficient time to review the amended disclosure statement).

The Creditors' Committee filed the amended Committee Term Sheets on the docket on March 17, 2017, reserving all rights to further amend, modify or supplement the Committee Term Sheets. [Docket No. 1033].

6.    *YPF Revised Settlement Proposal*

After the filing of the Committee Term Sheets, YPF presented the Special Independent Committee with a confidential revised proposal to settle the YPF Causes of Action. In the exercise of their fiduciary duties, the Special Independent Committee determined not to pursue

the revised settlement offer and instead determined to proceed with the Plan.  As of the date of this Disclosure Statement, YPF has refused to provide details of the revised proposal to the Creditors' Committee.

#### 7.    *Decision of the Debtors' Independent Directors*

The settlement of the YPF Causes of Action for $130 million under the YPF Settlement Agreement was supported by the Special Independent Committee, in an exercise of their fiduciary duties, because the Special Independent Committee believed the settlement represented reasonable value for contingent and unliquidated claims and would eliminate burdens, expense, uncertainty, and delay of litigation.[23]  The decision to enter into the YPF Settlement Agreement was an unbiased and fair-minded one made in good faith with the support of professional advisors.

Throughout the Chapter 11 Cases, however, creditor opposition to the YPF Settlement Agreement, including from the Creditors' Committee and creditors representing the substantial majority of unsecured claims, has been clear.  Creditors have voiced their distaste for the settlement, both with respect to the amount of consideration and the procedural means by which the settlement was being pursued (*i.e.* via a motion under Bankruptcy Rule 9019 as opposed to under a plan).

In consideration of creditor desires, the proposal of an alternative financing option, and the recognition of certain execution risks embedded in the Initial Plan that do not exist in the Amended Plan, the Special Independent Committee reconsidered the best strategy for maximizing the value of the alter ego claims.  In so doing, the Special Independent Committee determined that pursuit of the Amended Plan, which enjoys substantial creditor backing, is in the best interests of the Debtors' stakeholders. The Amended Plan includes favorable replacement debtor-in-possession financing and exit financing, contains limited execution risk, aligns the interests of the Debtors with their creditors, and allows the creditors to pursue the Debtors' claims against the YPF Entities in the manner they see fit through a well-funded liquidating trust.

#### 8.    *OCC DIP Facility; Repayment of the YPF DIP Facility*

On March 28, 2017, the Plan Proponents filed the Disclosure Statement and the Plan.

Also on March 28, 2017, the Debtors filed an emergency motion seeking approval to enter into a debtor-in-possession financing agreement (the "OCC DIP Agreement") with OCC (in its capacity as debtor-in-possession lender, the "OCC DIP Lender"), for a multiple-draw term loan debtor-in-possession financing facility of up to $17.5 million (the "OCC DIP Facility"). The OCC DIP Agreement provided for (a) a first-priority security interest and lien on nearly all of the Debtors' assets to secure the obligations under the OCC DIP Facility, subject to certain exceptions; and (b) superpriority administrative expense status for the OCC DIP Facility, subject

---

[23]  The Debtors' financial advisor, Scott Winn, previously concluded that the projected recovery range in respect of the YPF Causes of Action was between $0 and $284 million.  *See* Expert Report of Scott Winn, dated February 27, 2017, attached as Exhibit A to *The YPF Entities Objection To The Amended Disclosure Statement For The Amended Chapter 11 Plan Of Liquidation Proposed By Maxus Energy Corporation Et Al. And The Official Committee Of Unsecured Creditors* [Docket No. 1222] (available on the website maintained by Prime Clerk for the Chapter 11 Cases at https://cases.primeclerk.com/maxus).

to certain exceptions.  The hearing on the OCC DIP Facility was set for April 18, 2017, subject to the Debtors' right to seek an earlier hearing if necessary.

On April 10, 2017, the YPF DIP Lender sent a notice declaring that (a) the filing of the Plan on March 28, 2017 constituted an Event of Default under the YPF DIP Agreement, (b) the YPF DIP Lender's commitment to make Loans (as defined in the YPF DIP Agreement) under the YPF DIP Agreement was terminated, (c) all amounts owed under the YPF DIP Agreement were immediately due and payable, and (d) pursuant to the YPF DIP Order, the Debtors had no right to use DIP Collateral (as defined in the YPF DIP Agreement) other than to repay the YPF Tranche A Facility without the consent of the YPF DIP Lender.

After a hearing on April [__], 2017, the Bankruptcy Court entered an order approving the Debtors' entry into the OCC DIP Facility on a final basis (as may be amended, the "OCC DIP Order").  In accordance with the OCC DIP Agreement and OCC DIP Order, the proceeds of the OCC DIP Facility will be used to repay the YPF Tranche A Facility and fund the Debtors' bankruptcy expenses and general business expenses.

The OCC DIP Agreement requires the Debtors to take certain actions including withdrawing the 9019 Motion one business day after entry of the interim OCC DIP Order.

On [__] 2017, the Debtors withdrew the 9019 Motion.

D.     *Transition of Remediation Responsibilities.*

1.     *Services Agreement Between Tierra and OCC*

On November 1, 2016, the Bankruptcy Court entered an order (the "Services Agreement Order") approving a services agreement (the "Services Agreement") by and between Tierra and OCC [Docket No. 495].  The Services Agreement establishes a framework by which Tierra can effectuate a transition to OCC of certain remediation projects and services for which Tierra historically has been responsible as part of Maxus's indemnification obligation to OCC. Pursuant to the Services Agreement, Tierra has been providing OCC with the information that OCC requires to continue cleanup efforts at certain contaminated industrial sites across the country.  The Services Agreement also provides that OCC will reimburse Tierra for the costs and expenses incurred by Tierra in the employment of skilled and experienced remediation professionals required to identify, collect, and transmit this information to OCC.  Since the motion seeking approval of the Services Agreement was filed, Tierra has received nine work orders from OCC that were approved by the Debtors and OCC and work is proceeding pursuant to the terms of those work orders.  The Debtors and OCC are also discussing issues outside of the approved work orders, including Tierra's work on certain projects that may impact OCC going forward.

On January 9, 2017, the Bankruptcy Court entered an amended stipulation and consent order for Tierra to share certain data and other information with various parties in interest concerning the Diamond Alkali Superfund Site (the "Amended Consent Order") [Docket No. 714].  The Debtors conducted a diligent search of their books and records and produced all responsive, non-privileged, non-work product documents in the Debtors' possession. Accordingly, the Debtors have completed the production of information responsive to the

Gibbons Parties' requests and have no further obligations to the Gibbons Parties under the Amended Consent Order. In its objection to this Disclosure Statement [Docket No. 1168], the Gibbons Parties incorrectly assert that the Debtors' counsel did not respond to a March 27, 2017 letter from the Gibbons Parties. In fact, on March 28, 2017, the Debtors' counsel advised counsel to the Gibbons Parties that the Debtors were withholding documents based on privilege, which documents are identified in the privilege log from the Passaic River Litigation that was already in the possession of the Gibbons Parties, and no other privilege log would be forthcoming. Accordingly, contrary to the assertions of the Gibbons Parties, the Debtors are not stripping the Gibbons Parties' rights under the Amended Consent Order.  The Debtors have fulfilled their obligations under the Amended Consent Order, but have agreed to provide the recent results of the Newark Bay sampling to the Gibbons Parties when it becomes available.

2.    *Status of Transition of Environmental Projects*

With a few exceptions, the Debtors' environmental remediation projects relate to properties and facilities for which OCC and the Debtors share liability.[24]  The Debtors have been effectuating an orderly transition of those projects to OCC that they intend to complete by the conclusion of the Chapter 11 Cases.  The projects fall into two general categories.  The first category consists of ongoing projects that, if stopped, could pose a hazard to public health or safety, or disrupt an orderly transition of the project to OCC.  To the extent these projects have not already been transitioned to OCC, they are now being funded by the OCC DIP Facility (and were previously funded by the YPF Tranche B Facility).  The second category consists of projects that were not started as of the Petition Date and/or do not require ongoing funding to be transitioned to OCC without material disruption.  The projects in this second category are not being funded by the Debtors.[25]

The Debtors have made significant progress in their efforts to transition responsibility for both categories of projects to OCC.  The Debtors' efforts in this regard include the following:

- On September 20, 2016, principals of Tierra and Glenn Springs Holdings, Inc. ("Glenn Springs"), OCC's environmental remediation affiliate, met in Houston, Texas to discuss projects under the Services Agreement and to outline a transition plan.  Teams at Tierra and Glenn Springs are currently conducting weekly calls regarding the status of various environmental projects involving OCC.

- On October 26, 2016, principals of Tierra and Glenn Springs held a working group session to structure a process by which Tierra will provide Glenn Springs with a comprehensive set of data for each site for which it manages environmental remediation matters for OCC.  It is anticipated that, through this process, Glenn Springs will validate its receipt of all of the relevant data from Tierra for each

---

[24]  The Debtors have several other minor (or substantially completed) remediation projects that do not involve OCC, and the Debtors will undertake reasonable best efforts to transition such projects to the appropriate PRPs by the conclusion of the Chapter 11 Cases.

[25]  The Debtors are presently being reimbursed by OCC under the Services Agreement for certain costs associated with the transition of projects in this second category.

such site, and then assume future primary environmental remediation responsibilities for those sites.

- On November 1, 2016, the Bankruptcy Court entered the Services Agreement Order, thereby approving the parties' agreement to enter into a master services agreement establishing the general terms and conditions governing OCC's future requests for assistance from Tierra (*i.e.*, work orders) related to the eventual transition of day-to-day responsibility for certain remediation sites to OCC.

- In November 2016, the Debtors and OCC finalized a plan (subject to final documentation) to transition existing remediation projects to OCC in a manner that is acceptable in form and substance to OCC.  Thereafter, the parties met and agreed upon a form of transition plan checklist, which will be used to facilitate the necessary transition of information to OCC so that OCC can assume responsibility for remediation obligations at specific remediation sites.

- On January 16, 2017, legal representatives from OCC and Tierra met and reviewed a draft of a proposed transition agreement, as well as the various assignment agreements that will ensure OCC obtains the legal rights necessary to continue remediation efforts at certain of the Debtors' sites.  Among the rights under discussion were agreements necessary to ensure (a) long term access to properties subject to remediation, and (b) that all relevant environmental covenants are properly recorded and preserved.  The agreement remains subject to further negotiation and revision.

- On January 17, 2017, OCC and the Debtors' legal representatives met with the principals of Glenn Springs and Tierra's project management team to coordinate document transfers and to discuss other matters pertaining to contaminated sites where the Debtors are performing remediation work on behalf of OCC.

- The Debtors and OCC representatives met on March 23, 2017 to finalize all transition arrangements, including management of electronically stored information, permit transfers, assignments of access agreements, and required regulatory notices.

- On March 28, 2017, the parties executed the Transition Agreement and filed a motion seeking approval of the Transition Agreement.  [Docket No. 1069].  The Transition Agreement provides for the safe, orderly and efficient transfer, from the Debtors to Glenn Springs (an OCC affiliate), of all available information, including technical files, agreements, permits, access agreements, and service provider contact information related to and necessary for the future management of environmental responsibilities at the sites identified on Exhibit A to the Transition Agreement (the "Sites"). The Transition Agreement also provides for the transfer or assignment of agreements and permits, and the provision of any required notification to regulators concerning such transfers. As of the date on which the order approving the Transition Agreement is entered by the Bankruptcy Court (the "Transition Effective Date"), the Debtors shall cease performance of

environmental remediation and incur no future costs related to environmental remediation at the Sites. Glenn Springs shall then commence performance of environmental remediation at the Sites. Tierra shall coordinate with Glenn Springs to provide notices to Governmental Authorities immediately upon the Transition Effective Date, as well as any communications to professional service providers, consultants, and third party service providers, as sought by Glenn Springs in accordance with the terms of the Transition Agreement.

- The parties will continue to collaborate in the period following the transition to ensure issues identified in the initial post-transition phase are addressed.

In addition to those sites at which the Debtors undertake remediation activities pursuant to the contractual indemnification obligation owing to OCC, prior to the Petition Date, the Debtors had been involved with remediation-related litigation and/or government agency-directed activities at six other sites, consisting of:

*Pointe Coupee Parish, Louisiana (i.e., Jumonville)*: Private landowners alleged that Maxus's past oil and gas activities had damaged or contaminated their property, including the soil and groundwater. The landowners commenced litigation against Maxus and others, but the parties' tentative settlement was never approved by a court order, the state has not prescribed any remediation requirements, and neither the plaintiffs nor the state filed proofs of claim against the Debtors on account of any alleged damages or environmental harm. The Debtors have no unaddressed remediation-related obligations associated with this particular site.

*Ruby Mhire*: Maxus's obligation to remediate this site derives from a settlement of a lawsuit titled *Ruby Mhire et al. v. Total Petrochemicals USA, Inc.*, which was filed in the 38th Judicial District for the Parish of Cameron, State of Louisiana [Docket No. 10-18239], and a related settlement and cost sharing agreement that was entered into between Maxus and Chevron U.S.A. Inc. ("Chevron") in July of 2013. Consistent with these settlements and Louisiana state law, the Debtors have fully implemented a work plan approved by the Louisiana Department of Natural Resources Office of Conservation to plug and abandon inactive water wells, remove tanks and other equipment from the site, and address soil and groundwater matters. A site closure report based on recent confirmation soil sampling is scheduled to be submitted to the Office of Conservation by May 2017, with the expectation that the Office of Conservation will approve closure of the site before the end of the year. The Debtors estimate the remediation costs for this site following submission of the closure report, including for further confirmatory groundwater sampling, if required, may be approximately $75,000. The Debtors will not be able to fund their share of these costs under Maxus's prior agreement with Chevron after the Effective Date. Accordingly, Maxus recently notified Chevron of this and the need for Chevron to assume the technical lead role at the site by the end of May 2017. Maxus and Chevron USA are in the process of scheduling a meeting for early April 2017 to further discuss the transitioning of site responsibilities.

*Gateway Coal*: Tierra has been handling mining permit-imposed maintenance matters at the Gateway Coal site, including monitoring groundwater elevation levels and providing such data to the Pennsylvania Department of Environmental Protection ("PADEP"). In addition, there are two surety bonds associated with mining permit-imposed closure obligations at this site -

(a) Seaboard Surety Bond 355577, a $10,000 mine subsidence bond and (b) Seaboard Surety Bond 355582, a $10,000 closure bond on the Gateway Deep Mine Permit No. 30841321. PADEP approved closure of the mine borings and termination of groundwater level monitoring on March 1, 2017. Based on receipt of competitive bids, closure of mine borings is likely to cost approximately $153,000 and take 6-9 months.

*Geothermal*: Maxus, along with approximately twenty (20) other parties, was named as a responsible party in a 2002 California Regional Water Board Cleanup and Abatement Order concerning the remediation of this site. The required remediation was completed and a "No Further Action" letter was issued by the California Regional Water Board (the "Water Board") in 2014. The Water Board recently verified that all further monitoring requirements were assigned solely to Pacific Gas and Electric Company. Accordingly, the Debtors have no further responsibilities at this site.

*Ricerca*: This is a former location of Diamond Alkali's corporate offices and Diamond Alkali's research and development center. This site consists of several acres of land located near Concord, Ohio and is currently occupied by Ricerca Biosciences (the "Ricerca Site"). In late 2006, Maxus acquired the Ricerca Site and subsequently sold all of its right, title, and interests in the Ricerca Site to Munsell Realty Advisors ("Munsell"). In conjunction with this conveyance, Maxus entered into an Environmental Assessment Escrow Agreement (the "Escrow Agreement") pursuant to which Maxus and Munsell collectively contributed $2,000,000 to fund the cost of an environmental investigation and remediation of the Ricerca Site. Following a five year environmental investigation and remedial program, Ricerca Biosciences received a "No Further Action" letter in June 2011, and in early 2012, the Escrow Agreement was terminated pursuant to its terms. Accordingly, the Debtors have no future obligations at the Ricerca Site.

*Milwaukee Solvay*: Maxus is a named PRP at the Solvay Site. In January 2007, the EPA entered into an Administrative Settlement Agreement and Order on Consent with certain PRPs for a Remedial Investigation/Feasibility Study ("RI/FS") covering portions of the Solvay Site. Along with Maxus, the PRPs, including (a) Wisconsin Electric Power Company and Wisconsin Gas, LLC, (b) Cliffs Mining Company, (c) Greenfield Investors LLC, and (d) American Natural Resources Company (collectively, the "PRP Group"), are responsible for costs associated with the RI/FS. The EPA also recently issued a Special Notice letter to Honeywell seeking to name it as an additional PRP and Maxus has recently instituted a CERCLA contribution lawsuit against Honeywell for remediation costs at the site. Pursuant to an agreement among the existing PRPs, Maxus agreed to contribute  to the costs incurred by the PRP Group in association with the RI/FS.

During the Chapter 11 Cases, the Debtors, utilizing funding from the YPF Tranche B Facility, have continued to participate in the PRP Group. In addition, Tierra has fulfilled the role of serving as the Group's Project Coordinator for the RI/FS work at the Solvay Site. After the conclusion of the Chapter 11 Cases, however, the Debtors will not be in a position to continue their participation at the Solvay Site. Accordingly, on March 2, 2017, the Debtors requested that the PRPs at the Solvay Site release Maxus from the PRP Group and locate a replacement for Tierra as Project Coordinator. The PRP Group and the Debtors are currently attempting to negotiate a termination agreement relative to ending Maxus's participation in the Group but an agreement has not yet been reached, including with respect to the potential for Maxus to use

proceeds of the OCC DIP Facility to pay an outstanding assessment for RI/FS costs and with respect to the potential disposition, upon completion of the RI/FS, of reversionary interests Maxus may have, or which its Estate may inherit, relative to funds Maxus previously contributed to a financial assurance trust fund that the EPA required to secure the performance necessary to complete the RI/FS. If a termination agreement is not consummated, the Debtors anticipate that, due to lack of funding, Maxus will cease performing under the PRP Group agreement in June 2017, with its reversionary interest in funds remaining in the financial assurance trust account at the completion of the RI/FS, if any, being assigned to the Liquidating Trust.

## ARTICLE V.

## SUMMARY OF THE PLAN

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Equity Interests under the Plan, and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan controls the actual treatment of Claims against, and Equity Interests in, the Debtors under the Plan, and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Equity Interests in the Debtors and the Debtors' Estates, all parties receiving property under the Plan, and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

A.    *DIP Claim, Administrative Claims, Professional Claims, Priority Tax Claims, and U.S. Trustee Fees*

In accordance with section 1123(a)(1) of the Bankruptcy Code, any DIP Claim, Administrative Claims, Professional Claims, Priority Tax Claims, and U.S. Trustee Fees have not been classified and, therefore, are excluded from the Classes of Claims and Equity Interests set forth in Article III of the Plan and shall have the following treatment:

1.    *DIP Claim*

The DIP Claim shall be deemed satisfied if the DIP Lender receives, on the Effective Date, (i) the aggregate amount of liquid proceeds of DIP Collateral held by the Debtors as of the Effective Date (net of amounts necessary, in conjunction with the proceeds of the Liquidating Trust Promissory Note, to fund the Cash distributions and other Cash requirements provided under the Plan), whether in the form of cash, marketable securities, or any other liquid assets

(any and all such assets, the "Liquid DIP Assets") and (ii) a senior secured promissory note (the "DIP Promissory Note") in an aggregate principal amount equal to the difference (if any) between (a) the outstanding amount of the DIP Claim and (b) the amount paid and/or value received by the DIP Lender pursuant to subsection (i) hereof.  The DIP Promissory Note shall have economic terms identical to the economic terms of the DIP Facility except that (x) the DIP Promissory Note shall be secured by a valid, enforceable, fully perfected, and nonavoidable first priority lien on the Liquidating Trust Assets and any DIP Collateral remaining in the Debtors' Estates, (y) the maturity date of the DIP Promissory Note shall be the earlier of (i) the sale, transfer or disposition of substantially all of Liquidating Trust Assets and the distribution of the proceeds in accordance with the Liquidating Trust Waterfall, (ii) the date of acceleration by the Exit Lender after an Event of Default (as defined in the DIP Promissory Note), and (iii) five years from the Effective Date, and (z) the DIP Promissory Note shall be repaid in accordance with the Liquidating Trust Waterfall.

2.    *Treatment of Administrative Claims Other than Professional Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim, or set forth in an order of the Bankruptcy Court, such Holder of an Allowed Administrative Claim (other than Holders of Professional Claims and Claims arising under 28 U.S.C. § 1930) shall receive payment in Cash of the full unpaid amount of such Claim: (a) if the Administrative Claim is Allowed before the Effective Date, on the Effective Date, or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due, or as soon as practicable thereafter); or (b) if the Administrative Claim is Allowed on or after the Effective Date, on the date such Administrative Claim is Allowed, or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due, or as soon as practicable thereafter); provided, however, that Allowed Administrative Claims other than Professional Claims that arise in the ordinary course of the Debtors' business shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.  On or after the Effective Date, the Liquidating Trust may settle and pay any Administrative Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    *Administrative Claims Bar Date*

Holders of Administrative Claims that were required, but failed, to File and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date will not be permitted to receive payment or participate in any distribution under the Plan on account of such Administrative Claims.

4.    *Supplemental Administrative Claims Bar Date*

Holders of Administrative Claims (other than Holders of Administrative Claims paid in the ordinary course of business, Holders of Professional Claims, Holders of Claims arising under 28 U.S.C. § 1930, Holders of Claims arising under section 503(b)(1)(D) of the Bankruptcy Code, and Holders of post-petition Intercompany Claims) that first arose (or, only in the case of unexpired leases of real and personal property, accrued) as to or against the Debtors on or after

March 1, 2017 but prior to the Effective Date must File and serve on the Debtors or the Liquidating Trust, as applicable, requests for the payment of such Administrative Claims not already Allowed by Final Order by the Supplemental Administrative Claims Bar Date or the Holders of such Administrative Claims will not be permitted to receive payment or participate in any distribution under the Plan on account of such Administrative Claims. The Debtors shall serve a notice of the Supplemental Administrative Claims Bar Date within five (5) days after Confirmation. Objections to requests for payment of such Administrative Claims must be Filed and served on the Debtors or the Liquidating Trust, as applicable, and the requesting party within twenty (20) days after the Filing of the applicable request.

     5.    *Professional Claims*

     a.    *Final Fee Applications*

All final requests for Professional Claims must be Filed no later than sixty (60) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims will be determined by the Bankruptcy Court.

     b.    *Professional Claims*

The amount of Professional Claims owing to the Professionals will be paid in Cash to such Professionals by the Liquidating Trust from Available Cash within 10 days of the Bankruptcy Court's approval thereof.

     c.    *Post-Effective Date Fees and Expenses*

Except as otherwise specifically provided in the Plan, the Liquidating Trust, the Property Trust and the Environmental Response/Restoration Trust shall pay in Cash the legal, professional, or other fees and expenses incurred by their respective professionals from and after the Effective Date, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court. Upon the Effective Date, professionals may be employed by the Liquidating Trust, the Property Trust and/or the Environmental Response/Restoration Trust and paid in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court from the Liquidating Trust Assets, the PT Assets, and the ERRT Assets, respectively.

     6.    *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, the Liquidating Trust shall pay each Holder of an Allowed Priority Tax Claim, in full and final satisfaction, settlement, and release of such Allowed Priority Tax Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, the full unpaid amount of such Allowed Priority Tax Claim in Cash on, or as soon as practicable after, the latest of: (a) the Effective Date; or (b) the date such Priority Tax Claim becomes Allowed.

7.      *U.S. Trustee Fees*

On the Effective Date or as soon as practicable thereafter, the Liquidating Trust shall pay all U.S. Trustee Fees that are due and owing as of the Effective Date.  For the avoidance of doubt, nothing in the Plan shall release the Liquidating Trust from its obligation to pay all U.S. Trustee Fees arising from and after the Effective Date before a Final Order is entered by the Bankruptcy Court concluding or closing the Chapter 11 Cases.

B.      *Classification, Consolidation, Treatment, and Voting of Claims and Equity Interests*

1.      *Classification of Claims and Equity Interests*

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Equity Interests.  A Claim or Equity Interest is placed in a particular Class for the purposes of voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest has not been paid, withdrawn or otherwise settled before (a) the Claims Record Date for voting purposes, or (b) the time at which distributions are made with respect to such Claims or Equity Interests pursuant to the Plan for distribution purposes.

2.      *Record Date for Claims*

As of the Claims Record Date, the transfer registers for each Class of Claims or Equity Interests, as maintained by the Debtors or their agents, shall be deemed closed and there shall be no further changes made to reflect any new record Holders of any such Claims or Equity Interests without the written consent of the Debtors or the Liquidating Trustee, as applicable. The Debtors and the Liquidating Trust shall have no obligation to recognize any transfer of such Claims or Equity Interests occurring on or after the Claims Record Date.

3.      *Consolidation of the Debtors*

The Plan will consolidate all of the Debtors for all purposes, including for the purpose of implementing the Plan, for purposes of voting, for assessing whether Confirmation standards have been met, for calculating and making distributions under the Plan and for filing post-Confirmation reports and paying quarterly fees to the U.S. Trustee.  Pursuant to the Confirmation Order, as of the Effective Date: (a) all assets and liabilities of the Debtors will be deemed merged; (b) all guarantees by one Debtor of the obligations of any other Debtor will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors will be deemed to be one obligation of the consolidated Debtors; (c) each and every Claim Filed or to be Filed in the Chapter 11 Case of any Debtor will be deemed Filed against the consolidated Debtors and will be deemed one Claim against and a single obligation of the consolidated Debtors, and the Debtors may File and the Bankruptcy Court will sustain objections to Claims for the same liability that are Filed against multiple Debtors; and (d) Intercompany Claims between Debtors will be eliminated and extinguished.  This consolidation will not: (i) affect the legal and corporate organizational structures of the Debtors; (ii) affect the vesting of assets in the Liquidating Trust, the Property Trust or the Environmental Response/Restoration Trust; (iii) affect the rights of any Holder of an Other Secured Claim with respect to the collateral securing

such Claim; (iv) constitute a change of control of any Debtor for any purpose, (v) cause a merger or consolidation of any legal entity, or (vi) prejudice the rights of any Debtor with respect to the prosecution or defense of any Cause of Action.

      a.      *The Effect of Consolidation*

Consolidation is an equitable remedy that a bankruptcy court may apply in the chapter 11 cases of affiliated debtors, among other instances. Consolidation of the estates of multiple debtors in a bankruptcy case effectively combines the assets and liabilities of multiple debtors for certain purposes under a plan. The effect of consolidation is the pooling of the assets of, and claims against, consolidated debtors, satisfying liabilities from a common fund and combining the creditors of consolidated debtors for purposes of voting on a plan. In the absence of consolidation, the creditors of an individual debtor could only look to the assets of that debtor to fully or partially satisfy such creditor's claim.

      b.      *The Basis for Consolidation*

Substantive consolidation of the Debtors is an important element of the successful implementation of the Plan. It is well established that section 105(a) of the Bankruptcy Code empowers the bankruptcy court to substantively consolidate multiple debtors. Controlling law in the Third Circuit provides that a court may substantively consolidate estates if (a) the debtors disregarded separateness and their creditors treated them as one legal entity in the prepetition period or (b) the debtors' assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors. *See In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005).

The Plan Proponents believe that the Plan's proposed consolidation structure is supported by the applicable legal standards, practical considerations, and the Debtors' prepetition and postpetition operations and financial affairs. First, with limited exceptions, each of the Debtors has agreed to pledge substantially all of its assets as DIP Collateral that will be used to satisfy the OCC DIP Facility. Second, the recoveries for unsecured creditors in the Chapter 11 Cases will predominantly derive from Causes of Action held by the Debtors, including the YPF Causes of Action, the Debtors' most valuable asset. The Plan Proponents submit that it will be nearly impossible to allocate such recoveries among each of the Debtor's Estates. This is because, in the unlikely event that a particular creditor may receive a better recovery in the absence of substantive consolidation, that recovery is likely to be consumed by the costs associated with investigating and litigating any allocation disputes regarding those recoveries. Furthermore, the consolidation of the Debtors will expedite the conclusion of the Chapter 11 Cases.

      c.      *Consolidation Order*

The Plan will serve as a motion seeking entry of an order consolidating the Debtors, as described and to the extent set forth in Article III of the Plan. Unless an objection to such consolidation is made in writing by any creditor or claimant affected by the Plan and timely Filed and served on or before the Confirmation Objection Deadline, or such other date as may be fixed by the Bankruptcy Court, the order approving consolidation (which may be the Confirmation Order) may be entered by the Bankruptcy Court. In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing. This, however, will

not affect the obligation of the consolidated Debtors to (a) pay a single quarterly fee to the U.S Trustee in accordance with 28 U.S.C. § 1930 based upon the consolidated disbursements made by the substantively consolidated Debtors or (b) seek the closing of their substantively consolidated Chapter 11 Cases.

4.      *Summary of Classification and Class Identification*

Except for Claims addressed in Article II of the Plan, all Claims and Equity Interests are classified in the Classes set forth in Article III of the Plan in accordance with section 1122 of the Bankruptcy Code.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes.  A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. In no event shall any Holder of an Allowed Claim be entitled to receive payments under the Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Equity Interests.  The Plan Proponents reserve the right to modify the Plan in accordance with Article XIII of the Plan.

The following table assigns each Class a number designation for purposes of identifying each separate Class, a description of whether that Class is Impaired, and the voting rights of each Class:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 2 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| 3 | General Unsecured Convenience Claims | Unimpaired | No (presumed to accept) |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | Certain Environmental Claims for the Diamond Alkali Site | Impaired | Yes |
| 6 | Intercompany Claims | Impaired | No (deemed to reject) |
| 7 | YPF Tranche B Claim | Impaired | No (deemed to reject) |
| 8 | Equity Interests | Impaired | No (deemed to reject) |

5.      *Treatment of Claims and Equity Interests*

a.      *Class 1 – Other Secured Claims*

(i)      <u>Classification:</u>  Class 1 consists of all Other Secured Claims.

(ii)   <u>Treatment</u>:  Except to the extent that a Holder of an Other Secured Claim agrees to a less favorable treatment, such Holder shall receive, at the option of the Plan Proponents or the Liquidating Trust (as applicable): (1) Cash equal to the amount of such Allowed Other Secured Claim on or as soon as practicable after the latest of the (x) the Effective Date, (y) the date that such Other Secured Claim becomes Allowed, and (z) a date agreed to by the Plan Proponents or the Liquidating Trust (as applicable) and the Holder of such Other Secured Claim; (2) reinstatement of such Other Secured Claim; or (3) property securing such Other Secured Claim, with any deficiency to result in a Class 4 General Unsecured Claim.

b.   *Class 2 – Other Priority Claims*

(i)   <u>Classification</u>:  Class 2 consists of all Other Priority Claims.

(ii)   <u>Treatment</u>:   Except to the extent that a Holder of an Other Priority Claim agrees to a less favorable treatment, such Holder shall receive Cash equal to the amount of such Allowed Other Priority Claim on or as soon as practicable after the latest of (x) the Effective Date, (y) the date that such Claim becomes Allowed, and (z) a date agreed to by the Plan Proponents or the Liquidating Trust (as applicable) and the Holder of such Claim.

c.   *Class 3 – General Unsecured Convenience Claims*

(i)   <u>Classification</u>:   Class 3 consists of all General Unsecured Convenience Claims.

(ii)   <u>Treatment</u>:   Except to the extent that a Holder of a General Unsecured Convenience Claim agrees to a less favorable treatment, such Holder shall receive Cash equal to 100% of the amount of such Allowed General Unsecured Convenience Claim on or as soon as practicable after the latest of (x) the Effective Date, (y) the date that such General Unsecured Convenience Claim becomes Allowed, and (z) a date agreed to by the Plan Proponents or the Liquidating Trust (as applicable) and the Holder of such General Unsecured Convenience Claim.

d.   *Class 4 – General Unsecured Claims*

(i)   <u>Classification</u>:  Class 4 consists of all General Unsecured Claims.

(ii)   <u>Treatment</u>:   Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, such Holder shall receive its Pro Rata Share of the Class A Beneficial Interests in the Liquidating Trust on or as soon as

practicable after the latest of (x) the Effective Date, (y) the date that such General Unsecured Claim becomes Allowed, and (z) a date agreed to by the Plan Proponents or the Liquidating Trust (as applicable) and the Holder of such General Unsecured Claim; provided, however, that a Holder of an Allowed General Unsecured Claim that is not a PBGC Claim, Class 4 Environmental Claim, Lakeview Claim, or YPF Claim may elect to receive, in lieu of its Pro Rata Share of Class A Beneficial Interests, payment in Cash of such Holder's Pro Rata Share of the GUC Cash Pool (any Holder making such election, an "Electing GUC Holder") on or as soon as practicable after the latest of (x) the Effective Date, (y) the date that such General Unsecured Claim becomes Allowed, and (z) a date agreed to by the Plan Proponents or the Liquidating Trust (as applicable) and the Holder of such General Unsecured Claim, provided, however, that in no event will any such Electing GUC Holder receive more than 5% of such Holder's Allowed Claim, and provided, further, that in no event shall such Electing GUC Holder receive less than $1,000. The Holders of the Class A Beneficial Interests shall receive distributions from the Liquidating Trust pursuant to the Liquidating Trust Waterfall set forth in Article VI of the Plan.

Additionally, all Holders of Class 4 Claims (other than the Holders of the United States Class 4 Claims) shall receive their Pro Rata share of the Class C Beneficial Interests, and shall be entitled to receive distributions from the Liquidating Trust pursuant to the Liquidating Trust Waterfall set forth in Article VI of the Plan.

e.    *Class 5 – Certain Environmental Claims for the Diamond Alkali Site*

   (i)    Classification:  Class 5 consists of all Class 5 Diamond Alkali Claims.

   (ii)    Treatment:  On the Effective Date, in full and final satisfaction of all Allowed Class 5 Diamond Alkali Claims, the Liquidating Trust shall issue the Class B Beneficial Interests to the Environmental Response/Restoration Trust. The Environmental Response/Restoration Trust shall receive distributions from the Liquidating Trust on account of the Class B Beneficial Interests pursuant to the Liquidating Trust Waterfall set forth in Article VI of the Plan. The Environmental Response/Restoration Trust will apply any funds received on account of the Class B Beneficial Interests pursuant to the ERRT Waterfall set forth in Article IX of the Plan.

f.      *Class 6 – Intercompany Claims*

(i)      <u>Classification</u>:  Class 6 consists of all Intercompany Claims.

(ii)      <u>Treatment</u>:  Class 6 Claims will be eliminated and extinguished, and no payment on account of Intercompany Claims will be made.

g.      *Class 7 – YPF Tranche B Claim*

(i)      <u>Classification</u>:  Class 7 consists of the YPF Tranche B Claim.

(ii)      <u>Treatment</u>:  The YPF Tranche B Claim shall be subordinated to the prior payment in full in Cash of (i) all Claims described in Article II of the Plan and (ii) all Claims described in Classes 1 through 5 above, and shall receive no distribution under the Plan until all Claims described in clauses (i) and (ii) immediately above have been satisfied in full in accordance with the Plan.

h.      *Class 8 – Equity Interests*

(i)      <u>Classification</u>:  Class 8 consists of all Equity Interests in the Debtors.

(ii)      <u>Treatment</u>:  On the Effective Date, the Equity Interests in the Debtors shall be cancelled and the Holders of the Equity Interests shall not be entitled to, and shall not receive or retain, any property on account of such Equity Interests under the Plan.

6.      *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan take into account the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.

7.      *Distributions on Account of Allowed Claims*

Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the distributions that the Plan provides for Allowed Claims in the applicable Class pursuant to Article III of the Plan.  All distributions required under the Plan shall (a) in the case of Cash, be paid by the Disbursing Agent from the Distribution Reserve, and (b) in the case of Class A Beneficial Interests and Class C Beneficial Interests, by the Liquidating Trust's issuance thereof.

01:21813073.1

8.      *Workers' Compensation*

Notwithstanding any other provision hereof, no future Workers Compensation Claims shall be paid by the Debtors (or the Liquidating Trust) after the Effective Date. Such Workers' Compensation Claims shall be paid solely from any applicable workers compensation fund, agency, or program, or from such other third-party source as provided for under applicable law, and no Holder of a Workers' Compensation Claim shall receive a distribution under the Plan.

9.      *Retiree Claims*

  a.      *Pre-Modification Benefit Claims*

All Pre-Modification Benefit Claims shall be treated as Administrative Claims.

  b.      *Post-Modification Benefit Claims*

   (i)      Retirees shall receive either (A) the treatment set forth in the Modification Agreement, if the Modification Agreement is approved by the Bankruptcy Court, or (B) the treatment provided in a Modification Order, if the Modification Agreement is not approved by the Bankruptcy Court.

   (ii)      If a Modification Order is approved by the Bankruptcy Court, and such order provides Retirees with Claims for any reduction in Retiree Benefits, such Claims shall be treated as General Unsecured Claims or General Unsecured Convenience Claims as otherwise set forth in such Modification Order.

10.      *Elimination of Vacant Classes*

Any Class of Claims or Equity Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

11.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Equity Interests.

C.      *Implementation of the Plan*

    1.      *Cancellation of Documents Evidencing Claims and Equity Interests*

    Subject to the assumption of Executory Contracts and Unexpired Leases as set forth herein, and except as otherwise set forth herein or in the Confirmation Order, and except for purposes of evidencing a right to distributions under the Plan, on the Effective Date, all notes, stock, instruments, certificates, indentures, guarantees, and other documents or agreements evidencing a Claim against or Equity Interest in the Debtors will be deemed automatically cancelled with respect to the Debtors and shall be of no further force or effect as against the Debtors, whether such document is surrendered for cancellation or not, and none of the Debtors, the Liquidating Trust, the Property Trust, or the Environmental Response/Restoration Trust, as applicable, shall have any liability with respect thereto except as set forth in the Plan.

    2.      *The Debtor LOCs*

    The Plan shall constitute notice of non-renewal of each Debtor LOC, and all such Debtor LOCs shall expire on the first expiration date after the Effective Date to occur thereunder and shall not be automatically renewed or otherwise renewed by the Debtors or the Liquidating Trust, as the case may be.

    To the extent permitted under applicable law, and only with respect to undrawn amounts on any Debtor LOC that is not renewed, any right, recourse, or recovery available under the LOC Guaranty (or in connection therewith), on and after the Effective Date, shall be reduced, cancelled, and become null and void with respect to such undrawn amounts, and such LOC Guaranty will be deemed cancelled with respect to such undrawn amounts.

    Unless otherwise specified therein, any Cash collateral posted to secure any of the Debtor LOCs shall, to the extent of any undrawn amounts, revert to the Liquidating Trust upon the expiration of such Debtor LOC.

    3.      *Environmental Trust Accounts*

    The Debtors have funded the Environmental Trust Accounts, which contain restricted cash to fund payments for environmental remediation activities at certain sites, as required by various governmental agencies.  As part of the Transition Agreement by and between Tierra and OCC, the Debtors and OCC will cooperate to transfer the agreements governing the Environmental Trust Accounts with respect to OCC sites to OCC.  With respect to all other sites, the Debtors will use their best efforts to transfer remediation projects to the appropriate potentially responsible party or parties prior to the Effective Date.  The Debtors will also, prior to the Effective Date, assign to the Liquidating Trust any reversionary interest the Debtors hold in the Environmental Trust Account for the Milwaukee Solvay Site.

    4.      *Corporate Action*

    Except as otherwise provided in the Plan, the corporate or related actions to be taken by or required of the Debtors in connection with each matter provided for by the Plan shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan, and shall be

authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Equity Interests, directors of the Debtors, or any other Entity.  On or prior to the Effective Date, the appropriate officers of the Debtors shall be authorized and directed to issue, execute, and deliver the agreements, securities, instruments, or other documents contemplated by the Plan, or necessary or desirable to effect the transactions contemplated by the Plan, in the name of and on behalf of the Debtors. Notwithstanding any requirements under nonbankruptcy law, the authorizations and approvals contemplated by this provision shall be effective.

On the Effective Date, upon the appointment of the Liquidating Trust Oversight Committee, the persons acting as directors and officers of the Debtors prior to the Effective Date, as the case may be, shall have no further authority, duties, responsibilities, and obligations relating to or arising from (i) operating of the Debtors or (ii) the Chapter 11 Cases.

5.      *Dissolution of the Debtors*

On and after the Effective Date, the Liquidating Trust Oversight Committee shall be authorized, in its sole and absolute discretion, to take all actions necessary to wind down and dissolve the Debtors under applicable laws, including the laws of the jurisdictions in which they may be organized or registered, notwithstanding any applicable consent requirements or other restrictions contained in any financing agreements or other debt documents to which any Debtor is a party, and to pay all reasonable costs and expenses in connection with such wind down and dissolutions, including the costs of preparing or filing any necessary paperwork or documentation.  Except by action of the Liquidating Trust Oversight Committee, the Debtors shall have no authorization to implement the provisions of the Plan from and after the Effective Date except as specifically provided in the Plan.  Notwithstanding the foregoing, the Liquidating Trust Oversight Committee shall not dissolve any Debtor to the extent such Debtor is required to hold, after the Effective Date, Liquidating Trust Assets pursuant to Article VI.C of the Plan or PT Properties pursuant to Article VIII.A of the Plan, and any such Debtor shall be authorized to take such actions at the direction of the Liquidating Trustee or the PT Trustee, as applicable, as may be necessary to implement the provisions of the Plan with respect to such Liquidating Trust Assets or PT Properties.

6.      *Effectuating Documents; Further Transactions*

On the Effective Date, the Liquidating Trustee, the PT Trustee and the ERRT Trustee will be authorized to take any actions or effect transactions, including conversions, dissolutions, transfers, liquidations, or other corporate transactions, as may be determined by the Liquidating Trustee, the PT Trustee or the ERRT Trustee, as applicable, to be necessary or appropriate to implement the terms of the Plan.  After the Effective Date, the Liquidating Trustee, the PT Trustee and the ERRT Trustee may utilize the aforementioned authority without any further notice to or action, order or approval of the Bankruptcy Court.

On and after the Effective Date, the Liquidating Trustee, the PT Trustee and the ERRT Trustee are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and

conditions of the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorizations, or consents, except for those expressly required by the Plan.

7.      *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp, real estate transfer, mortgage reporting, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

8.      *Preservation of Causes of Action*

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, settled, transferred, or assigned under the Plan, or otherwise resolved by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trust shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors or the Estates, whether arising before or after the Petition Date, and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action as a consequence of Confirmation. The Liquidating Trust may pursue the Causes of Action, as appropriate, in accordance with the best interests of the Liquidating Trust. The Liquidating Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt and without limiting the breadth and generality of the foregoing, the YPF Causes of Action, the Repsol Causes of Action, and the Preserved Contribution Claims shall be preserved for prosecution by the Liquidating Trust. Any release, waiver, exculpation or compromise under the Plan shall not be offered or admitted into evidence in any subsequent proceeding as an admission of any fact in any litigation against any party (including against any of the YPF Entities or the Repsol Entities or in any litigation of the Preserved Contribution Claims).

**No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against such Entity as any indication that the Liquidating Trust will not pursue any and all available Causes of Action against such Entity. The Liquidating Trust expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. For the avoidance of doubt, the Plan does not release any Causes of Action that the Debtors have or may have now or in the future against any Entity other than the Released Parties (and only in their capacity as Released Parties). The Liquidating Trustee is deemed the representative of the Estates for the purpose of prosecuting, as applicable, the Liquidating Trust Causes of Action and any objections to Claims pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.**

9.      *D&O Policies*

Notwithstanding anything to the contrary contained herein or in the Confirmation Order, Confirmation shall not impair or otherwise modify (a) any obligations arising under the D&O Policies, or (b) any person's rights to receive any benefits under such D&O Policies. In addition, after the Effective Date, the Debtors and the Liquidating Trust, as applicable, shall not terminate or otherwise reduce coverage under any D&O Policy, including, without limitation, any "tail policy" in effect as of the Effective Date, and all Persons shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such Persons remain affiliated with the Debtors after the Effective Date.

10.     *Closing the Chapter 11 Cases*

The Liquidating Trustee shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules, <u>provided</u>, <u>however</u>, that the Liquidating Trustee may keep one or more of the Debtors' cases open in order to resolve any Disputed Claims or to pursue Causes of Action or until the Liquidating Trust has been terminated and all remaining Liquidating Trust Assets have been distributed.  For the avoidance of doubt, the Chapter 11 Cases may be closed prior to termination of the Liquidating Trust, the Property Trust and the Environmental Response/Restoration Trust.

D.      *Treatment of Executory Contracts and Unexpired Leases*

1.      *Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously assumed shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (a) is expressly identified on the Assumption Schedule; (b) has been previously assumed by the Debtors by Final Order or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (c) is the subject of a motion to assume pending as of the Effective Date; or (d) is otherwise assumed pursuant to the terms herein.  The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

At least twenty (20) days prior to the deadline to object to the Plan, the Debtors shall serve notices of rejection upon each known counterparty to an Executory Contract or Unexpired Lease that the Debtors propose to reject pursuant to the Plan.  Objections, if any, to the proposed rejection (including any amendment notice) must be filed with the Bankruptcy Court and served so as to be actually received by the Debtors no later than fourteen (14) days after service of such rejection notice, which deadline may be extended in the Debtors' sole discretion.   Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed rejection will be deemed to have assented to such rejection.  The Debtors may amend any such notice of rejection to either include additional Executory Contracts or Unexpired Leases or remove Executory Contracts or Unexpired Leases at any time prior to the Effective

Date provided that any such amendment or supplement affords the affected counterparty with no less than fourteen (14) days' notice to respond to such amendment or supplement.

In addition, unless otherwise provided by an order of the Bankruptcy Court, any Claim arising from the rejection of an Executory Contract or Unexpired Lease under the Plan must be asserted by Filing a Proof of Claim with the Claims and Noticing Agent and serving such Proof of Claim on the Debtors or the Liquidating Trust, as applicable, no later than thirty (30) days after the Effective Date. Proof of Claim forms may be obtained at the following websites: https://cases.primeclerk.com/maxus or http://www.uscourts.gov/forms/bankruptcy-forms/proof-claim-0. Any Claim based upon such rejection not Filed within such time will be automatically disallowed, forever barred from assertion, and unenforceable against the Debtors, the Liquidating Trust, the Property Trust and the Environmental Response/Restoration Trust, or their respective assets or properties, without the need for any objection or further notice to, or action, order, or approval of, the Bankruptcy Court.

All Allowed Claims arising from the rejection of Executory Contracts or Unexpired Leases will be classified as General Unsecured Claims and treated in accordance with the terms of Article III of the Plan. The deadline to object to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, shall be the Claims Objection Deadline.

## 2.    *Assumption of Executory Contracts and Unexpired Leases*

The Debtors will file the Assumption Schedule with the Bankruptcy Court at least twenty (20) days prior to the deadline to object to the Plan. The Assumption Schedule will (a) include (i) the name of the non-Debtor counterparty, (ii) the legal description of the Executory Contract or Unexpired Lease to be assumed, and (iii) the proposed amount to be paid on account of an associated Cure Claim, if any, and (b) identify whether each such Executory Contract or Unexpired Lease will be assigned to the Liquidating Trust or the Property Trust. On the same date the Debtors file the Assumption Schedule, the Debtors will serve notices of assumption upon each non-Debtor counterparty to an Executory Contract or Unexpired Lease that the Debtors propose to assume pursuant to the Plan. The notices of assumption will describe the procedures by which such parties may object to the proposed assumption of their respective Executory Contract or Unexpired Lease or the proposed Cure Claim amount, and explain how such disputes will be resolved by the Bankruptcy Court at the Confirmation Hearing, or such other date to which the parties may mutually agree or as ordered by the Bankruptcy Court, if the parties are not able to resolve a dispute consensually. Objections, if any, to the proposed assumption and/or Cure Claim must be filed with the Bankruptcy Court and served so as to be actually received by the Debtors no later than fourteen (14) days from the date of the service of the assumption notice, which deadline may be extended in the Debtors' sole discretion. Any non-Debtor counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim amount will be deemed to have assented to such assumption and Cure Claim amount. The Debtors may amend any such notice of assumption to include additional Executory Contracts or Unexpired Leases, remove Executory Contracts or Unexpired Leases, or reduce the proposed Cure Claim amount at any time prior to the Effective Date provided that any such amendment, supplement, or reduction affords the affected counterparty with no less than ten (10) days' notice to respond to such amendment or supplement or to propose an alternative Cure Claim amount.

If an objection to the proposed Cure Claim is sustained by the Bankruptcy Court, the Debtors, prior to the Effective Date, or the Liquidating Trust or the Property Trust, as applicable, following the Effective Date, may elect to deem such Executory Contract or Unexpired Lease rejected in lieu of assuming it by filing an amended rejection notice as set forth in Article V.A. of the Plan, and the non-Debtor counterparty shall then be entitled to file a Proof of Claim asserting Claims arising from the rejection thereof, if applicable, in accordance with the terms of the Plan and the General Bar Date Order.

The Debtors, prior to the Effective Date, or the Liquidating Trust or the Property Trust, as applicable, following the Effective Date, may settle any dispute regarding the amount of a Cure Claim without further notice to any party or action, approval, or order of the Bankruptcy Court. If the Debtors, prior to the Effective Date, or the Liquidating Trust or the Property Trust, following the Effective Date, object to any request for payment of a Cure Claim, the Bankruptcy Court shall determine the Allowed amount of such Cure Claim and any related issues. Unless the parties to the Executory Contract or Unexpired Lease agree otherwise, all disputed defaults that are required to be cured shall be cured by the later of (a) ten (10) days after entry of a Final Order determining the amount, if any, of the Debtors' liability with respect thereto and (b) the Effective Date. The Debtors, prior to the Effective Date, or the Liquidating Trust or the Property Trust, as applicable, following the Effective Date, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease no later than thirty (30) days after a Final Order determining a Cure Claim greater than that proposed by the Debtors.

**ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS AGAINST OR DEFAULTS BY THE DEBTORS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE THE DEBTORS, THE LIQUIDATING TRUST, OR THE PROPERTY TRUST ASSUME SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT.**

The assumption of Executory Contracts and Unexpired Leases under the Plan shall include the assignment to and vesting of such contracts and leases in the Liquidating Trust or the Property Trust, as applicable. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, assignments, and vesting.

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumption Schedule, nor anything contained in the Plan or each Debtor's Schedules, shall constitute an admission by the Debtors that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease capable of assumption, that any Debtor has any liability thereunder, or that such Executory Contract or Unexpired Lease is necessarily a binding and

enforceable agreement.  Further, the Debtors expressly may (a) remove any Executory Contract or Unexpired Lease from the Assumption Schedule and reject an Executory Contract or Unexpired Lease pursuant to the terms of the Plan, up until the Effective Date, and (b) contest any Claim (including any Cure Claim) asserted in connection with assumption of any Executory Contract or Unexpired Lease.

In the event a written objection is filed with the Bankruptcy Court as to whether a contract or lease is executory or unexpired, the right of the Debtors to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the entry of a Final Order by the Bankruptcy Court determining that the contract or lease is executory or unexpired, in which case the deemed assumptions and rejections provided for in the Plan shall not apply to such contract or lease.

Notwithstanding anything to the contrary, if the Modification Agreement is approved by the Bankruptcy Court, the Distribution Agreement shall be assigned, or assumed and assigned, as applicable, as provided for in the Modification Agreement without the need to comply with the procedures identified in the Plan.

3.      *Contracts and Leases Entered Into After the Petition Date*

Executory Contracts and Unexpired Leases entered into after the Petition Date by any Debtor will be assigned to and vest in the Liquidating Trust or the Property Trust, as applicable, and any rights, obligations and benefits thereunder shall be transferred to the Liquidating Trust or the Property Trust, as applicable.  Obligations arising under such Executory Contracts and Unexpired Leases shall be paid by the Liquidating Trust or the Property Trust, as applicable, in the ordinary course of business as they come due following the Effective Date without any obligation on the part of the counterparties to such Executory Contracts or Unexpired Leases to file or assert a Claim in the Chapter 11 Cases.

## A.  Insurance Policies

Notwithstanding any other provision of the Plan, pursuant to sections 365 and 1123 of the Bankruptcy Code and in accordance with the terms of the Plan, the Insurance Policies shall be assumed by the Debtors and assigned, to the extent permitted by law, as follows:  all Insurance Policies other than the PT Insurance Policies shall be assigned to the Liquidating Trust and all PT Insurance Policies shall be assigned to the Property Trust, in each case unless any Insurance Policy was previously rejected by the Debtors pursuant to a Bankruptcy Court order or is the subject of a motion to reject pending on the Effective Date.  The Liquidating Trust and the Property Trust shall share copies of such Insurance Policies as provided for in Article XV.E. of the Plan.

Coverage for defense and indemnity under any such Insurance Policy, including the D&O Policies, shall remain available to all individuals within the definition of "Insured" in any such Insurance Policy, including the D&O Policies.  Notwithstanding anything to the contrary herein, nothing in the Plan, the Liquidating Trust Agreement, the PT Agreement, or the ERRT Agreement shall affect any party's rights under any Insurance Policy, and the substantive

consolidation of the Debtors for the purposes of the Plan shall not affect any Insurance Policies, the proceeds of such policies, or distributions under such policies.

Nothing in the Plan or the Confirmation Order (a) releases, exculpates, precludes, or enjoins the enforcement of any liability or obligation of any Person or Entity under any Insurance Policy, reimbursement or similar agreement, or surety bond securing any liability or obligation of any of the Debtors for or related to a Workers' Compensation Claim, including any claim under the Black Lung Benefits Act, 30 U.S.C. § 901 *et seq.*, or (b) administers any surety bond securing any liability or obligation of any of the Debtors for a Workers' Compensation Claim, including any claim under the Black Lung Benefits Act, 30 U.S.C. § 901 *et seq.*

4.    *Indemnification Obligations*

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Effective Date to indemnify, defend, reimburse, or limit the liability of the current and former directors, officers, employees, attorneys, other professionals and agents of the Debtors against any Claims or Causes of Action under the Indemnification Provisions or applicable law, shall survive Confirmation, shall be assumed by the Debtors and assigned to the Liquidating Trust and will remain in effect after the Effective Date if such indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before the Effective Date; provided, however, that, notwithstanding anything herein to the contrary, the obligation of the Liquidating Trust to fund such Indemnification Provisions shall be limited to the extent of coverage available under any D&O Policies.

5.    *Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such Executory Contract or Unexpired Lease. Notwithstanding any applicable non-bankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a non-Debtor party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors from non-Debtor parties to rejected Executory Contracts or Unexpired Leases.

6.    *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request, pursuant to section 365(d)(4) of the Bankruptcy Code, to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases.

7.    *No Change in Control*

The consummation of the Plan or the assumption of any Executory Contract or Unexpired Lease is not intended to, and shall not, constitute a change in ownership or change in control under any employee benefit plan or program, financial instrument, loan or financing

agreement, Executory Contract or Unexpired Lease or contract, lease or agreement in existence on the Effective Date to which a Debtor is a party.

E.    *The Liquidating Trust*

    1.    *Generally; Creation and Conversion*

The powers, authority, responsibilities, and duties of the Liquidating Trust shall be set forth in and will be governed by the Liquidating Trust Agreement.  The Liquidating Trust shall be a representative of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

    2.    *Purpose of the Liquidating Trust*

The Liquidating Trust shall be established for the purpose of liquidating and distributing the Liquidating Trust Assets in accordance with Treasury Regulations Section 301.7701-4(d) for the benefit of the Liquidating Trust Beneficiaries, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, its liquidating purpose described in the Plan and set forth in the Liquidating Trust Agreement. The Liquidating Trust shall wind down the affairs of the Debtors in accordance with the terms of the Plan.

    3.    *Transfer of Assets to the Liquidating Trust*

On the Effective Date, the Debtors are authorized and directed to transfer, grant, assign, convey, set over, and deliver to the Liquidating Trust, for the benefit of the Liquidating Trust Beneficiaries, in the form thereof existing on such date, all of the Debtors' and Estates' right, title and interest in and to all of the Debtors' assets other than the PT Properties, free and clear of any and all Liens, Claims, encumbrances and interests (legal, beneficial or otherwise) of all other Persons and Entities, other than (i) the Liens securing the obligations under the DIP Promissory Note, the Liquidating Trust Promissory Note, and the Liquidating Trust Facility; and (ii) any defenses and other rights of potential defendants (including any rights to set off) with respect to Causes of Action, including without limitation, any Preserved Contribution Claims transferred to the Liquidating Trust.  For the avoidance of doubt but subject to the terms of the Liquidating Trust Agreement, the Liquidating Trust shall have no responsibility to perform any environmental remediation at any site.

Notwithstanding the foregoing, if, on the Effective Date, any of the Liquidating Trust Assets cannot be transferred to the Liquidating Trust or it is deemed impractical or inadvisable to do so, as determined by the Liquidating Trustee, the Debtors shall retain such Liquidating Trust Assets until such time as the Liquidating Trust may receive such Liquidating Trust Assets (and any proceeds of such assets retained by the Debtors shall constitute Liquidating Trust Assets).

The Debtors and the Liquidating Trust may (a) execute and deliver any instruments, documents, books, and records (including those maintained in electronic format and original documents as may be needed), and (b) take, or cause to be taken, all such further action in order to evidence, vest, perfect or effectuate the transfer of the Liquidating Trust Assets to the Liquidating Trust and consummate transactions contemplated by and to otherwise carry out the intent of the Plan.  Upon the transfer of the Liquidating Trust Assets, the Liquidating Trust shall

succeed to all of the Debtors' right, title and interest in the Liquidating Trust Assets, and the Debtors will have no further rights or interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.

In connection with the Liquidating Trust Assets, any attorney-client privilege, work-product privilege, joint interest privilege or other privilege or immunity attaching to any documents or communications (in any form, including, without limitation, written, electronic or oral) shall be transferred to and shall vest in the Liquidating Trust.  The Liquidating Trust's receipt of such privileges associated with the Liquidating Trust Assets shall not operate as a waiver of those privileges possessed or retained by the Debtors, nor shall it operate to eliminate the rights of any co-defendant to any applicable joint privilege.

The Liquidating Trust shall also be vested with the Debtors' and the Creditors' Committee's respective rights, as such rights existed prior to the Effective Date, to conduct discovery and oral examinations of any party under Bankruptcy Rule 2004.

The Liquidating Trust, however, shall not be considered a successor of any Debtor and shall not assume any obligations of the Debtors other than expressly provided for herein.  For the avoidance of doubt, the Liquidating Trust shall not assume any obligations of the Debtors under the Amended Stipulation and Consent Order [D.I. 714].

4.    *Liquidating Trust Waterfall*

The Cash proceeds of the Liquidating Trust Assets (other than the Preserved Contribution Claims) shall be distributed in accordance with the following priority of payments:

(a)    *first*, to the payment of the expenses of the Liquidating Trust included in the Liquidating Trust Budget;

(b)    *second*, pro rata to the payment of the DIP Promissory Note and the Liquidating Trust Promissory Note;

(c)    *third*, to the repayment of the Liquidating Trust Facility;

(d)    *fourth*, to payment of Administrative Claims whose Holders accepted an impaired treatment under the Plan;

(e)    *fifth*, to the payment of other expenses of the Liquidating Trust;

(f)    *sixth*, ratably (i) 15% to the Environmental Response/Restoration Trust on account of the Class B Beneficial Interests, and (ii) 85% on account of the Class A Beneficial Interests until such time as the Allowed Claims of the Holders of the Class A Beneficial Interests have been paid in full (together with interest at the Federal Judgment Rate calculated from the Effective Date); and

(g)    thereafter, 100% to the Environmental Response/Restoration Trust on account of the Class B Beneficial Interests.

The Cash proceeds of the Preserved Contribution Claims shall be distributed in accordance with the following priority of payments:

(a) *first*, an amount equal to the aggregate then-outstanding amounts under the Exit Financing, including any fees, interest and expenses thereunder, shall be set aside in a segregated account as collateral for the Exit Lender, and any amounts in excess of the foregoing shall be distributed ratably to the Holders of the Class C Beneficial Interests.  Upon the liquidation of all Liquidating Trust Assets, such segregated amounts shall be used to pay remaining outstanding amounts under the Exit Financing, if any, with any excess to be distributed ratably to the Holders of the Class C Beneficial Interests; and

(b) *second*, upon the satisfaction in full in Cash of the Exit Financing and the termination of any commitments under the Liquidating Trust Facility, ratably to the Holders of the Class C Beneficial Interests.

5. *Liquidating Trust Financing*

On the Effective Date, the Exit Lender will provide the Liquidating Trust with up to $16 million of financing (the "Liquidating Trust Loan Commitment") in the form of (a) a single draw term loan facility evidenced by a promissory note in the amount of up to $5 million (the "Liquidating Trust Promissory Note") secured by a valid, enforceable, fully perfected, and nonavoidable first-priority lien on the Liquidating Trust Assets, the proceeds of which will constitute a portion of the Available Cash and will be used to fund certain Cash distributions under the Plan; and (b) a multiple-draw term loan facility in the amount of up to the remainder of the Liquidating Trust Loan Commitment (the "Liquidating Trust Facility"), the proceeds of which will be used, subject to the Liquidating Trust Budget, to satisfy reasonable costs and expenses related to the administration of the Liquidating Trust and other obligations incurred or reasonably anticipated by the Liquidating Trust in accordance with the Plan Documents, including, without limitation, fees and costs incurred in connection with (i) implementation of the Plan, (ii) the liquidation of the Liquidating Trust Assets (including prosecution of the Causes of Actions), (iii) the winding down of the Estates and affairs of the Debtors, and (iv) compensation for the Liquidating Trustee, the Liquidating Trust Oversight Committee and the employees, professionals, advisors and other agents of the Liquidating Trust.

6. *Distribution Reserve*

The Distribution Reserve shall be established by the Liquidating Trust and funded from Available Cash on the Effective Date or as soon thereafter as practicable for the purpose of maintaining Cash from time to time necessary to satisfy (a) Administrative Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims, (b) Professional Claims, (c) U.S. Trustee Fees, (d) General Unsecured Convenience Claims, and (e) General Unsecured Claims of Electing GUC Holders, in each case, that are entitled to distributions of Cash and are (i) Allowed on or after the Effective Date, or (ii) Disputed Claims as of the Effective Date but that may become Allowed after the Effective Date.  Notwithstanding anything in the foregoing to the contrary, in its discretion, the Liquidating Trustee may reserve non-Cash assets in satisfaction of

the aforesaid reserve requirements (with the exception of any amounts required to satisfy Professional Claims), which non-Cash assets may be monetized from time to time by the Liquidating Trustee; provided, however, that in connection with any such reservation of non-Cash assets, the Liquidating Trust Oversight Committee shall give due consideration to the timing and amount of scheduled and anticipated payments and both the fair market value and the timing of monetization of such non-Cash assets, so as to enable the Liquidating Trustee to make distributions to the Holders of Claims as they become due.  Any Cash released from the Distribution Reserve upon the disallowance of any Claim shall become general, unrestricted Liquidating Trust Assets.

7.      *Liquidating Trust Governance*

The affairs of the Liquidating Trust shall be managed by the Liquidating Trustee, under the direction of the Liquidating Trust Oversight Committee, which shall have five members. Three of the members of the Liquidating Trust Oversight Committee shall be appointed by OCC, and the remaining two members shall be selected by the CPG.  The identities of the Persons to serve on the Liquidating Trust Oversight Committee as of the Effective Date will be identified in the Plan Supplement.  The Liquidating Trustee shall be authorized and empowered to undertake, acting through the management and agents of the Liquidating Trust, actions on behalf of the Liquidating Trust, including without limitation (a) to hold, manage, dispose and convert to Cash, the Liquidating Trust Assets, (b) to pursue the Causes of Action, (c) to maintain the Distribution Reserve, (d) to distribute Class A Beneficial Interests, Class B Beneficial Interests, and Class C Beneficial Interests, (e) to make distributions to the Holders of the Class A Beneficial Interests, the Environmental Response/Restoration Trust on account of the Class B Beneficial Interests, and the Holders of the Class C Beneficial Interests, (f) to appoint and supervise management and agents of the Liquidating Trust, and (g) to prepare and review periodic financial reports of the Liquidating Trust.

The Liquidating Trust Oversight Committee shall elect a Chairman and may designate one or more committees of the Liquidating Trust Oversight Committee.  The Liquidating Trustee shall appoint officers or other representative agents of the Liquidating Trust to carry out the purpose of the Liquidating Trust, subject to the Liquidating Trust Oversight Committee's approval.  The Liquidating Trustee shall be authorized to hire employees and engage advisors and other professionals, subject to any limitations imposed by the Liquidating Trust Oversight Committee.

The Liquidating Trust Agreement shall provide that decisions concerning whether to prosecute or settle any Causes of Action (other than Preserved Contribution Claims) shall be made by the Liquidating Trust Oversight Committee in good faith and in the best interests of the Liquidating Trust Beneficiaries.  The settlement of any of the Causes of Action shall require the approval of a simple majority vote of the Liquidating Trust Oversight Committee, provided, however, any settlement of the YPF Causes of Action shall be governed as follows:

(a)      In any settlement of the YPF Causes of Action, the Liquidating Trustee shall seek and attempt in good faith to obtain a release from YPF (the "YPF Contribution Release") containing the following specific language: "YPF, for itself and the YPF Entities, hereby releases any and all Causes of Action the YPF Entities may

have against the members of the Gibbons Group, the current and former members of the CPG, the United States, and OCC for contribution or cost recovery under or in connection with any Environmental Law and further covenants that neither YPF nor any of the YPF Entities shall sue on any related Causes of Action against any Entity that would expose these parties to potential liability for amounts paid in connection with this settlement and/or actual out of pocket costs and expenses related thereto." The language quoted in the prior sentence, subject to use of appropriate defined terms in the relevant operative document, shall constitute a sufficient YPF Contribution Release for purposes of the Plan and the governance of the Liquidating Trust.

(b)     If a proposed settlement of the YPF Causes of Action includes the YPF Contribution Release, the settlement may be approved by the affirmative vote of 3 out of 5 of the members of the Liquidating Trust Oversight Committee. However, if such proposed settlement does not contain the YPF Contribution Release, the settlement will require the affirmative vote of 4 of the 5 members of the Liquidating Trust Oversight Committee.

(c)     The Liquidating Trust Agreement shall provide that (a) no member of the Liquidating Trust Oversight Committee shall be obligated to vote for or against any settlement of the YPF Causes of Action if such settlement does not include the YPF Contribution Release, and (b) members of the Liquidating Trust Oversight Committee shall receive exculpation to the fullest extent permitted by law from any claims arising from any such vote.

The Liquidating Trustee will be vested with full authority to make all decisions regarding whether to prosecute any Preserved Contribution Claim, in furtherance of his or her fiduciary duty to the Liquidating Trust Beneficiaries. The Liquidating Trustee will make such determination based upon, among other things, the written advice of independent counsel as to whether sufficient facts exist to warrant the prosecution of the Preserved Contribution Claim, and taking into account the likelihood of success, the potential damages, the expected cost of litigation, and other matters that the Liquidating Trustee determines are relevant to the consideration. The settlement of any of the Preserved Contribution Claims shall require the approval of a simple majority vote of the Liquidating Trust Oversight Committee

8.    *Financial Statements/Reporting*

The Liquidating Trust will provide or make available certain financial and other information, including annual and quarterly financial statements.

9.    *Tax Treatment of the Liquidating Trust*

The Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Liquidating Trust Beneficiaries treated as grantors and owners of the trust. The Liquidating Trust will not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement.

The Liquidating Trustee shall file returns for the Liquidating Trust as a grantor trust pursuant to 26 C.F.R. § 1.671-4(a) and in accordance with this section of the Plan. The Liquidating Trust's taxable income, gain, loss, deduction or credit will be allocated to each Holder in accordance with its relative beneficial interest in the Liquidating Trust.

As soon as possible after the Effective Date, the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets, and such valuation shall be used consistently by all parties for all federal income tax purposes. The Liquidating Trust also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any Governmental Unit for taxing purposes.

The Liquidating Trustee shall be responsible for filing all federal, state, local and non-U.S. tax returns for the Liquidating Trust. The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local, or non-U.S. taxing authority, and all distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements.

10.   *Duration*

The Liquidating Trust shall be dissolved as soon as practicable after the date that is the earlier to occur of: (a) the distribution of all Liquidating Trust Assets available for distribution pursuant to the Plan, or (b) the determination of the Liquidating Trust Oversight Committee that the administration of the Liquidating Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit; provided, however, that in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date, unless the Bankruptcy Court, upon motion within the six (6) months prior to the fifth (5th) anniversary of the Effective Date (or within six (6) months prior to the end of an extension period), determines that a fixed-period extension is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

11.   *Conflicting Terms*

To the extent that the terms of the Plan with respect to the Liquidating Trust are inconsistent with the terms set forth in the Liquidating Trust Agreement, then the terms of the Liquidating Trust Agreement shall govern.

12.   *Exculpation; Indemnification; Insurance*

The Liquidating Trust Agreement shall provide for the following with respect to exculpation, indemnification, and insurance:

(a)   None of the Liquidating Trustee, the Liquidating Trust Oversight Committee, or their respective members, advisors or professionals, shall be liable for any damages arising out of the creation, operation or termination of the Liquidating Trust, including actions taken or omitted in fulfillment of his or her duties with respect to the Liquidating Trust, except in the case of such party's gross negligence, bad faith or willful misconduct; provided,

that in no event will any such party be liable for punitive, exemplary, consequential or special damages under any circumstances.

(b)     Neither the Liquidating Trustee nor the members of the Liquidating Trust Oversight Committee shall be subject to any personal liability whatsoever, whether in tort, contract or otherwise, to any person in connection with the affairs of the Liquidating Trust to the fullest extent provided under section 3803 of the Delaware Statutory Trust Act, and all persons claiming against either the Liquidating Trustee or any member of the Liquidating Trust Oversight Committee, or otherwise asserting claims of any nature in connection with affairs of the Liquidating Trust, shall look solely to the Liquidating Trust Assets for satisfaction of any such claims.

(c)     The Liquidating Trust Oversight Committee and its respective officers, directors, partners, members, managers and employees shall be indemnified to the fullest extent permitted by law by the Liquidating Trust against all liabilities arising out of the creation, operation or termination of the Liquidating Trust, including actions taken or omitted in fulfillment of their duties with respect to the Liquidating Trust, except for those acts that are determined by Final Order to have arisen out of their own willful misconduct, gross negligence, or bad faith.

(d)     The Liquidating Trust will maintain customary insurance coverage for the protection of the Liquidating Trustee and the Liquidating Trust Oversight Committee from and after the Effective Date.

F.     *Provisions Governing Liquidating Trust Distributions*

1.     *Applicability*

The provisions of Article VII of the Plan shall govern distributions to the extent not otherwise provided for in the Plan or in any financing agreement, trust agreement, or plan of allocation recognized under the Plan.   To the extent the provisions of any such financing agreement, trust agreement, or plan of allocation address specific matters set forth in Article VII of the Plan, the provision of such financing agreement, trust agreement, or plan of allocation shall govern.

2.     *Distributions for Administrative Claims, Professional Claims, Priority Tax Claims, Other Secured Claims, Other Priority Claims, and General Unsecured Convenience Claims*

The Liquidating Trustee shall pay from the Distribution Reserve any Administrative Claim, Professional Claim, Priority Tax Claim, Other Secured Claim, Other Priority Claim, General Unsecured Convenience Claim, or Claim of an Electing GUC Holder against the Debtors as soon as practicable after the later of (a) the Effective Date, and (b) the date upon which any such Claim becomes an Allowed Claim.

3.      *Interim Distributions to Liquidating Trust Beneficiaries*

Subject to approval of the Liquidating Trust Oversight Committee as set forth in the Liquidating Trust Agreement, the Liquidating Trustee shall (a) make an interim distribution pursuant to Liquidating Trust Waterfall to Holders of the Class A Beneficial Interests, the Environmental Response/Restoration Trust on account of the Class B Beneficial Interests, and Holders of the Class C Beneficial Interests  at least semi-annually (and within 30 Business Days of the receipt of the liquidated proceeds of Liquidating Trust Assets of more than $10,000,000) provided that any such distribution is not unduly burdensome to the Liquidating Trust, as determined in the sole discretion of the Liquidating Trust Oversight Committee, and (b) have the right to make more frequent interim distributions to the Holders of the Class A Beneficial Interests, the Environmental Response/Restoration Trust on account of the Class B Beneficial Interests, and the Holders of the Class C Beneficial Interests if the Liquidating Trustee determines that such interim distributions are warranted and economical; provided, further, however, that any such distribution shall only be made if the Liquidating Trustee retains amounts reasonably necessary to meet contingent liabilities, to maintain the value of the Liquidating Trust Assets during liquidation, and to satisfy other liabilities or expenses incurred by the Liquidating Trust in accordance with the Plan or the Liquidating Trust Agreement; provided, further, that the expenses of the Liquidating Trust included in the Liquidating Trust Budget shall be paid in the ordinary course of business as they come due, and the DIP Promissory Note, the Liquidating Trust Promissory Note and the Liquidating Trust Facility shall be repaid pursuant to the terms of their respective documentation.

4.      *Final Distributions to Liquidating Trust Beneficiaries*

Notwithstanding anything else in the Plan, upon the settlement and satisfaction of all Administrative Claims, Professional Claims, Priority Tax Claims, Other Secured Claims, Other Priority Claims, General Unsecured Convenience Claims, and Claims of Electing GUC Holders, the completion of the prosecution and/or settlement of all Claims Objections and Causes of Action, and the completion of the sale and/or liquidation of all Liquidating Trust Assets, the Liquidating Trustee shall distribute, as soon as practicable, all remaining Liquidating Trust Assets in accordance with the Liquidating Trust Waterfall.

5.      *Distributions on Account of Claims Allowed After the Effective Date*

If and to the extent that there are Disputed Claims, distributions on account of any Disputed Claims shall be made to the extent such Claims are Allowed in accordance with the provisions set forth in Article X of the Plan with respect to dispute resolution.  Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made from the Distribution Reserve as soon as practicable after the Disputed Claim becomes an Allowed Claim.

Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

6. *Disbursing Agent*

a. *Generally*

All distributions under the Plan shall be made by the Liquidating Trust, as Disbursing Agent, or by such other Person designated by the Liquidating Trust to act as a Disbursing Agent. Except as otherwise ordered by the Bankruptcy Court, a Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

b. *Rights and Powers of the Disbursing Agent*

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, securities, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated by the Plan to Holders of Allowed Claims; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan. For the avoidance of doubt, the Disbursing Agent (in his or her capacity as such) shall have no responsibility or authority to make distributions of the Liquidating Trust Assets, the PT Assets or the ERRT Assets.

c. *Expenses Incurred On or After the Effective Date*

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by a Person designated by the Liquidating Trust as Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Liquidating Trust pursuant to the Liquidating Trust Budget.

7. *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

a. *Delivery of Distributions*

If a Creditor holds more than one Allowed Claim in any one Class, all Allowed Claims of the Creditor in a single Class will be aggregated into one Allowed Claim and one distribution will be made with respect to the aggregated Allowed Claim.

b. *Distributions to Holders of Disputed Claims*

Except as otherwise provided in the Plan or agreed to by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claims have been Allowed or expunged. Any distributions arising from property distributed to Holders of Allowed Claims in a Class and made to such Holders under the Plan shall be made also, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or

dates that such distributions were earlier made to Holders of Allowed Claims in such Class.  No Disputed Claim shall accrue interest on or after the Petition Date on account of such Claim.

c.      *Minimum Distributions; and Other Distribution Limitations*

Other than with respect to Allowed General Unsecured Convenience Claims, no Cash payment of less than $50 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.  If a Holder of an Allowed Claim would be entitled to receive less than $50 as of the time of a particular distribution, but would be entitled to receive more than $50 in combination with later distributions, the Disbursing Agent will combine such distributions with later distributions to such Holder of an Allowed Claim so that such Holder may eventually be entitled to a distribution of at least $50 in value.

Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

d.      *Undeliverable Distributions and Unclaimed Property*

In the event that any distribution to a Holder of an Allowed Claim is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the applicable date of distribution.  After such date, all unclaimed property or interests in property shall revert to the Liquidating Trust (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be released, settled, compromised, and forever barred.

8.      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed upon it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding the above, each Holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such Holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution.  The Disbursing Agent has the right, but not the obligation, not to make a distribution until such Holder has made arrangements satisfactory to the Disbursing Agent for payment of any such withholding tax obligations and, if the Disbursing Agent fails to withhold with respect to any such Holder's distribution, and is later held liable for the amount of such withholding, the Holder shall reimburse the Disbursing Agent.  Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes,

withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes are reasonable and appropriate. The Disbursing Agent may require, as a condition to the receipt of a distribution, that the Holder complete the appropriate Form W-8 or Form W-9, as applicable to each Holder.  If the Holder fails to comply with such a request within six months, such distribution shall be deemed an unclaimed distribution. Finally, the Disbursing Agent reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

9.    *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount (as determined for federal income tax purposes) of such Claims, and then, to the extent the consideration exceeds the principal amount of such Claims, to any portion of such Claims for accrued but unpaid interest.

10.    *Setoffs and Recoupment*

The Liquidating Trust may, but shall not be required to, set off against or recoup from any Claims of any nature whatsoever that it may have against the claimant, including any Causes of Action transferred to the Liquidating Trust by the Debtors, but neither the failure to do so nor the Allowance of any Claim shall constitute a waiver or release by the Debtors or the Liquidating Trust of any such Claim it may have against the Holder of such Claim.

Before the Liquidating Trust can set off against or recoup from the distribution to be made on account of an Allowed Claim, the Holder of the Claim shall be served with written notice of the proposed setoff or recoupment at least thirty (30) days prior to the Liquidating Trust exercising any asserted setoff or recoupment right, and, if such claimant serves a written objection to such asserted setoff or recoupment on or before thirty (30) days of receipt of such written notice, (a) the objection shall be deemed to initiate a contested matter governed by, inter alia, Bankruptcy Rule 9014, (b) nothing herein shall affect the respective burden of each party in connection with such contested matter, and (c) the Liquidating Trust shall not proceed with the asserted setoff or recoupment absent the withdrawal of such objection or the entry of a Final Order overruling such objection.

Creditors shall retain all valid rights of setoff under section 553 of the Bankruptcy Code.

11.    *Claims Paid or Payable by Third Parties*

Except as otherwise provided herein, the Debtors or the Liquidating Trust, as applicable, shall reduce a Claim, and such Claim shall be disallowed without a Claims Objection having to be Filed and without order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor, the Liquidating Trust, or other party making distributions on account of the Claim pursuant to the Plan; provided that the Debtors or the Liquidating Trust, as applicable, shall provide 21 days' notice of the proposed disallowance to the Holder of such Claim during which period the Holder may object to such disallowance.  If the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.  Any and all rights of the Debtors or the Liquidating

Trust, as applicable, to seek return or repayment of a distribution under the Plan from the Holder of a Claim on account of payment of such Claim by a party that is not a Debtor, the Liquidating Trust, or other party making distributions on account of the Claim pursuant to the Plan, are reserved.

12.    *Marshalling*

Any Holder of a Claim that is the beneficiary of a Debtor LOC shall first be required to draw upon such Debtor LOC (to the extent permitted by the terms of such Debtor LOC) before such Holder may receive any distribution pursuant to the Plan on account of such Claim.  To the extent such Holder does receive payment on account of its Claim from such Debtor LOC, such Holder's Claim against the Debtors shall be reduced dollar for dollar.

13.    *Limitation on Contribution Claims*

No Creditor or party in interest shall be entitled to assert a right to contribution under CERCLA or other applicable law on account of amounts collected by the Liquidating Trust, distributions to the Holders of Allowed Claims under the Plan, the funding of the Liquidating Trust, Property Trust or the Environmental Response/Restoration Trust, or the collection, maintenance or expenditure of funds by the Liquidating Trust, the Property Trust, or the Environmental Response/Restoration Trust.

14.    *Distributions Free and Clear*

Except as otherwise provided herein, any distributions under the Plan shall be free and clear of any Liens, Claims, and encumbrances, and no other Entity, including the Debtors, the Liquidating Trust, or the Disbursing Agent, shall have any interest (legal, beneficial or otherwise) in property of the Estates distributed pursuant to the Plan.

15.    *Not Securities; Section 1145 Exemption*

Neither the rights of the Liquidating Trust Beneficiaries arising under the Plan nor the Class A Beneficial Interests, Class B Beneficial Interests, or Class C Beneficial Interests are intended to be "securities" under applicable laws, but the Plan Proponents do not represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If such rights constitute securities, the Plan Proponents intend for the exemption from registration provided by section 1145 of the Bankruptcy Code and under applicable securities laws to apply to their issuance under the Plan.

G.    *The Property Trust*

1.    *Creation, Funding, and Governance of the Property Trust*

To the extent any of the Properties are not sold or committed to be sold prior to the Effective Date, the Debtors shall establish the Property Trust on or prior to the Effective Date to hold such Properties.  On the Effective Date, (a) the Debtors will transfer to the Property Trust the PT Properties and PT Insurance Policies free and clear of any Liens, Claims, and encumbrances, and (b) the Liquidating Trust will fund the Property Trust with the PT Cash.  The

PT Cash shall be funded from proceeds of the Liquidating Trust Promissory Note.  From and after its formation, the Property Trust will be administered by the PT Trustee in accordance with the PT Agreement, the purpose of which shall be limited to (a) holding title to the PT Properties until such properties are remediated or otherwise disposed, (b) paying property and other taxes related to the PT Properties, (c) ensuring security of the PT Properties (including providing fencing, obtaining permits and licenses, removing snow and mowing, performing necessary repairs, and ensuring buoys are in place, among other similar administrative functions associated with holding the PT Properties), and (d) entering into agreements with OCC and other potentially responsible parties to provide access to the PT Properties for the purpose of conducting environmental remediation activities.  For the avoidance of doubt but subject to the terms of the PT Agreement, the Property Trust and the PT Trustee shall not have (i) the ability to assert any Cause of Action related to the PT Properties that arose prior to the Effective Date nor (ii) any responsibility to perform any environmental remediation at any site.

Notwithstanding the foregoing, if, on the Effective Date, any of the Properties cannot be transferred to the Property Trust or it is deemed impractical or inadvisable to do so, as determined by the PT Trustee, the Debtors shall retain such Properties (and the Liquidating Trust shall provide funding to preserve and maintain, but not perform any remediation for such properties) until such time as the Property Trust may receive such Properties or they are otherwise sold or transferred to a third party.

Any of the PT Properties transferred to the Property Trust may be sold or transferred. Any PT Property or proceeds thereof shall be administered at the discretion of the PT Trustee in accordance with the PT Agreement.  Any proceeds of the PT Assets in excess of the amounts needed to fund the Property Trust's limited purpose shall revert to the Liquidating Trust and be distributed in accordance with the Liquidating Trust Waterfall.  Neither the Debtors nor the Liquidating Trust shall have any reversionary or further interest in or with respect to any of the PT Assets.

The PT Agreement shall (a) be in form and substance consistent in all respects with the Plan, (b) be acceptable to the Plan Proponents, the Government Environmental Entities acting as lead agencies with respect to the PT Properties, and the Exit Lender, and (c) contain customary provisions for trust agreements utilized in comparable circumstances.  The powers, authority, responsibilities, and duties of the Property Trust and the PT Trustee will be set forth in and will be governed by the Plan, the Confirmation Order, and the PT Agreement.

In connection with the PT Assets, any attorney-client privilege, work-product privilege, joint interest privilege or other privilege or immunity attaching to any documents or communications (in any form, including, without limitation, written, electronic or oral) shall be transferred to and shall vest in the Property Trust. The Property Trust's receipt of such privileges associated with the PT Assets shall not operate as a waiver of those privileges possessed or retained by the Debtors or the Liquidating Trust, nor shall it operate to eliminate the rights of any co-defendant to any applicable joint privilege.

The PT Trustee shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the

event that the PT Trustee is otherwise so ordered, all costs and expenses of procuring any such bond or surety shall be paid with Cash derived from the PT Assets held by the Property Trust.

The beneficial interests to be issued to the PT Beneficiary under the Plan are not intended to be "securities" under applicable laws, but the Plan Proponents do not represent or warrant that such interests shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If such interests constitute securities, the Plan Proponents intend for the exemption from registration provided by section 1145 of the Bankruptcy Code and under applicable securities laws to apply to their issuance under the Plan.

2.      *Conflicting Terms*

To the extent that the terms of the Plan with respect to the Property Trust are inconsistent with the terms set forth in the PT Agreement, then the terms of the PT Agreement shall govern.

H.      *Environmental Response/Restoration Trust*

1.      *Creation, Funding, and Governance of the Environmental Response/Restoration Trust*

The Debtors will establish the Environmental Response/Restoration Trust prior to the Effective Date, and, on the Effective Date, the Liquidating Trust will transfer to the Environmental Response/Restoration Trust the ERRT Cash and the Class B Beneficial Interests, both of which shall be transferred free and clear of any Liens, Claims and encumbrances. From and after its formation, the Environmental Response/Restoration Trust will be administered by the ERRT Trustee in accordance with the ERRT Agreement, with the sole purpose of distributing funds pursuant to the ERRT Waterfall.

On the Effective Date, the Debtors shall have ceased performing environmental remediation work, and to the best of their ability shall have transferred such work to the applicable non-Debtor potentially responsible party or parties. For the avoidance of doubt but subject to the terms of the ERRT Agreement, the ERRT shall have no responsibility to perform environmental remediation at any site.

Neither the Debtors nor the Liquidating Trust shall have any reversionary or further interest in or with respect to any of the ERRT Assets.

The ERRT Agreement shall (a) be in form and substance consistent in all respects with the Plan, acceptable to the Plan Proponents, the Exit Lender, the Liquidating Trust Oversight Committee and the EPA, and (b) contain customary provisions for trust agreements utilized in comparable circumstances. The powers, authority, responsibilities, and duties of the Environmental Response/Restoration Trust and the ERRT Trustee will be set forth in and will be governed by the Plan, the Confirmation Order, and the ERRT Agreement.

In connection with the ERRT Assets, any attorney-client privilege, work-product privilege, joint interest privilege or other privilege or immunity attaching to any documents or communications (in any form, including, without limitation, written, electronic or oral) shall be

transferred to and shall vest in the Environmental Response/Restoration Trust. The Environmental Response/Restoration Trust's receipt of such privileges associated with the ERRT Assets shall not operate as a waiver of those privileges possessed or retained by the Debtors or the Liquidating Trust, nor shall it operate to eliminate the rights of any co-defendant to any applicable joint privilege.

The ERRT Trustee shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the ERRT Trustee is otherwise so ordered, all costs and expenses of procuring any such bond or surety shall be paid with Cash derived from the ERRT Assets held by the Environmental Response/Restoration Trust.

The ERRT Trustee may invest the ERRT Assets, subject to the guidelines established by the Liquidating Trust Oversight Committee, which guidelines shall be reasonably acceptable to the EPA.

2.    *ERRT Waterfall*

The Cash proceeds of the ERRT Assets shall be distributed in accordance with the following priority of use:

(a)    *first,* to the payment of the expenses of the Environmental Response/Restoration Trust;

(b)    *second*, $60 million to the United States to be allocated (i) 50% to the EPA to be paid to the EPA Diamond Alkali Special Account in accordance with instructions to be provided by the United States, and (ii) 50% to fund NRD restoration activities related to the Diamond Alkali Site, which shall be paid to the DOI Diamond Alkali Account or NOAA Diamond Alkali Account in accordance with instructions to be provided by the United States. The amount of Cash received by the United States with respect to the first $60 million (but not the total amount of the United States Class 5 Claim) shall be credited as a recovery by the United States with respect to the Diamond Alkali Site, which credit shall reduce the liability of non-Debtor potentially responsible parties at the Diamond Alkali Site by the amount of such credit. Monies paid into the EPA Diamond Alkali Special Account shall be retained and used to conduct or finance response actions at or in connection with the Diamond Alkali Site and to the extent all remediation and restoration is completed at the Diamond Alkali Site in the determination of the United States, any residual funds may be transferred to the Hazardous Substance Superfund. On the Effective Date, the Environmental Response/Restoration Trust will issue an irrevocable letter of direction to the Liquidating Trust directing the Liquidating Trust to make the first $60 million of distributions on account of the Class B Beneficial Interests (after providing for reasonable fees and expenses of the ERRT) directly to the EPA Diamond Alkali Special Account and the DOI Diamond Alkali Account or NOAA

Diamond Alkali Account as provided herein and in accordance with the written instructions to be provided by the United States.  For the EPA's internal accounting purposes only, the Cash received by the EPA shall be applied first to the EPA's pre-petition unreimbursed response costs of $42,609,903 in connection with the Diamond Alkali Site, as set forth in the United States EPA/NRD Trustees Claim, to the extent that such costs have not otherwise been fully reimbursed at such time; and

(c)     *thereafter*, (i) 90% to fund environmental remediation related activities at the Diamond Alkali Site in accordance with the Diamond Alkali Remediation Allocation;  and (ii) 10% to fund restoration activities related to NRDs at the Diamond Alkali Site.

3.      *Not Securities; Section 1145 Exemption*

The beneficial interests to be issued to the ERRT Beneficiary under the Plan are not intended to be "securities" under applicable laws, but the Plan Proponents do not represent or  warrant that such interests shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If such interests constitute securities, the Plan Proponents intend for the exemption from registration provided by section 1145 of the Bankruptcy Code and under applicable securities laws to apply to their issuance under the Plan.

4.      *Conflicting Terms*

To the extent that the terms of the Plan with respect to the Environmental Response/Restoration Trust are inconsistent with the terms set forth in the ERRT Agreement, then the terms of the ERRT Agreement shall govern.

I.      *Procedures for Resolving Disputed Claims*

1.      *Applicability*

The provisions of Article X of the Plan shall govern the resolution of Disputed Claims to the extent not otherwise provided for in the Plan or in any other trust agreement or plan of allocation approved under the Plan.  To the extent the provisions of any such trust agreement or plan of allocation address specifically matters set forth in Article X of the Plan, the provision of such trust agreement or plan of allocation shall govern.

2.      *Allowance of Claims*

On or after the Effective Date, the Liquidating Trust shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim (a) deemed Allowed as of the Effective Date or (b) waived, relinquished, exculpated, released, compromised, settled, or Allowed in the Plan or in a Final Order.  Except as otherwise provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed (i) under the Plan or the Bankruptcy Code or (ii) by Final Order of the Bankruptcy Court, including the Confirmation Order.

3.      *Prosecution of Objections to Claims*

On or after the Effective Date, the Liquidating Trust will have the exclusive authority to: (a) File, withdraw, or litigate to judgment, objections to Claims or Equity Interests; (b) settle or compromise (or decline to do any of the foregoing) any Disputed Claim or Cause of Action without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

4.      *Claims Estimation*

The Debtors, prior to the Effective Date, or the Liquidating Trust, following the Effective Date, may request that the Bankruptcy Court estimate any disputed, contingent, or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Debtors (prior to the Effective Date) or the Liquidating Trust (following the Effective Date) have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. Except as set forth below with respect to reconsideration under section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions.  If the estimated amount constitutes a maximum limitation on such Claim, the Liquidating Trust may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

5.      *Expungement or Adjustment of Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be marked as satisfied, adjusted or expunged (as applicable) on the Claims Register by the Claims and Noticing Agent at the direction of the Debtors or the Liquidating Trust, as applicable, without a Claims Objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court; <u>provided</u> that the Debtors or the Liquidating Trust, as applicable, shall provide 30 days' notice of any of the foregoing modifications to the Claims Register to the Holder of any affected Claim during which period the Holder may object thereto.

6.      *Deadline to File Claims Objections*

Any objections to Claims shall be Filed by no later than the applicable Claims Objection Deadline.

7.      *Disallowance of Claims*

Any Claims held by an Entity from which property is recoverable under sections 542, 543, or 550 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, by that Entity have been turned over or paid by such Entity to the Debtors or the Liquidating Trust.

**EXCEPT AS PROVIDED IN THE PLAN OR OTHERWISE AGREED BY THE DEBTORS OR THE LIQUIDATING TRUST, AS APPLICABLE, ANY AND ALL HOLDERS OF PROOFS OF CLAIM FILED AFTER THE APPLICABLE BAR DATE SHALL NOT BE TREATED AS CREDITORS FOR PURPOSES OF VOTING AND DISTRIBUTION PURSUANT TO BANKRUPTCY RULE 3003(c)(2) UNLESS ON OR BEFORE THE VOTING DEADLINE OR THE CONFIRMATION DATE, AS THE CASE MY BE, SUCH LATE PROOFS OF CLAIM ARE DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

8.      *Amendments to Claims*

On or after the Effective Date, a Claim may not be Filed or amended without prior authorization of the Bankruptcy Court or the Liquidating Trustee, as applicable, and any such new or amended Claim Filed without such prior authorization shall be deemed disallowed in full and expunged without any further action.

J.      *Release, Injunction, and Related Provisions*

1.      *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert or otherwise transfer to the Debtors, the Liquidating Trust, the Property Trust, or the Environmental Response/Restoration Trust, as applicable, and their respective successors and assigns.

2.    *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan take into account and conform to the respective priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Other than with respect to Claims that are Allowed pursuant to the terms of the Plan, pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right for the Debtors or the Liquidating Trustee, as applicable, to re-classify, upon approval by the Bankruptcy Court, any Claim or Equity Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

3.    *Debtor Release; Covenant Not to Sue*

**ON THE EFFECTIVE DATE OF THE PLAN AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY WILL BE EXPRESSLY, UNCONDITIONALLY, GENERALLY AND INDIVIDUALLY AND COLLECTIVELY RELEASED, ACQUITTED AND DISCHARGED BY THE DEBTORS ON BEHALF OF THEMSELVES AND THEIR ESTATES (SUCH THAT THE DEBTORS, THE LIQUIDATING TRUST, THE PROPERTY TRUST AND THE ENVIRONMENTAL RESPONSE/RESTORATION TRUST  WILL NOT HOLD ANY CLAIMS OR CAUSES OF ACTION RELEASED PURSUANT TO ARTICLE XI OF THE PLAN), FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, FROM ANY AND ALL ACTIONS, CLAIMS, DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, ANY OF THE DEBTORS' PRESENT OR FORMER ASSETS, THE RELEASED PARTIES' INTERESTS IN OR MANAGEMENT OF THE DEBTORS, THE PLAN, THE DISCLOSURE STATEMENT, THE CHAPTER 11 CASES, OR ANY RESTRUCTURING OF CLAIMS OR EQUITY INTERESTS UNDERTAKEN PRIOR TO THE EFFECTIVE DATE, INCLUDING THOSE THAT THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT OR THAT ANY HOLDER OF A CLAIM AGAINST OR EQUITY INTEREST IN THE DEBTORS OR ANY OTHER ENTITY COULD HAVE BEEN LEGALLY ENTITLED TO ASSERT DERIVATIVELY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES; PROVIDED, HOWEVER, THAT THE FOREGOING "DEBTOR RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS OR CAUSES OF ACTION OF THE DEBTORS OR THEIR CHAPTER 11 ESTATES**

**AGAINST A RELEASED PARTY (1) FOR ACTS OR OMISSIONS WHICH CONSTITUTE FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE AS DETERMINED BY FINAL ORDER OR (2) ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO THE DEBTORS THAT IS ENTERED INTO OR ASSUMED PURSUANT TO THE PLAN, OR THAT SUCH RELEASED PARTY IS OTHERWISE REQUIRED TO PERFORM PURSUANT TO ARTICLE V.F. OF THE PLAN; PROVIDED FURTHER, THAT THE FOREGOING "DEBTOR RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY PRESERVED CONTRIBUTION CLAIMS AGAINST THE RELEASED PARTIES AND SHALL NOT BE OFFERED OR ADMITTED INTO EVIDENCE IN ANY SUBSEQUENT PROCEEDING AS AN ADMISSION OF ANY FACT IN ANY LITIGATION AGAINST ANY PARTY (INCLUDING AGAINST ANY OF THE YPF ENTITIES OR THE REPSOL ENTITIES OR IN ANY LITIGATION OF THE PRESERVED CONTRIBUTION CLAIMS).**

**ON THE EFFECTIVE DATE OF THE PLAN AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, EACH OF THE DEBTORS, ON BEHALF OF THEMSELVES AND THEIR ESTATES, AND THE LIQUIDATING TRUST SHALL COVENANT AND AGREE NOT TO ASSERT ANY CLAIM, CAUSE OF ACTION, OR SUIT AGAINST JOSÉ DANIEL RICO, SEBASTIAN SÁNCHEZ TROLLIET, OR ROBERTO FERNANDO SEGOVIA INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, ANY OF THE DEBTORS' PRESENT OR FORMER ASSETS, JOSÉ DANIEL RICO'S, SEBASTIAN SÁNCHEZ TROLLIET'S, OR ROBERTO FERNANDO SEGOVIA'S INTERESTS IN OR MANAGEMENT OF THE DEBTORS, THE PLAN, THE DISCLOSURE STATEMENT, THE CHAPTER 11 CASES, OR ANY RESTRUCTURING OF CLAIMS OR EQUITY INTERESTS UNDERTAKEN PRIOR TO THE EFFECTIVE DATE, INCLUDING THOSE THAT THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT OR THAT ANY HOLDER OF A CLAIM AGAINST OR EQUITY INTEREST IN THE DEBTORS OR ANY OTHER ENTITY COULD HAVE BEEN LEGALLY ENTITLED TO ASSERT DERIVATIVELY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES; PROVIDED, HOWEVER, THAT THE FOREGOING "COVENANT NOT TO SUE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS, CAUSES OF ACTION OR SUITS OF THE DEBTORS OR THEIR CHAPTER 11 ESTATES AGAINST JOSÉ DANIEL RICO, SEBASTIAN SÁNCHEZ TROLLIET, OR ROBERTO FERNANDO SEGOVIA (1) FOR ACTS OR OMISSIONS WHICH CONSTITUTE FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE AS DETERMINED BY FINAL ORDER OR (2) ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO THE DEBTORS THAT IS ENTERED INTO OR ASSUMED PURSUANT TO THE PLAN, OR THAT ANY OF JOSÉ DANIEL RICO, SEBASTIAN SÁNCHEZ TROLLIET, OR ROBERTO FERNANDO SEGOVIA IS OTHERWISE REQUIRED TO**

PERFORM PURSUANT TO ARTICLE V.F. OF THE PLAN; PROVIDED FURTHER, THAT THE FOREGOING "COVENANT NOT TO SUE" SHALL NOT BE OFFERED OR ADMITTED INTO EVIDENCE IN ANY SUBSEQUENT PROCEEDING AS AN ADMISSION OF ANY FACT IN ANY LITIGATION AGAINST ANY PARTY (INCLUDING AGAINST ANY OF THE YPF ENTITIES OR THE REPSOL ENTITIES OR IN ANY LITIGATION OF THE PRESERVED CONTRIBUTION CLAIMS).

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE AND COVENANT NOT TO SUE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE AND COVENANT NOT TO SUE ARE: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES AND JOSÉ DANIEL RICO, SEBASTIAN SÁNCHEZ TROLLIET, AND ROBERTO FERNANDO SEGOVIA; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE AND THE CLAIMS THE DEBTORS HAVE AGREED NOT TO PURSUE UNDER THE COVENANT NOT TO SUE; (3) IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR AGAINST ANY OF THE DEBTORS' ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE OR AGREED NOT TO PURSUE PURSUANT TO THE COVENANT NOT TO SUE.  EXCEPT AS OTHERWISE PROVIDED, FOR THE AVOIDANCE OF DOUBT, NOTHING CONTAINED IN THE PLAN IS INTENDED TO RELEASE PREPETITION CLAIMS HELD BY ANY CREDITOR OF THE DEBTORS AGAINST ANY OTHER CREDITOR OF THE DEBTORS, OR ANY INDIVIDUAL CLAIM OF ANY CREDITOR AGAINST ANY RELEASED PARTY.

4.  *Exculpation*

EXCEPT AS OTHERWISE PROVIDED BY THE PLAN OR THE CONFIRMATION ORDER, ON THE EFFECTIVE DATE, THE DEBTORS, THE CREDITORS' COMMITTEE, THE RETIREE COMMITTEE, OCC, CPG, MALLINCKRODT LLC, BROWN AND CALDWELL, INC., AND EACH OF THE FOREGOING'S CURRENT OR FORMER DIRECTORS, OFFICERS, EMPLOYEES, ADVISORS, ATTORNEYS, PROFESSIONALS, AND AGENTS, AND EACH OF THEIR MEMBERS (EACH, AN "<u>EXCULPATED PARTY</u>," AND COLLECTIVELY, THE "<u>EXCULPATED PARTIES</u>"), SHALL BE DEEMED RELEASED BY EACH OF THEM AGAINST THE OTHER, AND BY ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS, OF AND FROM ANY CLAIMS, OBLIGATIONS, RIGHTS, CAUSES OF ACTION AND LIABILITIES FOR ANY ACT OR OMISSION IN CONNECTION WITH, OR ARISING OUT OF, THE CHAPTER 11 CASES, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION OR

APPROVAL OF THE PLAN OR ANY COMPROMISES OR SETTLEMENTS CONTAINED THEREIN, THE DISCLOSURE STATEMENT, OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT PROVIDED FOR OR CONTEMPLATED IN CONNECTION WITH THE CONSUMMATION OF THE TRANSACTIONS SET FORTH IN THE PLAN, EXCEPT FOR ACTS OR OMISSIONS WHICH CONSTITUTE FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE AS DETERMINED BY FINAL ORDER; PROVIDED, HOWEVER, THAT NO YPF ENTITY SHALL BE AN EXCULPATED PARTY.  NOTHING HEREIN SHALL PREVENT ANY EXCULPATED PARTY FROM ASSERTING A DEFENSE TO ANY CLAIM OF FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE.

     5.    *Injunction*

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES, INCLUDING, BUT NOT LIMITED TO, THOSE THAT:  (1) HAVE BEEN RELEASED PURSUANT TO ARTICLE XI.C OF THE PLAN; (2) ARE AGAINST AN EXCULPATED PARTY; OR (3) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM:  (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST A RELEASED OR EXCULPATED PARTY ON ACCOUNT OF ANY CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE LIQUIDATING TRUST, THE PROPERTY TRUST, THE ENVIRONMENTAL RESPONSE/RESTORATION TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES;  (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE LIQUIDATING TRUST, THE PROPERTY TRUST, THE ENVIRONMENTAL RESPONSE/RESTORATION TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING, OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE LIQUIDATING TRUST, THE PROPERTY TRUST, THE ENVIRONMENTAL RESPONSE/RESTORATION TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED,

COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF OR SUBROGATION OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATES OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF OR SUBROGATION RIGHT PRIOR TO CONFIRMATION IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF OR SUBROGATION; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE LIQUIDATING TRUST, THE PROPERTY TRUST, THE ENVIRONMENTAL RESPONSE/RESTORATION TRUST, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED, OR COMPROMISED PURSUANT TO THE PLAN; <u>PROVIDED</u> THAT NOTHING CONTAINED IN THE PLAN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; <u>PROVIDED</u>, <u>FURTHER</u>, THAT NOTHING CONTAINED IN THE PLAN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.

NOTWITHSTANDING ANYTHING IN THE PLAN, OR ANY ORDER CONFIRMING THE PLAN, NO CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION OR LIABILITIES WHATSOEVER AGAINST ANY ENTITY, EXCEPT THE DEBTORS, THE LIQUIDATING TRUST, THE ENVIRONMENTAL RESPONSE/RESTORATION TRUST, AND THE PROPERTY TRUST WITH RESPECT TO STATUTORY LIABILITIES ARISING UNDER ERISA CONCERNING THE PENSION PLANS SHALL BE RELEASED, EXCULPATED, DISCHARGED, ENJOINED, OR OTHERWISE AFFECTED BY THE PLAN, NOR SHALL THE ENTRY OF THE CONFIRMATION ORDER CONSTITUTE THE APPROVAL OF ANY RELEASE, EXCULPATION, DISCHARGE, INJUNCTION, OR OTHER IMPAIRMENT OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION OR LIABILITIES WHATSOEVER AGAINST ANY ENTITY, EXCEPT THE DEBTORS, THE LIQUIDATING TRUST, THE ENVIRONMENTAL RESPONSE/RESTORATION TRUST, AND THE PROPERTY TRUST WITH RESPECT TO STATUTORY LIABILITIES ARISING UNDER ERISA CONCERNING THE PENSION PLANS.

6.      *Compromise and Settlement of the Settled Claims*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan shall constitute a settlement between and among the Debtors, the Creditors' Committee, OCC, the CPG and the DOJ with respect to the allowance and treatment of the respective Claims of the EPA and the NRD Trustees, OCC, and the CPG; provided, however, that this settlement shall not constitute an admission of the Debtors' actual liability, or otherwise prejudice the rights of any Debtor with respect to any Cause of Action.  By agreeing to Allow the Claims of the EPA and the NRD Trustees, OCC, and the CPG as provided herein, the Debtors and their Estates can avoid costly estimation and related litigation regarding the amounts of such Claims, including the portion of such Claims that should be Allowed for future remediation costs and natural resource damages.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of this compromise and settlement, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors and the Estates, and is fair, equitable, and reasonable.

7.      *Exclusions*

For the avoidance of doubt, and unless otherwise explicitly provided herein, neither the Plan, the creation of the Liquidating Trust, the Property Trust or the Environmental Response/Restoration Trust (including any of their respective rules, regulations, actions or distributions), nor the classification or treatment of any Claim or Equity Interest under the Plan shall: (i) create, affect, abrogate or restrict any rights or defenses of any Creditor or party in interest to bring any claims against any other Creditor or party in interest for cost recovery or contribution for response costs or NRD claims under CERCLA or state law for amounts incurred and paid with regard to the Diamond Alkali Site (other than any amounts received pursuant to the Plan, Liquidating Trust Waterfall or ERRT Waterfall) and such rights are specifically preserved; provided, however, that nothing in Article XI.G. of the Plan shall affect or impair any rights of the United States to bring any claims under CERCLA or other applicable law to recover response costs or NRD against any Persons (other than the Debtors, the Liquidating Trust, the Property Trust and the Environmental Response/Restoration Trust); (ii) modify the obligations of any Creditor or party in interest under or in connection with any order, consent decree or agreement involving a Governmental Unit, or (iii) affect the choice of law in any future litigation for cost recovery or contribution for response costs or NRD claims under CERCLA or other applicable law with regard to the Diamond Alkali Site.  Furthermore, to the fullest extent permitted by law, no findings of fact or conclusions of law entered in any adjudication of the Contribution Claims pursued by the Liquidating Trustee shall have precedential or preclusive effect against any Person that was not a party to such litigation.

8.      *Contribution Claims*

The Plan shall constitute (i) an offer by the Debtors to release all Contribution Claims other than the Preserved Contribution Claims; and (ii) as to any Person who is not the subject of a Preserved Contribution Claim, an offer by OCC to release its Claims, rights, and Causes of Action under CERCLA or other applicable law to recover from any Person who is not the subject of a Preserved Contribution Claim any portion of the itemized amounts included in the OCC

Class 4 Claim ("Itemized Amounts"). Such releases by the Debtors and OCC shall be conditioned upon any Person receiving such release (a "Released Person") entering into a written agreement to release the Debtors, OCC, and all other Released Persons from claims for contribution or cost recovery under or in connection with any Environmental Law for amounts itemized in that Person's Class 4 Claim or, in the case of a current or former CPG member, such member's share of the amounts itemized in the CPG Class 4 Claim; provided, however, such releases shall not reduce or affect the CPG's right to receive distributions on account of the CPG Class 4 Claim. All Itemized Amounts included in the OCC Class 4 Claim shall be deemed incurred and paid prior to the Petition Date. For the avoidance of doubt: (a) OCC's release shall be limited solely to claims to recover the Itemized Amounts, (b) OCC shall not be required to offer a release to any Person who is the subject of a Preserved Contribution Claim and (c) neither OCC nor any Released Person shall be required to release any of its Claims, rights, and Causes of Action under CERCLA or other applicable law on account of amounts paid or incurred after the Effective Date.

9.      *Governmental Units*

Nothing in the Plan discharges, releases, precludes or enjoins any police or regulatory liability of any Entity (other than to the extent provided to the Debtors, the Liquidating Trust, the Environmental Response/Restoration Trust, and the Property Trust) to any Governmental Unit including, without limitation, any police or regulatory liability to a Governmental Unit that such Entity would be subject to as the owner or operator of property after the Confirmation Date. Nothing in the Plan divests any tribunal of any jurisdiction it may have under police and regulatory law to interpret the Plan or to adjudicate any defense asserted under the Plan.

K.      *Conditions Precedent to Confirmation and Consummation of the Plan*

1.      *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation that the following conditions shall have been satisfied or waived as provided herein or pursuant to Article XII.C of the Plan:

(a)      The Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code;

(b)      The Confirmation Order shall be (a) in form and substance reasonably acceptable to the Plan Proponents and the Exit Lender, and (b) entered no later than May 31, 2017;

(c)      The Plan Supplement and any related documentation shall be reasonably acceptable to the Plan Proponents and the Exit Lender;

(d)      The Bankruptcy Court shall have entered an order approving a Modification Agreement or an order approving a proposed Modification Order; and

(e)      The Bankruptcy Court shall have determined that the plan satisfies all conditions to Confirmation under the Plan.

01:21813073.1

2.      *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived as provided herein or pursuant to Article XII.C of the Plan:

(a)      The Bankruptcy Court shall have entered the Confirmation Order, which shall have become a Final Order, and which shall grant final approval of the Plan and the injunctions, releases, and Exculpation contained therein;

(b)      All conditions to the effectiveness of the Liquidating Trust Facility, the Liquidating Trust Promissory Note, and the DIP Promissory Note shall have been satisfied;

(c)      If a Property Trust is required under Article VIII hereof, (i) the Property Trust shall have been established, and (ii) the PT Agreement shall be acceptable to the to the parties to the PT Agreement;

(d)      The Environmental Response/Restoration Trust shall have been established, and the ERRT Agreement shall be acceptable to the parties to the ERRT Agreement;

(e)      Subject to Article VI of the Plan, the Liquidating Trust Assets shall have been transferred to the Liquidating Trust;

(f)      The Debtors shall have advised any potentially responsible parties of the Debtors' inability to further perform remediation at the sites on which they perform remediation activities and have taken all reasonable steps within their control to effectuate a transfer of future environmental remediation responsibilities to other potentially responsible parties;

(g)      All material governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan, shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(h)      All other actions, documents, and agreements necessary to implement the Plan as of the Effective Date will have been delivered and all conditions precedent thereto will have been satisfied;

(i)      All Allowed General Unsecured Claims receiving Class A Beneficial Interests in the Liquidating Trust pursuant to the Plan shall not aggregate to more than $1 billion;

(j)      All Allowed General Unsecured Convenience Claims shall not aggregate to more than $1,000,000 (exclusive of any Retiree Claim Allowed under any Modification Order or Modification Agreement).

(k)      The YPF Claims shall not have been ruled Allowed Claims by Final Order of the Bankruptcy Court; and

(l)    The DIP Claim shall have been satisfied in accordance with Article II.A. of the Plan.

3.    *Waiver of Conditions*

The conditions to Confirmation and/or the Effective Date of the Plan set forth in Article XII of the Plan may be waived by the Debtors, with the consent of the Creditors' Committee and the Exit Lender, without notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.

4.    *Effect of Nonoccurrence of Conditions*

Each of the conditions to the Effective Date must be satisfied or duly waived, and the Effective Date must occur on or before July 1, 2017.  If the Effective Date has not occurred on or before July 1, 2017, then upon motion by the Debtors made as soon as practicable after July 1, 2017 and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the Filing of such motion to vacate, the Confirmation Order may not be vacated if the Effective Date occurs before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, including the release of Claims and termination of Equity Interests pursuant to the Plan and the assumptions, assignments or rejections of Executory Contracts, and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims, Equity Interests or Causes of Action; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer or undertaking of any sort by such Debtor or any other Entity.

L.    *Modification, Revocation, or Withdrawal of the Plan*

1.    *Modification and Amendments*

The Plan Proponents may amend, modify, or supplement the Plan pursuant to section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date; provided, however, that, if the Confirmation Order has not been entered or if the Confirmation Order has been entered and a stay of such order is in effect, the Plan Proponents may extend the deadline for the Effective Date of the Plan.

2.    *Effect of Confirmation on Modifications*

Pursuant to section 1127(a) of the Bankruptcy Code, entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

3.    *Revocation or Withdrawal of the Plan*

The Plan Proponents reserve the right, with the consent of the Exit Lender, to revoke or withdraw the Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan(s).  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur,

then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (c) nothing contained in the Plan shall constitute a waiver or release of any Claims or Equity Interests or prejudice in any manner the rights of the Debtors, the Creditors' Committee or any other Entity, or constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

M.    *Retention of Jurisdiction*

(1)    Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, to the fullest extent permitted by law, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction:

(2)    to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured, or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

(3)    to determine, adjudicate, or decide any other applications, adversary proceedings, contested matters, and any other matters pending on the Effective Date;

(4)    to hear and determine any matter, case, controversy, suit, dispute, or Causes of Action regarding the existence, nature, and scope of the releases, injunctions, and Exculpation provided under the Plan, and to enter such orders as may be necessary or appropriate to implement such releases, injunctions, Exculpation, and other provisions;

(5)    to ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(6)    to hear and determine matters relating to insurance claims and settlements regarding insurance;

(7)    to resolve disputes as to the ownership of any Claim or Equity Interest;

(8)    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, reversed, modified, or vacated;

(9)    to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(10)     to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(11)     to hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan;

(12)     to hear and determine any matters relating to the Liquidating Trust, the Property Trust or the Environmental Response/Restoration Trust, including to hear and determine any actions brought against the Liquidating Trustee, the Liquidating Trust Oversight Committee, the PT Trustee or the ERRT Trustee in connection with the Plan, including any action or other dispute relating to distributions under the Plan, provided, that if the Plan does not become effective, nothing herein shall be deemed to transfer the venue or jurisdiction over any underlying litigation to the Bankruptcy Court;

(13)     to hear and determine any issue for which the Plan requires a Final Order of the Bankruptcy Court;

(14)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(15)     to hear and determine all matters related to applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(16)     to resolve any matters related to (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable, and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; and (ii) any dispute regarding whether a contract or lease is or was executory or expired;

(17)     to hear and determine any Causes of Action preserved under the Plan (including the YPF Causes of Action, the Repsol Causes of Action, and the Preserved Contribution Claims);

(18)     to enter a final decree closing any of the Chapter 11 Cases;

(19)     to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with Consummation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(20)     to enforce all orders previously entered by the Bankruptcy Court; and

(21)     to hear any other matter not inconsistent with the Bankruptcy Code.

N.    *Miscellaneous Provisions*

1.    *Immediate Binding Effect*

Subject to Article XII of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Liquidating Trust, the Property Trust, the Environmental Response/Restoration Trust, and any and all Holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with any Debtor.

Notwithstanding anything in Bankruptcy Rule 3020(e) to the contrary, (a) the entry of the Confirmation Order shall constitute a Final Order, and (b) the Confirmation Order shall take effect immediately upon its entry and the Debtors are authorized to consummate the Plan immediately after entry of the Confirmation Order and the satisfaction or waiver of all other conditions to the Effective Date of the Plan, in accordance with the terms of the Plan.

2.    *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court any and all agreements and other documents that may be necessary or appropriate in order to effectuate and further evidence the terms and conditions of the Plan.

3.    *Payment of Statutory Fees*

After the Effective Date, the Liquidating Trustee, on behalf of each of the Debtors, shall (a) pay all the respective fees arising under 28 U.S.C. § 1930, together with interest, if any, pursuant to 31 U.S.C. § 3717, until the earliest to occur of the entry of (i) a final decree closing such Debtor's Chapter 11 Case, (ii) a Final Order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (iii) a Final Order dismissing such Debtor's Chapter 11 Case, and (b) be responsible for the filing of consolidated post-confirmation quarterly status reports with the Bankruptcy Court in accordance with the Local Bankruptcy Rules, which status reports shall include reports on the disbursements made by each of the Debtors.

4.    *Dissolution of the Creditors' Committee and Retiree Committee*

On the Effective Date, the Creditors' Committee and the Retiree Committee shall dissolve; provided, however, that following the Effective Date, the Creditors' Committee and the Retiree Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (a) Claims and/or applications for compensation by Professionals and requests for allowance of Administrative Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; (b) any appeals to which the Creditors' Committee or the Retiree Committee are a party; (c) any adversary proceedings or contested matters as of the Effective Date to which the Creditors' Committee or the Retiree Committee are a party; and

(d) responding to creditor inquiries for one-hundred-twenty (120) days following the Effective Date. Upon the dissolution of the Creditors' Committee and the Retiree Committee, the current and former members of the Creditors' Committee and the Retiree Committee, and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's and the Retiree Committee's respective attorneys, accountants and other agents shall terminate, except that the Creditors' Committee, the Retiree Committee, and their respective Professionals shall have the right to pursue, review and object to any applications for compensation or reimbursement of expenses filed in accordance with Article II of the Plan.

5.      *Access to Debtors' Records after Effective Date*

On the Effective Date, (a) the Debtors shall be deemed to have transferred, assigned and conveyed to the Liquidating Trust, and the Liquidating Trust shall be authorized to take possession of, the Liquidating Trust Books and Records, and (b) the Debtors shall be deemed to have transferred, assigned and conveyed to the Property Trust, and the Property Trust shall be authorized to take possession of, the PT Books and Records. To the extent the PT Trustee or ERRT Trustee requires access to any of the Liquidating Trust Books and Records in order to fulfill its duties, obligations and purpose in accordance with the PT Agreement or the ERRT Agreement, respectively, the Liquidating Trustee shall provide copies of such books and records or coordinate with the PT Trustee or ERRT Trustee, as applicable, to develop a document sharing, retention, and maintenance policy with respect to such documents on terms and conditions agreed upon by the Liquidating Trustee, the PT Trustee, and the ERRT Trustee, as applicable.

The Liquidating Trust and the Property Trust shall have the responsibility of storing and maintaining the Liquidating Trust Books and Records and the PT Books and Records, as applicable. The Debtors shall cooperate with the Liquidating Trustee and the PT Trustee to facilitate the delivery and storage of their books and records in accordance herewith. For the purpose of this Section, books and records include computer generated or computer maintained books and records and computerized data, as well as electronically generated or maintained books and records or data, along with books and records of the Debtors maintained by or in possession of third parties, and all of the claims and rights of the Debtors in and to books and records, wherever located.

If and when the Liquidating Trust or the Property Trust determines to dispose of the Liquidating Trust Books and Records or the PT Books and Records, as applicable, it shall do so upon motion to the Bankruptcy Court on notice to all parties in interest.

6.      *Substantial Consummation*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

7.    *Reservation of Rights*

Except as otherwise provided in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

8.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

9.    *Service of Documents*

All notices, requests and demands hereunder to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered by mail or courier, addressed as follows:

(a)    if to the Debtors, to Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, Attn: Jennifer L. Marines and Jordan A. Wishnew, with copies to Young Conaway Stargatt & Taylor LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: M. Blake Cleary and Joseph M. Barry;

(b)    if to the Liquidating Trust, as provided in the Liquidating Trust Agreement for notices to the Liquidating Trust;

(c)    if to the Property Trust, as provided in the PT Agreement for notices to the Property Trust;

(d)    if to the Environmental Response/Restoration Trust, as provided in the ERRT Agreement for notices to the Environmental Response/Restoration Trust;

(e)    if to the Creditors' Committee, to Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York, 10022, Attn: Adam Harris and Lucy Kweskin, with copies to Cole Schotz, P.C., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, Attn: Norman Pernick and J. Kate Stickles;

(f)    if to OCC,  the DIP Lender or the Exit Lender, to White & Case LLP, 1221 Avenue of the Americas, New York, New York 10020, Attn:  J. Christopher Shore and Harrison L. Denman, with copies to Richards, Layton & Finger, P.A., One Rodney Square, 920 North King St., Suite 200, Wilmington, DE 19801, Attn: Mark D. Collins and Michael J. Merchant;

(g)    if to the YPF Entities, to Chadbourne & Parke LLP, 1301 Avenue of the Americas, New York, New York, 10019, Attn: Howard Seife, Samuel S. Kohn,

and Francisco Vazquez, with copies to Landis Rath & Cobb LLP, 919 Market St. – Suite 1800, Wilmington, Delaware 19801, Attn: Adam G. Landis and Matthew B. McGuire;

(h)    if to the Retiree Committee, to Akin Gump Strauss Hauer & Feld LLP, 1700 Pacific Avenue, Suite 4100, Dallas, Texas 75201-4624, Attn: Charles Gibbs, Eric Seitz, and Eric Haitz, with copies to Ashby & Geddes, P.A., 500 Delaware Avenue, 8th Fl., P.O. Box 1150, Wilmington, Delaware 19899-1150, Attn: William Bowden; and

**(i)**    if to the U.S. Trustee, to the Office of the United States Trustee, J. Caleb Boggs Federal Building, Room 2207, 844 North King Street, Wilmington, Delaware 19801, Attn: David L. Buchbinder and Linda J. Casey.

After the Effective Date, the Liquidating Trust has authority to send a notice to any Entity that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, it must File a renewed request to receive documents with the Bankruptcy Court. After the Effective Date, the Liquidating Trust is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

10.    *Further Assurances*

The Debtors, the Liquidating Trust, the Property Trust, the Environmental Response/Restoration Trust, all Holders of Claims receiving distributions pursuant to the Plan, and all other Entities, as applicable, shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

11.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan and the Confirmation Order shall remain in full force and effect in accordance with their terms.

12.    *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

13.    *Exhibits and Related Documents*

All exhibits and documents Filed in relation to the Plan are incorporated into and are a part of the Plan as if set forth in full in the Plan. After any exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Liquidating

Trust's counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website, https://cases.primeclerk.com/maxus, or the Bankruptcy Court's website, http://www.deb.uscourts.gov (a PACER login and password are required to access documents on the Bankruptcy Court's website).

14.    *Severability of Plan Provisions*

Except as otherwise provided herein, if, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Plan Proponents' and the Exit Lender's consent; and (c) nonseverable and mutually dependent.

15.    *Waiver or Estoppel Conflicts*

Each Holder of a Claim or Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, or as secured, or should not be subordinated, by virtue of an agreement made with the Debtors, or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

16.    *Conflicts*

Except as set forth in the Plan or unless otherwise ordered by the Bankruptcy Court, to the extent that the Disclosure Statement, any order of the Bankruptcy Court (other than the Confirmation Order), or any exhibit to the Plan or document executed or delivered in connection with the Plan is inconsistent with the terms of the Plan, the terms of the Plan shall control.

# ARTICLE VI.

## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the confirmation process. Holders of Claims and Equity Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in this Disclosure Statement.

A.    *Confirmation Hearing*

**The Bankruptcy Court has scheduled the Confirmation Hearing for May 22, 2017, at 10:00 a.m. prevailing Eastern Time, and, as necessary, May 23, 25, and 26, 2017 (commencing each day at 10:00 a.m. prevailing Eastern Time).**  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the Filing of a notice of such adjournment served in accordance with the Disclosure Statement Order.   Any objection to confirmation of the Plan must (a) be in writing, (b) comply with the Bankruptcy Rules and the Local Rules, (c) set forth the name of the objector and the nature and amount of any Claim or Equity Interest asserted by the objector against or in the Debtors, and (d) state with particularity the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan that would resolve such objection.   Any such objection must be Filed with the Bankruptcy Court and served on the following notice parties so that it is **actually received** on or before the Confirmation Objection Deadline.  **Unless an objection to the Plan is timely served and Filed, it may not be considered by the Bankruptcy Court**.

| *Counsel to the Debtors* | |
|---|---|
| **Morrison & Foerster LLP**<br>250 West 55th Street<br>New York, New York 10019<br>James M. Peck, Esq.<br>Lorenzo Marinuzzi, Esq.<br>Jennifer L. Marines, Esq.<br>Jordan A. Wishnew, Esq. | **Young Conaway Stargatt &**<br>**Taylor, LLP**<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801<br>M. Blake Cleary, Esq.<br>Joseph M. Barry, Esq.<br>Justin P. Duda, Esq.<br>Travis G. Buchanan, Esq. |
| *Counsel to the Creditors' Committee* | |
| **Schulte Roth & Zabel LLP**<br>919 Third Avenue<br>New York, New York 10022<br>Adam C. Harris, Esq.<br>Lucy F. Kweskin, Esq. | **Cole Schotz P.C.**<br>500 Delaware Avenue, Suite 1410<br>Wilmington, Delaware 19801<br>Norman L. Pernick, Esq.<br>J. Kate Stickles, Esq. |

| Counsel to the OCC DIP Lender | |
|---|---|
| **White & Case LLP**<br>1221 Avenue of the Americas<br>New York, New York 10020<br>J. Christopher Shore, Esq.<br>Harrison L. Denman, Esq. | **Richards, Layton & Finger, P.A.**<br>One Rodney Square<br>920 North King St., Suite 200<br>Wilmington, Delaware 19801<br>Mark D. Collins, Esq.<br>Michel J. Merchant, Esq. |

| Counsel to the YPF Entities | | |
|---|---|---|
| **Chadbourne & Parke LLP**<br>1301 Avenue of the Americas<br>New York, NY 10019<br>Howard Seife, Esq.<br>Samuel S. Kohn, Esq.<br>Francisco Vazquez, Esq. | **Landis Rath & Cobb LLP**<br>919 Market Street, Suite 1800<br>Wilmington, DE 19801<br>Adam Landis, Esq.<br>Matthew B. McGuire, Esq. | **Cravath, Swaine & Moore LLP**<br>825 Eighth Avenue<br>New York, NY 10019<br>Paul H. Zumbro<br>Omid H. Nasab |

| Counsel to the Retiree Committee | |
|---|---|
| **Akin Gump Strauss Hauer & Feld LLP**<br>1700 Pacific Avenue, Suite 4100<br>Dallas, Texas 75201-4624<br>Charles Gibbs, Esq.<br>Eric Seitz, Esq.<br>Eric Haitz, Esq. | **Ashby & Geddes, P.A.**<br>500 Delaware Avenue, 8th Fl.<br>P.O. Box 1150<br>Wilmington, Delaware 19899-1150<br>William Bowden, Esq. |

| U.S. Trustee |
|---|
| United States Department of Justice<br>Office of the United States Trustee<br>J. Caleb Boggs Federal Building<br>844 King Street, Suite 2207<br>Wilmington, Delaware 19801<br>Linda J. Casey, Esq.<br>David Buchbinder, Esq. |

B.    *Confirmation Standards*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Plan Proponents believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code. Specifically, the Plan Proponents believe that the Plan

satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

1.    *Feasibility*

The Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor unless contemplated by the plan.

The Plan provides for the liquidation and distribution of the Debtors' assets. Accordingly, the Plan Proponents believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

2.    *Best Interests of Creditors*

Notwithstanding acceptance of the Plan by a voting Impaired Class, to confirm the Plan, the Bankruptcy Court must still independently determine that the Plan is in the best interests of each Holder of a Claim or Equity Interest in any such Impaired Class that has not voted to accept the Plan, meaning that the Plan provides each such Holder with a recovery that has a value at least equal to the value of the recovery that each such Holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.  Accordingly, if an Impaired Class does not unanimously vote to accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Equity Interest that has a value, as of the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtors were liquidated under chapter 7.

The Plan Proponents believe that the Plan satisfies the best interests test because, among other things, the recoveries expected to be available to Holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a hypothetical chapter 7 liquidation, as discussed more fully below.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established under the Bankruptcy Code.  Generally, secured creditors are paid first from the proceeds of sales of their collateral.  If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are paid next.  Unsecured creditors are paid from any remaining liquidation proceeds, according to their respective priorities.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority.  Finally, interest holders receive the balance that remains, if any, after all creditors are paid in full.

Substantially all of the Debtors' assets will either have been liquidated during the Chapter 11 Cases or will be liquidated by the Liquidating Trust pursuant to the Plan.  Although the Plan effects a liquidation of the Debtors' assets and a chapter 7 liquidation would achieve the same goal, the Plan Proponents believe that the Plan provides a greater recovery to Holders of Allowed General Unsecured Claims than would a chapter 7 liquidation.  Liquidating the Debtors' Estates

under the Plan provides Holders of Allowed General Unsecured Claims with a larger, more timely recovery in part because of the expenses that would be incurred in a chapter 7 liquidation, including the potential added time (thereby reducing the present value of any recovery for Holders) and expense incurred by a chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors and the Chapter 11 Cases, as well as the fees of a chapter 7 trustee under section 326(a) of the Bankruptcy Code. Moreover, the conversion to chapter 7 would require entry of a new bar date. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately Filed and Allowed against the Debtors could materially increase, thereby reducing the estimated creditor recoveries.

The information contained in the Liquidation Analysis attached as **Exhibit D** hereto provides a summary of the recoveries under the Plan and in a chapter 7 liquidation. In sum, the Plan Proponents believe that a chapter 7 liquidation would result in diminution in recoveries to be realized by Holders of Claims, as compared to the proposed distributions under the Plan. Consequently, the Plan Proponents believe that the Plan will provide a greater ultimate return to Holders of Claims than would a chapter 7 liquidation of the Debtors.

C.    *Acceptance by Impaired Classes*

The Bankruptcy Code requires, as a condition to Confirmation, that except as described in the following section, each class of claims or equity interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Pursuant to section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" under a plan unless, with respect to each claim or interest of such class, the plan:  (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (2) cures any default, reinstates the maturity of such claim or interest as such maturity existed before such default, and compensates the holder of such claim or interest for any damages incurred.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan. Thus, a Class of creditor Claims will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their Ballots in favor of acceptance, subject to Article III of the Plan. Only Holders of Claims in the Voting Classes will be entitled to vote on the Plan.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of interests as acceptance by holders of at least two-thirds (2/3) in dollar amount of those interests who actually vote to accept or reject a plan. Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of interests. Thus, a Class of Equity Interests will have voted to accept the Plan only if two-thirds (2/3) in amount actually voting cast their Ballots in favor of acceptance, not counting designated votes, subject to Article III of the Plan. No Class including Holders of Equity Interests is entitled to vote on the Plan.

D.    *Confirmation Without Acceptance by All Impaired Classes*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if Impaired Classes entitled to vote on the plan have not accepted it or if an Impaired Class is deemed to reject the Plan, <u>provided</u> that the plan is accepted by at least one Impaired Class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of a plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

1.    *No Unfair Discrimination*

This test applies to Classes of Claims or Equity Interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of Classes of Claims of equal rank (*e.g.*, classes of the same legal character).  The Plan Proponents do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Plan Proponents believe that the Plan and the treatment of all Classes of Claims and Equity Interests satisfy the foregoing requirements for nonconsensual Confirmation.

2.    *Fair and Equitable Test*

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the non-accepting class, the test sets different standards depending on the type of claims or interests in such class.  As set forth below, the Plan Proponents believe that the Plan satisfies the "fair and equitable" requirement because there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such dissenting Class that will receive or retain any property on account of the Claims or Equity Interests in such Class.

a.    *Secured Claims*

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

b.    *Unsecured Claims*

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of

such class receives or retains on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

      c.     *Equity Interests*

The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirement that either: (i) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (A) the allowed amount of any fixed liquidation preference to which such holder is entitled; (B) any fixed redemption price to which such holder is entitled; or (C) the value of such interest; or (ii) if the class does not receive the amount as required under (i) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

## ARTICLE VII.

## CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING

Holders of Claims should read and carefully consider the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan. These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

A.    *Risk Factors that May Affect Recoveries Available to Holders of Allowed Claims Under the Plan*

    1.    *The Amount of Allowed Claims May Adversely Affect the Recovery of Some Holders of Allowed Claims*

The Plan Proponents cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed, and thus the projected recoveries disclosed in this Disclosure Statement are highly speculative. A large amount of Allowed Claims may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims and Allowed Equity Interests under the Plan. Some Holders are not entitled to any recovery pursuant to the terms of the Plan, and, depending on the accuracy of the Plan Proponents' various assumptions, even those Holders entitled to a recovery under the terms of the Plan may ultimately receive no recovery.

    2.    *The Plan Proponents Cannot State with Certainty What Recovery Will Be Available to Holders of Allowed Claims in the Voting Classes*

The Plan Proponents cannot know with certainty, at this time, the number or amount of Claims in Voting Classes that will ultimately be Allowed. Accordingly, because certain Claims

under the Plan will be paid on a pro rata basis, the Plan Proponents cannot state with certainty what recoveries will be available to Holders of Allowed Claims in the Voting Classes.

3.    *Any Valuation of Any Assets to Be Distributed Under the Plan Is Speculative and Could Potentially be Zero*

Any valuation of any of the assets to be distributed under the Plan is necessarily speculative, and the value of such assets could potentially be zero. Accordingly, the ultimate value, if any, of these assets could materially affect, among other things, recoveries to the Debtors' creditors, including Holders of Claims in the Voting Classes.

4.    *Holders of Class A Beneficial Interests and Class B Beneficial Interests Risk Receiving Nothing On Account of their Claims Because the Liquidating Trust May Not Recover on the YPF Causes of Action*

Under the Plan, the YPF Causes of Action will be contributed to the Liquidating Trust and the proceeds thereof, after paying certain administrative and financing costs, shall be distributed to the Holders of the Class A Beneficial Interests and the Holders of the Class B Beneficial Interests in accordance with the Liquidating Trust Waterfall. The Creditors' Committee believes that the damages recoverable on account of the Debtors' alter ego and fraudulent conveyance claims against YPF could be up to $12 billion. However, litigation with respect to any such Claims or Causes of Action (including Claims and Causes of Action based on an alter ego theory) could be complex, and could involve extensive, time-consuming and costly appeals, and possible retrials. There is a risk that the Liquidating Trust will not obtain a judgment against any of the YPF Entities or that any such judgment would be *de minimis*. Further, although certain of the YPF Entities may have significant resources, substantially all of those resources are located in Argentina. If the Liquidating Trust obtains a non-consensual judgment against any of the YPF Entities, collection on that judgment could prove to be time consuming, expensive, and uncertain. Accordingly, there is no guarantee that the Liquidating Trust will obtain a judgment against any of the YPF Entities, and in the event that a judgment is entered against any of the YPF Entities, there is no guarantee that the Liquidating Trust will successfully collect on any such judgment. If the Liquidating Trust cannot successfully recover on Claims and Causes of Action against the YPF Entities, or if the cost of litigating such Claims and Causes of Action exceeds any eventual recovery, the Holders of Allowed Claims will in turn be unable to recover value from the Liquidating Trust on account of such Claims and Causes of Action.

5.    *Holders of Class C Beneficial Interests Risk Receiving Nothing On Account of Such Interests Because the Liquidating Trust May Not Recover on the Preserved Contribution Claims*

Under the Plan, the Preserved Contribution Claims will be transferred to the Liquidating Trust, and the Liquidating Trustee will have full authority to make all decisions regarding whether to prosecute any Preserved Contribution Claim. The Preserved Contribution Claims are the only source of recovery for Holders of the Class C Beneficial Interests. The Debtors have, in their reasonable business judgment, decided not to waive the Preserved Contribution Claims as those represent the highest likelihood of recoveries. However, there is no guarantee that the

Liquidating Trustee will prosecute any of the Preserved Contribution Claims. Further, any litigation with respect to such Preserved Contribution Claims could be complex, and could involve extensive, time-consuming discovery and trials, costly appeals, and possible retrials as the allocation of responsibility for environmental liabilities is vigorously disputed. Thus, there is no guarantee that the Holders of Class C Beneficial Interests will receive a recovery on account of the Class C Beneficial Interests.

      6.      *The Plan Proponents Cannot Guarantee Recoveries or the Timing of Such Recoveries*

Although the Plan Proponents have made commercially reasonable efforts to disclose projected recoveries in this Disclosure Statement, it is possible that the amount of Allowed Claims will be materially higher than any range of possible Allowed Claims the Plan Proponents have considered to date, and thus creditor recoveries could be materially reduced or eliminated. In addition, the timing of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, the Plan Proponents cannot guarantee the timing of any recovery on an Allowed Claim.

      7.      *The Chapter 11 Cases May Convert to Chapter 7 if the Effective Date Has Not Occurred*

Pursuant to the terms of the OCC DIP Agreement, if the Effective Date has not occurred by July 1, 2017, the OCC DIP Lender can elect to accelerate the maturity of, and terminate the financing commitment available under, the OCC DIP Facility. If the foregoing were to occur, the Debtors will likely need to obtain alternative financing to (a) repay the OCC DIP Facility, and (b) continue funding the Chapter 11 Cases, or risk immediate conversion of the Chapter 11 Cases to a case(s) under chapter 7 of the Bankruptcy Code.

      8.      *Certain Tax Implications of the Debtors' Bankruptcies*

Holders of Allowed Claims should carefully review Article VIII of this Disclosure Statement, "Certain United States Federal Income Tax Consequences," for a description of certain tax implications of the Plan and the Chapter 11 Cases.

9.      *Tax Treatment of the Liquidating Trust*

Despite the discussion in Article VI of the Plan, the tax treatment of the Liquidating Trust as a grantor trust is uncertain.  Because the Liquidating Trust has multiple classes of interests, the Liquidating Trust could fail to be treated as a grantor trust and be treated as a partnership for U.S. federal income tax purposes.  If the interests in the Liquidating Trust are freely transferable, then the Liquidating Trust may be characterized for federal income tax purposes as a publicly traded partnership taxed as a corporation. However, it is anticipated that interests in the Liquidating Trust will not be transferable.  If the Liquidating Trust is taxed as a corporation, distributions available to the Liquidating Trust Beneficiaries could be substantially reduced.

B.      *Certain Bankruptcy Law Considerations*

The occurrence or nonoccurrence of any or all of the following contingencies, and any others, may affect distributions available to Holders of Allowed Claims and Allowed Equity Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1.      *Parties in Interest May Object to the Plan's Classification of Claims and Equity Interests or the Amount of Such Claims or Equity Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Plan Proponents believe that the classification of the Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Plan Proponents created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Furthermore, certain parties in interest, including the Debtors, reserve the right, under the Plan, to object to the amount or classification of any Claim.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is or may be subject to an objection or is not yet Allowed.  Any Holder of a Claim that is or may be subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

2.      *Failure to Satisfy Vote Requirements*

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Plan Proponents intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Plan Proponents may seek to pursue another strategy to wind down the Estates, such as an alternative chapter 11 plan, a dismissal of the Chapter 11 Cases and an out-of-court dissolution, an assignment for the benefit of creditors, a conversion to a chapter 7 case(s), or other strategies.  There can be no assurance that the terms of any such alternative strategies

would be similar or as favorable to the Holders of Allowed Claims and Allowed Equity Interests as those proposed in the Plan.

3.    *The Plan Proponents May Not Be Able to Secure Confirmation of the Plan*

The Plan Proponents will need to satisfy section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by a bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim or an Allowed Equity Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or the Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the Solicitation Procedures, and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Equity Interests will receive with respect to their Allowed Claims and Allowed Equity Interests.

The Plan Proponents, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan.  Such a less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

4.    *Nonconsensual Confirmation*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting class.  The Plan Proponents believe that the Plan satisfies these requirements and the Plan Proponents may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other

things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

5.    *Risk of Nonoccurrence of the Effective Date*

Although the Plan Proponents believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

6.    *Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan*

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Claims to be Allowed.  The occurrence of any and all such contingencies, which may affect distributions available to Holders of Allowed Claims and Allowed Equity Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

C.    *Disclosure Statement Disclaimer*

1.    *The Financial Information Contained in this Disclosure Statement Has Not Been Audited*

In preparing this Disclosure Statement, the Plan Proponents and their advisors relied on financial data derived from the Debtors' books and records that was available at the time of such preparation.  Although the Plan Proponents have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and although the Plan Proponents believe that such financial information fairly reflects the financial condition of the Debtors, the Plan Proponents are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

2.    *Information Contained in this Disclosure Statement Is for Soliciting Votes*

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3.    *This Disclosure Statement Was Not Reviewed or Approved by the United States Securities and Exchange Commission*

This Disclosure Statement was not Filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws.  Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement or the exhibits or the statements contained in this Disclosure Statement.

4. *This Disclosure Statement May Contain Forward Looking Statements*

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology. All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained herein is an estimate only, based upon information currently available to the Plan Proponents.

5. *No Legal or Tax Advice Is Provided to You by this Disclosure Statement*

**This Disclosure Statement is not legal advice to you**. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his, her, or its Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

6. *No Admissions Made*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors, the Creditors' Committee, OCC, or the YPF Entities) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Equity Interests, or any other parties in interest.

7. *Failure to Identify Projected Objections*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Liquidating Trustee may object to Claims or Equity Interests after Confirmation or the Effective Date of the Plan irrespective of whether this Disclosure Statement identifies objections to such Claims or Equity Interests.

8. *No Waiver of Right to Object or Right to Recover Transfers and Assets*

The vote by a Holder of a Claim or Equity Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Equity Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their Estates are specifically or generally identified in this Disclosure Statement.

01:21813073.1

9.      *Information Was Provided by the Debtors and Was Relied Upon by the Plan Proponents' Advisors*

The Plan Proponents' respective advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Plan Proponents' respective advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

10.      *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Plan Proponents as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Plan Proponents have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Plan Proponents nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Plan Proponents may subsequently update the information in this Disclosure Statement, the Plan Proponents have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11.      *No Representations Outside this Disclosure Statement are Authorized*

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to respective counsel the Debtors and the Creditors' Committee and the U.S. Trustee.

D.      *Liquidation Under Chapter 7*

If no plan can be confirmed, the Chapter 11 Cases may be converted to a case(s) under chapter 7 of the Bankruptcy Code, pursuant to which a chapter 7 trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.

## ARTICLE VIII.

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of implementation of the Plan to the Debtors and certain Holders of Claims.  This discussion is intended for general information purposes only, and is not a complete analysis of all potential U.S. federal income tax consequences that may be relevant to any particular Holder.

This discussion is based on the Internal Revenue Code of 1986, as amended (the "IRC") and the Treasury Regulations promulgated thereunder, judicial decisions and published administrative rulings, and pronouncements of the IRS, each as in effect on the date hereof. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the discussion set forth below with respect to the U.S. federal income tax consequences of the Plan.  Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences described herein.

Except as otherwise set forth herein, this discussion does not address the U.S. federal income tax consequences to Holders of Claims that (a) are Unimpaired or otherwise entitled to payment in full in Cash on the Effective Date, or (b) are otherwise not entitled to vote on the Plan.  Furthermore, this discussion does not address the U.S. federal income tax consequences with respect to the Property Trust, or the Environmental Response/Restoration Trust.  The discussion assumes that each Holder of a Claim holds only Claims in a single Class.

The U.S. federal income tax consequences of the Plan are complex and are subject to substantial uncertainties.  The discussion set forth below of certain U.S. federal income tax consequences of the Plan is not binding upon the IRS.  Thus, no assurance can be given that the IRS would not assert, or that a court would not sustain, a position different from any discussed herein, resulting in U.S. federal income tax consequences to the Debtors and/or Holders of Claims that are substantially different from those discussed herein.  The Plan Proponents have not requested an opinion of counsel with respect to any of the tax aspects of the Plan, and no opinion is given by this Disclosure Statement.

This discussion does not apply to a Holder of a Claim that is not a "United States person," as such term is defined in the IRC.  Moreover, this discussion does not address U.S. federal taxes other than income taxes, nor any state, local, U.S. possession, or non-U.S. tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to United States persons in light of their individual circumstances or to United States persons that may be subject to special tax rules, such as persons who are related to the Debtors within the meaning of the IRC, governments or governmental entities, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, real estate mortgage investment conduits, tax-exempt organizations, pass-through entities, beneficial owners of pass-through entities, Subchapter S corporations, employees of the Debtors, persons who received their Claims as compensation, persons that hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark to market method of accounting, and Holders of Claims that are themselves in bankruptcy.  If a partnership or entity treated as a partnership for U.S. federal income tax purposes holds Claims, the tax treatment of a partner generally will depend on the status of the partner and the activities of the partnership.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  THIS SUMMARY IS LIMITED TO THE U.S. FEDERAL INCOME TAX ISSUES ADDRESSED IN

THIS DISCLOSURE STATEMENT.  ADDITIONAL ISSUES MAY EXIST THAT ARE NOT ADDRESSED IN THIS SUMMARY AND THAT COULD AFFECT THE U.S. FEDERAL TAX TREATMENT OF CONSUMMATION OF THE PLAN.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, U.S. POSSESSION INCOME, NON-U.S. INCOME, ESTATE, GIFT, AND OTHER TAX CONSEQUENCES OF THE PLAN.

A.      *Certain United States Federal Income Tax Consequences to the Debtors*

For U.S. federal income tax purposes, the Debtors are members of a consolidated group of corporations of which the common parent, YPF Holdings, is a nondebtor.  The U.S. federal income tax consequences of the Plan to the Debtors should generally be reported and accounted for by YPF Holdings as the parent of the consolidated group.  The members of the consolidated group have not entered into a tax sharing agreement which governs the allocation and payment of tax liabilities of the members of the consolidated group.  Consequently, though there may be items of income – including income from cancellation of indebtedness –, gain, or loss generated as a result of transactions contemplated by the Plan, YPF Holdings will generally be responsible for paying any tax liability associated with these items.

B.      *Certain United States Federal Income Tax Consequences to Holders of Allowed Claims*

1.      *General*

The U.S. federal income tax consequences to a Holder receiving, or entitled to receive, a payment in partial or total satisfaction of a Claim will depend on a number of factors, including the nature of the Claim, the Holder's method of tax accounting, and its own particular tax situation.

Because the Holders' Claims and tax situations differ, Holders should consult their own tax advisors to determine how the Plan affects them for U.S. federal, state, local, and non-U.S. tax purposes, based on their particular tax situations.  Among other things, the U.S. federal income tax consequences of a payment to a Holder may depend initially on the nature of the original transaction pursuant to which the Claim arose.

The U.S. federal income tax consequences of a transfer to a Holder may also depend on whether the item to which the payment relates has previously been included in the Holder's gross income or has previously been subject to a loss or a worthless security or bad debt deduction. For example, if a payment is made in satisfaction of a receivable acquired in the ordinary course of a Holder's trade or business, the Holder had previously included the amount of such receivable payment in its gross income under its method of tax accounting, and had not previously claimed a loss or a worthless security or bad debt deduction for that amount, the receipt of the payment should not result in additional income to the Holder but may result in a loss.  Conversely, if the Holder had previously claimed a loss or worthless security or bad debt deduction with respect to the item previously included in income, the Holder generally would be required to include the amount of the payment in income.

A Holder receiving a payment pursuant to the Plan in satisfaction of its Claim generally may recognize taxable income or loss measured by the difference between (a) the amount of

Cash and the fair market value (if any) of any property received by the Holder, including, as discussed below, any beneficial interests in the Liquidating Trust, and (b) its adjusted tax basis in the Claim.  For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item.  The character of any income or loss that is recognized will depend upon a number of factors, including the status of the Holder, the nature of the Claim in the Holder's hands, whether the Claim was purchased at a discount, whether and to what extent the Holder has previously claimed a bad debt deduction with respect to the Claim, and the Holder's holding period of the Claim.  Each Holder of the Claim should consult its own tax advisor to determine the character of any gain or loss recognized by such Holder.  It is possible that any loss, or a portion of any gain, realized by a Holder of a Claim may have to be deferred until all of the distributions to such Holder are received.

As discussed below, each Holder of an Allowed Claim that receives a beneficial interest in the Liquidating Trust will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Liquidating Trust Assets, consistent with its economic rights in the trust.  Pursuant to the Plan, the Liquidating Trustee will value the assets transferred to the Liquidating Trust in good faith, and all parties to the Liquidating Trust (including Holders of Claims receiving beneficial interests in the Liquidating Trust) must consistently use such valuation for all U.S. federal income tax purposes.

2.    *Information Reporting and Backup Withholding*

In general, information reporting requirements may apply to distributions or payments under the Plan.  Additionally, under the backup withholding rules, a Holder of an Allowed Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding.  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded or credited against the Holder's U.S. federal income tax liability to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

The Debtors, or the Liquidating Trustee, or the applicable withholding agent, will withhold all amounts required by law to be withheld. The Debtors will comply with all applicable reporting requirements of the IRS.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL,**

**U.S. POSSESSION, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

C.      *Tax Treatment of the Liquidating Trust and Holders of Beneficial Interests*

1.      *Classification of the Liquidating Trust*

Because the Liquidating Trust, created pursuant to the Plan, has multiple classes of interests, the tax treatment of the Liquidating Trust is uncertain. It is possible that the Liquidating Trust could be treated as a partnership. If the interests in the Liquidating Trust are freely transferable, then the Liquidating Trust may be characterized as a publicly traded partnership for federal income tax purposes, in which case the Liquidating Trust would be taxed as a corporation. However, it is anticipated that interests in the Liquidating Trust will not be transferrable. Further, the Liquidating Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (i.e., all income and loss is taxed directly to the liquidating trust beneficiaries). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and Holders) will be required to treat, for U.S. federal income tax purposes, the Liquidating Trust as a grantor trust. The holders of beneficial interests in the Liquidating Trust are the owners and grantors of the Liquidating Trust. The following discussion assumes that the Liquidating Trust will be so respected for U.S. federal income tax purposes.

2.      *General Tax Reporting by the Liquidating Trust and Holders of Beneficial Interests*

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and Holders) must treat the transfer of the Liquidating Trust Assets to the Liquidating Trust in accordance with the terms of the Plan. Pursuant to the Plan, the Liquidating Trust Assets (other than assets allocable to Disputed Claims) are treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the Holders of the respective Claims receiving beneficial interests in the Liquidating Trust (with each Holder receiving an undivided interest in such assets in accordance with their economic interests in such assets), followed by the transfer by the holders of such assets to the Liquidating Trust in exchange for a beneficial interest in the Liquidating Trust. Accordingly, all parties must treat the Liquidating Trust as a grantor trust of which the holders of beneficial interests in the Liquidating Trust are the owners and grantors, and treat the holders of beneficial interests in the Liquidating Trust as the direct owners of an undivided interest in the Liquidating Trust Assets (other than any assets allocable to Disputed Claims), consistent with their economic interests therein, for all U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust among the Liquidating Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time)

if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all of its assets (valued at their tax book value) to the Liquidating Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of the Liquidating Trust Assets. All parties to the Liquidating Trust (including, without limitation, the Debtors and holders of beneficial interests) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

The U.S. federal income tax obligations of a holder with respect to its beneficial interest in the Liquidating Trust are not dependent on the Liquidating Trust distributing any Cash or other proceeds. Thus, a holder may incur a U.S. federal income tax liability with respect to its allocable share of Liquidating Trust income even if the Liquidating Trust does not make a concurrent distribution to the holder. In general, other than in respect of Cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a holder's Allowed Claim), a distribution of Cash by the Liquidating Trust will not be separately taxable to a holder of a beneficial interest in the Liquidating Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Liquidating Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash originally retained by the Liquidating Trust on account of Disputed Claims or undeliverable distributions.

The Disbursing Agent will comply with all applicable governmental withholding requirements (see section VII.H of the Plan). Thus, in the case of any holders of beneficial interests in the Liquidating Trust that are not U.S. persons, the Disbursing Agent may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate).

The Liquidating Trustee will file with the IRS tax returns for the Liquidating Trust consistent with its classification as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a). Except as discussed below with respect to any reserve for Disputed Claims, the Liquidating Trustee also will send annually to each holder of a beneficial interest in the Liquidating Trust a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

3.    *Treatment of the Distribution Reserve*

The Distribution Reserve is intended to be treated, for U.S. federal income tax purposes, as a disputed ownership fund within the meaning of Treasury Regulation Section 1.468B-9(b)(1). If so treated, any payment of Cash or distribution of a beneficial interest in the Liquidating Trust made out of the reserve should not be deemed to have been made to any recipient until, and to the extent that, the amount to which the recipient is entitled has been determined and distributed. At such time, the recipient (including the holders of any beneficial interests in the Liquidating Trust upon the disallowance of a Disputed Claim) will take such amount into account for U.S. federal income tax purposes as an amount received in respect of its Claim.    Upon the disallowance of a Disputed Claim, the Distribution Reserve will be treated as having distributed to holders of any beneficial interests in the Liquidating Trust the portion of the Liquidating Trust Assets allocable to such Disputed Claim.    Recipients of amounts from the Distribution Reserve should report these amounts consistently with the foregoing and should consult their tax advisors concerning the federal, state, local, and non-U.S. tax consequences of the receipt of amounts from the Distribution Reserve.

Upon the allowance or disallowance of a Disputed Claim, the Distribution Reserve generally will be treated as having sold or exchanged the portion of the Liquidating Trust Assets allocable to such Claim for purposes of IRC section 1001(a).    Amounts earned by the Distribution Reserve will generally be subject to an entity level tax on a current basis.    The Distribution Reserve will be taxed in a manner similar to either a corporation or a qualified settlement fund, depending on the type of assets transferred to it.    In general, in determining the Distribution Reserve's taxable income, (a) any amounts transferred to the Distribution Reserve would be excluded from its income, (b) any sale or exchange of property (including recoveries with respect to the Causes of Action) by the Distribution Reserve would result in the recognition of gain or loss equal to the difference between the amount received on such disposition and the Distribution Reserve's adjusted basis in such property and (c) any interest income or other earnings with respect to the Distribution Reserve's assets would be included in income.

**THE FOREGOING SUMMARY IS PROVIDED FOR GENERAL INFORMATIONAL PURPOSES ONLY.    HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING FEDERAL, STATE, LOCAL, U.S. POSSESSION, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN TO THEM.**

# ARTICLE IX.

## RECOMMENDATION OF THE DEBTORS AND THE CREDITORS' COMMITTEE

The Debtors and the Creditors' Committee believe that the Plan is in the best interests of all Holders of Claims against and Equity Interests in the Debtors, and urges all Holders of Claims against and Equity Interests in the Debtors entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Voting Agent by the Voting Deadline.

Dated: April 19, 2017
      New York, New York

Respectfully Submitted,

MAXUS ENERGY CORPORATION
for itself and its Debtor affiliates

By: */s/ Bradley I. Dietz*
Name: Bradley I. Dietz
Title: Independent Director


By: *Theodore P. Nikolis*
Name: Theodore P. Nikolis
Title: Independent Director


THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR MAXUS ENERGY CORPORATION, ET AL

By: */s/ Mike Anderson*
Name: Mike Anderson, solely in his individual capacity as Chairperson and not in his individual capacity
Title: Chairperson

Prepared by:

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
M. Blake Cleary (No. 3614)
Joseph M. Barry (No. 4221)
Justin P. Duda (No. 5478)
Travis G. Buchanan (No. 5595)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

- and -

**MORRISON & FOERSTER LLP**
James M. Peck
Lorenzo Marinuzzi
Jennifer L. Marines
Jordan A. Wishnew
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for Debtors and Debtors-in-Possession*

**COLE SCHOTZ P.C.**
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
500 Delaware Avenue
Suite 1410
Wilmington, DE 19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

- and -

**SCHULTE ROTH & ZABEL LLP**
Adam C. Harris
David M. Hillman
Lucy F. Kweskin
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile:  (212) 593-5955

*Counsel to the Official Committee of
Unsecured Creditors of Maxus Energy
Corporation, et al.*

# **EXHIBIT A**

Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, *et al.* and the Official Committee of Unsecured Creditors

# **EXHIBIT B**

Disclosure Statement Order

[TO BE INSERTED UPON ENTRY OF DISCLOSURE STATEMENT ORDER]

## **EXHIBIT C**

List of Properties

1. 80-120 Lister Avenue, Newark, New Jersey (1 master site consisting of 3 parcels)

2. 1015-1035 Belleville Turnpike, Kearny, New Jersey (1 master site consisting of 1 parcel)

3. 2 O'Brien Road, Kearny, New Jersey (1 master site consisting of 1 parcel)

4. Lake County, Ohio (1 master site consisting of 23 parcels in Painesville, Ohio, Fairport Harbor, Ohio, and Mentor City, Ohio)

5. 5421 Reichold Road, Tuscaloosa, Alabama (1 master site consisting of 5 parcels)

## **EXHIBIT D**

Liquidation Analysis

# HYPOTHETICAL LIQUIDATION ANALYSIS[1]

# MAXUS ENERGY CORPORATION, *ET AL.*

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Allowed Claim or Equity Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code ("Chapter 7") on the Effective Date. This legal standard is known as the "best interests of creditors" test.

Based on the following analysis comparing distributions to Creditors proposed under the Plan and distributions to Creditors under a hypothetical liquidation of the Debtors under Chapter 7 (the "Liquidation Analysis"), the Plan Proponents believe that the Plan satisfies the best interests of creditors test. The Plan Proponents believe that the Liquidation Analysis and the conclusions set forth herein are fair and accurate, and represent the Plan Proponents' best judgment with regard to the results of a liquidation under Chapter 7. The Liquidation Analysis was prepared solely to assist the Bankruptcy Court in making the legal determination required by section 1129(a)(7) of the Bankruptcy Code, and should not be used for any other purpose. Nothing contained in the Liquidation Analysis is intended to or may be deemed to constitute a concession of, or admission by, the Plan Proponents, or a guaranty that any Creditor will receive the amounts listed herein.

The first step in determining whether the best interests of creditors test has been satisfied is to determine the estimated amount of Cash that would be generated from liquidating the Debtors' assets in Chapter 7. The gross amount of Cash available to the Holders of Claims against, and Equity Interests in, the Debtors is the sum of the Cash held by the Debtors at the time of the commencement of the Chapter 7 cases (including the proceeds from the sale, transfer or other disposition of assets prior to the Conversion Date (defined below)) and the proceeds expected to be received from the liquidation of the Debtors' assets during the Chapter 7 cases (including from the prosecution or settlement of Causes of Action). The second step is to satisfy secured claims (to the extent of the value of the underlying collateral) and administrative expenses associated with the Chapter 7 liquidation, including administrative expenses that may result from the termination of the Debtors' businesses in a Chapter 7 liquidation. The third step is to allocate any remaining Cash to Holders of Claims and Equity Interests in accordance with the priorities set forth in section 726 of the Bankruptcy Code.[2]

---

[1] Terms not otherwise defined herein shall have the meanings ascribed to them in the *Amended Disclosure Statement for the Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of Unsecured Creditors* (as the same may be further amended, modified, and/or supplemented from time to time, the "Disclosure Statement") or the *Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of Unsecured Creditors* (as the same may be further amended, modified, and/or supplemented from time to time, the "Plan").

[2] For purposes of the Liquidation Analysis, it is assumed that the Debtors' assets are liquidated for the benefit of the Debtors' Creditors.

A general summary of the assumptions used in preparing the Liquidation Analysis follows:

### *Estimate of Net Proceeds*

The Liquidation Analysis assumes that the Chapter 11 Cases would convert to Chapter 7 on or about June 30, 2017 (the "Conversion Date"), and that such converted cases would be administered by a Chapter 7 trustee for three years.  For purposes of this analysis, it is assumed that substantially all of the Debtors' assets would be sold prior to the Conversion Date, and that any Cash proceeds (net of related costs), together with Cash on hand, would then be distributed to Creditors in accordance with the priorities established under the Bankruptcy Code.  The Plan Proponents would expect the Chapter 7 trustee to retain professionals to assist in the liquidation and distribution of assets to Creditors and pursue certain litigation recoveries, including alter ego claims against YPF and Repsol (the "Alter Ego Litigation"), as well as the Preserved Contribution Claims.

The recovery in the Alter Ego Litigation is assumed, for the purposes of the Liquidation Analysis, to be between $500 million and $2.5 billion.[3]  The expense of pursuing the Alter Ego Litigation through a third-party litigation financing provider, as opposed to the exit facility to be provided by OCC in connection with the Plan (the "Exit Facility"), and the fees of a Chapter 7 trustee under section 326(a) of the Bankruptcy Code, are the primary drivers of the reduced recoveries to Creditors in a hypothetical Chapter 7 liquidation as opposed to under the Plan.

The Liquidating Trust may also elect to pursue contribution claims against other potentially responsible parties ("PRPs") with respect to the Diamond Alkali Site.  These claims would also be available to a Chapter 7 trustee upon conversion.  It is impossible to estimate at this time the cost associated with the pursuit of these claims or the potential recoveries that might be achieved.  Accordingly, any recoveries on account of the contribution claims have been excluded from the Liquidation Analysis.

For the purposes of the Liquidation Analysis, the Plan Proponents and their advisors have attempted to ascribe value to each of the asset categories individually.  The value ascribed to these assets is expected to be identical to the value ascribed under the Plan and the Disclosure Statement because the assets are assumed to be liquidated prior to the Conversion Date.

### *Estimate of Cost*

The Liquidation Analysis assumes that the wind-down of the Debtors will last for three years, during which time the Alter Ego Litigation and other Causes of Action will be pursued and the other assets of the Estates monetized.  The Debtors' cost of liquidation under Chapter 7 would include fees payable to a Chapter 7 trustee, as well as overhead costs and fees that would

---

[3]  The Debtors' financial advisor, Scott Winn, previously concluded that the projected recovery range in respect of the YPF Causes of Action was between $0 and $284 million.  *See* Expert Report of Scott Winn, dated February 27, 2017, attached as Exhibit A to *The YPF Entities Objection To The Amended Disclosure Statement For The Amended Chapter 11 Plan Of Liquidation Proposed By Maxus Energy Corporation Et Al. And The Official Committee Of Unsecured Creditors* [Docket No. 1222] (available on the website maintained by Prime Clerk for the Chapter 11 Cases at https://cases.primeclerk.com/maxus).

be payable to attorneys and other professionals in the Chapter 7 cases, including the cost of litigation financing.

### *Distribution of Net Proceeds under Absolute Priority Rule*

The Liquidation Analysis assumes that the costs, expenses, fees, and other claims that may arise and constitute necessary costs and expenses in the Chapter 7 cases would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to Creditors. Under the absolute priority rule, no junior Creditor would receive any distribution until all senior Creditors were paid in full.

The Liquidation Analysis considers the effect that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to Creditors. The Plan Proponents have determined, as summarized herein, that confirmation of the Plan will provide more value to Creditors than a liquidation of the Debtors under Chapter 7.

Underlying the Liquidation Analysis are a number of estimates and assumptions that are inherently subject to significant economic, competitive, and operational uncertainties, as well as contingencies beyond the control of the Plan Proponents or a Chapter 7 trustee. In addition, various liquidation decisions upon which certain assumptions are based are subject to change. Therefore, there can be no assurance that the assumptions and estimates employed in determining the liquidation values of the Debtors' assets will result in an accurate estimate of the proceeds that would be realized. The actual amounts of Claims against the Debtors could vary significantly from the estimates set forth herein, depending on the Claims asserted during the pendency of the Chapter 7 cases. Moreover, the Liquidation Analysis may not include all liabilities that may arise as a result of additional litigation, potential tax assessments, or other potential claims. The Liquidation Analysis does not include potential recoveries from avoidance actions or intangible assets, and includes no incremental costs for the pursuit of such recoveries. Therefore, the actual liquidation value of the Debtors' assets could vary materially from the estimates provided herein.

The Liquidation Analysis is based on the estimated or known fair market values of the Debtors' assets on April 17, 2017. An independent public accounting firm has not examined, compiled, or otherwise applied procedures to these values and, consequently, no such firm has expressed an opinion or any other form of assurance with respect to these values.

## ASSET RECOVERY ASSUMPTIONS

All recoveries cited in the asset recovery assumptions below are presented on a consolidated basis, which means the assets are not attributed to any particular Debtor. The assets vary between Debtors, and, as such, recovery percentages may vary on an unconsolidated basis.

### *Cash and Cash Equivalents*

As of the Conversion Date, the Debtors are assumed to have a cash balance of $21,000 and segregated bank accounts containing an aggregate of $163,000 that (a) act as security for the Debtors' corporate credit card program, (b) act as security for the Debtors' utility providers, and

(c) fund workers' compensation benefits. The Debtors maintain a rabbi trust account funded with $760,000, which is expected to be consumed in ordinary course operations prior to the Conversion Date. It is also assumed that the ORRIs[4] and the IPv4/16 Addresses[5] will be sold prior to the Conversion Date. Proceeds from the sale of these assets will be consumed as part of chapter 11 operations, reducing the DIP Claim. Proceeds from the sales may make up a portion of the cash balance on the Conversion Date.

### *Security for Environmental Letter of Credit*

The Debtors maintain a bank account containing restricted cash which acts as security for an irrevocable $20 million letter of credit that Citibank has issued for the benefit of the NJDEP to address financial assurance requirements for the performance of environmental remediation obligations at properties located in Kearny, New Jersey. The Debtors believe that the collateral securing the letter of credit is an asset of the Estates.

### *Accounts Receivable*

In 1987, Diamond Shamrock Corporation (n/k/a Maxus) spun off a subsidiary that eventually was purchased by, or merged into, Valero Corporation ("Valero"). Valero bears responsibility for one-third of the cost of retiree benefits for retirees who retired prior to May 1, 1987. The Debtors estimate that the total value of the Valero receivable through the Conversion Date is $270,000.

No other accounts receivable are expected to be outstanding as of the Conversion Date because the Chapter 7 liquidation is assumed to occur after the Neptune working interest and the ORRIs (the two assets with significant accounts receivable) are sold, and the buyer would receive any accounts receivable as part of the sale.

### *Neptune*

MUSE currently owns a 15% non-operating working interest in five oil and gas leases relating to the Neptune offshore oil and gas drilling field. The Debtors retained a sales broker and consultant to auction MUSE's working interest in Neptune. Bids have been solicited for the "as is" sale of the working interest, and the winning bidder submitted a final bid of approximately $15 million (before deduction of a sale commission) and agreed to assume the decommissioning liability.

---

[4] Maxus owns ORRIs in over 3,700 oil and gas wells located in five states within the United States (Louisiana, New Mexico, Oklahoma, Texas, and West Virginia) that entitle Maxus to receive periodic payments from the operators of the wells as revenues are generated. A sealed bid auction was completed and the winning bidder offered to purchase the ORRIs for an amount in excess of $15.5 million (net of a sale commission), which sale is subject to Bankruptcy Court approval.

[5] The Debtors own a block of IPv4/16 addresses (totaling 65,536 individual addresses). The Debtors have sought Bankruptcy Court approval of a sale of the IP addresses that is expected to yield approximately $680,000 (net of a sale commission). The IP addresses are expected to be liquidated prior to the Conversion Date.

### Ohio Mineral Interests

The estimated recovery value for the Debtors' mineral interests in Ohio is calculated using a range of estimated prices per acre, determined through research and discussion with a local E&P company operator and local attorney, and the number of acres proposed to be sold. The estimated prices per acre were then multiplied by the number of acres that are proposed to be sold to arrive at an estimated recovery value between $0-50,000.

### Annuity Contracts

The Debtors own three annuity contracts established in 1986 to supplement the Debtors' prepetition obligations related to the SERPs pursuant to which the Debtors receive, in aggregate, approximately $22,000 per month. The Debtors currently estimate that they will receive between $200,000-400,000 (net of sales commissions) from the sale of these annuity contracts.

### Tierra Real Estate

Tierra owns properties that are the subject of environmental remediation at five master sites in New Jersey, Ohio, and Alabama. The Debtors undertook a comprehensive marketing process of the Tierra real estate, which concluded with a March 22, 2017 bid deadline. The Debtors recently received an offer (in the form of a Letter of Intent) from an interested third party to purchase all five of the properties, including the 1,000+ acres in Painesville, Ohio, for an amount in excess of $19 million. The Debtors are in the process of negotiating an asset purchase agreement with the bidder and will move promptly to seek the Bankruptcy Court approval of this transaction. To the extent the Debtors' efforts to sell the Properties are unsuccessful in whole or in part, then title to the unsold Properties will be transferred to the Property Trust. For the purposes of this analysis, the Debtors currently estimate that they will receive between $2.6-18.2 million (net of sales commissions) from the sale of these properties.

### Office Supplies, Furniture, and Fixtures

The Debtors' fixed assets are comprised of office supplies, furniture, and fixtures used in operations. The Debtors estimate that the liquidation proceeds from these assets would be between $0-20,000.

### Alter Ego Litigation

The recovery in the Alter Ego Litigation is assumed to be between $500 million and $2.5 billion. Holders of General Unsecured Claims should be advised, however, that there can be no assurance as to the outcome of the Alter Ego Litigation, and that the amounts recovered by the

Liquidating Trust from the prosecution of any such Cause of Action could differ in material respects from the values attributed thereto in this Liquidation Analysis.[6]

### Insurance Litigation Recoveries

The Debtors may pursue litigation recoveries stemming from various insurance policies. The cost of this litigation has not been budgeted for as part of the Plan.

### Contribution Claims Recoveries

The Liquidating Trust may elect to pursue contribution claims against other PRPs with respect to the Diamond Alkali Site.  It is impossible to estimate at this time the cost associated with the pursuit of these claims for the benefit of holders of Class C Beneficial Interests, or the potential recoveries to the Estates.  Accordingly, any recoveries on account of the contribution claims have been excluded from the Liquidation Analysis.

### Chapter 7 Administrative Claims

Chapter 7 administrative claims include wind-down costs, professional fees, litigation financing costs, and Chapter 7 trustee fees required for the duration of the Chapter 7 liquidation (assumed to be three years).  There are no brokers fees, as substantially all of the Debtors' assets are assumed to be sold prior to the Conversion Date.

Wind-down costs deemed necessary to operate the Debtors during the pendency of the Chapter 7 liquidation include payments to employees/contractors, tax preparation expenses, and records retention expenses. Total wind-down costs are estimated to be approximately $870,000.

Professional fees are the assumed costs and expenses of attorneys, financial advisors, and other professionals retained by the Chapter 7 trustee to administer wind-down activities, claims reconciliation, and distribution of estate assets.  Total professional fees are estimated to be approximately $2.6 million (excluding professional fees associated with the prosecution of the Alter Ego Litigation).

With respect to the pursuit of the Alter Ego Litigation, the litigation financing to be provided in a Chapter 7 is assumed to have substantially less favorable terms than the Exit Facility.  It is assumed that the cost of litigation financing of the magnitude required in a Chapter 7 would be between 30-40% of the overall recovery, or between $150 million and $1 billion, which includes legal and other costs of the litigation.

The Plan Proponents estimate that between $16.1 million and $76.6 million in Chapter 7 Trustee fees would be incurred pursuant to section 326(a) of the Bankruptcy Code.

---

[6] Based upon discussions between the Plan Proponents, the values attributed to the Alter Ego Litigation in this Liquidation Analysis were increased from those set forth in the Liquidation Analysis filed as an Exhibit to the Disclosure Statement dated December 29, 2016 to reflect the Creditors' Committee's views regarding the probability of success in the Alter Ego Litigation.  Regardless of the values attributed to the Alter Ego Litigation, however, for purposes of section 1129(a)(7) of the Bankruptcy Code, so long as the same recovery ranges are applied in both the Chapter 7 and Chapter 11 scenarios, creditor recoveries will always be higher in the Chapter 11 scenario.

### DIP Claim

The Liquidation Analysis assumes that the outstanding balance on the DIP Facility will be $15.8 million on the Conversion Date. The professional fee carve-out of approximately $5 million to cover accrued and unpaid professional fees for retained professionals is included within this estimate. The estimated recovery for the DIP Facility is 100%.

### Priority Tax Claims

The Liquidation Analysis assumes that there will be approximately $131,000 in Priority Tax Claims on the Conversion Date. The estimated recovery for Priority Tax Claims is 100%.

### Other Secured Claims

The Liquidation Analysis assumes that there will be no Other Secured Claims on the Conversion Date.

### Other Priority Claims

The Liquidation Analysis assumes that there will be approximately $5,000 in Other Priority Claims on the Conversion Date. The estimated recovery for Other Priority Claims is 100%.

### General Unsecured Claims

The Liquidation Analysis assumes that there will be approximately $12.5 billion in General Unsecured Claims on the Conversion Date. The Liquidation Analysis assumes that depending on the amount of the recovery in the Alter Ego Litigation, the recovery for General Unsecured Claims is between 2.7-11.5%.[7]

### All Other Claims

The Liquidation Analysis assumes that no other Claims (*i.e.*, Intercompany Claims and the YPF Tranche B Claim) or Equity Interests junior to the General Unsecured Claims would receive any recovery.

---

[7] In a Chapter 7 liquidation, General Unsecured Convenience Claims would not exist. Accordingly, in a Chapter 7, Holders of General Unsecured Convenience Claims and any Environmental Claims for the Diamond Alkali Site would be treated the same as Holders of General Unsecured Claims."