## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MAXUS ENERGY CORPORATION, *et al.*,[1] | ) |
| | ) Case No. 16-11501 (CSS) |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) |
| | ) **Re: Docket Nos. 1208; 1704; 1973** |
| | ) |
| MAXUS LIQUIDATING TRUST, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Adversary Proceeding No. _____ |
| v. | ) |
| | ) |
| YPF S.A., YPF INTERNATIONAL S.A., YPF HOLDINGS, INC., CLH HOLDINGS, INC., REPSOL, S.A., REPSOL EXPLORACIÓN, S.A., REPSOL USA HOLDINGS CORP., REPSOL E&P USA, INC., REPSOL OFFSHORE E&P USA, INC., REPSOL E&P T&T LIMITED, and REPSOL SERVICES CO., | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

The Maxus Liquidating Trust (the "Liquidating Trust") appointed in the chapter 11 cases

(the "Chapter 11 Cases") of the above-captioned debtors (collectively, the "Debtors"), by and

through its undersigned counsel, hereby sues YPF S.A., YPF International S.A., YPF Holdings,

Inc. and CLH Holdings, Inc. (the "YPF Entities"), and Repsol S.A. ("Repsol"), Repsol

---

[1] The Debtors in the above-captioned Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Maxus Energy Corporation (1531), Tierra Solutions, Inc. (0498), Maxus International Energy Company (7260), Maxus (U.S.) Exploration Company (2439), and Gateway Coal Company (7425). The address of each of the Debtors is 10333 Richmond Avenue, Suite 1050, Houston, Texas 77042.

Exploración, S.A., Repsol USA Holdings, Corp., Repsol E&P USA, Inc., Repsol Offshore E&P

USA, Inc., Repsol E&P T&T Limited and Repsol Services Company for up to $14 billion in

damages arising in connection with claims for alter ego liability and piercing the corporate veil,

for fraudulent transfers under state laws (including Delaware, Kentucky, New Jersey, Ohio,

Texas and Wisconsin law), as well as for unjust enrichment and civil conspiracy.

## STATEMENT OF THE CASE

1.      On December 12, 2013, Judge Allan Gropper of the United States Bankruptcy

Court for the Southern District of New York entered his much awaited memorandum decision in

the case of Tronox, Inc. v. Kerr McGee.  In that decision, Judge Gropper addressed what he

viewed as an issue of first impression—the issue of "fraudulent conveyance laws in the face of

substantial environmental and tort liability."  Tronox, 503 B.R. 239, 271 (Bankr. S.D.N.Y.

2013). Fundamentally, the court framed that issue as whether a

> shrewd and unscrupulous enterprise [could] divest itself of
> 'substantially all of its assets'… continue to satisfy environmental
> liabilities from the cash flow of the combined entity until the
> statute of limitations period had run and the divestiture was ready
> for completion, and then split the good assets from the bad.  If the
> architects of such a scheme could claim that the statute of
> limitations had already run by virtue of the first step in the scheme,
> they would have free reign to hinder and delay creditors.

Id. at 271.  Defendants here were the collective architects of the scheme at issue in this action.

All were, as set forth herein, both "shrewd" and "unscrupulous."  Within hours of the publishing

of the Tronox decision, these architects' phones and computer keyboards flew into action.

Within days, multiple law firms were tasked with analyzing the Tronox case.  Within weeks, the

most senior executives within the Debtors' and the Defendants' organizations were briefed on

the one question to which they wanted an answer: what did Tronox mean for them?  For, as

described herein, those individuals had for nearly two decades been engaged in the very "scheme" posited by Judge Gropper. They <u>had</u> forced Maxus[2] to divest itself of all of its physical assets. They <u>had</u> kept Maxus on an I.V. drip of capital barely sufficient for Maxus to satisfy its environmental liabilities, while they thought they were running the clock on the relevant statutes of limitation. They <u>had</u>, at the last minute, attempted to cut all of their ties with Maxus using this Court to bless their scheme in a plan settlement that would have allowed YPF and Repsol to walk away from Debtors' enormous environmental liabilities without having to face legal or economic consequences anywhere near their actual exposure.

2.      Whereas <u>Tronox</u> involved "Project Titan" and "Project Focus," Defendants called their scheme "Project Hollywood" and "Project Jazz," the latter named for the project's genesis in a New York City jazz bar. But, the financial reengineering schemes were strikingly similar for both Kerr McGee and Defendants here. Both had bought corporations with extremely valuable exploration and production ("E&P") businesses tied into extremely toxic legacy chemicals businesses. Both sought to separate value from exposure. The central strategy of their schemes was also strikingly similar – (1) to separate the E&P businesses from the chemical businesses by stripping away valuable assets, (2) to use the profits from the E&P businesses to continue to defray the chemicals businesses' remediation expenses such that the defunct chemicals businesses would never suffer an unpaid creditor (and would never have a profit, either), and then, (3) when the environmental expenses eventually exploded as forecast decades prior, to run to bankruptcy court to bury their toxic subsidiary. Kerr McGee did not succeed in

---

[2] Capitalized terms not otherwise defined in this "Statement of the Case" are defined in the below sections "Parties and Related Entities" and "Factual Background."

3

its scheme.   At heart, this proceeding addresses whether Defendants have succeeded in their scheme or whether the roughly $14 billion of environmental claims asserted against the Debtors in these Chapter 11 Cases will have recourse to the Defendants, who cynically left Debtors with barely enough money to repay the administrative claims incurred in the process.

3.      A bit of digression is in order.   The origin of the conduct at issue in this lawsuit emanates from Maxus's (and its predecessors') ownership and operation of chemical plants, including one known as the Lister Site on the bank of the Passaic River, by a Maxus predecessor: Diamond Alkali Company ("Diamond Alkali").

4.      Between 1951 and 1969, Diamond Alkali manufactured pesticides and herbicides (including Agent Orange) as a part of its agricultural chemical business operating out of the Lister Site.   In the 1980s, the Lister Site was identified as one of the most contaminated environmental sites in the country.[3]   Upon information and belief, a substantial portion of the environmental claims underpinning this action relate to Diamond Alkali's discharges at and from the Lister Site prior to 1969.[4]   In the late 1960s, Diamond Alkali became a wholly-owned subsidiary of Diamond Shamrock Corporation ("DSC").

5.      When DSC sold its active, ongoing chemicals business to Occidental Chemical Corporation ("OCC") in 1986, it specifically retained ownership of the Lister Site and various other contaminated sites.   It also contractually agreed to defend, indemnify and hold harmless

---

[3] The Lister Site was long ago shut down and a protective cap was installed.

[4] As set forth below, however, this proceeding is not limited to claims related to the Lister Site, but also to contaminated sites in Alabama, California, Ohio, New Jersey, New York, Mississippi, Texas and Wisconsin, amongst many others.

OCC, without limitation, for environmental liabilities of the chemical business prior to the sale, including remediation efforts at and relating to the Lister Site.

6.      Following that divestiture, Maxus (as DSC was renamed in 1987) was one of the largest independent oil and gas exploration and production companies in the United States, with significant international assets in Indonesia, Latin America, the Oklahoma/Texas panhandle and the Gulf of Mexico.

7.      Enter YPF, the former national oil company of Argentina.  As alleged more fully below, YPF acquired all of the outstanding stock of Maxus in 1995 in an admitted bid to expand its E&P operations into international markets such as the United States.  YPF was the original architect of the <u>Tronox</u>-like scheme.

8.       YPF's scheme dates back to 1995, when YPF first realized the extent of Maxus's environmental liabilities both as an owner of the Lister Site and other polluted sites across the country and as an indemnitor of OCC.  In the months following the closing of its stock purchase, YPF began to fully appreciate the potential for total destruction of the company it had just purchased.  As Maxus's lawyer promptly warned YPF's Board of Directors at the time, "YPF has already placed at risk to adverse developments an amount more than 10 times as large as Maxus's current loss reserve . . . and this figure can only grow with time."  At that moment, any independent fiduciary to Maxus and its creditors would have understood that the appropriate next step was to develop a strategy to preserve assets and to reserve funds to cover or hedge Maxus's future liabilities.

9.      Without any apparent deliberation, however, YPF immediately rolled out its <u>Tronox</u> playbook.  It adopted a strategy to strip assets, manage and settle potential claims against

Maxus and its creditors, and then bury Maxus before its environmental claims ever manifested their true extent.

10.      YPF began to implement its strategy to strip Maxus of its valuable assets almost immediately following its acquisition of Maxus in 1995.   YPF first eliminated Maxus's commercial debt and replaced it with $1.4 billion in loans held by YPF.  This exchange allowed YPF to remove all restrictions on self-dealing and asset transfer in its third-party debt documents while also creating an illusory "credit bid" currency for YPF to use to acquire Maxus's assets. Between 1996 and 1997, YPF transferred Maxus's most valuable international E&P assets, including assets in Bolivia, Venezuela, Ecuador, and Indonesia, to YPF subsidiaries.   All transfers were made for less than reasonably equivalent value through a global "restructuring." These initial transfers resulted in Maxus's total assets decreasing from $2.9 billion to less than $1 billion and in a near total elimination of Maxus's revenue streams.  Adding insult to injury, after Maxus's transfer of the international E&P assets to YPF subsidiaries, YPF used Maxus's personnel to manage the transferred E&P assets through the "Maxus Management Group."  All of that work was performed without fair consideration to Maxus.

11.      Next enter Repsol.  In 1999, Repsol acquired majority control of YPF through stock purchases.   Immediately thereafter, Repsol continued the asset stripping phase of its subsidiary's scheme.  For example, in January 2000, Repsol caused YPF to direct Maxus to sell its most valuable remaining asset, its interest in Crescendo Resources LP ("Crescendo"), without legitimate negotiations and for far less than its fair value.  By the end of 2000, this sale alone caused a 98% decline in Maxus's total revenues.  In the following years, Repsol (with YPF approval and execution) raided the remaining Maxus assets for the benefit of Repsol subsidiaries,

including by taking Maxus's remaining production assets in the Gulf of Mexico, Maxus's employees, and Maxus's data and technology, without providing fair consideration to Maxus. The asset stripping phase of the <u>Tronox</u> strategy came to a close around 2009.  At that time, what remained of the Maxus business was: (1) Maxus, whose only remaining business operations consisted of collecting insignificant revenue from its remaining onshore oil and gas royalty interests, complying with environmental remediation obligations, providing general and administrative services for its subsidiaries, and managing litigations on behalf of itself and OCC; (2) Tierra, whose business consisted solely of managing Maxus's and its own environmental liabilities; and (3) various related special purpose entities, such as (a) Debtor Maxus (U.S.) Exploration Company ("<u>MUSE</u>"), which held a non-operating interest in the Neptune prospect, and (b) Debtor Gateway Coal Company, whose business was limited to the administration of retiree benefits for its 142 former employees and their dependents.

12.    The second phase of the architects' strategy—to use shareholder control to prop up the shell and attempt to cause the limitations periods on legal claims to pass—was soon implemented and continued through 2016.  During that period, YPF and Repsol "managed" Maxus's environmental obligations by keeping Maxus and Tierra entirely dependent on them for financial support and as-needed cash infusions to meet their obligations.  By 2000, Maxus was not allowed to handle its own financials, and the only way auditors could plausibly conclude Maxus was a going-concern was that YPF furnished letters of support as it continued to drip-feed Maxus the bare minimum in cash needed to fund daily operations.  Tierra's entire purpose was to manage the environmental liabilities related to Maxus and thus it did not have any way to generate cash or income in its own right.  Instead, Tierra depended on Maxus, YPF and Repsol to

fund its general and administrative expenses and allow it to cover any costs related to Maxus's environmental liabilities as passively and cheaply as possible.

13.     The "string out" phase of the scheme began to face uncertainty, however, on December 13, 2005, when the State of New Jersey filed a complaint against OCC, Tierra, Maxus, Maxus International Energy Company ("MIEC"), Repsol, YPF, YPFH and CLH Holdings in the New Jersey Superior Court, Law Division, Essex County (hereinafter the "Passaic River Litigation").  By the Passaic River Litigation, the State of New Jersey sought to hold those entities liable for environmental damages at the Lister Site, and alleged that for twenty years, Tierra, MIEC, Repsol, YPF, YPFI, YPFH and CLH Holdings "have orchestrated and implemented a strategy to delay and impede the clean-up and restoration of the Passaic River and strand the associated liabilities in Maxus and Tierra."

14.     In or around 2012, as the ongoing Passaic River Litigation grew progressively more complicated and Maxus's last productive asset (the Neptune reserves) was nearly exhausted, YPF began to consider the final play of the strategy: "Project Jazz."  That project was designed to use the U.S. Bankruptcy Courts to discharge YPF's liabilities to Maxus and its creditors.  To implement Project Jazz, YPF hired two "independent" directors in 2014, Bradley Dietz and Theodore Nikolis.  They were hired to establish a special independent committee of the Maxus Board, whose sole duty was to evaluate potential causes of action against YPF.  Their sole function was to reach a settlement with YPF that could be approved in a U.S. Bankruptcy Court over the certain objection of the subsidiaries' creditors.  By the terms of its original charter, the special "independent" committee was not authorized even to recommend that litigation be pursued against YPF, much less cause Maxus to initiate such litigation.

15.    On June 17, 2016, the literal eve of a trial in the Passaic River Litigation that would have resulted in a determination that YPF would have legal alter-ego liability for all of Maxus's debt, YPF caused the Debtors to file for relief under Chapter 11.   That filing was accompanied by a much-touted "independent" settlement as the centerpiece of the YPF-sponsored and funded plan.

16.    Ultimately, Project Jazz failed after the creditors in these Cases vehemently opposed the proposed settlement.  On July 14, 2017 (the "<u>Effective Date</u>"), the effective date of the Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al., and the Official Committee of Unsecured Creditors [Docket No. 1231] (the "<u>Amended Plan</u>"), Maxus's environmental creditors blocked Project Jazz and the denouement of Defendants' scheme.  The claims against Defendants were not settled, but instead were preserved for the benefit of the targets of Defendants' scheme.  The Amended Plan created the Liquidating Trust with the dual mission of liquidating the Debtors' remaining physical assets and prosecuting the Debtors' claims and causes of action on behalf of, and for the benefit of, the Debtors' creditors through this action, including the claims described herein.

17.    By this action, the Liquidating Trustee seeks to do what YPF (and later Repsol) should have done long ago—provide the necessary financial support sufficient to create the proverbial "warm safe bed" for all of Maxus's environmental responsibilities.  That support will now have to take the form of up to $14 billion in damages that Maxus and Tierra sustained as a result of the systemic fraudulent conveyances, alter ego transgressions and other conduct supporting the causes of action set forth herein.

## THE PARTIES AND RELATED ENTITIES

18.     Plaintiff, the Liquidating Trust, was created on the Effective Date of the Amended Plan, with the dual mission of liquidating the Debtors' assets and prosecuting the Debtors' claims and causes of action on behalf and for the benefit of the Debtors' creditors.  The Trustee and Delaware Trustee of the Liquidating Trust is the Honorable Joseph J. Farnan, Jr. (Ret.).

19.     Debtor Maxus Energy Corporation ("Maxus") is a Delaware corporation, a wholly-owned subsidiary of Defendant and non-Debtor YPF Holdings, Inc. ("YPFH").  At the time of the filing of the Debtors' Chapter 11 petitions on June 17, 2016 (the "Petition Date"), Maxus's business consisted of collecting onshore oil and gas royalties from over 3,000 wells located in six states in the United States, overseeing the administration of benefits for Maxus and Debtor Gateway Coal Company ("Gateway") retirees, complying with environmental remediation obligations, providing general and administrative services for its subsidiaries and Debtor Tierra Solutions, Inc., and managing U.S.-based and international litigation on behalf of itself and Occidental Chemical Corporation ("OCC").

20.     Debtor Tierra Solutions, Inc. ("Tierra") is a Delaware corporation that is directly owned by Defendant and non-Debtor CLH Holdings, Inc., which, in turn, is owned by YPFH. At the time of the Petition Date, Tierra's business was to manage its own environmental remediation obligations as well as those owed by Maxus, either as principal or when acting on behalf of third parties, principally OCC.

21.     Debtor Maxus International Energy Company ("MIEC"), a wholly-owned subsidiary of Maxus, is a Delaware corporation whose business was inactive at the time of the Petition Date.

22.     Debtor Maxus (U.S.) Exploration Company ("MUSE"), a wholly-owned subsidiary of Maxus, is a Delaware corporation that was involved at the time of the Petition Date in oil and gas exploration efforts in the deep waters of the Gulf of Mexico, primarily through its ownership of a 15% non-operating working interest in three oil and gas leases relating to an offshore oil and gas drilling field known as "Neptune."

23.     Debtor Gateway Coal Company, (and collectively with the other Debtors above, "Debtors"), a wholly-owned subsidiary of Maxus, is a Delaware corporation whose business was limited to the administration of retiree benefits for its former employees and their dependents.

24.     Defendant YPFH is a Delaware corporation and a wholly-owned subsidiary of Defendant YPF, S.A. ("YPF").

25.     Defendant YPF is a corporation formed under the laws of Argentina with its principal place of business in Buenos Aires, Argentina.

26.     Defendant YPF International S.A. ("YPFI"), formerly known as YPF International Ltd., is a Bolivian entity with its principal place of business in Bolivia.

27.     Defendant CLH Holdings, Inc. ("CLHH," an inactive entity) is a wholly-owned subsidiary of YPF Holdings.

28.     Defendant Repsol, S.A. ("Repsol") is a corporation formed under the laws of Spain with its principal place of business in Madrid, Spain.

29.     Defendant Repsol Exploración, S.A. is a corporation formed under the laws of Spain with its principal place of business in Madrid, Spain.  It is a wholly-owned subsidiary of Defendant Repsol.

30.     Defendant Repsol USA Holdings Corporation is a Texas corporation with its principal place of business in Texas.  It is a wholly-owned subsidiary of Defendant Repsol Exploración, S.A.

31.     Defendant Repsol E&P USA, Inc. is a Delaware Corporation with its principal place of business in Texas.  It is a wholly-owned subsidiary of Defendant Repsol USA Holdings Corporation.

32.     Defendant Repsol E&P T&T Limited is a Trinidad and Tobago corporation and a wholly-owned subsidiary of Defendant Repsol Exploración, S.A.

33.     Defendant Repsol Offshore E&P USA, Inc. is a Delaware corporation with its principal place of business in Texas.  It is a wholly-owned subsidiary of Defendant Repsol USA Holdings Corporation.

34.     Defendant Repsol Services Company is a Delaware corporation with its principal place of business in Texas.   It is a wholly-owned subsidiary of Repsol USA Holdings Corporation.

### JURISDICTION AND VENUE

35.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1334(b) because the claims arose in and/or relate to a case under Title 11 of the United States Code.

36.     This is a core proceeding under 28 U.S.C. § 157(b) because it relates to the administration and property of the bankruptcy estate in the Chapter 11 Cases, including in connection with the Amended Plan.  The Liquidating Trust consents to this Court's entry of final orders with regard to any claim in this action.

37.	The Court has personal jurisdiction over YPF and YPFH pursuant to Rules 4(e) and 4(k)(1)(C) of the Federal Rules of Civil Procedure, and Bankruptcy Rules 7004(a) and 7004(d).  Each has filed proofs of claim in the Chapter 11 Cases without reservation, and each has appeared without reservation in the Chapter 11 Cases and sought affirmative relief from the Court.  In addition, YPF was a Court-approved provider of debtor-in-possession finance to the Debtors and has submitted itself to the jurisdiction of the Court.

38.	In addition, those parties who have not filed proofs of claims in the Chapter 11 Cases, YPFI and Repsol, Repsol Exploración, S.A. and Repsol E&P T&T Limited have had minimum contacts with the United States as a whole and have affiliations with the United States that are so continuous and systematic so as to render them essentially at home in the United States.  Further, Repsol USA Holdings Corp., Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc. and Repsol Services Company are subject to general jurisdiction in Delaware where they are incorporated.  Based upon the allegations and facts below, YPFI, Repsol, Repsol Exploración, S.A., Repsol USA Holdings Corp., Repsol E&P T&T Limited, Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc. and Repsol Services Company are subject to specific and general personal jurisdiction.

39.	The exercise of personal jurisdiction over YPF, YPFI, Repsol, Repsol Exploración, S.A. and Repsol E&P T&T Limited is consistent with traditional notions of fair play and substantial justice.

40.	Venue is proper in this court pursuant to 28 U.S.C. § 1409(a).

**FACTUAL BACKGROUND**

**I.    The Genesis Of Maxus's Environmental Obligations**

41.     Diamond Alkali Company, a chemical company, was founded in 1910.  In the 1950s and 1960s, various predecessors and successors in interest to Diamond Alkali (collectively, "Diamond Alkali"), owned and operated chemical plants, including a chemical plant on a tract of land located along Lister Avenue in Newark, New Jersey (the "Lister Site") on the bank of the Passaic River, where it manufactured pesticides and herbicides (including Agent Orange) as a part of its agricultural chemical business.  The Lister Site has been inactive since 1977.  During the 1960s, Diamond Alkali became a wholly-owned subsidiary of Diamond Shamrock Corporation ("DSC").

42.     In 1982, the U.S. Environmental Protection Agency ("EPA") initiated a study of facilities which had produced herbicides and pesticides and discovered dioxin contamination at the Lister Site.

43.     In 1983, the New Jersey Department of Environmental Protection (the "NJDEP") issued an administrative order requiring DSC to implement certain partial-site stabilization measures designed to prevent off-site migration of dioxin and other contaminants from the Lister Site and in the Passaic River, and to take a number of immediate stabilization measures including covering the exposed soil to prevent migration.  The Lister Site was proposed for inclusion in the Superfund National Priority List in 1983 and was officially included in 1984.

44.     In September 1986, an affiliate of Occidental Chemical Corporation ("OCC") acquired DSC's active, ongoing chemicals business pursuant to a Stock Purchase Agreement (the "SPA"), with DSC.  Under the SPA, DSC retained ownership of the Lister Site and other

remediation sites across the country (these sites were later transferred to Tierra). By the terms of the SPA, DSC agreed to defend, indemnify, and hold harmless OCC—without limitation as to time or amount—for environmental liabilities related to DSC's chemicals business, including the known remediation efforts at and relating to the Lister Site.[5]

45.    In 1987, DSC changed its name to Maxus. Maxus's contractual obligations, as successor to DSC, to defend, indemnify, and hold harmless OCC for environmental liabilities at contaminated Sites pursuant to the SPA (the "<u>OCC Indemnification Obligations</u>") have been repeatedly affirmed by courts in the United States.[6]

46.    Also in 1987, the EPA approved an interim remedy for the Lister Site, which included the construction of a slurry wall and flood wall around the site, and the building of a permanent cap over the property to prevent exposure to and migration of the contaminated soil at the site. Tierra constructed the temporary remedies under EPA oversight, completing this phase in 2001. Tierra sold the Lister Site to an affiliate of OCC during the Chapter 11 Cases and OCC now maintains the site, subject to EPA oversight.

---

[5] Section 9.03(a)(iii) of the SPA requires DSC to "indemnify, defend and hold harmless" OCC, from and against, among other things, "any and all claims, demands, or suits . . . relating to, resulting from, or arising out of . . . any . . . Superfund Site." Schedule 2.07(g) to the SPA lists fifteen sites that were included on the National Priorities List under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("<u>CERCLA</u>"), as amended, 42 U.S.C. §§ 9601-9675. The Schedule includes three Superfund Sites in New Jersey, including "Diamond Alkali (#488)" in Newark, New Jersey. The SPA also contains similar defense and indemnity obligations by DSC for "Inactive Sites" and for "Historical Obligations."

[6] <u>See</u> Order Granting Defendant & Cross-Claimant Occidental Chemical Corporation's Motion for Partial Summary Judgment Against Defendant Maxus Energy Corporation, <u>NJDEP v. Occidental Chemical Corp., et al.</u>, No. ESX-L-9869-05 (PASR) (N.J. Supr. Ct. Aug. 24, 2011); <u>see also</u> Order Granting Occidental Chemical Corporation's Partial Motion for Summary Judgment Against Maxus Energy Corporation, <u>NJDEP v. Occidental Chemical Corporation, et al.</u>, No. ESX-L-9869-05 (PASR) (N.J. Supr. Ct. April 5, 2016); Final Judgment, June 27, 2006, Cause. No. 02-09156, <u>Occidental Chemical Corp. v. Maxus Energy Corp.</u>, in the 14th District Court of Dallas County, TX.

47.     In addition to remediation on the Lister Site, Maxus is also subject to liability for clean-up of the Passaic River, along with many other potentially responsible parties ("PRPs").  In March 2016, the EPA issued a Record of Decision selecting a final remedy for the lower 8.3 miles of the Passaic, including dredging of approximately 3.5 million cubic yards of contaminated sediment, and installation of a bank to bank cap of the river bed to prevent contamination.  The final remedy is still in the planning/preparatory phase, and the dredging work has yet to commence.

48.     Maxus also owned or operated over the years multiple other sites across the country that imposed significant environmental liabilities on Maxus, whether directly or by virtue of its OCC Indemnification Obligations.  The Debtors' Disclosure Statement (as defined below) and the Site Transition Agreement entered into with an OCC affiliate [Docket No. 1208] mentions at least 148 sites or operable units across the United States where the Debtors had environmental liabilities or were involved in remediation-related litigation and/or government agency-directed remediation activities arising as a result of DSC operations or Maxus's and Tierra's own operations (collectively, the "Sites").  While the Passaic River Litigation (as defined below) only relates to the Lister Site, Maxus faces potentially significant environmental liabilities relating to other Sites as well.

49.     For instance, Diamond Alkali operated a ferrous chromate processing plant in Kearny, New Jersey (the "Kearny Site") until the 1970s.  Tierra, OCC and the NJDEP entered into an Administrative Consent Order in 1990 and a related Consent Judgment in 2011 with respect to the Kearny Site, pursuant to which Maxus submitted an 8-year master schedule for remedial work that the NJDEP approved in 2013.

50.     Maxus, on behalf of OCC, was also a member of the Cooperating Parties Group for the Standard Chlorine Chemical Company Superfund Site, a 42-acre area in Kearny, New Jersey (the "Standard Chlorine Site").  The Standard Chlorine Site is a Superfund site where various heavy industrial activities occurred between 1916 and 1993, including coal tar processing, naphthalene distillation and lead battery production.  It is adjacent to a Diamond Alkali plant site on the banks of the Hackensack River (the "Kearny Plant Site").  An Administrative Consent Order entered into in April 1990 between OCC, the NJDEP and Chemical Land Holdings, Inc. (a predecessor of Tierra), required that Maxus and Tierra investigate and remediate all hazardous substances on the Kearny Plant Site, including chromium ore processing residue ("COPR").  Tierra was the titled owner of the Kearny Plant Site (until OCC affiliate Mariana Properties, Inc. acquired the Site from Tierra during the Chapter 11 Cases), and assumed clean-up obligations imposed on Maxus under the Administrative Consent Order.  Maxus and Tierra entered into a cooperation agreement with the owners of the Standard Chlorine Site and a third adjacent site to coordinate remediation at all three sites, and later became a member of the Standard Chlorine Cooperating Parties Group.  In 2013, the Standard Chlorine Cooperating Parties Group entered into a CERCLA Administrative Order on Consent with the EPA and agreed to conduct a Remedial Investigation and prepare a Focused Feasibility Study for remedial work at the Standard Chlorine Site.  In 2016 the EPA approved a final cleanup plan.

51.     Diamond Alkali, and subsequently DSC, operated a ferrous chromate processing plant in Painesville, Ohio until 1976 (the "Painesville Site").  Tierra owned the Painesville Site and pursuant to an order by the Ohio Environmental Protection Agency, the Debtors have

participated in the process of conducting Remediation Investigation and Focused Feasibility Studies relating to the 20 operable units at the Painesville Site.  The Painesville Site was purchased by Mariana Properties, Inc. during the Debtors' Chapter 11 Cases.

52.    Diamond Alkali, and subsequently DSC, also operated a facility for the manufacture of DDT and other chemicals in Greens Bayou, Texas (the "Greens Bayou Site"). Maxus and Tierra entered into settlement agreements with the Port of Houston Authority and other parties to conduct remediation at the Site, and negotiated a Consent Decree with state and federal environmental agencies, which was approved in 2013, and which required Maxus to reimburse certain costs incurred by those agencies.

53.    In June 2005, the EPA designated Maxus as a PRP at the Milwaukee Solvay Coke & Gas site in Milwaukee, Wisconsin (the "Milwaukee Solvay Site"), as a successor to companies that formerly owned or operated the site during the period 1966-1973.  The Milwaukee Solvay Site, like at least five other Sites as to which Maxus or its predecessors were subject to liability, does not relate to the activities of DSC or the SPA with OCC.  In 2006, Maxus signed a participation agreement with five other PRPs, which allocated Maxus a significant portion of the costs for funding a Remediation Investigation and Focused Feasibility Study.  In 2007, Maxus signed an Administrative Order on Consent obliging it and four other PRPs to conduct an investigation and study of contamination of soil and groundwater near the site, including contamination of sediment in the Kinnickinnic River.

54.    Maxus agreed to undertake the defense of a liability notice issued by the EPA to OCC relating to the Black Leaf Chemical site in Louisville, Kentucky (the "Black Leaf Site") pursuant to the SPA, which includes the Black Leaf Site as an inactive site for which Maxus has

OCC Indemnification Obligations.  Diamond Alkali or a subsidiary had previously owned or operated the Black Leaf Site prior to OCC's acquisition of DSC's chemicals business.  Upon information and belief, certain contamination at the site for which OCC is allegedly responsible resulted from pesticide and insecticide formulating operations conducted by Diamond Alkali and a predecessor in the 1950s.  Pursuant to the liability notice, the EPA required that OCC and other responsible parties perform remediation work and reimburse the EPA and local environmental regulators for certain past costs.  In September 2014, the Kentucky Energy and Environment Cabinet also began an investigation and, in October 2015, required that the PRPs for the Black Leaf Site present a remediation action plan.  OCC has resolved claims with EPA and is entering into an Agreed Order with the Commonwealth of Kentucky and other PRPs to remediate the site.

55.    Tierra faced environmental liability at a site in Holt, Tuscaloosa County, Alabama (the "Tuscaloosa Site") relating to an agricultural chemical manufacturing plant operated by predecessor Maxus Agricultural Chemicals Company.  The plant produced tall oil—a viscous, asphalt-like residue—that was deposited in numerous pits and storage lagoons across the Site. Maxus and/or Tierra have been responding to requirements from the Alabama Department of Environmental Management, pursuant to which they retain responsibility for monitoring and preventing discharges from a twelve-acre tar pond on the Site into a nearby river.

56.    Maxus agreed to defend OCC as a successor to DSC with respect to the Malone Services Company Superfund site in Galveston County, Texas, where DSC has been alleged to have sent waste products prior to OCC's acquisition (the "Malone Services Site").  Maxus, along with other PRPs, signed an Administrative Order on Consent and completed a Remediation Investigation and Focused Feasibility Study.  The EPA selected a final remedy and signed a

Record of Decision in 2009, and the PRPs signed a Consent Decree in 2012. Remediation activities at the Malone Services Site were completed in December 2017.

57.     Maxus, on behalf of OCC, was a member of the PRP Group relating to the Central Chemical Company Superfund Site in Hagerstown, Maryland, formerly a blending and packaging facility for agricultural pesticides and fertilizers (the "Central Chemical Site"). Under a 1998 Administrative Order on Consent, Maxus and the other PRPs conducted a Remediation Investigation and Focused Feasibility Study, which was completed in 2007. The EPA issued a Record of Decision in 2009, selecting a final remedy for the Site and calling for remediation of a former waste lagoon, including excavation, consolidation and capping of contaminated soils and the installation of a ground water extraction and treatment system.

58.     In sum, as of the Petition Date, Maxus and/or Tierra for themselves and/or as successors to DSC were subject to ongoing liability for remediation and clean-up at multiple Sites including the Lister Site, Kearny, Standard Chlorine, Painesville, Greens Bayou, Milwaukee Solvay, Black Leaf, Tuscaloosa, Malone Services and Central Chemical Sites, among many other Sites, and remained subject to liability relating to each of those Sites as of the Petition Date, whether to other PRPs, to environmental governmental authorities, or pursuant to its OCC Indemnification Obligations.

## II.     YPF's Acquisition Of Maxus

59.     In 1995, Maxus was one of the largest independent oil and gas exploration and production companies in the United States, with over $2.9 billion in total assets, $600 million in revenue, and approximately $860 million of stockholders' equity. Maxus's assets included

lucrative oil and gas properties in Indonesia and Latin America, as well as valuable technical and operating expertise.  At the time, however, Maxus was also facing liquidity issues.

60.    At the same time, YPF, which had been privatized in 1993 and had exclusively Argentine assets, sought to become a major international oil company.  Upon information and belief, YPF's management viewed the acquisition of Maxus as a means to realize, in a single transaction, YPF's international ambitions and gain the credibility it lacked in international capital markets.

61.    In contemplating the acquisition, YPF characterized Maxus's debt as "attractive" to its investors and engaged in an extremely limited due diligence of Maxus's environmental liabilities in connection with the acquisition.  Although Maxus's exposure to environmental liabilities related to DSC properties and other Sites was well-known, YPF's counsel, Andrews & Kurth LLP ("Andrews & Kurth," now known as Hunton Andrews Kurth LLP) was not asked to do a complete, top-to-bottom environmental review of each Site prior to the acquisition.  Nor was Andrews & Kurth authorized to retain the services of independent consultants to estimate the scope of Maxus's remediation responsibilities, time frames, and associated costs.  Upon information and belief, Andrews & Kurth did not visit the Lister Site or the Passaic River, or any other Site, prior to its client's closing.  In addition, Andrews & Kurth apparently never found— or purposefully ignored—a 1993 analysis prepared by a Maxus consultant (ChemRisk), which valued the Maxus environmental liabilities at the Lister Site as most likely in the $1.2 – $2 billion range at that time, with the primary driver being Maxus's share of the cost and scope of dredging the Passaic River.

62.     To be sure, Andrews & Kurth communicated to YPF that Maxus's legacy environmental liabilities were a "major issue."   But, upon information and belief, YPF management and its outside counsel nonetheless downplayed the risks associated with the Maxus acquisition, as they believed they could "manage" Maxus's environmental liabilities.  Following its perfunctory due diligence of Maxus's greatest liability, Andrews & Kurth seriously underestimated Maxus's potential environmental liabilities as within the range of $160 million to $194 million.

63.     In February 1995, YPF submitted its proposal to acquire Maxus as a leveraged buyout (the "LBO") by which Maxus would use up to $100 million of its cash on hand and refinance YPF's acquisition loan with proceeds from $500 million of indebtedness incurred by Maxus's subsidiaries.

64.     On February 26 and 28, 1995, Maxus's board of directors (the "Maxus Board") adopted resolutions conditionally approving the proposed merger agreement (the "Merger Agreement") and YPF's proposed financing structure.

65.     As part of its conditional approval, however, the Maxus Board explicitly retained the right to terminate the Merger Agreement, and to decline to recommend to shareholders the proposed financing structure of the LBO, if "necessary for the Board of Directors to comply with its fiduciary duties."   Additionally, the Maxus Board insisted that YPF guarantee the acquisition debt assumed by Maxus and provide in the Merger Agreement for a "Keepwell Covenant" in order to "neutralize" the problem created by acquisition financing.   By its terms, the Keepwell Covenant required YPF to provide financial support to Maxus up to the amount of the $425 million acquisition debt.   In addition to the Keepwell Covenant, YPF also unconditionally

guaranteed the approximately $1.4 billion in commercial debt held at Maxus, and guaranteed dividend payments to Maxus's shareholders and interest payments on Maxus's debt.

66.     YPF, through its wholly-owned subsidiary YPF Acquisition Corp. ("<u>YPFA</u>"), then completed its acquisition of Maxus's shares in early April 1995.

67.     Immediately thereafter, YPF convened the Maxus Board so that ten of the thirteen members could be replaced by five YPF-approved directors to constitute the new, eight-member Maxus board.   YPF's appointees to the Maxus Board included three senior YPF executives: Cedric Bridger, Nells Leon and J.R. Lesch; and two long-time YPF advisors, including YPF's counsel, Dexter Peacock of Andrews & Kurth (also a YPF alternate director) and Peter Gaffney, a founder at the E&P consultancy firm, Gaffney, Cline & Associates (retained by YPF in connection with the LBO and later used by Maxus).   While the Merger Agreement required that YPF maintain on the Maxus board three "legacy" (or nominally disinterested) directors who pre-existed the YPF acquisition, YPF selected two of the three legacy directors, George L. Jackson and Charles Blackburn, and retained Blackburn as a highly-paid consultant, such that YPF either directly appointed, or otherwise selected, seven of the eight members of the new Maxus Board.[7]

68.     The new Maxus Board, dominated as it was by YPF executives and advisors, immediately rendered moot Maxus's negotiated right to exercise its fiduciary out.   The new Maxus Board accepted—without any apparent testing or questioning of the underlying assumptions—an analysis prepared by solvency experts at Houlihan Lokey Howard & Zukin ("<u>Houlihan Solvency Opinion</u>").   The Houlihan Solvency Opinion gave Maxus a "pass"

---

[7] The other director was Mr. R.A. Walker, nominated and elected separately by the Prudential Insurance Company of America, the holder of Maxus's $9.75 Preferred Stock.

following the assumption of YPF's acquisition debt, but concluded that, without the Keepwell Covenant and YPF guarantee of the acquisition debt, the LBO would have rendered Maxus insolvent.

69.     Based on the information available to the Maxus Board at the time, the Board knew or should have recognized that the Houlihan Solvency Opinion's "pass" was based on faulty assumptions.  For example, the Houlihan forecast assumed that Maxus would spend $95 million in environmental liabilities between 1995 and 1998, with zero environmental expenditures after 1998.  This assumption was manifestly unreasonable given what the Board and YPF knew about the Diamond Alkali Superfund Site alone, in addition to what they knew at that time about Maxus's other significant environmental liabilities.  Houlihan did not independently estimate the environmental liabilities and instead used the Maxus recorded reserve estimate of $82 million for its analysis based on GAAP, just a fraction of what would reasonably be needed to cover Maxus's long-term contingent liabilities.  Moreover, while Maxus's cash flow projections showed operating deficits for 1995-1998 of $424 million, the Solvency Opinion projected that, during those years, YPF would make capital contributions to Maxus of around $417 million, but that no capital contributions would be required thereafter.

70.     Given the financial information to which the YPF-controlled Maxus Board had access, the Board knew—or should have known—that Maxus was undercapitalized and in the zone of insolvency as a result of the LBO.  It approved the transaction anyway.

71.     The next day, Maxus's shareholders met to vote on YPF's acquisition proposal. The YPF-controlled Maxus Board decided that the notice of meeting would be sent only to those stockholders "as of the close of business on April 22, 1995," the date on which YPF's wholly-

owned subsidiary, YPFA acquired a controlling interest in Maxus.  In other words, YPFA voted as Maxus's controlling shareholder to approve YPF's acquisition proposal for Maxus using Maxus's money despite the fact that Maxus was inadequately capitalized at the time.

72.    Two months later, on June 7, 1995, the new Maxus Board (appointed and controlled by YPF) met to give final approval to YPF's proposed financing structure.

## III.    YPF Realizes Its Exposure And Implements The Strategy

73.    Almost immediately following the closing of the merger, YPF definitively realized that the "major issue" of Maxus's environmental liabilities could not be easily managed and posed significant and unacceptable risks to YPF by virtue of the Keepwell Covenant and YPF's global guarantees of Maxus's commercial debt.  In a series of memoranda to YPF's Board, Mr. Dexter Peacock (lead counsel at Andrews & Kurth and Maxus Board member) presciently warned YPF that it could have "direct liability" for what he characterized as Maxus's potentially billion-dollar environmental liabilities through "pierc[ing] the corporate veil" or substantive consolidation in bankruptcy:

> [i]t is critical to an understanding of the proposals being made to the Board, however, to understand that YPF nevertheless has substantial indirect exposure to Maxus's environmental liabilities.
>
> [Y]PF has already exposed, or will by the end of this year will have been exposed (assuming Maxus $4.00 Preferred is redeemed) a total of about $1.1 billion in cash to Maxus's environmental liabilities.  As time goes on, that figure will go up rapidly, and it should not be forgotten that YPF has guaranteed $1.2 billion of Maxus debt on top of its cash investment.  To put it another way, YPF has already placed at risk to adverse developments an amount more than 10 times as large as Maxus's current loss reserve for environmental liabilities.  Environmental projects are normally slow to develop (they frequently take 15 years from start to finish), and this figure can only grow with time.

(Emphasis added)

74.    In response to this exposure, it does not appear that YPF ever seriously considered instituting a program to conserve Maxus's capital to ensure that Maxus could meet its future liabilities.  Instead, YPF immediately formulated and gambled on a strategy for Maxus to "strip, manage, and settle" (the "Strategy") by which YPF would siphon Maxus's assets for its own benefit, isolate the massive environmental liabilities from Maxus's revenue-producing assets, and keep Maxus on life support for as long as possible, while simultaneously avoiding that a single creditor remain unpaid before YPF could implement the final phase of the Strategy.

75.    To implement its Strategy, YPF caused Maxus to undertake a global restructuring in 1996 and 1997, purportedly for tax benefits which accrued only to YPF (not Maxus).  In reality, YPF restructured Maxus's debt, changed its corporate structure and reshuffled Maxus's assets and personnel in order to cut off YPF's direct exposure to Maxus's environmental liabilities through a series of three interrelated "restructuring" transactions.

76.    **The Debt "Restructuring."**    In order to cordon off future environmental liabilities from valuable E&P assets, YPF had to eliminate the restrictions and covenants in Maxus's bond indentures and its Certificate of Incorporation, which limited the transfer or sale of "all or substantially all" of Maxus's assets. As YPF readily acknowledged, these covenants "represent[ed] a significant obstacle to major redeployments of Maxus'[s] assets."

77.    YPF eliminated those covenants by a series of transactions that consolidated Maxus's debt with YPF and caused Maxus to borrow funds from YPF to prepay the existing public and private debt that contained the restrictions and to redeem its preferred stock (including

the Midgard Facility,[8] the Indonesian Facility,[9] certain sinking fund debentures, and a portion of Maxus's senior and medium term notes).

78.    In brief, after the restructuring of its debt, Maxus was saddled with more than $1.4 billion in new debt—now owed to YPF—which contained no restrictions on self-dealing or asset transfers.  Maxus had used all of the new YPF-loan proceeds to retire its existing debt – which triggered prepayment penalties totaling millions of dollars and the simultaneous loss of relatively low interest rates, long maturity dates, and parental guarantees associated with such existing debt.  Adding insult to injury, YPF required Maxus to pay a special dividend to its remaining preferred stockholders in order to obtain their consent to the elimination of any remaining restrictions on intercompany transfers in its Certificate of Incorporation.

79.    By causing Maxus to elect this costly refinancing path, YPF eliminated its guarantees of Maxus's debt, removed all impediments to its siphoning of Maxus's assets, and created an illusory credit bid currency for YPF to acquire certain Maxus assets.  The special dividend paid to the holders of preferred stock had the added benefit of removing from Maxus's corporate governance any remaining oversight by any independent fiduciary interested in Maxus *qua* Maxus.

80.    **The Environmental "Restructuring."**  In a further effort to separate Maxus's liabilities from its producing assets, YPF also created a set of shell companies – YPFH, YPFI, CLHH, and "Chemical Land Holdings, Inc." (later renamed Tierra) – beginning in July 1996.

---

[8] Credit Agreement between Midgard Energy Company, Lenders and Chase Manhattan Bank (National Association) dated as of June 8, 1995.

[9] Credit Agreement between Maxus Indonesia, Inc., Maxus Northwest Java, Inc. and Maxus Southeast Sumatra, Inc., dated as of June 16, 1995.

81.    YPF caused Maxus to transfer to Tierra the title to its contaminated real estate properties, including among others, the Lister Site, the Painesville Site and the Tuscaloosa Site. YPF also caused Maxus and Tierra to enter into an "Assumption Agreement," dated August 15, 1996, by which Tierra purported to assume all of Maxus's OCC Indemnification Obligations. This assumption was without the consent of OCC, and as such it did not relieve Maxus of the indemnity obligations it owed to OCC.

82.    Nominally in exchange for the assumption of the OCC Indemnification Obligations, YPF and certain of its affiliates entered into a "Contribution Agreement" with Tierra, pursuant to which YPF agreed to make certain capital contributions to Tierra up to $111.5 million to pay for environmental remediation and 110% of Tierra's budgeted administrative, general and legal costs on an annual basis.  Environmental liabilities above the Contribution Agreement cap would remain Maxus's obligation.  Significantly for YPF, any payments made under the Contribution Agreement had the benefit of reducing YPF's obligations to Maxus under the Keepwell Covenant (the key to Maxus's "solvency" per the Houlihan Solvency Opinion).

83.    Upon information and belief, YPF fully recognized in its Strategy that the environmental liabilities could far exceed the limited Contribution Agreement cap, and that Maxus and Tierra had inadequate capital to satisfy their obligations.  Accordingly, as part of the Strategy, YPF had, in effect, guaranteed only a fraction of the potential liabilities with "no obligation to increase the amount of its contribution obligation."  If the liabilities increased and became "very high in relation to the amount of assets YPF already has at risk, YPF would have the option of refusing the increase."  In other words, through the Contribution Agreement, YPF isolated the environmental liabilities in a shell corporation without providing consideration to

Maxus (given that YPF had already made the same promise through the Keepwell Covenant) or to Tierra to cover the OCC Indemnification Obligations (which would remain with Maxus). At the same time, YPF was in the process of siphoning Maxus's assets for itself and, if the Strategy worked, out of the reach of Maxus's creditors.

84.    **The Asset "Restructuring."**    As the third step in YPF's Strategy to strand environmental liabilities, YPF caused Maxus to sell to YPF subsidiaries Maxus's valuable international assets at discounted prices. Moreover, YPF paid for those assets by setting off intercompany debts that were, by then, worthless in light of Maxus's insolvent status. These asset sales were staggered in time to allow for the proceeds of the first sales to be used to take out the remaining debt covenants and sale restrictions before transferring the other assets.

### i.    The Bolivian and Venezuelan Asset Sales

85.    Maxus's Bolivian and Venezuelan oil and gas assets were among its most profitable assets. Both had a high expected return of 14% to 18% per year. Maxus's corporate valuation models indicated the assets were worth $305 million in aggregate.

86.    In June of 1996, YPF caused Maxus to transfer to YPFI the stock of Maxus's Bolivian and Venezuelan affiliates (the "Bolivian and Venezuelan Assets"), and then to sell the stock of YPFI to YPF for book value ($266 million) as determined by Credit Suisse First Boston ("CSFB"). The YPF-controlled Maxus Board did not use, discuss, or consider Maxus's higher, internal valuation of its Bolivian and Venezuelan Assets. Nor did the Maxus Board consider putting the assets on the open market, even though the Maxus Board had previously been advised that YPF would benefit from a quick acquisition of Maxus's assets and that a third-party sale

would avoid the need to "grapple with questions about valuations of early-stage assets like undrilled Bolivian exploration blocks, and with overarching questions of corporate opportunity."

87.     Maxus's financial condition was substantively worsened by the sale of the Bolivian and Venezuelan Assets, not only because Maxus lost the benefit of the future income and growth opportunities from those Assets, but also because Maxus did not retain the proceeds of the Bolivian and Venezuelan Asset sales to reinvest in its core E&P business.  Instead, YPF directed Maxus to pay $165 million of the proceeds to Maxus's $4 preferred stock holders, thereby incurring a $33 million premium for redeeming the stock early.  Moreover, the expected rate of return on the assets was more valuable than the avoided dividend payments on the preferred shares, making this transaction on its face unfavorable to Maxus.

88.     On the other hand, these sales were clearly for the benefit of YPF.  Retiring the preferred stock early benefitted YPF (1) by increasing its ownership interest in Maxus, (2) by enabling YPF to complete the reorganization without being bound by the limitations on asset sales contained in Maxus's Certificate of Incorporation, and (3) by giving YPF all the benefits of the high expected returns from E&P assets for the lowest (supposedly fair) value, before new discoveries could increase their value.

### ii.     The Ecuadorian and Indonesian Asset Sales

89.     In 1997, YPF next caused Maxus to transfer its Ecuadorian and Indonesian assets, which together constituted a significant percentage of Maxus's total operating revenue.

90.     In December 1997, YPF caused Maxus to convey 100% of the stock of Maxus Ecuador to YPFI for $185 million (the "Ecuadorian Assets").

91.    This transaction was also well below market value.  Maxus's internal model and an outside expert valued the Ecuadorian Assets at between $275 and $310 million.  CSFB valued them at $205-245 million in December 1997.  Nevertheless, the Maxus Board appeared to rely only on the property valuation of the Ecuador Assets conducted by Gaffney Cline, the company of one of Maxus's nominally independent directors (Peter Gaffney), which valued them at $165 million.  The Internal Revenue Service ("IRS") later challenged the sale and contended that the fair market value was $225 million, $40 million higher than the "sale price."  YPF ultimately settled the issues with the IRS but never paid Maxus the difference between sale price and fair market value of the Ecuadorian Assets.

92.    Moreover, YPF caused Maxus to use the $185 million in proceeds from the sale of the Ecuador Assets to repay a portion of the $200 million loan that YPFI had extended to Maxus one month earlier and that Maxus used at YPF's behest to redeem certain senior and medium term Maxus notes.

93.    On December 31, 1997, YPF caused Maxus to transfer to YPFI 100% of the stock of YPF Java and Maxus Southeast Sumatra (together, the "Indonesian Assets") to YPFI for $505 million.

94.    The Indonesian Assets were Maxus's most valuable assets and the purchase price of $505 million—ultimately adjusted to $575.4 million—was far below fair market value:  Maxus's internal estimate of the value of the Indonesian Assets was $834 million, a third party bid $809 million for these assets, an outside expert valued them at $750-850 million, and CSFB valued the Indonesian Assets at $645-795 million.

95.     Once again, rather than reinvesting the proceeds from the sale of the Indonesian Assets into Maxus's core E&P business, YPF caused Maxus to use $436 million of the proceeds to repay a YPFI note which had been used to retire the LBO debt, and approximately $75 million to partially repay a YPFI note which had been used to repurchase Maxus's sinking fund debentures (which included a premium of $6.8 million).[10]

96.     In short, the "sale price" YPF paid for the Ecuadorian and Indonesian Assets was clearly hundreds of millions of dollars below fair market value.  In fact, in accordance with GAAP, YPFI recorded the fair market value of the assets on its balance sheet at approximately $1.2 billion, rather than the approximately $700 million of the purchase price paid to Maxus in December 1997.  In addition to siphoning Maxus's most valuable international E&P assets (including future revenue and cash flows) by causing Maxus to use the proceeds to pay down YPFI loans, YPF significantly reduced its exposure to Maxus at a time when Maxus was insolvent or in the zone of insolvency.

### iii.     The Siphoning of Personnel

97.     In addition to siphoning assets in exchange for debt repayment between 1995 and 1998, YPF effectively siphoned Maxus's other valuable asset:  its personnel.  YPFI, the entity that acquired the international E&P assets, had no employees and no operational capacity, so YPF required Maxus to use its own personnel to manage those assets for YPFI without fair consideration.  This was done through the "Maxus Management Group," a group of companies managed by Maxus personnel that included YPFI and Maxus (but not Tierra) and had

---

[10] An additional $63.7 million price adjustment from the sale was used to repay a portion of the CSFB loan used to repurchase the Maxus's senior and medium term notes in August 1998.

responsibility for Maxus's assets, Maxus's legacy assets transferred to YPFI and other YPF assets outside of Argentina, all outside the formal Maxus corporate structure.  While YPF and Maxus had a services agreement that provided that Maxus would be compensated "at cost" for its services to YPF, that agreement did not cover YPFI or any other YPF subsidiary included in the Maxus Management Group, to which Maxus was providing such services effectively for free. Due to YPF's pervasive control of Maxus, Maxus did not receive fair compensation for its services despite multiple internal acknowledgements that actual service agreements should be— but never were—put in place.

## IV.    YPF's Domination And Control Of Maxus Between 1995 And 1999

98.    Throughout the 1990s, YPF acted as though Maxus and YPF held themselves out as a single business unit and not separate companies.  "As a result of the acquisition of Maxus," YPF's 1995 Annual Report declared, "the Company has organized its international operations into an international Business Unit for its upstream operations."  By 1996, YPF's Annual Report confirmed that YPF had "completed the integration of Maxus Energy Corporation," referring to Maxus as "our international E&P business unit (formerly Maxus)."

99.    Internal documents referred to Maxus as the "international projection of YPF . . . contributing to the profitable growth of YPF," and a "strategic business unit which will manage YPF's upstream activities outside of Argentina" with "full responsibility" for those activities, and "the International Exploration and Production Strategic Business of YPF."  Maxus's newly appointed CEO, Mr. Roberto Monti, explained that, "while our legal business name is Maxus, we identify 100% with YPF's strategy and act as such in the international arena."  Mr. Nells Leon, President and CEO of YPF, admitted that he considered himself, not Mr. Peter Gaffney

(who was the nominal Maxus CEO immediately after the acquisition), the real chief executive of Maxus.

100.    YPF was running Maxus and YPF as a single economic entity and this was reflected in the composition of Maxus's Board of Directors, as well as the decisions made by the Board during this time.

101.    After the acquisition, YPF immediately appointed five of eight members to the Maxus Board (Cedric Bridger, Nells Leon, J.R. Lesch, Peter Gaffney and Dexter Peacock) and handpicked at least two of Maxus's three continuing "legacy" directors (George Jackson and Charles Blackburn).  Upon information and belief, none of these directors considered the effects of their actions on the billions of dollars of environmental liabilities that Mr. Peacock had warned them would arise.

102.    Most glaringly, the YPF-controlled Maxus Board failed to consider the impact of any of the foregoing transactions on Maxus's own solvency even though it was clear that Maxus was already insolvent by virtue of its environmental liabilities at the Lister Site alone, without considering the environmental liabilities related to over one hundred other Sites across the country.  The Board and other fiduciaries were simply content to ignore how the Strategy would impact those obligations.  In fact, Maxus's chief tax counsel, David Smith, candidly testified that, while working with YPF, Arthur Andersen and Andrews & Kurth, he "was worried about, and most of the people that I had dealings with in Maxus and YPF were worried about[,] the debtholders, the formal debtholders and preferred shareholders.  I was not worried about the environmental liabilities."

103.    As part of its ongoing scheme to separate the E&P assets from the environmental liabilities and perpetuate the Strategy, YPF also dominated and controlled Maxus's management. Between 1995 and 1998, YPF installed YPF executives in roles at Maxus while they continued to work for YPF.  For example, during his time as Maxus CEO, Mr. Monti was simultaneously working as YPF Vice President and reported to the Executive Vice President of YPF.  Mr. Mario Rosso had an even more complicated set of hats when he replaced Mr. Monti as Maxus CEO while also serving as YPF's Vice President of International Exploration and Production.  In his YPF role, Mr. Rosso presented to the Maxus Board a recommendation to sell Maxus's Ecuadorian and Indonesian assets to YPFI.

104.    YPF also caused Maxus management to abandon its authority over key decisions, including employment contracts and pay decisions within Maxus and its subsidiaries.  Just like Maxus, the other Debtors had to "run it through [YPF] first" for many types of decisions.  For example, the CEO of one Maxus affiliate had to obtain approval from YPF management for spending and budgets, to sign contracts above a certain dollar-value threshold, to draft mission statements and even to modify its own business cards.

105.    Maxus management operationally used financial statements that included assets owned by both Maxus and YPFI under the "Maxus Management Group," despite keeping separate unaudited financial statements.  The Maxus Controller, Ms. Linda Engelbrecht, occasionally reported to the Maxus Board regarding the Maxus Management Group—not Maxus Energy Corp.—even though the assets which were the subject of her reports had been transferred from Maxus to YPFI in the "restructuring."

106.    In addition to placing two long-time YPF advisors on the Maxus Board (Dexter Peacock of Andrews & Kurth and Peter Gaffney of Gaffney Cline), YPF expected Maxus to conform to YPF's business strategies and rely on YPF professionals, including through the "perfect coordination" of Maxus and Tierra's legal efforts with Andrews & Kurth, who, upon information and belief, was also YPF's counsel throughout that period.

## V.    The YPF Strategy Benefits YPF To The Detriment Of The Debtors And Creditors

107.    Within four years after the acquisition, YPF had effectively liquidated Maxus for YPF's own benefit.  YPF held directly or indirectly all of the international E&P assets and their respective revenue prospects previously available to satisfy Maxus's obligations prior to the LBO.  YPF had also removed most of Maxus's third-party creditors (such as the funded debt lenders and the holders of preferred equity interests), who could exercise any meaningful control over YPF's mismanagement of the Debtors (for instance, by seeking reporting, filing fraudulent transfer suits or filing involuntary petitions for bankruptcy).

108.    As a result of YPF's global "restructuring" of Maxus (really a "destructuring"), Maxus's total assets had been reduced from $2.9 billion to less than $1 billion and Maxus's revenue had declined by over 70%.  The stripping of Maxus's international E&P assets largely eliminated Maxus's ability to conduct business in a manner such that it could fund its ongoing obligations out of its own revenue.  By the end of 1998, Maxus was "solvent" only insofar as it received YPF capital contributions (in the form of intercompany debt forgiveness and cash to pay off LBO debt) pursuant to the Keepwell Covenant.

109.    The deterioration in Maxus's ability to independently satisfy its creditors was the obvious and intended consequence of YPF's implementation of the Strategy, and YPF's ongoing

capital contributions to a functionally insolvent Maxus merely continued the Strategy to shield YPF from exposure to Maxus's massive contingent liabilities by keeping Maxus's creditors' claims contingent.

## VI.    Repsol's Acquisition Of Maxus And Continuation Of The Strategy

110.    In 1999, Repsol, S.A., the former national oil and gas company of Spain, acquired YPF and changed its name to Repsol YPF, S.A. (Repsol, S.A. and Repsol YPF, S.A. are collectively referred to herein as "Repsol").  Repsol's acquisition of YPF significantly increased Repsol's debt to equity ratio and, by October 1999, Repsol sought to integrate YPF, reduce costs, and divest certain assets, including Maxus's last significant remaining E&P assets in Crescendo Resources LP ("Crescendo").

111.    After Repsol acquired ownership and control of YPF, it soon understood the scope and extent of the legacy liabilities at Maxus.  Instead of dealing with those liabilities in a responsible way by either cutting its losses and walking away or by stepping up and adequately capitalizing Maxus to face its mounting liabilities, Repsol decided to embrace and continue the execution of the Strategy.

112.    Repsol was able to continue the Strategy and to squeeze every bit of value from Maxus by dominating the Maxus Board.  For example, between February 1999 and July 2004, Repsol caused the Maxus Board of Directors to forego any in-person meetings.  Instead, under Repsol's control, the Maxus Board made material structural, operational and financial decisions solely through unanimous written consents and the occasional telephonic meeting (including decisions related to the sale of significant assets described below).

113.   **Crescendo Transfer.**   By 1999, Maxus's sole remaining producing assets and revenue stream were tied to Maxus's 59% interest in Crescendo, a joint venture between Midgard (a Maxus subsidiary) and BP Amoco with respect to properties in Texas and Oklahoma. Repsol understood that the sale of Crescendo would leave Maxus without assets or cash flow to service its liabilities and Tierra's annual losses.   Repsol decided to proceed with the sale of Maxus's interests in Crescendo as part of its unabashed adoption of the Strategy.

114.   In December 1999 and January 2000, Repsol caused YPF to cause Maxus to sell part of its Crescendo interests  (the "Crescendo Transfer") to BP Amoco for just $405.5 million, and the balance of the interests to Apache Resources for $219 million—a total cash price of $624.5 million.  Maxus's internal calculations valued its interests in Crescendo at $800 million to $1 billion, with a book value of $745 million.  Accordingly, Maxus had to record a loss of over $120 million on the Crescendo Transfer.   BP Amoco did not want its counterparty in the Crescendo joint venture to sell its interests to a third party, nor did it want Repsol to release data about Crescendo assets to third parties.  At the same time, Repsol was solely interested in a quick divestiture in furtherance of the Strategy.   As a result, neither Maxus nor BP Amoco was negotiating for a fair market value purchase price.

115.   Primarily due to the Crescendo Transfer, Maxus's assets, which were valued at $768 million at the end of 1998, plummeted to $26 million by the end of 2000 and Maxus's total revenue declined by 98%, just as YPF and Repsol had contemplated in devising and adopting the Strategy.  Maxus was thereafter left insolvent and completely dependent on YPF and Repsol to fund its daily operations.  More specifically, Maxus was left without an available revenue stream to honor any of the OCC Indemnification Obligations.

116.    Again, YPF and Repsol did not let Maxus use the proceeds of the Crescendo Transfer to further develop E&P projects; instead, they caused Maxus to use $236 million to pay down intercompany debt.  This benefitted YPF by eliminating debt that YPF had guaranteed and which YPF (and Repsol) knew Maxus could never repay.  Repsol and YPF caused Maxus to loan $325 million of the remaining purchase price to a Repsol affiliate, Repsol International Finance ("RIF"), which provided Maxus with only a 1% return —a rate that was generally below LIBOR and certainly below what Maxus had projected it would earn from the Crescendo exploration investments or any other investment of the purchase price.  Repsol agreed to fund Maxus's diminished continuing operations on an as-needed basis only, based on estimated cash needs calculated monthly.  This monthly receivable amounted to 90% of Maxus's total revenues at the time.

117.    Consistent with YPF and Repsol's stranglehold on Maxus, the Maxus Board did not even meet to discuss the Crescendo Transfer, despite the wide ranging and deleterious ramifications of the transaction.  Instead, YPF and Repsol engineered the Crescendo Transfer without the Maxus Board's involvement and wiped out Maxus's sole remaining producing asset and principal revenue source, stranding Maxus with all the legacy liabilities and no corporate opportunities to cover creditors' claims.

118.    **Sale of Maxus Legacy Assets from YPFI.**  In their efforts to continue the Strategy and to use Maxus assets for their own benefit, Repsol and YPF effectuated the sale of Maxus's international E&P assets (held by YPFI following the YPF global restructuring, described, supra, in Section III) to third parties or to Repsol subsidiaries between 2000 and 2002.

The point of those transfers was to further remove the assets from the reach of Maxus's creditors and the Maxus Management Group.

119.    In 2001, YPF approved the sale by YPFI of what had been Maxus's Ecuadorian Assets to a subsidiary of Repsol for $307.5 million.  Those assets had been sold by Maxus to YPFI for $185 million five years before.

120.    In August and September of 2001, YPF approved the sale to a Repsol subsidiary of Maxus Venezuela for a total consideration of $109.7 million and Maxus Guarapiche to Repsol for $203.3 million—together, those entities held what were previously Maxus's Venezuelan Assets.

121.    On January 18, 2002, YPF's Indonesian assets were sold to the China National Offshore Corporation ("CNOOC"), the Chinese national oil company, for $585 million, less assumed debt.  YPF's Indonesian assets included the legacy Maxus Indonesian Assets.  The proceeds from this sale were remitted to RIF as a loan from a YPF entity.

122.    In total, just a few years after the transfer of Maxus's international E&P assets to YPFI, YPFI had received more than $500 million in additional value from the resale of those same assets (without taking into account that the proceeds from Maxus's earlier sales of the legacy assets to YPFI had been used to retire debt for the sole benefit of YPF, YPFI and YPFH).

123.    Repsol also clearly benefitted from the transactions because it both received and controlled the cash proceeds from the transactions.  Repsol used that cash to reinvest in Repsol's business and corporate opportunities (which now included Maxus's legacy E&P assets).  In the case of the Ecuadorian and Venezuelan Assets, Repsol subsidiaries also received the underlying assets.

124.    YPF also benefited from the sales to the detriment of Maxus's creditors.  Rather than using the proceeds to fund the Maxus Management Group's liabilities, YPF took the proceeds for itself and, in accordance with its dividend payment policy, used them to pay dividends to Repsol and other YPF shareholders (thereby circuiting the majority of the purchase price back from where it came – Repsol).

125.    Additionally, and by design, Repsol and YPF also benefitted from the transfer of Maxus's legacy assets and their revenue streams out of YPFI (an alter ego for Maxus in the Maxus Management Group), as it created an additional corporate shell between Maxus's creditors and the value-making assets.

## VII.    Repsol Realizes The Legal Risks Of Its Strategy

126.    Following its acquisition, Repsol was well aware of YPF's and Repsol's exposure to Maxus's and Tierra's environmental liabilities and knew that "[t]hese contingencies have an unknown limit, nor [do they] have a time horizon regarding its maximum quantification or expiration."

127.    Indeed, since 2005, YPF's and Repsol's actions to control and dominate Maxus and siphon all of its assets to the detriment of Maxus's creditors took place with actual litigation over those issues underway in the New Jersey courts.  As noted, on December 13, 2005, the State of New Jersey (on behalf of the NJDEP and the Administrator of the New Jersey Spill Compensation Fund) initiated the "Passaic River Litigation."  Even then, the Passaic River Litigation did not relate to any of the multiple other Sites across the country.

128.    Upon information and belief, as soon as the Passaic River Litigation took hold, Repsol began exploring options with outside counsel to determine how to manufacture a new

corporate separateness among Repsol, YPF and the Maxus entities, while also avoiding any action that would increase scrutiny or invite litigation.  In particular, Repsol and YPF sought specific advice on how to whitewash issues of alter ego liability and how best to carry out their Strategy to end their subsidiaries' exposure to the environmental liabilities before any of the creditors' contingent, unliquidated claims crystallized.

129.    King & Spalding LLP ("King & Spalding") produced for Repsol a May 24, 2005 report which first identified some of the problems—euphemistically referred to as "anomalies"—in the historic economic relationships between Repsol, YPF, YPFH, Maxus and Tierra.[11]  These problems included (among other things) that YPFH, Maxus, and Tierra were insolvent, that Repsol and YPF had issued significant guarantees to YPFH, Maxus, and Tierra, that Repsol and YPF were using Maxus employees without adequate compensation, and that YPF had not fulfilled its Contribution Agreement with Maxus.

130.    At heart, King & Spalding recommended that Repsol take immediate steps to sever financial ties between Repsol and YPF on the one hand and Maxus and Tierra on the other, including by the termination of the Contribution Agreement, the cancellation of intercompany debt, and the extinguishment of guarantees.  The express purpose of the proposed severance was to circumvent alter ego liability for Maxus's and Tierra's environmental liabilities.  King & Spalding also recommended that Maxus's remaining E&P assets be sold at "market value."  The report further recommended that, while it would ultimately be necessary for Maxus to file for Chapter 11 in order to discharge its environmental liabilities, it was necessary to allow the statute

---

[11] Upon information and belief, Paul, Weiss, Rifkind, Wharton & Garrison LLP also advised Repsol and YPF of the legal risks associated with the Strategy and the steps to be implemented to limit those risks going forward.

of limitations to run on causes of action related to the foregoing transactions, which could be considered fraudulent transfers to YPF and Repsol. The two things King & Spalding did not recommend were (1) to unwind the prior transactions that stripped Maxus of any ability to repay its mushrooming environmental liabilities or (2) to install a truly independent board at Maxus whose duties would run to its actual, economic stakeholders—the environmental creditors.

## VIII.   Repsol Makes A Belated Effort To Establish A Façade of Corporate Separateness

131.   Consistent with their outside counsel's advice, Repsol and YPF spent nearly ten years attempting to whitewash the "strip" step of their Strategy and to effectuate the second— preventing Maxus and the other Debtors from ever filing a near-term chapter 11 bankruptcy to remedy their abject insolvency. Specifically, during the period from 2005 to 2016, Repsol continued the Strategy developed by YPF and attempted to implement the corporate separation plan through (1) the topical formalization of corporate structure; (2) the siphoning of Maxus's remaining assets; and (3) the entry into self-serving settlement agreements with Maxus which attempted to resolve glaring potential claims against Repsol and YPF under theories of alter ego liability and fraudulent conveyance.

132.   **Formalization of the Corporate Structure.**   In early 2005, Repsol created Repsol E&P USA as a direct subsidiary of Repsol Exploración, S.A (and parent to Maxus and Tierra). After the commencement of the Passaic River Litigation in 2005, Repsol orchestrated a more formal corporate governance façade calculated to isolate Maxus's environmental liabilities away from Repsol Exploración, S.A., and to transfer Maxus assets outside the direct property chain of YPF and YPFH.

133.    **Transfer of the Few Remaining Maxus Assets.**    Pursuant to the corporate separation plan devised in 2005, Repsol caused Maxus to sell certain of its remaining E&P assets to a Repsol subsidiary and removed the assets from the YPF and YPFH ownership chain to distance them further from Maxus's creditors to prevent them from being "earmarked for those [environmental] responsibilities."

134.    Effective July 15, 2005, Repsol E&P USA, Maxus and Hess entered into a participation agreement in which Repsol obtained a 16.5% interest in Hess's Gulf of Mexico prospect, Ouachita, in exchange for a 10% interest to Hess in the Ra prospect, another Gulf of Mexico prospect which was 100% owned by Maxus.  The deal also placed further encumbrances upon Maxus's remaining interests in Ra, including by granting Hess the right to earn up to an additional 40% working interest in Ra, and granting Repsol an option to acquire a 2% working interest in Ra.  Upon information and belief, the Maxus Board did not meet to discuss this transaction, and Maxus was not otherwise compensated beyond receiving a 1% interest in Ouachita, for which Maxus paid an additional $2.4 million.  In 2007, when Maxus attempted to market its remaining interests in the Ra prospect based on a third-party valuation of its interest between $39 and $73 million, potential buyers declined to pursue an acquisition, in part because of the Hess and Repsol encumbrances.

135.    As of late 2005, Maxus still held interests in offshore assets in the deepwater region of the Gulf of Mexico, including Stormy Monday, Tiger, North Bronto and Neptune. Preliminary drilling had occurred at Tiger and Neptune with proven reserves found at Neptune. In November 2005, the YPFH Board reported that Maxus's obligations for the expenses of Neptune development in 2006 and 2007 would be $130 million.  Because Maxus had already

been stripped of nearly all of its assets and had virtually no revenue stream, the YPFH Board—not the Maxus Board—retained Scotia Waterous to value Maxus's offshore assets.  Mr. Carlos Olivieri (Chairman of the Maxus Board at that time) explained to the YPFH Board that, because of Maxus's serious liquidity problems, it should consider a sale of the Stormy Monday and Tiger/North Bronto assets to a Repsol subsidiary.  On March 9, 2007, the Stormy Monday, Tiger/North Bronto assets were transferred to a Repsol subsidiary, Repsol Offshore E&P USA. In exchange, Maxus received $10 in consideration and an over-riding royalty interest of 9.5% in the Stormy Monday prospect and a 19% over-riding royalty interest in Tiger/North Bronto prospects.

136.    **Transfer of Maxus's Employees to Repsol.**  Following Repsol's acquisition of YPF, Maxus employees had been providing services to Repsol entities for which Maxus was either not compensated at all or not adequately compensated.  A 2006 presentation on YPFH's internal controls emphasized that Maxus continued to have missing service agreements and inadequate hourly rates for services provided to Repsol and YPF.  Not all Maxus departments completed timesheets, leading to incomplete or deficient invoicing.  Repsol acknowledged that in order to have full corporate separation from Maxus, these uncompensated intercompany receivables would have to be resolved and settled.

137.    Under Repsol's domination and control, Maxus's management and employee ranks were dramatically reduced.  By December 2005, Maxus did not have anyone at a Vice President position or higher in its corporate offices in Woodlands, Texas.  In 2007, Repsol formalized the transfer of approximately 147 of Maxus employees to Repsol entities as a step towards covering over the direct ties between Repsol and Maxus.  Repsol paid retention bonuses

to incentivize the employees to transfer.  The more than 140 Maxus employees that Repsol effectively raided from Maxus were generally Maxus's most talented and productive employees. Maxus's headcount dropped from 168 to 21 between December 31, 2006 and September 30, 2007.

138.    **Settlement Agreements.**  In another attempt to "fix" the chronic, historic fact of Repsol and YPF having commandeered Maxus's business assets, employees, and services without compensation, and also to limit Repsol and YPF's legal exposure from the Strategy it was pursuing, Repsol and YPF caused Maxus to enter into several "settlements."  Upon information and belief, these settlements, described below, were not for fair consideration. Rather, they evidence the complete domination and control of YPF and Repsol over the Debtors, the general disregard for corporate formalities between YPF and Repsol on the one hand and the Debtors on the other hand, and the attempt of YPF and Repsol to cover over their past mistakes—albeit in a manner that was completely unsatisfactory and unfair to Maxus and its creditors.  In connection with these Settlement Agreements, Maxus surrendered billions.

139.    **2007 Settlement Agreements.**  Specifically between April and July 2007, Repsol subsidiaries—Repsol Services Company and Repsol E&P T&T Limited—entered  into three separate pre-bankruptcy phase settlement agreements with Maxus to compensate Maxus for uncompensated services Maxus performed on behalf of Repsol during 2006 and 2007 (the "2007 Settlement Agreements").  On April 5, 2007, Repsol entered into an agreement to pay Maxus $1.6 million for uncompensated marketing and distribution services that Maxus had provided to Repsol Services Company in 2006.  On April 27, 2007, Repsol Services Company entered a second settlement agreement to pay the outstanding invoices to Maxus for services provided in

connection with exploration activities in the Gulf of Mexico in 2006 and early 2007.  In July 2007, Repsol E&P T&T entered into a third settlement agreement with Maxus for uncompensated technical services Maxus performed for Repsol in 2006 and 2007 related to operations in Trinidad and Tobago.

140.    **2007/2008 Settlement Agreement.**  As a continuation of the Strategy, on October 8, 2007, YPF caused Maxus and Tierra to sign yet another Settlement Agreement (the "2007/2008 Settlement Agreement").  Upon information and belief, YPF and Repsol wanted to eliminate intercompany receivables between YPF, YPFI, YPFH, Maxus and Tierra in an apparent effort to avoid alter ego liability risks.  Among other things, the 2007/2008 Settlement Agreement (1) released Tierra from the Assumption Agreement with Maxus; (2) formalized a Reimbursement Agreement by which Maxus agreed to fund Tierra's future expenses related to the OCC Indemnification Obligations for the next 20 years; and (3) terminated the Contribution Agreement to eliminate YPF's obligations to Tierra while simultaneously causing Maxus and Tierra to indemnify YPF for any future claims for payment under the Contribution Agreement.

141.    In exchange for these terms, all to the detriment of Maxus, YPF (1) forgave $363 million in intercompany debt "owed" by Maxus (which YPF knew Maxus could never pay anyway), (2) paid Maxus $43 million for an underfunded pension plan (for which YPF was already independently liable), and (3) made a $14.4 million advance to Tierra.

142.    Pursuant to the Contribution Agreement, YPF had agreed to provide a total of $115 million to fund environmental remediation costs and to provide funds for ongoing general and administrative and legal expenses of Tierra.  From 1996 to 1998, YPF provided only $25.5 million to Tierra under the agreement.  There were no similarly documented contributions

thereafter.  In sharp contrast, from 1996 to 2006, Tierra spent $250.7 million on environmental remediation projects and $64.3 million on general, administrative and legal expenses.

143.    Knowing the amount Tierra had spent on environmental remediation projects for which Tierra had <u>not</u> received any Contribution Agreement payments over the past decade, in November 2005, the YPFH Board met to develop a plan to negotiate a termination and settlement of the Contribution Agreement.

144.    One year later, in November 2006, YPF and Repsol sought to value the Contribution Agreement.  Dr. James Woods of Grant Thornton stated that a ballpark estimate could be as low as $270 million.  However, Mr. Guzman Solana, Maxus's CEO, stated in an email that the estimated values for the "Liquidation of Contribution Agreement Adjusted as of 12/31/2006" ranged from $1.3 billion to $1.5 billion from 1996 through 2026.  Adding an additional 10 years, the total estimates ranged from $1.4 billion to $1.7 billion.  A week later, Dr. Woods subsequently provided a revised "ballpark" estimate that the value of the Contribution Agreement, now including a calculation of the interest that would have accrued in the intervening years, was $524 million, with a sensitivity analysis showing a range of present values from $347 million to over $1 billion.

145.    Nevertheless, while the release of the Contribution Agreement was just one part of the 2007/2008 Settlement Agreement, the final terms of the 2007/2008 Settlement Agreement were not valued anywhere near what the release of the Contribution Agreement alone was worth to YPF.

146.    Due to the lopsided and inequitable nature of the 2007/2008 Settlement Agreement, the parties had difficulty obtaining a fairness opinion, and approached at least six

firms before they were able to find one that would provide a favorable opinion. The hunt for a company willing to issue the necessary fairness opinion took almost six months and delayed the closing until March 31, 2008. In the course of obtaining the fairness opinion, several firms informed the parties they could not opine that the 2007/2008 Settlement Agreement was fair to Maxus and Tierra. The fairness opinion that was ultimately obtained from Stout Risius Ross, Inc. was expressly limited to the fairness of the 2007/2008 Settlement Agreement for both Maxus and Tierra, as separately neither Maxus or Tierra – two independent companies – had received reasonably equivalent value for the termination of the Contribution Agreement and the Assumption Agreement.

147.    At the time the Maxus Board approved the 2007/2008 Settlement Agreement, all of its directors were also directors at YPFH. The minutes of the Board meeting reflect no deliberation over the terms of the 2007/2008 Settlement Agreement or how it would benefit Maxus or protect its creditors.

148.    **2009 Settlement Agreement.** On July 8, 2009, Repsol caused Maxus to enter into a third Settlement Agreement (the "2009 Settlement Agreement"), this time with Repsol E&P USA, Repsol Services Company, and Repsol Offshore E&P USA (collectively, the "Repsol Entities"). According to the recitals in the 2009 Settlement Agreement, the settlement related to several "disputes" between Maxus and the Repsol Entities for the use by Repsol and YPF entities of Maxus's assets and services, including: (i) use by Repsol Entities of Maxus-licensed seismic data, condensed seismic data and software; (ii) a lack of consideration to Maxus in exchange for the Ouachita/Ra and Valencia exploration assets; (iii) unpaid invoices for services rendered by

Maxus to Repsol or certain of its non-YPF subsidiaries; and (iv) performance corroboration (well data) related to Stormy Monday and Tiger/North Bronto.

149.    In return for a full release by Maxus of its claims with respect to all these matters, the Repsol Entities paid $50 million to Maxus—$3.62 million for the software, $23.69 million for the Ouachita/Ra and Valencia interests, $7.35 million for unpaid service invoices, and $15.34 million for the seismic data.  In essence, via the 2009 Settlement Agreement, Repsol caused Maxus to release it from the remaining unsettled claims related to Repsol's treatment of Maxus as a mere façade for Repsol.  Upon information and belief, the payments made in exchange for these releases were not for fair market value, and certainly did not include any consideration for the damage caused to the Debtors by the lack of corporate independence over the prior decade.

150.    The below chart shows the grossly inequitable nature of the settlement agreements discussed above.

| Agreement | Maxus and Tierra Get | Maxus Gives Up |
|---|---|---|
| 2007 Settlement Agreements | • $2.9 million in cash to Maxus<br><br>• Payment by Repsol of certain outstanding invoices to Maxus | • Marketing, distribution, exploration and technical services performed on behalf of Repsol<br><br>• All claims relating to such services provided to Repsol |
| 2007/2008 Settlement Agreement | • Forgiveness of $363 million of worthless intercompany debt owed by Maxus—real value: $0<br><br>• $43 million contribution by YPF to Maxus's underfunded pension (for which YPF was independently liable)—real value: $0<br><br>• $14.4 million cash advance to Tierra | • Contribution Agreement , obliging Maxus to now fund Tierra's future expenses relating to indemnification of OCC. Estimated to be worth between $524 million and $1.7 billion<br><br>• Assumption Agreement between Maxus and Tierra<br><br>• Maxus to indemnify counter-parties for future claims |

| 2009 Settlement of Claims Regarding Ouachita and Ra Prospects | • $50 million in cash to <u>Maxus</u> to settle outstanding amounts owed by Repsol for claims relating to Ouachita/Ra prospects, uncompensated use of Maxus's seismic data, unlicensed use of Maxus's software, and for unpaid invoices | • All claims related to Repsol's pledge of 10% of Maxus's 100% interest in the Ra prospect and the grant of earn-out rights to Hess, which encumbered Ra and rendered it unmarketable for Maxus (estimated value of $39-$73 million)<br><br>• All claims relating to at least $26.27 million in outstanding invoices, unpaid services and uncompensated use of Maxus data and software |
|---|---|---|

151.     Repsol's purpose in entering these settlement agreements was to achieve "corporate separation" on paper by eliminating intercompany receivables. Repsol's purpose was decidedly <u>not</u> to fully compensate Maxus, let alone improve Maxus's financial condition, as the above chart makes clear.

## IX.     After The Passaic River Litigation Is Commenced, Repsol And YPF Dominate Maxus So Thoroughly That Maxus Had No Separate Corporate Identity

152.     Despite Repsol's decision in 2005 to paper over Maxus's corporate separation issues, Repsol and YPF continued to exert control and dominance over the Maxus Board. For example, in 2008 a Maxus and YPFH board member, Harlow Sprouse, expressed confusion and frustration that, even though a goal of the company was to demonstrate that Maxus was a legitimate corporate entity and that no one should be able to pierce its corporate veil to reach YPF and Repsol, YPFH and Maxus did not have separate meetings, or separate minutes and resolutions.

153.     YPF further ensured that it had full control over any meaningful business decisions at the Debtors by regularly sending loyalists from Argentina to Maxus in Texas. For instance, in 2007, YPF employees Mr. Teodoro Marco (Maxus Board Member), Mr. Sebastian Sanchez Trolliet (Maxus's CFO) and Mr. Tomas Zapata (head of E&P at YPF) were sent to

Maxus and were in constant contact with Repsol and YPF in Argentina.  All meaningful decisions were cleared with Repsol before they were presented to the Maxus Board for "rubber stamp" approval.

154.    In addition, individuals on Maxus's and Tierra's boards frequently held executive positions or other significant positions within YPF and Repsol.  Individuals with key management positions at YPF and Repsol were appointed on Maxus's and Tierra's boards and/or given executive level positions at the Debtor entities.  For example, Mr. Olivieri was chairman of the Maxus Board and also a YPF vice president.  Even the nominally independent Maxus Board directors had significant conflicts and ties to YPF and Repsol's interests.  For example, both Mr. Notestine and Mr. Sprouse were also YPFH directors.

155.    In sum, the Maxus Board meetings between 2005 and 2012 were largely a meaningless and perfunctory exercise, performed only to comply with Repsol's "corporate separateness" plan to give Maxus the veneer of a functioning business that was not the alter ego of its parent and grandparent corporations.  From the day-to-day operations to board decision-making, YPF and Repsol completely dominated and controlled Maxus and Tierra.

156.    Between 2006 and 2016, Repsol and YPF controlled Maxus's purse strings and restricted Maxus executives' authority to make decisions and implement strategies at Maxus without excessive parental control.  While c-suite executives came and went, each executive found himself or herself without the independence or authority to act on opportunities to make the Debtors profitable companies that could actually satisfy their creditors' claims.

157.    In or around December 2008, Repsol went so far as to cause Maxus to change its Bylaws to require approval by the Repsol-dominated Board for any expenditure over $300,000, which effectively rendered Maxus's management impotent.

158.    Additionally, Repsol did not allow Maxus to manage its own financials.   An internal control visit in March 2000 revealed that "Maxus's purchasing and contracting procedures fell into disuse when functions were centralized in Buenos Aires and the entire purchasing department in the USA disappeared."  In a second quarter 2002 balance sheet review of YPFH, Deloitte & Touche ("Deloitte") noted that "the treasury function is handled in Buenos Aires."  Deloitte had to seek assistance from its staff in Buenos Aires in order to trace deposits made by Repsol on behalf of YPFH because the Finance Manager for YPFH and Maxus did not even have copies of the bank statements.

159.    By 2008, Maxus had lost control of its own bank accounts and had no knowledge of who had access to them.   In February 2008, Maxus's CFO, Mr. Mike Mills, asked a representative from Banco Bilbao Vizcaya Argentaria who from YPFH, Maxus, YPF or Repsol had control of Maxus's bank accounts.  The representative responded that Mr. Ricardo Chercoles in Spain (presumably with Repsol) had access to Maxus's accounts.

160.    Similarly, Repsol and YPF purposefully kept the Debtors entirely dependent on financial support and as-needed cash infusions to meet their obligations.  By 2000, Maxus was generating less than $5 million in total revenue annually, was recording large negative stockholders' equity, and was radically insolvent.  Tierra's entire purpose was to manage the environmental liabilities related to Maxus and as such it did not have any way to generate cash or

income, but was dependent on Maxus, YPF and Repsol to fund its general and administrative expenses, as well as to cover any costs related to the environmental liabilities.

161.    Accordingly, for years and at least by 2004, Maxus's auditors were able to conclude that Maxus was a going-concern only because YPF provided letters to Deloitte indicating its support of YPFH.

162.    Maxus management was not permitted to make any decisions for Maxus without first consulting with either Repsol or YPF management, including decisions relating to pursuing new investments and corporate opportunities, providing information to the press, hiring and compensating Maxus's own employees, and making environmental expenditures.   Moreover, YPF and Repsol personnel at Maxus were held separate and apart from the remaining Maxus employees.

163.    For example, Mr. Guzman Solana Gomez did not have an office at Maxus while he was Maxus CEO (2006 - 2007).   Instead, YPF leased separate office space for Mr. Solana Gomez apart from the other Maxus employees under his charge, where, while being paid by Maxus, Mr. Solana Gomez performed work for Repsol with no benefit to Maxus.   Notably, Mr. Solana Gomez, while formally the Maxus CEO, set up a new Repsol subsidiary (Repsol E&P USA) that ultimately siphoned all of Maxus's most valuable employees and assisted Repsol with non-Maxus negotiation efforts.

164.    In 2007, Mr. Jon Slater was hired as Maxus's CEO, despite the fact his only experience with oil and gas was limited to "putting gas in my car and getting the oil changed." Nor did Mr. Slater have any experience in environmental remediation, by then virtually the Debtors' sole operating activity.   Neither was a problem from Repsol's or YPF's perspective,

since it was clear the CEO job would be a position with no meaningful authority: "[t]he president position is a good opportunity for someone who has retired and wants to make some extra money during the next 3 to 5 years."

165.    When Mr. Slater resigned in 2009, he did so following a dispute in which YPF felt Mr. Slater had overstepped the very little authority he had by causing Maxus to enter into an Administrative Order on Consent with the EPA for a removal action associated with the Lister Site at an estimated cost of approximately $80 million—a decision that only bound Maxus, not Repsol or YPF, and that ultimately favored Maxus, its creditors, and the broader public.  It was not, however, necessarily favorable to Repsol or YPF as it increased the risk that Maxus's creditors' claims would become liquidated in the near future.

166.    In his February 2009 resignation letter, Mr. Slater stated that his reasons for resigning included YPF intervening in Maxus's management, withholding critical information, and delaying business decisions and funding for the operation of its remaining resources in the Gulf of Mexico such that Maxus could not develop revenue sources but would remain entirely dependent upon YPF for funding.  For example, YPF canceled a Maxus Board meeting in order to prevent discussion of the Neptune project, an offshore oil and gas drilling field in the deep waters of the Gulf of Mexico, over Mr. Slater's strong objections.  The Maxus CFO, Mr. Michael Mills, resigned on the same day stating similar complaints and noting that his responsibilities were so reduced that his ability to function was materially impaired.

167.    Similarly, when Mr. John Enloe (CEO of Maxus between 2009 and 2013) attempted to get YPF to support potential small Maxus investments and initiatives, he was told repeatedly that YPF was not interested and would not support them.  Such investment was

contrary to the Repsol and YPF intention of keeping Maxus around solely as a buffer for their exposure to Maxus's liabilities.

168.   **Control over the Passaic River Litigation.**  Repsol and YPF's pervasive control during this period also extended to the Passaic River Litigation, where Maxus, YPF and Repsol were being sued as alter egos by the State of New Jersey and OCC (see Section XI, infra). Repsol unilaterally hired Kirkland & Ellis ("K&E") to take over all legal activities, including litigation strategy on behalf of Maxus.  K&E lawyers went to Madrid to meet with Repsol and YPF representatives and secretly developed a new litigation strategy without Maxus's involvement.  According to Mr. Slater, Repsol and YPF refused to even tell Maxus the agreed-upon litigation strategy.  Other documents show that K&E, on Repsol's behalf, took over entire swaths of Maxus's privilege review and document collection efforts, eliminating the lines between parent and subsidiary in the middle of, ironically, an alter ego litigation.  Repsol was also placed directly in charge of the settlement of Maxus's liabilities to the State of New Jersey.

169.   This trend of privileging YPF and Repsol's interests in the New Jersey Litigation over Maxus's own interest continued over the years, when the next CEO, Mr. Guillermo Jalfin, made a plea for a settlement between OCC and Maxus that would have been strategically more advantageous for Maxus (but perhaps not YPF) at the time.  YPF unceremoniously shut that door, seeing any settlement with OCC as an immediate threat to its Strategy to keep Maxus as a buffer in the Passaic River Litigation.

170.   To summarize, even though the Debtors were already insolvent when Repsol acquired YPF in 1999, the Debtors' creditors likely could have recovered some of their claims in the ensuing years if Repsol or YPF had permitted the Debtors to manage their own affairs.

Instead, between 1999 and 2012, Repsol and YPF continued to implement the Strategy through their complete and total domination of the Maxus Board and Maxus management to completely strip Maxus of any meaningful value or future income prospects and transfer them all to Repsol entities.  At the same time, Repsol and YPF would not permit Maxus to do anything other than passively manage the already-authorized environmental activities and maintain routine, day-to-day operational functions like payroll and human resources functions based on the bare minimum payments made from Repsol to Maxus.  All of this was done as a calculated part of the final phases of the Strategy to "manage" the Maxus legacy liabilities until a Chapter 11 proceeding would conclusively (and favorably for Repsol and YPF) resolve them.

X.    **The Second YPF Period And Continuation Of The Strategy**

171.    In May 2012, Repsol was displaced as the majority holder of YPF's shares.

172.    Prior to the change of control, the Argentine government criticized Repsol for having used YPF "to support and finance its strategy for global expansion, thus predating Argentina's oil and gas resources with a short-term vision that gave priority to the transfer of dividends to its headquarters over the exploration and exploitation activities characteristic of the best practices of the oil business."  In the ultimate "pot calling the kettle black," Argentine Senator Anibal Fernandez accused Repsol's management of being "responsible for the looting and depredation of YPF."  YPF was said to have been "stripped of a number of leases, including in some of the biggest oil fields in the country."  The strategy said to have been implemented by Repsol on YPF was summarized in a report known as the "Mosconi Report" issued by Argentina's comptroller, Julio de Vido.  The Mosconi Report thus made the same asset siphoning allegations set forth in this complaint against the Defendants and put the blame

squarely on Repsol for the events that occurred during Repsol's ownership of YPF and the Debtors.

173.    The Mosconi Report fails to account, however, for the fact that YPF approved the remaining transfer of assets out of Maxus during the Repsol period and, as Maxus's parent, used Maxus (with Repsol) as a single economic entity to strand the contingent liabilities in shell companies.  As such, the Mosconi Report does not exculpate YPF, but rather exists as a confirmation that YPF and Repsol knowingly implemented the Strategy to the detriment of Maxus's creditors.

174.    Moreover, after 2012, YPF did not adopt any change in the Strategy with respect to Maxus.  To the contrary, YPF accelerated the execution of the Strategy.  That acceleration was, upon information and belief, spurred on by (1) a practical concern that environmental expenses at Maxus were now increasing annually, and (2) an ideological concern that an Argentinian entity should not be paying for environmental remediation in the United States.  At the end of May 2012, despite Maxus's insolvency, YPF determined that Maxus had an "excess" of cash and swept it for use by other YPF subsidiaries—only for Maxus to have to request loans or equity contributions from YPF to meet its obligations a couple of months later.

175.    In August 2012, YPF created and developed a business plan for Maxus and YPFH (really another iteration of the Strategy) and estimated Maxus's environment remedial expenses as between $900 million and $2.3 billion over ten years, confirming YPF's full understanding of the burgeoning scope of the Debtors' liabilities.

176.    On or about April 30, 2013, the new YPF management terminated John Enloe's contract as a CEO.  Negotiations regarding Mr. Enloe's termination and separation agreement

were handled by YPF and its counsel, Chadbourne & Park LLP (now Norton, Rose, Fulbright LLP), with no input from the Maxus Board or Maxus management before it was rubber-stamped by the Maxus Board.

177.    YPF then installed Mr. Guillermo Jalfin, a close friend and former co-worker of the new YPF CEO, Mr. Miguel Galluccio, as CEO of Maxus.  Mr. Jalfin came into the Maxus CEO role with visions of reviving Maxus to its former glory as a true E&P company, but, like the Maxus CEOs before him, he discovered that YPF had no interest in Maxus acquiring or developing any significant assets or business operations that might be accessible to its environmental creditors, including but not limited to OCC, the State of New Jersey and the EPA. Moreover, YPF dispatched Mr. Jalfin to work on solely YPF projects in which Maxus had no interest, such as the Deltana Platform Project.

178.    While YPF still exercised total control over Maxus in the final years of the Strategy, both during Mr. Jalfin's tenure and his successor (Mr. Daniel Rico)'s tenure, YPF increasingly attempted to conceal that control, most likely due to the renewed focus on alter ego liability in the Passaic River Litigation.  For example, YPF loyalists were regularly sent to Maxus's Houston offices to ensure Maxus was complying strictly with directions from Buenos Aires.  Upon information and belief, those Maxus employees with YPF allegiances used YPF-specific laptops to connect to the YPF server and communicate with YPF headquarters in a "non-discoverable" way.[12]  Mr. Rico's appointment, which took place when preparations for "Project Jazz" were starting in earnest (see Section XII, infra), was explicitly done to "maximize the

---

[12] At least three of those laptops are now in the Liquidating Trust's possession.  The Liquidating Trust also has email traffic sent by Maxus employees to their personal YPF email address.

Replacement [CEO]'s influence over YPF Holdings and its subsidiaries without weakening YPF's defenses to the veil piercing/alter ego claims."

179.    Between November 26, 2010 and November 30, 2015, YPF continued to keep Maxus on life support in an effort to run out the statutes of limitations on potential fraudulent transfer claims.  At this time, other than the minimal cash collections coming from the Neptune prospect, Maxus was running severe cash deficits and the only way Maxus could meet its obligations was through cash contributions from YPF.  In order to pay the very minimum amount necessary, YPF caused Maxus to send it weekly cash flow forecasts that stated specifically the amount needed to cover a week's worth of disbursements.  These strict limitations applied not only to operating expenses but also to expenditures that Maxus and Tierra required in order to perform their environmental obligations to OCC and others.

180.    In the years leading to the inevitable bankruptcy filing, YPF caused Maxus to make and accept loans from YPF subsidiaries without a legitimate Maxus business rationale. For example, on May 29, 2012, YPF caused Maxus to make a $10 million intercompany loan to AESA Peru.  This loan was repaid within two months in two equal installments of $5.02 million on June 1, 2012 and July 19, 2012 respectively.  There was no commercial benefit to Maxus in making this loan.  Instead, upon information and belief, YPF instructed Maxus to make the loan in order to limit Maxus's cash balances (in the short window before August 1, 2012 when it would make the required $10 million payment due to the Removal Action Trust related to the Passaic River remediation), so as to avoid the attention of Argentinian bondholders who might seek to lay claim to any cash present in the United States.  Conversely, when the Central Bank of Argentina temporarily prohibited YPF, in 2014, from making additional capital infusions to

Maxus, on September 25, 2014, YPF caused an affiliate, YPF Chile, to issue a $4.5 million loan to Maxus to continue funding its operational needs. Maxus paid this loan back with interest in November and December 2014.

181.    During this time, YPF refused to allow Maxus to pursue additional corporate opportunities. For example, in 2012, Maxus was approached by Chevron with an opportunity to participate in a re-drill of a well in the deep waters of the Gulf of Mexico that had been abandoned years before (the "Coronado Project"). Maxus's CEO at the time, Mr. Enloe, presented the Coronado Project (and several other potential drilling opportunities) to YPF management. YPF did not support these projects. Because Maxus had no other source of revenue at this time, it could not take advantage of the Coronado Project opportunity.

182.    In 2013 and 2014, Maxus's CEO, Mr. Jalfin, was interested in starting additional exploration projects in Latin America. As part of that effort, Maxus began bidding on projects under the YPF Holdings name and engaged Karlin Pacific LLC ("Karlin") on August 19, 2013 to provide technical services related to the evaluation of 35 different oil fields in Argentina, Ecuador, and Venezuela. Throughout the course of the two-year engagement, Maxus paid Karlin approximately $2.9 million.

183.    At some point in 2014, YPFH was awarded the rights to an oil field in Ecuador that had been evaluated by Karlin at Maxus's expense. Soon thereafter (for reasons related to the Karlin engagement and subsequent acquisition of the Ecuador field), YPF terminated Mr. Jalfin as CEO. YPF then took control of the Ecuador field without reimbursing Maxus for any of the expenses Maxus incurred over the prior two years. On the same day Maxus filed for bankruptcy,

YPF issued a payment to Maxus in the amount of $3.9 million to reimburse Maxus for the expenses incurred with respect to Karlin and other professionals involved in the bidding process.

184.    YPF also continued to put its key personnel in positions of power at Maxus.  For example, Mr. Francisco Garcia Tobar, an employee of YPF acted as *de facto* Maxus CFO before he was employed by Maxus in June 2013.  Even after he was directly employed by Maxus, he continued to use an email address ending in ypf.com and continued to work in Argentina, rather than at the Maxus offices in Houston.  Other YPF employees were the major players in key Maxus business decisions, including the selection of insurance brokers and the specifics of D&O insurance policies for Maxus directors and officers.

185.    Likewise, MUSE did not employ any engineers or exploration-related employees after 2009.  Instead, as of July 17, 2009 MUSE signed a services agreement with YPF Services USA Corp. (a YPF owned subsidiary unrelated to the YPFH/Maxus group), pursuant to which Maxus contracted with YPF engineers.  At least four YPF employees worked exclusively for Maxus during this time period, including Juan Pedro Bretti Mandarano, Tomas Ramon Zapata, Matias Fernandez Badessich, and Jose Silvestro.

186.    Additionally, upon information and belief, YPF would occasionally direct Maxus to provide pay raises (sometimes as large as 9%) to various YPF expatriates and other YPF affiliated employees nominally working for Maxus.

**XI.    The Passaic River Litigation**

187.    During the period from 2006 through 2016, the Passaic River Litigation was becoming progressively more complicated for YPF and Repsol.  On April 15, 2008, the State of New Jersey filed its Second Amended Complaint, alleging that "[t]hrough a series of related

transactions, Defendants Repsol, YPF, YPFH, CLHH, Maxus, and Tierra (the 'Repsol Group') and non-party YPF International Ltd. have worked to strand the environmental liabilities associated with the Newark Bay Complex in Maxus and Tierra, while systematically stripping Maxus's and Tierra's assets and ability to satisfy these obligations in New Jersey and elsewhere."

188.    On October 6, 2008, the court granted OCC's motion to amend its answer to assert crossclaims for fraudulent transfer of Maxus's assets as well as for breach of the SPA, tortious interference with the SPA, unjust enrichment, contractual indemnification, common law indemnification, contribution under the Spill Act, statutory contribution and a declaratory judgment that Maxus, and not OCC, is the successor to the Lister Site.  On October 18, 2010, OCC filed its First Amended Cross-Claims adding YPFI as a cross-claim defendant and asserting claims against certain YPF/Repsol Entities for alter ego liability.

189.    On September 26, 2012, OCC filed its Second Amended Crossclaims, asserting claims for civil conspiracy/aiding and abetting, breach of fiduciary duty and aiding and abetting breach of fiduciary duty against the YPF/Repsol Entities.

190.    On December 12, 2013, the court approved a settlement between the State of New Jersey and the non-OCC defendants.  All claims the State of New Jersey had asserted against Repsol, YPF, YPFI, YPFH, CLHH, Maxus, Tierra, MUSE and some, but not all, claims against OCC were dismissed in exchange for $130 million.   Repsol funded $65 million and Maxus/Tierra/YPF funded the remaining $65 million, with Repsol later asserting a contribution claim against OCC for its $65 million share.

191.    On December 16, 2014, the court approved a settlement between the State and OCC.  In connection with that settlement, OCC paid $190 million for the release of the State's claims that remained against OCC, including for all costs already incurred by the State, economic damages, punitive damages, penalties, Natural Resource Damages assessment costs and Natural Resource Damages (subject to certain claims for future costs above a certain amount).  When OCC sought indemnification from Maxus in respect of the settlement, Maxus challenged the reasonableness of the settlement amount but acknowledged that some portion of the $190 million might be attributable to Maxus as covered by the SPA.  The only additional claims remaining in the action were the $65 million contribution claim by Repsol against OCC and OCC's cross-claims against Maxus for indemnification under the SPA and against Repsol and YPF for, among other things, fraudulent transfer and alter ego.

192.    Following additional discovery, the parties engaged in substantial motion practice, culminating in a December 10, 2015 hearing on six motions.  On January 14, 2016, the Special Master rendered its opinions on those six motions, and in substance recommended to the court that OCC's alter ego claims against Repsol be dismissed, reasoning that an alter-ego plaintiff must sequentially pierce each layer of the corporate structure to reach the ultimate parent.  The Special Master thus recommended that, by virtue of YPF's continued presence in the corporate structure, OCC had failed to demonstrate a basis for collapsing the entire corporate structure and had failed to demonstrate that YPF was without resources to meet Maxus's then-existing OCC Indemnification Obligations.  Similarly, the Special Master recommended that OCC's claims related to Maxus's indemnity for potential future obligations be dismissed as unripe.

193.    The Special Master also recommended to the court that Maxus be found liable to OCC for indemnification for all environmental losses arising from the Lister Site, including OCC's own pre-closing conduct, and that alter ego claims against YPF be allowed to proceed without limiting the scope of those claims.

194.    All six recommendations were appealed to New Jersey Superior Court Judge Garry Furnari, including OCC's appeal of the dismissal of its alter ego claims against Repsol, and YPF's appeal of the denial of its partial summary judgment motion.

195.    On April 5, 2016, Judge Furnari adopted the Special Master's recommendations in full and issued rulings on all six motions.   With respect to YPF's motion for summary judgment on the issue of whether YPF is the alter ego of the Debtors, Judge Furnari ruled that that a  "jury could easily look at the evidence and find that – when viewed in its entirety – OCC is entitled to pierce Maxus's corporate veil and recover from the YPF defendants."  The issue of YPF's liability as the alter ego of the Debtors was therefore headed towards a bench trial that was scheduled to start on June 18, 2016.  Project Jazz staved off that trial.

## XII.    Project Jazz And The Chapter 11 Cases

196.    In or about 2012, as the Passaic River Litigation was proceeding against it, YPF and its counsel formulated the final playbook of the strategy, what they called "Project Jazz."  To the best of the Liquidating Trust's information and knowledge, Project Jazz was named after a meeting between YPF executives and their New York-based outside counsel, Chadbourne & Park LLP, at a New York City jazz club.  After that meeting, YPF and its counsel fleshed out the details of the final phases of the Strategy—a "global" settlement between parents and

subsidiaries and the filing of Chapter 11 petitions by Maxus and Tierra—exactly as King & Spalding had advised YPF and Repsol roughly a decade earlier.

197.    Project Jazz centered around filing a "pre-pack" Chapter 11 bankruptcy petition on behalf of Maxus, Tierra and some affiliates in an attempt to discharge Maxus's and Tierra's debts and force on creditors a settlement between the Debtors and YPF by which YPF would resolve its alter ego and fraudulent transfer liabilities in a Bankruptcy Rule 9019 settlement for a fraction of the value of those claims.

198.    The YPF-dominated Debtors had extensive internal discussions about the timing for the launch of Project Jazz, which was, upon information and belief, driven by YPF's concerns about the upcoming trial on YPF's alter ego liability and the planned exhaustion of the Neptune reserves, which at that point were the very last productive asset left at the Debtors.

199.    It is clear that, at that time, both Maxus and YPF, and their respective counsel, knew that Maxus had viable fraudulent transfer and alter ego claims against YPF and Repsol.

200.    Maxus's counsel also spelled out the risks of Project Jazz clearly to YPF during a trip to Argentina (including the risk that alter ego claims could be brought against YPF in the Bankruptcy Court and that documents which had been privileged until then would become discoverable).   Nevertheless, YPF caused Maxus to enter into a joint defense agreement with YPF and Repsol in order to fight off creditor protest alongside its parents in any Chapter 11 proceeding.

201.    As a first step in this final phase of the Strategy, YPF hired two "independent" directors (Theodore Nikolis and Bradley Dietz) in 2014 and established a Special Independent Committee ("SIC") of the Maxus Board.  The SIC's stated mission was to evaluate the potential

causes of action against YPF (but not Repsol) and to reach a settlement that could be approved by the Bankruptcy Court in the upcoming Chapter 11 Cases. Those YPF-selected "independent" directors exchanged emails before their appointment revealing preconceived notions about the claims against YPF, the cost and the time frame for the investigation, and the fact that any settlement would have to be accomplished by filing for bankruptcy rather than by threatening litigation.

202. The SIC then engaged Morrison & Foerster LLP ("MoFo") and Zolfo Cooper, LLC ("Zolfo") to assist in this evaluation of the potential claims against YPF. The process was hardly searching: the SIC and its advisors only reviewed the record of the Passaic River Litigation, failed to investigate and value fraudulent transfer claims and other potential causes of action against YPF, and inexplicably failed to interview any witness, conduct any further discovery or talk to the parties that had been litigating the claims for 10 years. Moreover, they hastily expedited the investigation and settlement negotiations upon entry of the New Jersey state court's denial of the YPF summary judgment motion to avoid trial in the Passaic River Litigation.

203. Most importantly, the SIC was not given any right under the revised bylaws to sue YPF directly or even to approve any ultimate settlement with YPF. All of those powers remained with the YPF-controlled Maxus Board, as counsel to the SIC readily admitted.[13]

---

[13] *See "The Importance of Being Truly Independent, American Bankruptcy Institute,"* ABI Journal, Vol. XXXVII, No., 1, January 2018. Available at https://media2.mofo.com/documents/180100-importance-truly-independent.pdf. Counsel further acknowledged that it was not until creditors' objections to YPF control over the SIC was accepted and the Debtor's bylaws were accordingly amended, that "the independent directors gained meaningful control over the most critical aspects of the restructuring."

204.    Even with such glaring limitations, MoFo and Zolfo concluded in a 196-page report dated May 16, 2016 (the "MoFo Report"), that, while alter ego claims are difficult to prove, if a court were to look at the overall history and pattern of parent corporation conduct from YPF's acquisition of Maxus and Tierra in 1995 through 2016, there was a reasonable likelihood that the court would find alter ego liability.

205.    Despite the MoFo Report, and after a rapid round of negotiations, the SIC and YPF agreed upon the settlement of all of the Debtors' claims against YPF for merely $130 million (the "YPF Settlement"), far below the reasonably equivalent value of the claims.  This "settlement" became the centerpiece of the YPF-sponsored Chapter 11 Cases and the final piece of YPF and Repsol's Strategy to walk away from the Debtors' enormous environmental liabilities without having to face any legal consequences.

206.    On June 17, 2016, YPF pulled the trigger on Project Jazz and caused the Debtors to file voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Chapter 11 Cases automatically stayed the trial in the New Jersey Superior Court which was meant to start on the next business day.

207.    As further detailed herein, the filing for bankruptcy by the Debtors and the active prosecution of a plan funded, sponsored, and conceived by YPF and implementing a settlement of all claims against YPF was the ultimate and critical phase of the Strategy adopted as early as 1995.

208.    But the architects of the Strategy did not anticipate that the Debtors' creditors, represented by an official committee of unsecured creditors (the "Committee"), would conduct an in-depth investigation and conclude that the YPF Settlement on which the YPF plan was

premised was not a reasonable settlement of the alter ego claims against YPF and would recommend that the unsecured creditors reject the YPF plan.

209.    As a result of the Committee's findings, OCC proposed a replacement debtor-in-possession financing that freed the Debtors from YPF's financial stranglehold and was conditioned on the Debtors' filing of the Amended Plan providing for the creation of a liquidation trust to liquidate and distribute the Debtors' assets, including the Debtors' claims and causes of action, an environmental trust to fund environmental remediation and response and, if necessary, a property trust to hold and manage the Debtors' real estate properties.

210.    On April 19, 2017, the Debtors and the Committee filed the Amended Plan [Docket No. 1231] and the disclosure statement for the Amended Plan [Docket No. 1232].  On May 22, 2017, the Court entered an order confirming the Amended Plan [Docket No. 1460] (the "Confirmation Order").

211.    On July 17, 2017, the Debtors filed the Notice of (I) Entry of Order Confirming Amended Chapter 11 Plan of Liquidation, (II) Occurrence of Effective Date, and (III) Related Bar Dates [Docket No. 1701] (the "Effective Date Notice") informing parties in interest that the Amended Plan became effective on July 14, 2017 (the "Effective Date").  On the Effective Date, the Liquidating Trust was formed and all of the Debtors' assets, including all of the Debtors' claims and causes of action, were transferred to the Liquidating Trust.  The Liquidating Trust was also vested with the Debtors' attorney-client privilege, work-product privilege, joint interest privilege and any other privilege or immunities attaching to the documents and communications transferred to the Liquidating Trust.

CAUSES OF ACTION

## COUNT I – AGAINST THE YPF DEFENDANTS AND THE REPSOL DEFENDANTS
### Veil Piercing/Alter Ego Liability

212.    The Liquidating Trust repeats each allegation of paragraphs 1 through 211 above as though fully set forth herein.

213.    Almost immediately following its acquisition of Maxus, YPF had concluded that its environmental liabilities, including primarily the OCC Indemnification Obligations, would almost certainly exceed (and exceed significantly) the amount Maxus had reserved to satisfy such liabilities.

214.    As of or before its acquisition of a controlling interest in YPF in 1999, Repsol also had such actual knowledge.

215.    Despite this knowledge, YPF, YPFH, YPFI, and CLH Holdings (the "YPF Defendants") and Repsol, Repsol Exploración SA, Repsol USA Holdings Corp., Repsol E&P USA, Repsol E&P T&T Limited, Repsol Offshore E&P USA Inc., and Repsol Services Company (the "Repsol Defendants") dominated and controlled Maxus with the intention of executing the Strategy so as to acquire and use Maxus's profitable assets for the benefit of Maxus's parent corporations and to strand Maxus's environmental liabilities to the detriment of Debtors' creditors.

216.    Due to the pervasive domination and control of Maxus and Tierra by the YPF Defendants and the Repsol Defendants, Maxus, Tierra, and the other Debtors, YPF, YPFH, YPFI, CLH Holdings, Repsol, and the Repsol Defendants operated as a single economic entity for the benefit of YPF (1995 – 1999), then Repsol and YPF (1999-2012), and then solely YPF once again (after 2012).

217.    The Defendants controlled Maxus and Tierra by placing on the Maxus and Tierra Boards persons controlled by and loyal to YPF and Repsol and by ensuring that those persons would cause the Debtors to enter into transactions benefitting YPF and Repsol at the expense of the Debtors and their creditors.

218.    The Defendants formulated and implemented the Strategy to systematically strip Maxus and Tierra of their assets and cause them to be held by other corporations YPF and Repsol controlled, including the YPF and Repsol Defendants.

219.    The Defendants caused Maxus and Tierra to be undercapitalized and insolvent from the time the Defendants acquired them and began executing their Strategy to siphon assets from Maxus and Tierra, including, but not limited to, the 1996-1997 transfers of Maxus's Bolivian, Venezuelan, Ecuadorian, and Indonesian E&P Assets (together, the "1996-1997 Transfers"), the transfer of Maxus's Crescendo interests (the "Crescendo Transfer"), the subsequent transfer by YPF of YPFI's assets (the "Maxus legacy E&P assets") to Repsol entities in 2001 and 2002 (the "YPFI Transfers"), and the underlying transfers of Maxus's personnel, data, technical resources, wells, and other offshore interests which lead to the 2007 Settlement Agreements, the 2007/2008 Settlement Agreement, and the 2009 Settlement Agreements (the "Settlement Agreement Transfers").

220.    The Defendants operated Maxus and Tierra as incorporated pocketbooks when they siphoned Debtors' assets through the 1996-1997 Transfers, the Crescendo Transfer, the YPFI Transfers, and the Settlement Agreement Transfers for YPF's and Repsol's benefit.

221.    The Defendants made sure that Maxus and Tierra were financially dependent on YPF and Repsol by siphoning any assets that could have been used to create any financial independence for the benefit of the YPF and Repsol Defendants.

222.    The Defendants also siphoned assets from Maxus and Tierra by requiring them to repay insider debts owed to the YPF and/or Repsol Defendants, thus diluting the asset pool available to repay other creditors or liabilities and preventing Maxus and Tierra from using such funds to reinvest in their businesses.

223.    The Defendants' Strategy to siphon Maxus's and Tierra's assets rendered Maxus and Tierra unable to continue as businesses or to choose whether to independently meet their obligations, including, but not limited to, obligations to OCC.

224.    The Defendants further siphoned personnel from Maxus by requiring Maxus personnel to manage YPFI assets without fair consideration, including through the Maxus Management Group, the use of Maxus employees without payments as scheduled under services agreements or for no compensation in the absence of services agreements.

225.    The Defendants so dominated and controlled Maxus and Tierra as to render them mere shells and preclude them from having any independent control of their own operations or assets.

226.    The Defendants represented and held out to the public that Maxus and Tierra were viable enterprises able to pay their obligations to creditors as they came due.

227.    In fact, Maxus and Tierra were kept on life support and only survived by virtue of cash contributions from YPF and Repsol.  These payments were designed to allow Maxus and Tierra to satisfy their creditors sufficiently long enough to avoid an involuntary bankruptcy

during the statutory period for fraudulent transfers.  By this delay, YPF could initiate a Chapter 11 proceeding on its own schedule and finalize the Strategy by entering into a settlement agreement with the Debtors that would forever release the YPF (and Repsol) Defendants from exposure to the Debtors' environmental liabilities.  As to any obligations beyond the (*de minimis*) settlement amount, the Debtors' environmental creditors would have recourse only to an empty shell.

228.    Due to the Defendants' comprehensive and methodical Strategy to isolate the environmental liabilities in Maxus and Tierra while siphoning any assets that could be used to satisfy such liabilities, the Defendants perpetrated a manifest fraud and injustice on creditors of Maxus and Tierra.

229.    The Defendants' domination, control and operation as a single economic entity caused an overall element of injustice and unfairness to Maxus, Tierra, and the other Debtors and their respective creditors, including but not limited to, OCC, the EPA, various state agencies and other PRPs with respect to the Lister Site and the other Sites.

230.    The actions of the Defendants described herein were intentional and calculated and were significant factors in causing Debtors to be unable to satisfy their legal obligations to creditors, including, but not limited to OCC, the EPA and other PRPs with respect to the Lister Site and the other Sites, trade creditors, and other creditors.

231.    The actions of the Defendants described herein were intentional and calculated and were significant factors in causing Debtors to be unable to satisfy their legal obligations to creditors, including, but not limited to OCC, the EPA, and various state agencies, with respect to

each and every site where Maxus and Tierra had environmental and contractual obligations to others.

232.    As a result of the wrongful and inequitable conduct by the Defendants, Debtors' creditors have incurred damages and will continue to incur such damages.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it: (a) a judgment declaring that the Defendants are the alter egos of Maxus and Tierra and should be jointly and severally liable to the Liquidating Trust for all claims and liabilities asserted by Debtors' creditors in the Chapter 11 Cases; (b) a judgment requiring the Defendants to pay and to reimburse the Liquidating Trust for all damages, if any (including, but not limited to, punitive damages), costs, expenses, and attorneys' fees that Debtors' creditors have sustained; (c) judgment declaring that the Defendants are jointly and severally liable for all losses (including, but not limited to, damages, costs, expenses, and attorneys' fees) that the creditors of the Debtors may incur or that may be imposed on such creditors in the future and; (d) an award to the Liquidating Trust of reimbursement of counsel fees, costs of suit, pre- and post-judgment interest, and such further relief as the Court may deem just and proper.

## COUNT II – AGAINST THE YPF DEFENDANTS AND THE REPSOL DEFENDANTS
### Avoidance and Recovery of Fraudulent Transfers (Actual Fraud)

[11 U.S.C. §§544, and 550, and applicable law including but not limited to the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin]

233.    The Liquidating Trust repeats each allegation of paragraphs 1 through 232 above as though fully set forth herein.

234.    Under Section 544(b) of the Bankruptcy Code, any debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code or that is not allowable only under section 502(e) of the Bankruptcy Code.  The Liquidating Trust owns all assets and causes of action of the Debtors and is authorized to stand in the shoes of an actual creditor to avoid a transfer of the Debtors' property that such a creditor could have avoided under applicable law, including applicable state fraudulent transfer laws.

235.    In or about 1995 and during the closing of YPF's acquisition of Maxus, YPF realized the extent of Maxus's environmental liabilities as an owner of the Lister Site and other polluted sites across the country and as an indemnitor of OCC, pursuant to the OCC Indemnification Obligations.

236.    In response to this realization, the YPF Defendants developed the Strategy to strip Maxus of its assets, manage and settle potential claims against Maxus and its creditors, and ultimately file for bankruptcy after the limitations period as a means to walk away from Maxus's environmental liability obligations without legal consequence.

237.    Following its acquisition of YPF (and Maxus) in 1999, the Repsol Defendants carried out the Strategy—in conjunction with the YPF Defendants—by stripping Maxus of its remaining valuable assets.  When, in May 2012, Repsol was displaced as the majority holder of YPF's shares, the YPF Defendants continued the Strategy unabated.

238.    In carrying out the Strategy through their domination and control of Maxus and Tierra, the YPF and Repsol Defendants caused Debtors to transfer substantially all of Maxus's

assets to YPF affiliates, then subsequently to Repsol affiliates, for less than fair market value or reasonably equivalent value.  The YPF and Repsol Defendants also caused Debtors to use the proceeds of those transfers to pay down intercompany loans or otherwise use the funds for the benefit of the YPF and Repsol Defendants.

239.    These transfers of Maxus's assets include, but are not limited to, the individual 1996-1997 Transfers, the Crescendo Transfer, the YPFI Transfers, and the underlying transfers of Maxus's personnel, data, technical resources, and wells and other offshore interests which lead to the Settlement Agreements (the "<u>Fraudulent Transfers</u>").

240.    Each Fraudulent Transfer constituted a transfer of interest in the Debtors' property and was made for less than fair consideration or reasonably equivalent value.

241.    At the time of each Fraudulent Transfer, YPF and/or Repsol were the ultimate parent of the Debtors, and the YPF and/or Repsol Defendants were all insiders of the Debtor entities.

242.    As a result, YPF and/or Repsol were in a position to, and in fact did, control and dominate the Debtor entities.

243.    The Debtors made the Fraudulent Transfers to or for the benefit of the YPF and Repsol Defendants solely on account of the domination and control that YPF and Repsol exercised over Maxus, Tierra and the other Debtors at all relevant times.

244.    Each of the Fraudulent Transfers either rendered the Debtors insolvent, was made when the Debtors were insolvent or in the zone of insolvency, or at the least left the Debtors with unreasonably small capital in relation to the Debtors' business at the time.  Specifically, Maxus and Tierra were rendered insolvent (to the extent they were not otherwise insolvent in 1995 as a

result of LBO debt) as a result of the 1996-1997 Transfers.  Debtors were insolvent at the time of the Crescendo Transfer, the YPFI Transfers, and each of the Settlement Agreement Transfers, or became insolvent as a result of those Fraudulent Transfers. The Fraudulent Transfers were each part of the Strategy initiated by YPF and continued by Repsol to isolate the Debtors' valuable assets from Maxus's large environmental liabilities, which, by virtue of the Strategy, would be borne by the creditors.  Accordingly, the YPF and Repsol Defendants caused Debtors to make the Fraudulent Transfers with the actual intent to hinder, delay, or defraud the creditors or future creditors of the Debtors

245.    At the time of each of the Fraudulent Transfers, the YPF and Repsol Defendants intended or believed that the Fraudulent Transfers would leave the Debtors unable to pay obligations as they came due, especially including the OCC Indemnification Obligations (of which the YPF and Repsol Defendants were aware at all times).  Each of the Debtors, as a result of the Defendants' coercion and domination, affected each Fraudulent Transfer understanding and intending that this result would obtain.

246.    At the times of, and subsequent to, each of the Fraudulent Transfers and/or as of the Petition Date, the Debtors had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.  Such creditors include thousands of contractual counterparties and environmental plaintiffs, including, but not limited to, the Internal Revenue Service, the EPA, the environmental agencies of the States of New Jersey, Kentucky, Ohio, and Wisconsin, and multiple PRPs, all of which filed certain allowable unsecured claims against the Debtors that were unpaid on the Petition Date.

247.    By virtue of the foregoing, each of the Fraudulent Transfers was a fraudulent transfer avoidable under 11 U.S.C. §544 and applicable law, including the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin, by a creditor holding an unsecured claim that is allowable under 11 U.S.C. §502.    Thus, the Liquidating Trust is entitled to avoid and recover each of the Fraudulent Transfers for the benefit of all the Debtors' creditors pursuant to 11 U.S.C. §§544 and 550.

248.    Under 11 U.S.C. §550, "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."

249.    The Defendants are initial transferees of one or more of the Fraudulent Transfers, the entities for whose benefit one or more of the Fraudulent Transfers were made, or immediate or mediate transferees of the initial transferees.

250.    To the extent that one or more of the Fraudulent Transfers is avoided, the Liquidating Trust may recover the property transferred, or the value of the transferred property, from the Defendants pursuant to §550(a) of the Bankruptcy Code.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it damages from the Defendants in the amount equal to the dollar value of the property transferred pursuant to each Fraudulent Transfer as of the date of the transfer, together with pre- and post-

judgment interest on that amount from the date of the transfer, attorney's fees, costs of suit and collection allowable by law, and such further relief as the Court may deem just and proper.

## COUNT III – AGAINST THE YPF DEFENDANTS AND THE REPSOL DEFENDANTS
### Avoidance and Recovery of Fraudulent Transfers (Constructive Fraud)

[11 U.S.C. §§544, and 550, and applicable law including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin]

251.    The Liquidating Trust repeats each allegation of paragraphs 1 through 250 above as though fully set forth herein.

252.    Under Section 544(b) of the Bankruptcy Code, any debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code or that is not allowable only under section 502(e) of the Bankruptcy Code.  The phrase "under applicable law" has been interpreted to include the states' fraudulent transfer laws as well as federal fraudulent transfer laws that would govern potentially fraudulent transactions.

253.    The YPF and Repsol Defendants caused the Debtors to transfer substantially all of Maxus's assets to YPF affiliates, then subsequently to Repsol affiliates, for less than fair market value or reasonably equivalent value in a series of Fraudulent Transfers (including, but not limited to, the individual 1996-1997 Transfers, the Crescendo Transfer, the YPFI Transfers, the underlying transfers of Maxus's personnel, data, technical resources, wells and other offshore interests that led to the Settlement Agreements).

254.    Each Fraudulent Transfer constituted a transfer of interest in the Debtors' property and was made for less than fair consideration or reasonably equivalent value.

255.    At the time of each Fraudulent Transfer, YPF and/or Repsol were the ultimate parent of the Debtors and the YPF and/or Repsol Defendants were all insiders of the Debtor entities.

256.    As a result, YPF and/or Repsol were in a position to, and in fact did, control and dominate the Debtor entities.

257.    The Debtors made the Fraudulent Transfers to or for the benefit of YPF and Repsol solely on account of the domination and control that YPF and Repsol Defendants exercised over Maxus, Tierra and the other Debtors at all relevant times.

258.    Each of the Fraudulent Transfers either rendered the Debtors insolvent, was made when the Debtors were insolvent or in the zone of insolvency, or at the least left the Debtors with unreasonably small capital in relation to the Debtors' business at the time.  Specifically, the 1996-1997 transfers rendered Maxus and Tierra insolvent (to the extent they were not otherwise insolvent in 1995 as a result of LBO debt).  The Debtors were insolvent at the time of the Crescendo Transfer, the YPFI Transfers, and each of the Settlement Agreement Transfers, or became insolvent as a result of those Fraudulent Transfers.  The Fraudulent Transfers were each part of the Strategy initiated by YPF and continued by Repsol to isolate the Debtors' valuable assets from Maxus's large environmental liabilities, which, by virtue of the Strategy, would be borne by the creditors.

259.    At the times of, and subsequent to, each of the Fraudulent Transfers and/or as of the Petition Date, the Debtors had at least one creditor with an allowable unsecured claim for

liabilities, which remained unsatisfied as of the Petition Date. Such creditors include thousands of contractual counterparties and environmental plaintiffs, including, but not limited to, the Internal Revenue Service, the EPA, and the environmental agencies of the States of New Jersey, Kentucky, Ohio, and Wisconsin, and multiple PRPs, all of which filed certain allowable unsecured claims against the Debtors that were unpaid on the Petition Date.

260.    By virtue of the foregoing, each of the Fraudulent Transfers was a fraudulent transfer avoidable under 11 U.S.C. §544 and applicable law including the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin by a creditor holding an unsecured claim that is allowable under 11 U.S.C. §502. Thus, the Liquidating Trust is entitled to avoid and recover each of the Fraudulent Transfers for the benefit of all the Debtors' creditors pursuant to 11 U.S.C. §§544 and 550.

261.    Under 11 U.S.C. §550, "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."

262.    The Defendants are initial transferees of one or more of the Fraudulent Transfers, the entity for whose benefit one or more of the Fraudulent Transfers were made, or an immediate or mediate transferee of the initial transferee.

263.    To the extent that one or more of the Fraudulent Transfers is avoided, the Liquidating Trust may recover the property transferred, or the value of the transferred property from the Defendants pursuant to §550(a) of the Bankruptcy Code.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it damages from the Defendants in the amount equal to the dollar value of the property transferred pursuant to each Fraudulent Transfer as of the date of the transfer, together with pre- and post-judgment interest on that amount from the date of the transfer, attorney's fees, costs of suit and collection allowable by law, and such further relief as the Court may deem just and proper.

### COUNT IV – AGAINST YPF AND YPFI
**Avoidance and Recovery of Fraudulent Transfer (Actual Fraud) of the Bolivian Assets**

[11 U.S.C. §§544, and 550, and applicable law including but not limited to the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas, and Wisconsin]

264.    The Liquidating Trust repeats each allegation of paragraphs 1 through 263 above as though fully set forth herein.

265.    In 1996, YPF and YPFI, through their domination and control of Maxus, transferred Maxus's Bolivian Assets to YPFI for less than fair market value or reasonably equivalent value as part of the larger Strategy.

266.    At the time of the 1996 Bolivian Assets transfer, YPF was the ultimate parent of the Debtors and YPF and YPFI were Maxus insiders.  As a result, YPF was in a position to, and in fact did, control and dominate Maxus.

267.    In 1996, Maxus transferred the Bolivian Assets to YPFI for the benefit of YPF and YPFI and solely on account of the domination and control that YPF exercised over Maxus.

268.    YPF and YPFI caused Maxus to use the proceeds from the Bolivian Asset transfer for the benefit of YPF, by directing Maxus to redeem preferred stock early so that YPF could increase its ownership interest in Maxus, paving the way for YPF to complete its global restructuring without limitation on asset sales.

269.    The transfer of the Bolivian Assets either rendered the Debtors insolvent, was made when the Debtors were insolvent or in the zone of insolvency, or at the least left the Debtors with unreasonably small capital in relation to the Debtors' business at the time. Specifically, Maxus and Tierra were rendered insolvent by the Bolivian Assets transfer (to the extent they were not otherwise insolvent in 1995 as a result of LBO debt).

270.    The Bolivian Asset transfer was part of the Strategy initiated by YPF and continued by Repsol to isolate the Debtors' valuable assets from Maxus's large environmental liabilities, which, by virtue of the Strategy, would be borne by the creditors.  Accordingly, YPF and YPFI caused Maxus to transfer the Bolivian Assets with the actual intent to hinder, delay, or defraud the creditors or future creditors of the Debtors.

271.    At the time of the Bolivian Assets transfer, YPF and YPFI intended or believed that the Bolivian Asset transfer would leave Debtors unable to pay obligations as they came due, especially including the OCC Indemnification Obligations (of which the YPF Defendants were aware at all times).  As a result of the coercion and domination of YPF and YPFI, Maxus affected the Bolivian Asset transfer understanding and intending that this result would obtain.

272.    At the time of, and subsequent to, the transfer of the Bolivian Assets to YPFI and/or as of the Petition Date, the Debtors had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

273.    By virtue of the foregoing, the transfer of the Bolivian Assets was a fraudulent transfer avoidable under 11 U.S.C. §544 and applicable law including the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin by a creditor holding an unsecured claim that is allowable under 11 U.S.C. §502.    Thus, the Liquidating Trust is entitled to avoid the transfer of the Bolivian Assets and to recover the value of the Bolivian Assets for the benefit of all the Debtors' creditors pursuant to 11 U.S.C. §§544 and 550.

274.    YPF and YPFI are initial transferees of the Bolivian Assets transfer, the entities for whose benefit it was made, or immediate or mediate transferees of the initial transfer.

275.    To the extent the Bolivian Assets transfer is avoided, the Liquidating Trust may recover the property transferred, or the value of the transferred property, from the Defendants pursuant to §550(a) of the Bankruptcy Code.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it damages from YPF and YPFI in the amount equal to the dollar value of the property transferred pursuant to the Bolivian Assets transfer as of the date of the transfer, together with pre- and post-judgment interest on that amount from the date of the transfer, attorney's fees, costs of suit and collection allowable by law, and such further relief as the Court may deem just and proper.

## COUNT V – AGAINST YPF AND YPFI
### Avoidance and Recovery of Fraudulent Transfers (Constructive Fraud) of the Bolivian Assets

[11 U.S.C. §§544, and 550, and applicable law including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin]

276.    The Liquidating Trust repeats each allegation of paragraphs 1 through 275 above as though fully set forth herein.

277.    In 1996, YPF and YPFI, through their domination and control of Maxus, transferred Maxus's Bolivian Assets to YPFI for less than fair market value or reasonably equivalent value.

278.    At the time of the 1996 Bolivian Assets transfer, YPF was the parent of the Debtors and a Maxus insider.  As a result, YPF was in a position to, and in fact did, control and dominate Maxus.

279.    In 1996, Maxus transferred the Bolivian Assets to YPFI for the benefit of YPF and solely on account of the domination and control that YPF exercised over Maxus.

280.    The YPF Defendants caused Maxus to use the proceeds from the Bolivian Asset transfer for the benefit of YPF by directing Maxus to redeem preferred stock early so that YPF could increase its ownership interest in Maxus, paving the way for YPF to complete its global restructuring without limitation on asset sales.

281.    The transfer of the Bolivian Assets either rendered the Debtors insolvent, was made when the Debtors were insolvent or in the zone of insolvency, or at the least left the Debtors with unreasonably small capital in relation to the Debtors' business at the time. Specifically, Maxus and Tierra were rendered insolvent (to the extent they were not otherwise insolvent in 1995 as a result of LBO debt).

282.    The transfer of the Bolivian Assets was part of the Strategy initiated by YPF and continued by Repsol to isolate the Debtors' valuable assets from Maxus's large environmental liabilities, which, by virtue of the Strategy, would be borne by the creditors.

283.    At the time of, and subsequent to, the transfer of the Bolivian Assets to YPFI and/or as of the Petition Date, the Debtors had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

284.    By virtue of the foregoing, the transfer of the Bolivian Assets was a fraudulent transfer avoidable under 11 U.S.C. §544 and applicable law including the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin by a creditor holding an unsecured claim that is allowable under 11 U.S.C. §502.  Thus, the Liquidating Trust is entitled to avoid the transfer of the Bolivian Assets and recover the value of the Bolivian Assets for the benefit of all the Debtors' creditors pursuant to 11 U.S.C. §§544 and 550.

285.    YPF and YPFI are initial transferees of the Bolivian Assets transfer, the entities for whose benefit it was made, or immediate or mediate transferees of the initial transfer.

286.    To the extent the transfer of the Bolivian Assets is avoided, the Liquidating Trust may recover the property transferred, or the value of the transferred property, from the Defendants pursuant to §550(a) of the Bankruptcy Code.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it damages from YPF and YPFI in the amount equal to the dollar value of the property transferred pursuant to the transfer of the Bolivian Assets as of the date of the transfer, together with pre- and post-judgment interest on that amount from the date of the transfer, attorney's fees, costs of suit and collection allowable by law, and such further relief as the Court may deem just and proper.

## COUNT VI – AGAINST YPF AND YPFI
**Avoidance and Recovery of Fraudulent Transfers (Actual Fraud) of the Venezuelan Assets**

[11 U.S.C. §§544, and 550, and applicable law including but not limited to the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin]

287.    The Liquidating Trust repeats each allegation of paragraphs 1 through 286 above as though fully set forth herein.

288.    In 1996, YPF and YPFI, through their domination and control of Maxus, transferred Maxus's Venezuelan Assets to YPFI for less than fair market value or reasonably equivalent value as part of the larger Strategy.

289.    At the time of the 1996 Venezuelan Assets transfer, YPF was the parent of the Debtors and a Maxus insider.  As a result, YPF was in a position to, and in fact did, control and dominate Maxus.

290.    In 1996, Maxus transferred the Venezuelan Assets to YPFI for the benefit of YPF and solely on account of the domination and control that YPF exercised over Maxus.

291.    The YPF Defendants caused Maxus to use the proceeds from the transfer of the Venezuelan Asset for the benefit of YPF by directing Maxus to redeem preferred stock early so that YPF could increase its ownership interest in Maxus, paving the way for YPF to complete its global restructuring without limitation on asset sales.

292.    The transfer of the Venezuelan Assets either rendered the Debtors insolvent, was made when the Debtors were insolvent or in the zone of insolvency, or at the least left the Debtors with unreasonably small capital in relation to the Debtors' business at the time.

Specifically, Maxus and Tierra were rendered insolvent (to the extent they were not otherwise insolvent in 1995 as a result of LBO debt).

293.    The transfer of the Venezuelan Assets was part of the Strategy initiated by YPF and continued by Repsol to isolate the Debtors' valuable assets from Maxus's large environmental liabilities, which, by virtue of the Strategy, would be borne by the creditors. Accordingly, YPF and YPFI caused Maxus to transfer the Venezuelan Assets with the actual intent to hinder, delay, or defraud the creditors or future creditors of the Debtors.

294.    At the time of the transfer of the Venezuelan Assets, YPF and YPFI intended or believed that the transfer of the Venezuelan Assets would leave Debtors unable to pay obligations as they came due, especially including the OCC Indemnification Obligations (of which the YPF Defendants were aware at all times).  As a result of the coercion and domination of YPF and YPFI, Maxus affected the Venezuelan Asset transfer understanding and intending that this result would obtain.

295.    At the time of, and subsequent to, the transfer of the Venezuelan Assets to YPFI and/or as of the Petition Date, the Debtors had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

296.    By virtue of the foregoing, the transfer of the Venezuelan Assets was a fraudulent transfer avoidable under 11 U.S.C. §544 and applicable law including the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin by a creditor holding an unsecured claim that is allowable under 11 U.S.C. §502.  Thus, the Liquidating Trust is entitled to avoid the transfer of the Venezuelan Assets and recover the value

of the Venezuelan Assets for the benefit of all the Debtors' creditors pursuant to 11 U.S.C. §§544 and 550.

297.    YPF and YPFI are initial transferees of the transfer of the Venezuelan Assets, the entities for whose benefit it was made, or immediate or mediate transferees of the initial transfer.

298.    To the extent the Venezuelan Assets transfer is avoided, the Liquidating Trust may recover the property transferred, or the value of the transferred property, from the Defendants pursuant to §550(a) of the Bankruptcy Code.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it damages from YPF and YPFI in the amount equal to the dollar value of the property transferred pursuant to the transfer of the Venezuelan Assets as of the date of the transfer, together with pre- and post-judgment interest on that amount from the date of the transfer, attorney's fees, and costs of suit and collection allowable by law, and such further relief as the Court may deem just and proper.

## COUNT VII– AGAINST YPF AND YPFI
**Avoidance and Recovery of Fraudulent Transfers (Constructive Fraud) of the Venezuelan Assets**

[11 U.S.C. §§544, and 550, and applicable law including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin]

299.    The Liquidating Trust repeats each allegation of paragraphs 1 through 298 above as though fully set forth herein.

300.    In 1996, YPF and YPFI, through their domination and control of Maxus, transferred Maxus's Venezuelan Assets to YPFI for less than fair market value or reasonably equivalent value.

301.    At the time of the 1996 Venezuelan Assets transfer, YPF was the parent of the Debtors and a Maxus insider.  As a result, YPF was in a position to, and in fact did, control and dominate Maxus.

302.    In 1996, Maxus transferred the Venezuelan Assets to YPFI for the benefit of YPF and solely on account of the domination and control that YPF exercised over Maxus.

303.    The YPF Defendants caused Maxus to use the proceeds from the Venezuelan Asset transfer for the benefit of YPF, by directing Maxus to redeem preferred stock early so that YPF could increase its ownership interest in Maxus, paving the way for YPF to complete its global restructuring without limitation on asset sales.

304.    The transfer of the Venezuelan Assets either rendered the Debtors insolvent, was made when the Debtors were insolvent or in the zone of insolvency, or at the least left the Debtors with unreasonably small capital in relation to the Debtors' business at the time. Specifically, Maxus and Tierra were rendered insolvent (to the extent they were not otherwise insolvent in 1995 as a result of LBO debt).

305.    The transfer of the Venezuelan Assets was part of the Strategy initiated by YPF and continued by Repsol to isolate the Debtors' valuable assets from Maxus's large environmental liabilities, which, by virtue of the Strategy, would be borne by the creditors.

306.    At the time of, and subsequent to, the transfer of the Venezuelan Assets to YPFI and/or as of the Petition Date, the Debtors had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

307.    By virtue of the foregoing, the transfer of the Venezuelan Assets was a fraudulent transfer avoidable under 11 U.S.C. §544 and applicable law including the Uniform Fraudulent

Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin by a creditor holding an unsecured claim that is allowable under 11 U.S.C. §502.   Thus, the Liquidating Trust is entitled to avoid the transfer of the Venezuelan Assets and recover the value of the Venezuelan Assets for the benefit of all the Debtors' creditors pursuant to 11 U.S.C. §§544 and 550.

308.    YPF and YPFI are initial transferees of the transfer of the Venezuelan Assets, the entities for whose benefit it was made, or immediate or mediate transferees of the initial transfer.

309.    To the extent the Venezuelan Assets transfer is avoided, the Liquidating Trust may recover the property transferred, or the value of the transferred property, from the Defendants pursuant to §550(a) of the Bankruptcy Code.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it damages from YPF and YPFI in the amount equal to the dollar value of the property transferred pursuant to the Venezuelan Assets transfer as of the date of the transfer, together with pre- and post-judgment interest on that amount from the date of the transfer, attorney's fees, costs of suit and collection allowable by law, and such further relief as the Court may deem just and proper.

## COUNT VIII – AGAINST YPF AND YPFI
**Avoidance and Recovery of Fraudulent Transfers (Actual Fraud) of the Ecuadorian Assets**

[11 U.S.C. §§544, and 550, and applicable law including but not limited to the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin]

310.    The Liquidating Trust repeats each allegation of paragraphs 1 through 309 above as though fully set forth herein.

311.    In 1997, YPF, through its domination and control of Maxus, transferred Maxus's Ecuadorian Assets to YPFI for far less than fair market value or reasonably equivalent value as part of the larger Strategy.

312.    At the time of the 1996 Ecuadorian Assets transfer, YPF was the parent of the Debtors and a Maxus insider.  As a result, YPF was in a position to, and in fact did, control and dominate Maxus.

313.    In 1997, Maxus transferred the Ecuadorian Assets to YPFI for the benefit of YPF and solely on account of the domination and control that YPF exercised over Maxus.

314.    YPF caused Maxus to use the proceeds from the transfer of the Ecuadorian Assets for the benefit of YPF and YPFI by repaying a portion of its intercompany debt to YPFI early.

315.    The transfer of the Ecuadorian Assets either rendered the Debtors insolvent, was made when the Debtors were insolvent or in the zone of insolvency, or at the least left the Debtors with unreasonably small capital in relation to the Debtors' business at the time. Specifically, Maxus and Tierra were rendered insolvent (to the extent they were not otherwise insolvent in 1995 as a result of LBO debt).

316.    The transfer of the Ecuadorian Assets was part of the Strategy initiated by YPF and continued by Repsol to isolate the Debtors' valuable assets from Maxus's large environmental liabilities, which, by virtue of the Strategy, would thus be borne by the creditors. Accordingly, YPF and YPFI caused Maxus to transfer the Ecuadorian Assets with the actual intent to hinder, delay, or defraud the creditors or future creditors of the Debtors.

317.    At the time of the transfer of the Ecuadorian Assets, YPF and YPFI intended or believed that the Ecuadorian Assets transfer would leave Debtors unable to pay obligations as

they came due, especially including the OCC Indemnification Obligations (of which the YPF Defendants were aware at all times).  As a result of the coercion and domination of YPF and YPFI, Maxus affected the Ecuadorian Assets transfer understanding and intending that this result would obtain.

318.    At the time of, and subsequent to, the transfer of the Ecuadorian Assets to YPFI and/or as of the Petition Date, the Debtors had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

319.    By virtue of the foregoing, the transfer of the Ecuadorian Assets was a fraudulent transfer avoidable under 11 U.S.C. §544 and applicable law including the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin by a creditor holding an unsecured claim that is allowable under 11 U.S.C. §502.   Thus, the Liquidating Trust is entitled to avoid the transfer of the Ecuadorian Assets and recover the value of the Ecuadorian Assets for the benefit of all the Debtors' creditors pursuant to 11 U.S.C. §§544 and 550.

320.    YPF and YPFI are initial transferees of the transfer of the Ecuadorian Assets, the entities for whose benefit it was made, or immediate or mediate transferees of the initial transfer.

321.    To the extent the Ecuadorian Assets transfer is avoided, the Liquidating Trust may recover the property transferred, or the value of the transferred property, from the Defendants pursuant to §550(a) of the Bankruptcy Code.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it damages from YPF and YPFI in the amount equal to the dollar value of the property transferred pursuant to the Ecuadorian Assets transfer as of the date of the transfer, together with pre- and

post-judgment interest on that amount from the date of the transfer, attorney's fees, costs of suit and collection allowable by law, and such further relief as the Court may deem just and proper.

## COUNT IX – AGAINST YPF AND YPFI
### Avoidance and Recovery of Fraudulent Transfers (Constructive Fraud) of the Ecuadorian Assets

[11 U.S.C. §§544, and 550, and applicable law including, but not limited, to the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin]

322.    The Liquidating Trust repeats each allegation of paragraphs 1 through 321 above as though fully set forth herein.

323.    In 1997, YPF, through its domination and control of Maxus, transferred Maxus's Ecuadorian Assets to YPFI for far less than fair market value or reasonably equivalent value as part of the larger Strategy.

324.    At the time of the 1997 Ecuadorian Assets transfer, YPF was the parent of the Debtors and a Maxus insider.  As a result, YPF was in a position to, and in fact did, control and dominate Maxus.

325.    In 1997, Maxus transferred the Ecuadorian Assets to YPFI for the benefit of YPF and solely on account of the domination and control that YPF exercised over Maxus.

326.    YPF caused Maxus to use the proceeds from the transfer of the Ecuadorian Assets for the benefit of YPF and YPFI by repaying a portion of its intercompany debt to YPFI early.

327.    The transfer of the Ecuadorian Assets either rendered the Debtors insolvent, was made when the Debtors were insolvent or in the zone of insolvency, or at the least left the Debtors with unreasonably small capital in relation to the Debtors' business at the time.

Specifically, Maxus and Tierra were rendered insolvent (to the extent they were not otherwise insolvent in 1995 as a result of LBO debt).

328.    The transfer of the Ecuadorian Assets was part of the Strategy initiated by YPF and continued by Repsol to isolate the Debtors' valuable assets from Maxus's large environmental liabilities, which, by virtue of the Strategy, would be borne by the creditors.

329.    At the time of, and subsequent to, the transfer of the Ecuadorian Assets to YPFI and/or as of the Petition Date, the Debtors had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

330.    By virtue of the foregoing, the transfer of the Ecuadorian Assets was a fraudulent transfer avoidable under 11 U.S.C. §544 and applicable law including the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin by a creditor holding an unsecured claim that is allowable under 11 U.S.C. §502.   Thus, the Liquidating Trust is entitled to avoid the transfer of the Ecuadorian Assets and recover the value of the Ecuadorian Assets for the benefit of all the Debtors' creditors pursuant to 11 U.S.C. §§544 and 550.

331.    YPF and YPFI are initial transferees of the transfer of the Ecuadorian Assets, the entities for whose benefit it was made, or immediate or mediate transferees of the initial transfer.

332.    To the extent the Ecuadorian Assets transfer is avoided, the Liquidating Trust may recover the property transferred, or the value of the transferred property, from the Defendants pursuant to §550(a) of the Bankruptcy Code.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it damages from YPF and YPFI in the amount equal to the dollar value of the property transferred

pursuant to the Ecuadorian Assets transfer as of the date of the transfer, together with pre- and post-judgment interest on that amount from the date of the transfer, attorney's fees, costs of suit and collection allowable by law, and such further relief as the Court may deem just and proper.

## COUNT X – AGAINST YPF AND YPFI
### Avoidance and Recovery of Fraudulent Transfers (Actual Fraud) of the Indonesian Assets

[11 U.S.C. §§544, and 550, and applicable law including but not limited to the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin]

333.    The Liquidating Trust repeats each allegation of paragraphs 1 through 332 above as though fully set forth herein.

334.    In 1997, YPF, through its domination and control of Maxus, transferred Maxus's Indonesian Assets to YPFI for far less than fair market value or reasonably equivalent value as part of the larger Strategy.

335.     At the time of the 1997 Indonesian Assets transfer, YPF was the parent of the Debtors and a Maxus insider.  As a result, YPF was in a position to, and in fact did, control and dominate Maxus.

336.    In 1997, Maxus transferred the Indonesian Assets to YPFI for the benefit of YPF and solely on account of the domination and control that YPF exercised over Maxus.

337.    YPF caused Maxus to use the proceeds from the transfer of the Indonesian Assets for the benefit of YPF and YPFI by repaying a portion of its intercompany debt to YPFI early.

338.    The transfer of the Indonesian Assets either rendered the Debtors insolvent, was made when the Debtors were insolvent or in the zone of insolvency, or at the least left the Debtors with unreasonably small capital in relation to the Debtors' business at the time.

Specifically, Maxus and Tierra were rendered insolvent (to the extent they were not otherwise insolvent in 1995 as a result of LBO debt).

339.    The transfer of the Indonesian Assets was part of the Strategy initiated by YPF and continued by Repsol to isolate the Debtors' valuable assets from Maxus's large environmental liabilities, which, by virtue of the Strategy, would thus be borne by the creditors. Accordingly, YPF and YPFI caused Maxus to transfer the Indonesian Assets with the actual intent to hinder, delay, or defraud the creditors or future creditors of the Debtors

340.    At the time of the transfer of the Indonesian Assets, YPF and YPFI intended or believed that the transfer of the Indonesian Assets would leave Debtors unable to pay obligations as they came due, especially including the OCC Indemnification Obligations (of which the YPF Defendants were aware at all times).   As a result of the coercion and domination of YPF and YPFI, Maxus affected the transfer of the Indonesian Asset understanding and intending that this result would obtain.

341.    At the time of, and subsequent to, the transfer of the Indonesian Assets to YPFI and/or as of the Petition Date, the Debtors had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

342.    By virtue of the foregoing, the transfer of the Indonesian Assets was a fraudulent transfer avoidable under 11 U.S.C. §544 and applicable law including the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin by a creditor holding an unsecured claim that is allowable under 11 U.S.C. §502.   Thus, the Liquidating Trust is entitled to avoid the transfer of the Indonesian Assets and recover the value

of the Indonesian Assets for the benefit of all the Debtors' creditors pursuant to 11 U.S.C. §§544 and 550.

343.    YPF and YPFI are initial transferees of the transfer of the Indonesian Assets, the entities for whose benefit it was made, or immediate or mediate transferees of the initial transfer.

344.    To the extent the transfer of the Indonesian Assets is avoided, the Liquidating Trust may recover the property transferred, or the value of the transferred property, from the Defendants pursuant to §550(a) of the Bankruptcy Code.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it damages from YPF and YPFI in the amount equal to the dollar value of the property transferred pursuant to the transfer of the Indonesian Assets as of the date of the transfer, together with pre- and post-judgment interest on that amount from the date of the transfer, attorney's fees, and costs of suit and collection allowable by law, and such further relief as the Court may deem just and proper.

## COUNT XI – AGAINST YPF AND YPFI
### Avoidance and Recovery of Fraudulent Transfers (Constructive Fraud) of the Indonesian Assets

[11 U.S.C. §§544, and 550, and applicable law including but not limited to the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin]

345.    The Liquidating Trust repeats each allegation of paragraphs 1 through 344 above as though fully set forth herein.

346.    In 1997, YPF, through its domination and control of Maxus, transferred Maxus's Indonesian Assets to YPFI for far less than fair market value or reasonably equivalent value as part of the larger Strategy.

347.    At the time of the 1997 Indonesian Assets transfer, YPF was the parent of the Debtors and a Maxus insider.  As a result, YPF was in a position to, and in fact did, control and dominate Maxus.

348.    In 1997, Maxus transferred the Indonesian Assets to YPFI for the benefit of YPF and solely on account of the domination and control that YPF exercised over Maxus.

349.    YPF caused Maxus to use the proceeds from the Indonesian Asset transfer for the benefit of YPF and YPFI by repaying a portion of its intercompany debt to YPFI early.

350.    The transfer of the Indonesian Assets either rendered the Debtors insolvent, was made when the Debtors were insolvent or in the zone of insolvency, or at the least left the Debtors with unreasonably small capital in relation to the Debtors' business at the time. Specifically, Maxus and Tierra were rendered insolvent (to the extent they were not otherwise insolvent in 1995 as a result of LBO debt).

351.    The Indonesian Asset transfer was part of the Strategy initiated by YPF and continued by Repsol to isolate the Debtors' valuable assets from Maxus's large environmental liabilities, which, by virtue of the Strategy, would thus be borne by the creditors.

352.    At the time of, and subsequent to, the transfer of the Indonesian Assets to YPFI and/or as of the Petition Date, the Debtors had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

353.    By virtue of the foregoing, the transfer of the Indonesian Assets was a fraudulent transfer avoidable under 11 U.S.C. §544 and applicable law including the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin by a creditor holding an unsecured claim that is allowable under 11 U.S.C. §502.   Thus, the

Liquidating Trust is entitled to avoid the transfer of the Indonesian Assets and recover the value of the Indonesian Assets for the benefit of all the Debtors' creditors pursuant to 11 U.S.C. §§544 and 550.

354.    YPF and YPFI are initial transferees of the transfer of the Indonesian Assets, the entities for whose benefit it was made, or immediate or mediate transferees of the initial transfer.

355.    To the extent the transfer of the Indonesian Assets is avoided, the Liquidating Trust may recover the property transferred, or the value of the transferred property, from the Defendants pursuant to §550(a) of the Bankruptcy Code.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it damages from YPF and YPFI in the amount equal to the dollar value of the property transferred pursuant to the transfer of the Indonesian Assets as of the date of the transfer, together with pre- and post-judgment interest on that amount from the date of the transfer, attorney's fees, and costs of suit and collection allowable by law, and such further relief as the Court may deem just and proper.

## <u>COUNT XII – AGAINST YPF, YPFH, YPFI and REPSOL</u>
**Avoidance and Recovery of Fraudulent Transfers (Actual Fraud) Related to the Crescendo Transfer**

[11 U.S.C. §§544, and 550, and applicable law including but not limited to the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin]

356.    The Liquidating Trust repeats each allegation of paragraphs 1 through 355 above as though fully set forth herein.

357.    In December 1999 and January 2000, Repsol caused YPF to cause Maxus, through their domination and control of Maxus, to sell its Crescendo interests to BP Amoco for less than fair market value or reasonably equivalent value as part of the larger Strategy.

358.    At the time of the Crescendo Transfer, YPF and Repsol were the parents of the Debtors and were Maxus insiders.  As a result, YPF and Repsol were in a position to, and in fact did, control and dominate Maxus.

359.    Maxus sold its interests in Crescendo for the benefit of YPF and Repsol and solely on account of the domination and control that YPF and Repsol exercised over Maxus.

360.    YPF and Repsol caused Maxus to use the proceeds from the Crescendo Transfer for the benefit of YPF and YPFI by repaying a portion of its intercompany debt to YPF. Additionally, Repsol benefited from the Crescendo Transfer by directing that the remaining proceeds from the Crescendo Transfer be loaned to RIF for a below-market rate of return, advancing Repsol's interest in a quick divestiture of the Crescendo interests as part of the larger Strategy.

361.    The Crescendo Transfer either rendered the Debtors insolvent, was made when the Debtors were insolvent or in the zone of insolvency, or at the least left the Debtors with unreasonably small capital in relation to the Debtors' business at the time.

362.    The Crescendo Transfer was part of the Strategy initiated by YPF and continued by Repsol to isolate the Debtors' valuable assets from Maxus's large environmental liabilities, which, by virtue of the Strategy, would thus be borne by the creditors.  Accordingly, YPF and Repsol caused Maxus to affect the Crescendo Transfer with the actual intent to hinder, delay, or defraud the creditors or future creditors of the Debtors.

363.    At the time of the Crescendo Transfer, YPF and Repsol intended or believed that it would leave Debtors unable to pay obligations as they came due, especially including the OCC Indemnification Obligations (of which the YPF and Repsol Defendants were aware at all times). As a result of the coercion and domination of YPF and Repsol, Maxus affected the Crescendo Transfer understanding and intending that this result would obtain.

364.    At the time of, and subsequent to, the Crescendo Transfer and/or as of the Petition Date, the Debtors had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

365.    By virtue of the foregoing, the Crescendo Transfer was a fraudulent transfer avoidable under 11 U.S.C. §544 and applicable law including the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin by a creditor holding an unsecured claim that is allowable under 11 U.S.C. §502. Thus, the Liquidating Trust is entitled to avoid the Crescendo Transfer and recover the value of the transferred interests for the benefit of all the Debtors' creditors pursuant to 11 U.S.C. §§544 and 550.

366.    YPF and Repsol are initial transferees of the Crescendo Transfer, the entities for whose benefit it was made, or immediate or mediate transferees of the initial transfer.

367.    To the extent the Crescendo Transfer is avoided, the Liquidating Trust may recover the property transferred, or the value of the transferred property, from the Defendants pursuant to §550(a) of the Bankruptcy Code.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it damages from YPF and Repsol in the amount equal to the dollar value of the property transferred pursuant to the Crescendo Transfer as of the date of the transfer, together with pre- and post-

judgment interest on that amount from the date of the transfer, attorney's fees, costs of suit and

collection allowable by law, and such further relief as the Court may deem just and proper.

## <u>COUNT XIII – AGAINST YPF, YPFH, YPFI and REPSOL</u>
### Avoidance and Recovery of Fraudulent Transfers (Constructive Fraud) Related to the Crescendo Transfer

[11 U.S.C. §§544, and 550, and applicable law including but not limited to the Uniform
Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and
Wisconsin]

368.    The Liquidating Trust repeats each allegation of paragraphs 1 through 367 above

as though fully set forth herein.

369.    In December 1999 and January 2000, Repsol caused YPF to cause Maxus,

through their domination and control of Maxus, to sell its Crescendo interests to BP Amoco for

less than fair market value or reasonably equivalent value as part of the larger Strategy.

370.    At the time of the Crescendo Transfer, YPF and Repsol were the parents of the

Debtors and were Maxus insiders.  As a result, YPF was in a position to, and in fact did, control

and dominate Maxus.

371.    Maxus sold its interests in Crescendo for the benefit of YPF and Repsol and

solely on account of the domination and control that YPF and Repsol exercised over Maxus.

372.    YPF and Repsol caused Maxus to use the proceeds from the Crescendo Transfer

for the benefit of YPF and YPFI by repaying a portion of its intercompany debt to YPF.

Additionally, Repsol benefited from the Crescendo Transfer because it directed that the

remaining proceeds from the Crescendo Transfer be loaned to RIF for a below-market rate of

return, advancing Repsol's interest in a quick divestiture of the Crescendo interests as part of the

larger Strategy.

373.    The Crescendo Transfer either rendered the Debtors insolvent, was made when the Debtors were insolvent or in the zone of insolvency, or at the least left the Debtors with unreasonably small capital in relation to the Debtors' business at the time.

374.    The Crescendo Transfer was part of the Strategy initiated by YPF and continued by Repsol to isolate the Debtors' valuable assets from Maxus's large environmental liabilities, which, by virtue of the Strategy, would thus be borne by the creditors.

375.    At the time of, and subsequent to, the Crescendo Transfer and/or as of the Petition Date, the Debtors had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

376.    By virtue of the foregoing, the Crescendo Transfer was a fraudulent transfer avoidable under 11 U.S.C. §544 and applicable law including the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin by a creditor holding an unsecured claim that is allowable under 11 U.S.C. §502.  Thus, the Liquidating Trust is entitled to avoid the Crescendo Transfer and recover the value of the transferred interests for the benefit of all the Debtors' creditors pursuant to 11 U.S.C. §§544 and 550.

377.    YPF and Repsol are initial transferees of the Crescendo Transfer, the entities for whose benefit it was made, or immediate or mediate transferees of the initial transfer.

378.    To the extent the Crescendo Transfer is avoided, the Liquidating Trust may recover the property transferred, or the value of the transferred property, from the Defendants pursuant to §550(a) of the Bankruptcy Code.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it damages from YPF and Repsol in the amount equal to the dollar value of the property transferred

pursuant to the Crescendo Transfer as of the date of the transfer, together with pre- and post-judgment interest on that amount from the date of the transfer, attorney's fees, costs of suit and collection allowable by law, and such further relief as the Court may deem just and proper.

**COUNT XIV – AGAINST THE YPF DEFENDANTS AND THE REPSOL DEFENDANTS**
**Avoidance and Recovery of Fraudulent Transfers (Actual Fraud) Related to the YPFI Transfers**

[11 U.S.C. §§544, and 550, and applicable law including but not limited to the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin]

379.    The Liquidating Trust repeats each allegation of paragraphs 1 through 378 above as though fully set forth herein.

380.    In 2001 and 2002, Repsol caused YPFI to transfer to Repsol affiliates or third parties Maxus's legacy international E&P assets, which had been held by YPFI following the YPF global restructuring in 1997 and 1998, for less than fair market value or reasonably equivalent value as part of the larger Strategy.

381.    At the time of the YPFI Transfers, Repsol was the parent of YPF and YPF was the parent of Maxus.  As a result, Repsol and YPF were in a position to, and in fact did, control and dominate Maxus.

382.    Repsol caused YPF and YPFI to effect the YPFI Transfers for the benefit of YPF and Repsol and solely on account of the domination and control that YPF and Repsol exercised over Maxus.

383.    YPF and Repsol caused the YPFI Transfers to the benefit of YPF, YPFI and Repsol.  YPFI benefitted from the YPFI Transfers as it received more than $500 million in value in the resale of the assets it had acquired just a few years prior (without taking into account the

application of proceeds from Maxus's earlier sales of the underlying assets to YPFI to retiring Maxus debt for YPF's benefit).  Repsol benefited from the YPFI Transfers because it both received and controlled the proceeds for its own benefit, and in the case of the Ecuadorian and Venezuelan Assets, Repsol received the underlying E&P assets.  Moreover, both YPF and Repsol benefited from the YPFI Transfers as they moved Maxus's legacy assets (and their revenue streams) out of YPFI, a clear alter ego of Maxus in the Management Group, and created another corporate layer between Maxus's environmental creditors and the value-producing assets.

384.    The YPFI Transfers either rendered the Debtors insolvent, were made when the Debtors were insolvent or in the zone of insolvency, or at the least left the Debtors with unreasonably small capital in relation to the Debtors' business at the time.

385.    The YPFI Transfers were part of the Strategy initiated by YPF and continued by Repsol to isolate the Debtors' valuable assets from Maxus's large environmental liabilities, which, by virtue of the Strategy, would be borne by the creditors.  Accordingly, YPF, YPFI and Repsol caused Maxus to affect the YPFI Transfers with the actual intent to hinder, delay, or defraud the creditors or future creditors of the Debtors.

386.    At the time of the YPFI Transfers, YPF and Repsol intended or believed that they would leave Debtors unable to pay obligations as they came due, especially including the OCC Indemnification Obligations (of which the YPF and Repsol Defendants were aware at all times).  As a result of the coercion and domination of YPF, YPFI and Repsol, YPFI affected the YPFI Transfers understanding and intending that this result would obtain.

387.    At the time of, and subsequent to, the YPFI Transfers and/or as of the Petition Date, the Debtors had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

388.    By virtue of the foregoing, the YPFI Transfers were fraudulent transfers avoidable under 11 U.S.C. §544 and applicable law including the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin by a creditor holding an unsecured claim that is allowable under 11 U.S.C. §502.   Thus, the Liquidating Trust is entitled to avoid the YPFI Transfers and recover the value of the transferred property for the benefit of all the Debtors' creditors pursuant to 11 U.S.C. §§544 and 550.

389.    YPF and Repsol are initial transferees of the YPFI Transfers, the entities for whose benefit it was made, or immediate or mediate transferees of the initial transfer.

390.    To the extent the YPFI Transfers are avoided, the Liquidating Trust may recover the property transferred, or the value of the transferred property, from the Defendants pursuant to §550(a) of the Bankruptcy Code.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it damages from YPF and Repsol in the amount equal to the dollar value of the property transferred pursuant to the YPFI Transfers as of the date of the transfer, together with pre- and post-judgment interest on that amount from the date of the transfer, attorney's fees, and costs of suit and collection allowable by law, and such further relief as the Court may deem just and proper.

## COUNT XV – AGAINST THE YPF DEFENDANTS AND THE REPSOL DEFENDANTS
### Avoidance and Recovery of Fraudulent Transfers (Constructive Fraud) Related to the YPFI Transfers
[11 U.S.C. §§544, and 550, and applicable law including but not limited to the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and

Wisconsin]

391.    The Liquidating Trust repeats each allegation of paragraphs 1 through 390 above as though fully set forth herein.

392.    In 2001 and 2002, Repsol caused YPFI to transfer to Repsol affiliates or third parties Maxus's legacy international E&P assets which had been held by YPFI following the YPF global restructuring in 1997 and 1998 for less than fair market value or reasonably equivalent value as part of the larger Strategy.

393.    At the time of the YPFI Transfers, Repsol was the parent of YPF and YPF was the parent of Maxus.  As a result, Repsol and YPF were in a position to, and in fact did, control and dominate Maxus.

394.    Repsol caused YPF and YPFI to effect the YPFI Transfers for the benefit of YPF and Repsol and solely on account of the domination and control that YPF and Repsol exercised over Maxus.

395.    YPF and Repsol caused the YPFI Transfers to the benefit of YPF, YPFI and Repsol.  YPF and YPFI benefitted from the YPFI Transfers as they received more than $500 million in value in the resale of the assets they had acquired just a few years prior (without taking into account the application of proceeds from Maxus's earlier sales of the underlying assets to YPFI to retiring Maxus debt for YPF's benefit).  Repsol benefited from the YPFI Transfers because it both received and controlled the proceeds for its own benefit, and in the case of the Ecuadorian and Venezuelan Assets, Repsol also received the underlying E&P assets.  Moreover, both YPF and Repsol benefited from the YPFI Transfers as they moved Maxus's legacy assets (and their revenue streams) out of YPFI, a clear alter ego of Maxus in the Management Group,

and created another corporate layer between Maxus's environmental creditors and the value-producing assets.

396.    The YPFI Transfers either rendered the Debtors insolvent, were made when the Debtors were insolvent or in the zone of insolvency, or at the least left the Debtors with unreasonably small capital in relation to the Debtors' business at the time.

397.    The YPFI Transfers were part of the Strategy initiated by YPF and continued by Repsol to isolate the Debtors' valuable assets from Maxus's large environmental liabilities, which, by virtue of the Strategy, would thus be borne by the creditors.

398.    At the time of, and subsequent to, the YPFI Transfers and/or as of the Petition Date, the Debtors had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

399.    By virtue of the foregoing, the YPFI Transfers were fraudulent transfers avoidable under 11 U.S.C. §544 and applicable law including the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin by a creditor holding an unsecured claim that is allowable under 11 U.S.C. §502.   Thus, the Liquidating Trust is entitled to avoid the YPFI Transfers and recover the value of the transferred property for the benefit of all the Debtors' creditors pursuant to 11 U.S.C. §§544 and 550.

400.    YPF and Repsol are initial transferees of the YPFI Transfers, the entities for whose benefit it was made, or immediate or mediate transferees of the initial transfer.

401.    To the extent the YPFI Transfers are avoided, the Liquidating Trust may recover the property transferred, or the value of the transferred property, from the Defendants pursuant to §550(a) of the Bankruptcy Code.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it damages from YPF and Repsol in the amount equal to the dollar value of the property transferred pursuant to the YPFI Transfers as of the date of the transfer, together with pre- and post-judgment interest on that amount from the date of the transfer, attorney's fees, costs of suit and collection allowable by law, and such further relief as the Court may deem just and proper.

## COUNT XVI – AGAINST THE YPF DEFENDANTS AND THE REPSOL DEFENDANTS
### Avoidance and Recovery of Fraudulent Transfers (Actual Fraud) Related to the 2007 Settlement Agreements

[11 U.S.C. §§544, and 550, and applicable law including but not limited to the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin]

402.    The Liquidating Trust repeats each allegation of paragraphs 1 through 401 above as though fully set forth herein.

403.    In 2007, Repsol, through its domination and control of Maxus, caused Maxus and to enter into the 2007 Settlement Agreements with Repsol Services Company and Repsol E&P T&T Limited, which released Maxus's claims for uncompensated services Maxus provided to Repsol and/or its affiliates for less than fair market or reasonably equivalent value.

404.    The underlying transfers for which Maxus was providing releases included uncompensated marketing and distribution services to Repsol Services Company in 2006, unpaid invoices for Maxus's exploration activities for Repsol in the Gulf of Mexico in 2006 and 2007, and uncompensated technical services performed by Maxus related to Repsol operations in Trinidad.

405.    At the time of 2007 Settlement Agreements, YPF and Repsol were the parents of the Debtors and were Maxus insiders.  As a result, YPF and Repsol were in a position to, and in fact did, control and dominate Maxus.

406.    Maxus released its claims in the 2007 Settlement Agreements on account of the domination and control that YPF and Repsol exercised over Maxus.

407.    YPF and Repsol caused Maxus to release its claims for uncompensated services for the benefit of the YPF and Repsol Defendants, as they had an interest in papering over the earlier stages of the Strategy and the total disregard for corporate formalities between YPF, YPFH, YPFI, Repsol, Maxus, Tierra and the other Debtors.

408.    The 2007 Settlement Agreements were made when the Debtors were insolvent or in the zone of insolvency, or at the least left the Debtors with unreasonably small capital in relation to the Debtors' business at the time.

409.    The 2007 Settlement Agreements were part of the Strategy initiated by YPF and continued by Repsol to wring every bit of value from the Debtors' limited remaining assets (such as its personnel) and allow the statute of limitations to run on fraudulent transfer claims before filing for bankruptcy.  Accordingly, YPF and Repsol caused Maxus to enter the 2007 Settlement Agreements with the actual intent to hinder, delay, or defraud the creditors or future creditors of the Debtors.

410.    At the time of the 2007 Settlement Agreements, YPF and Repsol intended or believed that they would leave Debtors unable to pay obligations as they came due, especially including the OCC Indemnification Obligations (of which the YPF and Repsol Defendants were aware at all times).  As a result of the coercion and domination of the YPF and Repsol, Maxus

entered the 2007 Settlement Agreements understanding and intending that this result would obtain.

411.    At the time of, and subsequent to, the 2007 Settlement Agreements and/or as of the Petition Date, the Debtors had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

412.    By virtue of the foregoing, the 2007 Settlement Agreements were fraudulent transfers avoidable under 11 U.S.C. §544 and applicable law including the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin by a creditor holding an unsecured claim that is allowable under 11 U.S.C. §502.    Thus, the Liquidating Trust is entitled to avoid the 2007 Settlement Agreements and recover the value of the underlying claims released thereunder for the benefit of all the Debtors' creditors pursuant to 11 U.S.C. §§544 and 550.

413.    YPF and Repsol are initial transferees of the 2007 Settlement Agreements, the entities for whose benefit they were made, or immediate or mediate transferees of the initial transfer.

414.    To the extent the 2007 Settlement Agreements are avoided, the Liquidating Trust may recover the property transferred, or the value of the transferred property, from the Defendants pursuant to §550(a) of the Bankruptcy Code.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it damages from YPF and Repsol in the amount equal to the dollar value of the property transferred and claims released pursuant to the 2007 Settlement Agreements as of the dates of the settlements, together with pre- and post-judgment interest on that amount from the date of the

transfer, attorney's fees, costs of suit and collection allowable by law, and such further relief as the Court may deem just and proper.

## COUNT XVII – AGAINST THE YPF DEFENDANTS AND THE REPSOL DEFENDANTS
### Avoidance and Recovery of Fraudulent Transfers (Constructive Fraud) Related to the 2007 Settlement Agreements

[11 U.S.C. §§544, and 550, and applicable law including but not limited to the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin]

415.    The Liquidating Trust repeats each allegation of paragraphs 1 through 414 above as though fully set forth herein.

416.    In 2007, Repsol, through its domination and control of Maxus, caused Maxus to enter into the 2007 Settlement Agreements with Repsol Services Company and Repsol E&P T&T Limited, which released Maxus's claims for uncompensated services Maxus provided to Repsol and/or its affiliates for less than fair market or reasonably equivalent value.

417.    The underlying transfers for which Maxus was providing releases included uncompensated marketing and distribution services to Repsol Services Company in 2006, unpaid invoices for Maxus's exploration activities for Repsol in the Gulf of Mexico in 2006 and 2007, and uncompensated technical services performed by Maxus related to Repsol operations in Trinidad.

418.    At the time of the 2007 Settlement Agreements, YPF and Repsol were the parents of the Debtors and were Maxus insiders.  As a result, YPF and Repsol were in a position to, and in fact did, control and dominate Maxus.

419.    Maxus released its claims in the 2007 Settlement Agreements on account of the domination and control that YPF and Repsol exercised over Maxus.

420.    YPF and Repsol caused Maxus to release its claims for uncompensated services for the benefit of the YPF and Repsol Defendants as they had an interest in papering over the earlier stages of the Strategy and the total disregard for corporate formalities between YPF, YPFH, YPFI, Repsol, Maxus, Tierra and the other Debtors.

421.    The 2007 Settlement Agreements were made when the Debtors were insolvent or in the zone of insolvency, or at the least left the Debtors with unreasonably small capital in relation to the Debtors' business at the time.

422.    The 2007 Settlement Agreements were part of the Strategy initiated by YPF and continued by Repsol to wring every bit of value from the Debtors' limited remaining assets (such as its personnel) and allow the statute of limitations to run on fraudulent transfer claims before filing for bankruptcy.

423.    At the time of, and subsequent to, the 2007 Settlement Agreements and/or as of the Petition Date, the Debtors had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

424.    By virtue of the foregoing, the 2007 Settlement Agreements were fraudulent transfers avoidable under 11 U.S.C. §544 and applicable law including the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin by a creditor holding an unsecured claim that is allowable under 11 U.S.C. §502.    Thus, the Liquidating Trust is entitled to avoid the 2007 Settlement Agreements and recover the value of

the underlying claims released thereunder for the benefit of all the Debtors' creditors pursuant to 11 U.S.C. §§544 and 550.

425.    YPF and Repsol are initial transferees of the 2007 Settlement Agreements, the entities for whose benefit they were made, or immediate or mediate transferees of the initial transfer.

426.    To the extent the 2007 Settlement Agreement is avoided, the Liquidating Trust may recover the property transferred, or the value of the transferred property, from the Defendants pursuant to §550(a) of the Bankruptcy Code.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it damages from YPF and Repsol in the amount equal to the dollar value of the property transferred and claims released pursuant to the 2007 Settlement Agreements as of the dates of the settlements, together with pre- and post-judgment interest on that amount from the date of the transfer, attorney's fees, costs of suit and collection allowable by law, and such further relief as the Court may deem just and proper.

**COUNT XVIII – AGAINST THE YPF DEFENDANTS AND THE REPSOL DEFENDANTS**
**Avoidance and Recovery of Fraudulent Transfers (Actual Fraud) Related to the 2007/2008 Settlement Agreement**

[11 U.S.C. §§544, and 550, and applicable law including but not limited to the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin]

427.    The Liquidating Trust repeats each allegation of paragraphs 1 through 426 above as though fully set forth herein.

428.    In October, 2008, Repsol, through its domination and control of Maxus, caused Maxus to enter into the 2007/2008 Settlement Agreement, pursuant to which Maxus agreed to, among other things (1) release Tierra from the Assumption Agreement, (2) formalize a reimbursement agreement by which Maxus would fund Tierra's future expenses related to the OCC Indemnification Obligations for the next 20 years, and (3) terminate the Contribution Agreement to eliminate YPF's obligations to Tierra while simultaneously causing Maxus and Tierra to indemnify YPF for any future claims for payment under the Contribution Agreement. Maxus did not receive anything close to fair consideration or reasonably equivalent value pursuant to the 2007/2008 Settlement Agreement.

429.    At the time of 2007/2008 Settlement Agreement, YPF and Repsol were the parents of the Debtors and were Maxus insiders.  As a result, YPF and Repsol were in a position to, and in fact did, control and dominate Maxus.

430.    Maxus released its claims in the 2007/2008 Settlement Agreement on account of the domination and control that YPF and Repsol exercised over Maxus.

431.    YPF and Repsol caused Maxus to agree to fund Tierra's future expenses relating to the OCC Indemnification Obligations, which were estimated between $524 Million and $1.7 billion, and to agree to indemnify YPF for future claims in exchange for largely worthless consideration.  The terms of the 2007/2008 Settlement Agreement were for the sole benefit of YPF and Repsol as they obtained releases for future environmental liabilities, a defining part of the Strategy since its inception.

432.    The 2007/2008 Settlement Agreement was made when the Debtors were insolvent or in the zone of insolvency, or at the least left the Debtors with unreasonably small capital in relation to the Debtors' business at the time.

433.    The 2007/2008 Settlement Agreement was part of the Strategy initiated by YPF and continued by Repsol to avoid exposure to Maxus's environmental liabilities, by allowing the statute of limitations to run on fraudulent transfer claims before filing for bankruptcy. Accordingly, YPF and Repsol caused Maxus to enter the 2007/2008 Settlement Agreement with the actual intent to hinder, delay, or defraud the creditors or future creditors of the Debtors.

434.    At the time of the 2007/2008 Settlement Agreement, YPF and Repsol intended or believed that it would leave Debtors unable to pay obligations as they came due, especially including the OCC Indemnification Obligations (of which the YPF and Repsol Defendants were aware at all times).  As a result of the coercion and domination of the YPF and Repsol, Maxus entered the 2007/2008 Settlement Agreement understanding and intending that this result would obtain.

435.    At the time of, and subsequent to, the 2007/2008 Settlement Agreement and/or as of the Petition Date, the Debtors had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

436.    By virtue of the foregoing, the 2007/2008 Settlement Agreement was a fraudulent transfer avoidable under 11 U.S.C. §544 and applicable law including the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin by a creditor holding an unsecured claim that is allowable under 11 U.S.C. §502.   Thus, the Liquidating Trust is entitled to avoid the 2007/2008 Settlement Agreement and recover the value

of the underlying claims released thereunder for the benefit of all the Debtors' creditors pursuant to 11 U.S.C. §§544 and 550.

437.    YPF and Repsol are initial transferees of the 2007/2008 Settlement Agreement, the entities for whose benefit it was made, or immediate or mediate transferees of the initial transfer.

438.    To the extent the 2007/2008 Settlement Agreement is avoided, the Liquidating Trust may recover the property transferred, or the value of the transferred property, from the Defendants pursuant to §550(a) of the Bankruptcy Code.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it damages from YPF and Repsol in the amount equal to the dollar value of the property transferred and claims released pursuant to the 2007/2008 Settlement Agreement as of the dates of the Settlement, together with pre- and post-judgment interest on that amount from the date of the transfer, attorney's fees, costs of suit and collection allowable by law, and such further relief as the Court may deem just and proper.

## COUNT XIX – AGAINST THE YPF AND REPSOL DEFENDANTS
### Avoidance and Recovery of Fraudulent Transfers (Constructive Fraud) Related to the 2007/2008 Settlement Agreement

[11 U.S.C. §§544, and 550, and applicable law including but not limited to the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin]

439.    The Liquidating Trust repeats each allegation of paragraphs 1 through 438 above as though fully set forth herein.

440.    In October, 2008, Repsol, through its domination and control of Maxus, caused Maxus to enter into the 2007/2008 Settlement Agreement, pursuant to which Maxus agreed to,

among other things (1) release Tierra from the Assumption Agreement, (2) formalize a reimbursement agreement by which Maxus would fund Tierra's future expenses related to the OCC Indemnification Obligations for the next 20 years, and (3) terminate the Contribution Agreement to eliminate YPF's obligations towards Tierra while simultaneously causing Maxus and Tierra to indemnify YPF for any future claims for payment under the Contribution Agreement.  Maxus did not receive anything close to fair consideration or reasonably equivalent value pursuant to the 2007/2008 Settlement Agreement.

441.    At the time of 2007/2008 Settlement Agreement, YPF and Repsol were the parents of the Debtors and were Maxus insiders.  As a result, YPF and Repsol were in a position to, and in fact did, control and dominate Maxus.

442.    Maxus released its claims in the 2007/2008 Settlement Agreement on account of the domination and control that YPF and Repsol exercised over Maxus.

443.    YPF and Repsol caused Maxus to agree to fund Tierra's future expenses relating to the OCC Indemnification Obligations, which were estimated between $524 Million and $1.7 billion, and to agree to indemnify YPF for future claims in exchange for largely worthless consideration.  The terms of the 2007/2008 Settlement Agreement were for the sole benefit of YPF and Repsol as they obtained releases for future environmental liability, a defining part of the Strategy since its inception.

444.    The 2007/2008 Settlement Agreement was made when the Debtors were insolvent or in the zone of insolvency, or at the least left the Debtors with unreasonably small capital in relation to the Debtors' business at the time.

445.    The 2007/2008 Settlement Agreement was part of the Strategy initiated by YPF and continued by Repsol to avoid exposure to Maxus's environmental liabilities by allowing the statute of limitations to run on fraudulent transfer claims before filing for bankruptcy.

446.    At the time of, and subsequent to, the 2007/2008 Settlement Agreement and/or as of the Petition Date, the Debtors had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

447.    By virtue of the foregoing, the 2007/2008 Settlement Agreement was a fraudulent transfer avoidable under 11 U.S.C. §544 and applicable law including the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin by a creditor holding an unsecured claim that is allowable under 11 U.S.C. §502.    Thus, the Liquidating Trust is entitled to avoid the 2007/2008 Settlement Agreement and recover the value of the underlying claims released thereunder for the benefit of all the Debtors' creditors pursuant to 11 U.S.C. §§544 and 550.

448.    YPF and Repsol are initial transferees of the 2007/2008 Settlement Agreement, the entities for whose benefit it was made, or immediate or mediate transferees of the initial transfer.

449.    To the extent the 2007/2008 Settlement Agreement is avoided, the Liquidating Trust may recover the property transferred, or the value of the transferred property, from the Defendants pursuant to §550(a) of the Bankruptcy Code.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it damages from YPF and Repsol in the amount equal to the dollar value of the property transferred and claims released pursuant to the 2007/2008 Settlement Agreement as of the dates of the

settlements, together with pre- and post-judgment interest on that amount from the date of the transfer, attorney's fees, costs of suit and collection allowable by law, and such further relief as the Court may deem just and proper.

## COUNT XX– AGAINST YPF AND THE REPSOL DEFENDANTS
### Avoidance and Recovery of Fraudulent Transfers (Actual Fraud) Related to the 2009 Settlement Agreement

[11 U.S.C. §§544, and 550, and applicable law including but not limited to the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin]

450.    The Liquidating Trust repeats each allegation of paragraphs 1 through 449 above as though fully set forth herein.

451.    In 2009, Repsol, through its domination and control of Maxus, caused Maxus and Tierra to enter into the 2009 Settlement Agreement and release claims against Repsol for uncompensated use of Maxus's data and information, personnel and services, the Ouachita/Ra interests, and the Valencia interest, for less than fair market value or reasonably equivalent value.

452.    At the time of 2009 Settlement Agreement, YPF and Repsol were the parents of the Debtors and Maxus insiders.  As a result, YPF and Repsol were in a position to, and in fact did, control and dominate Maxus.

453.    Maxus released its claims against YPF, Repsol and their affiliates pursuant to the 2009 Settlement Agreement on account of the domination and control that YPF and Repsol exercised over Maxus.

454.    YPF and Repsol caused Maxus to release its claims related to Repsol's uncompensated use of Maxus's data and information, personnel and services, the Ouachita/Ra interests, and the Valencia interest for the benefit of the YPF and Repsol Defendants as they had

an interest in papering over the earlier stages of the Strategy and the total disregard for corporate formalities between YPF, YPFH, YPFI, Repsol, Maxus, Tierra and the other Debtors.

455.    The 2009 Settlement Agreement was made when the Debtors were insolvent or in the zone of insolvency, or at the least left the Debtors with unreasonably small capital in relation to the Debtors' business at the time.

456.    The 2009 Settlement Agreement was part of the Strategy initiated by YPF and continued by Repsol to wring every bit of value from the Debtors' limited remaining assets (such as its personnel, data, information, and remaining E&P interests) while allowing the statute of limitations to run on fraudulent transfer claims before filing for bankruptcy.  Accordingly, YPF and Repsol caused Maxus to enter the 2009 Settlement Agreement with the actual intent to hinder, delay, or defraud the creditors or future creditors of the Debtors.

457.    At the time of the 2009 Settlement Agreement, YPF and Repsol intended or believed that it would leave Debtors unable to pay obligations as they came due, especially including the OCC Indemnification Obligations (of which the YPF and Repsol Defendants were aware at all times).  As a result of the coercion and domination of the YPF and Repsol, Maxus entered the 2009 Settlement Agreement understanding and intending that this result would obtain.

458.    At the time of, and subsequent to, the 2009 Settlement Agreement and/or as of the Petition Date, the Debtors had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

459.    By virtue of the foregoing, the 2009 Settlement Agreement was a fraudulent transfer avoidable under 11 U.S.C. §544 and applicable law including the Uniform Fraudulent

Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin by a creditor holding an unsecured claim that is allowable under 11 U.S.C. §502. Thus, the Liquidating Trust is entitled to avoid the 2009 Settlement Agreement and recover the value of the underlying claims released thereunder for the benefit of all the Debtors' creditors pursuant to 11 U.S.C. §§544 and 550.

460.    YPF and Repsol are initial transferees of the 2009 Settlement Agreement, the entities for whose benefit it was made, or immediate or mediate transferees of the initial transfer.

461.    To the extent the 2009 Settlement Agreement is avoided, the Liquidating Trust may recover the property transferred, or the value of the transferred property, from the Defendants pursuant to §550(a) of the Bankruptcy Code.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it damages from YPF and Repsol in the amount equal to the dollar value of the property transferred and claims released pursuant to the 2009 Settlement Agreement as of the date of the transfer, together with pre- and post-judgment interest on that amount from the date of the transfer, attorney's fees, costs of suit and collection allowable by law, and such further relief as the Court may deem just and proper.

## COUNT XXI– AGAINST YPF AND THE REPSOL DEFENDANTS
### Avoidance and Recovery of Fraudulent Transfers (Constructive Fraud) Related to the 2009 Settlement Agreement

[11 U.S.C. §§544, and 550, and applicable law including but not limited to the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin]

462.    The Liquidating Trust repeats each allegation of paragraphs 1 through 461 above as though fully set forth herein.

463.    In 2009, Repsol, through its domination and control of Maxus, caused Maxus and Tierra to enter into the 2009 Settlement Agreement and release claims against Repsol for uncompensated use of Maxus's data and information, personnel and services, the Ouachita/Ra interests, and the Valencia interest, for less than fair market value or reasonably equivalent value.

464.    At the time of 2009 Settlement Agreement, YPF and Repsol were the parents of the Debtors and were Maxus insiders.  As a result, YPF and Repsol were in a position to, and in fact did, control and dominate Maxus.

465.    Maxus released its claims in the 2009 Settlement Agreement on account of the domination and control that YPF and Repsol exercised over Maxus.

466.    YPF and Repsol caused Maxus to release its claims related to Repsol's uncompensated use of Maxus's data and information, personnel and services, the Ouachita/Ra interests, and the Valencia interest for the benefit of the YPF and Repsol Defendants as they had an interest in papering over the earlier stages of the Strategy and the total disregard for corporate formalities between YPF, YPFH, YPFI, Repsol, Maxus, Tierra and the other Debtors.

467.    The 2009 Settlement Agreement was made when the Debtors were insolvent or in the zone of insolvency, or at the least left the Debtors with unreasonably small capital in relation to the Debtors' business at the time.

468.    The 2009 Settlement Agreement was part of the Strategy initiated by YPF and continued by Repsol to wring every bit of value from the Debtors' limited remaining assets (such as its personnel, data, information, and remaining E&P interests) while allowing the statute of limitations to run on fraudulent transfer claims before filing for bankruptcy.

469.    At the time of, and subsequent to, the 2009 Settlement Agreement and/or as of the Petition Date, the Debtors had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

470.    By virtue of the foregoing, the 2009 Settlement Agreement was a fraudulent transfer avoidable under 11 U.S.C. §544 and applicable law including the Uniform Fraudulent Transfer Act as enacted in Delaware, Kentucky, New Jersey, Ohio, Texas and Wisconsin by a creditor holding an unsecured claim that is allowable under 11 U.S.C. §502.    Thus, the Liquidating Trust is entitled to avoid the 2009 Settlement Agreement and recover the value of the underlying claims released thereunder for the benefit of all the Debtors' creditors pursuant to 11 U.S.C. §§544 and 550.

471.    YPF and Repsol are initial transferees of the 2009 Settlement Agreement, the entities for whose benefit it was made, or immediate or mediate transferees of the initial transfer.

472.    To the extent the 2009 Settlement Agreement is avoided, the Liquidating Trust may recover the property transferred, or the value of the transferred property, from the Defendants pursuant to §550(a) of the Bankruptcy Code.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it damages from YPF and Repsol in the amount equal to the dollar value of the property transferred and claims released pursuant to the 2009 Settlement Agreement as of the date of the transfer, together with pre- and post-judgment interest on that amount from the date of the transfer, attorney's fees, costs of suit and collection allowable by law, and such further relief as the Court may deem just and proper.

## COUNT XXII – AGAINST THE YPF DEFENDANTS AND THE REPSOL DEFENDANTS
### [Unjust Enrichment]

473.    The Liquidating Trust repeats each allegation of paragraphs 1 through 472 above as though fully set forth herein.

474.    The Defendants have received a benefit through their scheme of transferring Maxus's assets to other entities controlled by YPF and Repsol, in an attempt to prevent those assets from being used to satisfy the claims owed by Maxus to its creditors, including the OCC Indemnification Obligations to which Maxus is subject under the SPA, as well Maxus's legacy environmental liabilities to other creditors.

475.    Under the circumstances, as alleged herein, allowing the Defendants to retain the benefit of Maxus's E&P assets without paying the environmental obligations of Maxus would unjustly enrich the Defendants.

476.    The unjust enrichment of YPF and Repsol has caused damages to the Liquidating Trust.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it: (a) a judgment declaring that the Defendants have been unjustly enriched at the expense of and to the detriment of Maxus and Tierra's creditors in the Chapter 11 Cases; (b) a judgment requiring the Defendants to pay and to reimburse the Liquidating Trust for all damages, if any (including, but not limited to, punitive damages), costs, expenses, and attorney's fees that Maxus and/or Tierra's creditors have sustained; (c) a judgment declaring that the Defendants are jointly and severally liable for all losses (including, but not limited to, damages, costs, expenses, and attorney's fees) that the creditors of Maxus and/or Tierra have incurred, may incur, or that may be imposed on

such creditors in the future and; (d) an award of the Liquidating Trust reimbursement of counsel fees, costs of suit, pre- and post-judgment interest, and such further relief as the Court may deem just and proper.

## COUNT XXIII – AGAINST THE YPF DEFENDANTS AND THE REPSOL DEFENDANTS
### [Civil Conspiracy]

477.    The Liquidating Trust repeats each allegation of paragraphs 1 through 476 above as though fully set forth herein.

478.    Under Delaware and New Jersey common law, a person is liable for the tort of civil conspiracy when that person: (1) agrees with at least one other person to accomplish an unlawful purpose; (2) by means of the commission of one or more unlawful acts; and (3) causes injury to a third-party that results from the commission of one or more unlawful acts undertaken in furtherance of the agreed-to unlawful purpose.  The injured third-party can obtain damages to the extent of the injury.

479.    Almost immediately after YPF acquired Maxus in 1995, YPF came to understand that it faced massive environmental liability potentially exceeding by ten-fold the reserve that Maxus then had in place to pay environmental remediation expenses as they came due.  At the same time, Maxus was a viable exploration and production concern with over $2.9 billion in total assets, $600 million in revenue, and approximately $860 million of stockholders' equity.

480.    In light of its exposure to Maxus's environmental liabilities and the related Keepwell Covenant —which effectively destroyed the economic value of its recent acquisition of Maxus—YPF formed a three-fold Strategy.  One, strip Maxus of as much of its economic value as possible.  Two, restructure YPF's corporate organization to strand Maxus's environmental

liabilities such that YPF would not have to fulfill Maxus's remediation obligations.  Three, wait until the statutory period had run on fraudulent transfer claims and then cause Maxus and its affiliated Debtors to file for Chapter 11 protection and to settle claims against the YPF Defendants in the context of a Chapter 11 proceeding.

481.    The YPF Defendants, and later the Repsol Defendants, acted together and knowingly participated together in the Strategy, in order to enrich YPF and its affiliates, and subsequently Repsol and its affiliates, by transferring substantially all of the Debtors' valuable assets to YPF and its affiliates, and subsequently to Repsol and its affiliates, while stranding environmental liabilities at Maxus and Tierra.

482.    At all times, the Defendants knew that the relevant Debtors, especially Maxus, were functionally insolvent and could only satisfy a fraction of their environmental remediation obligations without significant contributions from YPF.

483.    As described above, the Defendants engaged in numerous wrongful, overt acts in furtherance of the Strategy, including without limitation: the Debt Restructuring that resulted in Maxus incurring $1.4 billion in new debt on unfavorable terms; the YPF-directed sales of Venezuelan Assets, Bolivian Assets, Ecuadorian Assets, and Indonesian Assets to YPFI for substantially less than fair value; YPFI's sale to a Repsol affiliate of the Ecuadorian Assets for substantially more than YPFI paid Maxus for the same assets two years prior; the Repsol-directed sale of Maxus's interest in the Ra Prospect to Hess; the YPF-directed use by Maxus of the purchase price from asset transfers to pay down intercompany debt, as well as Maxus's public debt and the related incurrence of prepayment penalties; the Settlement Agreements, calculated to immunize the Defendants from alter ego liability; and, the YPF-directed attempted

Rule 9019 settlement of all of the Debtors' claims against YPF and its affiliates for substantially less than fair value, all of which constitute fraudulent transfers or attempted fraudulent transfers.

484.    The Debtors, together with their creditors, were harmed by these wrongful acts of the Defendants.

485.    The Defendants are jointly and severally liable as co-conspirators.

WHEREFORE, the Liquidating Trust respectfully requests that the Court grant it damages from the Defendants in an amount equal to the dollar value of the property transferred and claims released pursuant to each Fraudulent Transfer as of the date of each such Fraudulent Transfer, and all damages resulting from the Strategy and Defendants' domination of the Debtors in furtherance thereof, together with pre- and post-judgment interest on that amount from the date of the transfer, attorney's fees, costs of suit and collection as permitted by law, and such further relief as the Court may deem just and proper.

## CONCLUSION

WHEREFORE, the Liquidating Trust prays that the Court grant it the relief it seeks above, as set forth at the end of each enumerated count, along with the requested attorney's fees, costs, expenses, pre and post-judgment interest, and such further relief as the Court may deem just and proper.

Dated: June 14, 2018                    Respectfully submitted,

                                        FARNAN LLP

                                        /s/ Michael J. Farnan
                                        Brian E. Farnan (Bar No. 4098)
                                        Michael J. Farnan (Bar No. 5165)
                                        919 North Market Street, 12th Floor
                                        Wilmington, DE 19801
                                        (302) 777-0300
                                        bfarnan@farnanlaw.com
                                        mfarnan@farnanlaw.com

                                        J. Christopher Shore (admitted *pro hac vice*)
                                        Thomas MacWright  (admitted *pro hac vice*)
                                        WHITE & CASE LLP
                                        1221 Avenue of the Americas
                                        New York, NY 10020
                                        (212) 819-8200
                                        cshore@whitecase.com
                                        tmacwright@whitecase.com

                                        *Attorneys for the Liquidating Trust*

AMERICAS 94892133