**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | Case No. 16-11501 (CSS) |
| MAXUS ENERGY CORPORATION, | ) | |
| et al., | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| MAXUS LIQUIDATING TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. Pro. No.: 18-50489 (CSS) |
| | ) | |
| YPF S.A., YPF INTERNATIONAL S.A., | ) | |
| YPF HOLDINGS, INC., CLH | ) | |
| HOLDINGS, INC., REPSOL, S.A., | ) | |
| REPSOL EXPLORATION, S.A, REPSOL | ) | |
| E&P USA, INC., REPSOL OFFSHORE | ) | |
| E&P USA, INC., REPSOL E&P T&T | ) | |
| LIMITED AND REPSOL SERVICES | ) | |
| COMPANY | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

<u>**OPINION**</u>

FARNAN LLP
Brian E Farnan
Michael J. Farnan
919 North Market Street
12th Floor
Wilmington, DE 19801

-and-

WHITE & CASE LLP
J. Christopher Shore
1221 Avenue of the Americas

MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
Robert J. Dehney
Curtis S. Miller
1201 North Market Street
Wilmington, Delaware 19899

-and-

WEIL, GOTSHAL & MANGES LLP
Corey D. Berman
1395 Brickell Avenue, Suite 1200

New York, New York 10020
Counsel for the Liquidating Trust

John J. Kuster
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019

-and-

Matthew McGuire
LANDIS RATH & COBB LLP
919 N. Market Street, Suite 1800
Wilmington, Delaware 19801

Counsel for YPF S.A., YPF
International S.A., YPF
Holdings, Inc. and CLH
Holdings, Inc.

Miami, Florida 33131
Counsel for Defendants Repsol, S.A.,
Repsol Exploración S.A., Repsol USA
Holdings Corp., Repsol E&P USA, Inc.,
Repsol Offshore E&P USA, Inc., Repsol
E&P T&T Limited and Repsol Services
Company

Dated: June 23, 2020

Sontchi, C.J._____

## INTRODUCTION

Before the Court is a discovery dispute between (i) the Maxus Liquidating Trust,

the plaintiff (the "Trust"), (ii) defendants YPF S.A., YPF International S.A., YPF Holdings,

Inc. and CLH Holdings, Inc. (collectively, "YPF"), and (iii) defendants Repsol S.A., Repsol

Exploración, S.A., Repsol USA Holdings Corp., Repsol E&P USA, Inc., Repsol Offshore

E&P USA, Inc., Repsol E&P T&T Ltd., and Repsol Services Company (collectively,

"Repsol" and together with YPF, the "Defendants").  By way of background the causes

of action in the complaint principally revolve around fraudulent conveyance, and alter

ego/veil-piercing claims.  Pursuant to the simultaneous discovery dispute letters[1] and

---

[1] Adv. D.I. 216, 217, and 219 (the "Opening Letters").

simultaneous responses[2] there appear to be three main unresolved issues: (i) the number

of depositions each side will be permitted to take; (ii) the extent of discovery into the facts

underlying certain environmental claims against the estate; and (iii) the validity of certain

privilege claims.  Several collateral issues were raised in the Letters and will be discussed

below.  The Court conducted a telephonic hearing on April 20, 2020, regarding these

disputes[3] (the "Hearing").  At the conclusion of the Hearing, the Court took the matter

under advisement.  The matter is ripe for decision.

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court has the judicial power to

enter a final order.

## BACKGROUND

### A.  General Background

In December 2005, the State of New Jersey (the "State") filed a civil action against

Maxus, Tierra Solutions, Inc. ("Tierra"), CLH Holdings, YPF, YPF Holdings, Repsol, and

Occidental Chemical Corporation ("Occidental") (collectively, the "Defendants"),

alleging they were liable for environmental damage and pollution of the Passaic River in

---

[2]  Adv. D.I. 220, 221, and 222 (the "Responsive Letters" and, together with the "Opening Letters," the "Letters").

[3]  Transcript of Hr'g, Apr. 20, 2020 (D.I. 225).  Docket items in the main case (Del. Bankr. Case No. 16-11501) shall be noted as "D.I. #"); and docket items in the adversary action (Del. Adv. Case No. 18-50489) shall be noted as "Adv. D.I. #."

New Jersey (the "New Jersey Action"). Specifically, the State alleged that the pollution stemmed from 80 Lister Avenue in Newark, New Jersey (the "Lister Site"), a former site of Maxus, which is expressly covered as part of Maxus's defense and indemnity obligation to Occidental in the Stock Purchase Agreement (wherein Maxus sold its chemicals business to Occidental), and that the Defendants were responsible for environmental remediation of the Passaic River arising out of the Lister Site.

The New Jersey Action consists of (i) the YPF Claims brought by Occidental, alleging mainly that YPF is an alter ego of Maxus; (ii) the Occidental Claims, alter ego-based claims against Repsol, and (iii) the Repsol Counterclaim, a counterclaim brought by Repsol against Occidental under the New Jersey Spill Act.

Extensive discovery was conducted with respect to those cross-claims, among other claims, which included deposing nearly 50 fact witnesses, many of whom were deposed for more than one day, for a collective total of 71 days of depositions. Importantly, in the New Jersey Action, before the 35 fact witness depositions were taken, the New Jersey court had already dismissed ten of Occidental's twelve asserted cross-claims against Maxus, YPF, and Repsol.

On June 17, 2016 (the "Petition Date"), Maxus and certain of its affiliates and subsidiaries (collectively, the "Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code in this Court.

On June 20, 2016, Occidental moved in the New Jersey Bankruptcy Court to transfer the venue of the NJ Environmental Litigation to this Court. On June 28, 2016, the

New Jersey Bankruptcy Court granted Occidental's motion, and the NJ Environment Litigation was transferred to this Court.  The NJ Environmental Litigation consists of (i) the YPF Claims, brought by Occidental, alleging mainly that YPF is an alter ego of Maxus; (ii) the OCC Claims, alter ego-based claims against Repsol, and (iii) the Repsol Counterclaim, a counterclaim brought by Repsol against Occidental under the New Jersey Spill Act. The Removed Claims are thus comprised of the YPF Claims, the OCC Claims, and the Repsol Counterclaim.

On July 20, 2016, Repsol moved to remand the OCC Claims and Repsol Counterclaim to the New Jersey Court.  The YPF Claims were not at issue in Repsol's motion to remand. On November 15, 2016, this Court entered the Order and the Opinion,[4] granting Repsol's motion, and remanded the OCC Claims and Repsol Counterclaim to New Jersey.  The Court based its decision on permissive abstention.[5]  Following this Court's decision to grant Repsol's motion to remand, on November 29, 2016, Occidental filed a motion for clarification or, in the alternative, for reconsideration of the Court's aforementioned Order and Opinion.  Thereafter, the Court entered its "Clarification Opinion"[6] and Order.  Wherein the Court held:

---

[4] *NJ Dep't of Envtl. Prot. v. Occidental Chem. Corp. (In re Maxus Energy Corp.)*, 560 B.R. 111 (Bankr. D. Del. 2016).

[5] *Maxus Energy Corp.*, 560 B.R. at 128–29 ("[C]ourts have held that "evaluating the twelve factors is not a mathematical formula" yet, when the majority of factors weigh in favor of abstention, the court should do just that. Specifically, when those factors favoring abstention are the more substantive ones, abstention is appropriate. All substantive factors in the instant permissive abstention analysis favor abstention and remand.").

[6] *NJ Dep't of Envtl. Prot. v. Occidental Chem. Corp. (In re Maxus Energy Corp.)*, 571 B.R. 650, 653 (Bankr. D. Del. 2017) (the "Clarification Opinion").

> The Court's previous finding that the claims were property of the Debtors' estates (i) is supported by controlling Third Circuit law, and (ii) was a necessary element for ruling on the Motion for Remand, and, therefore, does not meet the burden of "completely disregarding controlling law," nor does it result in manifest injustice necessary to warrant clarification or reconsideration under Rule 59(e).[7]

On April 19, 2017, the Debtors filed the *Amended Disclosure Statement for the Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of Unsecured Creditors*.[8]   On May 20, 2017, the Debtors filed the *Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of Unsecured Creditors*[9] (as the same may be amended, modified, and/or supplemented from time to time, the "Plan").   On May 22, 2017, the Court entered *Order Confirming Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and The Official Committee of Unsecured Creditors Pursuant to Chapter 11 of the Bankruptcy Code*[10] confirming the Plan (the "Confirmation Order").   On July 17, 2017, the Debtors filed the *Notice of (I) Entry of Order Confirming Amended Chapter 11 Plan of Liquidation, (II) Occurrence of Effective Date, and (III) Related Bar Dates*[11] (the "Effective Date Notice") informing parties in interest that the Plan became effective on July 14, 2017 (the "Effective Date").   On the Effective Date, the Trust was formed.

---

[7]  *Id.* at 653.

[8]  D.I. 1232.

[9]  D.I. 1451.

[10]  D.I. 1460.

[11]  D.I. 1701.

### B. Procedural Background Regarding this Adversary Proceeding

This adversary action was commenced by the Trust on June 18, 2018.[12]  Thereafter, Repsol moved this Court to abstain from hearing the adversary action.[13]  YPF, and later Repsol, moved to dismiss the adversary action.[14]  The Court denied both motions to dismiss on February 15, 2019.[15]  On February 25, 2019, the Court entered an Order and Opinion denying the motion for abstention;[16] from which the Defendants filed motions to filed interlocutory appeals;[17] which were subsequently denied by the United States District Court for the District of Delaware (the "District Court").[18]

Thereafter, separately, YPF and Repsol filed a motions to file an interlocutory appeal related to the denial YPF's motion to dismiss.[19]  The District Court denied both motions for interlocutory appeal.[20]  The Defendants also filed motions to withdraw the reference,[21] which were also denied by the District Court.[22]

---

[12] Adv. D.I. 1.

[13] Adv. D.I. 32 and 35.

[14] Adv. D.I. 50, 51, 57 and 58.

[15] Adv. D.I. 107 (Letter Op.) and 108 (Order).

[16] Adv. D.I. 111 (Opinion) and 112 (Order).

[17] Adv. D.I. 131 (notice of interlocutory appeal) and 132 (motion for leave to appeal).

[18] Adv. D.I. 211.

[19] Adv. D.I. 119 (YPF) and 123 (Repsol).

[20] Adv. D.I. 207.

[21] Adv. D.I. 181 (Repsol) and 186 (YPF).

[22] Adv. D.I. 215.

The Defendants also filed a motion to, among other things, treat the depositions taken in the NJ Environmental Litigation as if they were taken in this adversary action.[23] These motions were denied by this Court.[24]

As a result, the adversary action is proceeding before this Court pursuant to *Amended Case Management Plan and Scheduling Order Scope of Discovery* ("Case Scheduling Order").[25]    Pursuant to the Case Scheduling Order, fact discovery was scheduled to conclude at the end of April 2020.  However, at the conclusion of the argument on the current discovery dispute, held April 20, 2020, the Court held all discovery in abeyance until the issues set forth herein could be decided.[26]  As a result, the Case Scheduling Order must also be further amended pursuant to the rulings set forth herein.

## ANALYSIS

### A.    Number of Depositions

The Trust asserts that each side, i.e., plaintiff on the one hand and Defendants on the other, should be allowed up to 15 fact witness depositions whereas the Defendants request up to 35 fact witnesses per side.  Federal Rule of Civil Procedure 30(a)(2)(A) states:

> (2) *With Leave.* A party must obtain leave of the court, and the court **must grant leave to the extent consistent with Rule 26(b)(1) and (2)**:
>
> (A) if the parties have not stipulated to the deposition and:

---

[23]  Adv. D.I. 153 (Repsol) and 156 (YPF).

[24]  Adv. D.I. 193 (Letter Op.) and 194 (Order).

[25]  Adv. D.I. 213.

[26]  Transcript of Hr'g, Apr. 20, 2020, 81:6-20.  Adv. D.I. 225.

> (i) the deposition would result in more than 10 depositions being taken under this rule or Rule 31 by the plaintiffs, or by the defendants, or by the third-party defendants . . . .[27]

Importantly, Federal Rule of Civil Procedure 26(b)(1) states that the requested discovery must be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."[28]  The rule continues that discovery should not be unreasonably cumulative or duplicative.[29]  Furthermore, "[t]o justify its request, a party is required to specify the individuals it wishes to depose and make a 'particularized showing' of the reasons the additional depositions are needed.[30]  Although Rule 30(a)(2)(A) uses the word "must," the judge's decision must be "proportional."

In support of the argument that each side should be allowed 35 depositions, the Defendants make several points.  The Defendants assert that (i) this is a very complex case involving a 485 paragraph complaint (130 pages long) asserting 23 causes of action against 12 defendants, the allegations of which span decades and three separate regimes of corporate ownership; (ii) the Trust asserts damage claims as high as $14 billion under

---

[27]  Fed. R. Civ. P. 30(a)(2)(A)(i) (emphasis added), made applicable by Fed. R. Bankr. P. 7030.

[28]  Fed. R. Civ. Pro. 26(b)(1), made applicable by Fed. R. Bankr. P. 7026.

[29] Fed. R. Civ. P. 26(b)(2), made applicable by Fed. R. Bankr. P. 7026.  "According to Rule 26(b)(1) and (2), parties may obtain discovery of non-privileged matters relevant to any party's claim or defense so long as they are proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1)."  *Jenkins v. Miller*, No. 2:12-CR-184, 2020 WL 64306, at *2 (D. Vt. Jan. 7, 2020).

[30] *Arconic Inc. v. Novelis Inc.*, No. CV 17-1434, 2018 WL 6732992, at *6 (W.D. Pa. Nov. 6, 2018) (citation omitted).

the alter-ego theory of liability; and (iii) witnesses are located on three continents and have individual knowledge of distinct facts.  Furthermore, the Defendants assert that if the Court and/or the Trust would allow use of the depositions previously taken in the NJ Action, then twenty of the requested depositions would not be needed to be taken in this action.

The Court notes that the Trust does not have its own witnesses *per se*, as it is an entity created out of the Plan and Confirmation Order.  This, in and of itself, limits the number of depositions required by Defendants as many of the persons on the Defendants' deposition list will also appear on the Trust's list.  Nonetheless, the Court is mindful of the extensive time-period covered by the allegations and the numerous changes in corporate regimes, which has served to multiply the number of potential witnesses.  On the other hand, the Court does not believe it is proportional discovery to take the deposition of every person at a meeting, for example.  Rather, the information can be fairly gathered through a representative person or persons at each meeting.  Moreover, although there is a long history between the parties, the Trust is alleging a series of fraudulent transfers and alter-ego/veil piercing theories of liability against the Defendants.  Although rooted in the facts, these claims are not overly complex.  Bankruptcy lawyers routinely litigate large fraudulent conveyance cases without taking anything remotely approaching 70 depositions. Thus, the Court has considered the "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant

information,"[31] and finds that each side shall be given leave to take the depositions of no more than 20 fact witnesses.[32]

### B. Scope of Discovery

The parties disagree regarding the scope of discovery for the alter ego/veil piercing claims and related damages.

In the Plan and related Confirmation Order, the Court approved settlement and allowance of the most significant claims against the Debtors' estates. The Plan-related claims comprise approximately $700 million of the total allowed Class 4 environmental claims, which were liquidated and non-contingent. The Trust and the Debtors further settled or allowed additional claims after the Effective Date, in accordance with Article X.C of the Plan, with a total Class 4 claims pool of around $708 million as of today (plus disputed claims).

The Trust believes that this Court's claims allowance and settlement approvals sufficiently establish the existence of valid prepetition claims against the Debtors' estates that provide *prima facie* proof of damages on the alter ego counts. The Trust argues that the Defendants' proposed discovery (outlined below) would be expensive and time consuming and is simply unnecessary.

---

[31] Fed. R. Civ. Pro. 26(b)(1), made applicable by Fed. R. Bankr. P. 7026.

[32] The Court has already ruled that the depositions taken in the NJ Action would not be admissible as if taken in this action. Adv. D.I. 193 (Letter Op.) and 194 (Order). Although the parties may come to some sort of agreement regarding the use of the NJ Action depositions; the Court is not reconsidering its ruling at this time and does not weigh-in on the parties discussions regarding use of the NJ Action depositions.

YPF and Repsol seek blanket authorization to take discovery on, and challenge, the underlying allowed creditor claims, on the assumption that the Trust must prove the validity of every allowed claims of every creditor.  YPF and Repsol argue that Article XV.P of the Plan provides: "[n]either the allowance or disallowance of any Claim against any Debtor in these Chapter 11 Cases, nor the allowed amount of any Claim, shall have any precedential, preclusive or other effect, including as a purported measure of any valuation or damages, against any person or entity in any litigation, including in any Causes of Action preserved under the Plan . . . ."[33]  Although none of the Defendants objected to the Plan in relation to the Class 4 claims nor do they object to the claim settlements now, they argue that the claims, as settled are not proven damages.

The linchpin of the Defendants' argument is that there is a casual connection between the specific environmental claims and purported alter ego conduct, such that if the Defendants' purported alter ego conduct did not cause the underlying claim to go unpaid, then neither Defendant can be held liable for it as Maxus's alter ego.[34]

---

[33] D.I. 1451 (Art. XV.P).

[34] Repsol also claims that it was not a party in interest in the Chapter 11 Cases and did not have standing to object or to challenge actions taken by the Debtors, Trust, or claims asserted by Maxus' creditors and that Repsol never filed a proof of claim.  The Repsol Defendants appeared numerous times in these Chapter 11 Cases; including, but not limited to, (i) the remand and removal proceedings in front of this Court (Case No. 16-51025, D.I. 28; Case No. 16-11502, D.I. 85, 758, 1024, and 1100), (ii) attendance at depositions on the Debtors' DIP Motion, (iii) agreeing to be bound by the Protective Order in effect in the Chapter 11 Cases (*see* Case No. 16-11501, D.I. 402), (iv) filing an objection to the Disclosure Statement Motion (Case No. 16-11501; D.I. 1172), and (v) filing an objection to the Committee's motion to enforce the Site Transition Agreement (Case No. 16-11501; D.I. 1986).  Furthermore, Article XI.J of the Plan was included at the express request of Repsol to resolve their Plan objection (Case No. 16-11501; D.I. 1410). Although the Court is not remarking on Repsol's standing, as such was not requested of the Court and is thus not ripe; the Court dismisses this argument without further discussion, as Repsol was an active participant in these Chapter 11 cases and this argument is wholly without merit.

The Defendants further assert that there is no basis in law that the Trust's assertion that so long as independent parties settle claims against the estate and the Court approves them as reasonable that the Defendants are limited to challenging only the propriety of the claim settlement process and not for the merits of the underlying claim.

The Trust responds that (i) no casual connection between the Defendant' conduct and the harm to creditors for which recovery is required and (ii) discovery relating to the claims themselves will not be relevant to damages because the Debtors "harm" was the claims. Furthermore, an analysis of creditor-by-creditor harm is not necessary for damages – it can be generalized per this Court's Clarification Opinion, wherein the Court held that there was a "two-part test for determining whether a claim constitutes property of the bankruptcy estate: (1) the claim must be one that both existed at the commencement of the filing and that the trustee could have asserted on his own behalf under applicable state law; and (2) the claim must be a general one, with no particularized injury arising from it."[35] The Trust conclude that the damages are what the Defendants took out of the Debtors because of their derogation of proper corporate separateness.

YPF and Repsol argue that nothing in Confirmation Order limits YPF from fully defending themselves, including from underlying environmental liability that the Trust seeks to impose on YPF though alter-ego theory. The Defendants further reply that they

---

[35]  Clarification Opinion, 571 B.R. at 658 (citations omitted). The Court also held "for purposes of determining whether a claim based upon a theory of successor or alter ego liability against a third-party non-debtor belongs to the bankruptcy estate, *Emoral* holds that, notwithstanding the individualized nature of the injury or cause of action, to the extent the other creditors and the debtor could pursue claims based upon the same theory, the claim in question should be considered general, and, therefore, property of the bankruptcy estate." *Id.* at 657 (*citing In re Emoral, Inc.*, 740 F.3d 875, 877 (3d Cir. 2014)).

13

are not challenging the Trust's claims process. Rather, they are challenging the use of those claims against YPF as a measure of damages against YPF even though the Plan specifically reserved the right for YPF to defend themselves.

In other words, the Defendants are arguing that *if* they committed the "wrong" it, nonetheless, did not cause the environmental liabilities to occur. However, the alter-ego liability being asserted is the spin-off of Maxus and isolating the environmental liabilities with the Debtors, not necessarily causing the pollution in the first instance. As a result, the Defendants do not believe they should be responsible for the environmental remediation; rather, *at most* the "harm" caused by the corporate action of isolating the liabilities. This argument is too clever by half because *if* the wrongs alleged are true – then these environmental liabilities would have been the Defendants' responsibility, but now they want to limit the alleged wrongs to *just* the damages arising from the corporate behavior. Environmental liability is not like a breach of contract claim or a tort – environmental liability stays with the land and the ownership regardless of who caused the original damage.[36] Here, the alleged alter-ego claims directly resulted in the claims against the estates, including the settled claims.

---

[36] *See, e.g., New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 808 F. Supp. 2d 417, 488 (N.D.N.Y. 2011), *aff'd in part, vacated in part, remanded*, 766 F.3d 212 (2d Cir. 2014) (citations omitted) ("Generally speaking, § 107(a) [of Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), Pub.L. No. 96–510, 94 Stat. 2767] provides for joint and several liability among [Potentially Responsible Parties ("PRPs")] . . . ; under that section one PRP can be potentially responsible for the entire amount expended to remove or remediate hazardous materials."); *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 120 (2d Cir. 2010) (citations omitted)) ("CERCLA empowers the federal government and the states to initiate comprehensive cleanups and to seek recovery of expenses associated with those cleanups. Somewhat like the common law of ultra-hazardous activities, property owners are strictly liable for the hazardous materials on their property, regardless of whether or not they deposited them there."); *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 216 (3d Cir. 2010).

The Trust asserts that the Court should accept the "all liability theory," or general theory of liability. The Trust's theory is that once a defendant is liable for abusing the corporate form, the defendant is susceptible to a claim of each creditor that the individual liability needs to be addressed by the claim of each creditor. In other words, the Trust seeks to establish that the independent directors looked at each claim and reached an appropriate settlement of each claim. This would necessitate information *only* concerning the settlements in the Plan and that spring out of the Plan. The Trust asserts that this would negate the need for discovery based on, for example, the soil samples at the polluted sites (i.e. opening up discovery in the Environmental Protection Agency's claim, the Ohio Environmental Protection Agency's claim, etc.), which the Defendants are now seeking.

The Defendants refer to *FirstEnergy Corp.* for the proposition that the fraud or wrong sought to be imposed on the Defendants was the corporate misconduct of the merger being alleged and not the creation of the pollution. The Defendants assert that this stands for the proposition that there must be a proximate cause for the damages being asserted.[37] *FirstEnergy Corp.* states:

> Courts will pierce the corporate veil to prevent fraud or achieve equity by imposing a corporate obligation upon a parent. But to successfully pierce the veil, a plaintiff must show both domination of the corporation and that "such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury."[38]

---

[37] Tr. 40:8-41:4.

[38] *New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 229 (2d Cir. 2014) (citations omitted) ("Here, the 'fraud' or 'wrong' committed by AGECO would be the merger of the subsidiaries into NYSEG,

However, the *FirstEnergy Corp.* held that the fraud was the corporate misconduct as a result of the merger and not the creation of the pollution.  Similarly, here, the wrong being alleged is the corporate misconduct and not the actual pollution, as a result it seems inconsistent that the Defendants also want discovery related to the soil samples.  Here, the Trust is alleging that the alter ego has stripped the Debtors' assets so they could not pay their liabilities.  The alleged harm to the Debtors is those liabilities, which are claims and/or settled claims against the estates.  The damages are not related to the actual pollution or clean-up thereof.  The Defendants, if liable, should be responsible for the damages arising from the corporate misconduct, and here that is the claims alleged and/or settled against the Debtors' estates.

Additionally, as this Court ruled earlier in these cases:

> this Court reads *Emoral* as setting forth a two-part test for determining whether a claim constitutes property of the bankruptcy estate: (1) the claim must be one that both existed at the commencement of the filing and that the trustee could have asserted on his own behalf under applicable state law; and (2) the claim must be a general one, with no particularized injury arising from it.[39]

It is law of the case, that this is a "general" claim with no particularized injury.  As a result, and consistent with *FirstEnergy Corp.*, the particularized claim of the underlying

---

not the creation of coal tar. There is nothing in the record to suggest AGECO was directing the creation of coal tar at the subsidiaries prior to purchasing them. While AGECO may have sought to merge its subsidiaries into NYSEG to further its financial improprieties, NYSEG does not allege AGECO did so to avoid CERCLA liability.  Environmental liability for spilling coal tar was not a major concern at the time these subsidiaries were merged.  AGECO's domination was not used to commit a fraud or wrong against NYSEG regarding pollution, and domination by itself is not enough to justify veil piercing—it must be accompanied by a showing of wrongful or unjust action toward the plaintiff.").

[39]  Clarification Opinion, 571 B.R. at 658 (*citing In re Emoral, Inc.*, 740 F.3d at 879); additional citations omitted).

pollution and resultant clean-up costs (i.e. discovery relating to the soil samples) is likewise unnecessary.

Thus, the Court will not expand the scope of discovery to include the bases for the individualized claims against the Debtors' estates.

## C. Privilege Claims

### (i)    YPF Defendants' Privilege Designations

YPF Defendants purport to rely on privilege applicable to YPF Holdings Inc. ("YPFH") or CLH Holdings, Inc. ("CLHH") as a basis to withhold producing documents and communications that were prepared by or sent to directors, officers, or employees of the Debtors to prevent the Trust from using those documents and communications in this matter.  These "shared" employees include the Debtors' management, including their ex-Chief Executive Officers, Chief Financial Officers, treasurer, comptroller, Human Resources director, and Debtors' successive general counsels.  YPF asserts that because these individuals simultaneously worked for YPFH or CLHH, the holding companies that held all of the Debtors' equity, because they were working in their capacity as YPF employees and not for the Debtors.

The Trust asserts that the facts on record establish that YPFH and CLHH never had corporate identity independent of the Debtors and both were merely empty holding companies for the Debtors' equity.  The Trust further argues that all corporate actions of YPFH and CLHH related exclusively to management of the Debtors.

YPF replies that each employee wore "two-hats" – and if individuals sent or received YPF-privileged information in their YPF capacities, the applicable privilege is not waived. YPF claims that corporate separateness was observed in good faith. YPF further asserts that it is the nature and content of material that is important and that it does not matter that similar communications are not privileged; or similar communications to the same people does not mean that privilege is destroyed as to all communications.

Although it is "entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts."[40]

> This recognition that the corporate personalities remain distinct has its corollary in the "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." Since courts generally presume "that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary[.]"[41]

However, it is YPF's burden to show that those individuals were not wearing their "subsidiary hat."[42]

---

[40] *United States v. Bestfoods*, 524 U.S. 51, 69, 118 S. Ct. 1876, 1888, 141 L. Ed. 2d 43 (1998) (internal quotation marks and citations omitted).

[41] *Bestfoods*, 524 U.S. at 69 (citations omitted).

[42] *Id.* ("The Government would have to show that, despite the general presumption to the contrary, the officers and directors were acting in their capacities as CPC officers and directors, and not as Ott II officers and directors, when they committed those acts.").

To date, YPF has not met this burden and, thus, must produce these documents. The only argument in Court was that there should not be a blanket waiver of privilege because these employees wore "two hats," however, YPF did not produce any information to show that these individuals were not working in their capacity for the Debtors at the time of the e-mails and YPF is required to carry that burden. The Court presumes that these shared employees were acting on behalf of Maxus, as YPF has not met its burden. As a result, the documents must be produced. To be clear, YPF has not met its burden to those shared employees regardless of whether they were using a "Maxus" email.

### (ii)    Trust's Privilege Designations

#### a.  Morrison & Foerster Report

In its Complaint, the Trust refers to a 196-page report prepared by Morrison & Foerster ("MoFo") and Zolfo Cooper, dated May 16, 2016 (the "MoFo Report").[43]  MoFo was the Debtors' counsel and the MoFo Report discusses causes of action against the

---

[43]  Morrison and Forrester, along with Zolfo Cooper, were hired by the Special Independent Committee ("SIC") of Maxus' board to evaluate any potential claims against YPF held by Maxus. Complaint at ¶202. The Complaint refers to the MoFo Report twice in the Complaint:

> 204. Even with such glaring limitations, MoFo and Zolfo concluded in a 196-page report dated May 16, 2016 (the "MoFo Report"), that, while alter ego claims are difficult to prove, if a court were to look at the overall history and pattern of parent corporation conduct from YPF's acquisition of Maxus and Tierra in 1995 through 2016, there was a reasonable likelihood that the court would find alter ego liability.

> 205. Despite the MoFo Report, and after a rapid round of negotiations, the SIC and YPF agreed upon the settlement of all of the Debtors' claims against YPF for merely $130 million (the "YPF Settlement"), far below the reasonably equivalent value of the claims. . . .

Complaint at ¶¶204-205.  There are no other references to the MoFo Report in the Complaint.

Defendants in anticipation of the Debtors' Chapter 11 Cases.  YPF seeks to discover the MoFo Report and all drafts thereof.  YPF claims that the Debtors waived their privilege by referring to the MoFo Report twice in a 485-paragraph complaint.

The Trust asserts that the MoFo Report was intended to demonstrate the conflict of interest that YPF imposed on the Debtors' special independent directors depriving them of authority to prosecute any of the estate claims against YPF and that only minimal disclosure of MoFo Report does not mean the whole report should be turned over. Furthermore, the Trust asserts that YPF cannot state any "disadvantage" from not receiving MoFo Report.

YPF responds that the MoFo Report is 196-page report and that the complaint relies upon that report, which is an unequivocal waiver of privilege.  YPF continues that the disclosure of even a part of the contents of a privileged communication surrenders the privilege as to those communications.

The Trust replies that using MoFo Report is different than referencing MoFo Report; and the limited references did not put advice/recommendations from MoFo report in "view."

YPF, in turn, replies that the law does not require "heavy" use of the MoFo report to in order to waive privilege because the Trust identified the content and conclusions. YPF asserts that the MoFo Report is the whole basis for the alleged conflict of interest argument because that is the conclusion in MoFo Report.  YPF concludes that the Trust, in effect, cannot use the MoFo Report as a sword and a shield.

The Trust's disclosure of the MoFo Report in the Complaint is only a partial disclosure:

> It is clear that the disclosure of even a part of the contents of a privileged communication surrenders the privilege as to those communications.  However, such a waiver does not open to discovery all communications between attorney and client.  The so-called "rule of partial disclosure" limits the waiver to the subject matter of the disclosed communication.  The exact extent of the disclosure is guided by the purposes behind the rule: fairness and discouraging use of the attorney-client privilege as a litigation weapon.[44]

In *Interfaith Housing of Delaware, Inc. vs. Town of Georgetown*,[45] the plaintiff proposed to purchase and develop low-income housing.  After a public hearing, the planning commission approved the development plan with numerous conditions.  The developer asserted that the conditions were racially motivated and imposed without authority.  During his deposition, the defendant, a member of the planning commission, discussed a statement which had been attributed to him in a newspaper article.  The plaintiff claimed that defendant Tyndall's statement constituted a waiver of the attorney-client privilege with respect to the Town Council's authority to adopt all twelve conditions imposed upon the development project.  The defendant responded that his statements were not a waiver because they were not "clear and intentional."  The court held that the statements were voluntary and that "Tyndall disclosed a significant part of the Town Solicitor's legal advice without compulsion or asserting the privilege, he waived the

---

[44] *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 825 (Del. 1992) (citations omitted).

[45] *Interfaith Hous. Delaware, Inc. v. Town of Georgetown*, 841 F. Supp. 1393 (D. Del. 1994).

attorney-client privilege as to the subject matter of his statement."[46]  The Court's ruling, however, was narrow.

> At the time Tyndall waived the attorney-client privilege, he stated the Town Council had to "eliminate that Section 8 or stipulation 8 from the proposals."  Based on this statement, the Court holds the subject matter of Tyndall's waiver of the attorney-client privilege is limited to stipulation or condition 8; it does not reach the other stipulations or conditions.[47]

Here, there were two references to the MoFo Report in a lengthy Complaint – with  only one of those references relating to the MoFo Report's conclusions regarding the alter-ego claims being asserted against the Defendants.  The Court finds that this is not even "light use" of the MoFo Report and the privilege was not waived by such limited use in the Complaint.  This is not akin to the statements made regarding the Town Counsel's decision making in *Interfaith Housing of Delaware*.  The only mention of substance is a conclusion, which is the same as the alleged counts in the Complaint.  As a result, there is nothing to be gleaned from the reference in the Complaint that is not subject of the Complaint in and of itself – there is no rationale, or facts, or anything other than a conclusion.  As a result, the Court finds that there was no waiver of privilege and the MoFo Report or drafts thereof need not be disclosed.

### b.  *Common Interest Privilege Asserted by the Trust*

YPF disputes the propriety of certain categories or common interest privilege, pursuant to which the Trust has withheld documents regarding communications

---

[46] *Id.* at 1398-99.

[47] *Id.* at 1399.

between the Debtors and the Official Committee of Unsecured Creditors ("OCC").  The

Trust asserts that communications should remain privileged because they go to

preservation and maximization of the estate's main asset (the causes of actions against

Defendants).  YPF asserts that two time periods could not possibly be covered by the

"common interest privilege" because, at those times, the Debtors and the OCC were

adverse to one another.

The common-interest privilege is a waiver exception to the attorney-client

privilege.

> The attorney-client privilege" is a common-law privilege that
> "protects communications between attorneys and clients
> from compelled disclosure."  In order for the privilege to
> apply, there must be "(1) a communication (2) made between
> privileged persons (3) in confidence (4) for the purpose of
> obtaining or providing legal assistance for the client."  The
> party asserting the privilege bears the burden of establishing
> the requisite elements.  A communication is only privileged if
> made in confidence.  If "persons other than the client, its
> attorney, or their agents are present, the communication is not
> made in confidence."  Further, "if a client subsequently shares
> a privileged communication with a third party, then it is no
> longer confidential, and the privilege ceases to protect it."
>
> The common interest doctrine is an exception to the general
> rule that voluntary disclosure to a third party of purportedly
> privileged information waives the privilege.  The privilege
> protects "all communications shared within a proper
> 'community of interest.'"  The interests "must be 'identical,
> not similar, and be legal, not solely commercial.'"
> Additionally, to show that the members of the community are
> "allied in a common legal cause," the party asserting the
> privilege bears the burden of showing "that the disclosures

> would not have been made but for the sake of securing,
> advancing, or supplying legal representation."[48]

Although a written agreement is evidence of such common interest, it is not necessary.[49]

The Third Circuit has stated that "the community-of-interest privilege allows attorneys

representing different clients with similar legal interests to share information without

having to disclose it to others.  It applies in civil and criminal litigation, and even in purely

transactional contexts."[50]

Defendants assert that the Debtors and the OCC could not have a common interest

during two distinct time-periods:

### (1) Category 7 – August 19, 2016 through December 15, 2016

YPF claims that the Debtors and OCC could not have shared a common interest

privilege between August 19, 2016 and December 15, 2016 ("Category 7 Time Period")

because Debtors and OCC were adverse to one another.  During this time Debtors and

YPF entered into a settlement for $130 million (the "YPF Settlement") and the Debtors

filed a motion to approve the settlement[51] (the "9019 Motion") and proposed plan which

included the YPF Settlement[52] (the "YPF Plan").  OCC argued against approval of the

9019 Motion and YPF Plan claiming that the settlement with YPF was inadequate and

---

[48] *TC Tech. LLC v. Sprint Corp.*, No. 16-CV-153-RGA, 2018 WL 6584122, at *2 (D. Del. Dec. 13, 2018) (citations and footnotes omitted).

[49] *Id.* at *5 ("I did not set a firm rule that parties must have a written agreement or have filed suit to share a legal interest. Rather, I merely considered the lack of an agreement or suit as evidence of the lack of a shared interest.").

[50] *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 364 (3d Cir. 2007), as amended (Oct. 12, 2007) (citations omitted).

[51] D.I. 300 (later withdrawn, *see*, D.I. 1260).

[52] D.I. 697.

below range of reasonableness.  On April 24, 2017, the Debtors withdraw the 9019 Motion

and filed an amended plan which no longer contained the YPF Settlement.[53]  YPF asserts

that it was after the withdrawal of the 9019 Motion that the Debtors and OCC aligned.

While the Trust agrees that the OCC was adverse to the YPF Settlement, the

adversity is not preclusive of having other similar interests.  The Trust asserts that it

withheld documents on the matters where the Debtors and the OCC were not adverse to

one another during the Category 7 Time Period.

YPF asserts that "common interest" only exists insofar as interests are identical; if

not, then the common interest loses any privilege.  YPF continues that as to all issues of

plan modifications and corporate governance during the Category 7 Time Period, the

time during which the YPF Settlement was being pursued by the Debtors, then it is not

conceivable that the Debtors (and now the Trust asserting in the shoes of the Debtors)

and the OCC can assert a "common interest," because the OCC was actively opposing

the YPF Settlement.

### (2) Category 9 – Petition Date (June 17, 2016) through April 28, 2017

YPF also asserts that communications between the Petition Date and April 28, 2017

("Category 9 Time Period"), among the Debtors, MoFo, Zolfo, OCC and White & Case

also cannot be withheld under the common interest privilege.  The Trust withheld

documents stating that "[c]ommunications and/or documents relating to environmental

liabilities shared by the Debtors and OCC, related remediation obligations and

---

[53]  *See* D.I. 1260 and amended plan, D.I. 1056, 1209, 1231, and 1451.

expenditures, and/or Site Transition Agreement" for the period June 19, 2016 through March 27, 2017 among the Debtors, MoFo, Zolfo, OCC and White & Case.

YPF asserts that several arguments in support of its position. First, as discussed above, prior to the withdrawal of the 9019 Motion on April 24, 2017, OCC's legal interests were adverse to the Debtors' legal interests. Second, the lack of a shared common interest between the Debtors and OCC is evidenced by the Site Transition Agreement, by and between the Debtors and Glenn Spring Holdings, Inc. (acting for the benefit of OCC) and executed on March 28, 2017. The Debtors in their motion to approve the Site Transition Agreement stated that the Debtors and the OCC had been negotiating for two months (i.e. January 2017). Third, during this time period the OCC filed four identical proofs of claims in the amount of $579 million, plus contingent and/or unliquidated amounts, against Tierra (Claim Nos. 316 and 408) and Maxus (Claim Nos. 320 and 413). YPF asserts that the filing of a proof of claim is akin to filing a complaint, and that it is evidence of the adversity between the parties. Fourth, the Debtors and OCC entered into a "joint defense and common interest agreement" on July 14, 2017 ("JDA"), which states that it dates back to *April 28, 2017*.[54] Furthermore, YPF asserts that negotiations on Site Transition Agreement did not begin until January 2017 – so there could not have been a

---

[54] D.I. 217, Exh. H (Paragraph 15 of the JDA reads: "Each of the Parties agrees that, to the extent its attorneys have already been in communication or had any discussions with attorneys for any of the other Parties, dating back to April 28, 2018, about matters related to the Claims their communications, discussions, and work product have been and are subject to the attorney-client privilege, joint defense privilege, common interest doctrine, and business strategies doctrine and are specifically incorporated herein.").

common interest for the period from the Petition Date (June 17, 2016) through March 27, 2017.

The Trust replies that the Debtors and OCC, in fact, had a 30-year commonality of interest relating to certain environmental liabilities (not just limited to the Site Transition Agreement), and that negotiations between the Debtors and the OCC were continual and ongoing throughout their entire history, which now results in a common interest privilege.

YPF replied that Debtors and OCC were opposing each other with respect to the conduct and progress of Chapter 11 proceedings; and OCC had been actively suing Debtors in the NJ Action for years regarding environmental liability and remediation obligations.

*In re Leslie Controls, Inc.*[55] involved a discovery dispute between insurers and the debtor over whether a legal memorandum shared by the debtor pre-petition with an ad hoc committee of asbestos plaintiffs (the "Ad Hoc Committee") and the debtor's proposed future claimants' representative (the "Pre-Petition FCR") was protected from discovery by the insurers under the common interest doctrine.[56]  The legal memorandum was prepared by insurance coverage counsel for the debtor providing advice with respect to the effect of the insurers' likely position on insurance recoveries in bankruptcy.[57]  The debtor ultimately determined that a bankruptcy filing was necessary to deal with

---

[55] *In re Leslie Controls, Inc.*, 437 B.R. 493 (Bankr. D. Del. 2010).

[56] *Id.* at 495.

[57] *Id.*

mounting liabilities from asbestos personal injury lawsuits and, pre-filing, began negotiations with the Ad Hoc Committee and the Pre-Petition FCR to develop a consensual plan of reorganization—those negotiations were successful and the plan of reorganization, which the insurers objected to, was then pending before the court.[58]  The insurers sought to discover the memorandum and emails regarding the memorandum— all of  which occurred prior to the bankruptcy filing and several occurred prior to a proposed settlement.[59]

The *Leslie Controls* court noted that "[b]roadly speaking, these cases stand for the proposition that the party invoking the common interest doctrine must present evidence that a legal interest is implicated.  If such a legal interest is established then the common interest doctrine will apply (assuming the other elements of the test are met) even if there are separate or overlapping commercial interests."[60]  The insurers had argued that the debtor, the Ad Hoc Committee, and the Pre-Petition FCR were adversaries on the issue of insurance proceeds since the information was shared pre-petition and prior to those parties reaching an agreement on the terms of a plan of reorganization.[61]  But the court noted that "the common interest privilege does not require a complete unity of interests among the participants, but it is limited by the scope of the parties' common interest."[62] Regardless of the ongoing negotiations at the time of the communications, the court

---

[58] *Id.* at 495-96.

[59] *Id.* at 496.

[60] *Id.* at 500.

[61] *Id.* at 498.

[62] *Id.* at 500.

found the operative question was "whether the Debtor shared information related to the parties' common legal interest against the insured, their "common enemy.""[63]  The court held that while the debtor, the Ad Hoc Committee, and the Pre-Petition FCR had conflicting interests in the sense that each desired to obtain the largest share of the debtor's assets possible, the parties "shared a common interest in maximizing the asset pool, which would include insurance proceeds . . . the size of the pie and the size of the pieces are two separate questions.  The parties are in accord as to the former and adversaries as to the latter."[64]  Thus, because the information contained in the documents went to the size of the asset pool—a matter of common interest—a common legal interest existed and the communications were shielded by the common interest doctrine.[65]  The *Leslie Controls* court also held:

> The common interest exception does not protect information exchanged among parties simply because they are negotiating toward what they hope will be an agreement. During negotiations, adverse parties have no common interest, and indeed, their interests are in conflict—each party wants to get the best deal from the other, and to the extent that one succeeds in its goal, the other suffers. As a result, until an agreement is actually reached, it is not objectively reasonable for a negotiating party to believe that a communication of privileged material to other negotiating parties "was confidential" and thus protected by the common interest privilege because, while negotiating parties may all have hoped for a successful outcome each side is representing

---

[63] *Id.* at 502.

[64] *Id.*

[65] *Id.*  at 502-03.

its or their own interest, and a successful outcome was not assured.[66]

Here, the facts are remarkably similar to *Leslie Controls*, the Debtors and the OCC were negotiating and eventually reaching a settlement against which included withdrawal from the proposed settlement with the Defendants, litigation against the Defendants, and a consensual plan of reorganization between the Debtors and the OCC – all against their "common enemy," the Defendants.

Additionally, the complexity of a bankruptcy case, the numerous moving parts, the multitude of motions on different topics and the negotiations between the debtors and official committees cannot be downplayed. This is not a simple three-party litigation. Hundreds of parties were involved in these cases. It is not surprising that the Debtors would be discussing case strategy with the OCC from the inception of the OCC. Although, at the time, the Debtors were in settlement with the now-Defendants, it is not the least bit alarming that the Debtors were also having discussions with the OCC, which ultimately led the Debtors to withdraw the settlement with the Defendants and pursue litigation. Furthermore, the agreements between the Debtors and the OCC were eventually approved by the Court – they were not failed negotiations.[67] As a result, the documents are protected by the common interest doctrine and the Court will not order production of these documents.

---

[66] *Id.* at 501 (citations, quotations marks and modifications omitted).

[67] Furthermore, such common interests were legal in nature as they sought to reach agreement on a proposed plan of reorganization and approval of the Site Transition Agreement. *See, e.g., In re Simplexity, LLC,* 584 B.R. 495, 501 (Bankr. D. Del. 2018) (finding that there was a financial common interest but not a legal common interest).

### D.    *Production Deficiencies*

#### (i) Repsol

There appears to be a dispute over whether and to what extent Repsol must review and produce documents pre-dating the NJ Action discovery cut-off.  It appears that the Trust has requested that Repsol include additional search terms related to the NJ Action. Repsol claims that it is "too late" to add additional search terms because Repsol was substantially completed with production of documents and the Trust waited nearly four months to question whether Repsol applied the "Agreed-Upon Search Terms" to the NJ Documents.

The Trust does not agree regarding Repsol's production of pre-2012 documents. The Trust claims that the parties have engaged in discussions regarding targeted search terms for Repsol to apply to such documents and have reached a workable compromise such that the Court does not need to be involved at this time.

As such, and although raised in the letters presented to the Court, this is not ripe for decision.

#### (ii) YPF

Furthermore, the Trust asserts that YPF has not produced documents similar to the sample documents in March 18, 2020 discovery dispute.  The Trust disputes whether YPF's production is "substantially complete" based on an alleged subset of documents that YPF hand-picked.  YPF replies that they need additional information as this is a wholesale objection and YPF has no understanding of what was not produced.

This issue was not discussed at oral argument and the Court does not have enough information to make a decision at this time.  As a result, and without requesting additional information on this issue, the Court will not require this production - without prejudice.

### (ii)    Return of Laptops

YPF asserts that the Trust has nine YPF laptops that should be returned to YPF. YPF asserts that there is no legitimate reason for the Trust not to return these laptops. The Trust responded that these are not YPF laptops but that they belonged to Maxus employees.  Furthermore, the Trust asserts that these laptops were used to search for discoverable documents and that such documents were produced to YPF.

As the laptops were used by Maxus employees in their roles for Maxus, and all documents on the laptops were searched in the discovery process, the Trust does not have to turn over the laptops.

### CONCLUSION

For the reasons set forth above, the Court will (i) limit the number of fact depositions to 20 per side; (ii) will not allow discovery related to the underlying environmental claims; (iii) reject the "two-hat" basis for withholding production of documents and communications on the basis of privilege claimed by YPF, and require production; (iv) uphold the assertion of privilege relating to the MoFo Report; (v) uphold the privilege of the Trust under the common interest privilege, notwithstanding disclosures and communications to the UCC; (vi) not require production of documents

related to alleged production deficiencies asserted by the Trust; and (vii) not require turnover of the laptops.

Furthermore, the Case Scheduling Order must be amended pursuant to the rulings set forth herein. The Court requires that the parties meet and confer and submit an amended Case Scheduling Order within 30 days of the date hereof. If the parties are unable to agree regarding an amended Case Scheduling Order, the parties shall submit dueling proposed orders within 30 days of the date hereof.

An order will be entered.