UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

| **Fill in this information to identify the case** |
| **(Select only one Debtor per claim form):** |

- [X] Maxus Energy Corporation (Case No. 16-11501)
- [ ] Tierra Solutions, Inc. (Case No. 16-11502)
- [ ] Maxus International Energy Company (Case No. 16-11503)
- [ ] Maxus (U.S.) Exploration Company (Case No. 16-11504)
- [ ] Gateway Coal Company (Case No. 16-11505)

Official Form 410

# Proof of Claim

04/16

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. **Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| **Part 1:** | **Identify the Claim** |
|---|---|

| 1. Who is the current creditor? | United States on behalf of EPA, DOI, and NOAA |
|---|---|
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor _____ |

| 2. Has this claim been acquired from someone else? | [✓] No |
|---|---|
| | [ ] Yes. From whom? _____ |

| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent?<br><br>David L. Gordon<br>Donald G. Frankel<br>Environmental Enforcement Section<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>P.O. Box 7611<br>Washington, D.C. 20044-7611<br><br>Contact phone  202 514 3659<br>Contact email  david.l.gordon@usdoj.gov | Where should payments to the creditor be sent? (if different)<br><br>United States Attorney's Office<br>Financial Litigation Unit<br>1007 Orange St. Suite 700<br>Wilmington, DE 19899-2046<br><br>Attn: Renee Austin<br><br>Contact phone  302-573-6277<br>Contact email  renee.austin2@usdoj.gov |
|---|---|---|

| 4. Does this claim amend one already filed? | [✓] No<br>[ ] Yes.  Claim number on court claims registry (if known)_____ | Filed on _____<br>MM  / DD  / YYYY |
|---|---|---|

| 5. Do you know if anyone else has filed a proof of claim for this claim? | [X] No<br>[ ] Yes. Who made the earlier filing? _____ |
|---|---|

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |

**6. Do you have any number you use to identify the debtor?**

☒ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

---

**7. How much is the claim?**

$ _7,173,650,159 - 11,941,650,159_ **Does this amount include interest or other charges?**

☒ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.
Liability for response costs and natural resource damages under the Comprehensive Environmental Response, Compensation, and Liability Act. Documentation in support of this Proof of Claim is too voluminous to attach, but is available upon request.

---

**9. Is all or part of the claim secured?**

☒ No

☐ Yes. The claim is secured by a lien on property.

   **Nature of property:**

   ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

   ☐ Motor vehicle

   ☐ Other. Describe: _____

   **Basis for perfection:** _____

   Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

   **Value of property:**                                  $_____

   **Amount of the claim that is secured:**      $_____

   **Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

   **Amount necessary to cure any default as of the date of the petition:**      $_____

   **Annual Interest Rate** (when case was filed) _____%

   ☐ Fixed

   ☐ Variable

---

**10. Is this claim based on a lease?**

☒ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**      $_____

---

**11. Is this claim subject to a right of setoff?**

☒ No

☐ Yes. Identify the property: _____

---

| | | |
|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** <br> A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ No <br> ☒ Yes. *Check one:* | **Amount entitled to priority** |

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $_____

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $_____

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $_____

☒ Other. Specify subsection of 11 U.S.C. § 507(a)( 2 ) that applies.    $ 9,205

* Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   12/15/2016      (mm/dd/yyyy)

Signature:   *David Gordon (legal issues only)*
David Gordon (legal issues only) (Dec 15, 2016)

Email:  david.l.gordon@usdoj.gov

Print the name of the person who is completing and signing this claim:

| | |
|---|---|
| Name | David Louis Gordon |
| | First name          Middle name          Last name |
| Title | Senior Counsel |
| Company | US Dept. of Justice |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | |
| | Number        Street |
| | City                              State      ZIP Code |
| Contact phone | _____          Email _____ |

**Attach Supporting Documentation** (limited to a single PDF attachment that is less than 5 megabytes in size and under 100 pages):

☒ I have supporting documentation.
   (attach below)                       ☐ I do not have supporting documentation.

 **Attachment**

PLEASE REVIEW YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTS AND REDACT ACCORDINGLY PRIOR TO UPLOADING THEM. PROOFS OF CLAIM AND ATTACHMENTS ARE PUBLIC DOCUMENTS THAT WILL BE AVAILABLE FOR ANYONE TO VIEW ONLINE.

IMPORTANT NOTE REGARDING REDACTING YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTATION When you submit a proof of claim and any supporting documentation you must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. The responsibility for redacting personal data identifiers (as defined in Federal Rule of Bankruptcy Procedure 9037) rests solely with the party submitting the documentation and their counsel. Prime Clerk and the Clerk of the Court will not review any document for redaction or compliance with this Rule and you hereby release and agree to hold harmless Prime Clerk and the Clerk of the Court from the disclosure of any personal data identifiers included in your submission. In the event Prime Clerk or the Clerk of the Court discover that personal identifier data or information concerning a minor individual has been included in a pleading, Prime Clerk and the Clerk of the Court are authorized, in their sole discretion, to redact all such information from the text of the filing and make an entry indicating the correction.

Official Form 410

# Instructions for Proof of Claim

United States Bankruptcy Court

**These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.**

> **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
> 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- **Fill in all of the information about the claim as of the date the case was filed.**

- **Fill in the caption at the top of the form.**

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.** Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child (John Doe, parent, 123 Main St., City, State)*. See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, either enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at http://cases.primeclerk.com/maxus.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. § 101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. § 507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. § 506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of § 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

Maxus Energy Corporation Claims Processing Center
c/o Prime Clerk LLC
830 Third Avenue, 3rd Floor
New York, NY 10022

**Do not file these instructions with your form**

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

| Fill in this information to identify the case (Select only one Debtor per claim form): | |
|---|---|
| ☒ Maxus Energy Corporation (Case No. 16-11501) | ☐ Tierra Solutions, Inc. (Case No. 16-11502) |
| ☐ Maxus International Energy Company (Case No. 16-11503) | ☐ Maxus (U.S.) Exploration Company (Case No. 16-11504) |
| ☐ Gateway Coal Company (Case No. 16-11505) | |

Modified Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1: Identify the Claim

| | | |
|---|---|---|
| 1. Who is the current creditor? | United States on behalf of EPA, DOI, and NOAA | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor _____ | |
| 2. Has this claim been acquired from someone else? | ☑ No<br>☐ Yes. From whom? _____ | |
| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent?<br><br>DAVID L. GORDON<br>DONALD FRANKEL<br>Environmental Enforcement Section<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>P.O. Box 7611<br>Washington, D.C. 20044-7611<br><br>Contact phone (202) 514-3659<br>Contact email david.l.gordon@usdoj.gov, donald.frankel@usdoj.gov | Where should payments to the creditor be sent? (if different)<br><br>United States Attorney's Office<br>Financial Litigation Unit<br>1007 Orange St. Suite 700<br>Wilmington, DE 19899-2046<br><br>Attn: Renee Austin<br><br>Contact phone _____<br>Contact email _____ |
| 4. Does this claim amend one already filed? | ☑ No<br>☐ Yes. Claim number on court claims registry (if known)_____ Filed on ___/___/____ <br> MM / DD / YYYY | |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☒ No<br>☐ Yes. Who made the earlier filing? _____ | |

**Part 2:**    Give Information About the Claim as of the Date the Case Was Filed

| | |
|---|---|
| 6. Do you have any number you use to identify the debtor? | ☒ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: |
| 7. How much is the claim? | $ $7,173,650,159 to $11,941,650,159.___   **Does this amount include interest or other charges?**<br>☒ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| 8. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as health care information.<br>Liability for response costs and natural resource damages under the Comprehensive Environmental Response, Compensation and Liability Act. Documentation in support of this Proof of Claim is too voluminous to attach, but is available upon request. |
| 9. Is all or part of the claim secured? | ☒ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>    **Nature of property:**<br>    ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br>    ☐ Motor vehicle<br>    ☐ Other. Describe: _____<br><br>    **Basis for perfection:** _____<br>    Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>    **Value of property:**      $_____<br><br>    **Amount of the claim that is secured:**    $_____<br><br>    **Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>    **Amount necessary to cure any default as of the date of the petition:**    $_____<br><br>    **Annual Interest Rate** (when case was filed)_____%<br>    ☐ Fixed<br>    ☐ Variable |
| 10. Is this claim based on a lease? | ☒ No<br>☐ Yes. Amount necessary to cure any default as of the date of the petition.    $_____ |
| 11. Is this claim subject to a right of setoff? | ☒ No<br>☐ Yes. Identify the property: _____ |

| | | Amount entitled to priority |
|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☐ No | |
| | ☒ Yes. *Check one:* | |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,850 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,850) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☑ Other. Specify subsection of 11 U.S.C. § 507(a)(2 ) that applies. | $9,205 |
| **13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☒ No | |
| | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case(s), in which the goods have been sold to the debtor in the ordinary course of such debtor's business. Attach documentation supporting such claim. | $_____ |

## Part 3:    Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  12/13/2016          (mm/dd/yyyy)

_Signature_

Print the name of the person who is completing and signing this claim:

| | |
|---|---|
| Name | W. Owen Thompson |
| | First name          Middle name                    Last name |
| Title | Remedial Project Manager, Superfund Division |
| Company | U.S. Environmental Protection Agency Region 5 |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 77 W. Jackson Blvd., SR-6J |
| | Number        Street |
| | Chicago, IL 60604 |
| | City                                State        ZIP Code |
| Contact phone | (312) 886-4843                    Email    thompson.owen@epa.gov |

| | | | Amount entitled to priority |
|---|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☐ No | | |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☒ Yes. *Check one:* | | |
| | ☐ | Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ |
| | ☐ | Up to $2,850 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ |
| | ☐ | Wages, salaries, or commissions (up to $12,850) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ |
| | ☐ | Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ |
| | ☐ | Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ |
| | ☑ | Other. Specify subsection of 11 U.S.C. § 507(a)( 2 ) that applies. | $9,205 |

| | |
|---|---|
| **13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☒ No |
| | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case(s), in which the goods have been sold to the debtor in the ordinary course of such debtor's business. Attach documentation supporting such claim.   $ |

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.
☑ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   12/13/2016 (mm/dd/yyyy)

*Signature*   Alice Yeh

Print the name of the person who is completing and signing this claim:

| | |
|---|---|
| Name | Alice                                         Yeh |
| | First name         Middle name                Last name |
| Title | Remedial Project Manager |
| Company | US Environmental Protection Agency |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 290 Broadway |
| | Number   Street |
| | New York                    NY     10007-1866 |
| | City                        State   ZIP Code |
| Contact phone | 212-637-4427        Email   yeh.alice@epa.gov |

Modified Official Form 410                    **Proof of Claim**                    page 3

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☐ No | |
| --- | --- | --- |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☒ Yes. Check one: | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,850 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,850) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☒ Other. Specify subsection of 11 U.S.C. § 507(a)(2   ) that applies. | $9,205 |

| 13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)? | ☒ No | |
| --- | --- | --- |
| | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case(s), in which the goods have been sold to the debtor in the ordinary course of such debtor's business. Attach documentation supporting such claim. | $_____ |

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☐ I am the creditor.
☒ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   12/12/2016 (mm/dd/yyyy)

_Signature_

Print the name of the person who is completing and signing this claim:

| Name | Chauncey     Thomas Patrick     Kelly |
| --- | --- |
| | First name    Middle name    Last name |
| Title | Section Chief |
| Company | National Oceanic and Atmospheric Administration |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 1315 East-West Highway, Suite 15107 |
| | Number    Street |
| | Silver Spring    MD    20901 |
| | City    State    ZIP Code |
| Contact phone | 301-713-7440    Email   Chauncey.Kelly@noaa.gov |

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☐ No | |
|---|---|---|
| | ☒ Yes. Check one: | Amount entitled to priority |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | ☐ Up to $2,850 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $12,850) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☒ Other. Specify subsection of 11 U.S.C. § 507(a)(2  ) that applies. | $9,205 |

| 13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)? | ☒ No | |
|---|---|---|
| | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case(s), in which the goods have been sold to the debtor in the ordinary course of such debtor's business. Attach documentation supporting such claim. | $ _____ |

## Part 3:   Sign Below

**The person completing this proof of claim must sign and date it.** FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.** 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  12/13/2016 (mm/dd/yyyy)

_Signature_

Print the name of the person who is completing and signing this claim:

| Name | MACK   _First name_   _Middle name_   BARASH   _Last name_ |
|---|---|
| Title | Senior Attorney |
| Company | US Department of the Interior |
| | _Identify the corporate servicer as the company if the authorized agent is a servicer._ |
| Address | 300 Washington St., Suite 612   _Number_   _Street_ |
| | Newton, MA 02458   USA   _City_   _State_   _ZIP Code_ |
| Contact phone | 617 527 3103   Email mark.barash@sol.doi.gov |

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MAXUS ENERGY CORPORATION, et al.[1] | ) Case No. 16-11501 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**PROOF OF CLAIM AND PROTECTIVE PROOF OF CLAIM OF THE
UNITED STATES OF AMERICA, ON BEHALF OF THE UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY, NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION, AND UNITED STATES DEPARTMENT
OF THE INTERIOR, FISH AND WILDLIFE SERVICE**

## I. INTRODUCTION

1.      This Proof of Claim and Protective Proof of Claim are filed by the Attorney

General of the United States at the request of the United States Environmental Protection Agency

("EPA"), the United States Department of Commerce acting through the National Oceanic and

Atmospheric Administration ("NOAA"), and the United States Department of the Interior

("DOI") acting through the Fish and Wildlife Service. This Proof of Claim includes claims and

protective claims against Debtors Tierra Solutions, Inc. ("Tierra") and Maxus Energy

Corporation ("Maxus") (collectively "Debtors") related to the Diamond Alkali Superfund Site in

New Jersey, including the Lower Passaic River Study Area, the Newark Bay Study Area, and the

Lister Avenue Property. This Proof of Claim also includes claims and protective claims against

Maxus related to the Milwaukee Solvay Coke & Gas Superfund Site in Wisconsin. In addition,

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are:
Maxus Energy Corporation (1531), Tierra Solutions, Inc. (0498), Maxus International Energy Company
(7260), Maxus (U.S.) Exploration Company (2439), and Gateway Coal Company (7425. The address of
each of the Debtors is 10333 Richmond Avenue, Suite 1050, Houston, Texas 77042.

this Proof of Claim includes protective claims against Tierra for post-petition liabilities, response costs, and injunctive obligations.

2.      The Attorney General is authorized to file this environmental, public health, and natural resource damages proof of claim on behalf of the United States.

3.      In *New Jersey Department of Environmental Protection v. Occidental Chemical Corporation, et. al.*, (Docket No. ESX-L9868-05) pending in the Superior Court of New Jersey, Essex County, the court, on May 21, 2012, held that Maxus is the alter ego of Tierra. The factual bases for this finding are alleged in Paragraphs 16 and 17 below. Accordingly, in this Proof of Claim, each claim set forth against Tierra is also asserted against Maxus, and each claim against Maxus is also asserted against Tierra.

## II. CLAIMS RELATED TO THE DIAMOND ALKALI SUPERFUND SITE

### A. Site Description

4.      The Diamond Alkali Superfund Site includes four Operable Units. Each Operable Unit relates to a geographical area impacted by releases of hazardous substances where EPA and potentially responsible parties are implementing response actions. These areas include:

- the properties at 80 and 120 Lister Avenue in Newark, New Jersey, collectively the "Lister Avenue Property" (Operable Unit 1);

- 8.3 miles of the Lower Passaic River stretching from the river's confluence with Newark Bay to River Mile 8.3 near the border between the City of Newark and Belleville Township, New Jersey (Operable Unit 2);

- the Newark Bay Study Area, which includes Newark Bay and portions of the Hackensack River, the Arthur Kill, and the Kill van Kull (Operable Unit 3); and

- the Lower Passaic River Study Area ("LPRSA"), a 17.4-mile stretch of the Passaic
  River from its confluence with Newark Bay to Dundee Dam (Operable Unit 4).[2]

Releases of hazardous substances from the Lister Avenue Property, located on the banks of the

Passaic River, have threatened and will continue to threaten human health and the environment

and have injured and will continue to injure natural resources and their services at the Lister

Avenue Property and at each of the other operable units listed above, as well as other areas

where hazardous substances have come to be located. In addition, as set forth below, EPA has

selected and overseen certain removal actions at the Diamond Alkali Superfund Site.

**B. Background on Lister Avenue Property Ownership and Operations**

5.    In approximately January 1947, Kolker Realty Company and/or Kolker Chemical

Works, Inc. (collectively "Kolker") acquired, through purchase or lease, an approximate 3.4-acre

tract of land located at 80 Lister Avenue for the production of dichlorodiphenyltrichloroethane

("DDT") and phenoxy herbicides.

6.    In 1951, Diamond Alkali Company acquired Kolker, and Kolker's name was

eventually changed to Diamond Alkali Organic Chemicals Division, Inc. In 1954, Diamond

Alkali Organic Chemicals Division, Inc. was dissolved and merged into Diamond Alkali

Company, which assumed all of Diamond Alkali Organic Chemicals Division, Inc.'s liabilities.

Diamond Alkali Company continued to own and operate a manufacturing facility at 80 Lister

Avenue until August 1967, when Diamond Alkali Company merged with Shamrock Oil & Gas

Company, and the company's name was changed to Diamond Shamrock Corporation

(hereinafter "Old Diamond Shamrock"). Old Diamond Shamrock continued to operate the

---

[2] Until recently, EPA identified the Lower Passaic River Study Area as Operable Unit 3 and Newark Bay
as Operable Unit 4, but has now decided that Newark Bay will be known as Operable Unit 3 and the
Lower Passaic River Study Area as Operable Unit 4 in order to align terminology with EPA's data
systems.

manufacturing facility at 80 Lister Avenue until August 1969.  Old Diamond Shamrock is the legal successor to Kolker, Diamond Alkali Organic Chemicals Division, Inc., and Diamond Alkali Company.

7.      Between 1951 and 1969 Old Diamond Shamrock and its predecessors used the 80 Lister Avenue property for the manufacture of the pesticides 2,4,5-trichlorophenol ("2,4,5 TCP"), dichlorodiphenyl-trichloroethane ("DDT"), 2,4-dichlorophenoxyacetic acid ("2,4-D"), and 2,4,5- trichlorophenoxyacetic acid ("2,4,5-T"), among other products. The herbicides 2,4-D and 2,4,5-T are ingredients in the defoliant known as "Agent Orange." A waste by-product of the manufacturing process was 2,3,7,8-tetrachlorodibenzo-p-dioxin ("2,3,7,8-TCDD"), a particularly toxic form of dioxin.

8.      In 1971, Old Diamond Shamrock sold 80 Lister Avenue to a newly formed company known as Chemicaland Corporation ("Chemicaland"), which was created by and included former Old Diamond Shamrock managers. Chemicaland leased 80 Lister Avenue to Cloray NJ Corporation ("Cloray"). Cloray was under the same management as Chemicaland, which included former managers of Old Diamond Shamrock. From 1971 until at least 1977, Chemicaland and/or Cloray continued to manufacture organic pesticides, including herbicides, at 80 Lister Avenue for and at the direction of Old Diamond Shamrock.

9.      On November 22, 1976, Occidental Chemical Company, a predecessor to Occidental Chemical Corporation ("OCC"), assumed temporary management and operation of the 80 Lister Avenue plant. During that time, the plant continued to manufacture pesticides including herbicides. On February 24, 1977, Chemicaland resumed management of the 80 Lister Avenue plant but did not resume operations.

10.      In 1980, Walter Ray Holding Company purchased 80 Lister Avenue at a tax sale, and thereafter the property was conveyed to William Leckie.

11.      In June 1981, Marisol, Inc. bought 80 Lister Avenue from Walter Leckie. Marisol conducted salvage operations, including removal of certain materials to certain off-site locations, and waste consolidation activities.

12.      In May 1983, high concentrations of 2,3,7,8-TCDD were discovered at 80 Lister Avenue, at adjacent properties, and in the Passaic River adjacent to the Lister Avenue Property. Shortly thereafter, Old Diamond Shamrock created and incorporated New Diamond Shamrock Corporation ("New Diamond Shamrock") as its own parent. A few days later, New Diamond Shamrock changed its name to Diamond Shamrock Corporation, and in 1987 again changed its name to Maxus Energy Corporation ("Maxus"). For clarity, this entity will hereinafter be referred to as "New Diamond Shamrock (a/k/a Maxus)" or "Maxus."

13.      On or about September 1, 1983 -- after the creation of New Diamond Shamrock (a/k/a Maxus) -- Old Diamond Shamrock changed its name to Diamond Chemicals Company, and on or about October 26, 1983, changed its name again to Diamond Shamrock Chemicals Company. For clarity, this entity will continue to be referred to as "Old Diamond Shamrock."

14.      After 2,3,7,8-TCDD contamination was discovered at the Lister Avenue Property, Old Diamond Shamrock acquired ownership of 120 Lister Avenue in 1984 and reacquired 80 Lister Avenue in 1986.

15.      On or about September 4, 1986, New Diamond Shamrock (a/k/a Maxus) sold all of the stock of Old Diamond Shamrock to an affiliate of OCC. Old Diamond Shamrock was subsequently merged into the affiliate, which itself was subsequently merged into OCC. To effectuate the sale of the stock, New Diamond Shamrock (a/k/a Maxus) and OCC executed a

5

September 4, 1986, Stock Purchase Agreement ("SPA").  In the SPA, New Diamond Shamrock (a/k/a Maxus) agreed to indemnify OCC for certain environmental liabilities, including liabilities related to the Lister Avenue Property.

16.    In 1986, Old Diamond Shamrock transferred title to both 80 Lister Avenue and 120 Lister Avenue to Diamond Shamrock Chemical Land Holdings, Inc., a wholly-owned subsidiary of New Diamond Shamrock (a/k/a Maxus).  Diamond Shamrock Chemical Land Holdings, Inc. subsequently changed its name to Chemical Land Holdings, Inc. and thereafter to Tierra Solutions, Inc. ("Tierra"). Tierra remains the owner of the Lister Avenue Property.

17.    By order dated May 21, 2012, in *New Jersey Department of Environmental Protection v. Occidental Chemical Corporation, et. al.*, (Docket No. ESX-L9868-05) pending in the Superior Court of New Jersey, Essex County (hereinafter "New Jersey Litigation"), the New Jersey Superior Court held that Maxus is the alter ego of Tierra. The court reached this conclusion recognizing that Tierra was created solely for the benefit of Maxus; was dominated and dependent on Maxis; and "wasn't capitalized to pay for any risks that was inherent in buying contaminated property." *See* New Jersey Litigation, May 17, 2012, Hearing Transcript p. 376-377. The court further found that Maxus created Tierra to hold title to the Lister Avenue in an effort to evade the law and escape liability. Id. 381-385. Hence, the Court concluded that "Maxus is, and always has been, the alter ego of Tierra." *Id.* 387.

## C. Background on the Lister Avenue Property Contamination, Releases, and Remediation

18.    In 1983, as part of EPA's National Dioxin Strategy targeting sampling and investigations at facilities where dioxin was produced as a waste byproduct of manufacturing, EPA and New Jersey Department of Environmental Protection ("NJDEP") found high levels of dioxin at and in the vicinity of the Lister Avenue Property and in the Lower Passaic River.

Although the facility at the Lister Avenue Property was not producing dioxin or herbicides at this time, high levels of 2,3,7,8-TCDD and other hazardous substances remained in and on the process buildings, tanks, sumps, drains, sewers, pipes, and other equipment, and continued to spill and leak into the environment.

19.     EPA and NJDEP thereafter initiated several emergency response actions including: securing the Lister Avenue Property, covering the exposed soils to reduce migration, and addressing 2,3,7,8-TCDD found on nearby properties through excavation, vacuuming, and other means. On September 21, 1984, the Diamond Alkali Superfund Site was listed on the National Priorities List, which is the list of known releases or threatened releases of hazardous substances, pollutants or contaminants that are national priorities. 40 C.F.R. Part 300, Appendix B.

20.     Since 1986, Tierra has been the owner and operator of the Lister Avenue Property.  During at least a portion of the time from 1986 to the present, discharges of 2,3,7,8-TCDD and other hazardous substances from the Lister Avenue Property continued to occur.

21.     EPA issued a Record of Decision ("ROD") in 1987, selecting an interim remedy for Operable Unit 1, the Lister Avenue Property. The remedy consisted of capping, subsurface slurry walls and a flood wall, and a groundwater collection and treatment system.  In 1990, OCC and Tierra, then known as Chemical Land Holdings, Inc., entered into a consent decree (hereinafter "1990 Consent Decree") with EPA under which OCC agreed to perform the cleanup and Tierra agreed to provide access and abide by agreements on conveyance and use the property. *United States, et al. v. Occidental Chemical Corporation et al.* (D.N.J. Civ. No. 89-5064).

7

22.     Construction of the remedy was completed in 2001. In particular, the sheet pile wall that cut off discharges from the upland Lister Avenue Property to the Lower Passaic River (also known as the "flood wall") and the slurry trench cutoff wall were fully installed in 2001, as was the groundwater withdrawal system and treatment plant. Until this containment remedy was completed in 2001, releases of contaminated groundwater from the upland Lister Avenue property readily flowed into the river. In addition, until the sheet pile wall was constructed in 2001, contaminated soil along the river bank was washed into the river and distributed throughout the Lower Passaic River and Newark Bay through tidal action and river flow.

### D. Tierra and Maxus are Liable for the Diamond Alkali Superfund Site under CERCLA

23.     Tierra and Maxus, as alter egos, are jointly and severally liable, along with other parties, to the United States for any unreimbursed past response costs, future response costs, and damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss, related to the Diamond Alkali Superfund Site pursuant to:

a.  Section 107(a)(1) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a)(1), as the owner or operator of the Lister Avenue Property; and

b.  Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), as the owner or operator of the Lister Avenue Property at the time of disposal of hazardous substances, including ongoing discharges from the equipment, surface water, and groundwater from the Lister Avenue Property into the Lower Passaic River.

24.     The Diamond Alkali Superfund Site is a "facility" as defined in Section 101(9) of CERCLA, 42 U.S.C § 9601(9). Dioxin is a "hazardous substance" as defined in Section 101(14)

8

of CERCLA, 42 U.S.C § 9601(14). There has been an actual and/or threatened "release," as defined in Section 101(22) of CERCLA, 42 U.S.C. § 9601(22), of hazardous substances from the Diamond Alkali Superfund Site, including the Lister Avenue Property, which has caused the incurrence of response costs and natural resource injuries throughout the Diamond Alkali Superfund Site and its environs. Tierra and Maxus are each a "person" as defined in Section 101(21) of CERCLA, 42 U.S.C § 9601(22).

### E. Claims and Protective Claims Related to the Lister Avenue Property (Operable Unit 1).

25.      Under the 1990 Consent Decree, OCC's remaining obligations include operation and maintenance of the remedy at the Lister Avenue Property, including operating the groundwater pump and treatment system, disposing of any waste materials generated by the operations, maintaining the cap, providing site security, and paying EPA's oversight costs. To the extent that OCC is unable to fulfill these obligations, Tierra is contingently liable for EPA's costs of maintaining the remedy and/or future oversight costs. The United States is not required to file a proof of claim for response costs incurred in connection with property of the estate, including the Lister Avenue Property, after the petition date, and expects to file an administrative expense claim with respect to such costs in the event OCC is unable to fulfill these obligations. The United States is including these response costs in its proof of claim, as a contingent general unsecured claim, only in a protective manner in case the appropriate court ultimately determines that the United States is not entitled to administrative expense priority with respect to such response costs. Thus, with respect to the Lister Avenue Property, the United States asserts a contingent and protective general unsecured claim for response costs related to maintaining the remedy and payment of EPA's oversight costs, including $9,205 in post-petition oversight costs incurred through October 31, 2016, and which will continue to be incurred. The United States

9

reserves the right to file applications for administrative expenses and to take other action in the future with respect to such costs and estate property.

26.     The United States is also not required to file a proof of claim with respect to Tierra's injunctive obligations under the 1990 Consent Decree because such obligations are not claims under 11 U.S.C. § 101(5) and Tierra must comply with such mandatory requirements. Under Sections III and XI the 1990 Consent Decree, Tierra must provide access to the Lister Avenue Property so that EPA can oversee the remedy, including ongoing operation and maintenance of the cap and groundwater treatment system. Tierra must also abide by agreements on conveyance and use of the property. Such agreements on conveyance include, *inter alia*, that "no conveyance or transfer of the title, lease, easement or other interest in the Site shall be consummated without a provision permitting a continuance of the Work pursuant to the Consent Decree," and that Tierra's obligations shall continue "unless the grantee agrees to assume these obligations and both EPA and NJDEP agree, in writing, to allow the grantee to assume the obligation of the grantor." (1990 Consent Decree, Section III.D). While the United States believes that its position will be upheld by the appropriate court, the United States has included the aforementioned obligations and requirements in this Proof of Claim in a protective fashion to safeguard against the possibility that Tierra will contend that it does not need to comply with such obligations and requirements, and the appropriate court finds that they are not required to do so. Therefore, a protective contingent claim is filed in the alternative for such obligations and requirements, but only in the event that the appropriate court finds that such obligations and requirements are dischargeable claims under 11 U.S.C. § 101(5), rather than obligations and requirements that Tierra must comply with. Nothing in this Proof of Claim constitutes a waiver

of any rights by the United States or an election of remedies with respect to such rights and obligations.

**F.  Claims Related to the Lower Passaic River – 8.3 Mile Stretch (Operable Unit 2)**

27.    Contamination that has discharged from the Lister Avenue Property into the Lower Passaic River, including 2,3,7,8-TCDD, has migrated within the river as a result of tidal action and river flow. Investigations have revealed that approximately 90% of the volume of contaminated sediments in the 17.4-mile stretch of the Passaic River from Dundee Dam to Newark Bay are located in the lower 8.3 miles. EPA identifies this lower 8.3 miles as Operable Unit 2.

28.    On March 4, 2016, EPA issued a Record of Decision for Operable Unit 2 selecting a remedy for the lower 8.3 miles of the Lower Passaic River. The selected remedy includes the following elements:

- an engineered cap will be constructed over the river bottom of the lower 8.3 miles;

- before the cap is placed, the river will be dredged bank-to-bank (approximately 3.5 million cubic yards) so that the cap can be placed without increasing flooding and to allow for continued commercial use of the navigation channel in the 1.7 miles of the river closest to Newark Bay;

- dredged materials will be barged or pumped to a sediment processing facility in the vicinity of the Lower Passaic River/Newark Bay shoreline for dewatering, and dewatered materials will be transported to permitted treatment facilities and landfills for disposal;

- mudflats dredged during implementation of the remedy will be covered with an engineered cap consisting of one foot of sand and one foot of mudflat reconstruction substrate;

- institutional controls will be implemented to protect the engineered cap, and New Jersey's existing prohibitions on fish and crab consumption will remain in place and will be enhanced with additional community outreach;

- long-term monitoring and maintenance of the engineered cap will be required to ensure its stability and integrity; and

- long-term monitoring of fish, crab and sediment will be performed to determine when interim remediation milestones, remediation goals, and remedial action objectives are reached.

29.     The estimated cost of the Operable Unit 2 remedy is $1.38 billion. This is not a complete project budget estimate, but an estimate prepared for purposes of remedy selection and is an appropriate estimate for the purposes of this Proof of Claim. Accordingly, the United States asserts a general unsecured claim related to Operable Unit 2 against Tierra and Maxus for $1.38 billion.

30.     In September 2016, EPA entered into an Administrative Order on Consent, CERCLA Docket No. 02-2016-2021, ("2016 Remedial Design AOC") with OCC for a Remedial Design of the Operable Unit 2 remedy. This administrative settlement requires that OCC undertake the Remedial Design under EPA oversight, including various procedures and technical analysis to produce a detailed set of plans and specifications for implementation of the Operable Unit 2 Remedial Action. EPA estimates that the Remedial Design will cost $165 million. This estimated cost is not included in the estimated cost of the $1.38 billion remedy referred to in paragraph 27 above. In the event OCC fails to implement the Remedial Design for Operable Unit 2, the United States asserts a contingent claim against Maxus and Tierra for $165 million.

## G. Claims and Contingent Claims Related to the Newark Bay Study Area (Operable Unit 3)

31.     Contamination from the Lister Avenue Property, including 2,3,7,8-TCDD, has migrated as a result of tidal action and river flow in the Lower Passaic River, including to the Newark Bay Study Area, which includes Newark Bay and portions of the Hackensack River, the

Arthur Kill, and the Kill van Kull. EPA identifies the Newark Bay Study Area as Operable Unit 3.

32.    On February 13, 2004, EPA and OCC entered into an Administrative Order on Consent to undertake a Remedial Investigation and Feasibility Study of the Newark Bay Study Area (CERCLA-02-2004-2010) ("Newark Bay AOC"). The Newark Bay AOC was amended on February 17, 2004, and again on March 18, 2010. The purpose of the Remedial Investigation and Feasibility Study is to determine the nature and extent of the contamination within the Newark Bay Study Area and to develop and evaluate remedial alternatives.

33.    EPA expects to issue a Proposed Plan identifying a preferred remedial alternative for the Newark Bay Study Area when the Remedial Investigation and Feasibility Study has been completed. After public notice and comment, EPA anticipates selecting a remedy for the Newark Bay Study Area. Due to the nature and complexity of the Newark Bay Study Area, and the stage of completion of the Remedial Investigation and Feasibility Study, it is particularly challenging for EPA to project the remedial alternatives that will be evaluated and develop cost estimates. Solely for the purposes of filing proofs of claim in this matter, EPA, subject to a number of assumptions, has estimated that a remedy that will be selected for Operable Unit 3 (not including oversight costs) will cost between $22 million and $4.4 billion. Accordingly, the United States asserts a general unsecured claim against Tierra and Maxus up to $4.4 billion for future response costs to be incurred related to Operable Unit 3.

### H.  Claims Related to the Lower Passaic River Study Area – 17.4 Mile Stretch (Operable Unit 4)

34.    Contamination from the Lister Avenue Property, including 2,3,7,8-TCDD, has migrated as a result of tidal action and river flow in the Lower Passaic River to all or part of a 17.4 mile stretch of river referred to as the Lower Passaic River Study Area. EPA identifies this

area as Operable Unit 4. This 17.4 mile stretch of river includes the lower 8.3 miles addressed

through Operable Unit 2 and extends upstream thereof to the Dundee Dam. Certain potentially

responsible parties referred to as the Cooperating Parties Group ("CPG") are presently

undertaking a Remedial Investigation and Feasibility Study of this 17.4 mile stretch of river

pursuant to an Administrative Order on Consent. CERCLA No. 02-2007-2009 ("17.4 Mile

AOC"). After completion of the 17.4 Mile AOC, EPA expects to issue a Proposed Plan that

identifies a preferred remedial alternative for the Lower Passaic River Study Area, and, after

public notice and comment, select a remedy that addresses the entire Lower Passaic River,

consisting of the contaminated sediments above River Mile 8.3 and the water column for the

entire study area. EPA has concluded that addressing the sediments of the lower 8.3 miles first

pursuant to the Operable Unit 2 remedy will be consistent with any remedy selected for Operable

Unit 3.

35.    Due to the nature and complexity of the Lower Passaic River Study Area, and the

stage of completion of the Remedial Investigation and Feasibility Study, it is particularly

challenging for EPA to project the remedial alternatives that will be evaluated and develop cost

estimates. Solely for the purposes of filing proofs of claim in this matter, EPA, subject to a

number of assumptions, has estimated that a remedy that will be selected for Operable Unit 4

(not including oversight costs) will cost between $10 million and $400 million. Accordingly, the

United States asserts a general unsecured claim against Tierra and Maxus up to $400 million for

future response costs to be incurred related to Operable Unit 4.

### I.  Contingent and Protective Claims related to Sediment Removal Action Adjacent to the Lister Avenue Property

36.    In 2008, OCC entered into an Administrative Order on Consent, Docket No.

CERCLA-02-2008-2020 ("2008 Removal AOC"), to perform a non-time-critical removal action

in the Lower Passaic River to remove approximately 200,000 cubic yards of highly contaminated sediments from the river directly adjacent to the Lister Avenue Property. Tierra also entered into the 2008 Removal AOC for limited purposes related to access. The removal action was divided into two phases. The first phase addressed 40,000 cubic yards of the most contaminated sediments, which were disposed of off-site. The first phase was completed by Tierra, on behalf of OCC, in or about 2012. The second phase, which has not been implemented, requires the removal of the remaining 160,000 cubic yards, which under the terms of the 2008 Removal AOC are to be disposed of in a Confined Disposal Facility in the vicinity of the river/Newark Bay. A decision on the siting of the Confined Disposal Facility has not been made. The United States asserts a contingent and unliquidated general unsecured claim against Tierra and Maxus for the future response costs related to the 2008 AOC in the event OCC does not to complete its obligations as required by EPA.

37.     The United States is not required to file a proof of claim with respect to Tierra's injunctive obligations to provide access under the 2008 AOC because such obligations are not claims under 11 U.S.C. § 101(5). While the United States believes that its position will be upheld by the appropriate court, the United States has included the aforementioned obligations in this Proof of Claim in a protective fashion to safeguard against the possibility that Tierra will contend that it does not need to comply with such obligations and requirements, and the appropriate court finds that it is not required to do so. Therefore, a protective contingent claim is filed in the alternative for such obligations and requirements, but only in the event that the appropriate court finds that such obligations and requirements are dischargeable claims under 11 U.S.C. § 101(5), rather than obligations and requirements that the Tierra must comply with. Nothing in this Proof

of Claim constitutes a waiver of any rights by the United States or an election of remedies with respect to such rights and obligations.

### J. Contingent and Protective Claims related to Sediment Removal Action at River Mile 10.9

38.     In 2012, EPA entered into an Administrative Agreement on Consent, Docket No. CERCLA-02-2012-2015 ("River Mile 10.9 AOC"), with the CPG requiring the performance of a time-critical removal action at a mudflat located at River Mile 10.9 of the Lower Passaic River Study Area. The removal action involved the dredging of 16,000 cubic yards of contaminated sediment and installation of a cap. This work is mostly complete, although matters relating to the long term monitoring plan must still be resolved. In addition, an area in the middle of the mudflat has not yet been dredged because of concerns relating to a high pressure water main that runs underneath. EPA has also issued a Unilateral Administrative Order, Docket No. CERCLA-02-2012-2020, ("River Mile 10.9 UAO") to OCC requiring OCC to participate and cooperate in the removal of contaminated sediment in this area. The United States asserts a contingent and unliquidated general unsecured claim against Tierra and Maxus for the future response costs related to the sediments at River Mile 10.9 in the event the CPG and/or OCC fail to complete their obligations as required by EPA under the respective administrative orders.

### K. Claims for EPA's Unreimbursed Past Response Costs

39.     As of August 31, 2015, EPA has incurred over $42.6 million investigating the Lower Passaic River Study Area and selecting a remedy for the Lower 8.3 miles. This amount does not include oversight costs that EPA has billed to parties performing work under the above referred judicial and administrative settlements including the 2016 Remedial Design AOC and 17.4 Mile AOC. Accordingly, the United States asserts a general unsecured claim against Tierra

16

and Maxus of $42.6 million for unreimbursed past response related to the Diamond Alkali Superfund Site.

L. **Natural Resource Damages Claims**

40.     CERCLA Sections 107(a) and 107(f), 42 U.S.C. § § 9607(a) and 9607(f), provide for the recovery of damages for injury to, or destruction or loss of, natural resources caused by a release of hazardous substances to the environment. Injured resources may include, but are not limited to, birds, mammals, fish, plants, and their supporting habitats. The United States, through NOAA and DOI, acting as natural resource trustees, is authorized to act on behalf of the public to recover natural resource damages, as well as the reasonable costs of assessing the injury to, or destruction or loss of, natural resources.

41.     NOAA and DOI have not yet fully calculated natural resource damages relating to releases of hazardous substances at the Diamond Alkali Superfund Site. Solely for the purposes of filing proofs of claim in this matter, the Trustees are able at this time to only partially estimate natural resource damages. This estimate is based on the interim loss only of ecological resource services attributable to contaminants within the Passaic River and Newark Bay, and not including any other portions of the Newark Bay Study Area (the Hackensack River, the Arthur Kill, and the Kill van Kull), for the period 1981 through 2036. This estimate is calculated using habitat equivalency analysis, a standard methodology commonly applied in the field of natural resource damage assessment, and is based solely on injuries to biological resources resulting from direct and indirect exposure to contaminated sediments. On that basis, the Trustees estimate that the specified natural resource damages to be at least $5.5 billion, calculated in 2017 dollars.

42.     This estimate is partial for several reasons, including but not limited to: 1) it does not address other potentially substantial categories of natural resource injuries, such as

17

recreational fishing losses and increased costs for navigational dredging; 2) it only addresses ecological loss for aquatic-dependent biota (and omits, for example, floodplain impacts); 3) it only addresses ecological loss in the Passaic River and Newark Bay, even though ecological injuries are present in a broader geographic area (e.g., Hackensack River, Kill van Kull and Arthur Kill); and 4) it only includes ecological loss through the year 2036.

43.     The Trustees damages estimation reflects procedures identified in CERCLA Natural Resource Damage regulations. 43 C.F.R. Part 11. The estimate quantifies injury based on impacts to sediment-dwelling organisms residing in contaminated sediments and to higher trophic level aquatic-dependent biota (e.g., fish and wildlife) exposed to contaminated sediments and surface water and/or to contaminated prey.

44.     Damages are calculated as the cost, adjusted for inflation, of the amount of wetland restoration necessary to compensate for quantified ecological service losses. Wetland restoration projects are anticipated to be undertaken as close as is feasible to injured areas, and costs are based on substantive wetland projects completed in the past 15 years in this general area.

45.     Accordingly, the United States asserts a general unsecured claim against Tierra and Maxus of at least $5.5 billion for natural resource damages, as well as for damages associated with those injuries listed above in Paragraph 42 that the Trustees have not yet estimated, related to the Diamond Alkali Superfund Site. In addition, the United States asserts a general unsecured claim for: NOAA's unreimbursed costs associated with assessment of natural resource damages at the site, which as of July 9, 2016, totaled $300,051; NOAA's estimated future assessment costs at the site totaling at least $10 million, and DOI's estimated future assessment costs at the Site totaling at least $10 million.

### III. CLAIMS RELATED TO THE MILWAUKEE SOLVAY COKE & GAS SUPERFUND SITE

#### A. Site Background – Description, Ownership, and Operations

46.    The Milwaukee Solvay Coke & Gas Superfund Site ("Milwaukee Solvay Site") is located at 311 East Greenfield Avenue, Milwaukee, Wisconsin. The Milwaukee Solvay Site is a former coke and manufactured gas plant. The Milwaukee Solvay Site consists of approximately 46 acres in a primarily industrial and commercial area and contaminated sediment in the Kinnickinnic River where coal tar and other contamination from facility operations came to be located.

47.    Coke and gas production took place at the Milwaukee Solvay Site for approximately 80 years, from 1902 to 1983, when the coke facility ceased operations. Portions of the Milwaukee Solvay Site have been owned and/or operated by a number of entities, including Pickands Mather & Co. ("PM-1").

48.    In Maxus's November 18, 2004, response to EPA's information request under Section 104(e) of CERCLA, 42 U.S.C § 9604, Maxus stated that it is the successor of PM-1, which owned the Milwaukee Solvay Site and operated the coke and gas facility through an unincorporated division, Milwaukee Solvay Coke Co. In January 1969, PM-1 was acquired by Diamond Shamrock Corporation through a stock acquisition. At the time of PM-1's acquisition, PM-1 already owned the Milwaukee Solvay Site and its Milwaukee Solvay Coke Co. division was operating the facility. In April 1973, PM-1 sold all of its assets to a subsidiary of Moore and McCormack Co., Inc. ("Moore and McCormack"). PM-1 subsequently changed its name to Emerald Mining Company ("Emerald"). In 1986, Emerald merged into Maxus Corporate Company, which was subsequently merged into Maxus Energy Corporation (Maxus).

49.     Following sale of the facility to the subsidiary of Moore and McCormack, the subsidiary continued to operate the facility under the name Pickands Mather & Co. ("PM-2"). PM-2 was acquired by Cleveland-Cliffs Inc. in 1986. Cleveland-Cliffs Inc. is the parent company of Cliffs Mining Company, which was the owner of record of the Site until 2003. In 2003, Water Street Holdings Co., purchased the facility from the Cliffs Mining Company. The facility is currently owned by Golden Marina Causeway, L.L.C.

### B.  Background on Environmental Contamination and Enforcement

50.     On October 25, 2001, EPA, the Wisconsin Department of Natural Resources, and the City of Milwaukee conducted a site reconnaissance to evaluate site conditions and determine potential areas for sampling. From December 10-19, 2001, EPA conducted a multimedia sampling event at the Milwaukee Solvay Site to screen for possible contamination and identify threats to human health and the environment. Based upon the results of that sampling event, EPA's contractor, Tetra Tech EM Inc., prepared a site assessment report dated May 1, 2002. The site assessment concluded that hazardous substances were located at the Milwaukee Solvay Site including inorganics (antimony, arsenic, cadmium, chromium, copper, cyanide, lead, iron, mercury), asbestos containing material (ACM), benzene, carbazole, and polynuclear aromatic hydrocarbons (PAH) such as benzo(a)anthracene, benzo(b)fluoranthene, benzo(a)pyrene, benzo(g,h,i)perylene, benzo(k)fluoranthene, chrysene, fluoranthene, indeno(1,2,3-c,d)pyrene, phenanthrene, pyrene, and other organics (dibenzofuran and naphthalene).

51.     EPA, Cliffs Mining Company, Wisconsin Wrecking Company, L.L.C., and Water Street Holdings, L.L.C., entered into an Administrative Order on Consent ("Milwaukee Solvay Removal AOC"), dated February 14, 2003, pursuant to Sections 106(a), 107 and 122 of CERCLA, 42 U.S.C. §§ 9606, 9607, and 9622.  The administrative settlement required

performance of removal actions at the Site and reimbursement of EPA's oversight costs. Work performed under the Milwaukee Solvay Removal AOC addressed four primary sources of hazardous substances: 1) asbestos containing material in structures, on piping inside and outside structures, and loose asbestos containing material located on the ground; 2) coal tar from the manufactured gas plant operations located in tanks, piping, on the ground, and in an open pit; 3) numerous above ground storage tanks and associated piping containing coal tar and other residue; and 4) other hazardous substances located throughout the Site such as drums of naphthalene crystals and oil in electrical transformers. The work required by the Milwaukee Solvay Removal AOC is now complete, and on September 3, 2005, EPA issued a Notice of Completion of On-Site Work under Order No. V-W-03-C-733.

52.    In 2007, EPA and American Natural Resources Company, Cliffs Mining Company, East Greenfield Investors LLC,  Wisconsin Electric Power Company and Wisconsin Gas LLC (d/b/a We Energies), and Maxus (collectively "Respondents") entered into an Administrative Settlement Agreement and Order on Consent for Remedial Investigation/Feasibility Study ("Milwaukee Solvay RI/FS AOC"). This administrative settlement requires Respondents to determine the nature and extent of contamination and to evaluate remedial alternatives to address any remaining threats to public health, welfare or the environment. The final Remedial Investigation Report for the Site was approved by EPA in August 2016. The Respondents to the Milwaukee Solvay RI/FS AOC have ongoing requirements to conduct the Feasibility Study for the Site under EPA and Wisconsin Department of Natural Resources oversight.

**C. Maxus's Liability**

53.     Maxus is jointly and severally liable to the United States, along with other parties, for any unreimbursed past response costs and future response costs related to the Milwaukee Solvay Site pursuant to Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(1), as an owner or operator of a facility at the time of disposal of hazardous substances or as a successor to such persons.

54.     The Milwaukee Solvay Site is a "facility" as defined in Section 101(9) of CERCLA, 42 U.S.C § 9601(9). There has been an actual and/or threatened "release" of hazardous substances from the Milwaukee Solvay Site as defined in Section 101(22) of CERCLA, 42 U.S.C § 9601(22). These hazardous substances, including inorganics (antimony, arsenic, cadmium, chromium, copper, cyanide, lead, iron, mercury), asbestos containing material (ACM), benzene, carbazole, and polynuclear aromatic hydrocarbons (PAH) such as benzo(a)anthracene, benzo(b)fluoranthene, benzo(a)pyrene, benzo(g,h,i)perylene, benzo(k)fluoranthene, chrysene, fluoranthene, indeno(1,2,3-c,d)pyrene, phenanthrene, pyrene, and other organics (dibenzofuran and naphthalene), are each a "hazardous substance" as defined in Section 101(14) of CERCLA, 42 U.S.C § 9601(14). Maxus is a "person" as defined in Section 101(21) of CERCLA, 42 U.S.C § 9601(22).

**D. Claim and Protective Claims**

55.     As of September 30, 2016, EPA has incurred $1,740,903 in unreimbursed response cost related to the Milwaukee Solvay Site, and accordingly the United States asserts a general unsecured claim against Maxus for $1,740,903 for such costs.

56.     The United States is not required to file a proof of claim with respect to Maxus's injunctive obligations under the Milwaukee Solvay RI/FS AOC, including ongoing requirements

to conduct the Feasibility Study because such obligations are not claims under 11 U.S.C.
§ 101(5). While the United States believes that its position will be upheld by the appropriate
court, the United States has included the aforementioned obligations and requirements in this
Proof of Claim in a protective fashion, to safeguard against the possibility that the Debtors will
contend that they do not need to comply with such obligations and requirements, and the
appropriate court finds that they are not required to do so. Therefore, a protective contingent
claim is filed in the alternative for such obligations and requirements, but only in the event that
the appropriate court finds that such obligations and requirements are dischargeable claims under
11 U.S.C. § 101(5), rather than obligations and requirements that the Maxus must comply with.
Nothing in this Proof of Claim constitutes a waiver of any rights by the United States or an
election of remedies with respect to such rights and obligations.

57.    At the Milwaukee Solvay Site, the Feasibility Study has not been completed, and
a Record of Decision has not been issued. Solely for the purposes filing proofs of claim, EPA has
estimated the costs of a remedy that will address both upland and sediment contamination
including the following components:

> For the Upland Remedial Alternative including remediation of upland soil and
> protection of groundwater:
>
> - Remediation of surface soil in the coke/gas facility are to 4 feet (20 acres);
> - Remediation of surface soil in other areas (26 acres) – grading of soil;
> - Hot spot removal of NAPL;
> - Engineered barrier backfill – 2 feet across Site;
> - Institutional controls to limit future use; and
> - Long-term monitoring of groundwater.
>
> Estimated cost $21 million.
>
> For the Sediment Remedial Alternative of:
>
> - Removal of near-side sediment slope to 8 feet x 50 feet wide;
> - Removal of far-side sediment slope to 8 feet x 20 feet wide; and

23

- Removal of sediment from the turn basin near the KK bridge to the turning bridge (2,000 feet).

Estimated cost for remediation of sediment is: $11 million.

Total estimated costs: $32 million.

58.     Following the completion of the Feasibility Study, the State of Wisconsin may take the lead for some of the response actions.  The United States' claim may overlap with Wisconsin's claim.[3] Thus, EPA asserts a contingent general unsecured claim of $32 million for future remedial costs at the Milwaukee Solvay Site.

## IV. DEBTOR OWNED OR OPERATED SITES

59.     Debtors have or may in the future have, environmental liabilities for their operations. Debtors also have, or may in the future have, environmental liabilities for their other properties that are part of the bankruptcy estates and/or for the migration of hazardous substances from property of the bankruptcy estates. Such real properties that are part of the bankruptcy estates include: the Lister Avenue Property; the Diamond Shamrock Kearny Plant Site at 1015 Belleville Turnpike, Kearny, New Jersey; the St. Johnsbury Trucking Site at Obrien St. and Sellers St. in Kearny, New Jersey: certain real property related to the Painesville Works Site in Painesville, Ohio, including real property related to Operable Unit 2 (Cement Plant), Operable Unit 3 (Lake Erie Eastern Bluff Area), Operable Unit 4 (Brine Ponds), Operable Unit 6 (Coke Plant), Operable Unit 7 (Settling Basin #3), Operable Unit 10 (One Acre Site Landfill), Operable Unit 14 (Settling Basin #4), Operable Unit 15 (Main Plant Area), Operable Unit 16 (Chrome Site), Operable Unit 18 (Internal Railroad Spur), Operable Unit 20 (Chrome Site Support Area)

---

[3] EPA's cost estimate is highly dependent on the selected remedial alternative and unit costs for soil/sediment volume, and excavation/transportation/disposal costs for the soil and sediment, as well as future use scenario for the upland areas of the Site.  The State of Wisconsin Department of Natural Resources has filed a Proof of Claim for remediation at the Milwaukee Solvay Site totaling $18.9 million to $26.9 million. *See* Claim # 80.

and Painesville Parcel 7A1; and the Maxus Agricultural Chemicals facility at 5421 Reichhold Rd., Tuscaloosa, Alabama.

60.     Pursuant to 28 U.S.C. § 959(b), Debtors are required to manage and operate estate property in accordance with non-bankruptcy law, including all applicable environmental statutes and regulations. Further, any reorganized debtor will be subject to liability under environmental laws with respect to any property it owns or operates. The United States is not required to file a proof of claim relating to property of the estates for response costs incurred in connection with such property after the petition date. This Proof of Claim is only filed protectively with respect to post-petition liabilities and response costs relating to property of the estates.

61.     The United States is entitled to administrative expense priority for, *inter alia,* any response costs it incurs with respect to property of the estates after the petition date. The United States reserves the right to file an application for administrative expenses and to take other appropriate action in the future with respect to property of the estates.

## V.  PROTECTIVE FILING FOR ADDITIONAL WORK OBLIGATIONS

62.     The United States is also not required to file a proof of claim with respect to any additional injunctive obligations of the Debtors to comply with work requirements and compliance obligations imposed by court orders or by environmental statutes, regulations, administrative orders, licenses, or permits, because such obligations are not claims under 11 U.S.C. § 101(5). Debtors and any reorganized debtor must comply with such mandatory requirements. The United States reserves the right to take future actions to enforce any such obligations of Debtors. While the United States believes that its position will be upheld by the appropriate court, the United States has included the aforementioned obligations and requirements in this Proof of Claim in a protective fashion, to safeguard against the possibility

that the Debtors will contend that they do not need to comply with such obligations and requirements, and the appropriate court finds that it is not required to do so. Therefore, a protective contingent claim is filed in the alternative for such obligations and requirements, to the extent not already specifically asserted above, but only in the event that the appropriate court finds that such obligations and requirements are dischargeable claims under 11 U.S.C. § 101(5), rather than obligations and requirements that any reorganized debtor must comply with. Nothing in this Proof of Claim constitutes a waiver of any rights by the United States or an election of remedies with respect to such rights and obligations.

## VI. ADDITIONAL TERMS

63.    This Proof of Claim is filed as an unsecured non-priority claim, except to the extent: (i) any rights of setoff secure the United States' claims; (ii) any secured/trust interest exists in insurance proceeds received by the Debtors on account of the United States' claims; and (iii) administrative priority exists with respect to property of the estate, post-petition violations of law, or otherwise. The United States will file any application for administrative expenses at the appropriate time. The United States' positon with respect to injunctive obligations is set forth in Part V above.

64.    This Proof of Claim is also filed to the extent necessary to protect the United States' rights with respect to any insurance proceeds received by the Debtors, and any funds held in escrow by the Debtors, in connection with the matters discussed herein.

65.    This Proof of Claim is without prejudice to any right of the United States under 11 U.S.C. § 553 to set off against this claim debts owed to Debtors by federal agencies.

66.    The United States has not perfected any security interest on its claims against the Debtors.

67.    To the extent that Debtors have established financial assurance mechanisms in favor of the United States related to any of the sites discussed above or any other sites, such monies are not property of their estate and are held for the benefit of the United States. To the extent that any court with appropriate jurisdiction determines that such funds are property of the Debtors' estates, the United States asserts a security interest in such funds.

68.    This Proof of Claim reflects certain known liabilities of the Debtors to the United States. The United States reserves the right to amend this Proof of Claim to assert additional liabilities, including but not limited to liabilities for additional costs for the matters discussed herein.

69.    Additional documentation in support of this Proof of Claim is too voluminous to attach, but is available upon request.

## VII.    TABLE: SUMMARY OF CLAIMS

70.    The following table lists/identifies all claims asserted herein. For those claims asserted herein where the amount of the claim is liquidated (past costs), or where an estimate has been provided with respect to natural resource damages or future costs, the table provides those dollar amounts. For those claims asserted herein that are not liquidated and for which there is no estimate at present, the table does not include dollar amounts.

| Sites and/or Operable Units | Past Response Costs | Future Response Costs | Natural Resource Damages (including assessment costs) |
|---|---|---|---|
| | | | |
| **DIAMOND ALKALI SITE** | | | |
| Diamond Alkali Site | | | At least $5,520,300,051 |
| OU 1: Lister Avenue Property | $9,205 (entitled to administrative expense priority) | | |
| OU 2: Lower Passaic River (8.3 miles) | $42,600,000 (for investigation of LPRSA and selection of remedy for the Lower 8.3) | $1,545,000,000 | |
| OU 3: Newark Bay and portions of Hackensack River, the Arthur Kill, and the Kill van Hill | | $22,000,000 to $4,400,000,000 | |
| OU 4: Lower Passaic River (17.4 miles) from Dundee Dam to Newark Bay | | $10,000,000 to $400,000,000 | |
| Sediment Removal Action Adjacent to Lister Avenue Property | | | |
| Sediment Removal Action at River Mile 10.9 | | | |
| Diamond Alkali Site Column Totals | $42,609,205 | $1,577,000,000 to $6,345,000,000 | $5,520,300,051 |

**Total Diamond Alkali Site Past and Future Costs and Natural Resource Damages:**

**$7,139,909,256 to $11,907,909,256**

| | | | |
|---|---|---|---|
| **MILWAUKEE SOLVAY SUPERFUND SITE** | $1,740,903 | $32,000,000 | |
| | | | |

**TOTAL PAST AND FUTURE RESPONES COST AND NATURAL RESOURCE DAMAGES:**

**$7,173,650,159 to $11,941,650,159**

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**:

ELLEN M. MAHAN
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division


s/David L. Gordon
_____

DAVID L. GORDON
Senior Counsel
(as to legal issues only)
DONALD FRANKEL
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611

CHARLES M. OBERLY, III
United States Attorney
District of Delaware

ELLEN SLIGHTS
Assistant United States Attorney
Office of the United States Attorney
1201 Market Street
Suite 1100
P.O. Box 2046
Wilmington, DE 19899-2046

Of Counsel:

Mark Barash, Esq., DOI
Kate Barfield, Esq., NOAA
Frances M. Zizila, Esq., EPA



# Electronic Proof of Claim

Adobe Sign Document History                12/15/2016

| | |
|---|---|
| Created: | 12/15/2016 |
| By: | Prime Clerk (epoc@primeclerk.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAa9O9P7xzlwzSmxyc1_M0ykGFoWZaMLys |

## "Electronic Proof of Claim" History

🗐 Widget created by Prime Clerk (epoc@primeclerk.com)
12/15/2016 - 1:51:12 PM EST

🖉 David Gordon (legal issues only) (david.l.gordon@usdoj.gov) uploaded the following supporting documents:
🖉 Attachment
12/15/2016 - 1:56:14 PM EST

🗐 Widget filled in by David Gordon (legal issues only) (david.l.gordon@usdoj.gov)
12/15/2016 - 1:56:14 PM EST- IP address: 149.101.1.119

🖉 (User email address provided through API User-Agent: Mozilla/5.0 (Windows NT 6.1; Trident/7.0; DOJ3jx7bf; rv:11.0) like Gecko)
12/15/2016 - 1:56:18 PM EST- IP address: 149.101.1.119

✅ Signed document emailed to Prime Clerk (epoc@primeclerk.com) and David Gordon (legal issues only) (david.l.gordon@usdoj.gov)
12/15/2016 - 1:56:18 PM EST