IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | Case No. 16-11501 (CSS) |
| MAXUS ENERGY CORPORATION, | ) | |
| et al., | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| MAXUS LIQUIDATING TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. Pro. No.: 18-50489 (CSS) |
| | ) | |
| YPF S.A., YPF INTERNATIONAL S.A., | ) | |
| YPF HOLDINGS, INC., CLH | ) | |
| HOLDINGS, INC., REPSOL, S.A., | ) | |
| REPSOL EXPLORATIÓN, S.A, REPSOL | ) | |
| E&P USA, INC., REPSOL OFFSHORE | ) | |
| E&P USA, INC., REPSOL E&P T&T | ) | |
| LIMITED AND REPSOL SERVICES | ) | **Related Adv. D.I. 621, 637 and 645** |
| COMPANY | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>OPINION</u>

FARNAN LLP
Brian E Farnan
Michael J. Farnan
919 North Market Street
12th Floor
Wilmington, DE  19801

-and-

WHITE & CASE LLP
J. Christopher Shore
1221 Avenue of the Americas
New York, New York 10020
Counsel for the Liquidating Trust

MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
Robert J. Dehney
Curtis S. Miller
1201 North Market Street
Wilmington, Delaware 19899

-and-

WEIL, GOTSHAL & MANGES LLP
Corey D. Berman
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131

John J. Kuster
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019

-and-

Matthew McGuire
LANDIS RATH & COBB LLP
919 N. Market Street, Suite 1800
Wilmington, Delaware 19801

        -and-

Jeffrey A. Rosenthal
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY  10006

Counsel for YPF S.A., YPF
International S.A., YPF
Holdings, Inc. and CLH
Holdings, Inc.

Counsel for Defendants Repsol, S.A.,
Repsol Exploración S.A., Repsol USA
Holdings Corp., Repsol E&P USA, Inc.,
Repsol Offshore E&P USA, Inc., Repsol
E&P T&T Limited and Repsol Services
Company

Dated: June 22, 2022

Sontchi, J. _____

2

**Table of Contents**

Introduction .......................................................................................................... 1

Jurisdiction ........................................................................................................... 4

Procedural History and Background .................................................................... 4

   A.  The Parties ..................................................................................................... 4

   B.  The History of the Diamond Alkali Superfund Site ...................................... 5

   C.  The Diamond Alkali Superfund Site Has Always Been the Primary Driver of Maxus's Environmental Obligations ........................................................... 7

   D.  Maxus Offers Itself for Sale Knowing It Faces the Potential of Material Future Environmental Expenditures ..................................................................... 10

   E.  YPF Seeks to Acquire Maxus .................................................................... 11

   F.  Trust's Allegations of a YPF Strategy ....................................................... 12

   G.  Maxus Transfers Assets to YPFI ................................................................ 16

   H.  Repsol Acquires YPF (and Maxus) ........................................................... 16

   I.  The Crescendo Transfers (1999 to 2000) .................................................. 17

   J.  The YPFI Transfers (2000 to 2002) ........................................................... 18

   K.  The NJ Litigation Commences ................................................................... 18

   L.  The EPA's 2007 Draft FFS Makes Clear that a Large-Scale, Active Remediation at the DASS is Expected .......................................................................... 19

   M. Settlement Agreements ............................................................................... 19

   N.  The Second YPF Period: Project Jazz and the Run Up to the Chapter 11 Cases ... 20

   O.  The Chapter 11 Cases ................................................................................. 21

Analysis .............................................................................................................. 22

   A. Standard of Review ...................................................................................... 22

Trust's Motion for Summary Judgment ............................................................. 26

   A. Damages ....................................................................................................... 26

       i.  The Theory That Applies to Alter Ego Damages Is a Matter of Law Suitable for Disposition on Summary Judgment .................................... 28

       ii.  It is Premature to Decide the Quantum of Damages Before Alter Ego Liability ............................................................................................ 38

   B.  Fraudulent Transfers .................................................................................... 41

       i.  Actual Fraudulent Transfers ................................................................. 41

       ii.  "Transfers" of "Interests" of the Debtors in "Property" ..................... 42

          a.  Repsol's Good Faith Defense ........................................................ 44

          b.  Collapsing Defendants and Transactions ...................................... 47

          c.  Imputing Intent .............................................................................. 47

       iii. Badges of Fraud ................................................................................... 49

          a.  Badge 1: Were the Transfers Made to Insiders? ........................... 50

             1.  Repsol ...................................................................................... 51

             2.  YPF ......................................................................................... 52

          b.  Badge 2: Did the Debtors Retain Possession or Control of the Property Transferred After the Transfers? ....................................... 54

             1.  Repsol ...................................................................................... 54

2. YPF.................................................................................................. 55
c. Badge 3: Were the Transfers or Obligations Disclosed or Concealed? 55
d. Badge 4: Before the Transfers Were Made or Obligations Were Incurred, the Debtors Were Sued or Threatened with Suit.................................... 58
1. Repsol............................................................................................ 58
2. YPF.................................................................................................. 59
e. Badge 5: Were the Transfers of Substantially All the Debtor's Assets? 60
1. Repsol............................................................................................ 61
2. YPF.................................................................................................. 61
f. Badge 7: Did the Debtors Remove or Conceal Assets?.......................... 61
g. Badge 8: Was the Value of the Consideration Received by the Debtors Not Reasonably Equivalent to the Value of the Assets Transferred or the Amount of the Obligations Incurred?...................................................... 62
h. Badge 9: Were the Debtors Insolvent or Did the Debtors Become Insolvent Shortly After the Transfers Were Made or the Obligations Were Incurred?................................................................................................ 64
i. Badge 10: Did the Transfers Occur Shortly Before or Shortly After a Substantial Debt Was Liquidated? ........................................................... 64
iv. Conclusion ................................................................................................... 64
C. Defenses.................................................................................................................. 65
**Defendants' Cross Motions for Summary Judgment ....................................................... 71**
A. Whether the Actual Fraudulent Transfer Claims Fail Under the Legitimate Supervening Purpose Test as a Matter of Law ......................................................... 71
B. Whether the Collapsing Doctrine Is Inapplicable as a Matter of Law to the Trust's Actual Fraudulent Transfer Claims.......................................................................... 77
C. Whether the Constructive Fraudulent Transfer Claims are Time Barred or Extinguished ............................................................................................................. 95
i. Whether the Constructive Fraudulent Transfer Claims Fail Even If *Tronox II* Collapsing Is Applicable............................................................................. 96
ii. Whether the EPA or the States of Ohio or Wisconsin Can Serve as Triggering Creditors Under 11 U.S.C. § 544(b) ........................................... 98
iii. Whether the EPA or the States of Ohio or Wisconsin Are Subject to a Statute of Repose ....................................................................................... 100
a. EPA................................................................................................. 102
b. State of Ohio................................................................................... 104
c. State of Wisconsin ......................................................................... 106
iv. Whether the EPA's Constructive Fraudulent Transfer Claims Were Tolled Up to and Including the Petition Date ...................................................... 108
D. Whether Repsol is the Alter Ego of Maxus ......................................................... 112
i. Piercing the Corporate Veil..................................................................... 112
a. Dominion and Control ................................................................... 113
b. Fraud and Injustice ........................................................................ 120
ii. Sequential Veil Piercing........................................................................... 122

iii. Discrete Transactions vs. Strategy ............................................................... 126

E. Repsol Has Not Rebutted Maxus's Case-in-Chief on Fraudulent Transfers ....... 126

    i.   Counts II and III Assert the "Strategy" Against All Defendants ............. 127

    ii.  Counts XIV-XV Regarding the 2001-2002 YPFI Transactions ................. 128

        a.  Transfers "By a Debtor" .......................................................................... 128

        b.  Extraterritorial ...................................................................................... 129

    iii. Crescendo Transfer and Reasonably Equivalent Value ........................... 132

    iv. Settlement Agreements .................................................................................... 134

F. The Claims for Unjust Enrichment and Civil Conspiracy Must Go To Trial ...... 139

    i.   Time-Barred .................................................................................................... 139

    ii.  Unjust Enrichment Claim .............................................................................. 139

    iii. Civil Conspiracy ............................................................................................. 141

**Conclusion** .............................................................................................................................. **144**

# INTRODUCTION

The Maxus Liquidating Trust (the "Trust" or the "Plaintiff"), which is the successor in interest to Maxus Energy Corporation filed a 23-count complaint against YPF S.A. and numerous of its affiliates and Repsol, S.A. and numerous of its affiliates.[1]

Before the Court are three motions (i) *Plaintiff's Motion for Partial Summary Judgment on Counts I, IV, VI, VIII, X, XII, and XIV*[2] *of the Complaint and Related Affirmative Defenses*[3] and the responsive documents thereto;[4] (ii) *YPF Defendants' Cross Motion for*

---

[1] *See* Adv. D.I. 1 (Compl.).  The Complaint contains 20 claims for avoidance of fraudulent conveyances under the theories of both actual and constructive fraud, the remaining counts are for alter ego liability, unjust enrichment and civil conspiracy.

[2] The Trust inadvertently added Count II in a parenthetical defining the 1996-1997 Transfers (defined *infra*) and then repeated this mistake in the title and conclusion of its Motion. *See* Adv. D.I. 701 (Trust Reply) at p. 46.  For the avoidance of doubt, the Trust has not moved for summary judgment on Count II of its Complaint.

[3] Adv. D.I. 621 ("Plaintiff's Motion"), Adv. D.I. 622 (Memorandum of Law in Support of Plaintiff's Motion); Adv. D.I. 623 (Statement of Undisputed Facts in Support of Plaintiff's Motion); and Adv. D.I. 624 (Declaration of Erin M. Smith in Support of Plaintiff's Motion) (the "Smith Decl.").

[4] Adv. D.I. 640 (Repsol Defendants Opposition to Plaintiff's Motion for Partial Summary Judgement on Counts I, II, IV, VIII, X, XII and XIV); Adv. D.I. 641 (Repsol Defendants Responses to the Statement of Undisputed Facts in Support of Plaintiff's Motion for Partial Summary Judgement and Counterstatement of Undisputed Material Facts) ("Repsol CSOF"); Adv. D.I. 642 (YPF Defendants' Memorandum of Law in Opposition to the Trust's Motion for Partial Summary Judgment); Adv. D.I. 643 (YPF Defendants' Response to Plaintiff's Statement of Undisputed Facts in Support of Plaintiff's Motion for Partial Summary Judgment); Adv. D.I. 644 (Declaration of Charity E. Lee in Support of YPF Defendants' Response to Plaintiffs Statement of Undisputed Facts) (the "Lee Decl."); Adv. D.I. 700 (Plaintiff's Responses and Objections to Repsol Defendants' Affirmative Statement of Undisputed Material Facts) ("Trust RCSOF"); Adv. D.I. 701 (Plaintiff's Omnibus Reply in Support of Its Motion for Partial Summary Judgment); Adv. D.I. 702 (Plaintiff's Reponses and Objections to YPF Defendants' Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment and Counterstatement of Undisputed Facts in Opposition to the Trust's Motion for Partial Summary Judgment) ("Trust YPFCSOF"). Simultaneously, Repsol and YPF each filed their own cross-motions for summary judgment (*see* Adv. D.I. 637, 638, 645, 648, and 672) (collectively, the "Cross-Motions").  Subsequently, Plaintiff filed The Trust's Response to the YPF Defendants' Sur-Reply to the Trust's Motion for Summary Judgment (the "Sur-Sur Reply") (Adv. D.I. 726); and the Declaration of Brett Bakemeyer in Support of Plaintiff's Response to the YPF Defendants' Sur-Reply to the Plaintiff's Motion for Summary Judgment (the "Bakemeyer Decl.") (Adv. D.I. 727).

*Summary Judgment*[5] and the responsive documents thereto;[6] and (iii) *Repsol Defendants'*

*Motion for Summary Judgment*[7] and the responsive documents thereto[8] (collectively, the

"Motions").  The Court heard oral argument on the Motions on June 13, 2022.[9]

The Trust's Motion seeks partial summary judgment on three issues: (i) the

measure of damages (not liability) with regard to the Trust's alter ego claims; (ii) certain

elements of the Trust's actual fraudulent transfer claims, i.e., the transfers each involved

"transfers" of "interests" of the "Debtors" in "property," as well as certain badges of

---

[5] Adv. D.I. 645 ("YPF's Motion"); Adv. D.I. 672 (Corrected Memorandum of Law in Support of YPF's Motion); Adv. D.I. 646 (YPF Defendants' Affirmative Statement of Undisputed Material Facts); Adv. D.I. 652, 655, 656, 658, and 659 (the Declaration of Andrew P. Propps in Support of YPF Defendants' Motion for Partial Summary Judgment) (the "Propps Decl.").

[6] Adv. D.I. 701 (Plaintiff's Omnibus Reply); Adv. D.I. 698 (Plaintiff's Memorandum of Law in Opposition to YPF's Motion for Summary Judgment); Adv. D.I. 702 (Plaintiff's Responses and Objections to YPF Defendants' Affirmative Statement of Undisputed Material Facts); Adv. D.I. 703 (Declaration of Jade H. Yoo) (the "Yoo Decl."); Adv. D.I. 720 (YPF Defendants Reply in Support of Their Cross-Motion for Partial Summary Judgment); Adv. D.I. 722 (Supplemental Declaration of Andrew P. Propps).  Along with its reply papers, YPF also filed a Motion Pursuant to L.B.R. 7007-2(b)(ii) Requesting the Court Not Consider a Portion of the Trust's Reply and, Should It Decline to Do So, for Leave to File a Sur-Reply to the Trust's Motion for Partial Summary Judgment (Adv. D.I. 721). The Court granted this Motion on June 9, 2022.  *See* Adv. D.I. 725.  Thereafter, the Trust filed the Sur-Sur Reply, Adv. D.I. 726 (Trust's Response to the YPF Defendants' Sur-Reply to the Trust's Motion for Summary Judgment); and Adv. D.I. 727 (the Declaration of Brett Bakemeyer in Support of Plaintiff's Response to the YPF Defendants' Sur-Reply to the Plaintiff's Motion for Summary Judgment).  The Plaintiff and Repsol each filed their own cross-motions for summary judgment (*see* Adv. D.I. 621, 623, 624, 637, and 638).

[7] Adv. D.I. 637 ("Repsol's Motion"), Memorandum of Law in Support of Repsol's Motion (Adv. D.I. 638); Repsol Defendants' Affirmative Statement of Undisputed Material Facts (Adv. D.I. 639); and the Declaration of Edward Soto in Support of Repsol Defendants' Motion for Partial Summary Judgment (Adv. D.I. 649, 650, 651, 653, and 654) (the "Soto Decl.").

[8] Adv. D.I. 701 (Plaintiff's Omnibus Reply); Adv. D.I. 697 (Plaintiff's Memorandum of Law in Opposition to Repsol's Motion for Summary Judgment); Adv. D.I. 700 (Plaintiff's Responses and Objections to Repsol Defendants' Affirmative Statement of Undisputed Material Facts); Adv. D.I. 703 (Declaration of Jade H. Yoo); Adv. D.I. 716 (Repsol Defendants' Reply Memorandum of Law in Support of Motion for Summary Judgment); Adv. D.I. 717 (Repsol Defendants' Reply in support of Affirmative Statement of Undisputed Material Facts; and Adv. D.I. 718 (Declaration of Edward Soto in Support of Repsol Defendants' Motion for Summary Judgment).  The Plaintiffs and YPF each filed their own cross-motions for summary judgment (see Adv. D.I. 621, 623, 624, 645, and 648).

[9] Bankr. D.I. 2509 (Tr. of Hr'g June 13, 2022), hereinafter referred to as "Hr'g Tr. page:line."

fraud; and (iii) Defendants' affirmative and other defenses. As set forth below, the Court finds that it is premature to rule on the damages portion of the alter ego claim, there are genuine issues of material fact as to whether the transfers were "property" of the "Debtors" and as to various badges of fraud; and the Trust has not established an absence of material disputed facts regarding Defendants' affirmative and other defenses.

YPF's Motion reads like an opposition because many arguments are made in defense to the issues raised by the Trust's Motion.[10] The issues YPF seeks partial summary judgment on are: (i) the applicability of the collapsing doctrine; (ii) statute of limitations for constructive fraudulent transfer claims; (iii) the legitimate supervening purpose test for actual fraudulent transfer claims; and (iv) the damages portion of the Trust's alter ego claim. As set forth below, YPF's Motion will be granted, in part, and denied, in part. More specifically, the Court will grant YPF partial summary judgment on the causation theory of damages. The Court will deny summary judgment on the remainder of YPF's Motion because the Court finds that there are material disputes of fact that prevent summary judgment on the remainder of issues raised by YPF.

---

[10] For example, with respect to the Trust's actual fraudulent transfer claims, YPF dedicates a significant portion of its Motion to arguing that certain badges of fraud enumerated in the Delaware Uniform Fraudulent Transfer Act ("DUFTA"), 6 Del. C. § 1304, *et seq.*, rest on material facts in dispute (such as reasonably equivalent value and insolvency) or that summary judgment on these badges should be granted in its favor, despite acknowledging the factual nature of this inquiry. *See* Adv. D.I. 672 (YPF Mot.) at p. 59 ("[T]o the extent the Court accepts the Trust's position that it can weigh the evidence notwithstanding its fact-intensive nature (with which, to be clear, the YPF Defendants disagree), summary judgment … in favor of the YPF Defendants is appropriate."). These are the same badges of fraud that the Trust raised in its Motion (other than badges 6 and 11, which the Trust deemed "not relevant"). *See* Adv. D.I. 622 (Trust Mot.) at p. 46 n. 49.

Repsol seeks summary judgment on the following: (i) that the alter ego claim against Repsol is legally meritless; (ii) that the Plaintiff cannot rely on the collapsing doctrine to extend the statute of limitations for its Fraudulent Transfer claims; (iii) that the Plaintiff's claims for fraudulent transfer fail as a matter of law; and (iv) that the Plaintiff's unjust enrichment and civil conspiracy claims also fail.  As set forth below, the Court finds that there are material disputes of fact that prevent summary judgment on any issue raised by Repsol.

## JURISDICTION

This Court has jurisdiction over this matter, pursuant to 28 U.S.C. § 1334.   Venue is proper in this District, pursuant to 28 U.S.C. §§ 1408 and 1409.

## PROCEDURAL HISTORY AND BACKGROUND[11]

### A.  The Parties

Plaintiff, the Trust, was created on July 14, 2017 (the "Effective Date"), upon consummation of the Amended Plan (defined within).  At that time, the Trust succeeded to ownership of all of the assets, including claims and causes of action, of Maxus Energy Corporation ("Maxus"), Tierra Solutions, Inc. ("Tierra"), Maxus International Energy Corporation ("MIEC"), Maxus (U.S.) Exploration Company ("MUSE"), and Gateway Coal Company ("Gateway") (collectively, the "Debtors").  Defendant YPF S.A. ("YPF") is an oil and gas company formed under the laws of Argentina and is the sole shareholder

---

[11]  Although the Court attempted to distill the relevant facts necessary to making its decision, this Adversary Proceeding is compiled of a myriad of facts, places, and people, much of which is not disputed. The Court refers to the statements of facts submitted by the parties liberally and people, places, and events not defined herein shall have the meaning ascribed to them by the parties in their respective pleadings. *See, e.g.*, Adv. D.I. 623, 639, 641, 643, 646, 699, 700, 702, and 717.

4

of subsidiaries YPF International, S.A. ("YPFI"), YPF Holdings, Inc. ("YPFH"), and CLH Holdings, Inc. ("CLHH") (together with YPF the "YPF Defendants" or "YPF"). Defendant Repsol, S.A. ("Repsol") is an oil and gas company formed under the laws of Spain and is the sole shareholder of subsidiaries Repsol Exploración, S.A., Repsol USA Holdings Corp., Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc., Repsol E&P T&T Limited, and Repsol Services Company (together with Repsol the "Repsol Defendants" or "Repsol," and together with YPF, the "Defendants").

**B. The History of the Diamond Alkali Superfund Site**

Diamond Alkali Company operated a manufacturing facility at 80 and 120 Lister Avenue in Newark, New Jersey ("Lister Site") from March 1951 to August 1969 and discharged dichlorodiphenyltrichloroethane ("DDT") and dioxins into the Passaic River during this time.  In 1967, Diamond Alkali Company merged with Shamrock Oil & Gas Company to become Diamond Shamrock Corporation ("DSC").[12]  DSC "was a large diversified corporation, with multiple divisions engaged in different businesses, including chemicals manufacturing, coal production, oil and gas exploration, and petroleum refining."[13]

In 1983, DSC became a wholly-owned subsidiary of a newly-formed entity named New Diamond Corporation.  New Diamond Corporation then changed its name to DSC

---

[12] *N.J.D.E.P. v. Occidental Chem. Corp. et al.*, No. L9868-05 (N.J. Super. Ct. Mar.13, 2012) ("Maxus's NJ Material Facts").

[13] *Id.* ¶ 1.

in 1983, and the old DSC changed its name to Diamond Shamrock Chemicals Company ("DSCC").  DSC changed its name to Maxus in 1987.

DSC (which would later become Maxus) sold DSCC to Oxy-Diamond Alkali Corporation (which would later become Occidental Chemical Corporation "OCC"), a subsidiary of Occidental Petroleum Corporation ("OPC").  Under the SPA, as defined below, Maxus agreed to indemnify Oxy-Diamond Alkali Corporation, among other entities, for certain liabilities related to the Lister Site and other Inactive Sites of DSCC, which included the Lister Site.

OPC's due diligence in connection with the SPA, "included a thorough review of environmental issues and liabilities, which involved examinations of environmental permits, hazardous waste manifests, correspondence with regulators, and remediation cost estimates for DSCC active and inactive sites."[14] "At the time of the acquisition, OCC knew that DSCC had discharged hazardous pollutants into the Passaic River, that the federal and state governments had required cleanup of the [Diamond Alkali Superfund Site ('DASS')], and that an investigation of the Passaic River's environmental contamination was underway and could result in future cleanup."[15]

---

[14] Maxus's NJ Material Facts at ¶ 147.

[15]  Adv. D.I. 653 (Soto Decl.), Ex. 151 (New Jersey Order & Opinion Granting Repsol's Mot. Summ. J. on its Spill Act Contrib. Countercl. Against OCC, Oct. 19, 2017) at 1-2; Adv. D.I. 651 (Soto Decl.), Ex. 150 (1986 SPA § 9.03 (discussing governmental and third party claims for natural resource damage)), Adv. D.I. 651 (Soto Decl.), Ex. 150 (1986 SPA at Schedule 2.07 (listing DASS as a Superfund site)).

After the SPA was executed, "DSCC was . . . merged into the OCC entities, and ultimately into [OCC]."[16]  OCC therefore became the successor to DSCC, an entity that polluted the Passaic River.[17]  DSCC sold the Lister Site in 1971.[18]

## C. The Diamond Alkali Superfund Site Has Always Been the Primary Driver of Maxus's Environmental Obligations

Environmental liabilities have long been the centerpiece of the story of Maxus.  At all relevant times, Maxus has been subject to massive existing and future legacy environmental liabilities, both as owner of various non-productive industrial properties across the United States, and as an obligor on account of indemnification obligations it undertook to OCC, pursuant to a 1986 Stock Purchase Agreement ("SPA").  By that SPA, OCC acquired Maxus's (then known as Diamond Shamrock Corporation) active chemical business, and Maxus contractually obligated itself to defend and to indemnify OCC for liabilities arising out of environmental contamination at chemical sites around the country.  As noted, while Maxus has environmental liabilities at multiple sites across the United States, the primary driver of those liabilities has always been the DASS in New

---

[16]  Adv. D.I. 653 (Soto Decl.), Ex. 152 (Hr'g on Mot. Partial Summ. J., No. L-9868-05, 237:7-8 (July 19, 2011) (Lombardi, J.)).

[17]  Adv. D.I. 653 (Soto Decl.), Ex. 153 (Hr'g on Mot. Partial Summ. J., No. L-9868- 05, 218:4-9 (July 15, 2011) (Lombardi, J.)) ("I also think it's not in dispute that old Diamond Shamrock and DSCC as the alleged successor, that they are considered a discharger. It's not in dispute that they did dump or spill or pour hazardous substances, toxic substances, into the waters of the State, into the Passaic River"); Adv. D.I. 653 (Soto Decl.), Ex. 152 (Hr'g on Mot. Partial Summ. J., No. L-9868-05, 244:7-11 (July 19, 2011) (Lombardi, J.)) ("So I am going to enter an order that OCC is as the undisputed legal, you know, successor by merger with DSCC, that they are responsible for the liabilities of the original Diamond Shamrock Corporation.").

[18]  Adv. D.I. 649 (Soto Decl.), Ex. 3 (USEPA, Record of Decision for the Lister Site (Sept. 30, 1987) MAXUS0693092 – MAXUS0693299 at MAXUS0693112). DSCC did not reacquire 120 Lister Avenue until January 27, 1984 and 80 Lister Avenue until February 7, 1986. Adv. D.I. 649 (Soto Decl.), Ex. 4 (Contract for Sale of Real Estate for 120 Lister Avenue, MAXUS0399722 – MAXUS0399726); Adv. D.I. 649 (Soto Decl.), Ex. 5 (Affidavit of Title for 80 Lister Avenue, MAXUS3099157 – MAXUS3099158).

Jersey.  This is because, decades ago, the manufacturing of Agent Orange and other chemicals at the Lister Site, which is adjacent to the Passaic River in Newark, New Jersey, caused the sediments in the river to be among "the most highly dioxin-contaminated in the nation."  Following the U.S. Environmental Protection Agency's ("EPA") discovery of dioxin contamination at the Lister Site in 1982, the EPA ordered Maxus's predecessor (Diamond Shamrock Corporation) to take immediate measures to prevent the migration of contamination in 1983.  In 1984, the EPA placed the Lister Site and surrounding areas on the Superfund National Priorities List, commonly considered the most hazardous or the most dangerous Superfund sites in the country, making it eligible for remediation under EPA's CERCLA authority.[19]  The DASS has since been expanded and divided for remediation purposes into several operable units ("OUs"), including along the Passaic River and into Newark Bay.  All of the experts in this case generally acknowledge that: (1) under CERCLA, persons responsible for the release of hazardous substances can be held jointly and severally liable for all the associated investigation and cleanup costs, and (2) remediation of contaminated sites under CERCLA typically involves several steps, each of which can take years: a remedial investigation ("RI") to determine and characterize the nature of the site and the contamination; an assessment of the human and ecological risks posed by the contamination; a feasibility study ("FS") to evaluate remedial technologies and potential remedial alternatives and technologies and identify a preferred alternative; and, ultimately, the formal selection of the chosen remedy in a

---

[19] "CERCLA" is the Comprehensive Environmental Response, Compensation, and Liability Act of 1980.

record of decision ("ROD").  The remedial options available for contaminated sediments generally include passive remedies (no action or monitored natural recovery) and active remedies (including capping, dredging, or a combination of dredging and capping). Following issuance of a ROD, the selected remedy is designed and implemented. CERCLA also authorizes damages for injury to natural resources, which requires its own investigatory and decision-making process.  Over the past thirty years, the DASS has plodded through the CERCLA investigation and remediation stages, including, among other things: the 1994 issuance of an administrative order on consent ("AOC"), pursuant to which OCC agreed to carry out an RI/FS; the 2002 expansion of the study area to cover a 17-mile stretch of the Passaic River and Newark Bay; a multi-agency work group's February 2006 presentation that evaluated several dredging scenarios, including bank-to-bank dredging of 10 million cubic yards of sediment at a cost of $1.2 billion; and the June 2007 EPA release of a draft Focused Feasibility Study ("FFS") that outlined several alternatives for remedial action in the Lower 8 Miles of the Lower Passaic River, including extensive dredging and capping, with estimated costs from $900 million to $2 billion. Ultimately, on March 3, 2016, just months before the Debtors filed for bankruptcy protection, the EPA published the ROD for the Lower 8.3 Miles of the Lower Passaic River (OU2), which selected a final remedy that required dredging approximately 3.5 million cubic yards of sediment and installing an engineered cap over the river bottom of the lower 8.3 miles for an estimated cost of $1.3 billion.  Investigation and remedy selection, including the ongoing evaluation of natural resource damages, continues today in other

OUs of the Passaic River and Newark Bay.  At all times relevant to the Trust's claims

against YPF and Repsol, Maxus (like its predecessor) and other Debtors have accepted

legal responsibility for the investigation and remediation costs at the DASS, pursuant to

CERCLA.

**D. Maxus Offers Itself for Sale Knowing It Faces the Potential of Material Future Environmental Expenditures**

In 1995, prior to the close of the YPF acquisition of Maxus, Maxus was one of the

largest independent oil and gas exploration and production companies in the United

States with an asset value of approximately $2.9 billion, total long-term debt of

approximately $858 million, other liabilities and adjustments of $1.2 billion, and an

implied equity value of approximately $860 million.  In early 1995, in connection with the

YPF due diligence process, Maxus openly acknowledged its responsibilities for

remediation expenses at the DASS.  But, as set forth below, management represented to

YPF's attorneys that they believed (1) contaminated sediments in the Passaic River would

not be dredged and (2) Maxus's potential liability arising out of the contamination in the

river ranged from just $14 million to $18 million.  But Maxus's own internal files at that

time contained several years' worth of internal documents—created both by Maxus

personnel and by outside consultants—reflecting an awareness that dredging or a similar

large-scale active remedy could be pursued at the site at a cost of hundreds of millions or

even billions of dollars.

### E. YPF Seeks to Acquire Maxus

Hoping to gain a toehold in the U.S. oil and gas markets,[20] and unaware of the full extent of Maxus's own environmental assessments, YPF agreed to purchase Maxus through a leveraged buyout ("LBO") on February 28, 1995.[21]  In April 1995, YPF reshaped Maxus's board and installed YPF-approved directors.

YPF itself conducted only limited environmental due diligence at the time, and YPF senior management have acknowledged that YPF had little, if any, familiarity with U.S. environmental liabilities and their associated financial risk.

Only after the Merger Agreement closed did YPF conduct actual, meaningful diligence into the range of Maxus's environmental liabilities at the DASS.

Preliminary data from the summer of 1995 identified exceedingly high levels of dioxin contamination in the Passaic River as well as evidence that the contaminated sediments were being disturbed and moved within the river (a phenomenon known as "scour").  Maxus management and YPF's advisors understood that the evidence of sediment migration might cause the imposition of interim remedies by the EPA in order to contain the problem.  In November 1995, Maxus received the preliminary results of an engineering evaluation/cost analysis study ("EE/CA") performed by a recognized consultant in the industry, EA Engineering, Science, and Technology ("EA"), laying out

---

[20]  At the time of its acquisition of Maxus, YPF was operating solely in Argentina.

[21]  Maxus initially rejected but then ultimately accepted a higher YPF offer of $5.50 per share, contingent on Maxus's absorbing a portion of the acquisition financing.  Maxus's independent directors all voted to accept YPF's offer, and after a YPF subsidiary ("YPFA") acquired Maxus's shares, the new Maxus board (including three pre-YPF legacy members) approved the acquisition.  This LBO was contingent on a "Keepwell Covenant" under which YPF agreed to provide Maxus up to $425 million over nine years.

11

what an interim remedy might cost.  The EE/CA described that, should the EPA require

the dredging and incineration of contaminated sediment in just four areas of the river

("hot spots"), the cost of even that limited interim remedy could be as high as $2.74

billion.  In November 1995, Maxus concluded the 1995 data showed the "scour" was

limited, while the feasibility of a remedy was "very questionable."  EA's June 1996 draft

EE/CA concluded no action was the best option for the "hot spots," and confirmed the

dredging and treatment option (now estimated to be $682 million) faced feasibility

hurdles that were likely difficult to overcome.  However, at the high end, with the

EA/CA, YPF was facing a total wipeout of its investment within a few months of its stock

purchase.

### F.  Trust's Allegations of a YPF Strategy[22]

Although it is undisputed that beginning in 1996 YPF began to transfer some of

Maxus' oil and gas assets, the Trust alleges that the transfers were a "strategy" to rob

Maxus's creditors of assets; YPF alleges that such transfers were for tax[23] and corporate

reasons (the "Global Restructuring").

The Trust contends that all the alleged fraudulent transfers are part of a single,

integrated scheme.  Using the Trust's framing of the issue, the question raised by this

dispute is "how does one appropriately run a business with productive assets, short-term

_____

[22] Although this discussion appears in the Court's fact section, the facts discussed are contested.  The facts herein encompass the Trust's *allegations*, not undisputed facts.

[23] *See* Adv. D.I. 642 (YPF Opp.) at pp. 10-14.  Although YPF's discussion of the history and its decision making is important to the impending trial, for the purposes of this Opinion, the only discussion necessary is that there is an intense factual inquiry that the trial court will have to make about the Defendants' intent.

funded debt, and long-tailed environmental liabilities that will destroy the business when they come to fruition?"[24]   The Trust is confident that YPF and Repsol's management of Maxus was inappropriate for a business with long-term environmental liabilities.  Not only was it inappropriate but, according to the Trust, it was a coordinated, fraudulent scheme to strand Maxus's environmental creditors.

The Trust alleges that, soon after YPF acquired Maxus and realized the potential extent of Maxus's environmental liabilities, it orchestrated a "strip-and-strand" scheme. In other words, the Trust alleges that YPF "stripped" Maxus of all its valuable assets by transferring those assets to insiders or affiliates of YPF in an attempt to "strand" Maxus's environmental creditors.  Next, after Repsol acquired YPF in 1999 and subsequently grasped the potential catastrophic extent of Maxus's environmental liabilities, Repsol continued or ratified YPF's scheme, thereby transferring Maxus's remaining valuable assets in an attempt to further separate assets from environmental liabilities.  YPF came back into the picture after Repsol's interest in YPF was expropriated by the Argentine government in 2012.  At that point, YPF picked up where it left off and continued to act in furtherance of the scheme by orchestrating "Project Jazz" with its attorneys at Chadbourne & Parke, LLP ("Chadbourne & Parke").  The Trust continues that this Strategy included running the statute of limitations on fraudulent transfer claims, thereby fully ensuring that Maxus's environmental creditors could not seek to avoid the prior transfers.  Project Jazz, according to the Trust, was informed by the *Tronox II* decision,

---

[24]  Adv. D.I. 701 (Trust Reply) at p. 2.

and culminated in the Debtors' Chapter 11 bankruptcy with a pre-negotiated settlement and release that would have released the YPF Defendants from liability for fraudulent transfers and alter ego[25] (collectively, the Trust refers to this series of events as the "Strategy").  Had things gone according to the Defendants' Strategy, they would have obtained the benefits from all the transfers, any fraudulent transfer claims would be statutorily time-barred, and they would have no exposure for Maxus's environmental liabilities.

At oral argument, counsel for the Trust relied on five primary documents which it argues prove the existence of the Strategy:

> (1) In November 1995, Maxus received the preliminary results of an engineering evaluation/cost analysis study ("EE/CA") performed by a recognized consultant in the industry, EA Engineering, Science, and Technology ("EA"), laying out what an interim remedy might cost.  The EE/CA described that, should the EPA require the dredging and incineration of contaminated sediment in just four areas of the river ("hot spots"), the cost of even that limited interim remedy could be as high as $2.74 billion.[26]

> (2) The sampling results—along with their severe potential regulatory and financial consequences—were fully debated at a November 1995 meeting attended by, among others, senior Maxus environmental personnel and several of YPF's attorneys at Andrews & Kurth.[27]

> (3) Only after the Merger Agreement closed did YPF conduct actual, meaningful diligence into the range of Maxus's environmental liabilities at the DASS.  In a June 1995 memo, written days after the close of the acquisition, Mr. Peacock

---

[25] *See* Bankr. D.I. 300 at Ex. A.

[26] Adv. D.I. 624 (Smith Decl.), Ex. 110.

[27] Adv. D.I. 624 (Smith Decl.), Ex. 107.

(having just visited the environmental sites in New Jersey) informed Nells Leon (replacement CEO of YPF after Mr. Estenssoro's death):

> First, the problem is not primarily a legal problem; it is a scientific/engineering problem with a significant legal component. What I mean is that big money is associated with the results of the scientific battles, not the legal battles, at least not now . . . . Second, there are no laws that we can consult that will tell us how much those cleanups will cost or even what we have to do . . . . The risks are not easily quantifiable, and unquantifiable risks have a high price."

During a February 2010 interview of Mr. Peacock by Kirkland & Ellis LLP ("K&E") (counsel to both YPF and Repsol in the NJ Litigation), Mr. Peacock stated that "YPF felt that it was 'sandbagged by Maxus' because Maxus did not fully disclose its environmental liabilities." Mr. Peacock further recalled that, Andrews & Kurth "were just trying to come to an understanding of what these liabilities were and to put them into a 'breadbox'" and stated, "[i]n valuing this stuff, who the f*ck knows."[28]

(4) Meeting notes from an August 1995 strategy session show that Maxus and its consultants identified an interim capping remedy as a potential option to allow EPA to select No Action for the final remedy in a ROD, even while recognizing that the dioxin contamination was a "lingering issue that does not truly have an end."[29]

(5) "Draft Engineering Evaluation/Cost Analysis Document, Passaic River Study Area, Newark, New Jersey," dated May 1996.[30]

---

[28] *See* Adv. D.I. 624 (Smith Decl.) Ex. 106.

[29] Adv. D.I. 624 (Smith Decl.), Ex. 108.

[30] Adv. D.I. 702 (Yoo Decl.), Ex. 17.

The Trust states that the *absence* of documents is also telling.   There are no documents analyzing the tax benefits from the alleged Tax Restructuring.  Meaning, there is no analysis or spreadsheet explaining the benefits or risks of any "Tax Restructuring," which was YPF's asserted legitimate business reason for the 1996-1997 Transfers.[31]

## G.  Maxus Transfers Assets to YPFI

Maxus sold its international assets to YPFI, pursuant to the Maxus Tax Department plans. The first transfers occurred as of July 1, 1996 and involved the sale of Maxus's Bolivian and Venezuelan assets to YPFI.  The second transfers involved the sale of Maxus's Indonesian and Ecuadorian assets to YPFI as of December 31, 1997 (collectively, the "1996-1997 Transfers").  Maxus received $1.0269 billion for its international assets.[32]

YPF and Maxus reported these transfers in its SEC filings.[33]

## H.  Repsol Acquires YPF (and Maxus)

In 1999, Repsol acquired YPF through a hostile takeover in which it acquired more than 99% of YPF's shares.  Repsol and the YPF Defendants never discussed Maxus prior to Repsol's takeover or its installation of new management, as the Trust admits.

Through this takeover, Repsol acquired a controlling interest in YPF and established "Repsol YPF S.A." ("Repsol YPF") as the combined enterprise. By this time, Maxus's remaining oil and gas assets consisted largely of its interest in the Crescendo Resources L.P. partnership ("Crescendo"), which was operated by Maxus's wholly

---

[31] *But see* Adv. D.I. 644 (Lee Decl.), Ex. 53.

[32] There is a material factual dispute as to whether these international assets were sold for reasonably equivalent value.

[33] There is another material factual dispute concerning whether these disclosures were adequate.

owned subsidiary Midgard Energy Company ("Midgard"), and other exploratory interests in the Gulf of Mexico.

The full extent of environmental liability was still not known at this time. However, in 1999, the New Jersey Office of Maritime Resources published a "conceptual proposal" for dredging of highly contaminated "hot spots" in the Passaic River.  In 2002, the EPA significantly expanded the size of the DASS remedial study area to 17 miles of the Passaic River into the Newark Bay.  In September 2003, the state of New Jersey issued a directive to several potentially responsible parties ("PRPs"), including Maxus, to assess natural resource damages and restoration options at the Passaic River.

## I.   The Crescendo Transfers (1999 to 2000)

In December 1999 and January 2000, Repsol YPF caused Maxus to sell its interests in Crescendo (Maxus's most valuable remaining asset) (the "Crescendo Transfer") to BP and Apache in exchange for $619.5 million in cash, plus a 1% royalty interest.[34]

The balance of the proceeds from the Crescendo Sale were held for approximately one year by Maxus.  In January 2001, Repsol International Finance ("RIF") borrowed $325 million of the remaining Crescendo proceeds from Maxus, pursuant to a credit agreement calling for repayment by December 27, 2001 (the "RIF Loan").[35]  The RIF Loan was ultimately repaid to Maxus over a four-year period (ending in approximately January 2005), based on Maxus's intermittent estimated cash flow needs.

---

[34]  The Trust disputes whether the price received from the Crescendo Transfer was adequate and alleges that the parties to the Crescendo partnership valued the assets contributed by Maxus with a higher value.

[35]  The Trust alleged that the RIF Loan benefited Repsol at Maxus's expenses because Repsol paid below-LIBOR interest rates.

By 2000, Maxus's remaining fixed assets were reduced to $26 million, and its annual operating revenue declined to just over $4 million.

**J.   The YPFI Transfers (2000 to 2002)**

Between 2000 and 2002, the Trust asserts that Repsol continued YPF's Strategy of transferring Maxus's international exploration and production assets ("E&P") (then held by YPFI following the 1996-1997 Transfers) to third parties or Repsol subsidiaries to further remove the assets from the reach of Maxus's creditors (the "2000-2002 Transfers"). The Trust continues that the proceeds from those transfers were used to pay down or cancel debt or otherwise remitted to YPF as a dividend.  Those proceeds were then further transferred to Repsol through a dividend.

**K.  The NJ Litigation Commences**

The EPA, the New Jersey Department of Environmental Protection ("NJDEP"), and the U.S. Army Corps of Engineers work together to investigate, oversee and determine the removal or remedy to be imposed.[36]  In December 2005, the NJDEP sued OCC, Maxus, Tierra, YPF, and Repsol under the New Jersey Spill Act for discharges of hazardous substances from the Lister Avenue chemical plant into the Passaic River and parts of Newark Bay (the "NJ Litigation").  The NJDEP's operative complaint alleged that Maxus's prior asset sales to its shareholders constituted fraudulent transfers, and that Repsol and YPF were liable for Maxus's environmental liability as alter-egos because they

---

[36] *See* Adv. D.I. 652 (Propps Decl.), Ex. 25 ("The matter of the New Jersey Lawsuit concerned much of the same Passaic River Study Area in New Jersey that has been and continues to be studied and remediated under EPA's lead federal authority under the Comprehensive Environmental Response, Compensation, and Liability Act.").

had abused the corporate form in their several attempts to capture the economic value of such assets.  In October 2008, OCC filed cross-claims against Maxus for breach of the SPA indemnity obligation and for fraudulent transfers, and against Repsol and YPF for civil conspiracy, aiding and abetting civil conspiracy, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty.  OCC also sought to recover from Repsol and YPF as alter-egos of Maxus.

**L.  The EPA's 2007 Draft FFS Makes Clear that a Large-Scale, Active Remediation at the DASS is Expected**

Meanwhile, in June 2007, the EPA issued a draft FFS for the lower 8 miles of the Passaic River, which estimated that the cost for "active alternatives" ranged "from $0.9 billion to $2.3 billion."

**M. Settlement Agreements**

Repsol YPF (between 2007 and 2009) presided over a series of "intercompany settlement agreements" to address the "problematic financial arrangements" between YPF, Repsol, and Maxus.

i.  In 2007, Maxus entered into three settlement agreements (the "2007 Settlement Agreements") with Repsol Services Company (RSC) and Repsol E&P T&T Limited to resolve certain matters related to compensation for services Maxus provided to Repsol entities.

ii.  On October 8, 2007, the YPF entities, Maxus, CLH Holdings, Tierra, and MUSE entered into a settlement agreement to terminate the 1996 Assumption and Contribution Agreements (the "2007/2008 Settlement Agreement").  Maxus and Tierra received consideration of approximately $378.2 million, comprised of $14 million in cash and $364 million in loan forgiveness of an intercompany payable Maxus owed to YPFH, in exchange for YPF no longer having responsibility for payment to Tierra pursuant to the Contribution Agreement.

iii.   On July 8, 2009, Repsol E&P USA, RSC, and Repsol Offshore entered into a settlement agreement with Maxus (the "2009 Settlement Agreement") to resolve the various disputes related to transfers of Maxus's employees' services, data and software, and certain assets to Repsol subsidiaries, including the newly created Repsol E&P. SOF ¶¶ 97-98, 128.  The Repsol affiliates paid Maxus $50 million in exchange for a full release by Maxus of its claims with respect to all these matters.

When Maxus's sole remaining E&P asset (Neptune) suffered a series of setbacks in 2008, Maxus had virtually no revenue and no taxable income.  From as early as 2004, Maxus was only able to remain a going concern because YPF and Repsol provided financial support through the Settlement Agreements, parent support letters to auditors, and periodic capital contributions.[37]

## N.  The Second YPF Period: Project Jazz and the Run Up to the Chapter 11 Cases

In or about May 2012, the Government of Argentina nationalized YPF, seizing Repsol's majority ownership stake in YPF.  Around the same time, on May 21, 2012, the New Jersey court found that Tierra was an alter ego of Maxus.

Under the name "Project Jazz," YPF began to contemplate and seek legal advice regarding Maxus's bankruptcy and minimizing its risks for environmental purposes.  On May 23, 2014, Chadbourne & Parke wrote a memorandum regarding Project Jazz, which discussed bankruptcy alternatives for Maxus, among other things.

Thereafter, in March 2016, the EPA issued an ROD formalizing its selection of a remedy for the lower 8.3 miles of the Passaic, the estimated cost of which was $1.38 billion; and in April 2016, the court in the NJ Litigation adopted a number of

---

[37] *But see* Adv. D.I. 641 (Repsol CSOF) at ¶ 106 (Repsol disputes that it provided capital contributions to Maxus.  According to Repsol, only YPF provided capital contributions to Maxus).

recommendations by the Special Master, resolving a series of motions to dismiss and for summary judgment, and set June 20, 2016 as the trial date for OCC's alter-ego claims against YPF.

## O. The Chapter 11 Cases

On June 17, 2016, one business day before trial was set to commence in the NJ Litigation on OCC's alter ego claims against YPF, YPF caused the Debtors to file voluntary petitions for relief under Chapter 11. The centerpiece of the Debtors' Chapter 11 was the "settlement agreement" with YPF in which Maxus was to release all its, and its creditors', claims against YPF, including fraudulent transfer and veil-piercing claims, for a $164.35 million effective settlement amount.

The Official Committee of Unsecured Creditors ("UCC") objected to this settlement agreement.[38] Ultimately, with the UCC's assistance, the creditors funded the Amended Plan[39] that created the Trust with responsibility for prosecuting Maxus's claims against YPF and Repsol and that provided funding for Maxus's ongoing environmental remediation obligations. The Court confirmed the Plan on May 22, 2017. This litigation ensued shortly thereafter.

---

[38] *See* Bankr. D.I. 300 (Rule 9019 Motion), 536 (Committee objection to discovery related to settlement motion); 619 (Committee objection to exclusivity on basis of proposed settlement), 777 (Committee letter requesting mediation of settlement), and 810 (Committee objection to Disclosure Statement on basis of settlement).

[39] Referring to the *Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of Unsecured Creditors*, which the Court confirmed on May 22, 2017 (Bankr. D.I. 1451) (the "Amended Plan").

## ANALYSIS

### A.  Standard of Review

Summary judgment is a mechanism used to ascertain the existence of a genuine factual dispute between the parties that would necessitate a trial.  Fed. R. Civ. P. 56, made applicable by Fed. R. Bank. P. 7056 is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[40]

When seeking summary judgment, the movant bears the initial burden of "establishing the absence of a genuine issue of material fact."[41]  A genuine issue is not simply based on opposing opinions or unsupported assertions but rather on conflicting factual evidence over which "reasonable minds could disagree on the result."[42] Furthermore, a fact is material if it could "alter the outcome of a case."[43]  In other words, the movant's goal is "to establish an absence of evidence to support the nonmoving party's case."[44]

Under Federal Rule of Civil Procedure Rule 56, a party may move for summary judgment "upon all or any part" of a claim at issue.[45]  "Partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial

---

[40] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[41] *J. Aron & Co. v. SemCrude, L.P. (In re SemCrude, L.P.)*, 504 B.R. 39, 51 (Bankr. D. Del. 2013) (*citing Celotex*, 477 U.S. at 322).

[42] *Liquidation Tr. v. Huffman (In re U.S. Wireless Corp.)*, 386 B.R. 556, 560 (Bankr. D. Del. 2008) (citations omitted).

[43] *Id.*

[44] *Id.* (*quoting Celotex*, 477 U.S. at 325).

[45] Fed. Rule Civ. P. 56(a) and 56(b).

of the case."[46]    Motions for partial summary judgment are permitted where they are

conducive to conservation of judicial resources and are of benefit to the parties.[47]

Consistent with this purpose, courts have entertained and decided motions for partial

summary judgment on the question of damages to narrow the issues before trial.[48]

If the movant meets this initial burden, the burden shifts to the nonmoving party

to defeat summary judgment by producing "evidence in the record creating a genuine

issue of material fact."[49]   To demonstrate a genuine issue of material fact, the nonmoving

party "must do more than simply show that there is some metaphysical doubt as to the

material facts."[50]  The nonmoving party must demonstrate "sufficient evidence (not mere

allegations) upon which a reasonable trier of fact could return a verdict in favor of a

nonmoving party."[51]  This evidence "cannot be conjectural or problematic; it must have

---

[46] *Coffman v. Federal Laboratories*, 171 F.2d 94, 98 n.11 (3d Cir. 1948); *New Dominion, LLC v. BP Oil Supply Co. (In re SemCrude, L.P.)*, No. 08-11525 BLS, 2012 WL 694505, at *3 (Bankr. D. Del. Mar. 1, 2012) ("[T]he newly revised rules permit a party to move for partial summary judgment" as an "issue-narrowing adjudication." (*quoting Servicios Especiales Al Comercio Exterior v. Johnson Controls, Inc.*, 791 F.Supp.2d 626, 632 (E.D. Wis. 2011)).

[47] *See Coffman*, 171 F.2d at 98 n. 11 ("[T]he purpose of [partial summary judgment is] speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact."); *United States v. G-I Holdings Inc. (In re G-I Holdings Inc.)*, No. 01-30135 (RG), 2007 WL 1412294, at *3 (D.N.J. May 14, 2007) ("[W]hen partial summary judgment is appropriately granted 'the length and complexity of trial on the remaining issues are lessened, all to the advantage of the litigants, the courts, those waiting in line for trial, and the American public in general.'") (*quoting Calpetco 1981 v. Marshall Exploration*, 989 F.2d 1408, 1415 (5th Cir. 1993)); *Freeman v. Minn. Mining & Mfg. Co.*, 675 F. Supp. 877, 891 (D. Del. 1987) ("It would save judicial resources and be economical for the parties if the issue could be summarily disposed of.").

[48] *See, e.g., Reliance Insurance Co. v. Woodward-Clyde Consultants*, 243 F. App'x 674 (3d Cir. 2007) (affirming district court's grant of summary judgment on damages for unpaid retrospective insurance premiums); *Poultry Health Serv. of Georgia, Inc. v. Moxley*, 538 F. Supp. 276 (S.D. Ga. 1982) (granting in part and denying in part plaintiff's motion for partial summary judgment on the issue of damages).

[49] *In re W.R. Grace & Co.*, 403 B.R. 317, 319 (Bankr. D. Del. 2009).

[50] *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[51] *Giuliano v. World Fuel Servs., Inc. (In re Evergreen Int'l. Aviation)*, Adv. No. 15-51918, 2018 WL 4042662, at *2 (Bankr. D. Del. Aug. 22, 2018) (citations omitted).

substance in the sense that it [highlights] differing versions of the truth which a factfinder must resolve at an ensuing trial."[52]

When considering a motion for summary judgment, "the court does not weigh the evidence and determine the truth of the matter; rather, the court determines whether there is a genuine issue for trial."[53]  The Court must "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."[54]  "If the opposition evidence is merely colorable or not significantly probative, summary judgment may be granted."[55]  However, where the record could lead reasonable minds to draw "conflicting inferences, summary judgment is improper, and the action must proceed to trial."[56]  Summary judgment is proper only where one reasonable inference or interpretation of the facts can be drawn in favor of the moving party.[57]

A cross-motion filing does not change the standards or analysis by which to grant or deny summary judgment to the moving party.  Each moving party still bears the initial burden of demonstrating the absence of a genuine issue of material fact.  "[T]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the [summary

---

[52] *Huffman*, 386 B.R. at 560 (*quoting Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989)).

[53] *Argus Mgmt. Grp. v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del .2005) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted)).

[54] *Saldana v. Kmart*, 260 F.3d 228, 231-32 (3d Cir. 2001).

[55] *Whitlock v. Pepsi Ams.*, No. C 08-24742 SI, 2009 WL 3415783, at *7 (N.D. Cal Oct. 21, 2009) (citations omitted).

[56] *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002) (*quoting Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1087 (9th Cir. 2000)).

[57] *Id.*

judgment] standard."[58]  Although the filing of a cross motion may imply that the parties agree that no material issue of fact exists, "the court is not bound by this implicit agreement and is not required to enter a judgment for either party."[59]

As to the defenses made in the Defendants' answers to the Complaint, Defendants bear the ultimate burden of proof for their defenses.[60]  Here the Plaintiff moved for (partial) summary judgment on certain of these defenses.  To be granted summary judgment, the Trust needs to show an "absence of evidence" to support the Defendants' case for their defenses.[61]  However, a mere statement that the defenses fail, is not enough. This is because "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[62]

---

[58] *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (citations omitted).

[59] *Huffman*, 386 B.R. at 560-61 (*quoting WorldCom, Inc. v. HE Global Asset Mgmt. Servs. (In re WorldCom, Inc.*), 339 B.R. 56, 62 (Bankr. S.D.N.Y. 2006)).

[60] *Harper v. Del. Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1090-91 (D. Del. 1990) ("A party resisting summary judgment cannot expect to rely on the bare assertions or mere cataloguing of affirmative defenses.").

[61] *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145-46 (3d Cir. 2004) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) ("With respect to an issue on which the nonmoving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."); *Burtch v. Masiz (In re Vaso Active Pharms., Inc.)*, No. 10-10855 CSS, 2012 WL 4793241, at *1 (Bankr. D. Del. Oct. 9, 2012) ("[W]hen requesting summary judgment, the moving party must put the ball in play, averring an absence of evidence to support the nonmoving party's case.  In order to continue, the burden shifts to the nonmovant to identify some factual disagreement sufficient to deflect brevis disposition.").

[62] *Celotex*, 477 U.S. at 332 (Brennan, J., dissenting) ("Where the moving party . . . seeks summary judgment on the ground that the nonmoving party – who will bear the burden of persuasion at trial – has no evidence, the mechanics of discharging Rule 56's burden of production are somewhat trickier.  Plainly, a conclusory

**TRUST'S MOTION FOR SUMMARY JUDGMENT**

> My point is, all these discussions about good and evil, where
> do they ever lead?  A man is dead, and three children were
> orphaned.  No amount of moral judgment and labeling will
> change that.  Instead, we should ask ourselves what factors
> led to this situation . . . .  *Cause and effect, that's all that matters.*

Nicolas Lietzau, *Dreams of the Dying* (emphasis added)

\*      \*      \*

## A.  Damages

The Trust's first cause of action against the Defendants seeks to pierce the corporate veil.[63]  More specifically, the Trust argues that YPF and Repsol operated as alter egos of Maxus and, as a result, should be liable for all of Maxus's unpaid environmental debts and liabilities.[64]  In particular, the Trust submits that if it is successful in proving its veil piercing claim at trial, then the Defendants are jointly and severally liable for *all* the Allowed Class 4 and Class 5 Claims under the Amended Plan, along with pre-judgment interest (the "All Liabilities Damages Theory").[65]

By its Motion, the Trust acknowledges that the alter ego inquiry is highly fact intensive and better left as an issue reserved for trial.[66]  Accordingly, the ultimate issue

---

assertion that the nonmoving party has no evidence is insufficient . . . . Such a burden of production is no production at all and would simply permit summary judgment procedure to be converted into a tool for harassment.") (internal citations and quotations omitted).

[63]  *See* Adv. D.I. 1 (Compl.) Count I ¶¶ 212-232.

[64]  The terms "alter ego" and "piercing the corporate veil" are used interchangeably in Delaware law. *See Winner Acceptance Corp. v. Return on Capital Corp.*, Civ. Action No. 3088-VP, 2008 WL 5352063, at *5 n. 32 (Del. Ch. Dec. 23, 2008).

[65]  In its reply, the Trust calls this theory the "creditor claim aggregation doctrine." Adv. D.I. 701 (Trust Reply) at p. 31.

[66]  As noted, in response to the Trust's Motion for Summary Judgment, Repsol and YPF each filed Cross-Motions for Summary Judgment. Repsol's Cross-Motion seeks a ruling, on the merits, that it did not operate as an alter ego of Maxus.  That issue is fully discussed below.  *See infra.*

before the Court is, assuming the Trust successfully proves its veil piercing claim at trial,

whether the Defendants are jointly and severally liable under the All Liabilities Damages

Theory, as a matter of law.[67]

The Defendants answer the above question presented in the negative.[68]  Namely,

in opposition to the Trust's Motion, YPF and Repsol stress the requirement of causation.

Simply summarized, YPF and Repsol argue that there is a material factual dispute as to

the amount of damages owed to the Trust, if any, should alter-ego be proven at trial.

According to the Defendants, the issue of damages requires proof of causation and

should be limited to those damages "caused" by the alleged alter ego conduct (the

---

[67]  Pursuant to the terms of the Amended Plan, six claims filed against the Debtors' Estates were allowed and settled in exchange for Allowed Class 4 Environmental Claims and Class 5 Diamond Alkali Claims. *See* Adv. D.I. 624 (Smith Decl.), Ex. 3 (Amended Plan) at Art. XI.F (Compromises and Settlements of Certain Claims).

The Class 4 Claims comprise "Claim[s] against any of the Debtors arising under or in connection with any Environmental Law or the OCC Indemnity," to the extent such Claims constitute "actual out of pocket costs and expenses incurred," "costs and expenses … legally or contractually committed itself to expend (as evidenced by a writing between such Holder and a Governmental Environmental Entity or a judgment of a court ….)." Class 4 Claims also include "such other amounts as may be Allowed as a Class 4 Environmental Claim pursuant to (i) any agreement of settlement with the Debtors or (ii) order of the Bankruptcy Court."  The Class 4 Claims of substantially all of the Debtors' creditors were settled and allowed in the total aggregate amount of $700,688.553.32. *See* Adv. D.I. 624 (Smith Decl.), Ex. 3 (Amended Plan) at Art. I.A.29.

The Class 5 Claims represent several liabilities.  First, the Class 5 Claims encompass a "portion of the United States EPA/NRD Trustees Claim related to the Diamond Alkali Site arising under or in connection with any Environmental Law that is not included in the … Class 4 Claim … which shall be Allowed in an amount not less than $61 million."  Class 5 Claims also encompass other amounts that "(i) may be Allowed as a Class 5 … Claim pursuant to any agreement or settlement with the Debtors or an order of the Bankruptcy Court," or "(ii) that constitute Environmental Remediation Expenses or Environmental Restoration Expenses … that are reimbursed by the Environmental Response/Restoration Trust …."  Otherwise put, the Class 5 Claims represent unliquidated environmental expenditures for which the Debtors may be liable in the future. The Class 5 Claims are estimated to be upwards of $12 billion. *See* Adv. D.I. 624 (Smith Decl.), Ex. 3 at Art I.A.30.

[68]  At the outset, YPF and Repsol argue that determining damages before liability is established would constitute an advisory opinion or, at the minimum, be premature.  The Court agrees that this request is premature.  This is further discussed in detail *infra*.

"Causation Damages Theory").[69]  Moreover, the Defendants argue that this issue requires

expert testimony, and is not appropriate for disposition on summary judgment.  That

being said, the Defendants nevertheless argue that the Trust's All Liabilities Damages

Theory fails as a matter of law because that theory fully ignores the fundamental concept

of causation.

Thus, the Court is being asked to decide two separate but related issues: (i) if the

Trust proves its alter ego claim at trial, whether YPF and Repsol are liable under the All

Liabilities or Causation Damages Theory, and (ii) the quantum of those damages.

The first issue, i.e., which legal theory applies, is purely a legal question suitable

for disposition on summary judgment.  However, deciding the second issue, the quantum

of damages, requires the Court to resolve material facts which are in dispute.  Ruling on

the amount of damages owed, if any, prior to determining alter ego liability, which is

hotly contested and interdependent, is not appropriate for resolution on summary

judgment.

### i.    The Theory That Applies to Alter Ego Damages Is a Matter of Law Suitable for Disposition on Summary Judgment

The Trust argues that there is no dispute of fact that the Defendants can be held

liable for $712,560,327.76, plus pre-judgment interest, in respect of the Allowed Class 4

Claims, and for all the unliquidated Class 5 Claims as they become due, could be upwards

---

[69]  Under the Causation Damages Theory, YPF argues that "[t]he only possible harm caused by YPF … is the amount they allegedly caused Maxus not to be able to pay for … pre-existing liabilities." Adv. D.I. 642 (YPF Opp.) at pp. 29-30 n.48.  Repsol argues that the only damage to the estate as a result of the alleged fraud "would be the shortfall of the asset value, which could have been made available to Maxus's creditors." Adv. D.I. 640 (Repsol Opp.) at p. 22.

of around $12-$14 billion.[70]  In essence, the Trust's All Liabilities Damages Theory seeks to hold YPF and Repsol liable for all of Maxus's unpaid environmental debts through alter ego law without regard to causation. That theory, while creative, is too far reaching and is flawed as a matter of law.

First and foremost, the Trust cites no law to support its All Liabilities Damages Theory.[71]  Although counsel for the Trust emphasized *Pharmacia Corp. v. Motor Carrier Servs. Corp.*[72] to support its All Liabilities Damages Theory at oral argument, *Pharmacia* is readily distinguishable from the facts of this case.  Pharmacia (f/k/a) Monsanto Company manufactured chemicals at a facility abutting the Passaic River in Kearny, New Jersey.  In 1994, it sold the Kearny facility to Motor Carrier Services Corp. ("MCSC") under a purchase and sale agreement and obtained an indemnification from MCSC;

---

[70]  The Trust seeks a declaratory judgment on alter ego holding YPF and Repsol liable for the Class 5 amounts as they liquidate; it does not seek an award of cash damages.

[71]  While the Trust makes some creative arguments in furtherance of its All Liabilities Damages Theory, the Trust cites only to four cases. These cases do not substantiate the Trust's theory. *See Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239 (Bankr. S.D.N.Y. 2013) ("*Tronox II*") (holding that certain affiliates of Anadarko Petroleum owed the debtor somewhere between $5 billion and $14 billion as damages *for a fraudulent transfer* that began in 2002 and ended in 2006, which was valued at $14.459 billion); *Flame S.A. v. Freight Bulk Pte. Ltd.*, 807 F.3d 572 (4th Cir. 2015) (alter ego defendant liable up to the extent of the "entire fraud" based on multiple fraudulent conveyances); *Pearson v. Component Tech. Corp.*, 247 F.3d 471 (3d Cir. 2001) (analyzing whether defendants were a single employer under the WARN act using the Department of Labor regulations, not traditional veil-piercing factors); *Valdes v. Leisure Res. Grp., Inc.*, 810 F.2d 1345, 1353 (5th Cir. 1987) (remanding case for new trial on damages and finding that lender and lender's parent were not alter egos of defendant after jury awarded joint liability for specific fraudulent conduct).  The Trust also cites *Atateks Foreign Trade, Ltd. v. Private Label Sourcing, LLC*, 402 F. App'x 623 (2d Cir. 2010) for the proposition that its alter ego damages are not "limited to fraudulent transfer damages." *See* Adv. D.I. 701 (Trust Reply) at p. 31 n. 19.  While the Trust is correct – alter ego damages are not limited to fraudulent transfer damages – that is because there are other theories of alter ego liability that go beyond fraudulent transfer claims.  Moreover, the *Atateks* court explained that piercing the corporate veil "permits plaintiffs to hold those behind the corporation liable for *some* underlying corporate obligation." *Id.* at 627 (internal citations and quotations omitted).

[72]  *Pharmacia Corp. v. Motor Carrier Servs. Corp.*, 309 Fed. App'x 666 (3d Cir. 2009).

MCSC was responsible for "any and all costs and expenses … of Clean-up [required under federal or state law] …."[73]  Thereafter, in 1998, CSX Intermodal, Inc. ("Intermodal") acquired all the shares of MCSC.  In the meantime, in 1995 and again in 2003, the EPA informed Pharmacia and MCSC of its potential responsibility under CERCLA as a PRP.  MCSC refused to indemnify Pharmacia for the costs of the EPA or NJDEP actions under the indemnification.  Ultimately, Pharmacia sought and obtained summary judgment to pierce MCSC's corporate veil; as a result, the court held Intermodal liable for MCSC's liability under the indemnification, finding that Intermodal was an alter ego of MCSC.[74]  Specifically, the district court found that "Intermodal used Motor Carrier solely to hold the Kearny Site for its business (without payment), thereby shielding Intermodal from any potential liability arising out the environmental harms caused by Pharmacia's former operations."  On appeal, the Third Circuit specifically started its analysis by explaining that "[t]his is essentially a contract dispute."  In affirming the district court's holding, the Third Circuit found that "the District Court properly concluded that [MCSC's] corporate

---

[73]  *See Id.* at 668 ("The purchase and sale agreement (the "Agreement") between the parties expressly addressed the division of responsibility between Pharmacia and Motor Carrier regarding environmental cleanup activities at the Kearny Site.").

[74]  In finding that the first prong of alter ego was satisfied, the district court found:

> [s]ince the closing, in January 1998, neither the shareholders, officers nor directors of Motor Carrier have held a meeting as set forth in the company's by-laws. Moreover, Motor Carrier has not ... maintained a balance sheet, nor issued a financial report to Intermodal Motor Carrier also has no employees, and exists solely as a holding company for the Kearny [Site], and Intermodal uses that property without a lease or payment. The totality of these circumstances suggests that the District Court correctly concluded that Intermodal dominated Motor Carrier.

*Id.* at 673 (internal citations and quotation marks omitted).

veil should be pierced as a matter of law.  Therefore, Intermodal *is liable for Motor Carrier's obligations under the Agreement.*"[75]

Unlike *Pharmacia*, this is *not* a contract dispute[76] but, rather, an alter ego and fraudulent transfer case; no one contests any contractual liability herein.[77]  Furthermore, the damages sought here are entirely unlike those sought in *Pharmacia*.  If this case were like *Pharmacia*, then, by way of example, the Trust would seek to pierce Maxus's corporate veil to hold YPF and Repsol liable for Maxus's indemnity costs to OCC under the 1986 SPA[78] and this would be a contract dispute.  However, the Trust does *not* seek Maxus's contractual indemnification costs to OCC as damages.  Rather, the Trust seeks to hold YPF and Repsol liable for *all* the Allowed Class 4 and Class 5 Claims.  *Pharmacia* does not stand for the proposition that an alter ego parent or grand-parent entity is liable for all

---

[75]  The district court held that "Motor Carrier, Intermodal, and CSX *were required to indemnify Pharmacia under the Agreement* for any and all costs for which Pharmacia is or becomes liable to NJDEP and USEPA . . . or any future action by NJDEP, USEPA or any other regulatory agency related to the remediation of the Lower Passaic River, and for future cleanup of the Kearny Site."  *Id.* at 669 (internal citations and quotations omitted) (emphasis added).

[76]  One of the main issues on appeal was whether MCSC was responsible for the costs of cleanup activities "only if the pollutants at issue migrated from the Kearny Site after the Agreement became effective."  The Third Circuit found the Agreement unambiguous and found that "[n]othing in [the] definition suggests a temporal limit on Motor Carrier's liability for government-mandated cleanup."  *See Id.* at 670.

[77]  *See* Adv. D.I. 701 (Trust Reply) at p. 23 ("As an initial matter, none of the parties dispute certain key concepts related to the Debtors' CERCLA-related environmental liabilities that form the vast majority of the Class 4 and Class 5 Claims.  One, Tierra has primary liability under CERCLA as a landowner.  Two, Maxus was held to be Tierra's alter ego in the NJ Litigation, and is thus co-liable with Tierra.  Three, Maxus was responsible for OCC's CERCLA-related liability under the SPA indemnity.").

[78]  Tierra assumed Maxus's contractual indemnification obligations to OCC under the 1986 SPA. *See* Adv. D.I. 623 (Trust's SOF) ¶ 53.  In 2011, the New Jersey court held that "Defendant Maxus Energy Corporation is required to indemnify Occidental Chemical Corporation for any costs, losses and liabilities that may be incurred by Occidental Chemical Corporation … as a result of Occidental Chemical Corporation's acquisition of Diamond Shamrock Chemicals Company."  *See* Adv. D.I. 624 (Smith Decl.), Ex. 75 (Aug. 24, 2011 Order granting OCC's motion for partial summary judgment against Maxus).

the dominated subsidiary's environmental debts regardless of the corporate harm they caused.

Notwithstanding the lack of case law to support its theory, the Trust argues that, by virtue of being the alter egos of Maxus with the goal of isolating Maxus's assets from its environmental liabilities, YPF and Repsol should be held liable for *all* of Maxus's unpaid environmental debts, regardless of whether YPF and/or Repsol "caused" those debts to go unpaid.

The crux of the Trust's theory of the case is that YPF and Repsol's mismanagement of Maxus was motivated by stranding Maxus's environmental creditors. So, as a result of the Defendants alleged misconduct, the Trust seeks to hold YPF and Repsol fully responsible for all of Maxus's unpaid environmental debts.[79] The Trust's position is that there is "nothing fundamentally unfair about holding an alter ego liable for debts of its dominated subsidiary, particularly those that it intended to strand at the subsidiary."[80]

However, YPF and Repsol's arguments illuminate the extraordinary relief being sought. According to the Defendants, under the Trust's All Liabilities Damages Theory,

---

[79] *See* Adv. D.I. 227 at p. 16. In the context of deciding whether to extend the scope of discovery to include discovery related to underlying individualized pollution claims, the Court commented that:

> the Trust is alleging that the alter ego has stripped the Debtors' assets so they could not pay their liabilities. The alleged harm to the Debtors is those liabilities, which are claims and/or settled claims against the estates …. [The Trust alleges that] [t]he Defendants, if liable, should be responsible for the damages arising from the corporate misconduct, and here that is the claims alleged and/or settled against the Debtors' estates.

The Court was explaining its understanding of the Trust's theory of the case, and it was not this Court's intent to address how damages related to the alleged asset stripping should be quantified, as that issue was not before the Court at that time.

[80] Adv. D.I. 701 (Trust Reply) at p. 21.

regardless of whether YPF and Repsol were found to be the alter egos of Maxus for one day, one month, or one year, and regardless of the specific harm they "caused" during the time they were Maxus's alter egos, the damages owed to the Trust would be the same. Under this theory, the fact that Maxus was struggling financially prior to YPF's acquisition and would likely have never been able to pay its creditors the potentially billions of dollars sought by the Trust as damages would make no difference in the damages calculation.  Further, if the Court were to hold the Defendants liable under the All Liabilities Damages Theory, the difference between the reasonably equivalent value of the assets transferred and the value actually received for those assets would be wholly irrelevant. Damages would be the same (all of Maxus's environmental debts) regardless of whether the "short-fall" was $1 or $1 billion.  YPF and Repsol argue that awarding what is essentially a "blank check" would amount to an undeserved windfall for Maxus's creditors.  Moreover, the Trust's All Liabilities Damages Theory does not account for the fact that certain financial problems plaguing Maxus and contributing to its bankruptcy were not caused by YPF or Repsol, such as the failure of Maxus's Gulf of Mexico prospects.[81]

The Court finds it helpful to clarify the difference between damages calculations for alter ego liability versus CERCLA liability.  Under CERCLA, if YPF or Repsol owned

---

[81] This was highlighted in oral argument by the Trust admitting that the value of Maxus was approximately $3.5 billion.  Hr'g Tr. 154:19-156:7.  The Court notes that the lack of operating assets (allegedly stripped by the Defendants) and the failure of the assets in the Gulf of Mexico, including the Neptune prospect, exacerbated Maxus's value.  The Court observes, as it did at oral argument, that regardless of the Defendants' alleged strip-and-strand Strategy, Maxus would never have had sufficient assets to satisfy all of its liabilities.

or operated a property which caused hazardous substances to seep into the environment

(regardless of the length or extent of that ownership), YPF and Repsol would be held

jointly and severally liable for all environmental cleanup costs as PRPs, regardless of

fault.[82]    The length and extent of ownership would then be relevant in determining

contribution rights.[83]   In contrast, under alter ego law, fault and the length and extent of

ownership (among many other things) matter with respect to *both* liability and damages.[84]

Plaintiffs must prove the alter ego conduct, and the damages that resulted from that alter

ego conduct.   It is not simply the case that plaintiffs may prove alter ego conduct without

proving resulting damages.   To say otherwise would be to disregard the second element

of an alter ego claim, which is that the parent abused the corporate form "*to cause fraud or*

*injustice*."[85]   The Trust's theory would essentially "eliminate" *Maxus's* PRP joint and

several liability by making the solvent Defendants, which are not PRPs under CERCLA,

co-liable[86] (as neither owned nor operated the Lister Site).[87]   Alter ego law does not

---

[82]  *See* CERCLA § 107(a)(1)-(4), 42 U.S.C. § 9607(a)(1)-(4); *see also U.S. v. Colorado & Eastern R. Co.*, 50 F.3d 1530, 1535 (10th Cir. 1995) ("It is … well settled that § 107 imposes joint and several liability on PRPs regardless of fault."); *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 120 (2d Cir. 2010) ("Somewhat like the common law of ultra-hazardous activities, property owners are strictly liable for the hazardous materials on their property, regardless of whether or not they deposited them there.").

[83]  *See* CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1).

[84]  To this point, the Court agrees with YPF's position that "[w]hile causation is required for liability, it also limits the extent of the resulting damages a plaintiff may recover." Adv. D.I. 720 (YPF Reply) at p. 10.

[85]  *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) (emphasis added).

[86]  *See* Adv. D.I. 701 (Trust Reply) at p. 22 ("Defendants … complain that they will be prejudiced by having to pay those claims – representing the Debtors' joint and several liability for all environmental claims relating to the DASS ….").

[87]  Maxus's subsidiary, Tierra, owns the Lister Site.  Maxus and Tierra were held to be alter egos in the NJ Litigation and, thus, Maxus is co-liable with Tierra under CERCLA.  The Court recognizes that Maxus will remain liable as a PRP *even if* the Defendants are held to be alter-egos; however, as Maxus is insolvent, it

operate in the same "joint and several liability for *all* liabilities" manner that CERCLA does.[88]  Even the Trust agrees that "paying damages to the Trust for alter ego conduct is not [the same as] paying the Debtors' CERCLA liability."[89]  Causation between the alleged alter ego conduct and the harm caused as a result of that conduct is required. Ultimately, however, it may be the case that the alleged alter ego conduct *did* cause *all* the environmental liabilities to go unpaid given the underlying allegations of the Strategy. The point is that causation matters, but this is an issue for trial.

As a purely legal matter, the Court understands causation to be an integral part of alter-ego law.[90]  There must be a causal connection between the damages alleged and the abuse of the corporate form.[91]  "The issue is not whether an entity is the alter ego for all purposes[,]" rather, the issue is "whether in a particular case justice and equity requires

---

would have the practical effect of eliminating Maxus's liability and, in all practicality, would put the onus on the Defendants.

[88]  *See U.S. v. Bestfoods*, 524 U.S. 51, 65 (1998) ("[W]hen (but only when) the corporate veil may be pierced, may a parent corporation be charged with derivative CERCLA liability for its subsidiary's actions.") (internal citations and footnotes omitted).

[89]  Adv. D.I. 701 (Trust Reply) at p. 24.

[90]  For purposes of the Motion and Cross-Motions, all parties assume Delaware law applies to the alter ego claim. The Defendants have reserved their rights to argue that the laws of other jurisdictions may apply to the alter ego claim with respect to certain entities at trial, such as the laws of the Cayman Islands and Argentina.

[91]  *See Irwin v. Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 987 (Del. Ch. 1987) (*quoting Berger v. Columbia Broadcasting System, Inc.*, 453 F.2d 991 (5th Cir.) *cert. denied*, 409 U.S. 848, 93 S. Ct. 54, 34 L.Ed.2d 89 (1972)) (discussing the two elements of liability under the 'instrumentality' veil-piercing doctrine; the second element being that the dominant corporation "must have proximately caused plaintiff harm through misuse of [the] control); *GEBAM, Inc. v. Investment Realty Series I, LLC*, 15 F. Supp. 3d 1311 at n. 21 (N.D. Ga 2013) (applying Delaware law and finding that plaintiff needed to prove underlying misconduct and *resulting damages* to recover under its "piercing the corporate veil" claim); *Burtch v. Opus, LLC (In re Opus East, LLC)*, 528 B.R. 30 (Bankr. D. Del. 2015) *aff'd sub nom. In re: Opus E., LLC*, No. 09-12261, 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd sub nom. In re Opus E. LLC*, 698 F. App'x 711 (3d Cir. 2017) ("[t]he purpose of allowing the corporate veil to be pierced on an alter ego theory is to hold the party actually responsible *for the inequitable conduct* accountable ….).

that the entity be disregarded to prevent fraud or injustice."[92]  Accordingly, the Causation Damages Theory applies.

YPF and Repsol may ultimately only be held liable for the harm the estate suffered as a result of the asset stripping Strategy upon which the Trust bases its alter ego claim. The Allowed Class 4 and Class 5 Claims do not form the basis of damages per se.[93]  At trial, it is the Trust's burden to put forth sufficient evidence to establish this necessary causal link.

---

[92] 114 AM. JUR. 3d *Proof of Facts, Establishing Elements for Disregarding Corporate Entity and Piercing Entity's Veil* § 17 (Proximate Cause) (2022) (originally published in 2010) (footnote omitted).

[93] To address certain objections YPF and Repsol had with respect to confirmation, a reservation of rights was added to the Amended Plan (the "Claims ROR"). The Claims ROR expressly provides that:

> Neither the allowance or disallowance of any Claim against any Debtor in these Chapter 11 Cases, nor the allowed amount of any Claim, shall have any precedential, preclusive or other effect, including as a purported measure of any valuation or damages, against any person or entity in any litigation, including in any Causes of Action preserved under the Plan including the YPF Causes of Action [and] the Repsol Causes of Action ….

*See* Adv. D.I. 624 (Smith Decl.), Ex. 3 (Amended Plan) at Art. XV.P.

Defendants argue that under New York law, *see* Amended Plan Art. I.D., a plan will be construed under normal principles of contract interpretation. *In re SS Body Armor I, Inc.*, Case No. 10-11255, 2021 WL 2315177, at *5 n. 45 (Bankr. D. Del. June 7, 2021) (internal citations omitted). Where the language of a plan is unambiguous, its plain meaning will be given effect. *Chesapeake Energy Corp. v. The Bank of New York Mellon Trust Co.*, 773 F.3d 110, 113-14 (2d Cir. 2015). Here, the Amended Plan expressly states that "the allowed amount of any Claim" does not have any effect, including "as a purported measure of any valuation of damages," against the YPF and Repsol entities. The Trust argues that the undisputed record establishes that the settlement amounts which aggregate the Class 4 and Class 5 Claims are an accurate reflection of what the Debtors actually owe to their creditors, however, that is not the issue. The issue is whether YPF and Repsol, as Maxus's alter egos, are liable for those amounts in full (under the All Liabilities Damages Theory) or for a percentage of those amounts (under the Causation Damages Theory), as a result of their alleged misconduct. Simply because the Class 4 and Class 5 claims accurately represent the Debtors' environmental liabilities does not automatically mean that the Defendants are liable for *all* those environmental liabilities under alter ego law. The Defendants are entitled to a trial on causation (and that will be a factual issue, requiring a determination of the Defendants' potential liability, and then the damages that flow, which may be anywhere from 0-100% of Maxus's Class 4 and Class 5 Claims). But, at this point, this Court is not being asked to determine the size of the collective Class 4 and Class 5 Claims. Thus, the Claims ROR is not implicated by this ruling.

This is not to say that YPF and Repsol may only be held liable for the amount they allegedly caused Maxus not to be able to pay for its pre-existing liabilities or for the difference in reasonably equivalent value between the value of the assets transferred and the value actually received.  It may be the case that the evidence at trial supports finding that the alleged asset stripping Strategy warrants holding YPF and Repsol liable for all of Maxus's unpaid environmental debts, the same debts that the Defendants allegedly planned to strand with Maxus.[94]  Alter ego is an equitable remedy that does not require identical and rigid application in all circumstances.  There is no cut and dry test.  At trial, it will be up to the trial court to determine the quantum of damages YPF and Repsol should be held liable for, if any, caused by on their alleged and yet-to-be-proven inequitable conduct.[95]

---

[94] YPF acknowledges that "alter ego principals are not liable for all of the corporate debts of the subsidiary; they are responsible only for the *effects of their actions*" (internal citations and quotations omitted) (alterations included within). Adv. D.I. 720 (YPF Reply) at p. 11.  If the "effects of [the Defendants] actions" are that Maxus was left wholly unable to pay for its environmental liabilities, then it may be that the Defendants are ultimately held liable for all of Maxus's unpaid environmental debts.  The evidence at trial will shed light on this issue.

[95] This notion is consistent with the New Jersey state court's explanation of alter ego damages:

> The company alleges that the remaining defendants are alter egos and constitute a cohesive economic unit. The gist of the allegation is that OCC believes that the remaining defendants have abused their corporate status and that, in doing so, they created an injustice. They did this by allegedly stripping Maxus of its assets and isolating only environmental liabilities in that corporation. If you believe OCC, this left Maxus undercapitalized and unable to meet its obligations. The fraud and injustice occurred when these assets were purportedly transferred for less than fair market value. If true, OCC may be able to pierce the corporate veil. The extent of the damages will depend upon the facts, and while the damages may be limited to the value of the assets transferred, the facts as developed in discovery and at trial (if need be), will answer this question.

*N.J. Dep't of Envtl. Prot. v. Occidental Chem. Corp.*, ESX-L-9869-05 (PASR), 2015 N.J. Super. LEXIS 230, at *33-34 (N.J. Super. Ct. Law Div. Essex Co. Jan. 13, 2015), *aff'd in relevant part*, 2021 WL 6109820 (N.J. App. Dec. 27, 2021).

For these reasons, the Court holds that the Causation Damages Theory applies to the Trust's alter ego claim. Since alter ego is an equitable remedy, the Court finds that this theory is more consistent with equitable principles because it requires a causal link and takes into account the totality of the circumstances between Repsol and YPF's alleged mismanagement of Maxus and the harm to be remedied by that mismanagement, rather than the All Liabilities Damages Theory, which would hold Repsol and YPF, as alter egos of Maxus, liable for all of Maxus's environmental debts per se. That is simply not how alter ego damages operate.[96]

### ii.    It is Premature to Decide the Quantum of Damages Before Alter Ego Liability

Because the Causation Damages Theory applies to the Trust's alter ego damages, it is neither possible nor proper for the Court to determine the quantum of those damages on summary judgment.[97] This is because the issue of alter ego liability rests upon material facts which are currently in dispute, such as whether the harm the Debtors' creditors

---

[96] Under the Trust's theory, if it proves that any damages were caused by the alleged conduct, it need not prove the extent of causation at any phase. However, damages are fundamentally compensatory, serving "to compensate a plaintiff for his proven, actual loss caused by the defendant's wrongful conduct." *Christ v. Cormick*, C.A. Nos. 06-275-GMS, 07-060-GMS, 2008 WL 4889127, at *2 (D. Del. Nov. 10, 2008); *see Mass. Mut. Life Ins. Co. v. Certain Underwriters at Lloyd's of London*, C.A. No. 4791-VCL, 2010 WL 2929552, at *21 (Del. Ch. July 23, 2010) (compensatory damages redress "the injury sustained, and nothing more;" they "make good or replace *the loss caused by the loss or injury*") (citation omitted; emphasis added).

[97] In some respects, the Trust's damages argument makes logical sense because if the Court were to collapse the corporate entities into "one" then the Defendants would stand in the "shoes" of Maxus (i.e., the Defendants caused all Maxus's damages and liabilities). The counterargument also makes logical sense. Was Maxus an alter-ego of the Defendants for one week, one month or one year or were the corporate entities so intertwined that the Defendants "are" Maxus? What harm was caused by such corporate entity collapse (i.e., a fraction of the harm suffered by Maxus)? Here again, it is impossible to answer such questions on summary judgment.

suffered was proximately caused by the Defendants' alleged misuse of control over Maxus and then, if so, to what extent.

When fitting, damages may be reverse bifurcated from liability.[98]  Or, under the right set of circumstances and undisputed facts, the Court can conceive how it may be possible to determine damages prior to liability at the summary judgment phase. However, under these multifaceted and highly fact-intensive circumstances, moving the Court to decide the quantum of damages prior to a ruling on alter ego liability is putting the proverbial cart before the horse.

"The amount of damages a plaintiff is entitled to receive does not become an issue until after a finding of the defendant's liability."[99]  As eloquently put by the Southern District of New York, "[i]t is axiomatic that summary judgment as to damages can only follow a determination that damages are in fact owed (i.e., that the defendant is actually liable for damages)."[100]  In fact, "[a]warding partial summary judgment on damages issues *which depend upon the resolution of controverted matters* would be tantamount to

---

[98] *See generally Borman v. Raymark Indus., Inc.*, 960 F.2d 327 (3d Cir. 1992) (appeal from reverse bifurcated trial); *see also Greenleaf v. Garlock, Inc.*, 174 F.3d 352 (3d Cir. 1999) (explaining that damages are considered in "Phase I" and liability is considered in "Phase II" under a reverse bifurcated format).  Neither the Trust nor the Defendants have requested reverse bifurcation.

[99] *Scharba v. Braden*, Case No. 8:07-cv-1294-T-33TBM, 2008 WL 11336591, at *2 (M.D.Fla. 2008).

[100] *Lovely H. v. Eggleston*, No. 05 Civ. 6920(KBF), 2012 WL 4459463, at *2 (S.D.N.Y. 2012).

advisory opinions."[101]  It is well-settled law that federal courts will not give advisory opinions.[102]

The ultimate issue here – the quantum of damages YPF and Repsol are potentially responsible for, if any, turns directly on whether YPF and Repsol are found liable *at all* (and then, to what extent) on the Trust's alter ego claim.  That claim, as conceded by the Trust, is based on material facts which are heavily in dispute.[103]  Thus, liability for the Defendants' alleged alter ego conduct is an unresolved gate-keeping issue that must be resolved before the Court can address the quantum of damages.

Although the Trust argues that Fed. R. Civ. P. 56(g)[104] permits the Court to treat certain facts as undisputed even if the Court declines to grant the relief requested by its Motion, that Rule is only triggered when the underlying facts are *actually* undisputed.  Here, the scope of alter ego liability is entirely disputed and so are the damages that flow from the alleged alter ego conduct.  Accordingly, the Court will not use Fed. R. Civ. P. 56(g) as a mechanism to rule on the quantum of damages at this juncture.

For the foregoing reasons, the Trust's Motion with respect to the damages portion of Count I is denied.  The Trust's All Liabilities Damages Theory fails as a matter of law

---

[101] *Robson v. Duckpond, Ltd.*, Case No. 4:19-cv-01862-SRC, 2021 WL 1222429, at *8 (E.D.Mo. 2021) (*citing Marshall Contractors, Inc. v. Peerless Ins. Co.*, 827 F. Supp. 91, 93 (D.R.I. 1993)) (internal quotations omitted).

[102] *Robson*, 2021 WL 1222429, at *8 (*citing Flast v. Cohen*, 392 U.S. 83, 88 (1968)) ("The oldest and most consistent thread in the federal law of justiciability is that federal courts will not give advisory opinions.").

[103] Adv. D.I. 622 (Trust Mot.) at pp. 32-33 ("[G]iven the fact-intensive inquiry of the alter-ego exercise … the issue of whether the Defendants are alter egos of the Debtors might not be susceptible to resolution on summary judgment.").

[104] Fed. R. Civ. P. 56(g) states that, "if the court does not grant all the relief requested by the motion," the court may nevertheless "enter an order stating that any material fact – including an item of damages or other relief – that is not genuinely in dispute and treat the facts as established" for purposes of trial.

and, instead, the Causation Damages Theory applies. To that end, a determination as to the quantum of damages depends on material facts in dispute and is premature at this stage.[105] At trial, the Trust must meet its burden in proving the causal link between the harm alleged and the damages sought. The Class 4 and Class 5 Claims are not to form the basis for damages per se at trial.

## B. Fraudulent Transfers

The Trust seeks partial summary judgment, establishing Defendants' liability on its actual fraudulent transfer claims against YPF and Repsol on (1) the individual 1996-1997 Transfers (Bolivia Assets, Venezuela Assets, Ecuador Assets, and Indonesia Assets) (Counts II, IV, VI, VIII, and X); (2) the Crescendo Transfer (Count XII); and (3) the YPFI Transfers (of the Bolivia Assets, Venezuela Assets, Ecuador Assets, and Indonesia Assets) (Count XIV) (collectively, the "Intentional Fraudulent Transfers").

### i.   Actual Fraudulent Transfers

Section 548(a)(1)(A) governs federal claims for actual fraudulent transfers. Section 548(a)(1)(A) of the Bankruptcy Code provides that "[t]he trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or

---

[105] Because the Court is not posed to determine the quantum of damages at this juncture, the Trust's request for prejudgment interest is moot.

became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . ."[106]

Delaware's Section 1304(a)(1), made applicable through 11 U.S.C. § 544(b), has no material distinction from § 548(a)(1)(A). The pleading requirements for both the state and federal claims are identical. The difference between the federal and state transfer claims is that the state transfer claims have statutory provisions of elements the Court can consider in evaluating actual intent.[107] These same statutory elements are incorporated through case law into § 548 in the form of "badges of fraud."[108]

### ii.    "Transfers" of "Interests" of the Debtors in "Property"

"Transfer" is defined in the Bankruptcy Code and includes (a) the creation of a lien, (b) the retention of title as a security interest, (c) the foreclosure of a debtor's equity of redemption, or (d) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property.[109]

---

[106] 11 U.S.C. § 548(a)(1)(A).

[107] DUFTA also has a longer statute of limitations. *See* Adv. D.I. 622 (Trust Mot.) at p. 41 n. 47 ("[A]lthough the Bankruptcy Code and the DUFTA use the same substantial language . . . the Trust will rely on the DUFTA because of its longer statute of limitations.").

[108] DUFTA lays out the badges of fraud that the trial court may consider when inferring actual intent to defraud. *See* 6 Del. C. § 1304(b). Although DUFTA contains 11 badges of fraud, the Trust only moves for summary judgment on nine (9) of the 11, Factors 6 and 11 are not presented by the Trust and, thus, are not discussed herein.

[109] 11 U.S.C. § 101(54).

The Trust is asking the Court to find that (i) the 1996-1997 Maxus Transfers, (ii) the 2001-2002 YPFI Transfers, and (iii) the Crescendo Transfer "involved transfers of interests of the Debtors in property to both initial transferees and subsequent transferees."[110]

There is no dispute that the 1996-1997 Transfers were transfers of the Debtors' interest in property. It is undisputed that the Bolivia Assets, Venezuela Assets, Ecuador Assets, and Indonesia Assets were transferred from Maxus to YPFI. YPF does not dispute such. But, as discussed below, YPF asserts that its alleged fraudulent intent must be imputed to Maxus.

Although, no party disputes that the remaining enumerated transactions are "transfers," the Court cannot yet rule whether (i) the 2001-2002 YPFI Transfers were "by a Debtor" (*see infra*) and (ii) whether Repsol benefited from the Crescendo Transfer.[111] There are material disputes of fact as to whether YPFI is an alter ego of Maxus, thereby making the 2001-2002 Transfers a "transfer by a debtor." Furthermore, there are disputes

---

[110] *Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171, 181–82 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*, 142 S. Ct. 1209, 212 L. Ed. 2d 217 (2022) ("Section 550 authorizes a trustee to recover transfers voided under Section 548 from initial and subsequent transferees. *See* 11 U.S.C. § 550(a). But those transferees may defend against such recovery under various provisions of Sections 548 and 550, depending on whether they are initial or subsequent transferees. Section 550(b)(1), applicable only to subsequent transferees, enables 'a transferee that takes for value, . . . in good faith, and without knowledge of the voidability of the transfer avoided" to retain the property transferred. 11 U.S.C. § 550(a)(2)–(b)(1). Initial transferees find recourse in § 548(c), under which a transferee "that takes for value and in good faith has a lien on or may retain any interest transferred ... to the extent that such transferee ... gave value to the debtor in exchange for such transfer.' *Id.* § 548(c). The 'main difference' between § 550(b)(1) and § 548(c) is that § 550(b)(1) provides 'a complete defense to recovery of the property transferred,' whereas under § 548(c), 'the transaction is still avoided, but the transferee is given a lien to the extent value was given in good faith.'" (additional citations omitted)).

[111] Again, the Court must first rule on alter ego before it can decide if Repsol was an initial or subsequent transferee. The Trust concedes this point. Adv. D.I. 697 (Trust's Opp. to Repsol) at p. 27-28 (arguing that Repsol is liable as a 550 Defendants even though trial issues of fact remain regarding whether Repsol was a subsequent transferee).

of material fact as to whether the RIF Loan, which directly came out of the Crescendo Transfer proceeds, was a benefit to Repsol.[112]

Thus, although the Court could make a ruling finding that all of the above transactions are "transfers," it would be meaningless as the Court cannot determine whether the 2001-2002 Transfers were by a Debtor and whether the Crescendo Transfer involved "interests" of the Debtors in property to an initial or subsequent transferee.[113] Moreover, the issue of whether YPF's intent can be imputed to Maxus also remains outstanding, as discussed *infra*.

### a. Repsol's Good Faith Defense

Repsol also argues that it has a "good faith" defense to the YPFI and Crescendo Transfers.[114]

> In analyzing the issue of good faith, a court must consider whether the transferee had actual knowledge of the debtor's fraudulent purpose in making the transfers or had knowledge of facts or circumstances that would have induced an

---

[112] The Trust alleges that the RIF Loan was at a below-LIBOR rate and paid irregularly based on Maxus's cash needs (unlike a "traditional loan"); whereas Repsol asserts that RIF repaid Maxus the funds which allowed Maxus to pay for its operations and liabilities, including environmental liabilities under the OCC indemnity. Accordingly, the benefits of the Crescendo Transfer must be explored at trial.

[113] *See infra* pp. 128-129 (same).

[114] *See* Section 548(c) of the Bankruptcy Code which provides:

> Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

*See also* DUFTA §1308. "Under both the UFTA and Section 548(c) of the Bankruptcy Code, the transferee bears the burden of establishing good faith." *Wagner v. Ultima Homes, Inc. (In re Vaughan Co., Realtors)*, 493 B.R. 597, 610 (Bankr. D.N.M. 2013) (citations omitted).

ordinarily prudent person to make inquiry and if the inquiry, if made with reasonable diligence, would have led to the discovery of the debtor's fraudulent purpose.

"Once a transferee has been put on inquiry notice of either the transferor's possible insolvency or of the possibly fraudulent purpose of the transfer, the transferee must satisfy a 'diligent investigation' requirement.'"   A transferee cannot meet its burden of a diligent inquiry by intentionally remaining willfully ignorant of facts that would cause it to be on notice. The willful blindness inquiry focuses on whether an individual took deliberate action to avoid learning of a fact after there was a high probability that the fact was true.   A transferee may not put on "blinders" prior to entering into transactions with the debtor where circumstances would place the transferee on inquiry notice of the debtor's fraudulent purpose or insolvency.[115]

Here, Repsol asserts that, at the time of their hostile take-over, they *only* had knowledge of the transfers as disclosed in SEC filings.  However, the Trust counters that Repsol quickly learned of the Strategy and ratified it to serve its own purpose.[116]

If the focus of the Court's inquiry is whether Repsol possessed or should have possessed knowledge of facts that a transfer may be fraudulent, it suffices to say that, at this stage, it remains to be proven whether such transfers were, in fact, actually fraudulent.  Even if Repsol knew that transfers had occurred and that Maxus had legacy environmental liabilities through SEC filings, whether such knowledge negates Repsol's good faith defense is a question of fact for the trial court.

---

[115] *Mongelluzzi v. Regions Bank (In re Mongelluzzi)*, 587 B.R. 392, 411–12 (Bankr. M.D. Fla. 2018), *on reconsideration in part sub nom. In re Able Body Temp. Servs., Inc.*, No. 8:13-BK-06864-CED, 2018 WL 11206122 (Bankr. M.D. Fla. Sept. 4, 2018) (citations and quotation marks omitted).

[116] *Wasserman v. Bressman (In re Bressman)*, 327 F.3d 229, 236 (3d Cir. 2003) ("If a transferee possesses knowledge of facts that suggest a transfer may be fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that the property is recoverable, he cannot sit on his heels, thereby preventing a finding that he has knowledge. In such a situation, the transferee is held to have knowledge of the voidability of the transfer.").

Furthermore, Repsol relies on the King & Spalding memoranda to make its good faith argument.  The Trust asserts that Repsol did not produce these (and other documents) due to claims of privilege.  The Trust asserts that Repsol cannot use the legal memoranda as a "sword and a shield."[117]

At this point, it is premature to make a ruling on Repsol's alleged good faith defense given the outstanding issues of fact (including a potential discovery dispute).

---

[117] Repsol in its pleadings and statements of facts makes statements about King & Spalding's ("K&S") advice as to solvency, alter ego claims, and earlier fraudulent transfers. *See, e.g.*, Adv. D.I. 638 (Repsol Mot.) at p. 52 ("[T]he 2005 memorandum . . . cannot show Repsol's knowledge of a strategy"; "K&S was instructed to assume Maxus's insolvency for the purpose of its analysis;" and "K&S merely suggested possible alternatives to addressing Maxus's environmental liabilities, most of which were never implemented or outright rejected.").  Foreshadowing yet another discovery dispute, the Trust asserts that Repsol cannot ask this Court to enter summary judgment in its favor and make myriad findings concerning what King & Spalding advised Repsol generally based on a handful of documents when Repsol continues to withhold as privileged other contemporaneous King & Spalding communications. In that regard, the Trust believes that Defendants are withholding documents from King & Spalding, as well as other legal advice and communications pertaining to the Defendants' potential alter ego liability and Debtors' environmental liabilities.  While the Trust asserts that YPF makes similarly improper conclusory statements about advice it received from its advisors (Andrews & Kurth and Chadbourne & Parke), the Trust claims that Repsol's request that this Court make findings of fact with respect to the draft King & Spalding memoranda are particularly egregious because, on their face, the Trust has only two drafts of the memorandum at issue with significant missing attachments to the Index which, based on their titles alone, according to the Trust, indicate they are highly relevant to the findings of fact Repsol now seeks.  *See* Adv. D.I. 624 (Smith Decl. Ex.), 14 at MLTLEGACYESI_002711995-2711996 (listing attachments, including "Maxus Corporate History," "List of Material Documents Reviewed During Due Diligence," the "Contribution Agreement," "Memorandum Regarding Veil Piercing and Substantive Consolidation," "Memorandum Regarding Fraudulent Transfer Laws," and "Opinion of the United States District Court for the Western District of Michigan in *Kelley v. Thomas Solvent Co.*"); *see also* Adv. D.I. 624 (Smith Decl.), Ex. 142 at MLTLEGACYESI_002711995-2711997 (which contains largely, but not completely overlapping list of attachments with all but two attachments unproduced).  Repsol has never produced a full and final memorandum with the attachments listed in the indices. The Trust asserts that this is a case of using privilege as a sword and a shield, and seeks a ruling from the Court either: (i) denying Repsol the relief it seeks or (ii) finding a general subject matter waiver with respect to, at the very least, all the King & Spalding communications and advice. The Trust has reserved the right to properly present this issue before the Court at a later time.  To that end, the Court finds that this discovery dispute has not been properly presented at this time.  In fact, this discussion, although raised at oral argument, is limited to one footnote in the Trust's reply.  The Court notes this discovery dispute and leaves it for the trial court to determine the privilege issue before trial upon proper presentation.

### b. Collapsing Defendants and Transactions

Furthermore, the Defendants assert that the Trust "lumps" together (i) all Defendants and (ii) all the transactions in order for the Court to apply § 550 of the Bankruptcy Code.  The Court finds that such a ruling would be premature.[118]

Although the Trust is seeking summary judgment based on its theories of actual fraudulent transfers, as set forth in more detail below, there are disputes of material fact that prevent the entry of summary judgment.  As the Trust is not receiving a judicial determination on its claims under § 548, summary judgment on the grounds of § 550 are premature, as the condition precedent to recovery has not been met.[119]

### c. Imputing Intent

If the Trust cannot prove its alter ego theory,[120] to succeed on actual fraud, the plaintiff must establish fraudulent intent on the part of the debtor.[121]   "There is an exception to this rule, however. Most courts recognize that when a transferee is in a

---

[118]  The Court will discuss the collapsing doctrine in full *infra*.  For the purposes of the discussion herein, the only relevant fact is that the Court is not granting summary judgment on the allegations of actual fraudulent transfers and, thus, any ruling on § 550 would be premature.

[119]  *FBI Wind Down Inc. Liquidating Trust v. All American Poly Corp. (In re FBI Wind Down, Inc.)*, 581 B.R. 116, 146 (Bankr. D. Del. 2018).  *See also Mervyn's Holdings, LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 96, 102 (Bankr. D. Del. 2010) ("A valid avoidance claim against a subsequent transferee, requires a plaintiff to plead and prove that (1) the initial transaction was avoidable and (2) the initial transfer was later made to-or for the benefit of-the subsequent or mediate transferee." (*citing* 11 U.S.C. § 550(2009)).

[120]   *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 369 (S.D. Tex. 2008) ("Although there is no Delaware case law indicating whether Delaware would impute the transferee's intent onto the debtor/transferor if the domination and control test is met, this seems to be a generally recognized rule, and the Court predicts that the high court in Delaware would adopt this rule if called upon to do so.")).  *Elway Co., LLP v. Miller (In re Elrod Holdings Corp.)*, 421 B.R. 700, 712 (Bankr. D. Del. 2010) ("Cases imputing a transferee's intent to a transferor have typically involved sole shareholders of the transferor, with complete control of the transferor, transferring assets to themselves as transferee.").

[121]  *ASARCO LLC*, 396 B.R. at 369 (citations omitted).

position to dominate or control the debtor's disposition of the property, the transferee's intent to hinder, delay, or defraud will be imputed to the debtor/transferor."[122]   To establish this exception, the Trust must prove: (i) YPF possessed the requisite intent to hinder, delay or defraud Maxus's creditors, (ii) YPF was in a position to dominate or control Maxus; and (iii) this domination and control related to Maxus's disposition of the property.[123]

The Trust did not move for summary judgment on direct fraudulent intent (only on badges of fraud) or the issues of imputing fraudulent intent.  To the extent those issues were raised in response to the Trust's Motion and at oral argument, the issue of whether to impute the Defendants' knowledge or intent to Maxus is one of fact.  Namely, two elements necessary to impute the Defendants' knowledge are the same two elements of an alter-ego claim, which the Court finds (*infra*) to be a fact-intensive issue reserved for trial.[124]  The Trust asserts that imputation is shown through YPF employees and agents that dominated Maxus.  However, at this point, the Court does not know if YPF had fraudulent intent; in other words, the Court must first determine if YPF had fraudulent intent before it turns to whether such fraudulent intent can be imputed to the Debtor.

---

[122] *Id.* at 369 (citations omitted).

[123] *Id.* (citations omitted).

[124] *See In re Vaso Active Pharms., Inc.*, No. 10-10855 CSS, 2012 WL 4793241, at *10 ("There is a three-part test for determining whether the 'imputation doctrine' is applicable. 'First, is that the controlling transferee possesses the requisite intent to hinder, delay, or defraud the debtor's creditors.  Second, the transferee must be in a position to dominate or control.  And third, the pertinent domination and control relates to the debtor's disposition of his property.'" (citations and footnotes omitted)).

This inquiry might not be necessary if the Court finds that Maxus is an alter ego of YPF; however, again, the Court cannot make this ruling on summary judgment.[125]

Imputation is a gatekeeping issue that is not properly raised or sufficiently briefed on summary judgment and remains an issue for the trial court.

### iii.    Badges of Fraud

DUFTA lays out the following badges of fraud that the trial court may consider when inferring actual intent to defraud,[126] including whether:

>    (1) The transfer or obligation was to an insider;
>
>    (2) The debtor retained possession or control of the property transferred after the transfer;
>
>    (3) The transfer or obligation was disclosed or concealed;
>
>    (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
>    (5) The transfer was of substantially all the debtor's assets;
>
>    (6) The debtor absconded;
>
>    (7) The debtor removed or concealed assets;
>
>    (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
>    (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
>    (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

---

[125] *See* Adv. D.I. 701 (Trust Reply) at pp. 69-71; *but see* Adv. D.I. 642 (YPF Opp.) at pp. 39-41.

[126] As there is no direct evidence of actual intent.  The Court must consider circumstantial evidence to review the badges of fraud.  *MSKP Oak Grove, LLC v. Venuto*, 839 F. App'x 708, 712 (3d Cir. 2020) ("Because debtors rarely admit fraudulent intent, courts must usually infer it.").

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[127]

"Even [though] one badge of fraud can trigger a presumption of fraud," one badge is not considered conclusive evidence of fraudulent intent.[128]   Rather, it is the "confluence of several [badges] in one transaction [that] generally provides conclusive evidence of an actual intent to defraud."[129]

### a.  Badge 1: Were the Transfers Made to Insiders?[130]

"Transfers to an affiliate are deemed transfers to insiders."[131]   If the debtor is a corporation, the term 'insider' *includes*: (i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor.[132]   Furthermore, under DUFTA, an affiliate includes "[a] corporation, 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote by the debtor or a

---

[127] 6 Del. C. § 1304(b).  To the extent YPF moves on badges 6 and 11, the parties are essentially in agreement that these badges are not applicable to the facts of this matter and, thus, will not be discussed by the Court herein.

[128] *MSKP Oak Grove, LLC*, 839 F. App'x at 713 (citations omitted). *Gilchinsky v. Nat'l Westminster Bank N.J.*, 159 N.J. 463, 477, 732 A.2d 482, 490 (1999) ("Actual intent often must be established through inferential reasoning, deduced from the circumstances surrounding the allegedly fraudulent act." (citations omitted)).

[129] *See Zohar CDO 2003-1. Ltd. v. Patriarch Partners, LLC (In re Zohar III, Corp.)*, 631 B.R. 133, 174 (Bankr. D. Del. 2021) ("[T]he presence or absence of any single badge of fraud is not conclusive … Although the presence of a single factor, i.e.[,] badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud") (internal quotations and footnote omitted).

[130] The Trust admits that the transfer from YPFI to CNOOC of the Indonesia Assets and the Crescendo Transfer were made to non-affiliates and are not applicable under Factor 1.

[131] *Tronox II*, 503 B.R. at 283 (citation omitted).

[132] 11 U.S.C. § 101(31)(B).  *See also In re Vaso Active Pharms., Inc.*, 2012 WL 4793241, at *11.

person who directly or indirectly owns, controls or holds with power to vote 20 percent or more of the outstanding voting securities of the debtor."[133]

### 1. *Repsol*

The Trust asserts that the Crescendo assets were sold to a third party, all of the proceeds from that sale—the money the Trust now seeks to recover from the Defendants—indisputably went from one set of Repsol subsidiaries (Maxus and its subsidiary, Midgard) to Repsol or a Repsol subsidiary (YPF, as a result of the $262.1 million in debt repayments to YPFI, which were ultimately transferred through a dividend to Repsol, with the $325 million remainder of the proceeds going to RIF in the form of a loan with a below LIBOR rate of interest). However, the Trust concedes that "[t]he transfer from YPFI to CNOOC of the Indonesia Assets and the Crescendo Asset Sale were made to non-affiliates."[134] Each of the YPFI Transfers in 2001-2002 of the legacy Bolivia, Ecuador, and Venezuela Assets, were made from one Repsol subsidiary (YPFI) to other Repsol subsidiaries (Repsol YPF Santa Cruz S.A., Repsol YPF Ecuador, Repsol Exploración S.A., and Repsol Exploración Venezuela B.V. respectively). The proceeds from the YPFI Transfers also were first used to cancel or pay down intercompany debt or otherwise transferred through a dividend to YPF, and then transferred through a dividend to Repsol. Accordingly, there is a material dispute of fact as to whether such

---

[133]  6 Del. C. § 1301(1).

[134]  Adv. D.I. 621 (Plaintiff's Mot.) at n. 53.

payments were made by an "insider" and (of course) whether YPFI is an alter ego of Maxus, which is not subject to the Plaintiff's Motion.[135]

## 2. *YPF*

YPF appointed a majority of Maxus's directors (5 of the 8) and YPF was Maxus's sole shareholder at the time of the 1996-1997 Transfers.  Furthermore, each of the 1996-1997 Transfers were made from one set of YPF subsidiaries (Maxus and its subsidiaries, MIEC and Maxus Indonesia) to another YPF subsidiary (YFPI), i.e., from one affiliate to another.[136]  At the time of the Global Restructuring, both YPF and Maxus recognized that the restructuring could not be implemented without the disinterested directors' approval as mandated by Article Nine of Maxus's Articles of Incorporation.[137]  Thus, YPF argues that the disinterested directors controlled whether to execute the Global Restructuring.

Although there is no dispute that the 1996-1997 Transfers were made to YPFI, an affiliate of YPF, it is disputed whether having disinterested directors who voted in favor of these Transfers "cleansed" these transactions.  This is a mixed question of law and fact

---

[135] *See* Adv. D.I. 621 (Plaintiff's Mot.) at n. 48 ("The Trust submits that there may be triable issues of fact concerning whether YPFI was the alter ego of Maxus, and whether, as a result of being Maxus's alter ego, YPFI's subsequent transfers of the Bolivia Assets, Venezuela Assets, and Ecuador Assets to Repsol and the Indonesia Assets to CNOOC constituted transfers of "interest[s] of the Debtor in property" under Sections 544 and 548 of the Bankruptcy Code.").

[136] YPFI was initially formed as a direct subsidiary of MIEC with the purpose of purchasing, receiving and holding Maxus's Venezuela, Bolivia, Ecuador, and Indonesia Assets, and was later restructured as the holding company of YPFH.

[137] Adv. D.I. 624 (Smith Decl.), Ex. 18 at 41.

as to whether the disinterested directors had "control" and whether such control insulates an otherwise insider transaction.[138]

Accordingly, the issue for trial is whether having disinterested directors insulates an otherwise insider transaction; if not, the Trust should prevail on this badge.  Neither party provided case law to this pivotal question.  However, here, the Trust has alleged that YPF dominated Maxus, transferred Maxus's assets to an affiliate of YPF, all to strand Maxus's environmental creditors.  The Trust has asserted material facts, which YPF sufficiently disputes, for the trial court to determine whether the alleged disinterested directors who voted in favor of Transfers insulated the insider transactions; or whether they were so controlled by YPF as to hinder, delay and defraud Maxus's creditors.[139]  As such, this badge is not appropriate for summary judgment.

---

[138] *Weinstein Enterprises, Inc. v. Orloff*, 870 A.2d 499, 512 (Del. 2005) ("To establish that the committee was not independent, it is not enough for Orloff to assert that the Mays directors were nominated by Weinstein, the majority stockholder that controlled the outcome of the board election.  A controlling interest or majority stock ownership does not deprive the corporation's directors of the "presumptions of independence, and that their acts have been taken in good faith and in the best interests of the corporation. There must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person [or entity]." (footnotes and citations omitted)).  *See also Loveman v. Lauder*, 484 F. Supp. 2d 259, 269 (S.D.N.Y. 2007) (holding that "particularized allegations that a director yielded to the wishes of a controlling shareholder, as opposed to exercising his or her independent business judgment, would rebut the presumption of independence." (footnote and citations omitted)).

[139] *See In re Vaso Active Pharms., Inc.*, 2012 WL 4793241, at *11 (finding that the debtor's independent board of directors and the board of directors' approval of all transactions created disputed of material facts precluding summary judgment as to this factor).  *See also Kirschner v. Large Shareholders (In re Trib. Co. Fraudulent Conv. Litig.)*, 10 F.4th 147, 161 (2d Cir. 2021), *cert. denied sub nom. Kirschner v. FitzSimons*, 142 S. Ct. 1128, 212 L. Ed. 2d 18 (2022) (finding that "Trustee failed to plausibly allege that the intent of Tribune's senior management should be imputed to the Special Committee because the Trustee failed to allege that Tribune's senior management controlled the transfer of the property in question.").

b. *Badge 2: Did the Debtors Retain Possession or Control of the Property Transferred After the Transfers?*

The second badge of fraud is met where a party has "exclusive control over the property transferred" after the transfer.[140]  The Trust asserts that through the YPF created "Maxus Management Group," Maxus retained control over the transferred assets and through which Maxus personnel with specialized knowledge and expertise continued to manage and operate the international E&P assets.  The Trust further asserts that the Maxus Management Group was an "agreement" under which Maxus personnel managed the operations of Maxus and the former E&P assets that were transferred to YPFI, and the operational and financial results of Maxus Management Group were presented to Maxus's directors as though they were Maxus's own.

1. *Repsol*

Maxus did not retain possession or control of the property sold as part of the Crescendo Sale or 2001-2002 YPFI Transactions.  Rather, the property went to third parties (Crescendo and Indonesia) or to certain Repsol entities, in the case of certain YPFI Transactions (Venezuela, Ecuador, Bolivia).  Additionally, Maxus never had possession of significant portions of the assets in the 2001-2002 YPFI Transactions (e.g., Andina (part of Bolivia) and Block 14 (part of Ecuador)).  However, the Trust asserts that while there was a new corporate entity (YPFI), a new intercompany payment arrangement, and a new board and management for that entity (comprised of Maxus officers and directors), that does not alter the control issue asserted in this factor.  Furthermore, there is a dispute

---

[140] *Tronox II*, 503 B.R. at 283.

as to whether the Maxus Management Group ceased to be used after Repsol acquired YPF (the Trust asserts that for at least the three years between Repsol's acquisition of YPF and the completion of the YPFI Transfers, the Maxus Management Group managed the operations of Maxus' legacy assets for YPFI).

These are disputes of material fact, control and possession, and what employees were controlling what and when, that the Court cannot determine at the summary judgment phase.

### 2. *YPF*

YPF asserts that the Trust does not allege that Maxus Management Group had *exclusive* control nor that Maxus Management Group, a non-legal entity, operated outside of YPFI's directors and officers, who had legal control over the assets.  Furthermore, it is unclear whether Maxus was regularly paid for its services and whether the revenues and cash flows from these assets flowed to YPFI, or Maxus.[141]

Again, this is a dispute of material fact and it would be inappropriate to enter summary judgment on this badge.

### c.  *Badge 3: Were the Transfers or Obligations Disclosed or Concealed?*

A third badge of fraud exists when a transferor or transferee "concealed the nature and existence of transfers from Debtor's creditors at the time the transfers were made."[142]

The Trust claims that YPF and Repsol only made limited disclosures about the scope of Maxus's potential environmental obligations, particularly with respect to the

---

[141]  *See* Adv. D.I. 646 (YPF SOF) at ¶¶ 389-99.

[142]  *In re Vaso Active Pharms., Inc.*, 2012 WL 4793241, at *13.

DASS.  The Trust continues that YPF, and later Repsol, routinely took the public position

that, because there was "uncertainty" about the final remedy selected by the EPA, the

liabilities were "unknown" and, as such, Maxus's stated environmental reserves never

anticipated any final remedial costs for the Passaic River and Newark Bay — instead they

stated only the short-term expected expenditures on activities leading up to selection of

a remedy.

Repsol and YPF respond that the restructuring was disclosed in SEC filings and

that environmental liability was adequately disclosed as well, including descriptions and

remedial efforts at the major OCC sites subject to the OCC Indemnity.[143]

Repsol and YPF also assert that the EPA and OCC - Maxus's largest creditors –

were certainly aware of the ongoing regulatory developments at the Passaic River.

Furthermore, both YPF and Repsol could have only disclosed *what they knew* at the time

of each disclosure – another material question of fact.  In effect, Repsol and YPF state they

made disclosures and those disclosures were sufficient.[144]

---

[143]  YPF cites to the New Jersey Superior Court decision which states: "each [of the Global Restructuring] transaction[s were] disclosed in contemporaneous filings with the Securities Exchange Commission.  The last transaction, which took place in 1999, was disclosed to the SEC – and therefore became public – on June 2, 2000."  *N.J. Dep't of Envtl. Prot. v. Occidental Chem. Corp.*, 2015 N.J. Super. LEXIS 230, at * 4.  However, this holding relates to the statute of limitations and whether OCC acted reasonably when such transfers were announced in the SEC filings.  *Id.* at 21.  This is a holding related to "notice" and not "adequacy." *See Tronox II*, 503 B.R. at 284.

[144]  *See* D.I. 644 (Lee Decl.), Ex. 5 (1996 YPF Annual Report Form 20-F) at p. 35, which states:

> YPF International believes that its policies and procedures in the area of pollution control, product safety and occupational health are adequate to prevent unreasonable risk of environmental and other damage, and of resulting financial liability, in connection with its business.  Some risk of environmental and other damage is, however, inherent in particular operations of YPF International and, as disclosed below, Maxus, a subsidiary of YPF International, as certain potential liabilities associated

However, timing and sufficiency[145] are certainly questions of fact which necessitate evidence. These facts include questions of who knew what when and to what extent the liability was estimated? These are disputed questions for a trial court.[146] Furthermore, the strip-and-strand Strategy was never disclosed. Again, the trial court must determine what the appropriate disclosure should have been and whether it was made.

---

> with former operations. YPF International cannot predict what environmental legislation or regulations will be enacted in the future or how existing or future laws or regulations will be administered or enforced. Compliance with more stringent laws or regulations, as well as more vigorous enforcement policies of the regulatory agencies, could in the future require material expenditures by YPF International for the installation and operation of systems and equipment for remedial measures and in certain other respects. Such potential expenditures cannot be reasonably estimated.
>
> In connection with the sale of Maxus' former chemical subsidiary, Diamond Shamrock Chemical Company ("Chemicals"), to Occidental Petroleum Corporation ("Occidental") in 1986, Maxus agreed to indemnify Chemicals and Occidental from and against certain liabilities relating to the business or activities of Chemicals prior to September 4, 1986 closing date (the "Closing Date"), including certain environmental liabilities relating to certain chemical plants and waste disposal sites used by Chemicals prior to the Closing Date.

[145] *See e.g., Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 384 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004) ("The transactions here were not done in 'secret' and there was no effort to 'hide' any aspect of the transfers. To the contrary, the transfers involved public companies and were done openly. They were reported in Keene's (or Bairnco's) publicly-filed reporting statements. A **reasonable jury could only find that this factor weighs heavily against a finding of fraud**." (citations omitted, emphasis added)).

[146] *Off. Committee of Unsecured Creditors v. Goldman Sachs Credit Partners (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 545 (Bankr. D. Del. 2009) ("The fact that some financial covenants in the loan agreement were redacted pursuant to a request to the SEC for confidential treatment does not mean Fedders' transfer to the Lenders—memorialized in a security interest that was also publicly recorded—was materially concealed.").

### d. Badge 4: Before the Transfers Were Made or Obligations Were Incurred, the Debtors Were Sued or Threatened with Suit

It would be a badge of fraud if "prior to the transfer, Debtor had been sued or was threatened with suit relating to the disposition of the [funds.]"[147]

The Trust asserts that there is no dispute that Maxus had been in active litigation or in pre-litigation discussions with third parties and environmental regulators for years regarding (1) its liabilities for environmental remediation at multiple sites other than the DASS; (2) its indemnification responsibilities pursuant to the SPA with OCC; and (3) its liabilities for environmental remediation at the DASS.

### 1. Repsol

Although the Trust asserts that Repsol received periodic updates regarding pending litigation, there is no evidence about what Repsol was told during those updates. And, as yet, there is no assertion that Repsol knew the environmental liabilities would be substantial (i.e., in the billions of dollars) at the time Repsol made any of the transfers. Repsol further asserts that the environmental litigation, at the time, was against Maxus based on its contractual indemnity to OCC and that any such litigation would have no impact on YPFI and would not motivate Repsol to transfer away YPFI assets in the face of Maxus's liability to OCC.

---

[147] *In re Vaso Active Pharms., Inc.*, 2012 WL 4793241, at *13.  *Ingalls v. SMTC Corp. (In re SMTC Mfg. of Texas)*, 421 B.R. 251, 310–11 (Bankr. W.D. Tex. 2009) ("This factor is listed as a badge of fraud because the pendency of litigation implies fraudulent intent when the circumstances show that there is a causal connection between the threatened litigation or judgment and the transfer." (citations omitted)); *Dickinson v. Ronwin*, 935 S.W.2d 358, 364 (Mo. Ct. App. 1996) ("Conveyances made for the purpose of defeating an anticipated judgment in a case pending or about to be commenced are in fraud of creditors and void as to such plaintiff." (citation and internal quotation marks omitted)).

Here, again, there is a dispute of material fact as to what Repsol knew and when. And, whether the entities were so hopelessly intertwined (i.e., alter ego theories) that such entities were collapsed and such transfers were made to evade liability, or whether they were made for other corporate purposes (as alleged by Repsol).

Also, it is not entirely clear, without a further evaluation of the underlying litigation, whether there is a causal connection between the litigation and Repsol's motivation to transfer assets.

### 2. *YPF*

YPF asserts that the timing of the transfers indicates whether the transfers were to evade the lawsuit or whether the transfers were independent of any suit. Although, on the whole, the Court agrees with this contention,[148] in this case the environmental lawsuit has been going on for decades, and approximately $14 billion are at issue between and among the parties for the environmental clean-up.[149] The environmental issues at the DASS, in particular, had been known since at least 1983, and had resulted in regulatory orders in 1987 and 1994. Maxus had been aware of the likelihood of regulator action for at least 13 years before the first transfer in the Global Restructuring and continued to

---

[148] *Feldman v. Carbone (In re Carbone)*, 615 B.R. 76, 82–83 (Bankr. E.D. Pa. 2020), *reconsideration denied*, No. 18-13852 (JKF), 2020 WL 1680728 (Bankr. E.D. Pa. Mar. 31, 2020) ("While the transfer occurred after the suit was filed, six years would pass before the transfer was made. That amount of time makes it less of an indication that the transfer necessarily occurred in response to the lawsuit. In other words, the Court does not find the timing of the transfer to be particularly suspicious.").

[149] *Tronox II*, 503 B.R. at 284 (finding that factor 4 was satisfied by a demand letter from the EPA in the months preceding the 2005 IPO); *Springel v. Prosser (In re Innovative Commc'n Corp.)*, No. ADV 08-3004, 2011 WL 3439291, at *27 (Bankr. D.V.I. Aug. 5, 2011), *aff'd*, No. ADV. 3:08-03004, 2013 WL 5432316 (D.V.I. Sept. 27, 2013) (finding presence of fourth badge when "Debtors were facing litigation and clearly analyzing potential liability.").

work toward remediation of the DASS for almost 19 years after the last transfer in the

Global Restructuring, 16 years after the Crescendo Transfer, and 14 years after the YPFI

Transfers.  The environmental litigation in relation to the transfers relates to what YPF

knew and when and, in that regard, when they felt that YPF's investment in Maxus began

to be impacted by the environmental litigation.  The trial court has these questions,

among others, to investigate when determining if the environmental lawsuit resulted in

the "fraudulent transfer" of assets or not.[150]

### e.  Badge 5: Were the Transfers of Substantially All the Debtor's Assets?

The fifth badge of fraud is whether substantially all of Maxus's assets were

transferred to the Defendants.[151]  "The law is not 'majority of,' but, the more amorphous

'substantially all.'  One can easily imagine substantially all of a company's asset being

less than a majority.  . . . The company has fundamentally changed, and, in that case, it

must be that substantially all of its assets have been sold."[152]  The Trust asserts that

through the transfers substantially all of Maxus's assets were removed, sold, transferred,

and Maxus was fundamentally changed.[153]

---

[150] Although, at first blush, the Court is inclined to grant Badge 4 in favor of the Trust as against YPF, the issue of imputation remains and, as a gateway issue, must be decided first.

[151] *In re Vaso Active Pharms., Inc.*, No. 10-10855 CSS, 2012 WL 4793241, at *13.

[152] *Id.* at *14.

[153] *See, e.g.*, Adv. D.I. 624 (Smith Decl.), Ex. 159 (Milbank, Tweed, Hadley & McCloy LLP Memorandum to Clients, dated Apr. 3, 2014) at YPF_MAXUS_PRIV 0000102466-102467:

> The net effect of the YPF Transfers was to transform an entity that at one time held billions of dollars in assets into one with assets optimistically valued at $50 million.  The removal of the prior assets left Maxus with so little in standalone assets and revenues that, as the [K&E] Presentation recounts, in each of the years 2007 through 2010, YPF auditors declined to certify the Maxus Entities as "going concerns" . . . . [F]or purposes solely

### 1. *Repsol*

Repsol asserts in response that any "fundamental changes" prior to 1999 are inapplicable to Repsol.  Furthermore, the Crescendo Transfer resulted in Maxus receiving all the consideration of the sale (and using the proceeds of the sale to make a loan with interest, pay some of its environmental liabilities, as well as invest in exploratory assets).

### 2. *YPF*

YPF asserts that even after the "Global Restructuring" was completed in 1997, Maxus retained domestic assets valued at approximately $1 billion as of June 1999 and was projected to make $200 million annually.

Here again it is a question of material fact as to whether the series of transfers were individual transfers or part of an elaborate, single Strategy.  Without the crucial decision as to whether there was an integrated Strategy (upon which the Trust has not moved), it is fundamentally impossible to conclude whether there was a transfer of substantially all assets.  Will each transfer need to be examined on its own?  Will the transfers be looked at as a whole?  At this point, there are too many material facts in dispute as to whether the transfer of assets was "substantially all" the assets.  As such, it is inappropriate for the Court to rule on Factor 5 on summary judgment.

### f. *Badge 7: Did the Debtors Remove or Conceal Assets?*

This badge examines whether the defendants concealed the nature and existence of the transfers from the debtor's creditors at the time the transfers were made.[154]  The

---

of this badge of fraud, it would appear imprudent to deny that YPF Transfers related to "substantially all" of Maxus' assets.

[154] *In re Vaso Active Pharms., Inc.*, No. 10-10855 CSS, 2012 WL 4793241, at *13.

Trust asserts that, by virtue of the 1996-1997 Transfers, assets were removed from the reach of Maxus's creditors by having stock transferred from a domestic jurisdiction (Delaware, Maxus's state of incorporation) to the Cayman Islands (YPFI's place of incorporation).

Again, this is a question of material fact as to whether there was a series of individual transfers or a single Strategy.  If the Court holds that each transfer was individual or unrelated, then the Court may decide, as to each transfer, whether the Defendants concealed each transfer from Maxus's creditors.  If the Court finds that there was one, elaborate Strategy of removing assets and stranding liabilities, then, again, the Court will consider whether that Strategy was meant to conceal the nature and existence of the transfers from Maxus's creditors.  As a result, entering summary judgment on this factor is inappropriate.

### g. Badge 8: Was the Value of the Consideration Received by the Debtors Not Reasonably Equivalent to the Value of the Assets Transferred or the Amount of the Obligations Incurred?

It is a badge of fraud if Debtor did not receive reasonably equivalent value for the transfers to Defendants.[155]  This is a two-part analysis: (i) whether Maxus received *any* value, whether direct or indirect, without regard to the cost, the arm's length nature of the relationship, and the good faith of the transferee; and then (ii) whatever the value that was conferred was not "reasonably equivalent."[156]

---

[155] *Id.* at *15.

[156] *Mellon Bank, N.A. v. Off. Committee of Unsecured Creditors (In re R.M.L., Inc.)*, 92 F.3d 139, 152 (3d Cir. 1996).

Although the Trust moves for summary judgment on this badge of fraud, the Trust states:

> The Trust acknowledges that, in certain respects, the questions posed by this badge of fraud may substantially overlap with factual questions which may not be amenable to summary judgment (such as whether YPFI can be deemed an alter-ego of Maxus in connection with the YPFI Transfers), and to certain disputes over asset valuation.[157]

The Court agrees with the Trust's own statement. Whether Maxus received value for each Transfer (or for the Transfers as a whole if they were one, integrated Strategy) and whether that value was reasonably equivalent is a question of fact will involve factual testimony, expert testimony, and findings by a trial court.

> The term "reasonably equivalent value" is not defined in the Bankruptcy Code, however, the Third Circuit has noted that "a party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'" To determine reasonably equivalent value, the Third Circuit requires a "totality of the circumstances" analysis, taking into account "the good faith of the parties, the difference between the amount paid and the market value, and whether the transaction was at arms length." **This analysis is inherently fact driven**.[158]

As a result, the Court will not grant summary judgment on this badge.

---

[157] Adv. D.I. 621 (Plaintiff's Mot.) at p. 59.

[158] *Charys Liquidating Trust v. Growth Management, LLC (In re Charys Holding Co., Inc.)*, No. 08-10289, 2010 WL 2774852, at *7 (Bankr. D. Del. July 14, 2010) (citations omitted; emphasis added). *See also Transcenic, Inc. v. Google, Inc.*, No. CV 11-582-LPS, 2014 WL 7275835, at *2 (D. Del. Dec. 22, 2014) (denying summary judgment because the motions presented a "'battle of the experts' that is not amenable to resolution prior to the presentation of evidence, including testimony"); *Tarkus Imaging, Inc. v. Adobe Sys., Inc.*, No. CA 10-63-LPS, 2012 WL 2175788, at *1 (D. Del. June 14, 2012) ("battle of the experts" not amenable to resolution on summary judgment).

### h. Badge 9: Were the Debtors Insolvent or Did the Debtors Become Insolvent Shortly After the Transfers Were Made or the Obligations Were Incurred?

Solvency is not necessarily a required element of an intentional fraudulent transfer claim.[159] To the extent there is a factual dispute as to what was known or knowable about the Debtors' solvency at particular moments in time, it will be addressed at trial.[160]

### i. Badge 10: Did the Transfers Occur Shortly Before or Shortly After a Substantial Debt Was Liquidated?

Again, this badge of fraud is too marred in the allegations of whether the transfers at issue were individual, unrelated transfers or whether there was a Strategy to isolate the liabilities and remove all the assets of Maxus. If the transfers were individual then the Trust may be hard placed to prove that the transfers happened "shortly before" or "shortly after" the environmental debts were liquidated. However, if there is a Strategy (as asserted by the Trust), such transfers could be in avoidance of the environmental debt.

### iv. Conclusion

Not surprisingly, the badges of fraud are questions of fact and not questions of law. There are material facts in dispute surrounding the events spanning over 20 years,

---

[159] 11 U.S.C. § 548(a)(1); *Carroll v. Prosser (In re Prosser)*, 534 F. App'x 126, 132 (3d Cir. 2013) ("[I]nsolvency is not a necessary element of the [actual] fraudulent transfer claims.").

[160] Mr. Todd Menenberg, whose expertise extends to forensic accounting, observed that Maxus knew of the possibility that some day in the future, the EPA could potentially impose a remedy that was quite large. *See* Adv. D.I. 624 (Smith Decl.), Ex. 137 (Menenberg Report) at ¶ 55. But solvency analysis requires an assessment of the probability, not the possibility, that a contingent liability will come to pass, and then an estimate of the value of that contingency. *See, e.g., In re Xonics Photochemical, Inc.*, 841 F.2d 198, 199 (7th Cir. 1988) ("absurd" for a debtor to "assume[]" its contingent liabilities were greater than its assets, because doing so "would mean that every individual or firm that had contingent liabilities greater than his or its net assets was insolvent – something no one believes"). The Trust counters that the mere fact that a known future liability has uncertainty about an actual liquidated amount should not provide license for a debtor and its shareholders to transfer substantially all of the debtors' assets and use the proceeds to pay off those creditors whose claims were liquidated and who could protest. Thus, there is a material issue of fact regarding insolvency and whether the environmental liability (which would indicate insolvency) was a "probability" or a "possibility."

mainly, whether the transfers were stand-alone events or whether part of an integrated

Strategy (as alleged by the Trust).[161]   The trial court will have to weigh the evidence,

including expert testimony, and determine who knew what and when, among other

things.  Whether any badge of fraud can be established is a question for trial.

## C.  Defenses

The Trust dedicates three pages within its seventy-page Memorandum of Law in

Support of its Motion for Partial Summary Judgment to discussing YPF and Repsol's

defenses.[162]   Despite only discussing defenses throughout three pages in its Motion, the

Trust's reply brief contains more than thirty pages of argument related to defenses.[163]

Some of these defenses were merely identified in the Trust's Motion by name without

further discussion, but substantively argued in its reply brief for the first time.[164]   It is

well-settled that it is improper to argue or raise new issues in reply.[165]   Along with its

---

[161] *Wise v. Kidder Peabody & Co.*, 596 F. Supp. 1391, 1395 (D. Del. 1984) ("Intent is a question of fact involving so many intangible factors that it is not easily resolved as a matter of law."); *AgChoice Farm Credit, ACA v. Glenn (In re Glenn)*, 470 B.R. 731, 738 (Bankr. M.D. Pa. 2012) ("When intent is at issue, it is difficult to resolve an adversary complaint by summary judgment.").

[162] YPF and Repsol alleged fifty and twenty-nine affirmative and other defenses, respectively. *See* Adv. D.I. 139 (Repsol's Answer) at pp. 111-114; Adv. D.I. 140 (YPF's Answer) at pp. 100-112.  Clearly, not all of these affirmative defenses will reach trial.  Nonetheless, in this case, the appropriate mechanism for narrowing the affirmative defenses is through the pre-trial process and not through summary judgment.

[163] *See* Adv. D.I. 701 (Trust Reply) at pp. 75-110.

[164] *Compare* Adv. D.I. 622 (Trust Mot.) at p. 69 ("Defendants allege a number of affirmative defenses, such as statutes of limitation … that will not require a trial to resolve") *with* Adv. D.I. 701 (Trust Reply) (statute of limitations on intentional fraudulent transfers discussed throughout pages 75-102).

[165] *See Thor Merritt Square, LLC v. Bayview Malls LLC*, Civ.A. 4480-VCP2010 WL 972776, at *5 (Del. Ch. 2010) (discussing how "[t]he failure to raise a legal issue in an opening brief generally constitutes a waiver of the ability to raise that issue in connection with a matter under submission with the court" and finding that defendants waived arguments asserted in reply for the first time in connection with the specific motion); *see also* L.B.R. 7007-2(b)(ii) ("The party filing the opening brief shall not reserve material for the reply brief that should have been included in a full and fair opening brief."); *In re FBI Wind Down Inc.*, 581 B.R. at 149

reply papers, YPF filed a Motion pursuant to L.B.R. 7007-2(b)(ii), requesting that the Court either not consider the Trust's newly raised arguments with respect to statute of limitations, or allow YPF to file a sur-reply.[166]  The Court granted YPF's Motion, thereby permitting it to file its sur-reply, and allowed the Trust to file a sur-sur reply, with no further briefing permitted thereafter.[167]   After due deliberation, the Court will not consider or discuss the Trust's actual fraudulent transfer statute of limitations arguments, raised for the first time in its reply.

Although the Trust recognizes that it bears the burden on summary judgment to establish that there is no genuine issue of fact as to any essential element of the nonmovants' defenses,[168] it does not remotely carry this burden.[169]   In order to have satisfied its burden, the Trust could have either submitted "affirmative evidence that negates an essential element of the nonmoving part[ies' (here, Defendants)] claim[,]" or, the Trust could have "demonstrated to the Court that the nonmoving part[ies'] evidence is insufficient to establish an essential element of the nonmoving part[ies'] claim."[170]  However, "a conclusory assertion that the nonmoving party has no evidence is

_____

(movant's reply argument improper under Local Rule 7007-2(b)(ii) and nonmovant "should not be harmed" by not having a chance to respond).

[166] *See* Adv. D.I. 721.

[167] Adv. D.I. 725.

[168] *See Local Union 42 v. Absolute Envt'l Serv.*, 814 F. Supp. 392, 401 (D. Del. 1993) ("[W]hen the moving party seeks summary judgment based on a claim or defense upon which the nonmovant bears the ultimate burden of proof at trial, the moving party need only establish that there exists no genuine issue of material fact as to any essential element of the nonmovant's … defense.").

[169] Even using the Trust's characterization of its burden as to defenses on summary judgment – that it may discharge its burden by "pointing out" the absence of evidence to support the nonmovants case – that burden is not met.

[170] *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting).

insufficient . . . [T]he moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party."[171]  Because the Trust made conclusory assertions that the defenses fail, the Trust's failed to carry its burden.

The Trust separates the defenses into three categories. The first category constitutes several defenses which the Trust argues are conclusory assertions that amount to general denials.[172]  The Trust argues that if it establishes the allegations in its Complaint are true, these general denials do not preclude the Defendants' liability.  It remains to be seen whether the Trust can prove its claims at trial.  If it can, then these defenses will be moot.  Accordingly, the Court finds the Trust's request as to the "first category" premature and lacking support.

The second category, according to the Trust, are defenses which invoke legal doctrines that are inapplicable, amount to "mere assertions," or are unsound as a matter of law.  These include the defenses of *in pari delicto*, unclean hands, consent, waiver, ratification, unjust enrichment, the business judgment rule, accord and satisfaction, set-

---

[171] *Id.*

[172] *See* Adv. D.I. 139 at pp. 111 ¶¶ 3-4; 113 ¶¶ 17, 23 ("Plaintiff's claims are barred, in whole or in part, as Plaintiff legally cannot establish the requisite elements of its claims;" "Plaintiff's claims are barred because the Debtors are not the alter egos of Repsol and Repsol is not otherwise responsible for the Debtors;" "Transfers to Repsol from the Debtors are not avoidable pursuant to Section 546(e) of the Bankruptcy Code); *see also* Adv. D.I. 140 at pp. 107-108 ¶¶ 33, 35-36 ("At all relevant times, the YPF Defendants and/or the Debtors complied with all Applicable Laws, regulations, industry standards, and ordinance, and otherwise conducted themselves reasonably, prudently, and in good faith ….;" "With respect to any alleged alter ego liability … the claims asserted against the YPF Defendants … are barred because at all relevant times the YPF Defendants … exercised due care and took precautions against foreseeable acts or omissions ….;" "With respect to any alleged alter ego liability … the alleged damages complained of by the Trust were due to avoidable consequences beyond the control or fault of the YPF Defendants ….").

off, contribution or apportionment, failure to mitigate, and defenses that argue the relief sought by the Trust is excessive, unreasonable, punitive, or arbitrary and capricious.[173] This second category also includes defenses that have already been denied by the Court during previous motion practice.[174]

To the extent that the Court has already denied certain defenses in prior motion practice, those rulings are law of the case and warrant no further discussion.  As for the "other" second category defenses, the Trust has not met its burden of showing that there is no genuine dispute of any material fact as to any element of those defenses.  Merely stating that certain legal doctrines "do not clearly apply" or are "not legally sound" without pointing to *any* support as for *why* these doctrines do not apply does not satisfy the Trust's burden.[175]  To say otherwise would allow all plaintiffs to simply make a conclusory statement that defenses do not apply and then seek summary judgment as to those defenses, while shifting the burden on defendants to show why those defenses do apply in response.  That is not how summary judgment works.

---

[173] *See* Adv. D.I. 139 at pp. 112-113 ¶¶ 6-7 (waiver, consent, estoppel, release, unclean hands, *in pari delicto*), 9 (business judgment rule), 14-16 (unjust enrichment, single satisfaction rule, ratification); Adv. D.I. 140 at pp. 101-02 ¶¶ 6-8 (*in par delicto*, acquiescence, consent, waiver, ratification, release, laches, estoppel, unclean hands, unjust enrichment); pp. 106-107 ¶¶ 29 (failure to mitigate), 31 (accord and satisfaction), 41 (failure to mitigate).

[174] *See* Adv. D.I. 139 at pp. 111-112 ¶¶ 1 (lack of standing), 5 (statute of repose, laches, estoppel) 8 (*res judicata*, collateral estoppel, New Jersey entire controversy doctrine); Adv. D.I. 140 at p. 101 ¶¶ 3 (lack of standing), 5 (collateral estoppel, *res judicata*, New Jersey entire controversy doctrine); p. 108 ¶ 34 (lack of standing).

[175] To the extent certain defenses, affirmative or otherwise, are clearly inapplicable to the facts of this case, the Court encourages the parties to work together to narrow which defenses will go forward at trial.

The last category of defenses are defenses which the Trust simply states, "will not require a trial to resolve." These defenses include statute of limitations, transfers in exchange for reasonably equivalent value, solvency, lack of wrongful intent, improper or disqualifying transferor or transferee for fraudulent transfer claims and triggering creditor defects.[176]

First, in analyzing badges of fraud, the Court has already found reasonably equivalent value, solvency, and intent as fact intensive issues reserved for trial. These defenses are certainly at issue and warrant evidence, including expert testimony. Second, the Court notes that it has received substantial briefing regarding the issue of triggering creditor defects.[177] The parties disagree as to whether certain creditors may be triggering creditors for the purposes of § 544. This issue does simply "require a trial" when there are disputes as to what a triggering creditor knew and when, for the purposes of the statute of limitations.

Notably, the Trust argues that the Defendants' statute of limitations defenses will not require a trial even though the collapsing doctrine is at the center of this litigation, as discussed below. There are and have been statute of limitations issues from the very

---

[176] Adv. D.I. 139 at pp. 112-113 ¶¶ 5, (statute of limitations), 19 (reasonably equivalent value), 21 (improper transferee) 22 (extraterritoriality); Adv. D.I. 140 at p. 101 ¶ 4 (statute of limitations); p. 104 ¶ 18 (reasonably equivalent value); p. 105 ¶¶ 21 (solvency), 23 (improper transferee), 24 (lack of wrongful intent); p. 106 ¶ 28 (improper transferee); p. 109 ¶ 37 (public disclosure of transaction).

[177] *See* pp. 98-108, *infra.*

beginning of this case.  Indeed, when denying the Defendants' Motions to Dismiss[178] in

2019, the Court recognized that:

> [t]he defendants argue, quite correctly, that the bulk, if not all,
> of the alleged fraudulent conveyances that form the basis of
> the Complaint occurred outside the operable statute of
> limitations …. While it remains to be seen whether the Trust
> can prove its allegations, the facts alleged in the Complaint
> support a plausible theory that would expand the statute of
> limitations under *Tronox II*.[179]

Thus, it may be the case that the Trust's claims all depend on successfully proving

that the collapsing doctrine applies, thereby expanding the statute of limitations.[180]  To

date, it *still* remains to be seen whether the Trust can prove its allegations to expand the

statute of limitations under *Tronox II*.  Hence, there is a genuine dispute of material fact

surrounding whether the statute of limitations defense bars the Trust's claims against the

Defendants.

As for any remaining defenses, simply stating that they will not require a trial,

without any indication as to why, does not satisfy the Trust's burden.  The Trust does not

explain *at all* why these defenses will not require a trial, which elements of these defenses

---

[178]  Adv. D.I. 50 (YPF Defendants' Motion to Dismiss Adversary Complaint); Adv. D.I. 57 (Repsol Defendants' Motion to Dismiss).

[179]  Adv. D.I. 107 (Letter Opinion denying Motions to Dismiss, dated Feb. 15, 2019) at pp. 9-10.

[180]  Neither the Defendants nor the Trust have sought a ruling as to whether the Trust's alter ego claims are subject to a statute of limitations defense. *See* Adv. D.I. 701 (Trust Reply) at p. 80 ("[N]either Defendant has contended … that the Trust's alter ego claims are subject to any limitation defense. Thus, the Court can dismiss any such defense …."). The Court will not dismiss any limitations defense as to alter ego as that issue has not properly been put before the Court.  Accordingly, the Court offers no opinion on that issue. The Court does note, however, the New Jersey state court's comments: *See* Adv. D.I. 107 (*citing N.J. Dep't of Envtl. Prot. v. Occidental Chem. Corp.*, 2015 N.J. Super. LEXIS 230, at *24-25 ("[T]o the extent each of the [] claims are barred, so is alter ego liability based on them."  This is because "[a]lter ego liability is not a separate cause of action; it is a remedy … As such, a plaintiff invoking the doctrine must first establish an independent basis to hold the corporation liable, and without such an independent basis for liability, there is no ground for imposing alter ego liability.") (internal citations and quotations omitted)).

fail as a matter of law, or anything remotely close to pointing out the absence of evidence to support the defenses.

Consistent with the foregoing, the Court finds that the Trust has failed to meet its burden with respect to the defenses. Accordingly, the Trust's request for summary judgment on the defenses identified in its Motion will be denied.

\*      \*      \*

In sum, the Plaintiff's Motion is denied in full.

## DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT

> *Time will bring to light whatever is hidden . . . .*

Horace

\*      \*      \*

### A. Whether the Actual Fraudulent Transfer Claims Fail Under the Legitimate Supervening Purpose Test as a Matter of Law

YPF argues that, in the event the Court were to find the existence of certain badges of fraud enumerated in 6 Del. C. § 1304(b) (and, thus, a presumption of YPF's intent to defraud, hinder, or delay Maxus's environmental creditors), then the Trust's actual fraudulent transfer claims nonetheless fail for an independent reason: YPF had a legitimate supervening business purpose for the Global Restructuring. According to YPF, the Global Restructuring (the 1996-1997 Transfers) was done for the purpose of addressing tax inefficiencies, caused by virtue of Maxus operating in and being taxed by multiple countries.[181] Also, YPF argues that it had no role in deciding to sell Maxus's

---

[181] For example, YPF argues that the goal of the Global Restructuring was to address tax inefficiencies caused by the fact that Maxus's profits from each international subsidiary were being taxed by its respective domestic country, and then again by the United States at the Maxus level. YPF's acquisition added another

Crescendo assets to BP and Apache, the proceeds of which were then used to repay debt from Maxus to YPFI and loaned to a Repsol entity with an alleged below-LIBOR interest rate.[182] YPF also argues that it had no involvement whatsoever with the 2000-2002 YPFI transfers.

"The presence of a single badge [of fraud] is typically not sufficient to establish actual fraudulent intent."[183] On the other hand, the "confluence of several badges, … creates a presumption of fraudulent intent."[184] "Once a trustee establishes a confluence of several badges of fraud, the trustee is entitled to a presumption of fraudulent intent."[185] At that point, "the burden shifts to the transferee to prove some legitimate supervening purpose for the transfers at issue."[186]

At this juncture, the Court has not found the existence – or absence – of any of the badges of fraud as a matter of law and undisputed fact.[187]  Accordingly, this argument need not be addressed.  However, it is worth opining that the question of whether there was a legitimate supervening purpose for the Global Restructuring, that is attenuated from stranding Maxus's environmental creditors, is entirely based on material facts that

---

layer of tax inefficiencies because dividends to YPF would also be taxed. YPF submits that Maxus's international assets were sold to YPFI to create a "U.S. only" tax group for the United States entities.

[182] *See* Adv. D.I. 701 (Trust Reply) at p. 36. Proceeds from the Crescendo sale went from Maxus to YPF via a $262.1 million debt repayment from Maxus to YPFI and to Repsol via the remaining $325 million loaned to Repsol's cash management affiliate.

[183] *In re Vasvick*, 604 B.R. 810, 821 (Bankr. D.N.D. 2019).

[184] *Id.*

[185] *Kelly v. Armstrong*, 141 F.3d 799, 801 (8th Cir. 1998).

[186] *Id.* (*citing In re Acequia, Inc.*, 34 F.3d 800, 806 (9th Cir. 1994) (internal quotations omitted)).

[187] The Court's Opinion, *supra*, fully analyzes the badges of fraud under 6 Del. C. § 1304.

are in dispute. Namely, the Trust does not suggest that it is entirely out of the realm of possibilities that YPF had legitimate business purposes with respect to certain business decisions at issue here.[188]   However, the Trust's position is that separating Maxus's valuable assets from its environmental liabilities in an effort to limit YPF's own exposure was a significant – if not the primary – driving factor for the transfers at issue.[189]

Indeed, the Trust produced several emails from YPF's lawyers where they relayed concerns to YPF about Maxus's environmental liabilities shortly after the acquisition. For instance, in a December 1995 memo from Mr. Dexter Peacock, YPF's lawyer at Andrews & Kurth, he advised YPF that it should take steps to protect its potential exposure for Maxus's liabilities:

> I think that YPF must separate the risks derived from environmental contingencies that belong to Maxus from the rest of Maxus' business …. It would be a big mistake to forget that YPF has a serious risk of incurring expenses and suffering losses related to Maxus' environmental risks. I have to tell you there is no way right now to calculate what those environmental liabilities might ultimately come to represent….[190]

---

[188] *See* Adv. D.I. 702 (Trust's Response and Objections to YPF Defendants' Statement of Undisputed Facts In Support of Motion for Partial Summary Judgment and Counterstatement of Undisputed Facts In Opposition to the Trust's Motion for Partial Summary Judgment) ("Trust YPFCSOF") ¶ 251 (not disputing YPF's statement of fact that "YPF's tax lawyers at A&K were … identifying considerable tax inefficiencies if YPF acquired Maxus as early as February 2, 1995.").

[189] *See* Adv. D.I. 702 (Trust's Response and Objections to YPF Defendants' Statement of Undisputed Facts In Support of Motion for Partial Summary Judgment and Counterstatement of Undisputed Facts In Opposition to the Trust's Motion for Partial Summary Judgment) ("Trust YPFCSOF") ¶ 249 ("The purpose behind the Global Restructuring is a genuine issue of material fact that should be determined at trial. The Trust has submitted evidence that demonstrates that a primary objective of the restructuring was to isolate the environmental liabilities to protect the YPF Defendants.).

[190] Adv. D.I. 624 (Smith Decl.), Ex. 8.

However, while it is apparent that separating Maxus's environmental liabilities from its valuable assets to limit YPF's own exposure was a topic of discussion not long before the Global Restructuring, that same December 1995 memo also discussed why Maxus's environmental assets needed to be separated for an independent reason.  Mr. Peacock explained that separating the assets from liabilities will "solve two problems," one of which is that Maxus's environmental risks require specialized management. Specifically, Mr. Peacock explained that the environmental department at Maxus was not equipped to deal with the highly complicated environmental problems and the consequences of those problems; his legal advice was to separate Maxus's environmental liabilities and have those liabilities managed by those with experience in the environmental field.[191] Of course, this is but one example as there is a volume of evidence in the record that demonstrates YPF's reasons for the Global Restructuring (and Maxus's ultimate chapter 11 case).[192]  However, by way of this example, it is simple to demonstrate

---

[191] *Tronox II* explained that it is a defendant's burden to prove a legitimate supervening purpose for the *manner* in which the transfer was structured.  *Tronox II*, 503 B.R. 239, 289 (Bankr. S.D.N.Y. 2013) (*quoting ASARCO LLC*, 396 B.R. at 392).  Although the Trust argues that YPF has not shown "a legitimate business reason for imposing all of the legacy liabilities on Maxus[,]" Adv. D.I. 701 (Trust Reply) at p. 41,  without opining as to whether there is a legitimate supervening purpose for the manner in which the Global Restructuring was structured, the Court understands YPF's position to be that the Global Restructuring was structured the way it was so that all of Maxus's environmental liabilities were managed by a team of people with expertise in environmental liabilities and so that the tax structure was more financially efficient.

[192] *See e.g.,* Adv. D.I. 624 (Smith Decl.), Ex. 206 (Dec. 15, 1995, memo from Bob Simon, a corporate tax lawyer at Andrews & Kurth, stating that he has been told "for non-tax purposes" that YPF wants to "deconsolidate [environmental] liabilities from Maxus['s] "real" business operations"); *see also* Adv. D.I. 624 (Smith Decl.), Ex. 112 (March 5, 1996, memo from Jim Prince, a lawyer at Andrews & Kurth, seeking internal opinions to address an issue "involving a corporate subsidiary with a large environmental liability and an extremely solvent foreign parent," and explaining that issues of alter ego, veil piercing, and bankruptcy will need to be addressed); Adv. D.I. 624 (Smith Decl.), Ex. 112 (April 1996 memo explaining that "putting the environmental liabilities of Maxus into Envirosub may increase the chances to some unquantifiable degree that creditors of Envirosub could reach the assets of YPF," but explaining that "YPF would have a number

how summary judgment as to whether YPF had a legitimate supervening purpose for the transfers at issue is inappropriate because it requires the Court to weigh competing evidence.

One last point worth noting. In *Tronox II*, the Court considered whether actual fraudulent conveyance claims – based on eleven transactions approved in the exact same day that culminated in the spinoff of substantially all the assets of a chemical company and stranded its environmental liabilities – were made with actual intent to hinder, delay, or defraud a creditor.  Upon ruling in the plaintiffs' favor on actual fraudulent transfer claims, the court found that "a principal goal of the separation of E&P assets from the chemical business was to cleanse the E&P assets of every legacy liability …."[193]

*Tronox II* was a decision rendered after trial, and the evidence considered and discussed by the court in its opinion is extensive.  As here, the *Tronox II* principals testified

---

of strong defenses," and that the "possibilities that Maxus'[s] environmental liabilities will reach $1.6 billion (YPF's then-investment in Maxus) are almost zero"); Adv. D.I. 624 (Smith Decl.), Ex. 167 (May 23, 2014, Chadbourne & Parke memo discussing "Project Jazz" and bankruptcy alternatives for Maxus); *but see* Adv. D.I. 644 (Lee Decl.), Ex. 73 (April 3, 1995 memo "to discuss tax considerations associated with YPF's proposed acquisition of Maxus"); Adv. D.I. 644 (Lee Decl.), Ex. 53 (October 7, 1995 memo "discussing the most tax efficient way to structure the YPF international operations" and finding that "when YPF management desires to transfer cash earned in international operations to Argentine, moving the cash through the U.S. tax return is not efficient"); Adv. D.I. 624 (Smith Decl.), Ex. 167 (May 23, 2014 memo distinguishing *Tronox II* and concluding that it is not "as problematic" for YPF as has been argued); Adv. D.I. 655 (Propps Decl.), Ex. 121 (Engelbrecht Dep.) at 196:5-200:24 (testifying that Maxus was looking to restructure its tax structure five years before YPF came onboard and explaining the tax restructuring involved moving international properties to a YPF subsidiary); Adv. D.I. 624 (Smith Decl.), Ex. 114 (May 28, 1996 memo from Andrews & Kurth explaining that "[u]pon the acquisition of Maxus, YPF suddenly became a company with tax obligations in the United States, Indonesia, and … Latin America. Maxus' current structure as an independent subsidiary of YPF, organized without regard to YPF's global tax strategy, is not desirable.").

As the Trust pointed out in oral argument, there is a complete absence in the record of any tax analysis. The Trust questions how the Maxus Board could possibly make such global tax changes without reviewing any analysis of the benefits and risks of the proposed and implemented changes.  *See* Hr'g Tr. 24:25-28:4.

[193]  *Tronox II*, 503 B.R. at 281.

that they "never gave a moment's thought to the effect of the transactions on legacy creditors."[194]   However, the *Tronox II* Court found that the principal witnesses lacked credibility after weighing their testimony against the evidence in the record.

Just as the *Tronox II* Court made credibility determinations, the trial court in this case will have to as well, because at the summary judgment phase, the Court does not have the ability to weigh credibility.  At this point, it is premature and there are too many material facts in dispute for the Court to determine whether YPF had a legitimate supervening business purpose for effectuating the transfers at issue.  Furthermore, even if YPF had a legitimate business purpose or purposes for the transfers, the undertaking of which was not to defraud, hinder, or delay Maxus's environmental creditors, courts have found that mixed intents are sufficient to find actual intent to defraud, hinder, or delay.[195]  Thus, it still remains to be seen whether limiting its own exposure by separating

---

[194] *See id.*; *see also* Adv. D.I. 655 (Propps Decl.), Ex. 121 (Engelbrecht Dep.) at 199:24-200:14:

> Q: Can you tell me the reasons behind the transfer of Maxus's international properties to a YPF subsidiary?
>
> A:  Not specifically. I – I don't recall enough to describe it to you, but it was done for tax purposes – everything about the tax restructuring was done for tax purposes …. [E]verything that was done here was done for – for optimization of the tax positions for the combined entities.

*See also* Hr'g Tr. at 37:9-19 (reading from Dexter Peacock's deposition transcript):

> Q: As far as you were aware, people you were dealing with directly, management of YPF and Maxus, the board of directors of YPF and Maxus, all the decision-makers involved at YPF and Maxus, did any of them, to your knowledge, manifest any kind of evidence of intent that they were trying to defraud, hinder, or delay payment of any Maxus creditors in any way?
>
> A: No. We were working very hard to avoid that result, Mr. Kuster.  I mean, I think we were successful.

[195] *See Tronox II*, 503 B.R. at 280; *see also Kelley v. Thomas Solvent Co.*, 725 F. Supp. 1446, 1455 (W.D. Mich. 1988) ("The Court believes that § 566.17 does not contemplate liability under the fraudulent conveyance

assets from environmental liabilities was a "primary goal" of YPF's, such that the holding in *Tronox II* could be applicable to the Trust's actual fraudulent transfer claims.[196]

## B. Whether the Collapsing Doctrine Is Inapplicable as a Matter of Law to the Trust's Actual Fraudulent Transfer Claims

Leaving the ultimate statute of limitations issue(s) for trial,[197] YPF (and Repsol) move this Court to rule that the collapsing doctrine is inapplicable to the Trust's actual fraudulent transfer claims, such that each transfer must be analyzed individually. According to YPF, after extensive discovery and despite having access to thousands of privileged documents, the Trust has offered no evidence of the Strategy to strip Maxus's assets for the purpose of avoiding environmental liabilities and stranding environmental creditors. To that end, YPF argues that the Trust cannot invoke the collapsing doctrine

statute only if the intent to hinder, delay, or defraud creditors is the *sole* reason for the conveyance …. [T]here is no factual dispute among the parties that one reason Thomas Solvent Company created its spinoff corporations was to avoid potential [environmental] liability.").

[196] Otherwise said, although YPF may have had a legitimate supervening business purpose for transferring Maxus's assets, such as tax restructuring that had nothing to do with defrauding, hindering, or delaying environmental creditors, the issue is whether separating Maxus's valuable assets from its environmental liabilities was YPF's principal goal. If it was, according to *Tronox II*, that may be enough to find the fraudulent intent necessary for an actual fraudulent transfer claim. *See Tronox II*, 503 B.R. at 279-280 (internal citations and quotations omitted):

> Defendants contend [that the] Plaintiffs must also prove that the main or only purpose of the transfer was defendant's actual intent to damage a creditor by preventing it from collecting a debt … But their principal citation for this proposition … [was] ultimately reversed by the Seventh Circuit …. [T]he Seventh Circuit concluded that the district court had too narrowly construed the concept of actual intent to hinder, delay, or defraud, and that even though Sentinel's primary purpose may not have been to render the funds permanently unavailable to these creditors … it certainly should have seen this result as a natural consequence of its actions …. *Because one can be presumed to intend the natural consequences of his acts* (emphasis added).

[197] *See* Adv. D.I. 672 (YPF Mot.) at p. 62 n. 55 ("To be clear, on this Motion, the YPF Defendants are *not* moving on any issues relating to the statute of limitations … other than the permissibility of collapsing under the undisputed facts here under any potentially applicable law, leaving for trial the need to sort out the myriad material issues of disputed facts under whatever law is ultimately applies ….").

to collapse separate transactions beginning in 1995 and spanning decades through different phases of ownership in order to circumvent the four-year statute of limitations under DUFTA.  At this stage, YPF "[is] not seeking the dismissal of any claims, but rather a determination that each of the transfers must be examined individually."[198]

Repsol advances several arguments as to why the collapsing doctrine is inapplicable.  Repsol argues that the collapsing doctrine is inapplicable where the Trust alleges that each fraudulent transfer was individually fraudulent.  Alternatively, Repsol argues that the Trust fails to show that collapsing applies under the facts of this case.

In its response, the Trust ignores the fact that the Defendants are not moving the Court to decide the ultimate issue of statute of limitations,[199] instead arguing that it "welcomes the opportunity for this Court to resolve all of Defendants' limitations defenses in the Trust's favor," and that "delaying [this] argument any further seems counterproductive."[200]  It goes without saying that it is exclusively within this Court's discretion to determine which arguments will be resolved in light of the fact that none of the parties raised actual fraudulent transfer statute of limitations arguments in their

---

[198]  Adv. D.I. 672 (YPF Mot.) at p. 62.

[199]  Adv. D.I. 701 (Trust Reply) at pp. 79-80.

[200]  Adv. D.I. 701 (Trust Reply) at pp. 79-80; 83.  The Trust also disputes that it is only entitled to the four-year statute of limitations under the DUFTA.  The Trust argues that it simply relied upon the standards set forth in the DUFTA for purposes of proving the elements of its intentional fraudulent transfer claim because there are no material differences between the elements of an intentional fraudulent transfer claim throughout the various jurisdictions argued to be applicable here.  On the contrary, the statute of limitations applicable in the different jurisdictions "materially differ," and, according to the Trust, require this Court to look at each various jurisdiction's limitations depending on the triggering creditor at issue.  As has been noted throughout, the Court will not be considering arguments related to statute of limitations on actual fraudulent transfer claims for purposes of ruling on the Motions.  At trial, it will be up to the court to determine which jurisdiction's statute of limitations are applicable for the actual fraudulent transfer claims.

respective opening motions.[201]  That being said, the Court will not consider any statute

of limitations arguments other than those raised in YPF and Repsol's Cross Motions,[202]

the collapsing doctrine being one of them.

The Trust argues that its actual fraudulent transfer claims are timely through

collapsing.  Namely, the Trust contends that the evidence shows that YPF, and later

Repsol, "devised, carried out, and had complete knowledge that the transfers from 1995

to 2016 were part of a "single integrated scheme" to syphon … profitable assets from the

Debtors to leave them stranded with all the environmental liabilities …."[203]  According

to the Trust, there is no dispute that YPF and Repsol had a years-long scheme to "run the

clock" on statute of limitations and place Maxus into bankruptcy once Maxus's

environmental creditors' claims were going to be liquidated in order to preclude claims

against themselves for fraudulent transfers and alter ego.

---

[201] The Court addressed this issue in its section on the Trust's Motion.  In the Trust's Motion, it argued only that the statute of limitations defenses "will not require a trial."  That was quite literally the only argument the Trust made in support of its request for summary judgment on the Defendants' statute of limitations defenses and the Court found that the Trust had not met its burden – even if that burden was simply to "point out" the absence of a genuine dispute of material facts as to any element(s) of the Defendants' defenses.  Only after YPF and Repsol filed their Cross-Motions and the Trust filed its Omnibus Reply did the Trust make substantive arguments on certain defenses, including the statute of limitations for actual fraudulent transfers.  The Court found that the Trust's arguments, made for the first time in reply, are waived in connection with these Motions.  This is further emphasized by the fact that YPF and Repsol did not move the Court to decide statute of limitations defenses on the Trust's actual fraudulent transfer claims but, rather, to solely decide the issue of the collapsing doctrine's applicability.  For these reasons, the Court will not be considering or addressing the Trust's arguments with respect to any actual fraudulent transfer claims statute of limitations defenses (such as discovery tolling under New Jersey law, tolling under Texas law, or the *nullum tempus* doctrine), except with respect to: (i) the collapsing doctrine; and (ii) constructive fraudulent transfers (both of which YPF and/or Repsol raised).

[202] As noted, any statute of limitations defenses "raised" by the Trust's Motion have been addressed *supra*.

[203] Adv. D.I. 701 (Trust Reply) at p. 94.

In general, fraudulent transfer law requires "each transfer [to] be evaluated as a separate transaction."[204]  The collapsing doctrine – a notable exception to the general rule – is an equitable doctrine which allows courts to "dispense with the structure of structures of a transaction or series of transactions."[205]   Under the right set of circumstances, multiple transactions may be "collapsed" and treated as "steps in a single transaction for analysis under . . . fraudulent conveyance laws."[206]   "While the transactions that are sought to be collapsed may be … independent or distinct from one another, courts focus their analysis not on the structure but the knowledge and intent of the parties involved …."[207]   Thus, "[i]n assessing a collapsing claim, a court must focus on the interdependence of the multiple transactions and whether the participants knew or should have known that no transaction would occur unless all of the other transactions occurred."[208]   Moreover, "[t]he passage of some time between the various transactions sought to be collapsed is not fatal if they are sufficiently related."[209]

---

[204] *Mills v. Everest Reins. Co.*, 410 F. Supp.2d 243, 254-55 (S.D.N.Y. 2006).

[205]  *Route 70 & Massachusetts, L.L.C. v. The Bank (In re Route 70 & Massachusetts, L.L.C.)*, Adv. No. 09-1473(MBK), 2011 WL 1883856, at *5 (Bankr. D.N.J., May 17, 2011).

[206] *Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 731 (Bankr. S.D.N.Y. 2008).

[207] *Official Comm. of Unsecured Creditors v. The CIT Group/Business Credit, Inc. (In re Jevic Holding Corp.)*, Adv. No. 08-51903, 2011 WL 4345204, at *5 (Bankr. D. Del. Sept. 15, 2011) (internal citations and quotation marks omitted).

[208]  *Bachrach Clothing, Inc. v. Bachrach (In re Bachrach Clothing, Inc.)*, 480 B.R. 820, 855 (Bankr. N.D.Ill. 2012).

[209] *In re Jevic Holding Corp.*, Adv. No. 08-51903, 2011 WL 4345204, at *5 (*citing Boyer v. Crown Stock Distribution Inc. (In re Boyer)*, 587 F.3d 787, 795-96 (7th Cir. 2009)).

In *Jevic Holding Corp.*,[210] Judge Brenden L. Shannon explained the "test" used to determine the applicability of the collapsing doctrine:

> Courts in this District consider the following factors when assessing whether the parties to the transactions sought to be collapsed had the requisite knowledge and intent to warrant consideration of the asserted transactions in the aggregate: whether all parties involved in the individual transactions had knowledge of the other transactions; whether each transaction sought to be collapsed would have occurred on its own; and whether each transaction was dependent or conditioned on the other transactions.[211]

The applicability of the collapsing doctrine is important to the Trust's claims.[212]

Although the Defendants took the position that the collapsing doctrine could not be used to extend fraudulent transfer statute of limitations,[213] in ruling on the Defendants'

---

[210] *In re Jevic Holding Corp.*, 2011 WL 4345204, at *4-7.

[211] *In re Jevic Holding Corp.*, 2011 WL 4345204, at *5; *see In re Mervyn's Holdings, LLC*, 426 B.R. at 497 (*citing In re Hechinger Inv. Co.*, 327 B.R. 537, 546-547 (D. Del. 2005) (internal citations and quotations omitted)):

> [W]hen a series of transactions were part of one integrated transaction, courts may look beyond the exchange of funds and collapse the individual transactions …. To make this determination, courts consider three factors in their analysis. First, whether all of the parties involved had knowledge of the multiple transactions. Second, whether each transaction would have occurred on its own. And third, whether each transaction was dependent or conditioned on other transactions.

[212] In its reply, the Trust argues that it may rely on doctrines other than the collapsing doctrine to toll the statute of limitations for its actual fraudulent transfer claims, such as New Jersey and Texas's discovery tolling rules and the *nullum tempus* doctrine. As noted previously, the Court is not considering those arguments as they were improperly raised for the first time in reply. Neither YPF nor Repsol moved the Court to rule on any statute of limitations issues other than with respect to the applicability of the collapsing doctrine and constructive fraudulent transfers, discussed *infra*. To the extent the Trust seeks to prove that other doctrines apply to toll the statute of limitations, those arguments are reserved for trial. The Court's discussion herein is narrow and focused solely on the collapsing doctrine.

[213] *See Mills*, 410 F. Supp.2d at 255 (finding that the collapsing doctrine had never been invoked for determining whether a fraudulent conveyance was timely under a statute of limitations and holding that" because a new claim for fraudulent conveyance accrues at the time of each conveyance, it would be illogical and contrary to the spirit of the law to treat a series of transfers as one transaction for the purpose of determining when the statute of limitation was triggered.").

motions for leave to file interlocutory appeals of this Court's opinion on the Defendants' motions to dismiss,[214] the District of Delaware held that this is not the case. Rather, "when to start the limitations clock on a fraudulent conveyance claim is a fact-intensive inquiry typically decided at the summary judgment or trial stage."[215]

Indeed, the collapsing doctrine was used to do just that in *Tronox II*, a Second Circuit case that the Trust heavily relies on, and the Defendants attempt to distinguish. There, the bankruptcy court for the Southern District of New York examined the fraudulent conveyances "for their substance, not their form," and held that, "[w]here a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications."[216]  A major issue in *Tronox II* was whether 2002 transactions (which were outside the Oklahoma UFTA's statute of limitations) could be "collapsed" with 2005-2006 transactions (which were timely) as part of an overarching scheme, or whether each transaction had to be looked at independently (in which case a fraudulent transfer claim for the 2002 transfers would be time-barred).  After trial, the bankruptcy court found that it was appropriate to collapse the fraudulent transactions and to apply the statute of limitations from the last act that finalized the defendants' scheme.[217]  This

---

[214] *See* Adv. D.I. 119 (YPF's Notice of Interlocutory Appeal); *see also* Adv. D.I. 123 (Repsol's Notice of Interlocutory Appeal).

[215] *Maxus Liquidating Trust v. YPF S.A. (In re Maxus Energy Corp.)*, Adv. No. 19-50489, 2019 WL 4343722, at *7 (D. Del. Sept. 12, 2019).

[216] *Id.* (citing *Tronox II*, 503 B.R. 239, 268 (Bankr. S.D.N.Y. 2013)).

[217] *See Tronox II*, 503 B.R. at 270 ("Yet the question for "collapsing" purposes is … whether Plaintiffs proved that the asset transfers in 2002 were part of a single integrated scheme, known to Defendants, that culminated only in the years 2005–2006. Plaintiffs proved this by clear and convincing evidence.").

is because the bankruptcy court found, by clear and convincing evidence, the existence

of a scheme to isolate oil and gas assets and to leave all environmental liabilities with the

debtor that started in 2000 but was not concluded until 2005-2006, within the applicable

statute of limitations for fraudulent conveyances under Oklahoma law.[218]

Here, the Trust asserts that there was an overarching Strategy to isolate liabilities

while stripping assets, like the scheme found in *Tronox II*.  Because similar statute of

limitations and collapsing doctrine questions that existed in *Tronox II* are present in this

case,[219] this issue is the crux of the litigation.  In ruling on the Defendants' motions to

dismiss more than three years ago, this Court observed:

---

[218]  *See Tronox II*, 503 B.R. at 271:

> Neither Pilcher nor any of Defendants' 27 other witnesses undertook to
> explain why the good business reason of splitting the chemical and E & P
> business could be fulfilled only if 85 years of legacy liabilities were left for
> the chemical business to bear while "substantially all the assets" were
> cleansed of those liabilities.  The evidence is clear and convincing that the
> Defendants' good business reason was undertaken with the purpose of
> cleansing the E & P assets of all of the legacy liabilities, a scheme that
> included separation of the legacy liabilities in 2002 and was completed
> when the spinoff was finalized in 2005–2006.

[219]  The *Tronox II* court offered several reasons for why the statute of limitations did not bar the Trust's fraudulent transfer claims. First, the court explained that the "transfer of the oil and gas assets was not complete and not viewed by Kerr-McGee itself as complete until 2005, well within a four-year limitations period." *Tronox II*, 503 B.R. at 267. Second, the Oklahoma UFTA recognizes that a fraudulent transfer takes effect when there is an actual effect on creditors; since the plaintiffs "suffered no immediate injury" from the 2002 stock transfers and would not have been able to pursue any recourse within the four-year limitations period because Kerr-McGee paid all environmental expenses and claims until November 2005, the statute of limitations was not a bar. *Id.* Next, the court held that the collapsing doctrine applied since the "transfers in 2002 were part of a single integrated scheme to create a pure play E & P business free and clear of the legacy liabilities," which "culminated only in the years 2005-2006." *Id.* at 270-271.  The last and "conclusive" reason was one of policy; "[a]n entity that has had or assumed an obligation to clean up a site … cannot avoid that obligation, except perhaps in its own bankruptcy case." *Id.* at 271. The court rejected the defendants' view of the law, which "would permit a shrewd and unscrupulous enterprise to divest itself of substantially all of its assets … continue to satisfy environmental liabilities from the cash flow of the combined entity until the statute of limitations period had run … and then split the good assets from the bad."  According to the court, if it were to accept the defendants' arguments, "the architects of such a scheme could claim that the statute of limitations had already run by virtue of the first step in the scheme,

> [t]he defendants argue, quite correctly, that the bulk, if not all, of the alleged fraudulent conveyances that form the basis of the Complaint occurred outside the operable statute of limitations …. While it remains to be seen whether the Trust can prove its allegations, the facts alleged in the Complaint support a plausible theory that would expand the statute of limitations under *Tronox II* [220]

In any event, the Court has not been asked to rule with respect to the ultimate statute of limitations question because, as put by YPF, there are genuine disputes of fact as to what law will ultimately be applied for statute of limitations purposes.[221] Accordingly, for purposes of determining the applicability of the collapsing doctrine to the actual fraudulent transfer claims, the issue before the Court is whether there is no genuine dispute of material fact that the alleged fraudulent transfers were part of a "single integrated scheme known to Defendants."  If the Court answers this question negatively, then each transfer must be examined individually.

 Ultimately, for the reasons set forth below, the Court finds that determining the applicability of the collapsing doctrine rests on material facts currently in dispute, namely, the existence of the Strategy. The collapsing doctrine's application is fact-intensive; indeed, the *Tronox II* court held a thirty-four-day trial, received tens of thousands of pages of documents, and heard testimony from over fifty witnesses before issuing its decision.  Only after finding the existence of a scheme by clear and convincing

---

[and] they would have free reign to hinder and delay creditors as long as they could do it in two steps several years apart …."). *Id.*

[220]  Adv. D.I. 107 (Letter Opinion denying Motions to Dismiss, dated Feb. 15, 2019) at pp. 9-10.

[221]  Adv. D.I. 672 (YPF Mot.) at p. 62 n. 55 ("[T]he YPF Defendants are *not* moving on any issues relating to the statute of limitations … other than the permissibility of collapsing under the undisputed facts here under any potentially applicable law, leaving for trial the need to sort out the myriad material issues of disputed facts under whatever law is ultimately applied ….").

evidence did the court decide to collapse the 2002 transactions with the 2005-2006 transactions.

### i. Whether All Parties Involved Had Knowledge of Transactions[222]

It is undisputed that Repsol did not acquire YPF until 1999, through a hostile takeover, and did not have access to information regarding Maxus's environmental liabilities or transactions other than what was publicly disclosed.[223] To that end, it is undisputed that Repsol could not have known about the alleged fraudulent nature of the transfers YPF was causing Maxus to make prior to its involvement in 1999.[224] The converse also applies; YPF could not know about the transactions Repsol was going to cause Maxus to make after it was acquired.

---

[222] The Court notes that YPF did not provide an organized argument with respect to the collapsing doctrine factors in its opening motion (but did so in its reply). Although the Court is not inclined to simply let YPF "piggyback" off of Repsol's analysis, for purposes of the collapsing doctrine, the circumstances surrounding both YPF and Repsol's transfers must be analyzed. *See In re W.R. Grace & Co.*, 475 B.R. 34, 108 (D. Del. 2012) (jointly considering the claims of co-defendants where one co-defendant relied on an argument in the co-defendant's brief.).

[223] The Court understands that it is not in dispute that four of the allegedly fraudulent transfers occurred prior to Repsol's ownership and that it was not Repsol's ultimate decision to place Maxus into bankruptcy in 2016 (the culmination of the Strategy) since, at that time, Repsol's' interest in YPF was expropriated by the Argentine government. *See* Adv. D.I. 701 (Trust Reply) at p. 95 ("[E]ven though Repsol was "not around" for the inception of the scheme, it surely continued the scheme that its subsidiary, YPF, began prior to the acquisition."). Repsol emphasizes the fact that it could not have known of the Strategy when it was implemented. While that may be true, the issue for purposes of collapsing is whether Repsol had notice of the overall Strategy, which does not necessarily have to be at its inception.

[224] *See* Adv. D.I. 624 (Smith Decl.), Ex. 129 (Perez Blanco Dep.) 85:14-56.

> Q: What analysis was done in the pre-acquisition period by Repsol, S.A. or any of its representatives regarding transfers that Maxus Energy had made prior to 1999?
>
> A: 1999 doesn't make sense. That's the past. When you do a transaction, an M & A transaction, you look at the future. The past is the past, so you didn't look at it. So none.

However, that by itself does not end the inquiry given the allegations here.  The Trust alleges that "YPF and Repsol devised, carried out, and had complete knowledge that the transfers from 1995 to 2016 were part of a single integrated scheme to syphon the valuable and profitable assets from the Debtors to leave them stranded with all the environmental liabilities …."[225]   More specifically, the Trust alleges that Repsol "continued the asset stripping phase of [YPF's] scheme after acquiring YPF."[226]  Although Repsol argues that no court has ever accepted a "joining" theory to meet this factor, when viewing the evidence in a light most favorable to the Trust, the Court finds that there is, at a minimum, a question of fact as to whether the parties had knowledge that all the transactions were part of a Strategy.[227]

Given that the collapsing doctrine is rooted in equity, the Court is of the opinion that its factors cannot be read as narrowly as the Defendants would like.  Simply because

---

[225]  Adv. D.I. 701 (Trust Reply) at p. 94.

[226]  Adv. D.I. 1 (Compl.) ¶ 11.

[227]  For example, the Trust argues (and the evidence shows) that Repsol received an introduction to the ongoing litigation in New Jersey shortly after its acquisition of YPF, and that it started transferring virtually all of Maxus's remaining assets away from its environmental liabilities. *See* Adv. D.I. 624 (Smith Decl.), Ex. 129 (Perez Blanco Dep.) 109:8-15 (testifying that Repsol received nonpublic information regarding environmental matters "shortly after the acquisition").  The Trust also relies on attorney-client privileged documents to demonstrate that, in 2005, King & Spalding advised Repsol that the "US Subsidiaries … are [] individually and collectively, insolvent or in the zone of insolvency," and that a "US bankruptcy should be delayed, in order to avoid the … statute of limitations for any cause of action that could be asserted …." *See* Adv. D.I. 624 (Smith Decl.), Ex. 142.  As for evidence demonstrating YPF's knowledge of the Strategy, the Trust relies on, among other things, privileged attorney-client information that was produced and shows Chadbourne & Parke's entire "Project Jazz" outline and analysis, *see* Adv. D.I. 624 (Smith Decl.), Ex. 167 (May 23, 2016 Chadbourne & Parke memo discussing "Project Jazz," fraudulent transfers, alter ego, bankruptcy options for Maxus, etc.); *see also* Adv. D.I. 624 (Smith Decl.), Ex. 206 (Dec. 15, 1995 memo from Bob Simon explaining that, "for non-tax purposes," YPF wants to "deconsolidate" environmental liabilities from Maxus's "real business operations"); Adv. D.I. 624 (Smith Decl.), Ex. 114 (May 28, 1996 memo from Andrews & Kurth explaining that the transfer of Maxus's assets to a YPF subsidiary is intended as "a means of cutting off YPF's direct liability for Maxus' environmental liabilities.").

every detail of the alleged Strategy was not determined by both YPF and Repsol from the outset does not automatically result in this factor being unsatisfied.  Otherwise, the same concerns in *Tronox II* are implicated here, allowing an alleged "shrewd and unscrupulous enterprise" to strip a debtor with legacy environmental obligations of all its valuable assets, continue to provide financial support and pay down some environmental obligations, all while running the statute of limitations on environmental creditors' claims until the time period had run and then leaving the debtor without sufficient assets to pay for its environmental obligations.  Like in *Tronox II*, this logic would allow parent (or grandparent) enterprises to "claim that the statute of limitations had already run" simply because every detail was not set in stone at the outset of said alleged strategy and would give that enterprise "free reign to hinder and delay creditors" so long as they could strategically plan their scheme over the course of multiple steps.[228]

For the foregoing reasons, namely, because the alleged Strategy remains to be proven, YPF and Repsol's knowledge of all the transactions, or more specifically their knowledge that all the transactions formed the Strategy,[229] cannot be determined at the summary judgment phase.

### ii.  Whether Each Transaction Would Have Occurred on its Own

While the Trust's position is that each transaction would not have occurred on its own because each transaction was part of the overall Strategy, the Defendants argue that

---

[228]  *Tronox II*, 503 B.R. at 271.

[229]  *In re Jevic Holding Corp.*, 2011 WL 4345204, at *5 ("Whether the relevant parties to the various transactions had notice of the overall scheme has been a central issue for courts that have applied the collapsing theory.").

the transactions were never part of any integrated Strategy and, to the contrary, were all isolated business decisions. Specifically, Repsol argues that there is "no evidence that any party intended that … transactions be linked or depend on one another,"[230] and YPF argues that "there was never one integrated scheme, known by the YPF Defendants …."[231]

By and large, the Defendants contend that all the transfers would have occurred on their own. For example, Repsol argues that the Crescendo Transfer was not contingent on the 2000-2002 YFPI Transfers, and that none of the transfers were contingent on the allegedly fraudulent Settlement Agreements. These arguments miss the point. The crux of the Trust's theory is that all the transfers were linked to one another to effectuate the Strategy. Thus, the question of whether the YPF transfers would have occurred with or without the Repsol transfers, and vice versa, is a material fact in dispute. Namely, whether each transaction would have occurred on its own is dependent on whether there was a Strategy. If the Defendants' objective was to isolate Maxus's environmental liabilities while removing valuable assets, then an individual transfer could not have accomplished this goal. If the purpose of *each transfer* was to eventually get to a total separation of assets and liabilities, then it would be disingenuous to conclude that each transfer would have occurred on its own because transferring one asset or some assets would not have achieved the ultimate goal of total separation. Only as a whole could the

---

[230] Adv. D.I. 638 (Repsol Mot.) at p. 54.

[231] Adv. D.I. 672 (YPF Mot.) at p. 64.

transfers reduce or eliminate the environmental exposure.  In other words, *only* in the aggregate could the transfers leave Maxus's assets unencumbered by the environmental liabilities.

For that reason, this issue is reserved for trial.  If the evidence at trial supports the finding of a Strategy, then it may well be that this factor is satisfied.  Otherwise put, if there was a Strategy, then each transfer likely would not have occurred on its own because each was structured with the purpose of total separation.  The evidence at trial will guide the Court's analysis accordingly.

### iii. Whether Each Transaction Was Dependent on Other Transactions

The parties disagree as to whether the transactions were dependent upon one another.  YPF takes the position that "[t]here is not a shred of evidence that … [YPF] … ever contemplated further sales of the YPFI international assets to another party," or that the YPF Defendants were engaged in bankruptcy planning, which is an essential part of the Strategy.[232]  YPF also contends that the transactions were entirely independent by arguing that the Global Restructuring was done to rationalize multinational corporate taxes to avoid excess taxation.  Repsol argues that "none of the allegedly fraudulent transactions had interdependent terms."[233]

However, the Trust argues that:

> [t]here is ample evidence that the transactions were dependent on or conditioned on the other transactions as Defendants managed the risks along what they knew could

---

[232]  *See* Adv. D.I. 692 (YPF Mot.) at p. 64.

[233]  Adv. D.I. 638 (Repsol Mot.) at p. 54.

be a long road in their scheme to protect their exposure to Maxus's contingent environmental liabilities along the way towards an inevitable bankruptcy. As soon as YPF began to appreciate that, while perhaps uncertain, Maxus's environmental liabilities could be catastrophic, YPF adopted the Global Restructuring, by which YPF directed Maxus to make seriatim, closely related and in fact interdependent debt, environmental and asset restructurings, intended as a means of cutting off YPF's direct liability for Maxus's environmental liabilities …. Next, shortly after Repsol acquired YPF, it learned about Maxus's contingent environmental liabilities …. Every year, between 1999 and 2012, personnel from Repsol, YPF, and Maxus met with auditors to discuss Maxus's public disclosures and agreed they would only publicly disclose the short term expected expenditures and never reserve for any remedial costs, which they deemed uncertain but knew carried the potential to be catastrophic …. After Repsol had directed Maxus to sell virtually all its productive E&P assets, the YPFI Transfers had moved Maxus's legacy assets additional steps away from the reach of environmental creditors, and the proceeds from the Crescendo Transfer were drying up, Repsol sought and received legal advice concerning how to best manage the risks presented by Maxus's contingent environmental liabilities …. The unambiguous advice was to run the statute of limitations as long as they could …. King & Spalding advised that Repsol and YPF address problematic financial dealings …. Over the next several years, Repsol in fact, took steps to address those problematic financial arrangements, including by … effectuating the Settlement Agreements in an attempt to release its own and YPF's prior fraudulent transfer actions …. Until the expropriation in 2012, the litigation strategy was developed and controlled by Repsol and YPF through their counsel ….[234]

The Trust's argument and the evidence that supports it shows that this issue is not

so one sided that summary judgment is appropriate. Rather, there is a dispute of material

---

[234] Adv. D.I. 701 (Trust Reply) at pp. 96-99 (internal citations, quotation marks, and footnotes omitted).

fact as to whether the transfers were all interdependent.[235]  This factor, like the second,

depends on proof of the Strategy.   On the one hand, the transfers occurred between two

separate periods of ownership, spanning decades, and there is evidence that YPF had tax

concerns (which Repsol did not have post-acquisition), that it wanted to address through

a transfer of assets.  Similarly, the evidence and undisputed facts demonstrate that Repsol

was not involved prior to 1999 or after 2012 and, thus, the Trust has to overcome the fact

that the 1996-1997 Transfers occurred prior to Repsol's involvement, and that Project Jazz

occurred after its involvement, which may prove to be a hurdle in establishing this factor.

Nonetheless, the evidence *also* demonstrates that both of the Defendants were aware of

and concerned about Maxus's contingent environmental liabilities shortly after their

respective acquisitions,[236] which they knew could be substantial; both Defendants sought

legal advice on alter ego and fraudulent transfer law as well as bankruptcy options for

Maxus;[237] both Defendants transferred Maxus's valuable assets; and, at the minimum,

---

[235]  *See supra* n. 117.

[236]  *See* Adv. D.I. 624 (Smith Decl.), Ex. 129 (Perez Blanco Dep.) 109:8-15 (testifying that Repsol received nonpublic information regarding environmental matters "shortly after the acquisition"); *see* Adv. D.I. 624 (Smith Decl.), Ex. 104 (After Dexter Peacock went to New Jersey to conduct post-close diligence in June 1995, he advised YPF that the remediation costs at the DASS were "not easily quantifiable" and the "big money" was "associated with the scientific battles, not the legal battles."); *and see* Adv. D.I. 624 (Smith Decl.), Ex. 107 (YPF learns that sampling of the Passaic River conducted in June 1995 showed high levels of dioxin contamination.).

[237]  Adv. D.I. 624 (Smith Decl.), Ex. 112 (March 5, 1996, memo from Jim Prince, a lawyer at Andrews & Kurth, seeking internal opinions to address an issue "involving a corporate subsidiary with a large environmental liability and an extremely solvent foreign parent," and explaining that issues of alter ego, veil piercing, and bankruptcy will need to be addressed); Adv. D.I. 624 (Smith Decl.), Ex. 142 (April 2005 King & Spalding memo discussing veil piercing, fraudulent transfers, and bankruptcy options for Maxus).

both considered advice on running the statute of limitations prior to putting Maxus into bankruptcy.[238]

Given the competing evidence, the Court is not posed to determine whether the transactions were dependent upon one another. Once again, if the Trust proves that the Defendants' Strategy was to achieve total separation between Maxus's assets and environmental liabilities, then it could be that the transfers were dependent upon one another because only a transfer of all the assets would accomplish this end goal. On the other hand, for example, if YPF can successfully prove that the Global Restructuring was simply done to address tax inefficiencies that never concerned Repsol, then it could appear that the transactions were not dependent upon one another, such that each transfer should be analyzed individually. Because there is competing evidence and a material dispute of fact as to whether the transfers were part of the Strategy, this issue is reserved for trial.[239] The trial court will weigh the competing evidence in determining whether this factor has been met.

Repsol advances an additional argument regarding the collapsing doctrine. According to Repsol's understanding of how this doctrine works, the Trust cannot claim,

---

[238] Adv. D.I. 624 (Smith Decl.), Ex. 142 (April 2005 King & Spalding memo advising Repsol that a chapter 11 bankruptcy will not serve them well "in the near term" and that the "statute of limitations for any cause of action… will likely expire as time passes" but also advising that a "Chapter 11 bankruptcy case could provide the greatest possibility of achieving ultimate, long-term finality with respect to the contingent environmental liabilities faced by Maxus and Tierra"); Adv. D.I. 624 (Smith Decl.), Ex. 167 (May 23, 2014, Chadbourne & Parke memo discussing "Project Jazz" and bankruptcy alternatives for Maxus, including timing options for when to file a pre-negotiated chapter 11.).

[239] The issue of whether just the YPF transactions may be collapsed for the purpose of establishing the Strategy (regardless of Repsol's intervening ownership and transactions) is one for the trial court. This Court does not offer its opinion on this issue.

on one hand, that each transfer is individually fraudulent and, on the other hand, that

that the transfers in the aggregate amount to one fraudulent transfer (the Strategy).

Repsol's understanding is mistaken.

First and foremost, it is not a controversial point that pleading in the alternative is

permissible under the Federal Rules of Civil Procedure.[240]  Indeed, Rule 8[241] was drafted

"to provide maximum flexibility in allowing a party to plead inconsistent facts and

theories in a complaint …."[242]  If a party makes alternative statements, "the pleading is

sufficient if any one of them is sufficient."[243]  Moreover, Rule 8 "allows the Court to

construe separate allegations in a complaint as alternative theories, at least when drawing

all inferences in favor of the nonmoving party as the Court must do on motions to dismiss

or for summary judgment."[244]  Accordingly, the Trust may advance two alternative

theories, one being that each transfer was individually fraudulent, and the other being

that each transfer was made in furtherance of the Strategy and amounted to one all-

encompassing fraudulent transfer.  That is precisely what the Trust did.

Independently, other courts have done what Repsol argues cannot be done.  In *In
re DSI Renal Holdings, LLC*,[245]  the Trustee's complaint alleged multiple intentional and

---

[240]  Fed. R. Civ. P. 8(d)(2) provides, in pertinent part, "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically …. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."

[241]  Made applicable to this proceeding by way of Fed. R. Bankr. P. 7008.

[242]  *Gladstone v. Acri (In re Urbanski)*, Adv. No. 11-90477-A7, 2012 WL 1514772, at *3 (Bankr. S.D.Cal. Apr. 27, 2012).

[243]  Fed. R. Civ. P. 8(d)(2).

[244]  *Buchwald v. Di Lido Beach Resort, Ltd. (In re McCann, Inc.)*, 318 B.R. 276, 289 (Bankr. S.D.N.Y. 2004).

[245]  *Giuliano v. Schnabel (In re DSI Renal Holdings, LLC)*, 574 B.R. 446 (Bankr. D. Del. 2007).

constructive fraudulent transfer claims.  Specifically, as demonstrated by a chart included in the court's opinion,[246] and as discussed throughout, counts 1-3 alleged actual and constructive fraudulent transfers.  The trustee claimed that the defendants "orchestrated a restructuring … through a complex series of agreements, transfers and transactions that, ultimately, stripped [the debtor] of its valuable assets …."[247]  As a result of the alleged restructuring, "the Debtors were left as insolvent shells."[248]  In assessing the trustee's actual fraudulent transfer claim under count 1 of the complaint, the court "viewed [the series of transactions] as a single integrated transaction," and ultimately found that "[i]f the multiple transactions at issue are viewed as a single integrated transaction, the facts as pled are sufficient to support an inference that the [d]efendants moved … assets through an intermediary with actual intent to hinder, delay, or defraud non-insider creditors."  Accordingly, Repsol is incorrect.

Lastly, this argument is neither here nor there because the Trust may ultimately only recover once on its fraudulent transfer claims.[249]  Otherwise put, the Trust cannot recover on each individual fraudulent transfer claim *and* on its claim that each of these transfers amounted to a Strategy (Count II of the Complaint).[250]

---

[246] *See In re DSI Renal Holdings, LLC*, 574 B.R. at 454.

[247] *See id.* at 455-56.

[248] *See id.*

[249] *See Youngman v. Yucaipa Am. Alliance Fund I, L.P. (In re Ashinc Corp.)*, 629 B.R. 154, 187 n. 122 (Bankr. D. Del. 2021) (where there are two claims for the same "harm" the trustee could have only prevailed once on its damages.).

[250] Nothing herein limits the Trust's potential recovery on other theories or damages related to the alleged Strategy.

For the foregoing reasons, Repsol's argument that the collapsing doctrine cannot be used to aggregate multiple transactions that are alleged to be individually fraudulent is inaccurate.

In sum, the applicability of the collapsing doctrine is not susceptible to resolution on summary judgment given the facts of this case. The collapsing doctrine and the existence of the Strategy are mutually dependent; and only after the issue of whether there was a Strategy is decided can the applicability of the collapsing doctrine be determined.

## C. Whether the Constructive Fraudulent Transfer Claims are Time Barred or Extinguished

YPF seeks summary judgment on the Trust's constructive fraudulent transfer claims based on statute of repose and statute of limitations grounds. According to YPF, a statute of repose is not subject to tolling, and because "[e]ach of the transfers … occurred on or before July 8, 2009,"[251] the constructive fraudulent transfer claims "must be dismissed because the four-year statute of repose expired years before the Petition Date."[252] Additionally, YPF argues that even if repose is unavailable, and the Court were to collapse all the transfers into the last alleged constructively fraudulent transfer against the Repsol Defendants on July 8, 2009, the Trust's claims nevertheless fail because they were time barred as of July 8, 2013, three years before the Petition Date.

---

[251] Although the last transfer alleged in the Trust's Complaint relates to a Settlement Agreement which occurred on July 8, 2009, YPF contends that none of the YPF Defendants were involved in that transfer. According to YPF, the transfers relevant to the YPF Defendants occurred between July 1, 1996 and March 31, 2008.

[252] Adv. D.I. 692 (YPF Mot.) at p. 66.

95

In response, the Trust argues that it can utilize the rights of any actual creditor, including the applicable statute of limitations period that creditor might seek had they commenced an action themselves. To that end, the Trust argues that it may rely on the statute of limitations applicable to any of Maxus's creditors, including the EPA, and the States of Ohio and Wisconsin. The Trust cites case law for the proposition that the issue of whether a statute is one of repose or limitations is irrelevant in a case involving governmental creditors, like the EPA. So, the Trust's position is that it is immune to any state's statute of repose. Furthermore, the Trust argues that federal government entities' statute of limitations for constructive fraudulent transfers are six years, but subject to tolling. The Trust's position is essentially that the statute of limitations for its constructive fraudulent transfer claims were tolled until a U.S. government official knew or reasonably could have known of the facts that are material to the claims. Since the Trust's stance is that the Strategy culminated in Maxus's bankruptcy, the Trust argues that the statute of limitations for its constructive fraudulent transfer claims were tolled up to and through the Petition Date.

### i. Whether the Constructive Fraudulent Transfer Claims Fail Even If *Tronox II* Collapsing Is Applicable

First, the Court will address YPF's contention that, even through collapsing, the Trust's constructive fraudulent transfers claims fail. The Court disagrees with YPF's assertion because it is not necessarily the case that the collapsing doctrine will operate to collapse all the allegedly fraudulent transfers into the last fraudulent transfer, which occurred on July 8, 2009. It is important to keep the Trust's theory of the Strategy in mind.

The Trust alleges that YPF and Repsol sought to delay putting Maxus into bankruptcy in order to allow the statute of limitations for fraudulent transfers to lapse. Only then (according to the Trust) was bankruptcy an option. And even further, the Trust alleges that the Strategy *continued* into the bankruptcy by way of the *Motion to Approve The Settlement Agreement By and Among the Debtors, YPF S.A., YPF International S.A., YPF Holdings, Inc., CLH Holdings, Inc. and YPF Services USA Corporation* (the "Rule 9019 Motion") filed and argued before this Court.[253]

Thus, if the Court decides that collapsing is appropriate after trial, it may be the case that the allegedly fraudulent transfers are collapsed into the last fraudulent transfer, but it may also be that the transfers are collapsed and the statute of limitations measured from the culmination of the Strategy, since "the law is clear that for statute of limitations purposes fraudulent conveyances are examined for their substance, not their form," and "where a transfer is only a step in a general plan, the plan must *be viewed as a whole with all its composite implications*."[254] In view of that, the operative date could potentially be the day after the statute of limitations lapsed (which will differ depending on which jurisdiction's statute of limitations are applicable),[255] the Petition Date, which was June

---

[253] *See* Bankr. D.I. 300. The Rule 9019 Motion was objected to by several parties, including the UCC, *see* Bankr. D.I. 536 (Committee objection to discovery related to Rule 9019 Motion); D.I. 619 (Committee objection to exclusivity on basis of proposed settlement); Bankr. D.I. 777 (Committee letter requesting mediation of Rule 9019 Motion); Bankr. D.I. 810 (Committee objection to Disclosure Statement on basis of Rule 9019 Motion) and was eventually withdrawn on April 24, 2017. *See* Bankr. D.I. 1260.

[254] *See Tronox II*, 503 B.R. at 268-69 (emphasis added) (internal citations and quotations omitted).

[255] *See Finkel v. Polichuk (In re Polichuk)*, Adv. No. 10-0031ELF, 2010 WL 4878789, at *3 (Bankr. E.D. Pa. Nov. 23, 2010) ("Under 11 U.S.C. § 544(b), the Trustee may use the statute of limitations available to any creditor of the debtor as of the commencement of the case."). The Trust argues that the last act of the Strategy –

Case 16-11501-CTG    Doc 2512    Filed 06/22/22    Page 103 of 150

16, 2016, or the day the Rule 9019 Motion was filed, which was August 29, 2016.[256] Should

that be the case, then to the extent claims for constructive fraudulent transfers were timely

(through collapsing) on the Petition Date, the Trustee's filing of the Complaint in this

Adversary Proceeding on June 14, 2018 would be considered timely by operation of 11

U.S.C. § 108.[257]

Accordingly, the Court declines to grant YPF summary judgment based on its

argument that the collapsing doctrine will not operate to save the Trust's constructive

fraudulent transfer claims as a matter of law and undisputed fact. If the Trust proves the

Strategy and the Court collapses the transfers, it will then necessarily decide what the

operative date is for statute of limitations purposes.

### ii.    Whether the EPA or the States of Ohio or Wisconsin Can Serve as Triggering Creditors Under 11 U.S.C. § 544(b)[258]

Next, the Court will address the related issues of triggering creditors, statutes of

repose, and statutes of limitations. The first threshold issue is whether the Trustee may

---

Maxus's 2016 bankruptcy – is timely under Delaware law, Ohio law, Wisconsin law, Texas law, and federal law. *See* Adv. D.I. 701 (Trust Reply) at p. 102 n. 69.

[256] These dates are illustrative and not exhaustive. Nothing herein limits the trial court from finding that another date is the operative date for collapsing and statute of limitations purposes.

[257] 11 U.S.C. § 108(a) states, in pertinent part:

> If applicable nonbankruptcy law … fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of –
> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
> (2) two years after the order for relief.

[258] Although the Trust mentions two individuals who it argues may serve as triggering creditors in its Motion, *see* Adv. D.I. 622 (Trust Mot.) at p. 42 ("[t]he Trust submits the Declarations of Lanny Bilbrey and Daniel Fetsick, establishing both gentlemen as triggering creditors in whose shoes the Trust may stand on its Section 544 claims"), the Trust does not use those individuals as triggering creditors in its analysis in

stand in the shoes of a federal government creditor, such as the EPA, or in the shoes of a

state creditor, such as Ohio or Wisconsin.  The answer to this question is yes.[259]

Although the Trust has not provided the Court with any specific case law

permitting the EPA to serve as a valid triggering creditor for purposes of 11 U.S.C.

§ 544(b), the Court understands that other courts have permitted trustees to stand in the

shoes of other various federal agencies, such as the IRS, and to utilize the statute of

limitations applicable to those agencies.[260]  "In the case of [federal] government creditors,

the statute of limitations provided by federal law to the specific creditor in question

trumps any statute of limitations set forth in the appliable state fraudulent transfer

law."[261]  The Court sees no logical reason why a state government creditor could not serve

as a triggering creditor,[262] with the obvious caveat that the statute of limitations for a state

---

response to YPF's constructive fraudulent transfer arguments.  Accordingly, the Court will only address the EPA and the States of Ohio and Wisconsin as potential triggering creditors.

[259]  In its reply, YPF does not address the issue of whether the EPA or the States of Ohio or Wisconsin can be valid triggering creditors for purposes of 11 U.S.C. § 544. *See generally* Adv. D.I. 720.

[260] *See Tronox II*, 503 B.R. at 276 n. 41, 44 (explaining that the United States can be a proper triggering creditor for purposes of § 544(b)); *see also Williamson v. Smith (In Re Brian G. Smith)*, Adv. No. 22-07002, 2022 WL 1814415, at *3-6 (Bankr. D. Kan. June 2, 2022) (following the majority position and allowing IRS to serve as triggering creditor and permitting trustee to utilize its ten-year statute of limitations).

[261] *Alberts v. HCA Inc. (In re Greater Se. Cmty. Hosp. Corp. I)*, 365 B.R. 293, 302 (Bankr. D.D.C. 2006) ("[I]f the United States comes into possession of a valid claim, that claim cannot be "cut off" by a state statute of limitations.") (internal citations omitted); *see In re Polichuk*, Adv. No. 10-0031ELF, 2010 WL 4878789, at *3 n. 9 ("The IRS has at least a ten year lookback period … and its rights supersede any statute of limitations under state law.").

[262] *See Miller v. Fallas (In re J & M Sales, Inc.)*, Adv. No. 20-50775 (JTD), 2022 WL 532721, at *1 (Bankr. D. Del. Feb. 22, 2022) ("The Trustee's theory was that state government creditors could rely on the doctrine of *nullum tempus* to avoid application of the statute of limitations under Section 1309 of DUFTA. I concluded, however, that because DUFTA specifically applies to government entities, *nullum tempus* did not apply and the claims were time barred.").

creditor's fraudulent transfer claim is governed under the state fraudulent transfer law applicable to the state itself.

### iii.    Whether the EPA or the States of Ohio or Wisconsin Are Subject to a Statute of Repose[263]

Since the Trustee may stand in the shoes of the EPA or the States of Wisconsin or Ohio for purposes of its constructive fraudulent transfer claims, the Trustee is "cloaked with the rights of"[264] the EPA or a state creditor, because under 11 U.S.C. § 544(b), the Trustee is "subject to the benefits as well as the burdens" of relying on a triggering creditor.[265]   Thus, the Court must next determine whether the Trustee's constructive

---

[263] A choice of law analysis is a fact-intensive inquiry which the Court finds currently unnecessary.  Solely for purposes of this analysis will the Court assume, without deciding, that each triggering creditor's fraudulent transfer claim is analyzed under the substantive law of that triggering creditor's respective home state rather than Delaware law.  In any event, there is no material difference between the statutes of repose for fraudulent transfer claims under Delaware, Wisconsin, or Ohio law.  *See infra* n. 266, 267, and 268.

[264] *See In re Greater Se. Cmty. Hosp. Corp. I*, 365 B.R. at 304 ("The estate representative steps into the shoes of each unsecured creditor and is cloaked with the rights of that creditor.").

[265] *Ebner v. Kaiser (In re Kaiser)*, 525 B.R. 697, 714 (Bankr. N.D. Ill. 2014).

fraudulent transfer claims are barred by the statutes of repose enumerated in 6 Del. C.

§ 1309,[266] Wis. Stat. Ann. § 893.87,[267] or the Ohio Rev. Code § 1336.09.[268]

---

[266] 6 Del. C. § 1309 (Extinguishment of causes of action):

> A cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought:
>
> (1) Under § 1304(a)(1) of this title, within 4 years after the transfer was made or the obligation was incurred or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant;
>
> (2) Under § 1304(a)(2) or § 1305(a) of this title, within 4 years after the transfer was made or the obligation incurred; or
>
> (3) Under § 1305(b) of this title, within 1 year after the transfer was made or the obligation was incurred.

[267] Wis. Stat. Ann. § 893.87 (Limitations of Commencement of Actions And Proceedings; Procedure for Claims Against Governmental Units):

> Any action in favor of the state, if no other limitation is prescribed by this chapter, shall be commenced within 10 years after the cause of action accrues or be barred. No cause of action in favor of the state for relief on the ground of fraud shall be deemed to have accrued until discovery on the part of the state of the facts constituting the fraud.

[268] Ohio Rev. Code § 1336.09 (Statute of limitations):

> A claim for relief with respect to a transfer or an obligation that is fraudulent under section 1336.04 or 1336.05 of the Revised Code is extinguished unless an action is brought in accordance with one of the following:
>
> (A) If the transfer or obligation is fraudulent under division (A)(1) of section 1336.04 of the Revised Code, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or reasonably could have been discovered by the claimant;
>
> (B) If the transfer or obligation is fraudulent under division (A)(2) of section 1336.04 or division (A) of section 1336.05 of the Revised Code, within four years after the transfer was made or the obligation was incurred;
>
> (C) If the transfer or obligation is fraudulent under division (B) of section 1336.05 of the Revised Code, within one year after the transfer was made or the obligation was incurred.

Although the heading of § 1336.09 uses the term "statute of limitations" this does not alter the conclusion that this is indeed a statute of repose, as the substance is nearly identical to that enumerated in 6 Del. C. § 1309. It is settled law that 6 Del. C. § 1309 is a statute of repose. *See Miller v. Fallas (In re J & M Sales, Inc.)*, Adv. Pro. No. 20-50775, 2021 Bankr. LEXIS 2268, at *69 n. 91 (Bankr. D. Del. Aug. 20, 2021).

The Third Circuit has explained the difference between statutes of limitations and statutes of repose:

> A statute of repose bars any suit that is brought after a specified time since the defendant acted, even if this period ends before the plaintiff has suffered a resulting injury. Unlike statutes of limitations, which traditionally do not begin to run until a cause of action has accrued (i.e., when all required elements have occurred) and the onset of which is often subject to delay by late discovery of the injury (or when a reasonable person should have discovered it), statutes of repose start upon the occurrence of a specific event and may expire before a plaintiff discovers he has been wronged or even before damages have been suffered at all. It might be said that statutes of repose pursue similar goals as do statutes of limitations (protecting defendants from defending against stale claims), but strike a stronger defendant-friendly balance. Put more bluntly, there is a time when allowing people to put their wrongful conduct behind them—and out of the law's reach—is more important than providing those wronged with a legal remedy, even if the victims never had the opportunity to pursue one.[269]

### a. EPA

"Almost every court that has considered the issue" of whether a statute is one of repose or limitations has held that it is irrelevant in the context of a *federal* governmental creditor under the doctrine of *quod nullum tempus occurrit regi* ("no time runs against the king").[270] The *nullum tempus* doctrine is not without limits; the doctrine applies only "to

---

[269] *In re Exxon Mobil Corp. Securities Litigation*, 500 F.3d 189, 199-200 (3d Cir. 2007) (internal citations, quotation marks, and emphasis omitted); *see also DeAngelis v. Taylor (In re Taylor)*, 449 B.R. 686, 689 (Bankr. E.D. Pa. 2011) (same).

[270] *See In re Polichuk*, 2010 WL 4878789, at *3 n. 9.

protect the United States' sovereign power to enforce public rights and the public interest."[271]

This doctrine "finds modern justification in the policy that public rights, revenues, and property should not be forfeited due to the negligence of public officials."[272] Although one court, in *In re Vaughan Co.*, concluded that a bankruptcy trustee's exercise of avoiding powers "does not implicate public rights or interests," and, thus, a trustee cannot ignore state law limits on its avoiding power, that view has been rejected by every other court.  In *In re CVAH, Inc.*, the court viewed *Vaughan* as "premised upon a faulty conception about the purpose and operation of § 544(b)(1)."[273]  The court ruled that:

> the equitable operation of the bankruptcy law is a matter of critical public interest. As explained above, a bankruptcy trustee's avoiding powers are essential tools to ensure that an insolvent debtor's assets are distributed among its creditors fairly and equitably, a fundamental goal of the Code. Without the avoiding powers, potential debtors, in concert with creditors and others, not Congress, could dictate how the debtor's cash and property were distributed, with the transferees immune from the liability that would otherwise exist under state and other transfer avoidance statutes. In other words, allowing a bankruptcy trustee, standing in the shoes of IRS, to avoid fraudulent transfers promotes the public interest of maintaining fairness in the bankruptcy process. Moreover, it also promotes the same interest as that advanced when IRS seeks to avoid transfers: payment of a debtor's tax obligations. Given these laudable goals, applying *nullum tempus* in favor of a bankruptcy trustee representing IRS in an avoiding action is appropriate.[274]

---

[271] *In re Vaughan Co., Realtors*, 498 B.R. at 304.

[272] *Id.*

[273] *Hillen v. City of Many Trees, LLC (In re CVAH, Inc.)*, 570 B.R. 816, 835 (Bankr. D. Idaho 2017).

[274] *Id.* at 835.

The Court adopts this logic and, in the context of this case, finds that allowing the Trustee to stand in the shoes of the EPA to avoid fraudulent transfers promotes the public interest of fairness in the bankruptcy process; it also promotes the same interest that is advanced when the EPA seeks to avoid transfers: payment of a debtor's environmental liabilities.

As a result, "when seeking to avoid fraudulent transfers via application of state law, [the federal government] is not subject to the state's extinguishment period."[275] Accordingly, if the Trustee stands in the shoes of the EPA, it is not subject to any state's statute of repose, including the DUFTA.[276]

### b.  *State of Ohio*

Next is the issue of whether the Trustee is subject to a statute of repose if it stands in the shoes of the State of Ohio.  While the doctrine of *nullum tempus* applies to the federal government, many states have also enacted statutes that apply *nullum tempus* to exempt governmental entities from state statute of limitations.  However, "such laws typically provide that *nullum tempus* does not apply where a statute expressly provides that it runs against the government."[277]

As the Trust correctly states, under Ohio law, statutes of limitations only apply to the State of Ohio if the applicable statute expressly makes it applicable.[278]  Although Ohio

---

[275] *Id.* at 834.

[276] However, the EPA is subject to a statute of limitations, discussed *infra*.

[277] *See In re J & M Sales, Inc.*, 2021 Bankr. LEXIS 2268, at *72-74.

[278] Adv. D.I. 698 (Trust Opp. to YPF Mot.) at p. 8.

may have codified the *nullum tempus* doctrine,[279] the Court disagrees with the Trust's contention that the State of Ohio's fraudulent conveyance claims are not extinguished by the four-year time limitation in Ohio's UFTA.  In *In re J & M Sales, Inc.*, Judge John T. Dorsey dealt with a similar issue.  In the context of a motion to dismiss, the trust pled the existence of state government creditors for purposes of its constructive fraudulent transfer claims and asserted that, by virtue of the laws of their respective states, these state governmental creditors had the benefit of the *nullum tempus* doctrine.  In rejecting the trust's argument that his reliance on state government entities as predicate creditors provided an exemption to the time limitations set forth in the DUFTA, the Court interpreted the language of the DUFTA and concluded that "DUFTA makes it clear that the government is not exempt from its time limitations," because 6 Del. C. § 1301 defines a "creditor" to mean "a person who has a claim" and then defines "person" to mean "an individual, partnership, corporation, association, organization, *government or governmental subdivision or agency* . . . ."  Following that logic, the Court held that "[b]ecause any state government entity asserting a claim here would be doing so as a "creditor," that entity, and consequently the [t]rustee, would be required to file its claim before the time limitations expire and the claim is extinguished."  The Court dismissed the trustee's constructive fraudulent transfer claims as time-barred.

---

[279] YPF disputes that Ohio has codified its own *nullum tempus* doctrine.  *See* Adv. D.I. 720 (YPF Reply) at p. 65 n. 54; *but see State by & through Wray v. Karl R. Rohrer Assoc., Inc.*, 104 N.E.3d 865, 875 (Ohio Ct. App. 2018) ("[T]he policy underlying the continued application of *nullum tempus* in Ohio is premised on protecting the public interest from the negligence of public officials who fail to bring a claim in a timely fashion.").  Regardless, the Court's conclusion and analysis herein remains unchanged.

The language in Ohio Rev. Code § 1336.01 is the same as set forth in 6 Del. C. § 1301. Specifically, § 1336.01 defines "creditor" as "a person who has a claim,"[280] and defines "person" to mean "an individual, partnership, corporation, association, organization, _government or governmental subdivision or agency_, business trust, estate, trust, or any other legal or commercial entity."[281]  Accordingly, Ohio's UFTA "makes it clear that the government is not exempt from its time limitations."  Consequently, if the Trust steps into the shoes of the State of Ohio, it _is_ subject to Ohio's four-year statute of repose and statute of limitations as set forth in Ohio Rev. Code §§ 1336.04 and 1336.09.[282]  Thus, the Trust cannot rely on the State of Ohio as a triggering creditor for its § 544(b) claims.

### c. *State of Wisconsin*

The parties agree that Wis. Stat. Ann. § 893.87 is Wisconsin's *nullum tempus* doctrine.[283]  This Statute provides:

> Any action in favor of the state, *if no other limitation is prescribed in this chapter*, shall be commenced within 10 years after the cause of action accrues or be barred. No cause of action in favor of the state for relief on the ground of fraud shall be deemed to have accrued until discovery on the part of the state of the facts constituting the fraud.[284]

---

[280] Ohio Rev. Code § 1336.01(D).

[281] Ohio Rev. Code § 1336.01(I) (emphasis added).

[282]  *See Karl R. Rohrer Assoc., Inc.*, 104 N.E.3d at 875 (holding that Ohio's *nullum tempus* doctrine was inapplicable to statutes of repose "[b]ecause the statute of repose prevents a cause of action from accruing," so application of the "doctrine to the statute of repose would not stop time from running against the king, but rather would give the king a cause of action where otherwise one would not exist.") (internal quotations omitted).

[283] *See* Adv. D.I. 720 (YPF Reply) at p. 63 ("the Trust is correct that Wisconsin has codified the *nullum tempus* doctrine ….").

[284] Wis. Stat. Ann. § 893.87.

Accordingly, by its plain and unambiguous terms, this Statute sets a ten-year limitation for actions by the State of Wisconsin *only when* the action is not one that falls under any other limitations period set forth in Chapter 893 of the Wisconsin Statutes. However, as discussed directly below, Wis. Stat. § 893.425 *does* set forth a limitations period, which is applicable to the State of Wisconsin, making Wis. Stat. Ann. § 893.87 inapplicable here.[285]

Like Delaware and Ohio's UFTA, Wis. Stat. § 242.01, defines "creditor" as "a person who has a claim,"[286] and a "person" is defined to mean "an individual, partnership, corporation, limited liability company, association, organization, _government or governmental subdivision or agency_, business trust, estate, trust or any other legal or commercial entity."[287] Thus, for the same reasons articulated with respect to the State of Ohio, Wisconsin's UFTA "makes it clear that the government is not exempt from its time limitations."

Wis. Stat. § 242.09, the "statute of limitations" applicable to Wisconsin fraudulent transfer claims, provides that "[a]ctions under this chapter are barred as provided in s. 893-425." In turn, Wis. Stat. Ann. § 893.425 (titled "Fraudulent Transfers") provides:

> An action with respect to a fraudulent transfer or obligation under ch. 242 shall be barred unless the action is commenced:
>
> (1) Under s. 242.04(1)(a), within 4 years after the transfer is made or the obligation is incurred or, if later, within one year

---

[285] Because the Court finds Wis. Stat. Ann. § 893.87 inapplicable, the Court need not discuss the "fraud" sentence of the Statute.

[286] Wis. Stat. § 242.01(4).

[287] Wis. Stat. § 242.01(9).

after the transfer or obligation is or could reasonably have been discovered by the claimant.

(2) Under s. 242.04(1)(b) or 242.05(1), within 4 years after the transfer is made or the obligation is incurred.

(3) Under s. 242.05(2), within one year after the transfer is made or the obligation is incurred. [288]

Since *another limitation is prescribed* in Chapter 893 of the Wisconsin Statutes, the limitation set forth in Wisc. Stat. Ann. § 893.87 is inapplicable and, instead, the 4-year limitation in § 893.425 applies.   Thus, if the Trust steps into the shoes of the State of Wisconsin for purposes of its § 544(b) claims, it *is* subject to Wisconsin's statute of repose as set forth in Wis. Stat. § 242.09 and Wis. Stat. Ann. § 893.425.   The Trust cannot rely on the State of Wisconsin as a triggering creditor.[289]

### iv.   Whether the EPA's Constructive Fraudulent Transfer Claims Were Tolled Up to and Including the Petition Date[290]

While *nullum tempus* operates to prevail over any state's statute of repose, the federal government (the EPA) is nonetheless subject to a six-year statute of limitations for fraudulent transfer claims pursuant to 28 U.S.C. § 2415(a).[291]   This statute of limitations

---

[288]  Wis. Stat. Ann. § 893.425 ("Fraudulent Transfers").

[289]  Although the Trust argues that the discovery rule applies to constructive fraudulent transfer claims, *see* Adv. D.I. 726 (Trust Sur-Sur Reply) at p. 8 n. 7, that is not relevant.   The States of Ohio and Wisconsin are subject to the statute of repose in the Ohio and Wisconsin UFTAs and statutes of repose are not subject to tolling. *See CTS Corp. v. Waldburger*, 573 US. 1, 9-10 (2014) ("Statutes of repose [unlike statutes of limitations], generally may not be tolled, even in cases of extraordinary circumstances beyond a plaintiff's control.") (internal citations omitted).

[290]  At oral argument, the Trust raised other governmental claimants, such as the Department of the Interior and the National Oceanic and Atmospheric Administration.   Hr'g Tr. 190:9-193:18.   As these potential triggering creditors were not briefed, the Court will not discuss them herein.

[291]  28 U.S.C. § 2415(a), titled "Time for commencing actions brought by the United States," provides, in pertinent part,

> [s]ubject to the provisions of section 2416 of this title, and except as otherwise provided by Congress, every action for money damages brought by the United States or an officer or agency thereof which is

may be tolled until "facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with responsibility to act in the circumstances ...."[292]

YPF first argues that the Global Restructuring, Crescendo and YPFI Transfers, along with the 2007/2008 YPF Settlement Agreements were robustly disclosed in SEC filings, which is sufficient to put the EPA on notice of its potential fraudulent transfer claims such that they are now time-barred.  The Court has already found a genuine dispute of material fact as to whether the disclosures made in Maxus and the Defendants' SEC filings were adequate to put parties (including the EPA) on notice of the facts material to the fraudulent transfer claims.[293]   Moreover, although YPF repeatedly emphasizes that the New Jersey court found their disclosures adequate, the New Jersey court's opinion contains no discussion or analysis on this issue.[294]

There is also another issue - whether the EPA was on notice of the facts encompassing the Trust's constructive fraudulent transfer claims by virtue of the NJ

---

founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues ....

[292] 28 U.S.C. § 2416(c).

[293]  For example, the Trust argues that "no creditor of Maxus could or should be expected to scour YPF's SEC filings for the fraudulent transfers .... YPF glosses over the fact that the Crescendo Transfers, the YPFI Transfers and the 2007/2008 YPF Settlement Agreements were disclosed in YPF's 20-Fs.  Maxus's last public financial statement was filed in 1997, therefore making it impossible for a Maxus creditor to know about any transfers past that date, through public means." See Adv. D.I. 726 (Trust Sur-Sur Reply) at p. 7.  What was "possible" or "impossible" for a Maxus creditor to discover through YPF's SEC filings is an issue of fact.

[294] *N.J. Dep't of Envtl. Prot. v. Occidental Chem. Corp.*, 2015 N.J. Super LEXIS 230, at *3 ("[t]he last transaction, which took place in 1999, was disclosed to the SEC – and therefore became public – on June 2, 2000.").

Litigation.  Although this is a close call, the issue depends on the resolution of material

facts in dispute, i.e., proof of the Strategy.

On the one hand, the parties do not dispute that the EPA and NJDEP worked

together with respect to the environmental issues at the DASS,[295] and it is not in dispute

that fraudulent transfer claims were raised in the NJ Litigation in 2008.[296]  Furthermore,

the EPA was publicly critical of the NJ Litigation[297] and, thus, was aware of the facts

giving rise to the litigation itself.  These undisputed facts all weigh in favor of finding

that the EPA was on notice of the facts giving rise to the fraudulent transfer claims more

than six years before the Petition Date.

Notwithstanding, the Court is cautious to conclude that there is no dispute of fact

that the EPA was on notice of the facts giving rise to the Trust's fraudulent transfer claims

---

[295] *See* Adv. D.I. 702 (Trust's Response and Objections to YPF Defendants' Statement of Undisputed Facts In Support of Motion for Partial Summary Judgment and Counterstatement of Undisputed Facts In Opposition to the Trust's Motion for Partial Summary Judgment) ("Trust YPFCSOF") ¶ 45 ("Relevant to the Passaic River, EPA, New Jersey Department of Environmental Protection … and the U.S. Army Corps of Engineers … work together to investigate, oversee and determine any removal or remedy to be imposed to clean up the river.").

[296] Adv. D.I. 720 (YPF Reply) at p. 68.  OCC filed its motion for leave to amend its crossclaims to add fraudulent transfer claims on June 29, 2007. *Id*. at n. 59.

[297] *See* Adv. D.I. 652 (Propps Decl.), Ex. 53 (Dec. 7, 2005 Email from Andrews & Kurth re: "Star Ledger Article").  An excerpt of the Star Ledger Article reads:

> Department of Environmental Protection Commissioner … hired … a high-powered Texas law firm to sue the successors of former Newark Agent Orange manufacturer Diamond Alkali Co., for a range of damages to the residents of New Jersey.  ***This prompted an angry response from the federal Environmental Protection Agency***, which has taken a slower, less confrontational approach to pollution in the Passaic …. Attacking Tierra could prompt it to sue other companies linked to dioxin, leading to endless litigation and sabotaging the EPA's plans for a broader cleanup, federal officials said.

*Id*. (emphasis added).

because of the alleged Strategy.[298]  While it is true that fraudulent transfer claims were raised in the NJ Litigation in 2008, here, the Trust alleges that the fraudulent transfers all culminated in (or after) Maxus's bankruptcy in 2016.  Accordingly, even if the EPA was on notice of the facts giving rise to individual fraudulent transfer claims more than six years before the Petition Date, it could not have been on notice of the Strategy if it, in fact, culminated in 2016.

Unquestionably, more than six years before the Petition Date, the EPA was aware of the transfer of assets, and the EPA was aware that allegations were being made that the transfer of those assets was fraudulent in nature.  However, the EPA, at that time, could not have known about the nature or scope of the alleged Strategy since, according to the Trust, the culmination of the Strategy was placing Maxus in bankruptcy and seeking the Rule 9019 Motion.  Obviously, at the time of the NJ Litigation, those acts had not yet occurred.  Were those acts so "material" to the alleged Strategy that the EPA's constructive fraudulent transfer claims should remain viable through tolling?  Only the ultimate trial court can make this determination with the benefit of a completed record after trial.

---

[298] The Trust's mischaracterization of what the Court is being asked to do is worth dispelling. *See* Adv. D.I. 726 (Trust Sur-Sur Reply) at p. 10.  Although the Trust essentially argues that it would be unwise for this Court to hold that creditors must monitor court dockets in order to preserve potential fraudulent transfer claims, that is a broad overstatement of this ruling.  The Court is not being asked to rule that creditors must monitor dockets in all 50 states to preserve fraudulent transfer claims.  Instead, the evidence in the record demonstrates specifically that the EPA was *aware* of the NJ Litigation (having made public comments about its frustration with the NJDEP's litigation strategy).  Following this undisputed fact, YPF asks the Court to find that the EPA's claims are time-barred because it was aware of the fraudulent transfer claims in 2008, more than six years before the Petition Date.  Nevertheless, for the reasons stated herein, the Court declines to do so at this stage.

Accordingly, should the Trust successfully prove the existence of the Strategy, it could be that the EPA's fraudulent transfer claims were tolled up to and including the Petition Date, which would make the Trust's filing of the Complaint in this Adversary Proceeding timely.  Once again, this is a close call, but a call that the Court is unable to make at the summary judgment phase.

## D. Whether Repsol is the Alter Ego of Maxus[299]

### i.    Piercing the Corporate Veil

Generally, a "parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries."[300]  The separation of corporate entities is often referred to as being "separated" by a "corporate veil."  However, "the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, *inter alia*, the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the

---

[299] The damages issue with respect to the Trust's alter ego claim is discussed *supra* and will not be rediscussed herein.  As explained, the parties disagree as to which "theory" or measure of damages applies to the Trust's alter ego claim. The Trust argued that the "All Liabilities Damages Theory" was applicable to its alter ego claim and, as a result, the YPF and Repsol Defendants could be held liable for all the Allowed Class 4 and Class 5 Claims, which could potentially reach $12-14 billion.  YPF (and Repsol) argued that the "Causation Damages Theory" applies, meaning that alter ego damages require a causal link between the corporate misconduct and the harm suffered, and that they can only be held liable for the damages that they "caused" as a result of their alleged misconduct, not all of Maxus's unpaid environmental debts that either predate their ownership or were not proximately caused by their actions.  In ruling on this issue, the Court held that the Causation Damages Theory applies to the Trust's alter ego claim, but that damages may not be as limited and narrow as the Defendants argue.  The quantum of damages is a factual issue reserved for trial.

[300] *Bestfoods*, 524 U.S. at 61 (citations omitted).

shareholder's behalf."[301]  Piercing the corporate veil is an "extraordinary remedy."[302]  The Trust must prove facts by clear and convincing evidence to demonstrate "complete dominion and control" to where Maxus no longer had "legal or independent significance of its own."[303]

> Piercing the corporate veil under the alter ego theory "requires that the corporate structure cause fraud or similar injustice."  Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud.[304]

Thus, the Court needs to examine: (i) domination and control; and (ii) unfairness and injustice to determine if there are material disputes of fact regarding whether Repsol was Maxus's alter ego.[305]

### a. Dominion and Control

Courts consider several factors to evaluate dominion and control:

> (1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder.[306]

---

[301] *Id. at* 62 (citations omitted).

[302] *Round Rock Rsch. LLC v. ASUSTeK Computer Inc.*, 967 F. Supp. 2d 969, 978 (D. Del. 2013) (citation and quotation marks omitted).

[303] *Wood*, 752 A.2d at 1184 (citations and internal modifications omitted); *see also Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc.*, No. CV 17-374-LPS, 2018 WL 5109836, at *4 (D. Del. Oct. 18, 2018) (clear and convincing evidence standard; citations omitted).

[304] *Wood*, 752 A.2d at 1184 (footnote and citations omitted).

[305] *Standex Int'l Corp. v. QCP, Inc.*, No. 16 CIV. 492 (KPF), 2017 WL 481447, at *5 (S.D.N.Y. Feb. 6, 2017) (citations omitted) ("Moreover, with respect to the alter ego exception, liability can arise absent a showing a fraud.").

[306] *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, No. CIV.A. 3184-VCP, 2008 WL 4057745, at *12 (Del. Ch. Sept. 2, 2008) (citations and quotations omitted).

A court's decision to disregard the corporate entity results from a combination of these facts, not merely one.[307]

Repsol raises a variety of factual examples that each can be compartmentalized into the above factors.  However, because Repsol discusses each group separately, the Court will address them similarly herein for the purposes of consistency and clarity.

*Overlap of Directors and Officers:* Here, Repsol claims that the was no board and officer overlap.[308]  However, the Trust asserts that there was board and officer overlap between Repsol and Maxus as soon as Repsol acquired YPF in 1999 and that each of these individuals was directly involved in the challenged transactions.  For example, Mr. Rosso communicated with Repsol's CFO and Repsol's "Integration Committee" concerning what should be done about the Indonesia assets prior to those assets being sold as part of the 2001-2002 YPFI Transfers.[309]  Mr. Solana's job description for the Maxus CEO position was in line with King & Spalding's recommendations for shielding Repsol from Maxus's liabilities, including selling Maxus's Gulf of Mexico assets and settling inter-company obligations such as the contribution agreement, environmental liabilities, and pension obligations.[310]  In line with that job description, Mr. Solana was the Maxus officer who

---

[307] *Id.* (citations omitted).

[308] The Trust asserts the following: (i) Guzman Solana, who served as Maxus's CEO, also served on the 19-member Board of GasNatural, a Repsol subsidiary; (ii) Mario Rosso was an officer of Maxus and in 1999 served as the head of Repsol's non-Latin operation; (iii) Maxus CFO in 2007, Jamie Muñoz, had an employment contract with Repsol Exploración and was a "secondee" at Maxus; and (iv) the officers for Maxus and Repsol E&P USA were "nearly identical."

[309] *See* Adv. D.I. 651 (Soto Decl.), Ex. 113.

[310] Adv. D.I. 624 (Smith Decl.), Ex. 111 ¶ 262.

"negotiated" with Repsol E&P USA, Inc. regarding overriding royalty interests ("ORRIs") for the Tiger, North Bronto, and Stormy assets,[311] which led to the 2007 Settlement Agreements that sought to compensate Maxus for work performed for Repsol in the Gulf of Mexico.[312]  While attempting to resolve payments to Maxus for services rendered for Repsol in 2007, Mr. Borde spoke with Repsol's CFO Walter Forwood about creating "fictitious" contracts, time sheets, and task sheets as part of a larger effort to delineate the relationship between Maxus and Repsol.[313]

As such there are sufficient disputed facts to proceed to trial as to whether the overlap of officers and directors made Maxus a façade of Repsol.

*Corporate Formalities:* Repsol asserts that "Maxus was not a façade for Repsol's operations" and "Maxus had its own personnel and executive leadership."  However, the Trust has submitted evidence that intercompany payables and receivables were not recorded or respected, such as Maxus personnel providing services to Repsol entities without Maxus being compensated or adequately compensated, missing service agreements for services provided to Repsol, and deficient invoicing. For example, an internal audit in 2006 reported deficiencies with YPFH's accounting system and showed

---

[311] On March 9, 2007, Maxus assigned its rights in the Tiger/North Bronto and Stormy Monday prospects to Repsol Offshore E&P USA.  Adv. D.I. 624 (Smith Decl.), Ex. 29 at ¶ 541 and Ex. 51.  In exchange, Maxus retained a 9% ORRI in Stormy Monday and a 19% ORRI in Tiger and North Bronto. Adv. D.I. 624 (Smith Decl.), Ex. 29 at ¶ 541.  Repsol drilled dry holes at Stormy Monday and North Bronto. Adv. D.I. 624 (Smith Decl.), Ex. 29 at ¶ 555.

[312] *See* Adv. D.I. 651 (Soto Decl.) Ex. 156.

[313] Adv. D.I. 624 (Smith Decl.), Ex. 137 (Menenberg Report) at ¶ 269.  *See also* Adv. D.I. 624 (Smith Decl.), Ex. 137 (Menenberg Report) at Section XII, Adv. D.I. 624 (Smith Decl.), Ex. 172 at Section X, and Adv. D.I. 624 (Smith Decl.), Ex. 111 (Pulliam Report) at Section VIII.

that Maxus continued to have missing service agreements and inadequate hourly rates for services provided to Repsol.[314]    The Trust submits another example, Repsol's subsidiary Repsol E&P USA used Maxus's resources, technical model, and personnel to assess the Shenzi site in the Gulf of Mexico for months,[315] only to have Repsol E&P USA make the investment for its own and it is unclear whether Maxus was ever compensated for these efforts.[316]  All of this type of conduct resulted in Repsol entering into a series of settlement agreements in 2007 to 2009 to attempt to correct these shortcomings.[317]  The significance of Repsol's financial support and Repsol's utilization of Maxus's personnel without adequate compensation or documentation presents a clear issue of disputed material fact.

*Siphoning of Maxus's Assets:* The Trust submits that Repsol undertook a series of transactions in which the remaining legacy Maxus assets held by itself and YPFI, but operated by Maxus personnel under the auspices of the Maxus Management Group, were transferred or sold by YPFI to Repsol subsidiaries and third parties for the benefit of Repsol.[318]  These transactions directed by Repsol moved the legacy Maxus assets even

---

[314]  Adv. D.I. 624 (Smith Decl.), Ex. 137 (Menenberg Report) at ¶ 268.

[315]  Repsol elected to invest in the Shenzi development through its subsidiary Repsol E&P USA rather than through Maxus. Adv. D.I. 624 (Smith Decl.), Ex. 29 at ¶ 672. Repsol E&P USA entered into a purchase agreement with BP to acquire a 28% working interest in Shenzi on April 1, 2006.  Adv. D.I. 624 (Smith Decl.), Ex. 52.

[316]  *Id.* at ¶ 165.

[317]  *Id.* at ¶ 268.  *See also* Adv. D.I. 624 (Smith Decl.), Ex. 137 (Menenberg Report) at Section XII, Adv. D.I. 624 (Smith Decl.), Ex. 172 at Section X, and Adv. D.I. 624 (Smith Decl.), Ex. 111 (Pulliam Report) at Section VIII.

[318]  See Adv. D.I. 621 (Trust's Mot.) at pp. 15, 51.

further away from Maxus, thereby limiting Maxus's environmental creditors' ability to collect on their debts.[319]  Repsol exercised its domination and control over Maxus by "borrowing" the proceeds of the sale from Maxus, and "repaying" that loan to Maxus over a four-year period based on Maxus's cash flow needs.[320]  Maxus also gave up its interest in its Ra prospect[321] to Amerada Hess in order for Repsol E&P USA to gain an interest in Ouachita.[322]  Maxus sold its interests in its Gulf of Mexico prospects to Repsol Offshore E&P USA Inc.[323]  Repsol claims that it did not control the transactions, there was no board overlap for any of the transactions, and the deals involving Repsol and Maxus were negotiated at "arm's length."[324]  But this is another example of a disputed material fact that is only appropriate for trial – to determine whether the transactions were executed to benefit Repsol, and not Maxus.  The balance of the proceeds from the Crescendo sale were held for a year by Maxus before it was loaned to Repsol's subsidiary Repsol International Finance ("RIF"), who saw the proceeds from the transfers as a chance to refinance Repsol's own debt at a very low interest rate at a time when Maxus

---

[319]  Adv. D.I. 624 (Smith Decl.), Ex. 137 (Menenberg Report) at ¶ 268.

[320]  Adv. D.I. 624 (Smith Decl.), Ex. 137 (Menenberg Report) at Appendix 6.

[321]  On July 15, 2005, Maxus, Repsol E&P USA, and Hess entered into an agreement whereby Hess received a 10% interest in Maxus's Ra prospect in exchange for Repsol E&P USA's participation in Hess's Ouachita prospect. Adv. D.I. 624 (Smith Decl.), Ex. 29 at ¶ 529 and Ex. 50.  Repsol E&P USA obtained a 15.5% interest in Ouachita from Hess.  Adv. D.I. 624 (Smith Decl.), Ex. 29 at ¶ 529. Maxus was given a 1% interest in Ouachita. Adv. D.I. 624 (Smith Decl.), Ex. 29 at ¶ 529. Tristone, who Maxus hired to market its Ra asset, valued Maxus's interest in Ra between $39 and $73 million. Adv. D.I. 624 (Smith Decl.), Ex. 29 at ¶ 535. Repsol E&P USA gave Maxus $23.7 million as part of the July 8, 2009 settlement agreement to reimburse Maxus for the Ouachita/Ra encumbrance. Adv. D.I. 624 (Smith Decl.), Ex. 29 at ¶ 531.

[322]  Adv. D.I. 624 (Smith Decl.), Ex. 137 (Menenberg Report) at Appendix 6.

[323]  Adv. D.I. 624 (Smith Decl.), Ex. 137 (Menenberg Report) at Appendix 6.

[324]  Adv. D.I. 637 (Repsol Mot.) at pp. 38-39.

was "starving" for cash.[325]  It is again for the trial court to decide if the sale of Crescendo

left Maxus deprived of its primary source of operative revenue and income.[326]

    *Repsol's Knowledge of Potential Alter Ego Liability:*  Here, the Trust puts forth various

legal memoranda.  In 2004, Repsol directed outside counsel, King & Spalding LLP, to

prepare a report evaluating Repsol's potential exposure to Maxus's and Tierra's

contingent environmental liabilities, and exploring possibilities to minimize that

exposure.[327]  The resulting King & Spalding memo highlighted the "problematic financial

arrangements" that Repsol and YPF had with Maxus and Tierra, that "present[ed]

opportunities for the creditors of the US Subsidiaries to assert that Repsol, YPF, and the

Other Subsidiaries should be responsible for the debts of the US Subsidiaries."[328]  The

King & Spalding memo recommended that Repsol and YPF therefore engage in several

actions to establish corporate separateness.  Repsol forwarded the report to Walter

Forwood (then CFO of YPF), who proceeded to hire Jon Slater to be the CEO of Maxus

with a job description that closely tracked King & Spalding's recommendations.[329]

Although Repsol began implementing its corporate separation plan in 2005, even after

the implementation of this corporate separation plan, the Trust alleged YPF and Repsol

---

[325] Adv. D.I. 624 (Smith Decl.), Ex. 137 (Menenberg Report) at ¶¶ 132-136.

[326] *Id.* at 136.  *See also* Adv. D.I. 624 (Smith Decl.), Ex. 137 (Menenberg Report) at Section XII, Adv. D.I. 624 (Smith Decl.), Ex. 172 at Section X, and Adv. D.I. 624 (Smith Decl.), Ex. 111 (Pulliam Report) at Section VIII.

[327] Adv. D.I. 624 (Smith Decl.), Ex. 137 (Menenberg Report) at ¶ 153 (*citing* Ad. D.I. 624 (Smith Decl.), Ex. 55).

[328] Adv. D.I. 624 (Smith Decl.), Ex. 55 at YPF_MAXUS_0000293080.

[329] Adv. D.I. (Smith Decl.), Ex. 111 ¶¶ 263-264.

continued to exert domination and control over Maxus.[330]   Again, these are issues of material fact and the trial court must determine whether such legal advice was to "fix" a potential problem, in the ordinary course of corporate governance, and what impact, if any, such changes made.

*Control Over the New Jersey Litigation:* By the early 2000s, the Trust asserts that Maxus had been stripped down to essentially an environmental liability management operation, one of its only remaining business purposes was to defend claims asserted against it by its environmental creditors in the New Jersey Litigation.  Notwithstanding the dire implications to Maxus if it was held primarily liable for remediation at the DASS or if it was held to be liable to OCC for all amounts OCC spent with respect to that site, Repsol and its counsel Kirkland & Ellis LLP ("K&E") were, according to the Trust, running the show for Maxus during the NJ Litigation.  Repsol, YPF and Maxus each had distinct, competing interests on those issues, particularly over whether YPF and Repsol, too, could be held themselves liable for the DASS.  Nevertheless, although Maxus had its own assertable alter ego claims prior to its bankruptcy filing (as this Court has already found), Repsol and Maxus coordinated to oppose any imposition of alter ego liability, with Repsol (and K&E) taking active control of the fight.  Jon Slater (then President and CEO of Maxus) testified, "[u]nbeknownst to me . . . they developed a strategy for litigating New Jersey . . . [K&E, Repsol, and YPF] developed a strategy about how they

---

[330]  Adv. D.I. 624 (Smith Decl.), Ex. 137 (Menenberg Report) at ¶ 153.  *See also* Adv. D.I. 624 (Smith Decl.), Ex. 137 (Menenberg Report) at Section XII, Adv. D.I. 624 (Smith Decl.), Ex. 172 at Section X, and Adv. D.I. 624 (Smith Decl.), Ex. 111 (Pulliam Report) at Section VIII.

were going to deal with the lawsuit, but it wasn't privy to me."[331]  To that end, Repsol's counsel (not Maxus's) conducted privilege review of Maxus's documents responsive to the litigants' document requests, collected documents, and directly negotiated the settlement of Maxus's liabilities with the State of New Jersey.[332]  In fact, the Trust claims that K&E (counsel for the alter ego defendant) interviewed former personnel of Maxus (the putative alter ego plaintiff), without counsel for Maxus present, regarding alter ego issues.[333]

In all, the Trust has place enough disputed material facts into evidence regarding Repsol's dominion and control to preclude summary judgment.  The issue of Repsol's dominion and control warrants a trial with specific evidence regarding Maxus's day-to-day management.

### b.  Fraud and Injustice

In order to establish "fraud and injustice," there must be an abuse of the corporate form . . . some sort of elaborate shell game."[334]  Effectively, "the corporate must be a sham and exist for no other purpose than as a vehicle for fraud."[335]  The "requisite injustice or unfairness . . . is also not simple in nature but rather something that is similar in nature to fraud or a sham."[336]  Furthermore, "the plaintiff need not prove that the corporation

---

[331] Adv. D.I. 624 (Smith Decl.), Ex. 150 at Tr. 69:14-71:8.

[332] *See, e.g.*, Adv. D.I. 624 (Smith Decl.) at Exs. 112, 151, 152.

[333] *See* Adv. D.I. 624 (Smith Decl.), Ex. 106 at YPF_MAXUS_PRIV_0000025824.

[334] *Tese-Milner v. TPAC, LLC (In re Ticketplanet.com)*, 313 B.R. 46, 70 (Bankr. S.D.N.Y. 2004) (citation omitted).

[335] *Wood*, 752 A.2d at 1184.

[336] *Merchandise Coordinator Serv. Corp. v. Gen. Elec. Cap. Corp. (In re Foxmeyer Corp.)*, 290 B.R. 229, 236 (Bankr. D. Del. 2003); *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 177 (2d Cir. 2008) (holding that

was created with fraud or unfairness in mind. It is sufficient to prove that it was so used."[337]

Here, the Plaintiff has alleged a complex, long-term abuse of the corporate form. Although Repsol argues that the Trust *only* alleges undercapitalization and a potential for better performance, the Trust is asserting that over the Repsol period, Repsol caused assets to be sold, then forced Maxus to make a loan to Repsol for under market-terms, and treated Maxus like a Repsol-extension, rather than an independent corporation.[338]

---

injustice is whether the corporation was used to engage in conduct that was inequitable, prohibited, an unfair trade practice, or illegal (citations and internal quotation marks omitted)).

[337] *Martin Hilti Fam. Tr. v. Knoedler Gallery, LLC*, 386 F. Supp. 3d 319, 356 (S.D.N.Y. 2019) (citation and internal quotation marks omitted).

[338] *See, e.g., id.* at 349-59 (denying defendant's summary judgment motion on the plaintiff's alter ego claim under Delaware law because of the existence of material questions of facts in a case in which a parent holding company was the sole member, had cross-over employees, interdivisional receivables, shared office space, and other such overlapping evidence over a 15 year period); *Fendi Adele S.R.L. v. Filene's Basement, Inc.*, 696 F. Supp. 2d 368, 387 (S.D.N.Y. 2010) (denying defendants' motion for summary judgment dismissing its parent company from alter ego liability under Delaware law because there were numerous issues of fact and credibility which made the claim appropriate for trial).

The Trust's expert's conclusion also alleges sufficient disputed material facts. *See* Adv. D.I. 624 (Smith Decl.), Ex. 172 ("Menenberg Reply") which states:

> Based on my review of the corporate history of Maxus from the period shortly before the YPF acquisition until its bankruptcy, YPF, Repsol (during the relevant period), Maxus and the other Debtors did constitute a single economic entity. The record reflects that YPF and Repsol each managed the Debtors' assets and liabilities in order to enhance and protect their own financial interest without regard to, and even at the expense of, the Debtors' own financial well-being and that of its environmental creditors. At the same time, Maxus relied on the financial resources of its corporate parents to finance its business operations.

Adv. D.I. 624 (Smith Decl.), Ex. 172 ("Menenberg Reply") at ¶ 23.  The Trust also submitted as part of its Motion (1) the initial expert report of Barry Pulliam (Adv. D.I. 624 (Smith Decl.), Ex. 111 (Pulliam Report) and (2) the rebuttal expert report of Barry Pulliam (Adv. D.I. 624 (Smith Decl.), Ex. 136 (Pulliam Reply). Mr. Pulliam's conclusion also supports this Court's findings of disputed material facts:

> Maxus's sale of Crescendo, along with its loan to Repsol, was not in Maxus's best economic interest at the time and not something one would expect if Maxus were an independent entity. From that point on, Maxus's attempts (however feeble) in trying to continue as an E&P company were controlled and/or frustrated by its parent. Repsol controlled how much

As previously discussed, alter ego liability is a factually intensive inquiry.[339]  Here Repsol made virtually no factual assertions other than arguing that alter ego was difficult to prove and that the Complaint did not make a showing of alter-ego.  We are well past the pleading phase in this adversary action, and as held *supra*, there is a plethora of facts for the trial court to evaluate, including evidence of Repsol's use or abuse of the Maxus corporate structure.[340]

### ii.    Sequential Veil Piercing

Repsol asserts that the Plaintiff's claims for alter ego fail because the Trust has not alleged that they can pierce each corporate veil from Maxus to its great-grandparent,



---

and on what Maxus could spend its funds, by controlling Maxus's access to funds…Repsol utilized Maxus's employees, software, and seismic activity without contemporaneous agreements for access and sufficient compensation. Ultimately, Repsol attempted to provide some compensation for this access, but the fact that Repsol was able to use these resources for its benefit without negotiation, agreement, or sufficient compensation at the time of access is not consistent with Maxus operating as an independent company.

Adv. D.I. 624 (Smith Decl.), Ex. 111 (Pulliam Report) at ¶¶ 310-313.

[339] *See, e.g., Round Rock Rsch. LLC*, 967 F. Supp. 2d at 978 (citation and quotation marks omitted).

[340] *See New Jersey Dep't of Env't Prot. v. Occidental Chem. Corp.*, No. A-2036-17, 2021 WL 6109820, at *8 (N.J. Super. Ct. App. Div. Dec. 27, 2021) (The motion judge granted summary judgment to Repsol on OCC's alter ego liability claim in its second amended crossclaim.  The Appellate Division reversed and held that "[a]lthough the motion judge correctly ruled on Delaware's alter ego liability law, we are satisfied there are genuine issues of material fact concerning Respol's alter ego liability to preclude the resolution of this issue via summary judgment," especially with respect to the element of fraud.).

Repsol.  The below organizational chart reflects the corporate structure of Repsol after

December 2001.

As the Trust responded, this is not the first time that Repsol has asserted this

argument.  On appeal in New Jersey, the NJ Appellate Court held:

> Delaware's state courts, however, have not squarely decided
> the issue of sequential veil piercing of a multi-level corporate
> structure for alter ego liability purposes.  In *Outokumpu
> Engineering Enterprises., Inc. v. Kvaerner EnviroPower, Inc.*, 685
> A.2d 724, 729 (Del. Super. Ct. 1996), the court endorsed
> sequential veil-piercing among subsidiaries for personal
> jurisdictional purposes.
>
> Here, the parties in their briefs and the special master's
> recommendation cite extensively to various other
> jurisdictions to prove their respective positions and to report
> a nationwide consensus on sequential veil piercing.  Most of
> the cases cited are unpublished opinions which this court
> cannot consider as a matter of law. R. 1:36-3.  Despite the
> absence of controlling precedent from the Delaware state
> courts, we agree with intervenor in this respect.  To hold
> Repsol liable under an alter ego theory, OCC only needs to
> show (1) the parent and subsidiary operated as a single
> economic entity, as shown by exclusive domination and
> control after 1999, and (2) there was fraud or contravention of
> law or contract or similar injustice during that time. YPF's
> own alter ego liability between 1995 and 1999 would not enter
> that analysis.  There are genuine issues of material fact, which
> preclude the grant of summary judgment on the alter ego
> liability of Repsol.  Because the motion judge did not properly
> consider these facts, we reverse.[341]

---

[341] *Id.* at \*11.  In the conclusion, which Repsol points to, the New Jersey Appellate Court states: "Although the trial court correctly ruled on Delaware's alter-ego-liability law and **necessary sequential veil piercing** of a complex corporate organization, there are genuine issues of material fact that preclude the grant of summary judgment to Repsol on alter ego liability, especially as to the necessary element of fraud." *Id.* at \*19 (emphasis added).  This conclusion is inconsistent with the actual holding of the Opinion.  As such, the Court finds that this conclusory sentence misstates the Appellate Division's detailed holding on page \*11 (and quoted above) which reverses the trial court's ruling on alter ego and on sequential veil piercing.  *Id.*

In sum, the NJ trial court found that sequential veil piercing may be required, however, this decision was *reversed* by the NJ Appellate Court, which held that sequential veil piercing was not required under the facts and theories of this case.

And although sequential veil piercing has appealing logic in some respects (walking up the corporate entity ladder, so to speak), it does not account for the reality that corporate separateness may be ignored in many scenarios.  For example, all the entities could have acted as a whole (in a collective corporate-pot) or a grandparent-corporation could reach directly to the grandchild-corporation without regard to its corporate parent.  The test under Delaware law is to show that the corporations "operated as a single economic entity that resulted in an overall element of injustice or unfairness."[342]

> The purpose of allowing the corporate veil to be pierced on an alter ego theory is to hold the party actually responsible for the inequitable conduct accountable and to prevent that party from using another corporation to shield itself from liability.[343]

"To hold the party actually responsible" is the key phrase – not the sequential parent – but the *party actually responsible*.[344]  The Court agrees with the First Circuit which held:

---

at *11 ("Despite the absence of controlling precedent from the Delaware state courts [on the necessity of sequential veil piercing], we agree with intervenor [here, the Plaintiff] in this respect.").

[342] *In re Opus E., LLC*, 528 B.R. at 57 (citations omitted).

[343] *Id.* (citations omitted).

[344] *Official Comm. of Unsecured Creditors v. Morgan Stanley & Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 365 (Bankr. S.D.N.Y. 2002) (applying Delaware law) ("The purpose of allowing the corporate veil to be pierced on an alter ego theory is to hold the party actually responsible for the inequitable conduct accountable and to prevent that corporation from 'using another corporation to shield itself from liability.'" (citations omitted)).

appellants claim that these cases support RLA veil piercing only when the pierced corporation is a wholly owned subsidiary of the carrier. We reject this reading. First, while these cases deal with wholly owned subsidiaries, they do not state that veil piercing is inappropriate for other types of corporate relatives. In fact, *Burlington* speaks of piercing not just subsidiaries, but of entities in the "same corporate family." 862 F.2d at 1275. While alter ego liability may be most common in an ordinary parent-subsidiary context, "the equitable doctrine of piercing the corporate veil is not limited to the parent-subsidiary relationship." *C M Corp. v. Oberer Dev. Co.*, 631 F.2d 536, 538 (7th Cir.1980). Indeed, "[t]he separate corporateness of affiliated corporations owned by the same parent may be equally disregarded under the proper circumstances." *In re Bowen Transps., Inc. v. Bowen Transports, Inc.*, 551 F.2d 171, 179 (7th Cir.1977). Courts have pierced the veil in cases involving "sibling" corporations, and in cases involving even more intricately arranged corporate structures.[345]

In other words, there are numerous factual scenarios where a corporation disregards the corporate separateness and only *one* of those scenarios is sequential.[346]

The Court rejects Repsol's contention for the requirement of sequential veil piercing. The Trust just need prove at trial the elements of alter ego as stated above and

---

[345] *Bhd. of Locomotive Engineers v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 29 (1st Cir. 2000). *See also Inter-Tel Techs., Inc. v. Linn Station Properties, LLC*, 360 S.W.3d 152, 166 (Ky. 2012) (courts have "authority for piercing the veil of any related entity where the facts justify it." (citation omitted)).

[346] *Official Comm. of Unsecured Creditors v. Reliance Capital Group, Inc. (In re Buckhead Am. Corp.)*, 178 B.R. 956, 975 (D. Del. 1994) (declining to dismiss an alter ego claim against a corporate grandparent because it would allow defendants to "insulate themselves from liability by using corporate intermediaries and other complex business structures, thereby indirectly doing that which lawfully cannot be accomplished directly."); *Burnett v. Conseco Life Ins. Co.*, No. 118CV00200JPHDML, 2020 WL 4788012, at *6 (S.D. Ind. Aug. 17, 2020) (holding that there is no requirement for alter ego to be limited to a direct relationship such as parent and subsidiary); *Official Comm. of Unsecured Creditors v. Highland Capital Mgmt. L.P. (In re Moll Indus., Inc.)*, 454 B.R. 574, 587 (Bankr. D. Del. 2011) ("The Court concludes that it is not necessary for the Committee to make allegations sufficient to pierce every layer of the corporate structure between Moll and HCMLP. There is no indication in the two-part test that it may only be applied to a direct relationship such as a parent and subsidiary. Rather, the test requires that the companies operate as "a single economic entity," tied together by "an overall element of injustice." (citations omitted)). *AT&T Corp. v. Walker*, No. C04-5709FDB, 2006 WL 2585026, at *5 (W.D. Wash. Sept. 7, 2006) (declining to dismiss an alter ego claim despite the intermediate entities and complex business structure).

does not have to sequentially pierce each corporate layer in the organizational chart under these circumstances.

### iii.    Discrete Transactions vs. Strategy

Repsol asserts that YPF and Repsol are "separate entities" with "separate identities."  As such, Repsol cannot be jointly liable for conduct that occurred before (and after) its ownership.  Repsol is essentially arguing that *if* Repsol is the alter ego of Maxus, then such would be limited to the time Repsol owned Maxus (1999-2012) and *even if* YPF is also held to be the alter ego of Maxus, there is no justification for combining the "Repsol-Maxus" entity and the "YPF-Maxus" entity.[347]

This argument, while framed differently, relates to the issue of damages and what portion of damages Repsol can be held liable for as Maxus's alter ego.  These potential damages are discussed at length above.  It remains a trial issue for what portion of damages, if any, Repsol will be responsible for as a result of the alleged alter ego conduct. Furthermore, it would be advisory to limit Repsol's alter-ego damages (or liability) prior to determining if Repsol (or YPF, for that matter) were indeed alter egos of Maxus.

### E.  Repsol Has Not Rebutted Maxus's Case-in-Chief on Fraudulent Transfers

Repsol asserts that the Plaintiff's case-in-chief (as opposed to the badges of fraud discussed in the Opinion *supra*) fails as a matter of law.  To prove an actual fraudulent transfer, the Trust must show: (i) a transfer, (ii) by a debtor, (iii) with actual intent to hinder, delay, or defraud a creditor.[348]  Furthermore, no claim for constructive fraudulent

---

[347] *But see* Adv. D.I. 701 (Trust Reply) at pp. 95-96.

[348] *Crystallex Int'l Corp. v. Petroleos De Venezuela, S.A.*, 879 F.3d 79, 82 (3d Cir. 2018) (*quoting* 6 Del. C. § 1304).

transfer can succeed where the plaintiff failed to prove both (i) insolvency at the time of the transfer, and (ii) failure of the transferor to receive reasonably equivalent value.[349]

### i.   Counts II and III Assert the "Strategy" Against All Defendants

Repsol first raises that Counts II and III fail because they aggregate transfers not alleged as fraudulent against Repsol that are also alleged individually in subsequent counts.  The Trust responds that (i) Repsol was legally aware of all the facts necessary to appreciate what Maxus and YPF had done; (ii) Repsol was directly involved in ratifying and continuing the YPF-initiated Strategy of separating Maxus's assets and liabilities from Maxus's environmental creditors, managing Maxus's then-current environmental liabilities, and "settling" its corporate relationships with the Debtors to avoid alter-ego liability; and (iii) there are questions of material fact as to what Repsol knew and when they knew it.

For the reasons discussed above regarding the collapsing doctrine, there are material issues of fact as to whether there was a Strategy of stripping assets and isolating liabilities at Maxus.  The Court must first determine whether there was a Strategy before the Court can determine whether the Defendants were properly aggregated for purposes of Counts II and III.  As such, the Court will deny Repsol's summary judgment motion on this basis.

---

[349] *Off. Committee of Unsecured Creditors v. Combest Group Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 211, 262 (Bankr. D. Del. 2018) (*citing* 11 U.S.C. § 548(a)(1)(B)).

ii.    **Counts XIV-XV Regarding the 2001-2002 YPFI Transactions**

Repsol asserts that the Plaintiff has not met these "essential elements" of its claims

through several arguments.  The first is that the Trust's claims relating to the 2001-2002

YPFI Transactions do not (i) involve transfers by the debtor; (ii) are extraterritorial; and

(iii) with regard to the Trust's claim for constructive fraudulent transfer there, is no proof

there was a lack of reasonably equivalent value.

a.    *Transfers "By a Debtor"*

Repsol asserts that YPFI – not Maxus – owned the assets (together with other assets

never held by Maxus) that were the subject of the 2001-2002 YPFI Transactions at issue.

> Fraudulent transfer liability under DUFTA does not attach to
> a transfer by a non-debtor.  By extension, federal bankruptcy
> law does not impose liability for transfers of non-debtor
> property.[350]

The court agrees with the Trust's response to the contention.  First, the YPFI Transfers

involved initial and subsequent transfers of the subject assets from the Debtors, to YPFI,

to YPF, and then to Repsol.[351]   Second, the Trust alleges that YPFI is the alter-ego of

Maxus, which as discussed above, is an issue for trial.   If YPFI and Maxus are found to

be a single economic unit, then such assets would be transfers by the Debtors.

---

[350]  *Miller v. Matco Electric Corp. (In re NewStarcom Holdings Inc.)*, 816 F. App'x 675, 678 (3d Cir. 2020)
(citations omitted).

[351]  The Trust alleges that the 1996-1997 Transfers from Maxus to YPFI were intentionally fraudulent.  The
Trust further alleges that YPFI and Maxus were operated as a "combined entity" and the Maxus
Management Group ran the operations of these assets before, during and after the 1996-1997 Transfers.
This remained true until YPFI's business (including Maxus's legacy assets of Bolivia, Ecuador and
Indonesia Assets) were transferred to Repsol subsidiaries.  Furthermore, the Trust continues that any
money received by Maxus was paid as a dividend to first YPF and then Repsol.  All of these materially
disputed facts need to be flushed out at trial so that the Court can then determine if there was a "transfer"
of the Debtors' assets.

As such, it is premature for the Court to determine whether the assets were transferred by "a debtor."

### b. Extraterritorial

Repsol continues that the claims relating to the 2001-2002 YPFI Transactions fail because the Bankruptcy Code's avoidance provisions do not apply to the foreign transactions. Repsol asserts that the 2001-2002 YPFI Transactions are foreign transactions by foreign, non-debtor parties, involving foreign assets. Repsol asserts that the *only* domestic connection is that Maxus (a domestic entity) was the former owner of some (but not all) of the assets years prior.

> It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States. This principle represents a canon of construction, or a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate. It rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign, matters. Thus, unless there is the affirmative intention of the Congress clearly expressed to give a statute extraterritorial effect, we must presume it is primarily concerned with domestic conditions. The canon or presumption applies regardless of whether there is a risk of conflict between the American statute and a foreign law. When a statute gives no clear indication of an extraterritorial application, it has none.[352]

The Second Circuit held in *In re Picard* that the Court must look to the statute's "focus" to determine whether a case involves a domestic application of the statute.[353] The Supreme

---

[352] *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255, 130 S. Ct. 2869, 2877–78, 177 L. Ed. 2d 535 (2010) (citations omitted and quotation marks removed).

[353] *In re Picard*, 917 F.3d at 96 (citations omitted); *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 337, 136 S. Ct. 2090, 2101, 195 L. Ed. 2d 476 (2016) ("If the conduct relevant to the statute's focus occurred in the United

Court has explained that "[t]he focus of a statute is the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate."[354]  With that in mind, the *Picard* court held that the trustee sought to recover property under § 550(a) of the Bankruptcy Code in conjunction with § 548, which is the avoidance provision that enables a trustee's recovery (among other code sections).[355]  However, the trustee could not use § 550(a) to recover property unless the trustee *first* avoided a transfer under § 548.[356]  The *Picard* court held:

> Section 548(a)(1)(A) allows a trustee to "avoid any transfer ... of an interest of the debtor in property" that the debtor "made ... with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." 11 U.S.C. § 548(a)(1)(A).  A general purpose of the Bankruptcy Code's avoidance provisions, including 11 U.S.C. § 548, is protecting a debtor's estate from depletion to the prejudice of the unsecured creditor.  Thus, § 548(a)(1)(A)'s purpose is plain: it allows a trustee, for the protection of an estate and its creditors, to avoid a debtor's fraudulent, hindersome, or delay-causing property transfer that depletes the estate.
>
> Section 550(a) works in tandem with § 548(a)(1)(A) by enabling a trustee to recover fraudulently transferred property. Recovery is the business end of avoidance. In that sense, § 550(a) is a utility provision, helping execute the policy of § 548(a)(1)(A) by tracing the fraudulent transfer to its ultimate resting place (the initial or subsequent transferee).

---

States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.").

[354] *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2137, 201 L. Ed. 2d 584 (2018) (citations and internal quotation marks omitted).

[355] *In re Picard*, 917 F.3d at 97.

[356] *Id.*

> We hold that, in recovery actions where a trustee alleges a debtor's transfers are avoidable as fraudulent under § 548(a)(1)(A), § 550(a) regulates the fraudulent transfer of property depleting the estate.  While § 550(a) authorizes recovery, what a statute authorizes is not necessarily its focus.  When § 550(a) operates in tandem with § 548(a)(1)(A), recovery of property is merely the means by which the statute achieves its end of regulating and remedying the fraudulent transfer of property.[357]

With the above analysis, the *Picard* court held that a "domestic debtor's allegedly fraudulent, hindersome, or delay-causing transfer of property from the United States is domestic activity for the purposes of §§ 548(a)(1)(A) and 550(a).  The presumption against extraterritoriality therefore does **not** prohibit the debtor's trustee from recovering such property using § 550(a), regardless of where any initial or subsequent transferee is located."[358]

---

[357] *Id.* at 97–98 (citations, quotation marks and modifications omitted).

[358] *Id.* at 99–100 (footnote omitted; emphasis added).  Similarly, in *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 543 B.R. 127, 154–55 (Bankr. S.D.N.Y. 2016), the Bankruptcy Court held:

> This Court agrees with Professor Westbrook that section 541(a)(3) of the Bankruptcy Code supports a finding that Congress intended section 548 to extend extraterritorially.  Section 541(a)(3) provides that any interest in property that the trustee recovers under section 550 becomes property of the estate.  Section 550 authorizes a trustee to recover transferred property to the extent that the transfer is avoided under either section 544 or section 548.  It would be inconsistent (such that Congress could not have intended) that property located anywhere in the world could be property of the estate once recovered under section 550, but that a trustee could not avoid the fraudulent transfer and recover that property if the center of gravity of the fraudulent transfer were outside of the United States. It is necessary to rule as the French court did in order to protect the *in rem* jurisdiction of the bankruptcy courts over assets that Congress has declared become property of the estate when recovered under section 541(a)(3).

*Id.*

131

Thus, Repsol cannot assert that the Trust cannot pursue the YPFI Transfers because no relevant conduct occurred in the United States – here, Maxus, a domestic initial transferor, transferred the challenged assets to YPFI, which made the subsequent transfer to Repsol.  The Trustee can seek recovery under § 548 extraterritorially to claw back the 2001-2002 YPFI Transfers.[359]

### iii.    Crescendo Transfer and Reasonably Equivalent Value

Repsol asserted that the Trust's fraudulent transfer claims for Maxus's Crescendo Transfer must fail (1) because Repsol did not receive the assets or directly benefit from the transaction and (2) because Maxus received reasonably equivalent value for the assets.

Maxus's wholly owned subsidiary, Midgard, held a 59% interest in the Crescendo partnership, of which Amaco owned the remaining 41%.  After change-of-control events, Maxus and BP Amoco negotiated the dissolution of Crescendo.  Upon dissolution, Maxus sold its Midgard assets in two tranches to third parties: (1) the first tranche to BP Amoco, and (2) the second tranche to Apache.  Maxus received approximately $627 million for these combined transactions.  These facts are the basis of Repsol's argument that Repsol did not benefit from the transaction.  However, these facts only tell part of the story.  The Trust tells a much different story:

> • In December 1999 and January 2000, Repsol YPF caused Maxus to sell its interests in Crescendo (its last remaining productive asset) to BP and Apache. SOF ¶¶ 80-84. Proceeds

---

[359] Furthermore, the Trust has alleged that YPFI and Repsol are alter-egos of Maxus, as discussed above, it again makes the extraterritorial arguments inapplicable to the case *sub judice*.

from the sale went from Maxus to YPF via a $262.1 million debt repayment from Maxus to YPFI (which were then paid as a dividend to Repsol), and to Repsol via the remaining $325 million being loaned to Repsol's cash management affiliate. SOF ¶ 85; see also Repsol SOF ¶¶ 58-60.  It took almost one full year after the Crescendo Transfer for Repsol YPF to decide the most advantageous use of the remaining proceeds for Repsol YPF.  *See* Repsol SOF ¶ 59; Yoo Decl. Ex. 1 at REPSOL0002185 (Memorandum from Arthur Andersen to David Rabbe evaluating use of the proceeds of the Crescendo sale and potential tax implications); Yoo Decl. Ex. 2 at MAXBK000310130 (Memorandum from Arthur Andersen to Javier Escudero advising that YPFH's use of the Crescendo proceeds to buy Repsol bonds on the open market would be preferable to a loan to Repsol to "avoid possible attacks by the Internal Revenue Service on the arm-s length nature of the loan provisions" and "characterization to a constructive dividend.").

• Between 2001 and 2002, after being advised of "no monetary limit" to Maxus's environmental liability, Repsol performed its own "restructuring," having YPFI transfer Maxus's legacy E&P assets to Repsol subsidiaries or third parties.  SOF ¶¶ 86-95.  The proceeds from the YPFI Transfers were used to pay down or cancel debt or otherwise remitted to YPF as dividends. Trust SOF ¶¶ 88, 90, 93, 95.  Ultimately, those "proceeds" were made as a dividend to Repsol.[360]

In addition, whether or not YPFI and Repsol are alter-egos of Maxus is also a material fact in dispute – if these companies were alter-egos then Repsol caused Maxus to transfer these assets, and redeemed the benefit of the proceeds, including the alleged loan of the proceeds for a rate below LIBOR.[361]   These facts are ultimately inappropriate for

---

[360] Adv. D.I. 701 (Trust Reply) at pp. 33-38.

[361] The Trust's expert Mr. Pulliam opines that the below-LIBOR interest rates Maxus received on the $325 million, ultimately repaid to Maxus over a four-year period, could have resulted in an additional $49 million in interest at market rates.  One of the harms to Maxus, is that once Maxus lent its cash reserves to RIF, it would be forced to borrow money at an interest rate above what it was being paid by RIF.  Of course, this is just another example of material facts in dispute as to who benefited from such a loan.  *See* Adv. D.I. 624 (Smith Decl.), Ex. 111 at ¶¶ 199-201; Adv. D.I. 624 (Smith Decl.), Ex. 136 at ¶ 146.

summary judgement as the trial court will have to weigh the evidence and determine which theory of the benefit received prevails.

The Trust's expert, Mr. Pulliam, opines that, while Maxus received $627 million, the fair market value was $652; an alleged $25 million shortfall. Mr. Pulliam continues that the RIF loan at below market rates also results in a $49 million shortfall in interest to Maxus. The combined transactions are alleged to have caused Maxus at least a $75 million shortfall from market-rates (between the sale price and the shortfall in interest). How does this not create a material dispute of fact? The Court must evaluate expert testimony regarding the price of the Crescendo transactions and the RIF loan and determine if Maxus received reasonably equivalent value in these transactions. Although an "exact equivalent" is not required[362] – there is a dispute of material facts as to whether these amounts are reasonably equivalent.

### iv. Settlement Agreements

The Trust raises six counts relating to settlement agreements: the 2007 Settlement Agreements (which included more than one agreement), 2007/2008 Settlement Agreement, and the 2009 Settlement Agreement. Repsol asserts that these counts are fatally flawed because the Trust (i) lacks evidence that exchange was not fair value; (ii) cannot establish actual fraud; and (iii) cannot bring claims against non-defendant parties.

---

[362] *The Liquidation Trust v. Daimler AG (In re Old CarCo LLC)*, 454 B.R. 38, 52 (Bankr. S.D.N.Y. 2011), *aff'd*, No. 11 CIV. 5039 DLC, 2011 WL 5865193 (S.D.N.Y. Nov. 22, 2011), *aff'd sub nom. In re Old Carco LLC*, 509 F. App'x 77 (2d Cir. 2013) ("For the consideration to be fairly equivalent to the value of the property transferred or obligation assumed, the exchange does not require exact equivalence." (citations omitted)).

When evaluating a settlement, the Court "need only determine whether the settlement was in the range of a reasonable measure of the value of the Debtor's services."[363] Without citation to undisputed facts, Repsol states that the Trust failed to prove that the "range of reasonable measure" was not met for the 2007 Settlement Agreements and the 2009 Settlement Agreement. However, that is not the case.

Mr. Pulliam, in his expert report, opines:

> From 2007 to 2009, as part of the [King & Spalding ("K&S")] plan to isolate Repsol from Maxus's environmental liabilities, Repsol provided some compensation to Maxus for past services provided by Maxus. In the first half of 2007, Repsol paid Maxus approximately $20 million. From 2007 to 2009, Maxus entered into at least five settlement agreements with Repsol subsidiaries for unreimbursed intercompany services and expenses, all pursuant to the advice of K&S which was retained to advise on bankruptcy matters related to Maxus. *Not all subsidiaries willingly participated* in the reimbursement process and not all amounts were reimbursed. For example, Repsol's Brazilian subsidiary used the fact that there was no services agreement as an excuse to not reimburse Maxus.[364]

Mr. Pulliam also opines that the 2008/2009 Settlement Agreement, which was approved by Repsol's board, approved spending $50 million to settle several of Maxus's claims regarding the Gulf of Mexico businesses, but Maxus's claims with respect to its Tiger, North Bronto, Stormy Monday and Valencia prospects were settled without any value being allocated to them.[365] This is in addition to the Meneberg Initial Report with respect

---

[363] *Erie Marine Enterprises, Inc. v. Algoma Central Marine (In re Erie Marine Enterprises, Inc.)*, 213 B.R. 799, 803 (Bankr. W.D. Pa. 1997) (citation omitted).

[364] Adv. D.I. 624 (Smith Decl.), Ex. 111 at ¶ 306 (emphasis added).

[365] Adv. D.I. 624 (Smith Decl.), Ex. 111 at ¶ 307.

to the 2007/2008 Settlement which calls into questions whether the value received by Maxus was fair.[366] Repsol's statement that there is an absence of facts is incorrect. There are material disputes of fact as to whether these settlements fall into a range of reasonableness.

Next, Repsol contends that Trust has failed to set forth any evidence of actual intent to defraud. As set forth in the above, the Court has already found material facts in dispute as to the badges of fraud.[367] The Court will not repeat the discussion on the badges of fraud; however, the Trust has set forth enough evidence to proceed to trial on Repsol's part, if any, in the Strategy of stripping assets and stranding the environmental liabilities.

Lastly, Repsol argues that the Trust asserts claims against the Repsol entities without evidence of their involvement. Repsol claims that the counts (Counts XVIII and XIX) relating to the 2007/2008 Settlement Agreement are made against all Repsol Defendants, when no Repsol entities were involved. (The 20007/2008 Settlement Agreement was between YPF, Maxus, and Tierra relating to the Contribution Agreement and Assumption Agreement, before Repsol's acquisition of YPF. Repsol continues that the 2007 Settlement Agreements (Counts XVI and XVII) is between Maxus and RSC and

---

[366] Adv. D.I. 624 (Smith Decl.), Ex. 172 at ¶ 76 ("Not surprisingly, Maxus's financial condition continues to dramatically deteriorate as both Maxus and YPF knew, or should have known, it would. Maxus's annual losses *grew to an average of $91 million per year* from 1999 through 2015. I am not aware of any strategic plans or projections in which Maxus was projected to have a positive shareholders' equity. To be sure, this was not a start-up internet company with a new leading-edge technology where positive returns are often deferred or not expected for many years; Maxus was an oil and gas company with dwindling assets and large environmental liabilities." (footnotes omitted; emphasis supplied)).

[367] In its motion, Repsol conceded it was an "insider." Adv. D.I. 716 (Repsol Mot.) at p. 65.

Repsol E&P T&T Limited.  Repsol claims that there is no basis to sue the uninvolved Repsol entities (Repsol Exploración, S.A., Repsol USA Holdings, Corp., Repsol E&P USA, Inc., and transferees).

The Trust acknowledges that Maxus's legacy Indonesia assets were sold from YPFI to CNOOC, a third party.  The Trust also acknowledges that Maxus's legacy Ecuadorian assets were sold from YPFI to Repsol YPF Ecuador, not a named Defendant.  The proceeds of both of these transfers, however, were transferred by dividend to Repsol affiliates.  The relevant question as to these asset transfers is whether the issuing of a dividend of billions in proceeds from the sales to Repsol constituted fraudulent conveyances.

The Trust further responds that while Repsol's name was not physically written on the 2007/2008 Settlement Agreement, the YPF entitles, Maxus, CLH Holdings, Tierra, and MUSA entered into it *at the direction of* Repsol.[368]  The Trust asserts that the Contribution Agreement came directly from the King & Spalding advice in 2005 which stated: "the most recommendable action [is to] liquidate all of the obligations of the parent companies of the Maxus/Tier group and cut or minimize reciprocal ties . . . especially, the 'Contribution Agreement' must be evaluated."[369]  The Trust continues that Repsol's lawyers commented and discussed the Contribution Agreement.[370]  The Trust

---

[368] *See* Adv. D.I. 624 (Smith Decl.), Ex. 154.

[369] Adv. D.I. 624 (Smith Decl.), Ex. 145 at YPF-P000225.

[370] Adv. D.I. 702 (Yoo Decl.), Ex. 3 at MLTLEGACYESI_002049769.

has presented material facts that squarely attaches Repsol to the 2007/2008 Settlement Agreement – these facts must be explored during trial.

Similarly, the Trust has asserted material facts that allows the 2007 Settlement Agreement counts to be asserted against all the Repsol entities, even those not specially listed in the 2007 Settlement Agreement.  The 2007 Settlement Agreement was again based on 2005 advice from King & Spalding pertaining to Repsol's group liabilities to Maxus and its creditors which recommended that Repsol "undertake to repay or otherwise satisfy all inter-company liabilities and obligations existing between the US subsidiaries, on the one hand, and Repsol, YPF and their Non-US subsidiaries and affiliates, on the other hand, and thereafter sever or minimize all future inter-company dealings with the US Subsidiaries."[371]  King & Spalding continued that it would "limit[] the exposure of the overall Repsol family of companies for the contingent liabilities of the US Subsidiaries to those subsidiary Companies and their assets as of the date of the settlement" in order to "strengthen the protective wall between the US Subsidiaries and their parent companies and other affiliates sufficient to prevent the US Subsidiaries from successfully enforcing their claims against Repsol, YPF, or any of their-non-US subsidiaries and affiliates."[372]

---

[371]  Adv. D.I. 624 (Smith Decl.), Ex. 142 at MLTLEGAGCYESI_002711960 (emphasis removed).

[372]  Adv. D.I. 624 (Smith Decl.), Ex. 142 (Evaluation of Strategic Alternatives Regarding Maxus Energy Corporation and Tierra Solutions, Inc. by King & Spalding, dated April 2005) at MLTLEGAGCYESI_002711964 (also stating Alternative Two eliminates continued inter-company entanglements and, by so doing, reduces over time any arguments that third parties might have that Repsol, YPF and their other non-US subsidiaries and affiliates should be obligated to pay the liabilities of the US Subsidiaries. Second, it provides a method by which the Parent Companies can resolve their contractual liability to Tierra under the Contribution Agreement, a liability that absent such a resolution

At the very least, the Trust asserts enough evidence to support materially disputed facts to allow these counts to proceed to trial.

## F.  The Claims for Unjust Enrichment and Civil Conspiracy Must Go To Trial

### i.  Time-Barred

Repsol asserts that the Plaintiff cannot rely on the collapsing doctrine to extend the applicable statute of limitations.  As set forth above, the collapsing doctrine is an issue for trial, as such, this argument also fails summary judgment as to unjust-enrichment and civil conspiracy.

### ii.  Unjust Enrichment Claim

To establish a claim of unjust enrichment, a plaintiff must prove: "(1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and impoverishment; (4) the absence of justification; and (5) the absence of a remedy at law."[373]

Repsol claims that the Plaintiff's unjust enrichment claims failed because the Plaintiff has not established an absence of a remedy at law.  Repsol asserts that statutory fraudulent transfer claims would provide an adequate remedy at law.[374]  Repsol further

---

could be enforced at any time under the terms of the Contribution Agreement either by Tierra or a successor to Tierra (such as a bankruptcy trustee or creditors' committee in a bankruptcy case of Tierra. *Id.* at 002711963-94)).

[373] *Grace v. Morgan*, No. CIV.A. 03C05260JEB, 2004 WL 26858, at *3 (Del. Super. Ct. Jan. 6, 2004) (citation and footnote omitted).

[374] Repsol also claims that the Stock Purchase Agreement ("SPA") between Maxus and OCC, one of the Debtors' creditors, is an adequate remedy at law.  The Court is unclear how a contract between Maxus and one of the Debtors' creditors, OCC, could remedy the unjust enrichment of the Debtors' controlling shareholder, Repsol, for which the Trust seeks relief on behalf of all of the Debtors' creditors.  Here, the Trust is asserting a generalized claim of unjust enrichment on behalf of all creditors, not just OCC.

asserts that the claim of unjust enrichment requires a direct relationship between the alleged enrichment and impoverishment.

However, as this Court has previously held, the Plaintiff's unjust enrichment claims "arise under the same events as the 544 Claims and are intimately connected to them.  Allegations of . . . unjust enrichment . . . are part of the same story and the core fraudulent transfer claims."[375]  If the Plaintiff's fraudulent transfer claims should fail, the Plaintiff should be able to maintain its claims for unjust enrichment, its equitable alternative claims – even at the summary judgment phase of the litigation.[376]  However, "[r]ecovery of damages . . .  cannot be based on inconsistent theories when one theory precludes the other or is mutually exclusive."[377]  As such, the Trust may maintain its claims in law and claims in equity against Repsol.

As to whether there is a relationship between the enriched and the impoverished, the Court agrees with the Trust's statements that the Trust is attempting to prove that Repsol participated in a Strategy to strip Maxus of its assets and to strand the liabilities,

---

[375] *Maxus Liquidating Trust v. YPF S.A. (In re Maxus Energy Corp.)*, 597 B.R. 235, 244 (Bankr. D. Del. 2019).

[376] *Polanco v. City of New York*, No. 14 CIV. 7986 (NRB), 2018 WL 1804702, at *10 (S.D.N.Y. Mar. 28, 2018) ("It is well settled that the alternative pleading principles of Rule 8(d) apply even at the summary judgment stage of litigation.") *See Adler v. Pataki*, 185 F.3d 35, 41 (2d Cir. 1999); *Henry v. Daytop Vill., Inc.*, 42 F.3d 89, 95 (2d Cir. 1994) ("Under Rule 8(e)(2) of the Federal Rules of Civil Procedure, a plaintiff may plead two or more statements of a claim, even within the same count, regardless of consistency." (citations omitted)); *Scott v. District of Columbia*, 101 F.3d 748, 753 (D.C. Cir. 1996) ("[Plaintiff] could properly plead alternative theories of liability, regardless of whether such theories were consistent with one another. Similarly, [plaintiff] could properly argue alternative claims to the jury."); *Bussolari v. City of Hartford*, No. 14 Civ. 149 (JAM), 2016 WL 4272419, at *3 (D. Conn. Aug. 12, 2016) ("It is well established that a plaintiff may plead alternative theories of liability. The Second Circuit allows a party to proceed at summary judgment with inconsistency in claims, either in the statement of the facts or in the legal theories adopted." (citations omitted)).

[377] *Scott*, 101 F.3d at 753.

causing the statute of limitations to run, and then continuing that Strategy into bankruptcy where the Defendants attempted to submit a settlement agreement to the Court for its approval.  Here, the Trust is seeking the return of any funds or value received and retained by Repsol at the expense of Maxus.[378]

### iii.    Civil Conspiracy

First, Repsol asserts correctly that civil conspiracy is not an independent cause of action and requires a valid underlying claim.[379]  As a result, "if plaintiff fails to adequately allege the elements of the underlying claim, the conspiracy claim must be dismissed."[380] However, the Court, herein, is not granting summary judgment on any of the underlying claims, so, thus, the civil conspiracy claim continues for that purpose.

Second, Repsol asserts that the civil conspiracy claim is barred by the intercompany conspiracy rule that parents and subsidiaries are "legally incapable of forming a conspiracy with one another."[381]  Although the Court is aware that some courts have so ruled, the Court is unaware of any binding Delaware precedent regarding this theory.  In addition, the case cited by Repsol states (in full):

---

[378]  *Silverman v. A-Z RX LLC (In re Allou Distributors Inc.)*, No. 8-03-82321-ESS, 2012 WL 6012149, at \*28 (Bankr. E.D.N.Y. Dec. 3, 2012) ("Here, as discussed above, the record establishes that the Corporate Defendants received millions of dollars in transfers without offering fair value in return. The Defendants' evidence, including the Sentencing Memorandum, is not sufficient to raise a genuine dispute of material fact as to whether it would be unjust for the Corporate Defendants to retain any funds that they received and retained.").

[379]  *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 892 (Del. Ch. 2009) ("Civil conspiracy is not an independent cause of action; it must be predicated on an underlying wrong." (citations omitted)).

[380]  *Kuroda*, 971 A.2d at 892 (citations omitted).

[381]  *Premio Foods, Inc. v. Purdue Farms, Inc.*, No. 11-CV-4968 DMC-JAD, 2012 WL 3133791, at \*5 (D.N.J. July 30, 2012) (assuming that defendants were legally capable of forming a conspiracy but finding that the claim was not adequately plead under Rule 12).

the defendants contend that Delaware law does not permit the prosecution of a civil conspiracy claim against business entities under common control. In particular, they argue that a parent entity cannot, as a matter of law, conspire with its wholly-owned subsidiary.

By this argument, the defendants would have me render a bright-line ruling in an area of American jurisprudence that, both inside and outside of Delaware, is more characterized by confusion than clarity. Not only that, the defendants do not offer up briefing on this issue anywhere close in seriousness and depth to provide confidence that a ruling in their favor on this issue is justified.

I refuse to use this motion as a basis for holding that, as a per se matter, commonly-controlled or even owned business entities cannot conspire with one another and be held liable for acting in concert to pursue unlawful activity that causes damage.[382]

The Court could not have said it any better itself. Repsol provided less than a paragraph in support of this point on page 69 of its brief in support of its motion.[383] In no way is this issue briefed substantially for this Court to adopt such a per se ruling. Nor does this Court believe it to be a wise ruling – especially when like here, the economic interests of Repsol and Maxus have diverged so substantially.[384] Furthermore, it is alleged here that

---

[382] *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1037 (Del. Ch. 2006) (footnotes and citations omitted)).

[383] Adv. D.I. 637 and 638 (Repsol Mot.) at p. 69.

[384] *Allied Cap. Corp.*, 910 A.2d at 1039 (finding that "[t]he more important point is that this state's acceptance of claims for aiding and abetting breaches of fiduciary duty brought against parent corporations and their affiliates, including subsidiaries, belies any outright rejection of the proposition that wholly-owned and/or commonly-controlled entities cannot be held responsible for each other's acts when those acts result from concerted unlawful activity."). *But see LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, No. CV 12067-VCG, 2018 WL 1559936, at *15 (Del. Ch. Mar. 28, 2018) ("As the EPP Defendants point out, this Court has held that "a corporation generally cannot be deemed to have conspired with its wholly owned subsidiary. That rule 'ensure[s] that the first element of civil conspiracy is met: the requirement that there be two or more persons or entities in a conspiracy. The problem for the EPP Defendants is that NCM is not a wholly owned subsidiary of any of the EPP entities. Instead, according to the Complaint, 'NCM is principally owned by the EPP Funds.' The EPP Defendants have cited no authority from this state for the proposition that a non-wholly owned subsidiary cannot conspire with its parent. Indeed, this Court has sustained conspiracy and

142

neither Repsol nor YPF respected the corporate "separateness" of the entities, which moves us further from the proposed intercompany conspiracy proposition.[385]  As such, the Court rejects this legal argument as wholly insufficient for the Court to make a per se ruling; in addition, the Court is loathe to accept this argument without sufficient briefing. As an aside, the Court also does not believe that a per se rule against inter-corporate conspiracies to be wise, especially when the Plaintiff has alleged that Repsol (and YPF) did not respect the corporate structures and allegedly acted in their own self-interests.

Third, Repsol argues that the civil conspiracy claim fails because it is undisputed that Repsol was not involved with Maxus before 1999 or after 2012.  The Trust agrees that

---

aiding and abetting claims against a private equity firm alleged to have conspired with a company it controlled but did not wholly own." (footnotes and citations omitted)); *Accident Ins. Co., Inc. v. U.S. Bank Nat'l Ass'n*, No. 3:16-CV-02621-JMC, 2019 WL 1316087, at *4 (D.S.C. Mar. 22, 2019):

> First, the weight of Delaware authority holds that parent entities cannot conspire with wholly-owned subsidiaries.  Second, the reasoning of *Allied Capital Corp.* supports application of the rule against intra-corporate conspiracies.  In *Allied Capital Corp.*, the court declined to adopt a per se rule holding that a parent entity and wholly-owned subsidiary could not conspire as a matter of law in favor of a context-specific application.  910 A.2d at 1037, 1040-41.  However, the court recognized "[t]he bona fide concern [ ] that every breach of contract, tort or other case involving a controlled subsidiary will become a vehicle to sue controllers." Id. at 1040. The court further recognized that the rule against intra-corporate conspiracies would often apply when a parent and subsidiary "share common economic interests." Id. at 1042.  Accident has presented no evidence that the economic interests of U.S. Bank Trust or Fund Services diverged from the economic interests of U.S. Bank.  Accordingly, even under the reasoning of Allied Capital Corp., the rule that a parent entity cannot conspire with its wholly-owned subsidiary should apply.

[385] *Akande v. Transamerica Airlines, Inc. (In re Transamerica Airlines, Inc.)*, No. CIV.A. 1039-N, 2006 WL 587846, at *6 (Del. Ch. Feb. 28, 2006) ("A civil conspiracy requires a plaintiff to establish that two or more persons combined or agreed with the intent to do an unlawful act or to do an otherwise lawful act by unlawful means. Yet, a corporation generally cannot be deemed to have conspired with its wholly owned subsidiary, or its officers and agents. **This general rule does not apply, however, when the officer or agent of the corporation steps out of her corporate role and acts pursuant to personal motives.**" (emphasis added; footnotes omitted)).

Repsol is only liable for civil conspiracy during the period in which it conspired with YPF (the period between its acquisition of YPF and the expropriation). Thus, as the parties agree, there will be a limitation on this claim against Repsol for the period of Repsol's involvement with YPF (from the 1999 acquisition of YPF through the expropriation in 2012). During that time period, the Plaintiffs have alleged enough material facts in dispute to allow this claim, as limited, to go forward to trial.

*    *    *

In sum, YPF's Motion is denied, in part, and granted, in part; and Repsol's Motion is denied in full.

## CONCLUSION

For the reasons set forth above, the Court finds that the *Plaintiff's Motion for Partial Summary Judgment on Counts I, IV, VI, VIII, X, XII, and XIV of the Complaint and Related Affirmative Defenses* is denied. The Causation Damages Theory is applicable, and the quantum of damages is indeterminable at this time. Furthermore, there are material facts in dispute related to the badges of fraud for actual fraudulent transfers. Finally, the Trust has failed to meet its burden in connection with the Defendants' defenses. Thus, the Court will deny the Plaintiff's Motion.

For the reasons set forth above, the *YPF Defendants' Cross Motion for Partial Summary Judgment* is granted in part and denied in part. Specifically, the YPF Defendants are granted partial summary judgment as to the Trust's All Liabilities Damages Theory; the Causation Damages Theory is applicable as set forth herein. Furthermore, although

the Trust cannot use the States of Wisconsin or Ohio as triggering creditors, it may rely on the EPA to the extent consistent with the Court's discussion herein.  All other requests for relief are denied.

For the reasons set forth above, the Court finds that *Repsol Defendants' Motion for Summary Judgment* is denied because there are material disputes of fact that must be explored by the trial court.

An order will be issued.